McGREGOR W. SCOTT
United States Attorney
ANDRÉ M. ESPINOSA
ROGER YANG
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone:  (916) 554-2700

JENNIFER E. LEVY
Trial Attorney
Counterterrorism Section
National Security Division
U.S. Department of Justice
10th and Constitution Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 514-1092

Attorneys for Respondent/Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.  2:05-CR-240-GEB |
| Respondent/Plaintiff, | UNITED STATES' POST-HEARING OPPOSITION TO PETITIONER'S BRIEF IN SUPPORT OF HIS PETITION FOR A WRIT OF HABEAS CORPUS |
| v. | |
| HAMID HAYAT, | COURT: Hon. Deborah Barnes |
| Petitioner/Defendant. | |

UNITED STATES' POST-HEARING OPPOSITION TO PETITIONER'S BRIEF IN SUPPORT OF
HIS PETITION FOR A WRIT OF HABEAS CORPUS

TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................................1

PROCEDURAL HISTORY.....................................................................................................................6
    District Court Proceedings ...........................................................................................................6

    Direct and Collateral Review .......................................................................................................8

STATEMENT OF RELEVANT FACTS ................................................................................................9

I.      THE GOVERNMENT'S CASE AT TRIAL ................................................................................9

        A.      Hayat Told Cooperating Witness Naseem Khan of His Intentions to Attend a
                Jihadi Training Camp in Pakistan ...................................................................................10

        B.      After Initial Denials, Hayat Confessed to the FBI That He Attended Jihadi
                Training and Intended to Wage Violent Jihad in the United States...............................12

        C.      Umer Hayat Admits He Knew Hamid Hayat Went to Training Camps and that
                Umer Hayat Personally Saw a Camp...............................................................................14

        D.      A Series of Extremist Publications From 1999-2003 Discovered in Hayat's
                Living Space Further Evidenced Hayat's Intent..............................................................14

        E.      Expert Testimony Regarding the Existence of Militant Camps in the Balakot
                Region Corroborated Hayat's Confession to the FBI......................................................16

        F.      Expert Testimony and Satellite Evidence Corroborated Hayat's Confession
                that He Attended a Jihadi Camp in the Balokot Region ..................................................16

        G.      The Jihadi Supplication Hayat Carried Provided Further Evidence That Hayat
                Returned to the United States Intending to Engage in Violent Jihad ..............................17

II.     THE DEFENSE CASE AT TRIAL.............................................................................................17

ARGUMENT.........................................................................................................................................19
    Standard for Relief under § 2255.................................................................................................19

III.    HAYAT BEARS THE BURDEN TO ESTABLISH INEFFECTIVE ASSISTANCE
        OF COUNSEL RESULTING IN PREJUDICE. ........................................................................19

        A.      The Two-Prong Strickland Standard Governs Hayat's Ineffective Assistance
                of Counsel Claims............................................................................................................19

                1.      There is a strong presumption that Hayat's trial counsel's strategic
                        decisions were objectively reasonable. ...............................................................20

                2.      Hayat also bears the burden to show that any alleged ineffectiveness
                        undermines confidence in the verdict. .................................................................22

IV.      TO AVOID DEMONSTRATING PREJUDICE, HAYAT BEARS THE BURDEN TO ESTABLISH AN ACTUAL CONFLICT OF INTEREST, FINANCIAL OR OTHERWISE ..............................................................................................22

    A.    The Objective Evidence Establishes There was no Actual Conflict or Adverse Effect...........................................................................................................25

        1.    Ms. Mojaddidi's 2014 deposition and 2018 hearing testimony made clear she and Mr. Griffin pursued a garden-variety joint defense agreement, not multiple representation of both defendants, and there was no actual conflict between them or their clients. ...........................25

        2.    Hayat continued to retain Ms. Mojaddidi after he was charged with providing material support to terrorism, and Mr. Griffin did not interfere with her consideration of strategies to defend against that new charge..........................................................................................30

        3.    Consistent with their joint defense agreement, her testimony, and the remainder of the record evidence, Ms. Mojaddidi exercised independent control over all pre-trial and trial matters affecting Hayat................31

            a.    Ms. Mojaddidi independently elected to pursue the reasonable defense strategy of pushing for a fast trial and a challenging the sufficiency of the evidence. ......................................................32

            b.    Ms. Mojaddidi was aware of Bruton and its consequences before Hayat's trial and independently elected to force the government to meet its obligation to protect against a Confrontation Clause violation. ................................................33

            c.    Ms. Mojaddidi independently elected not to move to suppress Hayat's confession because she found it ridiculous, believed the jury would reject it, and wanted to avoid delay to reach trial. ..................................................................................34

            d.    Ms. Mojaddidi independently advised Hayat not to testify. (Claim 8) ..............................................................................38

            e.    Ms. Mojaddidi independently advised Hayat not to accept the government's plea offer. ....................................................39

            f.    Ms. Mojaddidi independently represented Hayat during trial, despite her relative inexperience.............................................40

    B.    Nothing in Dennis Riordan's Testimony Demonstrates the Existence of an Actual Conflict...........................................................................................41

        1.    Mr. Riordan's interest in this case percolated during the year he tracked Hayat's prosecution before offering to become Ms. Mojaddidi's co-counsel days after Hayat was convicted.....................................42

        2.    Mr. Riordan decision to investigate Ms. Mojaddid's representation of Hayat on his own, and while serving as her co-counsel, and to make

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

himself a fact witness for Hayat, calls into question the reliability of his declaration and testimony...................................................................................43

    a.    Mr. Riordan's decision not disclose the surreptitious investigation of his own co-counsel to her, Hayat, or the District Court calls into question the reliability of his declaration and testimony. ........................................................44

    b.    The manner in which Mr. Riordan collected and memorialized information rendered his declaration and testimony unreliable................46

    c.    Mr. Riordan's destruction of his notes made it impossible to compare his declaration to contemporaneous writings, and undermined the reliability of his declaration and testimony......................47

3.    Mr. Riordan's testimony undermined his claim that he accurately recorded in his declaration facts from several conversations over 16 months from his memory alone, and undermined the reliability of his declaration and testimony. ........................................................47

    a.    Mr. Riordan's discussions with his law partner to supplement his own memory, and his review of Hayat's legal argument while drafting his declaration, undermined the reliability of his declaration and testimony. ........................................................49

    b.    Mr. Riordan's concession on cross-examination that admissions he attributed to Ms. Mojaddidi in his declaration and testimony were overstated is direct evidence of the unreliability of the scope and detail of both...............................51

    c.    Mr. Riordan admitted that no contemporaneous records corroborate his claim that Ms. Mojaddidi ceded control to Mr. Griffin over decision-making for Hayat's defense. ................................54

4.    Mr. Riordan's role as Hayat's lead advocate resulted in the pollution of his testimony with details he did not recall but learned during his preparation of Hayat's petition or his preparation for the 2018 hearing...............57

5.    Mr. Riordan's allegations concerning visas illustrates how his declaration is more legal wishful thinking than fact............................................58

C.    Another Court in this District Found a Declaration Mr. Riordan Authored in a Past Habeas Matter "Unfairly" Took Statements by Another Person "Out of Context." ...............................................................................................60

D.    Hayat's additional facts witnesses did not corroborate the alleged admissions by Ms. Mojaddidi asserted in Mr. Riordan's declaration and testimony..........................62

1.    Nothing in Mark Reichel's testimony demonstrates the existence of an actual conflict...............................................................................63

    a.    Ms. Mojaddidi was anxious before Hayat's trial and considered but decided not to bring in Mr. Reichel as co-counsel for Hayat. ...............................................................................63

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

b.    Mr. Reichel demanded a long continuance as a condition of entering the case, which conflicted with the strategy chosen independently by Ms. Mojaddidi and Mr. Griffin ....................................64

c.    Mr. Reichel's destruction of his contemporaneous notes rendered him less credible than Ms. Mojaddidi............................68

d.    Mr. Griffin did not bar Mr. Reichel from entering the case as Hayat's counsel.............................................................................68

2.    Nothing in James Wedick's testimony demonstrates the existence of an actual conflict. ............................................................................70

a.    In certain instances, Wedick's testimony corroborated Ms. Mojaddidi's testimony and contradicted Mr. Riordan's. ........................71

b.    In other instances, Wedick's testimony was simply wrong. ......................71

c.    Ms. Mojaddidi selected Hayat's jury, and the record refutes Wedick's erroneous testimony to the contrary and Hayat's misleading claims on the question. ...........................................................72

E.    Hayat's father made Mr. Griffin unavailable by invoking the attorney-client privilege, preventing his testimony at the hearing and depriving the Court of critical information that could have been dispositive of Hayat's claims. ........................74

1.    The Court should re-open the evidentiary hearing and compel Mr. Griffin's testimony on matters outside the scope of the attorney-client privilege. ................................................................................................76

2.    The Court should re-open the evidentiary hearing and compel Mr. Riordan's testimony concerning his conversations with Mr. Schaffer and whether Umer should invoke the attorney-client privilege............................80

F.    There Was No Financial Conflict of Interest ................................................................81

1.    Mere potential or theoretical conflicts are insufficient to show actual financial conflicts under Ninth Circuit precedent.................................................81

2.    Hayat cannot show an actual financial conflict. ....................................................83

3.    Hayat Cannot Show that the Alleged Financial Conflict Prejudiced His Representation......................................................................................................84

G.    Hayat Did not, and Cannot, Allege an Actual Conflict of Interest. ...................................87

1.    Doran Weinberg's opinions are unreliable because they lack a proper foundation, and because they attempt to usurp the Court's judgment..................87

H.    Hayat Cannot Show an Adverse Effect on Ms. Mojaddidi's Representation of Him Under any Theory. ..............................................................................................92

V.    MS. MOJADDIDI PROPERLY AND ADEQUATELY INVESTIGATED THE SUPPOSED "ALIBI DEFENSE" AND REASONABLY SELECTED A SPEEDY TRIAL AND SUFFICIENCY OF THE EVIDENCE STRATEGY (CLAIMS 1 AND 2/OPHB II) ................................................................................................................92

    A.    Ms. Mojaddidi's Considered and Strategic Decision to Pursue a Speedy Trial and Sufficiency of the Evidence Defense Instead of an "Alibi Defense" Was Well Within the Wide-Range of Competent Representation ..........................................94

        1.    Ms. Mojaddidi made a reasonable efforts to investigate any potential alibi witnesses she, Hayat, or his family identified, including witnesses in Pakistan. ..........................................................................................95

        2.    Ms. Mojaddidi considered and rejected as problematic all potential alibi witnesses she, Hayat, or his family identified, including witnesses in Pakistan. ..........................................................................................98

            a.    Ms. Mojaddidi believed others in Pakistan might have seen Hayat engaged in innocent activities but she did not believe she could construct an effective alibi defense for the entire relevant period Hayat was in Pakistan. ......................................99

            b.    Ms. Mojaddidi discussed with Mr. Griffin the value of a potential alibi defense for both defendants but both attorneys ultimately agreed that it was not a sound defense strategy. .....................103

        3.    Ms. Mojaddidi decided to concentrate on a constitutionally effective challenge to the government's evidence and burden of proof. ...........................104

    B.    Hayat Has Not Established Prejudice from Ms. Mojaddidi's Failure to Investigate the "Alibi Defense" in Pakistan ........................................................106

        1.    The 2014 declarations are the product of a process focused on generating evidence to advance Hayat's habeas claims and are inherently unreliable. ....................................................................107

            a.    The failure by Hayat and his family to identify in 2005 more than a dozen relatives and close friends who claim they spent time with Hayat daily, weekly, or monthly over a two-year period undermines the reliability of the declarants' claims. ...................108

            b.    The process by which Hayat's advocates collected the declarations rendered them unreliable. ...................................................109

        2.    The substance of the declarants' claims of then-current recollections of seeing Hayat ten years earlier on a daily, weekly, or monthly basis more than strains credulity and renders the declarations unreliable. ...................115

            a.    The District Court's critique of the purported alibi declarations as unreliable and insufficient to satisfy Hayat's burden on summary judgment also applies on the merits. ......................................117

3.    The testimony of the live "alibi" witnesses and deponents was also unreliable, would not have altered the evidentiary picture at trial, and cannot carry Hayat's burden on his habeas claim....................................118

a.    The deponents claimed firm memories of ordinary interactions with Hayat nearly 15 years earlier, frequently contradicted their own testimony and that of others, admitted their bias, and conceded their poor recollection of other facts from the same period. ..................................................................................119

b.    The two live "alibi" witnesses also claimed firm memories of ordinary interactions with Hayat nearly 15 years earlier, frequently contradicted their own testimony and that of others, admitted their bias, and conceded their poor recollection of other facts from the same period...............................................128

4.    The testimony of the declarants and live witnesses cannot demonstrate prejudice.....................................................................................135

VI.    MS. MOJADDIDI'S INVESTIGATION OF THE BALAKOT EVIDENCE WAS PROPER AND ADEQUATE (CLAIM 3 / OPHB III)..................................................136

A.    Ms. Mojaddidi Did Not Provide Ineffective Assistance by Not Calling a Journalist Because Hearsay Testimony Would Not Have Undermined Abbas' Expert Testimony, and Was Inadmissible and Excludable.............................................136

B.    Hayat Has Not Established Prejudice Because the Balakot Jihadist Camps Were Operational and Producing Militants. ...................................................137

C.    Ms. Mojaddidi's Considered and Strategic Decision to Address the Government's Camp Evidence Through Cross-Examination of the Government's Expert Witnesses, Satisfies Strickland.....................................................139

1.    Ms. Mojaddidi Vigorously Cross-Examined Abbas at Trial ...............................140

2.    Hayat Cannot Articulate How a Bill of Particulars Would Have Affected His Trial. ........................................................................................142

VII.    MS. MOJADDIDI'S EFFECTIVELY HANDLED ERIC BENN'S TESTIMONY AND HAYAT HAS NOT ESTABLISHED PREJUDICE (CLAIM 10/ POHB VIII) ...............143

A.    Benn Properly Rendered an Opinion that the Site Had Features Consistent with a Militant Camp, not a Military Base. ...................................................144

1.    Benn was a qualified imagery analysis expert.....................................................144

2.    Benn properly explained the basis for his opinions.............................................145

3.    Benn did not opine on the credibility of Hayat's confession..............................147

a.    United States v. Scop is distinguishable because in that case, the expert stated a legal conclusion explicitly using statutory

and regulatory language, the expert directly assessed the credibility of key trial witnesses, and the expert was the investigator. ............................................................................................148

      b.    Mr. Benn's testimony was not otherwise excludable. ............................150

    B.    Ms. Mojaddidi Effectively Addressed and Used Eric Benn's Expert Testimony. ............................................................................................151

    C.    Hayat Has not Shown a Specific Prejudicial Effect of any Alleged Ineffectiveness from Benn's Testimony. ....................................................153

VIII.    HAYAT WAIVED HIS RIGHT TO TESTIFY, AND MS. MOJADDIDI ADEQUATELY AND INDEPENDENTLY ADVISED HAYAT NOT TO TESTIFY (CLAIM 8/NOT ADDRESSED IN OPHB). ..............................................................153

    A.    Hayat waived his right to testify, precluding a direct claim that Ms. Mojaddidi was ineffective. ........................................................................153

    B.    Any claim of conflict is speculative.............................................................154

    C.    Ms. Mojaddidi's advice to Hayat not to testify was independent and sound. .................154

IX.    THE LOCATION OF A CAMP IS NOT AN ELEMENT OF PROVIDING MATERIAL SUPPORT FOR TERRORISM, AND MS. MOJADDIDI WAS NOT INEFFECTIVE BY NOT MAKING A FRIVOLOUS OBJECTION TO A NON-EXISTENT AMENDMENT (CLAIM 9/NOT ADDRESSED IN OPHB). ..............................155

    A.    Even if Ms. Mojaddidi Was Somehow Deficient by Failing to Make a Frivolous Objection to a Non-Existent Amendment, Hayat Has Not Established Prejudice ..............................................................................157

X.    MS. MOJADDIDI WAS NOT INEFFECTIVE FOR NOT FILING MOTIONS TO SEVER THE TRIALS AND SUPPRESS HAYAT'S CONFESSION BECAUSE THERE WAS NO LEGAL BASIS FOR EITHER MOTION (CLAIMS 5 AND 6/ OPHB IV) ..............................................................................................158

    A.    The Use of Separate Juries for Hayat and his Father Eliminated any Bruton Issues, Thus Ms. Mojaddidi's Failure to File a Frivolous Motion to Sever Was Not Ineffective and Did Not Prejudice Hayat (Claim 5 / OPHB IV) ..............................159

    B.    Ms. Mojaddidi's Did Not Provide Ineffective Assistance by Not Filing a Frivolous and Futile Motion to Suppress Hayat's Confession, and Hayat Cannot Establish Prejudice (Claim 6 / OPHB IV)......................................................160

XI.    MS. MOJADDIDI WAS NOT INEFFECTIVE MERELY BECAUSE THE COURT EXCLUDED HER PROFFERED "FALSE CONFESSION" EXPERT AND HER DECISION TO RELY ON DIRECT AND CROSS-EXAMINATION TO CHALLENGE THE RELIABILITY OF HAYAT'S CONFESSION WAS WITHIN THE WIDE RANGE OF COMPETENT REPRESENTATION (CLAIM 7/OPHB V) ............164

A.      Ms. Mojaddidi Vigorously Cross-Examined Government Agents and Elicited Testimony in Support of the Defense Theory that Hayat's Confession Was Unreliable and He Did Not Attend a Jihadist Camp........................................167

      1.      May 30, 2005 Interview................................................................167

      2.      June 3, 2005 Interview.................................................................168

      3.      June 4 and 5, 2005 Interviews.....................................................169

B.      Ms. Mojaddidi Did Not Provide Ineffective Assistance by Not Calling an Alternative Expert Witness to Support Hayat's Defense Theory That His Confession Was Unreliable and That He Did Not Attend a Jihadist Camp (Claim 7/OPHB V) ...........................................................................................173

      1.      Dr. Leo's testimony confirmed the effectiveness of Ms. Mojaddidi's efforts to challenge the reliability of Hayat's confession and revealed his own work to be unreliable and unhelpful to a jury. ......................................173

      2.      Ms. Mojaddidi's efforts to challenge the reliability of Hayat's confession were effective....................................................................176

      3.      Ms. Mojaddidi Did Not Act Based on Ignorance of the Law and This is Not a Situation in Which Any Competent Counsel Necessarily Would Have Retained a False Confessions Expert.................................................178

C.      Hayat Has Not Established Prejudice as a Result of Ms. Mojaddidi's Purported Failure to Admit Testimony of a False Confession Expert............................180

XII.    MS. MOJADDIDI DID NOT PROVIDE INEFFECTIVE ASSISTANCE BY DECIDING NOT TO OBTAIN A SECURITY CLEARANCE BECAUSE SUCH A CLEARANCE WOULD NOT HAVE ENHANCED HAYAT'S DEFENSE, AND HAYAT CANNOT ESTABLISH PREJUDICE (CLAIM 4 / OPHB VI)...................................183

A.      Ms. Mojaddidi Understood, and the Court Correctly Applied, the CIPA Procedures...........................................................................................184

      1.      Mr. Cline's testimony specifically confirms Ms. Mojaddidi's understanding that the government could present classified material to the District Court in ex parte proceedings, and the Court could order any exculpatory or helpful material to be disclosed through substitutions or unclassified summaries as happened in this case. ....................185

      2.      Ms. Mojaddidi's actual litigation in this case establish that she was effective in her handling of CIPA issues even without a clearance....................186

      3.      Both Umer and Hamid Hayat stipulated and endorsed the decision not to seek clearance. ..........................................................................187

B.      Hayat cannot show prejudice.........................................................................189

1.    Ms. Mojaddidi properly and effectively used the summarized and substituted evidence at trial, therefore Hayat cannot show prejudice..................191

XIII.   MS. MOJADDIDI'S CROSS-EXAMINATION OF NASEEM KHAN WAS EFFECTIVE (CLAIM 12 / OPHB IX)...........................................................................195

A.    The District Court Correctly Ruled to Exclude Hearsay. ...............................................195

XIV.   MS. MOJADDIDI EFFECTIVELY CROSS-EXAMINED AND HANDLED THE TESTIMONY OF KHALEEL MOHAMMED (CLAIM 11 / OPHB VII) ...............................200

A.    Dr. Mohammed was a Properly Qualified Expert and Ms. Mojaddidi Provided Effective Assistance by Not Making a Frivolous Objection to his Testimony................201

B.    Dr. Mohammed's Expert Testimony Did Not Violate FRE 704(b), and Ms. Mojaddidi Did Not Provide Ineffective Assistance by Making a Frivolous Motion to Exclude....................................................................................................201

1.    Ms. Mojaddidi's Cross-Examination of Dr. Mohammed was Vigorous, Robust, Fruitful, and Well Within the Wide Range of Competent Representation, and Therefore There Was also no Prejudice .............................203

2.    Ms. Mojaddidi Did Not Provide Ineffective Assistance by Not Cross-Examining Dr. Mohammed About a Speculative "Guess" by a Student with Whom Dr. Mohammed Conferred Concerning Hayat's Ta'wiz ................206

C.    Ms. Mojaddidi Did Not Provide Ineffective Assistance by Using Dr. Weiss to Counter Dr. Mohammed's Testimony, and Hayat Cannot Establish Prejudice ..............207

D.    Counsel Is not Ineffective for Failing to Find a Better Expert. .....................................209

E.    Dr. Haykel's testimony does not establish ineffectiveness or prejudice because, he substantially agreed with Dr. Mohammed's testimony except for the conclusion and cannot eliminate that Hayat's interpretation was not a benign interpretation. ....................................................................................................210

F.    Imam Anwar's Testimony Would not Have Been Admissible, and also Acknowledged that Ms. Mojaddidi Elicited the Substance of His Testimony on Cross-examination. ...............................................................................................215

G.    Hayat Fails to Establish Ineffectiveness or Prejudice with regard to the Handling of Dr. Mohammed's Testimony...................................................................216

XV.   HAYAT'S BRADY CLAIMS ARE SPECULATIVE AND LACK MERIT............................217

A.    The District Court Ruled that Petitioner Has not Shown Sufficient Cause for Discovery Regarding the Existence of Training Camps.................................................217

B.    Hayat Has no Evidence of Brady Violations Relating to Aerial Photographs. ..............218

C.    Hayat's Conclusory Allegations about the Operational Status of the Balakot Camp Have no Support. ...........................................................................................219

D.    Hayat's Warrantless Surveillance Claim Is Purely Speculative. ...................................219

CONCLUSION ...........................................................................................................................219

**TABLE OF AUTHORITIES**

Federal Cases

Allen v. Woodford,
  395 F.3d 979 (9th Cir. 2005) ................................................................................ 11, 22, 24

Am. Pac. Whaling Co. v. Kristensen,
  93 F.2d 17 (9th Cir. 1937) ............................................................................................ 213

Atlas Flooring, LLC v. Porcelanite S.A. DE C.V.,
  425 Fed.Appx. 629 (9th Cir. 2011).............................................................................. 203

Babbitt v. Calderon,
  151 F.3d 1170 (9th Cir. 1998) ............................................................................... 105, 183

Bergmann v. McCaughtry,
  65 F.3d 1372 (7th Cir. 1995) ........................................................................................ 135

Bieghler v. McBride,
  389 F.3d 701 (7th Cir. 2004) ........................................................................................ 105

Blackledge v. Allison,
  431 U.S. 63 (1977)........................................................................................................ 218

Bonin v. Calderon,
  59 F.3d 815 (9th Cir. 1995) ................................................................... 23, 81, 82, 86, 92

Bower v. Quarterman,
  497 F.3d 459 (5th Cir. 2007) ........................................................................................ 142

Brady v. Maryland,
  373 U.S. 83 (1963)........................................................................................................ 217

Bragg v. Galaza,
  242 F.3d 1082 (9th Cir. 2001) ................................................................................ 98, 193

Briceno v. Scribner,
  555 F.3d 1069 (9th Cir. 2009) ...................................................................................... 148

Brown v. Hall,
  2006 WL 3524503 (E.D. Cal. October 23, 2006)........................................................... 98

Bruton v. United States,
  391 U.S. 123 (1968)................................................................................................... passim

Burger v. Kemp,
  483 U.S. 776 (1987)............................................................................... 23, 24, 92, 158

California Sportfishing Prot. All. v. Chico Scrap Metal, Inc.,
  299 F.R.D. 638 (E.D. Cal. 2014) .................................................................................... 77

Campbell v. Wood,
  18 F.3d 662 (9th Cir. 1994) .................................................................................... 21, 210

Carlson v. Nelson,
    443 F.2d 21 (9th Cir. 1971) ........................................................................................... 70

Carter v. Lee,
    283 F.3d 240 (4th Cir. 2002) ....................................................................................... 153

Chandler v. United States,
    218 F.3d 1305 (11th Cir. 2000) ............................................................................ 105, 106

Clarke v. Am. Commerce Nat'l Bank,
    974 F.2d 127 (9th Cir.1992) .................................................................................... 76, 77

Colorado v. Connelly,
    479 U.S. 157 (1986)..................................................................................................... 161

Cooks v. Spalding,
    660 F.2d 738 (9th Cir. 1981) ....................................................................................... 198

Cooper v. Fitzharris,
    586 F.2d 1325 (9th Cir. 1978) ....................................................................................... 20

Cooper v. United States,
    282 F.2d 527 (9th Cir. 1979) ....................................................................................... 143

Crane v. Kentucky,
    476 U.S. 683 (1986)..................................................................................................... 176

Cuen v. Evans,
    390 Fed.Appx. 721 (9th Cir. 2010)............................................................................... 147

Cuevas v. Henderson,
    801 F.2d 586 (2d Cir. 1986) ........................................................................................ 118

Currier v. United Technologies Corp.,
    393 F.3d 246 (1st Cir. 2004)........................................................................................ 203

Cuyler v. Sullivan,
    446 U.S. 335 (1980)............................................................................... 23, 24, 82, 92, 158

Darden v. Wainwright,
    477 U.S. 168 (1986)....................................................................................................... 21

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993)..................................................................................... 144, 151, 181

Dows v. Wood,
    211 F.3d 480 (9th Cir. 2000) ....................................................................................... 193

Education Logistics, Inc. v. Laidlaw Transit, Inc.,
    583 Fed.Appx. 624 (9th Cir. 2014)............................................................................... 203

Eggeleston v. United States,
    798 F.2d 374 (9th Cir. 1986) ......................................................................................... 97

Estate of Barabin v. AstenJohnson, Inc.,
   740 F.3d 457 (9th Cir. 2014) .......................................................................................... 91

Fitzpatrick v. McCormick,
   869 F.2d 1247 (9th Cir. 1989) ........................................................................................ 24

Frazier v. Cupp,
   394 U.S. 731 (1969)............................................................................................... 160, 161

Gallegos v. Schriro,
   583 F.Supp.2d 1041 (D. Ariz. 2008) ....................................................................... 138, 158

Garcia v. City of El Centro,
   214 F.R.D. 587 (S.D. Cal. 2003) ..................................................................................... 77

Glasser v. United States,
   315 U.S. 60 (1942)......................................................................................................... 24

Gray v. Maryland,
   523 U.S. 185 (1998)...................................................................................................... 158

Grayson v. Thompson,
   257 F.3d 1194 (11th Cir. 2001) ...................................................................................... 20

Greiner v. Wells,
   417 F.3d 305 (2d Cir. 2005) ........................................................................................... 21

Grisby v. Blodgett,
   130 F.3d 365 (9th Cir. 1997) ................................................................................... 138, 209

Guam v. Santos,
   741 F.2d 1167 (9th Cir. 1984) ........................................................................................ 21

Harrington v. Richter,
   562 U.S. 86 (2011)................................................................................................... passim

Hart v. Massanari,
   266 F.3d 1155 (9th Cir. 2001) ...................................................................................... 202

Hinton v. Alabama,
   571 U.S. 263, 134 S.Ct. 1081 (2014)............................................................................ 209

Holloway v. Arkansas,
   435 U.S. 475 (1978).................................................................................................. 23, 24

Holmgren v. State Farm Mut. Auto. Ins. Co.,
   976 F.2d 573 (9th Cir. 1992) ..................................................................................... 77, 80

Hughes v. Borg,
   898 F.2d 695 (9th Cir. 1990) .......................................................................................... 21

Hutchins v. Garrison,
   724 F.2d 1425 (4th Cir. 1983) ...................................................................................... 153

In re Grand Jury Subpoena (Mark Torf/Torf Environmental Management),
    357 F.3d 900 (9th Cir. 2004) ................................................................................................ 77

In Re Grand Jury Subpoena,
    739 F.2d 1354 (8th Cir. 1984) .............................................................................................. 22

In re Terrorist Bombings,
    552 F.3d 93 (2d Cir. 2008) ................................................................................................. 184

James v. Borg,
    24 F.3d 20 (9th Cir. 1994) ............................................................................... 21, 162, 217

Jelinek v. Costello,
    247 F.Supp.2d 212 (E.D.N.Y. 2003) ................................................................................ 142

Johnson v. Lockhart,
    921 F.2d 796 (8th Cir. 1990) .............................................................................................. 94

Kaplan v. United States,
    375 F.2d 895 (9th Cir. 1967) .............................................................................................. 29

Kimmelman v. Morrison,
    477 U.S. 365 ................................................................................................................ 21, 22

Klimavicius-Viloria,
    144 F.3d ..................................................................................................................... 184, 189

Knowles v. Mirzayance,
    556 U.S. 111 (2009) ..................................................................................... 105, 159, 162

Kumho Tire Co. Ltd. v. Carmichael,
    526 U.S. 137 (1999) ......................................................................................................... 144

Kyles v. Whitley,
    514 U.S. 434 (1995) ......................................................................................................... 218

LaGrand v. Stewart,
    133 F.3d 1253 (9th Cir. 1998) ..................................................................................... 21, 97

Lau Ah Yew v. Dulles,
    257 F.2d 744 (9th Cir. 1958) .............................................................................................. 44

Lawson v. Caspari,
    963 F.2d 1094 (8th Cir. 1992) ............................................................................................ 98

Lema v. United States,
    987 F.2d 48 (1st Cir. 1993) ................................................................................................ 94

LoCascio v. United States,
    395 F.3d 51 (2d Cir. 2005) ................................................................................................. 24

Lowry v. Lewis,
    21 F.3d 344 (9th Cir. 1994) ...................................................................................... 151, 160

Loza v. Mitchell,
  766 F.3d 466 (6th Cir. 2014) ........................................................................................ 181

Lunbery v. Hornbeak,
  605 F.3d 754 (9th Cir. 2010) ........................................................................................ 179

Mannhalt v. Reed,
  847 F. 2d 576 (9th Cir. 1988) .......................................................................................... 24

McCauley–Bey v. Delo,
  97 F.3d 1104 (8th Cir. 1996) ........................................................................................ 135

McDonald v. North America Specialty Ins. Co.,
  224 Fed.Appx. 761 (10th Cir. 2007) ............................................................................ 203

McMann v. Richardson,
  397 U.S. 759 (1970) ........................................................................................................ 20

Mickens v. Taylor,
  535 U.S. 162 (2002) .................................................................................................. passim

Milgard Tempering, Inc. v. Selas Corp. of America,
  902 F.2d 703 (9th Cir. 1990) ........................................................................................ 217

Mincey v. Arizona,
  437 U.S. 385 (1978) ...................................................................................................... 163

Miranda v. Arizona,
  384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) .......................................... 12, 160

Molina v. Rison,
  886 F.2d 1124 (9th Cir. 1989) ...................................................................................... 202

Morris v. State of Cal.,
  966 F.2d 448 (9th Cir. 1991) .......................................................................................... 23

Mukhtar v. Cal. State Univ., Hayward,
  299 F.3d 1053 (9th Cir. 2002) ........................................................................................ 91

Murray v. Schriro,
  745 F.3d 984 (9th Cir. 2014) ........................................................................................ 213

Murray v. Schriro,
  746 F.3d 418 (9th Cir. 2014) ........................................................................................ 203

Murtishaw v. Woodford,
  255 F.3d 926 (9th Cir. 2001) .................................................................................. 209, 210

Noe v. United States,
  601 F.3d 784, (8th Cir. 2010) ............................................................................. 25, 26, 28

North Carolina v. Butler,
  441 U.S. 369 ................................................................................................................. 160

Ortiz v. Stewart,
    149 F.3d 923 (9th Cir. 1998) ................................................................................................. 22

Phillips v. Woodford,
    267 F.3d 966 (9th Cir. 2001) ............................................................................................... 105

Pizzuti v. United States,
    809 F.Supp. 2d 164 (S.D.N.Y. 2011) ................................................................................... 42

Rich v. Calderon,
    187 F.3d 1064 (9th Cir. 1999) ................................................................................... 86, 88, 89

Rios v. Rocha,
    299 F.3d 796 (9th Cir. 2002) ............................................................................................... 105

Ritt v. Dingle,
    142 F.Supp.2d 1142 (D. Minn. 2001) ................................................................................. 177

Rogers v. D. Zant,
    13 F.3d 384 (1994 .................................................................................................... 104, 106

Romero v. Tansy,
    46 F.3d 1024 (1995) ................................................................................................... 108, 135

Roybal v. Davis,
    148 F.Supp.3d 958 (S.D. Cal. 2015) ................................................................................... 214

Runningeagle v. Ryan,
    686 F.3d 758 (9th Cir. 2012) ............................................................................................... 219

Sanders v. Ratelle,
    21 F.3d 1446 (9th Cir. 1994) ................................................................................................. 24

Sawyer v. Smith,
    497 U.S. 227 (1990) ...................................................................................................... 20, 21

Seymour v. Walker,
    224 F.3d 542 (6th Cir. 2000) ............................................................................................... 135

Shackleford v. Hubbard,
    234 F.3d 1072 (9th Cir. 2000) ............................................................................................. 162

Shah v. United States,
    878 F.2d 1156 (9th Cir. 1989) ............................................................................................. 162

Siripongs v. Calderon,
    133 F.3d 732 (9th Cir.1998) ................................................................................................ 105

Sisco v. Huskey,
    73 Fed.Appx. 911, 2003 WL 21801543 (9th Cir., Aug. 5, 2003) ....................................... 207

Sphere Drake Ins. PLC v. Trisko,
    226 F.3d 951 (8th Cir. 2000) ....................................................................................... 203, 204

Strickland v. Washington,
466 U.S. 668 (1984)................................................................................................................ passim

Taylor v. Burlington Northern R. Co.,
787 F.2d 1309 (9th Cir. 1986) .......................................................................................... 213

Terrovona v. Kincheloe,
912 F.2d 1176 (9th Cir. 1990) .................................................................................... 160, 161

Thomas v. Bible,
983 F.2d 152 (9th Cir. 1993) ............................................................................................ 217

Thomas v. Scully,
854 F.Supp. 944 ............................................................................................................... 118

Townsend v. Sain,
372 U.S. 293 (1963)......................................................................................................... 163

Turk v. White,
116 F.3d 1264 (9th Cir. 1997) ............................................................................................ 98

Turner v. Calderon,
281 F.3d 851 (9th Cir. 2002) ............................................................................................. 21

United States  v. Griffin,
324 F.3d 330 (5th Cir. 2003) ............................................................................................ 24

United States ex rel. Maxwell v. Gilmore,
37 F.Supp.2d 1078 (N.D.Ill. 1999) ................................................................................. 135

United States v. Adams,
271 F.3d 1236 (10th Cir. 2001) ................................................................................. 177, 182

United States v. Adamson,
291 F.3d 606 (9th Cir. 2002) ........................................................................................... 155

United States v. Addonizio,
442 U.S. 178 (1979)........................................................................................................... 19

United States v. Aichele,
941 F.2d 761 (9th Cir. 1991) ........................................................................................... 218

United States v. Alonso,
48 F.3d 1536 (9th Cir. 1995) ........................................................................................... 148

United States v. Alvarez,
837 F.2d 1024 (11th Cir. 1988)  ...................................................................................... 114

United States v. Antone,
412 Fed. Appx. 10 (9th Cir. 2011)............................................................................. 179, 181

United States v. Armstrong,
621 F.2d 951 (9th Cir. 1980) ........................................................................................... 159

United States v. Awkard,
  597 F.2d 667 (9th Cir. 1979) ................................................................................................ 148

United States v. Ayers,
  924 F.2d 1468 ....................................................................................................................... 143

United States v. Bao
189 F.3d 860 (9th Cir. 1999) .................................................................................................. 198

United States v. Baptista-Rodriguez,
  17 F.3d 1354 (11th Cir. 1994) ........................................................................................ 184, 185

United States v. Barnard,
  490 F.2d 907 (9th Cir. 1973) ................................................................................................ 148

United States v. Benally,
  541 F.3d 990 (10th Cir. 2008) ........................................................................................ 179, 181

United States v. Binder,
  769 F.2d 595 (9th Cir. 1985) ........................................................................................ 148, 160

United States v. Bishop,
  291 F.3d 1100 (9th Cir. 2002) .............................................................................................. 197

United States v. Blackman,
  72 F.3d 1418 (9th Cir.1995) ................................................................................................... 77

United States v. Brosnan,
  484 Fed.Appx. 167 (9th Cir. 2012) ....................................................................................... 156

United States v. Buffington,
  815 F.2d 1292 (9th Cir. 1987) ....................................................................................... 142, 156

United States v. Bynum,
  604 F.3d 161 (4th Cir. 2010) ................................................................................................ 145

United States v. Candoli,
  870 F.2d 496 (9th Cir. 1989) ................................................................................................ 150

United States v. Cazares,
  121 F.3d 1241 (9th Cir. 1997) .............................................................................................. 161

United States v. Cochrane,
  985 F.2d 1027 (9th Cir. 1993) ................................................................................................ 20

United States v. Coplan,
  703 F.3d 46 (2d Cir. 2012) ................................................................................................... 197

United States v. Crape,
  472 Fed.Appx. 581 (9th Cir. 2012) ....................................................................................... 157

United States v. Cronic,
  466 U.S. 648 (1984) ......................................................................................................... 21, 22

United States v. Crouch,
  731 F.2d 621 (9th Cir. 1984) ................................................................................................ 42

United States v. Daoud,
  755 F.3d 479 (7th Cir. 2014) .............................................................................................. 190

United States v. Dicesare,
  765 F.2d 890 (9th Cir. 1985) .............................................................................................. 156

United States v. Duncan,
  42 F.3d 97 (2d Cir. 1994) .................................................................................................... 91

United States v. Edwards,
  897 F.2d 445 (9th Cir. 1990) .............................................................................................. 153

United States v. Emmert,
  829 F.2d 805 (9th Cir. 1987) .............................................................................................. 197

United States v. Espinoza,
  866 F.2d 1067 (9th Cir. 1988) ............................................................................................ 218

United States v. Feijoo-Tomala,
  751 F. Supp. 40 (E.D.N.Y. 1990) ...................................................................................... 115

United States v. Frady,
  456 U.S. 152 (1982) ............................................................................................................. 19

United States v. Freeman,
  498 F.3d 893 (9th Cir. 2007) .............................................................................................. 215

United States v. Gallegos,
  108 F.3d 1272 (10th Cir. 1997) .......................................................................................... 154

United States v. George,
  987 F.2d 1428 (9th Cir. 1993) ............................................................................................ 163

United States v. Gomez-Norena,
  908 F.2d 497 (9th Cir. 1990) .............................................................................................. 202

United States v. Gonzalez-Lopez,
  548 U.S. 140 (2006) ............................................................................................................. 72

United States v. Haber,
  53 F.3d 236 (9th Cir. 1995) ................................................................................................ 150

United States v. Hamilton,
  792 F.2d 837 (9th Cir. 1986) ................................................................................................ 20

United States v. Harden,
  846 F.2d 1229 (9th Cir. 1988) ............................................................................................ 138

United States v. Hartz, 458 F.3d 1011, 1021 (9th Cir. 2006)
  458 F.3d 1011, 1021 (9th Cir. 2006) ........................................................................... 157, 158

United States v. Hayat,
  710 F.3d 875 (9th Cir. 2013) ................................................................................................. passim

United States v. Hayes,
  231 F.3d 1132 (9th Cir. 2000) ...................................................................................................... 202

United States v. Hirokawa,
  342 Fed.Appx. 242 (9th Cir. 2009) ............................................................................................... 151

United States v. Hoffman,
  733 F.2d 596 (9th Cir. 1984) .......................................................................................................... 82

United States v. Johnson,
  139 F.3d 1359 ........................................................................................................... 181, 183, 184

United States v. Kadir,
  718 F.3d 115 (2d Cir. 2013) ........................................................................................................ 197

United States v. Kahre,
  737 F.3d 554 (9th Cir. 2013) ....................................................................................................... 197

United States v. Kindle,
  925 F.2d 272 (8th Cir. 1991) .................................................................................................. 24, 25

United States v. Kirsh,
  54 F.3d 1062 (2d Cir. 1995) .......................................................................................................... 25

United States v. Larson,
  495 F.3d 1094 (9th Cir. 2007) ..................................................................................................... 155

United States v. Lewis,
  786 F.2d. 1278 (5th Cir. 1986) ...................................................................................................... 22

United States v. Little,
  753 F.2d 1420 (9th Cir. 1984) ..................................................................................................... 217

United States v. Lloyd,
  807 F.3d 1128 (9th Cir. 2015) ..................................................................................................... 215

United States v. Lockett,
  919 F.2d 585 (9th Cir. 1990) ....................................................................................................... 148

United States v. Long,
  706 F.2d 1044 (9th Cir. 1983) ..................................................................................................... 143

United States v. Lopez,
  576 Fed.Appx. 680 (9th Cir. 2014) .............................................................................................. 157

United States v. Lopez,
  762 F.3d 852, 863-64 (9th Cir. 2014) ......................................................................................... 215

United States v. Marchini,
  797 F.2d 759 (9th Cir. 1986) ....................................................................................................... 149

United States v. Martin,
278 F.3d 988 (9th Cir. 2002) ........................................................................................... 76

United States v. McMullen,
98 F.3d 1155 (9th Cir. 1996) ...................................................................................... 22, 91

United States v. Merritt,
528 F.2d 650 (7th Cir. 1976) ........................................................................................... 22

United States v. Miller,
874 F.2d 1255 (9th Cir. 1989) ....................................................................................... 177

United States v. Milstein,
401 F.3d ....................................................................................................................... 155

United States v. Mooney,
769 F.2d 496 (8th Cir. 1985) ........................................................................................... 24

United States v. Moore,
159 F.3d 1154 (9th Cir. 1998) ......................................................................................... 23

United States v. Morales,
108 F.3d 1031 (9th Cir. 1997) ................................................................................. 148, 202

United States v. Niebla-Torres,
847 F.3d 1049 (9th Cir. 2017) ....................................................................................... 147

United States v. Nohara,
3 F.3d 1239 (9th Cir. 1993) ........................................................................................... 153

United States v. Nolan,
910 F.2d 1553 (7th Cir. 1990) ....................................................................................... 162

United States v. Ortega,
203 F.3d 675 (9th Cir. 2000) ......................................................................................... 198

United States v. Pang,
362 F.3d 1187 (9th Cir. 2004) ....................................................................................... 155

United States v. Parra-Perez,
127 Fed.Appx. 241 (9th Cir. 2005) ................................................................................ 199

United States v. Patino,
962 F.2d 263 (2d Cir.1992) ........................................................................................... 156

United States v. Payne,
741 F.2d 887 (7th Cir. 1984) ......................................................................................... 143

United States v. Quintero-Barraza,
78 F.3d 1344 (9th Cir. 1995) ........................................................................................... 19

United States v. Redd,
759 F.2d 699 (9th Cir. 1985) ......................................................................................... 201

United States v. Redlightning,
   624 F.3d 1090 (9th Cir. 2010) ................................................................................................ 179

United States v. Richey,
   632 F.3d 559 (9th Cir. 2011) ................................................................................................... 76

United States v. Rivera,
   43 F.3d 1291 (9th Cir. 1995) ................................................................................................. 150

United States v. Rodrigues,
   347 F.3d 818 (9th Cir. 2003) .............................................................................................. 91, 92

United States v. Rowe,
   92 F.3d 928 (9th Cir. 1996) ................................................................................................... 199

United States v. Royal,
   972 F.2d 643 (5th Cir. 1992) ................................................................................................. 142

United States v. Ruehle,
   583 F.3d 600 (9th Cir. 2009) ................................................................................................... 77

United States v. Salim,
   855 F.2d 944 (2d Cir. 1988) .................................................................................................. 114

United States v. Salmonese,
   352 F.3d, 608 (2d Cir. 2003) ................................................................................................. 155

United States v. Sanchez-Cervantes,
   282 F.3d 664 (9th Cir. 2002) ................................................................................................... 19

United States v. Sandoval-Medoza,
   213 Fed.Appx. 624 (9th Cir. 2006) ........................................................................................ 159

United States v. Sarkissian,
   841 F.2d 959 (9th Cir. 1988) ................................................................................................. 190

United States v. Sayakhom,
   186 F.3d 928 (9th Cir. 1999) ................................................................................................. 197

United States v. Schaflander,
   743 F.2d 714 (9th Cir. 1984) ................................................................................................... 20

United States v. Scop,
   846 F.2d 135 (2d Cir. 1988) ...................................................................................... 148, 149, 150

United States v. Scrivner,
   189 F.3d 825 (9th Cir. 1999) ................................................................................................. 201

United States v. Sedaghaty,
   728 F.3d 885 (9th Cir. 2013) ................................................................................................. 190

United States v. Shwayder,
   312 F.3d 1109 (9th Cir. 2002) ................................................................................................. 92

United States v. Smart,
    135 Fed.Appx. 337 (11th Cir. 2005)................................................................................ 147

United States v. Smith,
    415 F.Appx. 826 (9th Cir. 2011) ................................................................................... 215

United States v. Stinson,
    647 F.3d 1196 (9th Cir. 2011) ....................................................................................... 213

United States v. Strem,
    959 F.2d 243 (9th Cir. 1992) ......................................................................................... 149

United States v. Swaid,
    458 Fed.Appx. 676 (9th Cir. 2011)................................................................................ 157

United States v. Taylor,
    487 U.S. 326 (1988)......................................................................................................... 32

United States v. Taylor,
    802 F.2d 1108 (9th Cir. 1986) ......................................................................................... 19

United States v. Varca,
    896 F.2d 900 (5th Cir. 1990) ................................................................................. 184, 194

United States v. Von Stoll
726 F.2d 584 (9th Cir. 1984)……………………………………………………...……………………157

United States v. Ward,
    747 F.3d 1184 (9th Cir. 2014) ....................................................................................... 155

United States v. Wells,
    394 F.3d 725 (9th Cir. 2005) ........................................................................................... 91

United States v. Younger,
    398 F.3d 1179 (9th Cir. 2005) ....................................................................................... 201

United States v. Yunis,
    867 F.2d 617 (D.C. Cir. 1989) ............................................................................... 184, 189

United States v. Zingaro,
    858 F.2d 94 (2d Cir. 1988) ............................................................................................ 155

Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Corp., Inc.,
    546 F.2d 530 (3d Cir. 1976) ..................................................................................... passim

Upjohn Co. v. United States,
    449 U.S. 383 (1981)......................................................................................................... 76

Waters v. Thomas,
    46 F.3d 1506 (11th Cir. 1995) ................................................................. 105, 106, 173, 198

Watts v. United States,
    841 F.2d 275 (9th Cir. 1988) .................................................................................... passim

Weil v. Inv. Indicators, Research & Mgmt., Inc.,
   647 F.2d 18 (9th Cir. 1981) ........................................................................................ 76

White v. Singletary,
   972 F.2d 1218 ................................................................................................... 104, 105

Williams v. Armontrout,
   912 F.2d 924 (8th Cir. 1990) ..................................................................................... 105

Williams v. Calderon,
   52 F.3d 1465 (9th Cir. 1995) ....................................................................................... 81

Williams v. Illinois,
   567 U.S. 50 (2012)...................................................................................................... 150

Willis v. United States,
   614 F.2d 1200, 1203 (9th Cir. 1979) .............................................................. 29, 70, 162

Wood v. Bartholemew,
   516 U.S. 1 (1995)........................................................................................................ 218

Woods v. Sinclair,
   655 F.3d 886 (9th Cir. 2011) .................................................................................. 22, 75

Woratzeck v. Ricketts,
   820 F.2d 1450 (9th Cir. 1987) ..................................................................................... 21

State Cases

Commonwealth of Pennsylvania v. Alicia,
   92 A.3d 753 (Pa. 2014) .............................................................................................. 182

People v. Doolin,
   45 Cal.4th 390 (Cal. 2009)..................................................................................... 83, 87

People v. Gilliam,
   670 N.E.2d 606 (Ill. 1996) ......................................................................................... 178

People v. Kowalski,
   821 N.W.2d 14 (Mich. 2012)...................................................................... 175, 181, 182

State v. Cobb,
   43 P.3d 855 (Kan. Ct. App. 2002) .............................................................................. 177

State v. Davis,
   32 S.W.3d 603 (Mo. App. 2000) ................................................................................ 177

State v. Free,
   351 N.J.Super. 203, 798 A.2d 83................................................................................ 177

State v. Ritt,
   599 N.W.2d 802 (Minn. 1999) ................................................................................... 177

State v. Tellier,
   526 A.2d 941 (Me. 1987).............................................................................................. 178

Vent v. State,
   67 P.3d 661 (Alaska Ct. App. 2003) ............................................................................................ 177

## Federal Statutes

18 U.S.C. App. 3 ............................................................................................................................. 185

18 U.S.C. App. 3 § 4 (1980) ............................................................................................. 184, 185, 189

18 U.S.C. App. 3 § 6(c)(1) ................................................................................................ 184, 185, 186

18 U.S.C. § 2339A ............................................................................................................ 155, 157, 217

18 U.S.C. § 3162(a)(2) ........................................................................................................................ 32

28 U.S.C. § 2255 ........................................................................................................................ passim

Section 6 ........................................................................................................................................... 186

## Federal Rules

Fed. R. Civ. P. 16(b)(1)(B) ........................................................................................................ 166, 179

Fed. R. Civ. P. 26(b)(3) .................................................................................................................... 77

Fed. R. Crim. P. 16(b)(1)(B) ............................................................................................................ 166

Fed. R. Crim. P. 16(d)(1) ................................................................................................................. 189

Fed. R. Evid. 602 ............................................................................................................................. 215

Fed. R. Evid. 701 ............................................................................................................................. 215

Fed. R. Evid. 801(c) ........................................................................................................................... 42

Federal Rule of Criminal Procedure 44(c)(1) ..................................................................................... 28

FRE 106 ............................................................................................................................................ 196

FRE 401 ..................................................................................................................................... 192, 194

FRE 403 ..................................................................................................................................... 192, 194

FRE 607 ..................................................................................................................................... 197, 199

FRE 702 ............................................................................................................................... 144, 166, 209

FRE 704(b) ................................................................................................................................... vi, 201

FRE 803(3) ........................................................................................................................... 196, 197, 198

## Other Authorities

H.R.Rep. No. 831......................................................................................................................... 190

The (In)Admissibility of False Confession Expert Testimony,
   26 Touro Law Review 23 (2010)................................................................................................ 182

McGREGOR W. SCOTT
United States Attorney
ANDRÉ M. ESPINOSA
ROGER YANG
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

JENNIFER E. LEVY
Trial Attorney
Counterterrorism Section
National Security Division
U.S. Department of Justice
10th and Constitution Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 514-1092

Attorneys for Respondent/Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:05-CR-240-GEB |
| Respondent/Plaintiff, | UNITED STATES' POST-HEARING OPPOSITION TO PETITIONER'S BRIEF IN SUPPORT OF HIS PETITION FOR A WRIT OF HABEAS CORPUS |
| v. | |
| HAMID HAYAT, | COURT: Hon. Deborah Barnes |
| Petitioner/Defendant. | |

**INTRODUCTION**

In 2002 and 2003, Hamid Hayat repeatedly told his best friend, in recorded conversations, that he planned to attend a jihadi training camp in Pakistan. They discussed the location, leadership, and training at some of those camps. In April 2003, Hayat went to Pakistan, to the region where he said some of those camps were located. From there, Hayat affirmed to his friend his plan to attend a jihadi training camp. In August 2003, Hayat told his friend he would attend a camp after Ramadan, at the end of November 2003. When Hayat returned to California in May 2005, the FBI interviewed him. In a videotaped confession, Hayat admitted he attended a jihadi training camp in 2000 and between October

2003 and November 2004. Hayat also admitted to FBI investigators that he trained to wage violent jihad in the United States and was awaiting orders. Before confessing, Hayat denied attending a camp. However, Hayat's cousin described Hayat as a person who is untruthful "a lot" to others, and said he and others warned Hayat that his untruthfulness would eventually "catch up" with him.

Hayat's confession was corroborated by other facts. His father, Umer, corroborated his son's confession. In his own videotaped statement, Umer admitted he knew his son attended training camps, and that he visited one of them and stood at the gate. Umer told investigators his son attended camps in 2000 and in late 2003 to early 2004, and corroborated other facts in Hayat's confession. Hayat's confession was also corroborated by circumstantial evidence demonstrating his intent, including publications showing his belief in violent jihad. Hayat collected those publications and more into a "jihadi scrapbook" that contained articles extolling the virtues of Islamic extremism, criticizing the United States government as "an enemy of Islam," and expressing support for Osama Bin Laden and the Taliban.

Against that backdrop, Wazhma Mojaddidi faced a daunting task in her first federal criminal trial. Her client had pledged to attend a jihadi training camp, traveled to the region where he knew those camps were located, affirmed his pledge and set a date he planned to go, and later confessed that he attended a camp when he said he would—a confession his father corroborated. Ms. Mojaddidi defended Hayat in a joint defense agreement with her more experienced co-counsel, Johnny Griffin, who represented Hayat's father. Hayat's family marshalled a pool of funds to pay for the defense of Hayat and his father, and to pay associated expenses. Mr. Griffin retained custody of those funds but Ms. Mojaddidi had full access to them to pay for expenses associated with Hayat's individual interests. In the context of their joint defense agreement, Ms. Mojaddidi conferred with Mr. Griffin on strategic and tactical issues. However, she also conducted independent research on those issues, and always retained independent decision-making authority for Hayat's defense.

The charges against Hayat and his father were closely related, as were their defense options. Hayat was charged with providing material support to terrorists by attending a jihadist camp and returning to the United States to commit violence. Both he and his father were charged with falsely denying to investigators that Hayat attended a militant camp. Each had a strong interest in quickly

putting the government to its proofs on cases built primarily around their confessions and circumstantial evidence. For each, the passage of time threatened to permit the government to strengthen its evidence proving Hayat attended a jihadi camp, thus increasing the odds of conviction for both defendants. Ms. Mojaddidi and Mr. Griffin pressed for as fast a trial as possible even after the District Court, over their objections, granted continuances sought by the government. In any event, trial began only eight months after the defendants' arrest. Despite Ms. Mojaddidi's efforts on Hayat's behalf, she could not change the evidence against him. The jury convicted Hayat of on all counts. A separate jury considered the evidence against Umer and could not reach a verdict.

Now, Hayat alleges Ms. Mojaddidi labored under a conflict of interest that affected her representation of him, and that she provided him with incompetent representation. However, the record demonstrates no objective evidence of an actual conflict, financial or otherwise. Nor does it reveal that Ms. Mojaddidi's representation of Hayat was deficient or resulted in prejudice. As the government argued before the evidentiary hearing, most of Hayat's claims fail as a matter of law and could not be advanced by an evidentiary hearing. The evidentiary hearing made that even clearer. Ms. Mojaddidi's testimony was consistent with her 2014 deposition testimony, and confirmed that her strategic and tactical decisions before and during trial were reasonable and sound. Moreover, none of the evidence presented at the hearing supports a finding of prejudice on any of Hayat's ineffectiveness claims. Likewise, Ms. Mojaddidi's 2104 deposition testimony and her consistent testimony at the hearing foreclosed Hayat's claim of any actual conflict, financial or otherwise.

To meet his legal and factual burdens, Hayat relies on less than persuasive tactics. First, to support his legal arguments, he offers the "expert" testimony of several career defense lawyers to replace the applicable legal standard with testimony about what each expert claimed *he* would have done in Mojaddidi's place and in a "perfect situation." Of course, the Strickland standard does not require perfection and recognizes wide variation in what constitutes effective representation. However, Hayat's paid experts—whose opinions were based not on the trial record but primarily on Hayat's pleadings and discussions with his lead counsel in this matter—merely parroted his legal claims. Such testimony is of no value because it seeks to substitute decisional law and the Court's judgment for the judgments of Hayat's hand-picked, career defense advocates. The Court should simply set their testimony aside.

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

3

Second, to account for the void of evidence to support his claims, Hayat offers the testimony of his own lead counsel in this habeas action, Dennis Riordan. Despite consistent evidence to the contrary, Mr. Riordan alleges, with no objective support in the record, that in 2007—after a bruising trial defeat—Ms. Mojaddidi "admitted" to him that her representation of Hayat was conflicted and that she was not competent to represent him. Mr. Riordan also claims Mr. Griffin implicitly affirmed her admission in a private conversation with him.[1] However, Ms. Mojaddidi has consistently refuted Mr. Riordan's otherwise unsupported claims. She did so first in 2007, after he sent her a draft of his declaration alleging her admissions, and she refused to endorse his claims. She also affirmatively denied Mr. Riordan's claims in her 2014 deposition, and repeated those denials in her 2018 testimony at the hearing in this matter. Ms. Mojadiddi's consistent and credible denials, especially when considered together with the rest of the record evidence, weigh heavily against the unsupported claims of Hayat's chief advocate in this matter.

To be sure, Mr. Riordan's allegations are not the neutral claims of a disinterested person. Rather, his accusations are tainted by his conflicted professional relationship with Mr. Mojaddidi. They are also skewed by his impassioned advocacy in this matter. For more than ten years, Mr. Riordan has labored to free Hayat. He has filed thousands of pages of written arguments and supporting exhibits in post-trial motions, on direct appeal, and in support of this habeas action. Along the way, he has argued on Hayat's behalf at a long list of hearings throughout the proceedings. However, from the outset, Mr. Riordan's overheated passion for this case resulted in his use of questionable tactics that have critically damaged the credibility of his factual assertions.

After following Hayat's prosecution in media reports, Mr. Riordan offered his help as Ms. Mojaddidi's co-counsel, days after Hayat was convicted. In that capacity, and without informing her, or Hayat, or the District Court of his ulterior motive, Mr. Riordan undermined his purported joint effort

_____

[1] Surely perceiving them to help his son, Hayat's father capitalized on Mr. Riordan's claims concerning Mr. Griffin's purported statements by invoking the attorney-client privilege to silence Mr. Griffin and prevent fair inquiry into those alleged statements and his joint defense with Ms. Mojaddidi. The ploy appeared orchestrated. Mr. Riordan admitted he discussed with Umer whether to invoke the privilege and referred Umer to his former associate and social friend before Umer invoked the privilege. As a result, Mr. Griffin refused to answer any questions at a deposition and at the hearing. If Umer believed Mr. Griffin's testimony would have helped his son's cause, he would have undoubtedly waived the privilege and allowed him to testify in this matter. That Umer refused to do so speaks volumes about his expectations for how Mr. Griffin would have testified.

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

4

with Ms. Mojaddidi by working to develop evidence against her to support a future habeas action. In doing so, Mr. Riordan abandoned his past practice of using an investigator in favor of collecting evidence from Ms. Mojaddidi on his own, something he has publicly said only a fool would do during litigation. He also destroyed notes he took during his alleged conversations with Ms. Mojaddidi, leaving the Court to rely only on his recollection, and shielding him from cross-examination about gaps, omissions, or conflicting statements he might have recorded in those notes. Those and other questionable tactics cast serious doubt on the credibility of Mr. Riordan's claims as a witness, especially in light of the absence of corroborating evidence in the record, his conflicted relationship with Ms. Mojaddidi, and his irreconcilable role as Hayat's chief advocate.

Consequently, Mr. Riordan's claims must withstand the heaviest scrutiny. They cannot. Undoubtedly, he and Ms. Mojadiddi discussed her defense of Hayat in 2007. He may have also spoken to Mr. Griffin in more detail than the email correspondence in the record supports. (Umer's invocation of the attorney-client privilege prevented fair inquiry into any such discussions.) Ms. Mojaddidi has conceded she spoke "candidly" with Mr. Riordan in the emotional aftermath of Hayat's conviction, and that she "beat herself up" and blamed Mr. Griffin for things. However, the record does not support Mr. Riordan's too-good-to-be-true claims. Instead, the record supports the conclusion that Mr. Riordan heard what he wanted to hear; that he heard what he needed to hear to support habeas claims not otherwise supported by sufficient evidence. Mr. Riordan's declaration and his testimony on those facts, more than 10 years later, are the inevitably skewed recollection of an impassioned and interested advocate. His persistent belief in his unfounded claims is merely the unfortunate but foreseeable result of his deviations from reliable evidence collection methods and his confirmation bias in favor of his client's litigation position.

Mr. Riordan's unreliable testimony cannot support vacating Hayat's lawful conviction. It is the equivalent of a defense lawyer at trial arguing that his client is innocent because his client told him so. It is unreliable because of the means of its alleged collection. It is unreliable because of Mr. Riordan's heavily interested role as Hayat's chief advocate. It is unreliable because Ms. Mojaddidi has denied credibly and consistently Mr. Riordan's claims, both at the time of the original allegations and in sworn testimony in 2014 and again in 2018. It is unreliable because it is contrary to the weight of the

remaining evidence. It is also unreliable because Hayat—through his father (with or without the participation of Mr. Riordan)—has affirmatively prevented the government from testing Mr. Riordan's allegations through fair examination of Mr. Griffin. Indeed, if there is nothing to hide, there is no need to keep Mr. Griffin from testifying.

In sum, the evidentiary hearing did not improve the landscape of evidence for Hayat, and hardly changed it. Nor did the hearing alter the conclusions that must flow from application of controlling legal principles to Hayat's claims. The full record demonstrates Hayat cannot support his claims. His chosen counsel, Ms. Mojaddidi, provided him with independent, zealous, and competent representation. Nothing about her decisions while representing him affected the fundamental fairness of his trial or prejudiced him. Thus, for the reasons set forth in more detail below, because his claims are unsupported or insufficient, the government requests that the Court deny Hayat's petition.

## PROCEDURAL HISTORY

**District Court Proceedings**

On June 7, 2005, Hamid Hayat ("Hayat") and Umer Hayat ("Umer"), son and father, were each charged in a Complaint with one count of Making a False Statement. (CR 1). Johnny Griffin appeared as retained counsel for Umer and stood in for Ms. Mojaddidi, who Hayat later retained as counsel. (CR 1; CR 5).[2] On June 16, 2005, Hayat was charged in an Indictment with Making False Statements (Counts One and Two), and Umer was charged with Making a False Statement (Count Three). (CR 8). On July 1, 2005, the Hon. Garland E. Burrell, Jr. set trial for August 24, 2005, at the request of the defense. (CR 17; Defense Exhibit in Support of Motion for Summary Judgment ("Def. Ex.") EEE.2 at 1:20-2:4). On July 6, 2005, the government moved for an exclusion of time under the Speedy Trial Act. The defense opposed the motion and the Court subsequently denied the motion on July 15, 2005. (CR 18, 20, 22, 25, 26). On August 4, 2005, the government moved to vacate the August 24, 2005 trial date, and for an exclusion of time under the Speedy Trial Act. Over the objection of the defendants, on August 5, 2005, the Court granted the motion and set the matter for further status on October 7, 2005. (CR 29, 30, 31; Def. Ex. EEE.4 at 10:1-14:24).

---

[2] Both defendants were ordered detained following detention hearings (CR 3, 5) and remained in custody throughout the district court proceedings.

On September 22, 2005, Hayat was charged in a Superseding Indictment with Providing, Concealing and Attempting to Conceal Material Support and Resources (Count One), and Making False Statements (Counts Two and Three).  Umer was charged with Making a False Statement (Count Four). (CR 50).  On October 6, 2005, the government moved for an exclusion of time under the Speedy Trial Act.  On October 7, 2005, the Court granted the motion and set the matter for further status on January 6, 2006.  (CR 74).  On January 6, 2006, the Court set the case for trial on February 14, 2006.  (CR 136).

On January 13, 2006, the defendants filed nine motions *in limine*, a motion to dismiss the indictment for outrageous governmental conduct, a motion to compel discovery, a motion for disclosure of Brady/Jencks material, and a motion to dismiss Count Two of the Superseding Indictment on multiplicity grounds.  (CR 143-147).  The Court denied the motions *in limine* and motion to dismiss for outrageous governmental conduct on January 19, 2006.  (CR 149, 152).

On January 26, 2006, Hayat was charged in a Second Superseding Indictment with Providing, Concealing and Attempting to Conceal Material Support and Resources (Count One), and Making False Statements (Counts Two through Four), and Umer was charged with Making False Statements (Counts Five and Six).  (CR 162).  On January 30, 2006, Ms. Mojaddidi filed a revised motion to dismiss Counts Two and Three of the Second Superseding Indictment on multiplicity grounds.  (CR 168).  On February 2, 2006, the Court deferred ruling on the multiplicity motion until after trial (CR 178).  On February 3, 2006, and April 3, 2006, the Court denied the motion to compel discovery.  (CR 185, 280, 281).

Hayat and his father were tried by separate juries from February 14, 2006 to April 25, 2006.[3]  On April 25, 2006, Hamid Hayat was found guilty of all charges by his jury; Umer's jury could not reach a verdict and the Court declared a mistrial as to the charges against him.  (CR 328, 331, 325).  On May 17, 2007, the Court denied Hayat's motion for a new trial.  (CR 329, 339, 441, 482).  On September 10 and 11, 2007, the Court sentenced Hayat to 288 months in custody.  (CR 500, 501).[4]  On November 7, 2007, the Court dismissed without prejudice Hayat's first, premature Section 2255 motion.  (CR 496, 516).

---

[3] On or about March 16, 2006, the defense filed a motion for unredacted Jencks material (CR 246), which the Court denied on March 21, 2006.  (CR 249).

[4] Hayat is in the custody of the Bureau of Prisons and has a scheduled release date of May 2, 2026.

**Direct and Collateral Review**

On March 13, 2013, a divided panel of the Ninth Circuit affirmed Hayat's conviction. See United States v. Hayat, 710 F.3d 875 (9th Cir. 2013). On April 30, 2014, Hayat filed a new petition for relief under 28 U.S.C. § 2255 alleging, among other claims, that Ms. Mojaddidi had an actual conflict of interest that adversely affected her performance and that her representation was ineffective. (CR 531). The parties, on an informal basis, produced or made documents relevant to the petition available for inspection from June to July 2014. On August 11, 2014, the parties, with leave of the Court, conducted a deposition of Ms. Mojaddidi. (CR 540; see also Gov. Sup. Ans. Ex. 22: August 11, 2014 Deposition of Wazhma Mojaddidi ("W.M. Depo.")). The parties, with leave of the Court, scheduled the deposition of Mr. Griffin for September 19, 2014. (CR 540). Mr. Griffin refused to answer any questions as part of the deposition, claiming that Umer refused to waive the attorney-client privilege, and the Court postponed his deposition until further notice. (See CR 542).

On November 13, 2014, Hayat filed a motion for summary judgment on his claims of conflict and ineffective assistance. (CR 548). With leave of the Court, the government filed its opposition on February 27, 2015. (CR 555, 557). Hayat filed a reply on March 20, 2015. (CR 558). On April 22, 2015, the Court heard the parties' arguments on Hayat's motion summary judgment.[5] (CR 569).

On March 10, 2016, Magistrate Judge Kellison issued Findings and Recommendations to the District Court, recommending denial of Hayat's motion for summary judgment and ordering the parties to file objections by March 24, 2016. (CR 588). Hayat filed objections to the Court's Findings and Recommendations on April 29, 2016. (CR 593). On May 11, 2016, the Court granted the government's request for leave to file its response to Hayat's objections to Judge Kellison's Findings and Recommendations, which the government filed on May 27, 2016. (CR 596). On November 11, 2016, the District Court affirmed the denial of Hayat's summary judgment motion, adopting in part and rejecting in part Judge Kellison's Findings and Recommendations. (CR 600).

On January 13, 2017, this Court held a status conference. (CR 604-05). On March 14, 2017, the

---

[5] While his summary judgment motion was pending, Hayat filed motions seeking leave to: (i) take foreign depositions, (CR 571); and (ii) to conduct discovery by interrogatories and requests for admissions, (CR 574), which the government opposed. (CR 581). The Court denied both discovery motions as premature. (CR 584).

Court granted the government leave to file a substantive supplemental answer based on the exhibits and discovery to that point, which argued, in part, that no evidentiary hearing was necessary and Hayat's claims were ripe for disposition on the record at that time. (CR 609-611). On June 7, 2017, the Court ordered an evidentiary hearing on Hayat's conflict and ineffective assistance claims, which, after a modification to the schedule, began on January 29, 2018, and lasted five days. (CR 616, 621, 663, 664, 696, 697, 699, 700, 701, 703). Over the government's objection, the also Court also permitted remote depositions by video-conference of four witnesses from Pakistan, whose testimony was taken on February 14 and 15, 2018, during night-court session between approximately 6:30 p.m. and 10:00 p.m. (CR 675, 683). The parties preserved objections to hearsay and relevance. (Tr. 440-41, CR 708).

Meanwhile, before the evidentiary hearing began, the Court granted, in part, Hayat's motion seeking discovery related to his Brady claims. (CR 630). The government moved for reconsideration, which Hayat opposed. (CR 633, 635). The Court granted the motion for reconsideration but affirmed its earlier order on modified grounds. (CR 649). The government moved for a stay of this Court's discovery orders and sought reconsideration of those orders by the District Court, which granted the motion to stay and reversed this Court's discovery orders. (CR 661, 665, 668, 686).

This Court ordered a post-hearing briefing schedule, which the parties extended by stipulation. (CR 706, 709, 719, 720). Hayat filed his opening brief, and a separate supplement, on April 18, 2018. (CR 721, 722). This opposition follows.

## STATEMENT OF RELEVANT FACTS

### I.   THE GOVERNMENT'S CASE AT TRIAL

At trial, the government presented abundant evidence to prove that Hayat wanted to attend jihadist training camps in Pakistan, that he attended a jihadist training camp in Pakistan between 2003 and 2004, that he returned to the United States with the intent to wage violent jihad, and lied about his training and intentions to the FBI—all consistent with his confession to FBI agents. In its case in chief, the government called eleven percipient witnesses and three expert witnesses.[6] A summary of the relevant trial testimony follows.

---

[6] The percipient witnesses were: (1) Special Agent ("SA") Lawrence Futa (RT 444-490) (May 30 interview of

**A.    Hayat Told Cooperating Witness Naseem Khan of His Intentions to Attend a Jihadi Training Camp in Pakistan**

Naseem Khan ("Khan"), a cooperating government witness, met Hayat in 2002.  (RT 847:4-22).  Thereafter, Khan, whom Hayat described as his "best friend" (Government's Exhibit to Supplemental Answer ("Gov. Sup. Ans. Ex.") 67.1 at 37), participated in a series of recorded and unrecorded conversations with Hayat.  Hayat often spoke with Khan about the existence of jihadi training camps in Pakistan and Hayat's intent to attend such a camp.  Hayat described a number of jihadi camps to Khan and told Khan several times that jihadi training was going on in Mansehra, a city and district of Pakistan located in Khyber Pakhtunkhwa, formerly known as the Northwest Frontier Province.[7]  (Gov. Sup. Ans. Ex. 2 at 5-6).  Hayat explained that the camp in Mansehra was run by Jaish-e-Muhammed ("JEM") and its leader Masood Azhar ("Azhar"), and he discussed the nature of training at the camp.  (Gov. Sup. Ans. Ex. 2 at 7-8, 10, 26-27).  Hayat told Khan that people came to the camp from all over the world, including America, and that there were lots of people, including Hayat's grandfather and his uncle, who could help someone get into a camp.  (Gov. Sup. Ans. Ex. 2 at 25-26).

Hayat told Khan that Hayat intended to attend a jihadi training camp and then engage in violent jihad.  Starting in late March 2003, Hayat pledged to Khan that Hayat was ready for jihad, stating, "I'm ready, I swear, friend."  (Gov. Sup. Ans. Ex. 3 at 18).  In April 2003, Hayat told Khan that Hayat had "one objective now" – "I'm going for training."  (Gov. Sup. Ans. Ex. 4 at 65).  In July 2003, Hayat, then in Pakistan, told Khan that the training camps had been closed and that Hayat's grandfather had advised

Hayat); (2) SA Harry Sweeney (RT 490-536) (June 4, 2005 interview of Hayat); (3) SA Tenoch Aguilar (RT 536-792) (June 4-5, 2005 interviews of Hayat); (4) Linguist Mr. Abdul (RT 792-837) (translations); (5) Cooperating Witness Nasseem Khan (RT 838-1385, 1758-1846; 2935-87) (interactions with Hayat); (6) Linguist Pamas Bhatti (RT 1852-1886) (translations); (7) SA Timothy Harrison (RT 1887) (seizure of supplication from Hayat); (8) SA Bridget Cox (RT 1939-68, 2116-85, 2277-2419) (search of Hayat home); (9) SA Walter Hart (RT 2185-97) (air travel by Hayat from Pakistan); (10) Inspector David Martinez (RT 2198-2204) (Hayat's air travel); and (11) Linguist Syed Abbas (RT 2204-67) (translation of Hayat scrap book).  The expert witnesses were: (1) Khaleel Mohammed (RT 1924-39, 1968-2116) (jihadi supplication); (2) Hassan Abbas (RT 2560-2934) (Pakistani matters); and Eric Benn (RT 2987-3119) (satellite imagery).  RT refers to the record transcript of the trial proceedings.  (See Gov. Sup. Ans. Ex. 20).

[7] Hayat lived with his grandparents in Rawalpindi, Pakistan, between the ages of approximately 7 and 18, from 1990 until 2000, therefore he was familiar with Pakistan.  (See Gov. Sup. Ans. Ex. 8 at 49-50).  From approximately mid-2000 through early 2003, Hayat resided in the United States, in Lodi, California.  Id.  On or about April 23, 2003, Hayat re-entered Pakistan.  Hayat left Pakistan to return to the United States approximately two-years later, on or about May 27, 2005.  (See RT 550:6-555:17, 559:18-25, 2187:17-2194:7; 2196:11-2197:5).

Hayat that he should go to camp but that the conditions were not right at that time. Hayat then stated that if the camp had been open, Hayat would have "been there." (Gov. Sup. Ans. Ex. 5 at 10). Finally, in August 2003, Hayat told Khan that Hayat was going to attend a training camp after Ramadan, which was to occur at the end of November 2003. (Gov. Sup. Ans. Ex. 6 at 14-15; RT 2599:1-13).

Hayat's conversations with Khan demonstrated that Hayat had a clear interest in violent jihad and served as further evidence of Hayat's knowledge and intent in this case. Hayat asserted that jihad was the duty of all Muslims, and that it was "our duty" to help Muslims anywhere in the world where Muslims or Muslim countries were attacked. (Gov. Sup. Ans. Ex. 2 at 31). Hayat spoke with pride to Khan about young men, many from his grandfather's madrasa in Pakistan, who had gone to jihadi training or for jihad in Afghanistan. (Gov. Sup. Ans. Ex. 1 at 10-13; Gov. Sup. Ans. Ex. 2 at 28-30). Hayat also said that participating in jihad was a path to martyrdom. (See Gov. Sup. Ans. Ex. 1 at 40 (knowing martyrs of extremist group Sipah-e-Sahaba ("SSP") and supporting their families)); Gov. Sup. Ans. Ex. 2 at 29 (relating story of "fortunate" Afghan martyrs); Gov. Sup. Ans. Ex. 2 at 29-30 (relating story of friend going to jihad and inspired to "die in God's path" for forgiveness of his sins)). Hayat expressed open disdain for groups that Sunni Muslims considered infidels, including Shia and Jews. For example, Hayat stated that he was "so pleased" that a jihadi group had cut Wall Street Journal reporter Daniel Pearl "into pieces." Hayat noted that Pearl "was Jewish" and that as a result of this "good job," now "they can't send one Jewish person to Pakistan." (Gov. Sup. Ans. Ex. 4 at 49; see also Gov. Sup. Ans. Ex. 1 at 21 (describing Shias as "a big nasty group" of "unbelievers")).

Hayat spoke to Khan unflinchingly about his hatred for the United States. At one point Hayat told Khan that the United States was his country "in name only" and that his "heart is in Pakistan." (Gov. Sup. Ans. Ex. 1 at 35; see Gov. Sup. Ans. Ex. 4 at 37 (referring to the President as "Bush, the worm"); Gov. Sup. Ans. Ex. 1 at 38-40 (speaking approvingly of extremist attacks on an American hotel, Embassy, and cinema in Islamabad)).

Hayat also demonstrated his familiarity with numerous Pakistani extremist groups and their leadership in his conversations with Khan. For example, Hayat made clear that he admired Azhar, the JEM leader, and was familiar with the contents of Azhar's anti-Semitic book: The Forty Maladies of Jews. (Gov. Sup. Ans. Ex. 2 at 19-20; see also Gov. Sup. Ans. Ex. 7 at 3-9 (expressing familiarity with

extremist group SSP and describing audio tapes Hayat gave to Khan that featured a speech by an SSP leader)).

### B. After Initial Denials, Hayat Confessed to the FBI That He Attended Jihadi Training and Intended to Wage Violent Jihad in the United States

On May 30, 2005, while Hayat was at the airport in Tokyo on his return trip to the United States from Pakistan, FBI Special Agent ("SA") Larry Futa questioned Hayat about his time in Pakistan. Hayat denied that he attended any kind of terrorist camp in Pakistan or elsewhere. (RT 457:7-12). A few days later, on June 3, 2005, FBI SAs Tenoch Aguilar and Sean Wells questioned Hayat about his time in Pakistan at Hayat's home in Lodi, California. Hayat again denied that he ever attended a jihadi camp, attended a jihadi madrasa, or that he was a jihadi member. (RT 566:2-23).

The next day, June 4, 2005, FBI SA Harry Sweeney ("SA Sweeney") questioned Hayat at the Sacramento FBI offices. After waiving his Miranda[8] rights, Hayat initially denied that he had received any weapons training at a jihadi terrorist training camp and denied that he had received any training at a jihadi camp to fight against the United States. (RT 493:11-497:12, 499:9-500:5). After SA Sweeney asked Hayat whether it was possible that Hayat did not realize he was going to a jihadi training camp and thought it was something else like a religious education camp, Hayat admitted that he had attended a jihadi training camp in 2000 for several days and explained details about the camp and his attendance. (RT 520:21-522:3, 521:4-522:10). SA Sweeney next told Hayat that the FBI had certain "technical" capabilities, and asked Hayat whether there would be any reason for Hayat's image to be on a satellite photograph during his 2003 visit to Pakistan. (RT 525:7-526:4). Hayat then admitted that he attended a jihadi training camp in 2003, in the vicinity of Balakot, for three months and explained details about the camp and his attendance. (RT 500:24-503:6).

Agents interviewed Hayat on videotape between 4:45 p.m. and 7:00 p.m., on June 4, 2005, and between approximately 12:37 a.m. and 3:00 a.m., on June 5, 2005. (RT 582:19-584:1). Excluding breaks, each interview lasted approximately two hours. (Id.) Hayat repeatedly admitted that he attended a jihadi camp in 2003-2004 (Gov. Sup. Ans. Ex. 8 at 15, 18, 21, 90-92), as well as in 2000 (Gov. Sup.

---

[8] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS                    12

Ans. Ex. 8 at 48-49, 51, 91).  Hayat told agents at least six separate times that the camp he attended was in the vicinity of Balakot, in the Northwest Frontier Province.  (Gov. Sup. Ans. Ex. 8 at 14, 21-22, 110, 113, 197).  Hayat explained, in detail, how he traveled from Rawalpindi to the camp in the Province. (Gov. Sup. Ans. Ex. 8 at 4, 7-8, 82-83).  Hayat stated that he was at the camp for a period of months, once stating three and one-half months (Gov. Sup. Ans. Ex. 8 at 18, 114) and, later, six months.  (Gov. Sup. Ans. Ex. 8 at 114-15).  He identified various time periods that he attended the camp, all from approximately October 2003, through November 2004.  (Gov. Sup. Ans. Ex. 8 at 15, 19-21, 90-91).

Hayat described the layout of the camp including buildings, designated living and teaching facilities, and an explosives and firearms training area.  (Gov. Sup. Ans. Ex. 8 at 83-87, 89, 194-196). Hayat stated that there were numerous attendees, once suggesting as many as seventy attendees, and later suggesting 200.  (Gov. Sup. Ans. Ex. 8 at 9-10, 196).  Hayat described the trainees as being between ages 18 to 30 (Gov. Sup. Ans. Ex. 8 at 61), mostly Pakistani (Gov. Sup. Ans. Ex. 8 at 13), and speaking mostly Urdu with some Pashto (Gov. Sup. Ans. Ex. 8 at 13-14).  Hayat stated that the camp trained him in physical fitness (Gov. Sup. Ans. Ex. 8 at 18, 44), fighting (Gov. Sup. Ans. Ex. 8 at 69), firearms (Gov. Sup. Ans. Ex. 8 at 18, 42-43, 45-46, 115), as well as what Hayat believed to be explosives (Gov. Sup. Ans. Ex. 8 at 39, 46-48).  Hayat reported that he received pistol training (Gov. Sup. Ans. Ex. 8 at 18) and training with a rifle or shotgun (Gov. Sup. Ans. Ex. 8 at 45), and specifically that he first shot at a bull's-eye and, later, that he shot at targets with pictures of U.S. leaders on them.[9] (Gov. Sup. Ans. Ex. 8 at 43-44, 96, 115, 174-75).  Hayat initially stated that he did not know the duration of the training (Gov. Sup. Ans. Ex. 8 at 11) but later said that the training lasted approximately five to six months.  (Gov. Sup. Ans. Ex. 8 at 79).  Finally, Hayat stated repeatedly that the purpose of the camp was to train individuals for jihad.  (Gov. Sup. Ans. Ex. 8 at 12, 53, 67-68).

Hayat made a number of statements regarding his intentions after training.  At one point, Hayat stated that attendees at these camps could to go wherever they wanted to go after training (Gov. Sup. Ans. Ex. 8 at 53) and that trainees were not given specific assignments.  (Gov. Sup. Ans. Ex. 8 at 48). Hayat told agents that he was prepared to fight if he received orders (Gov. Sup. Ans. Ex. 8 at 127-28),

---

[9] Umer Hayat also stated that he visited a camp and saw trainees shooting at targets with pictures of American leaders on them.  (Gov. Sup. Ans. Ex. 21 (4U5.4-4U5.6)).

that he had not yet been told what targets to attack, and that the target would come with the orders. (Gov. Sup. Ans. Ex. 8 at 157-58). Hayat also admitted that he was training for jihad, that he came to the United States for jihad, and that he was awaiting orders. (Gov. Sup. Ans. Ex. 8 at 160-61). He reiterated that he had been trained for jihad and was told to come to the United States for jihad. (Gov. Sup. Ans. Ex. 8 at 161-64).

### C.    Umer Hayat Admits He Knew Hamid Hayat Went to Training Camps and that Umer Hayat Personally Saw a Camp.

On June 4, 2005 and June 5, 2005, FBI agents also conducted videotaped interviews of Umer Hayat. (Gov. Sup. Ans. Ex. 21 (4U1.1-4U8.3); RT at 1420:13-1426:14; Gov. Sup. Ans. Ex. 21 (5U1.1-5U8.2); RT 1426:15-1430:3). During both interviews, Umer stated he knew that his son attended a training camp. (Gov. Sup. Ans. Ex. 21 (4U1.1); RT 1432:8-1433:13; RT 1433:14-21; RT 1434:7-1435:5 (5U1.1-1.6) Umer also stated that he visited one of the camps that Hamid attended, and stood at the gate. (Gov. Sup. Ans. Ex. 21 (4U5.1-4U5.4, 5U5.1-5U5.2)). In addition, Umer stated that Hamid attended a camp in 2000, and another one in late 2003 to early 2004, corroborating Hamid's confession. Umer also confirmed that Hamid's grandfather (Umer's father-in-law) was heavily involved in Pakistani politics and could grant access to the camps. (Gov. Sup. Ans. Ex. 21 (5U5.2, 5U8.2)). Umer also stated that Hamid's uncle, Attique Ur-Rehman, had trained at camps and gone to fight in the Afghan-Soviet war as a mujahedin. (Gov. Sup. Ans. Ex. 21 (5U1.3)).

### D.    A Series of Extremist Publications From 1999-2003 Discovered in Hayat's Living Space Further Evidenced Hayat's Intent

At trial, the government introduced a series of publications Hayat possessed, many that pre-dated his friendship with Khan, that showed Hayat's belief in violent jihad and his intent in this case. First, the government introduced Hayat's "jihadi scrapbook" (Gov. Sup. Ans. Ex. 9; RT 2216:11-2226:17), a scrapbook of Urdu newspaper and magazine articles – most from 1999, when Hayat previously was in Pakistan – bearing Hayat's name and found by FBI investigators in a converted garage Hayat used at his parents' house. (RT 857:21-858:6, 2159:3-2168:18, 2172:-2173:4; Gov. Sup. Ans. Ex. 1 at 5; Gov. Sup. Ans. Ex. 3 at 19).

Articles in the scrapbook extolled the virtues of Islamic extremism. For example, the articles:

described a "death to America" procession and a "long live Taliban" rally; criticized the United States government as the "biggest terrorist" and "an enemy of Islam;" expressed support for Osama Bin Laden and the Taliban; praised notorious Pakistani/Egyptian terrorists or extremist clerics; and threatened harm against Americans if Afghanistan was attacked. (See RT 2216:11-2226:17, 2780:20-2806:15). Many of the articles came from publications associated with Pakistani extremist groups including JEM and Harakut-ul-Mujahedin ("HUM"). (See RT 2216:11-2226:17, 2803:16-23; 2788:9-22, 2792:6-18).

Hayat showed Khan the scrapbook and highlighted extremist articles of interest. (See, e.g., RT 895:8-915:11, 917:19-928:11). For example, Hayat expressed sympathy towards the Taliban while showing Khan scrapbook articles, and Hayat even boasted that Hayat's grandfather had a close relationship with Taliban leader, Mullah Omar. (Gov. Sup. Ans. Ex. 1 at 19, 28-34; RT 907:16-908:11, 912:10-913:2, 926:17-928:11; see also Gov. Sup. Ans. Ex. 1 at 25-26; RT 921:6-923:12 (describing article about "Taliban" rioting and burning cars of white "unbelievers" at English newspaper in Pakistan); Gov. Sup. Ans. Ex. 1 at 9-21; 2795:13-2796:2 (describing article about the murder of a prominent Shia as "the best news of all"); Gov. Sup. Ans. Ex. 1 at 21-25; RT 913:21-914:21, 2802:2-12 (reviewing article about, and speaking approvingly of, extremist cleric, Ludhianvi)).

The government also introduced at trial a magazine (Gov. Sup. Ans. Ex. 10; Gov. Sup. Ans. Ex. 11 at 1-2) recovered by FBI investigators during a search of the converted garage Hayat occupied. (RT 2116:25-2119:5). The magazine was a weekly JEM publication, issued in Pakistan in June 2000, at a time when Hayat previously was in Pakistan. (RT 2735:1-22, 2737:1-2738:7). The magazine, edited by Azhar, the JEM leader: instructs readers to focus on jihad; details a JEM attack in the Kashmir; profiles jihadi "martyrs" in the Kashmir, details efforts of Filipino mujahedin, and explains Muslims' obligations to help mujahedin everywhere. (Gov. Sup. Ans. Ex. 11 at 1-2; RT 2735:23-25, 2744:7-2751:21). Agents also recovered two other Urdu books authored by Azhar: The Virtues of Jihad (Gov. Sup. Ans. Ex. 12; Gov. Sup. Ans. Ex. 13 at 1-3), published in 2000 in Karachi, Pakistan, from Hayat's garage area (RT 2116:25-2119:5, 2127:5-11; 2719:15-2720:6); and Reports from the Window of Prison (Gov. Sup. Ans. Ex. 14; Gov. Sup. Ans. Ex. 15 at 1-2), published in 2003 in Karachi, Pakistan, from the laundry room of Hayat's parents' home. (RT 1859:25-1864:6, 2753:18-2754:6). In these books, Azhar: extols and celebrates the concept of violent jihad; argues that violent jihad was compulsory for every Muslim;

argues that violent jihad should be waged all over the world, including in the United States; expresses hatred toward Indians, Hindus, Jews, Christians, Muslim minority groups, and Americans; and argues that the ideal system of government would be an Islamic state, such as the government of the Taliban. (RT 2720:12-2722:6, 2754:18-2756:22).

**E.  Expert Testimony Regarding the Existence of Militant Camps in the Balakot Region Corroborated Hayat's Confession to the FBI**

Hassan Abbas ("Abbas"), a government expert on Pakistani political and extremist groups, testified that jihadi training camps, in fact, existed in Pakistan between 2000 and 2005.  (RT 2622:4-2623:13).  Abbas described: the extremist groups known to run the camps (RT 2623:14-2624:15); the purpose of the camps (RT 2624:23-2625:5); typical camp attendee backgrounds (RT 2625:19-2630:6); the typical camp size and facilities, including security and training (RT 2631:20-2634:4, 2637:12-2638:9); typical religious, political and paramilitary training at the camps (RT 2638:10-2640:12); typical length of training at the camps (RT 2640:20-2641:10); what attendees did after they attended these camps (RT 2641:11-20); and the regions where these camps were known to be located (RT 2634:14-2636:9).  Of note, Abbas testified about the existence of a particular JEM camp in Balakot, known as the madrasa Ahmed Shaheed (RT 2691:1-2692:4).

**F.  Expert Testimony and Satellite Evidence Corroborated Hayat's Confession that He Attended a Jihadi Camp in the Balokot Region**

Government expert Eric Benn ("Benn"), a senior imagery analyst from the Department of Defense (RT 3004:11-19), confirmed that militant training camps, in fact, existed in Pakistan including camps in the vicinity of Balakot.  (RT 3082:7-3083:1).  In addition, viewing certain 2001 and 2004 satellite-derived images in the vicinity of Balakot, Benn opined that it was a "good solid possible" – that is, a 50% confidence or thereabouts – that the buildings and location depicted on the images constituted a militant training camp.  (RT 3062:2-12).  Finally, based on his review of the images combined with Hayat's videotaped interview statements, Benn opined that he was "very confident" that the buildings and location depicted in the images were a militant training camp – that is, a "ballpark" of 60% to 70% confidence level; "much more likely than not."[10]  (RT 3073:5-3075:1, 3114:24-3115:3).

---

[10] Benn also testified about certain signatures of these camps. For instance, he: identified buildings that would

**G.**   **The Jihadi Supplication Hayat Carried Provided Further Evidence That Hayat Returned to the United States Intending to Engage in Violent Jihad**

The government introduced at trial an Arabic supplication, or ta'wiz, Hayat possessed in his wallet. (Gov. Sup. Ans. Ex. 16, RT 1968:19-1970:20). Government expert Dr. Khaleel Mohammed testified that this ta'wiz was an uncommon and non-peaceful supplication which translated as: "Oh Allah, we place you at their throats and we seek refuge in you from their evils." (RT 1970:1-23, 1973:18-22, 1974:7-19, 2007:22-2008:12). He opined, among other things, that the ta'wiz would be used by a jihadi or a warrior who perceived himself to be engaged in a war for God against an enemy and who was completely ready to act. (RT1974:15-1975:1; 2008:24-2009:13; 2018:13-2019:17).

## II.   THE DEFENSE CASE AT TRIAL

At trial, Ms. Mojaddidi thoroughly cross-examined all fourteen government witnesses. In addition, the defense called percipient witnesses and an expert of its own.[11] As set forth in more detail below, Ms. Mojaddidi zealously challenged the government's evidence, presented substantial defense evidence, and forcefully argued that the government failed to prove its case. (See RT 4285:6-4330:21). However, the jury to convict Hayat on the strength of the compelling evidence of guilt offered by the government at trial.

In sum, Ms. Mojaddidi argued that:

- The government's cooperating witness, Naseem Khan, also known as "wildcat," was a wildly out-of-control, unsupervised, highly paid, liar and manipulator who encouraged Hayat to go to a camp and induced Hayat to say that he would go to a camp. (RT 4292:3-4307:20).

be found in militant training camps (RT 3033:1-12); explained that the camps are usually rurally located (RT 3021:1-3024:1; 3030:24-3031:8; 3044:15-19; 3032:4-20); explained that there is frequently security at the camps (RT 3032:21-25); and explained that these camps have physical and weapons training (RT 3033:13 3034:21).

[11] The percipient witnesses were: (1) SA Eric Barnhart (RT 3188-3316) (handling cooperating witness Khan); (2) SA Rachel Pfifer (RT 3316-3413) (same); (3) SA Terry Rankhorn (RT 3414-34) (interactions with Khan); (4) SA Michael Caputo (RT 3498-3580, 3896-3913) (handling Khan); (5) James Lazor (RT 3580-3614) (visit to Balakot area); (6) SA Gary Schaaf (RT 3614-3750) (Hayat interview); (7) SA Keith Slotter (RT 3813-43) (decision to record Hayat interview); (8) Taj Khan (RT 3843-3854) (whether two wanted men gave speeches at a Lodi mosque in 1998-99). The expert was Dr. Anita Weiss (RT 4044-4177) (Pakistani culture and practice of carrying a ta'wiz).

- Hayat visited Pakistan with his family for innocent and lawful purposes during the time in question. Hayat sincerely cooperated during initial FBI interviews, truthfully recounted his innocent experiences in Pakistan, and truthfully denied attending a camp. (RT 4307:21-4311:9).

- Hayat's confession during subsequent FBI interviews was meaningless and unreliable. Through leading questions and coercion, Hayat was intimidated to say the things that the FBI wanted him to say. Indeed, the reason Hayat could not accurately describe a camp in Pakistan was because he never went to such a camp. (RT 4311:10-4320:17).

- The four jihadi publications found at the Hayat home were commonly circulated books and articles in Pakistan. Anti-American sentiments are common among Pakistanis and it is not shocking that the articles and books espoused those views. None of the items indicated that Hayat actually attended a camp. Moreover, reading about jihad doesn't make you a jihadi, any more so than reading a murder novel makes you a murderer. (RT 4321:7-25).

- The ta'wiz Hayat carried did not prove that he attended a camp. The government expert, Dr. Mohammed, had no reliable basis to testify that it was a prayer carried by a jihadi warrior, and had no understanding of the cultural context for carrying such a prayer in Pakistan. Defense expert Dr. Anita Weiss, by contrast, reasonably testified that travelers in Pakistan commonly carry prayers in Arabic, such as the one at issue, for safety reasons. (RT 4323:15-18).

- The government's expert, Hassan Abbas, was biased against Pakistan and his highly-paid expert testimony was not trustworthy. (RT 4324:3-4325:24).

- Satellite images offered by the government and that purportedly depicted a military training camp did not prove that Hayat attended a camp, and, in fact, suggested that there was a reasonable doubt on the question. The government's expert, Eric Benn, testified that, after watching videotape of Hayat's purported confession, he was 60 to 70 percent sure that the camp was a militant training camp. Thus, by the government's expert's own estimation, there was a 30 to 40 percent chance that the satellite images did not depict a camp which could constitute reasonable doubt. (RT 4327:20-24).

- It was implausible that the governments of Pakistan and the United States would allow a camp to persist after 2001. Both government expert Eric Benn and defense witness James Lazor testified that there was a Pakistani military site just two miles away from the camp depicted in the satellite imagery. Pakistan and the United States would have shut this camp down if it really was a terrorist training camp. (RT 4328:1-4329:7).

## ARGUMENT

### Standard for Relief under § 2255

Under 28 U.S.C. § 2255, a district court may discharge or re-sentence a defendant if it concludes that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. A petitioner may not prevail on a motion under § 2255 merely by showing that some error occurred before the trial court. Rather, relief is available only if "the claimed error constituted a fundamental defect which inherently results in a complete miscarriage of justice." United States v. Addonizio, 442 U.S. 178, 185 (1979), abrogated on other grounds by rule, (internal quotation marks and citations omitted). Indeed, a petitioner seeking relief in a collateral attack "must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1982) ("we have long and consistently affirmed that a collateral challenge may not do service for an appeal."); see also Addonizio, 442 U.S. at 184 ("It has … long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.").

### III.   HAYAT BEARS THE BURDEN TO ESTABLISH INEFFECTIVE ASSISTANCE OF COUNSEL RESULTING IN PREJUDICE.

#### A.   The Two-Prong Strickland Standard Governs Hayat's Ineffective Assistance of Counsel Claims

The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. Strickland v. Washington, 466 U.S. 668, 686 (1984); see also Harrington v. Richter, 562 U.S. 86, 110 (2011) ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."). In Strickland, the Supreme Court established a two-pronged test that requires a defendant to establish by a preponderance of the evidence: (1) that his counsel's performance fell below an objective standard of reasonableness; and (2) that the deficient performance prejudiced his defense. Id. at 687; United States v. Quintero-Barraza, 78 F.3d 1344, 1347 (9th Cir. 1995); United States v. Taylor, 802 F.2d 1108 (9th Cir. 1986). "If either prong is not met, [the Court] must dismiss the claim." United States v.

Sanchez-Cervantes, 282 F.3d 664, 671 (9th Cir. 2002).

### 1. There is a strong presumption that Hayat's trial counsel's strategic decisions were objectively reasonable.

In order to satisfy the first prong of the Strickland the defendant must show that counsel made errors so serious that she was not functioning as the counsel guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 685. The Constitution does not guarantee infallible representation. Cooper v. Fitzharris, 586 F.2d 1325, 1330 (9th Cir. 1978). To establish ineffectiveness, the defendant must identify the acts or omissions that are outside the broad range of reasonable professional judgment.[12] Id. at 689-690; Eggeleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986); United States v. Schaflander, 743 F.2d 714, 717-718 (9th Cir. 1984) cert. denied, 470 U.S. 1058 (1985). A defendant must prove serious derelictions on the part of counsel. McMann v. Richardson, 397 U.S. 759, 774 (1970). "The object of an ineffectiveness claim is not to grade counsel's performance." Strickland, 466 U.S. at 697. Rather, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. The Court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. at 718. To be unreasonable, the performance must be such that "*no competent counsel would have taken the action that [the petitioner's] counsel did take*." Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis in original).

There is a strong presumption that counsel's conduct fell within the wide range of reasonable representation. Strickland, 466 U.S. at 689; United States v. Cochrane, 985 F.2d 1027, 1030 (9th Cir. 1993); United States v. Hamilton, 792 F.2d 837, 839 (9th Cir. 1986). Judicial scrutiny of counsel's performance must be highly deferential because it is "all too tempting for a convicted defendant to second-guess counsel's assistance after conviction or adverse sentence." Strickland, 466 U.S. at 689. Counsel's strategic choices made after thorough investigation of law and facts relevant to plausible

---

[12] Hayat claims that Ms. Mojaddidi's inexperience left her "incapable of providing Hamid with a constitutionally adequate defense." (Pet. at 5:11-13). The Supreme Court rejected inexperience in general and inexperience in the subject matter as grounds for ineffectiveness in United States v. Cronic, 466 U.S. 648, 665-66 (1984) overruled on other grounds by Sawyer v. Smith, 497 U.S. 227 (1990). "OPHB" refers to Hayat's Opening Post-Hearing Brief. CR 721.

options are virtually unchallengeable.  Id. at 690-91.  Trial counsel's strategic decisions are constitutionally effective so long as they "might be considered sound trial strategy."  Darden v. Wainwright, 477 U.S. 168, 186 (1986).  Given the strong presumption in favor of competence, the petitioner's burden of persuasion is a heavy one.  Kimmelman v. Morrison, 477 U.S. 365 at 384.  Trial counsel's inability to remember her reasons for conducting the trial in the manner that she did will not overcome the Strickland presumption of effective performance.  Harrington, 562 U.S. at 109 (a court "may [not] insist counsel confirm every aspect of the strategic basis for his or her actions.  There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'"); Greiner v. Wells, 417 F.3d 305, 326 (2d Cir. 2005).

The objective reasonableness standard recognizes that defense counsel have a broad range of tactical choices.  See James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994); Strickland, 466 U.S. at 689-90 ("Even the best criminal attorneys would not defend a particular client in the same way.").  Counsel need not recognize and assert every possible defense and argument.  Woratzeck v. Ricketts, 820 F.2d 1450, 1453 (9th Cir. 1987), vacated on other grounds, 859 F.2d 1559 (9th Cir. 1988).  A tactical decision by counsel that is not objectively unreasonable, but with which the defendant disagrees, does not constitute ineffective assistance of counsel.  Guam v. Santos, 741 F.2d 1167, 1169 (9th Cir. 1984); Hughes v. Borg, 898 F.2d 695, 703 (9th Cir. 1990).  The Ninth Circuit has continuously warned it will "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." Campbell v. Wood, 18 F.3d 662, 673 (9th Cir. 1994).  Therefore, "the defendant 'must overcome the presumption that under the circumstances the challenged action might be considered sound trial strategy.'"  Turner v. Calderon, 281 F.3d 851 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 689).

While the "character of a particular lawyer's experience may shed light in an evaluation of his actual performance … it does not justify a presumption of ineffectiveness in the absence of such an evaluation."  United States v. Cronic, 466 U.S. 648, 665 (1984) (rejecting ineffectiveness claim in fraud case based on allegations appointed counsel was young, practiced real estate law, and was facing his first jury trial), overruled on other grounds by Sawyer v. Smith, 497 U.S. 227 (1990).  To the contrary, "in considering a claim of ineffective assistance of counsel, it is not the experience of the attorney that is evaluated, but rather, [her] performance."  LaGrand v. Stewart, 133 F.3d 1253, 1275 (9th Cir. 1998).

Mere lack of criminal experience and lack of trial experience do not automatically render an attorney ineffective to represent criminal clients.  Id.  See also Cronic, 466 U.S. at 665 ("Every experienced criminal defense attorney once tried his first criminal case."); Ortiz v. Stewart, 149 F.3d 923, 933 (9th Cir. 1998) (rejecting ineffectiveness claim in murder and arson case and argument that counsel had practiced four years before taking case, two of which were spent as a justice of the peace); United States v. Lewis, 786 F.2d. 1278, 1281 (5th Cir. 1986) ("An attorney can render effective assistance of counsel even if [s]he has had no prior experience in criminal advocacy."); In Re Grand Jury Subpoena, 739 F.2d 1354, 1358 (8th Cir. 1984) ("Unfamiliarity with an area of the law does not justify a presumption of ineffectiveness."); United States v. Merritt, 528 F.2d 650, 651 (7th Cir. 1976) ("[a]dmission to the bar allows [a court] to assume that counsel has the training, knowledge, and ability to represent a client."). cf Allen v. Woodford, 395 F.3d 979, 998 (9th Cir. 2005). ("Trial counsel [in a capital case preceding the 1985 ABA recommendation to the contrary] cannot be said to be constitutionally ineffective for deciding not to bring in co-counsel, unless there is some reason ... why the first lawyer is unable to provide adequate representation.").  As with all ineffectiveness claims, Hayat must show that Ms. Mojaddidi engaged in specific acts or omissions that were ineffective.  Woods v. Sinclair, 655 F.3d 886, 907 (9th Cir. 2011), judgment vacated on other grounds, 132 S. Ct. 1819 (2012).

### 2. Hayat also bears the burden to show that any alleged ineffectiveness undermines confidence in the verdict.

In addition to overcoming the presumption that counsel's decisions were reasonable, a defendant alleging ineffective assistance also "must show there is some reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; United States v. McMullen, 98 F.3d 1155, 1157 (9th Cir. 1996).  This standard is "rigorous" and "highly demanding."  Kimmelman, 477 U.S. at 381-82.  In assessing prejudice, the Court must also consider the applicable legal standard.  Strickland, 466 U.S. at 695 (e.g., when conviction challenged, would fact finder have had a reasonable doubt, absent counsel's errors).

### IV. TO AVOID DEMONSTRATING PREJUDICE, HAYAT BEARS THE BURDEN TO ESTABLISH AN ACTUAL CONFLICT OF INTEREST, FINANCIAL OR OTHERWISE

To try to avoid having to show prejudice, Hayat argues that Ms. Mojaddidi did not make

independent judgments and decisions, instead allowing Mr. Griffin to take over his representation.  (See generally OPHB).  The record, however, demonstrates that Ms. Mojaddidi maintained and exercised her independent professional judgment in representing Hayat.  Furthermore, the interests of Umer and Hamid Hayat were aligned, and therefore were not competing interests.  Accordingly, because Hayat fails to show an actual conflict of interest, and the record, even after the evidentiary hearing, refutes the existence of any such conflict, the Court should deny Hayat's claim.

Under the Sixth Amendment, a criminal defendant has the right to effective assistance of counsel at trial, including representation that is free from conflicts of interest.  Strickland, 466 U.S. at 688.  "[T]o establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."  Cuyler v. Sullivan, 446 U.S. 335, 348 (1980).  A "conflict of interest is the existence of competing interests potentially affecting counsel's capacity to give undivided loyalty to his client's interests."  United States v. Moore, 159 F.3d 1154, 1158 (9th Cir. 1998).  "In the absence of an 'actual' conflict which squarely places the interests of the client in opposition to those of the attorney, and is likely to compromise a reasonable attorney's ability to comply with his legal and ethical obligation to represent his client with undivided loyalty, the Cuyler standard cannot be met."  Bonin v. Calderon, 59 F.3d 815, 827 (9th Cir. 1995).

A possible or potential conflict is insufficient to meet the actual conflict standard.  See Burger v. Kemp, 483 U.S. 776, 783-95 (1987).  In Burger, the Supreme Court reaffirmed that the Court has "never held that the possibility of prejudice that 'inheres in almost every instance of multiple representation' justifies the adoption of an inflexible rule that would presume prejudice in all such cases."  483 U.S. at 783 (quoting Cuyler, 446 U.S. at 348).  "An actual conflict must be proved through a factual showing on the record."  Morris v. State of Cal., 966 F.2d 448, 455 (9th Cir. 1991).  "Instead, we presume prejudice only if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance."  Burger, 483 U.S. at 783 (citations and internal quotations omitted).  The Court quoted language from Holloway v. Arkansas, 435 U.S. 475, 482-83 (1978), noting, "In many cases, a 'common defense gives strength against a common attack.'"  Burger, 483 U.S. at 784 (quoting Glasser v. United States, 315 U.S. 60, 92 (1942) (dissenting

opinion of Frankfurter, J.)).  The Supreme Court then stated that, when evaluating claims of actual conflict, "we generally presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client."  Burger, 483 U.S. at 784.  The Court has reaffirmed these standards over and over, requiring that defendants demonstrate that his counsel was actively representing conflicting interests before presuming prejudice.  See Mickens v. Taylor, 535 U.S. 162, 175 (2002) (restricting application of Cuyler, emphasizing the passage at 446 U.S., at 350, "'[U]ntil,' [Cuyler] said, 'a defendant shows that his counsel *actively represented* conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.'").

Joint defense agreements do not inherently create a conflict.  As the Supreme Court has recognized, "a common defense gives strength against a common attack." (internal quotations and punctuation omitted) Burger, 483 U.S. at 784 (quoting Holloway, 435 U.S. at 482-83).  "A defendant of course is free to pursue a joint defense strategy with a co-defendant, and such a strategy does not create a conflict of interest tainting a trial."[13]  LoCascio v. United States, 395 F.3d 51, 58 (2d Cir. 2005).  "The fact that counsel may have participated in a uniform defense strategy and acted jointly with codefendant's counsel does not mean there was 'constructive' joint representation or a conflict of interest."  United States v. Kindle, 925 F.2d 272, 275-76 (8th Cir. 1991).  "A decision by co-defendants to proceed with a unified defense is one of trial strategy, and not a basis for an ineffective assistance claim."  United States  v. Griffin, 324 F.3d 330, 364 (5th Cir. 2003); United States v. Mooney, 769 F.2d 496, 499–500 (8th Cir. 1985) (rejecting ineffectiveness claim that defendant-wife "was represented by separate counsel in name only" who "was unprepared [and] purposely assumed a 'fairly inactive' role at trial" because "[t]he decision to proceed with a unified defense strategy was a matter of trial tactics.").

[13] Hayat does not allege successive representation as a theory for actual conflict.  (Pet. at 24-29;  OPHB at 13-20). Therefore, the types of direct conflicts from successive representation of co-defendants who have a direct conflict with the defendant's defense are not implicated.  See Sanders v. Ratelle, 21 F.3d 1446, 1453 (9th Cir. 1994) (counsel previously represented brother, and counseled brother to take the Fifth in trial of defendant, making him unavailable and failing to elicit statement that brother was actual shooter); Fitzpatrick v. McCormick, 869 F.2d 1247, 1252-53 (9th Cir. 1989) (defense counsel represented co-defendant and failed to elicit statement implying prior client was guilty).  Nor can there be an allegation that the prior client made a criminal accusation against counsel.  See Mannhalt v. Reed, 847 F. 2d 576, 581-82 (9th Cir. 1988) (rejecting argument that successive representation by itself caused actual conflict, but finding conflict where key prosecution witness previously represented by counsel accused counsel of a criminal act in conjunction with the defendant, and counsel did not recuse himself to serve as a witness to rebut accusation and remove conflict.

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS                    24

One attorney serving as lead counsel, as part of a joint defense strategy, does not thereby represent both defendants and does not instantly or automatically create a conflict of interest. See United States v. Kirsh, 54 F.3d 1062, 1072 (2d Cir. 1995) ("The fact that Joseph and Mara may have decided to pursue a joint defense strategy in which Washburn acted as lead counsel, does not mean that Washburn represented both defendants. Mara failed to show a conflict of interest."). "A common or unified defense is sometimes the best trial strategy and nothing prevents one attorney from taking a more dominant role in that defense." Kindle, 925 F.2d at 275-76; see also Noe v. United States, 601 F.3d 784, (8th Cir. 2010) ("[W]e reject Noe's argument that the fee arrangement and designation of Garcia as lead counsel resulted in constructive joint representation.").

### A. The Objective Evidence Establishes There was no Actual Conflict or Adverse Effect.

#### 1. Ms. Mojaddidi's 2014 deposition and 2018 hearing testimony made clear she and Mr. Griffin pursued a garden-variety joint defense agreement, not multiple representation of both defendants, and there was no actual conflict between them or their clients.

The best evidence regarding conflict or the absence thereof, is the testimony of Ms. Mojaddidi, who testified repeatedly and credibly that there was no actual conflict as well as the contemporaneous statements of both counsel during the trial indicating that there was no actual conflict. Ms. Mojaddidi has repeatedly confirmed, in the face of Hayat's baseless accusations to the contrary, that she maintained and exercised complete, independent decision-making authority with respect to Hayat, for both tactical and strategic issues. (W.M. Depo. 131:2-21; see also Tr. 695:3-12). At her 2014 deposition the following exchange took place:

Q. What if there was a legal issue about what you know nothing and had experience, who would make the decision then?

A. Well, I – every time [Mr. Griffin] made a decision, I myself did independent research and tried to see if it was something that I thought made sense and so I didn't blindly agree on everything….

(W.M. Depo. 24:11-17). Ms. Mojaddidi also emphatically denied that Mr. Griffin required her to cede to him all final decision making power over Hayat's defense. (W.M. Depo. 131:22-25). She denied that Mr. Riordan ever even asked her about a potential conflict while he and she were co-counsel for Hayat after his conviction. (W.M. Depo. 95:19-96:5). She recalled that Mr. Riordan asked her about potential

ineffectiveness claims.  (Id.)  She also rejected Mr. Riordan's use of the word "interview," suggesting that he took an indirect route to try to elicit information from her about her representation of Hayat.[14] (Id. at 96:6-10).

Furthermore, Ms. Mojaddidi's 2018 testimony denying an actual conflict was consistent with her deposition testimony on this point.  She denied, unequivocally, that Mr. Griffin required her to cede authority over Hayat's defense to him, stating the claim was "not true at all."  (Tr. 693:20).  She also denied she told Mr. Riordan that Mr. Griffin insisted she cede decision making authority over Hayat's defense to him.  She testified: "I would never say that because it wasn't true…I did not say that to [Mr. Riordan]."  (Id. at 693:19-21).  To the contrary, Ms. Mojaddidi and Mr. Griffin discussed strategic and tactical issues daily, and she looked to Mr. Griffin to give her information on these issues so that she could make informed decisions.  (Id. at 131:10-15, 132:1-24; see also Tr. 695:19-25).  She understood that Hayat and his father would be "going through a lot of the same hearings" and she could rely on Mr. Griffin's background and knowledge to supplement her work and judgment concerning how to proceed on Hayat's behalf.  (Tr. 705:8-706:8).  However, she met with Hayat "dozens of times," to discuss "documents" and "issues in the case" with him, and to gather information.  (Tr. 690:4-19, 691:15-19).  She also independently researched issues and based her independent decisions on the results of her research.  (Tr. 695:19-21, 696:3).

Nothing about the existence of the joint defense agreement undermines this unequivocal testimony.  In this case, during the period of June 5 and 10, 2005, Hayat retained Ms. Mojaddidi and Umer retained Mr. Griffin.  (W.M. Depo. 21:4-13, 125:16-25, 126:3-7).[15]  Initially, Ms. Mojadiddi was contacted by a representative from the Council for American-Islamic Relations ("CAIR") to intervene to stop the interviews of Hayat and his father by FBI investigators.  (Tr. 685:12-688:7).  At the FBI offices

---

[14] At the 2018 hearing Ms. Mojaddidi also denied that she sat for an "interview type session" with Mr. Riordan or any of Hayat's other habeas lawyers.  (Tr. 710:7-8).  She conceded she spoke to Mr. Riordan and Mr. Horgan and "believed us to have a good working relationship."  (Id. at 710:8-13).   She testified she "provided information," "voiced frustrations," "made comments about…how things could have been done differently, because, you know, hindsight is always 20/20."  (Id.)  She described the period of those discussions as "a difficult and emotional time."  (Id.)

[15] W.M. Depo. refers to the transcript of Ms. Mojaddidi's 2014 deposition.  (See Def. Ex. FFF).  "Tr." refers to the transcript of the evidentiary hearing and Rule 15 depositions.

that day, June 5, 2005, a government attorney who did not appear in the case mistakenly told Mr. Griffin that Umer had the "heavier case." (W.M. Depo. 18:3-18, 126:8-127:11; Tr. 688:8-17).  Mr. Griffin discussed this fact with Ms. Mojaddidi as they decided which lawyer would represent which client in their effort to stop the interviews of Hayat and his father. (W.M. Depo. 126:18-21; Tr. 662:5-15, 688:12-17).  However, the final decision that Ms. Mojaddidi would represent Hayat, beyond stopping the interviews, "was not made the first day." (Tr. 692:9-10).  Rather, it was a decision "not made in haste," and only after Ms. Mojaddidi spoke with Hayat "individually." (Tr. 692:12-15).

Ms. Mojaddidi understood that she had no experience in criminal law and she advised Hayat of this prior to his decision to retain her. (W.M. Depo. 22:14-18, 27:17-20; Tr. 689:18-20).  Hayat wanted Ms. Mojaddidi to represent him and signed a retainer agreement. (W.M. Depo. 27:21-25, 125:19-21).  Ms. Mojaddidi determined that she could handle Hayat's representation. (W.M. Depo. 22:22-23:9).  Ms. Mojaddidi felt comfortable in the courtroom but knew she would need some guidance, particularly as to procedural issues. (W.M. Depo. 23:5-7).  She recognized that she had to learn on the job to do the case competently and she was "willing to learn it"—"to get in and do it." (Id. at 23:6-9, 24:14-19).  In her deposition, Ms. Mojaddidi expressed uncertainty about whether she would have felt qualified to represent Hayat alone if the cases had been severed. (W.M. Depo. 23:10-17).  She felt she did not need Mr. Griffin's participation in trial; but she would have wanted another attorney to help. (Id. at 52:25-53:8).  In her 2018 testimony, however, she clarified that by the time Hayat's trial actually began, she would have felt able to represent him without any assistance. (Tr. 702:1-8).  She conceded that on the eve of trial she felt some "anxiety" about representing Hayat but ultimately decided she could do it on her own, in part, because she felt reassured by Mr. Griffin and their shared defense strategy. (Id. at 702:12, 703:15-704:1, 704:7-9).

The plan, from the start, was that Ms. Mojaddidi would work with Mr. Griffin, an experienced criminal defense attorney, as part of a "joint defense," and would rely on Mr. Griffin for "a lot of things." (Id. at 22:22-23, 24:4-10).  Ms. Mojaddidi and Mr. Griffin had an oral and written joint defense agreement: each represented his/her own client and agreed to "work[] jointly" to prepare their cases. (W.M. Depo. 127: 21-25).  She testified that the representation arrangement was discussed with the clients and that the arrangement was memorialized in a document that "everybody signed." (Id. at

128:2-11, 130:5-16).[16] Ms. Mojaddidi and Mr. Griffin both looked into whether there was a potential conflict of interest. (Id. at 128:1-5). They determined that they did not "think there was going to be a conflict," and they discussed their conclusions with both clients, who agreed.[17] (Id. at 24:25-25:12; Tr. 692:20). Ms. Mojaddidi based her evaluation of any potential conflict, in part, on her law school training. (Tr. 896:9-25). Ms. Mojaddidi "definitely" discussed the joint defense agreement with Hayat. (Id. 697:19-24).

Ms. Mojaddidi and Mr. Griffin also informed the government and the District Court of their joint defense agreement before trial.[18] At a pretrial hearing on February 3, 2006, Mr. Griffin explained:

> [T]here are going to be two juries, and basically two cases being done in one, Ms. Mojaddidi will represent Mr. Hamid Hayat and I'll be representing Mr. Umer Hayat, we -- in certain areas we have a common, joint defense. We shared with the government that it's our intention, with the Court's permission of course, to continue to assist each other even

---

[16] Hayat signed a retainer agreement with Ms. Mojaddidi. (Ex. JJJ.2). His counsel questioned Ms. Mojaddidi about whether he signed a second retainer in January 2006. (Tr. 712:7-17). She "believed" he signed such an agreement. (Id.) She conceded he did not after reviewing an email from August 2007, in which she stated she intended for Hayat to sign a second retainer but did not "know why [she] never got the second one signed." (Id. at 712:13-714:15; Ex. JJJ.2). In later testimony, she suggested Hayat might have signed the second retainer but that she was never able to locate a signed copy. (Id. at 716:2-4). Hayat frames her acknowledgement of her memory failure concerning a discrete act from 11 years earlier as an admission that she gave *false* testimony. (CR 722 at 2). The accusation is nonsense. Characterizing a memory failure as an intentional false statement is as severe a stretch as Hayat's other unpersuasive arguments in support of his conflict claims. Hayat was aware of the joint defense agreement with Mr. Griffin and his father, the attorneys' agreement to share information, and the fee arrangement. Whether he signed a second retainer is meaningless.

[17] Ms. Mojaddidi understood at the time that that there could be a potential conflict of interest if one attorney was going to represent more than one defendant. (W.M. Depo. 26:7-25). Specifically, she testified. "I knew that that was an issue just from my training in law school and as an attorney, that if you are going to represent more than one defendant, there's a potential conflict of interest." (Id.) Her memory was less clear when she was questioned on the subject in 2018. (Tr. 698:9-20) (stating, "it's hard to remember what I thought then.").

[18] Hayat's litigation strategy concerning his conflict claim is to misrepresent the joint defense arrangement between Ms. Mojaddidi and Mr. Griffin as joint or multiple representation of both defendants by both attorneys. (See OPHB at 13-14). However, the weight of the evidence, including Ms. Mojaddidi's consistent testimony and the characterizations by Mr. Griffin of the joint defense agreement, utterly refutes that effort. Federal Rule of Criminal Procedure 44(c)(1) (defining joint representation as "two or more defendants…charged jointly … or … joined for trial … and … represented by the same counsel, or counsel who are associated in law practice") is not implicated here. Nor is Rule 3-300 of the California Rules of Professional Conduct, which does not even concern multiple representation. Hayat blindly relied on Mr. Weinberg's erroneous citation to Rule 3-300, (Tr. 455:17-24), instead of Rule 3-310(C), which concerns multiple representation. While Mr. Weinberg's error merely further undermines his opinions, Hayat's failure to correct it, and his parroting of the error, undermines confidence in his recitation of the facts and the law in this matter.

though, for example, say, my jury is not in the courtroom.

That assist does not mean that I'm going to examine witnesses on behalf of Mr. Hamid Hayat, but that I would be able to sit at counsel table, be present in the courtroom during that portion where, frankly, it doesn't involve Umer Hayat, and vice versa, when my jury, as I'm referring to it, is in the courtroom, that Ms. Mojaddidi will be able to sit at counsel table and provide me assistance in terms of various matters, but she will not, for example, object, examine any witnesses, but that she would be in the courtroom at counsel table providing me assistance.

The government -- I believe I'm correct in this, and if I'm not they'll correct me -- indicated that they had no objection to that, provided, for example, Ms. Mojaddidi doesn't try to examine one of my witnesses or cross-examine a witness when my jury is in the courtroom and her jury is not, and vice versa.

(Feb. 3, 2006 RT 60:17-61:15). The government did not object or otherwise comment on Mr. Griffin's description of the defendants' joint defense agreement. The District Court also found the proposal unremarkable, stating, "That doesn't bother me. … If you want to agree to help each other, I don't see why I need to get involved in that." (Id. at 61:18-21).

The non-response from the government and shrug from the Court was no surprise. Mr. Griffin made clear that each attorney represented his or her client, only.[19] He made clear that each desired the others presence only to provide assistance on matters involving the common nucleus of operative facts and law between their clients.[20] He also made clear that each attorney would observe the formalities of their separate representations by refraining from examining or cross-examining witnesses called in the other's case, or objecting during the cross-examinations of those witnesses, which they did. The passage plainly evidences Mr. Griffin's contemporaneous perspective on the limited nature and extent of the joint defense agreement between himself and Ms. Mojaddidi. It demonstrates that, at the time of trial,

---

[19] To the extent Hayat is claiming that Mr. Griffin's statement, and Ms. Mojaddidi's subsequent statements that there was no conflict are not entitled to any weight, that is foreclosed by the Supreme Court's decision in Mickens v. Taylor, holding that there is no duty to inquire, and requiring petitioner to establish an adverse effect on counsel's performance. 535 U.S. at 172-74. In addition, the Ninth Circuit has "also held that the trial court 'must be able . . . to rely upon counsel's representations that the possibility of such a conflict does or does not exist.'" Willis, 614 F.2d at 1206 (quoting Kaplan v. United States, 375 F.2d 895, 897 (9th Cir. 1967)).

[20] In a later pretrial discussion with the District Court, on February 14, 2006, Mr. Griffin stated his unequivocal view that, despite the joint defense agreement, he and Ms. Mojaddidi intended to and maintained separate representation of their clients. (RT 19:7-8) ("[E]ach defendant has separate counsel.").

Mr. Griffin did not view the arrangement as creating any conflict, nor did the government or the District Court. It also contradicts the testimony of Hayat's chief advocate concerning Ms. Mojaddidi's alleged admission that Mr. Griffin required her to permit him to represent Umer and Hayat.

At the 2018 evidentiary hearing, Ms. Mojaddidi rejected the suggestion by Hayat's counsel that she and Mr. Griffin jointly represented both defendants. She explained that, under their joint defense agreement:

> …I would rely on [Mr. Griffin] in my representation of Hamid, was my understanding, but that we would have -- parts of the trial would be together, or that at the hearings, when there were appearances made, I would join in his arguments, and that we could work together to develop strategies. But I always distinguished between the fact that I was not Umer Hayat's attorney, and [Mr. Griffin] was not Hamid Hayat's attorney.

(Tr. 693:2-8).

"Ultimately," as Ms. Mojaddidi testified, "I made the decision[s]" affecting Hayat's representation. (W.M. Depo. 131:14-15). She made many such decisions without Mr. Griffin's "stamp of approval." (Id. at 42:2-3). She did not "blindly defer[]" to Mr. Griffin as lead counsel for Hayat. (Id. at 24:15-17, 131:10-13, 132:1-24). Sometimes she and Mr. Griffin agreed regarding strategic and tactical issues and, other times, they disagreed. (Id. at 132:25-133:6). When they disagreed, Ms. Mojaddidi did what she thought was right for her client. (Id. at 133:7-11, 195:3-196:1). There was no actual conflict.

### 2. Hayat continued to retain Ms. Mojaddidi after he was charged with providing material support to terrorism, and Mr. Griffin did not interfere with her consideration of strategies to defend against that new charge.

After September 2005, when the grand jury indicted Hayat for providing material support to terrorism along with the initial false statement charges, Hayat did not fire Ms. Mojaddidi, and she did not reconsider her decision to represent him. (Tr. 706:9-708:3). At her deposition, Ms. Mojaddidi explained she thought the new charge was "eventually going to happen." (W.M. Depo. 65:11-12). She did not reconsider her decision to represent Hayat because she had already put in months of hard work on the case, she was "intimately knowledgeable of the evidence," her confidence was growing, she felt capable to stay on, and she knew Mr. Griffin, who had more experience, was there to assist. (W.M. Depo. 66:9-19). Ms. Mojaddidi responded to the new charge by independently researching and working

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

30

to develop strategies to defend against it.  (See Tr. 708-709:4).

Among other things, Ms. Mojaddidi worked to develop evidence that the Pakistani government had shut down militant camps in Pakistan.  (Id. at 708:14-25).  She also searched for useful information and expert witnesses.  (Id. at 708:23-25).  She attempted to secure a witness from the Pakistani government who might provide testimony that Pakistan had closed all militant camps.  (Id. at 709:1-4).  In those efforts, Ms. Mojaddidi acted independent of Mr. Griffin.  (Id. at 709:14-17).  When he learned of Ms. Mojaddidi's efforts, Mr. Griffin "may have" commented that the Pakistani government would not be of assistance.  (Id. at 709:10-13).  However, Ms. Mojaddidi testified with certainty that Mr. Griffin did not interfere with her work, and "didn't instruct [her] to cease [her] efforts."  (Id. at 709:14).  Before long, Ms. Mojaddidi and Mr. Griffin settled on a joint defense strategy that accounted for the closely aligned interests of their separate clients.

On the eve of trial, Ms. Mojaddidi grew understandably anxious about the challenge ahead of her and considered whether to bring in another attorney to assist her.  (Tr. 702:9-13; W.M. Depo. 93:5-21, 94:13).  Ms. Mojaddidi ultimately decided she could proceed without the help of another attorney.  (Tr. 702:12-13; W.M. Deop. 93:15-16).  Before she reached that conclusion, Mr. Griffin suggested she consult with Mark Reichel, a local criminal defense lawyer.  (W.M. Depo. 94:13-20).  As discussed in more detail below in the section addressing Mr. Reichel's testimony at the 2018 hearing, after Ms. Mojaddidi and Mr. Griffin consulted with Mr. Reichel, Ms. Mojaddidi decided not to add him to Hayat's defense.  (Tr. 702:9-704:6, 710:24-711:7).

### 3. Consistent with their joint defense agreement, her testimony, and the remainder of the record evidence, Ms. Mojaddidi exercised independent control over all pre-trial and trial matters affecting Hayat.

Ms. Mojaddidi affirmed that she, not Mr. Griffin, had the ultimate decision-making authority regarding all specific litigation decisions in pretrial and trial matters affecting her client.  (Tr. 695:19-21; W.M. Depo. 132:1-135:17).  She denied that Mr. Griffin functionally served as lead counsel for both clients, that he simultaneously represented both clients, or that she served as a junior associate to Mr. Griffin in representing Hayat.  (W.M. Depo. 135:10-25; see Tr. 697:14-698:8).  Pursuant to their joint defense agreement, Ms. Mojaddidi and Mr. Griffin considered and discussed various pretrial motions and decided the best strategy for their clients.  (W.M. Depo. 58:1-17; Tr. 695:19-21).  Those pre-trial

matters included, what motions were filed on behalf of Hayat; whether to seek a continuance for purposes of additional investigation; whether to obtain a CIPA clearance or stipulate to the admission of the satellite imagery evidence; whether Hayat would accept a plea offer from the government; which witnesses would be called on behalf of Hayat; and whether Hayat would testify.[21]  (See W.M. Depo. 132:1-135:17, 219:22-220:25, 231:1-232:5; Tr. 695:19-21, 727-771).

### a. Ms. Mojaddidi independently elected to pursue the reasonable defense strategy of pushing for a fast trial and a challenging the sufficiency of the evidence.

Ms. Mojaddidi affirmed that she relied on Mr. Griffin to provide, based on his experience, insight as to which motions were worth making.  (W.M. Depo. at 69:15-18).  She recalled that the joint defense strategy focused on pressing the government to trial as fast as possible, and that the government was trying to buy time "to obtain more evidence."  (Tr. 738:19-739:22).  She testified that even though the District Court granted the government's initial continuance requests, the government quickly "ran out of ways to get continuances," and she and Mr. Griffin succeeded in forcing a trial as quickly as possible under the circumstances.  (Tr. 739:13-22, 753:9-12).  That testimony was consistent with her deposition testimony, in which Ms. Mojaddidi recalled her belief that the government could not meet its burden if pushed to trial as soon as possible.[22]  (W.M. Depo. 53:15-24).

Indeed, at her deposition Ms. Mojaddidi testified that after she reviewed the "limited" discovery provided by the government, she concluded the government would not succeed if pushed to trial as soon

[21] Ms. Mojaddidi also testified that she exercised her own independent judgment based on what she believed was in the best interests of Hayat when she decided to stipulate to the admission of the images, and not to seek a security clearance.  Similarly, Ms. Mojaddidi decision to pursue a defense strategy of seeking a speedy trial and challenging the sufficiency of the evidence against Hayat, and to forego an alibi defense, was based on her investigation of potential alibi witnesses and her independent judgment.  Both matters are discussed below in more detail.  See Section III.

[22] In his argument, Hayat reduces the strategic decision to push for a speedy trial to a desire to win dismissal of the indictment for a violation of the Speedy Trial Act.  (Pet. at 18-20; OPHB at 64-65, 71, 81).  However, Ms. Mojaddidi's consistent testimony makes clear that the strategy employed by the joint defense was to force the government to trial on weak evidence and challenge the sufficiency of the evidence.  Of course, the defense could have *also* sought relief under the Speedy Trial Act in the event of a violation of the Act.  Ms. Mojaddidi was aware at the time of trial that even if she won a dismissal on that basis, it would likely not be with prejudice and the government could re-indict Hayat for the same offenses.  (W.M. Depo. 58:18-59:21); see also 18 U.S.C. § 3162(a)(2); United States v. Taylor, 487 U.S. 326, 334-35 (1988) reversed on other grounds (observing that while violation of the Speedy trial Act requires dismissal of the indictment upon a defendant's successful motion, whether to dismiss with or without prejudice is left to the "guided discretion of the district court," and the Act does not prefer one remedy to the other).

as possible.  (W.M. Depo. 53:18-24; Tr. 753:10-12).  Under questioning by Mr. Riordan, Ms. Mojaddidi denied that she initially preferred to "go on the offense and prove [Hayat's] innocence through affirmative alibi witnesses."  (W.M. Depo. 265:14-18).  She also denied she ever told Mr. Riordan that at the beginning of her representation of Hayat she believed she should present an affirmative alibi defense.  (Id. at 265:19-23).  Ms. Mojaddidi testified, "I do not think that I said that to you, because that would not have been true."  (Id. at 266:4-8).  Ms. Mojaddidi's consistent testimony demonstrates there was no conflict of opinion between Ms. Mojaddidi and Mr. Griffin about what each believed was the best defense strategy for their separate clients.

Ms. Mojaddidi could not recall filing any specific pretrial motions or whether there was a conscious decision made not to file pretrial motions, however, she testified that she and Mr. Griffin "considered the different types of motions," had "discussions," and "weighed what was the best strategy."  (Id. at 47:16-20, 49:15-23, 58:6-9, 73:11-25; see also Tr. 738:14-18).  The record reflects that, in fact, the defense filed a series of pretrial motions, including bail motions and discovery and dispositive motions.  (See, e.g., CR 143-47).  Ms. Mojaddidi affirmed that one of the "likely" reasons pretrial motions were not filed initially was because the defense wanted to push the government to trial as soon as possible, and for other reasons.  (W.M. Depo. 53:15-54:4, 58:1-17; Tr. 745:11-14).  As set forth below, at her 2014 deposition and at the 2018 hearing, Ms. Mojaddidi testified consistently about her recollection of her decision-making concerning various pre-trial matters.

> **b.    Ms. Mojaddidi was aware of <u>Bruton</u> and its consequences before Hayat's trial and independently elected to force the government to meet its obligation to protect against a Confrontation Clause violation.**

At the 2018 hearing, Ms. Mojaddidi testified that she was aware of the <u>Bruton</u>[23] issue associated with the confessions of Hayat and his father, and knew the government could not use either defendant's confession against the other (assuming neither testified), so no motion to sever was needed.  (Tr. 741:6-11, 770:16-23).  That testimony was consistent with her 2014 deposition testimony, where Ms. Mojaddidi testified she was aware of <u>Bruton</u> and its consequences at the time of Hayat's trial, discussed the issue with Mr. Griffin, and did not blindly follow his advice.  (W.M. Depo. 51:12-52:4, 224:11-

---

[23] <u>Bruton v. United States</u>, 391 U.S. 123 (1968) (holding that admission of the confession of one defendant against another violated the Confrontation Clause of the Sixth Amendment).

225:13).  She testified that the government also recognized the <u>Bruton</u> issue and affirmatively suggested the use of separate juries, alleviating the need for a motion to sever on that basis.  (W.M. Depo. 224:11-225:13).

Hayat argues that the fact Ms. Mojaddidi had not moved to sever his case from Umer's by the time of jury selection in February 2006, is evidence of her ignorance of <u>Bruton</u> and its consequences and, by extension, evidence that Mr. Griffin controlled her decision making.  (OPHB at 72).  The claim ignores the trial record.  It is clear, long before February 15, 2006, Ms. Mojaddidi understood the effects of <u>Bruton</u> and had discussed the matter with government counsel.  (RT 368:24-370:21).  Before February 2006, the parties had conferred and agreed to prepare proposed redactions to the statements of Umer and Hayat for a possible stipulation for trial.  (RT 370:12-21).

In February, Ms. Mojaddidi changed course and refused to agree to a stipulation but urged the government to meet its independent obligation to insure a fair trial.  (RT 370:12-371:17).  She told the District Court, "[o]ur position is that we're not ready to stipulate to anything, but the government should do what it thinks is appropriate."  (RT 373:8-10).  Meanwhile, the record demonstrates Ms. Mojaddidi wanted more time to review the governments proposed redactions and to consider the possibility of waiving <u>Bruton</u> claims concerning parts of Umer's statement, which she likely felt were so unbelievable that, rather than incriminate her client, might help her persuade the jury that his confession was false.[24] (RT 372:6-373:4, 374:16-25, 377:17-24; <u>see also</u> CR 192).  Nothing about the pretrial dispute between the government and the defense over how to deal with <u>Bruton</u>, an issue Ms. Mojaddidi clearly understood, is evidence that Mr. Griffin controlled Ms. Mojaddidi before or during trial.

> **c.      Ms. Mojaddidi independently elected not to move to suppress Hayat's confession because she found it ridiculous, believed the jury would reject it, and wanted to avoid delay to reach trial.**

Similarly, Ms. Mojaddidi testified that she did not blindly defer to Mr. Griffin on the decision not to move to suppress Hayat's videotaped confession.  (W.M. Depo. 225:21-228:1; Tr. 743:24-744:1-

---

[24] The defense filed a joint response to the government's <u>Bruton</u> motion asserting that the government had delivered its proposed redactions to the statements of Hayat and Umer only eight and three days before the start of trial.  (CR 192.)  According to that defense filing, only ten days earlier, the government had delivered 253 CDs and 45 audio tapes containing hundreds of hours of relevant recordings.  Ms. Mojaddidi's attempt to articulate those facts to the District Court and her objection to them (during a hearing concerning Hayat and not Umer, and at which she alone argued) is not evidence that Mr. Griffin controlled her at trial.  It is the opposite.

20).  Her memory was not clear about the details.  (W.M. Depo. 49:15-19, 229:2-6; Tr. 744:3-4). However, she recalled that she had "enough basic knowledge to know [how to] move to suppress evidence." (Tr. 744:14-15; see W.M. Deop. 226:9-12).  She had "learned about" the law governing voluntariness of a confession, and had discussed it with Mr. Griffin and James Wedick, a 35-year veteran of the FBI who served as the defense expert on the reliability of Hayat's confession and who had conducted hundreds of interviews and interrogations.  (Tr. 744:2-9, 575:12, 604:6-21; Gov. Sup. Ans. Ex. 18).  A challenge to the "voluntariness" of a confession was "certainly" something Ms. Mojaddidi knew could be a legal basis for a motion to suppress.  (Tr. 744:18-20).

Ms. Mojaddidi was aware that Hayat had suffered from meningitis years before the charges in this matter.  (W.M. Depo. 46:3-19; 260:1-3; Tr. 726:2-4).  She did not view that past illness as a basis to challenge Hayat's confession because he never mentioned suffering any continued effects from it during any of the "more than dozens of times" she met with him.  (Tr. 726:2-8, 681:2-4).  During their meeting, Ms. Mojaddidi asked Hayat "details about what he did [in Pakistan]," and they "talked about a lot of" issues concerning his case.  (Id. at 691:16-19).  He did not provide as much information as "typical" witnesses Ms. Mojaddidi had encountered "because of his education level and background."  (Tr. 691:12-14).  However, at no point during her representation of Hayat did Ms. Mojaddidi question his competence, his ability to understand the charges against him, or his ability to assist her in his defense. (W.M. Depo. 260:25-261:8).  Like the jurors who viewed Hayat's videotaped confession, Ms. Mojaddidi did not detect any basis in her discussions with Hayat to conclude that his confessions was involuntary.

Ultimately, Ms. Mojaddidi determined that Hayat's confession was unbelievable because "there were so many problems with it," including "internal inconsistencies," and concluded that a motion to suppress was unnecessary.  (See Tr. 744:4-7).  Indeed, Ms. Mojaddidi began her opening statement by directly attacking Hayat's confession as unbelievable.  She stated:

> Good morning, ladies and gentlemen. Again, my name is Wazhma Mojaddidi.  Typically in a criminal trial the defendant's attorney will come to the jury and ask you to believe everything that her client has to say. In this case I'm not going to ask you to do that. And I'm not going to ask you because, frankly, Hamid Hayat has made statements that are just simply not true.

(RT 423:7-14).  She returned to that theme later in her opening, stating:

> [Y]ou will see that these statements were nothing more than words that the FBI agents wanted to hear. You will hear that Hamid, in the spirit of cooperation, was trying to tell the FBI what they wanted to hear. And you will also see that Hamid provided a certain level of training – I'm sorry, a certain level of detail about attending a training camp. And the government will try to show you that the proof is in the details, but that is not the case.
>
> You will see that the details are exactly what will show you that he did not attend, and could not have possibly attended. You will hear Hamid's description of the location, duration and extent of the training couldn't possibly be true. All of his statements were entirely inconsistent with each other throughout the interview. And you will see that the FBI agents themselves expressed frustration and concern with Hamid's inconsistencies and his stories.
>
> Not only were the details he provided during this interview inconsistent with each other, but they were wholly inconsistent with all of the statements and details that Hamid described to Naseem Khan in those recorded conversations in 2003.
>
> When you see the video, you will see that Hamid complained of being tired, sleepy, and having a headache during the interview, and yet you will see that he continued to talk in the spirit of cooperation. You will see that he was trying his best to give them information they wanted so that he could get it all over with. He didn't tell them that he attended a camp and provided details because it was the truth. He said what he said because he thought he was telling the government what they wanted to hear.

(RT 434:21-436:1).

In her closing, too, Ms. Mojaddidi focused on her argument that Hayat's confession was not believable.  She stated, "[y]ou watched the videotape of Hamid Hayat on that screen. You watched his interview. And you got that feeling inside of you that something wasn't right when those agents manipulated him into answering leading questions, and getting him to say what they wanted him to say. (RT 4286:14-290).  She continued: "The problem, though, is that the government couldn't manage to get Hamid to say anything that was consistent during those interviews. Hamid couldn't keep his story straight."  (RT 4316:1-4).  Ms. Mojaddidi devoted extensive additional argument to attacking the believability of Hayat's confession by pointing out its inconsistencies, contradictions, and bizarre

components.  (See RT 4316:1-4320:10).

Contrary to Hayat's arguments, Ms. Mojaddidi's 2018 hearing testimony was consistent with her 2014 deposition testimony, in which she explained her view of the impact of Hayat's confession on the overall strength of the government's case:

> I watched the entirety of [Hayat's videotaped confession] and I saw the ridiculous inconsistencies in everything that he had said and his father said, I thought and I knew that all of the statements he made where he consistently told the truth about where he was were not recorded, I felt they had a weak case.

(W.M. Depo. 263:18-25, see also 265:4-13).  As the above makes clear, Ms. Mojaddidi and Mr. Griffin agreed that filing motions to suppress their clients' "ridiculous" confessions would only permit the government more time to strengthen its otherwise weak case and damage their joint strategy to force trial as quickly as possible and challenge the government's insufficient evidence.  That agreement is not evidence of a conflict.  To the contrary, it merely confirms Ms. Mojaddidi's consistent testimony that she and Mr. Griffin worked together in a joint defense agreement on behalf of their clients, whose interests were closely aligned.  At all times, Ms. Mojaddidi retained final decision-making authority for her client.

Hayat argues two alternatives to Ms. Mojaddidi's testimony concerning whether to move to suppress his confession.  First, he accuses Ms. Mojaddidi of wholesale perjury and claims her testimony was simply a "post-hoc fiction," given under oath.  (OPHB at 74, 85; CR 722).  To support his attack, he argues, without a shred of objective evidence and against the weight of the record, that Ms. Mojaddidi and Mr. Griffin never discussed a motion to suppress and that Ms. Mojaddidi blindly deferred to a trial strategy imposed by Mr. Griffin, requiring no pretrial motions.  (Id.)  Hayat's unsupported arguments are not evidence, and his use of overheated language cannot convert them into evidence.  Hayat's bald allegations cannot outweigh Ms. Mojaddidi's consistent testimony that she and Mr. Griffin agreed their clients' confessions were "ridiculous" and would not withstand scrutiny by a jury.[25]  Nor do they overcome Ms. Mojaddidi's consistent testimony that she explored other potential defense strategies and

---

[25] Mr. Griffin also spent significant time in his closing argument challenging the believability of Umer's statement.  (RT 4480:12-4495:1).

elected independently to push for a fast trial and to challenge the sufficiency of the government's evidence. Nothing in the objective record supports the conclusion that Ms. Mojaddidi perjured herself repeatedly on this or any other issue.

In his second argument, Hayat retreats from his accusation that Ms. Mojaddidi has lied about everything, and asserts that she has lied only about not acquiescing to Mr. Griffin's speedy trial strategy. (OPHB at 74). In this iteration of his attack, Hayat permits the possibility that Ms. Mojaddidi and Mr. Griffin spoke about how to deal with their clients' confessions (and agreed jurors would find them unbelievable) but he argues Ms. Mojaddidi repeatedly lied under oath when she denied that she deferred to Mr. Griffin's speedy trial strategy and agreed to file no pretrial motions. (Id.) Again, Hayat relies on no objective evidence to support this version of his perjury accusation. Rather, he offers only overheated rhetoric and pure speculation. To be sure, for Hayat to succeed on his unfounded conflict claim, this Court must find that Ms. Mojaddidi repeatedly committed willful perjury concerning her representation of Hayat and each time she asserted she did not blindly defer to Mr. Griffin. Of course, as Hayat's arguments on this point demonstrate, there is no objective support for such a conclusion. Nevertheless, unable to pound the facts or the law because neither supports his claims, Hayat pounds the table. Hayat's accusations that Ms. Mojaddidi has been criminally dishonest in this matter to avoid the modest consequences of an ineffectiveness finding associated with her first trial more than a decade ago, should be supported by more than mere hyperbole. They are not.

### d.    Ms. Mojaddidi independently advised Hayat not to testify. (Claim 8)

Hayat does not attempt to support his claim that Ms. Mojaddidi was ineffective for advising him not to testify. (Compare Pet. at 68-69 with OPHB). Ms. Mojaddidi also spoke with Hayat about whether to he should testify on his own behalf and advised him against doing so. (W.M. Depo. 229:8-18; Tr. 769:7-770:4). Ms. Mojaddidi had previously counseled clients concerning whether to testify in civil matters. (Tr. 769:10-15). After meeting with Hayat several times and watching his recorded confession, Ms. Mojaddidi "was certain he wasn't going to be a good witness." (Id. at 770:1-4). Hayat had made a series of inconsistent statements and she was concerned he might make the case worse. (W.M. Depo. 230:8-14). Ms. Mojaddidi did not recall asking for Mr. Griffin's view on whether Hayat should testify. (Tr. 769:24-770:1-4). Mr. Griffin did not attempt to influence her regarding whether

Hayat should testify, did not recommend against it, and did not pressure her to keep Hayat off the stand. (W.M. Depo. 231:9-232:5).  Rather, Ms. Mojaddidi and Mr. Grifffin agreed that neither defendant would make a good witness.  (Tr. at 770:7-8).  Ms. Mojaddidi denied Mr. Griffin made the decision for her or for Hayat.[26]  (Id. at 770:9-10).

### e.    Ms. Mojaddidi independently advised Hayat not to accept the government's plea offer.

Ms. Mojaddidi also discussed a potential plea agreement with Hayat before trial.  (W.M. Depo. 77:20-23).  She recalled that it was an offer for a fifteen-year sentence, and required both defendants to plead guilty or neither could plead guilty.  (Id. at 77:24-78:2, 78:3-7).  Umer's recommended sentence would have been time served, with the possibility of some additional in-home detention.  (Tr. 887:19-25).  Ms. Mojaddidi advised Hayat to reject the offer.  (Id. at 247:10-11).  She and Mr. Griffin discussed the plea offer and had different views about it.  (Id. at 247:12-16).  Mr. Griffin "may have been a little bit more willing to consider" the offer, and wanted Hayat to be "certain about his innocence" and make an "informed decision."  (Id. at 247:19-248:10).  However, Mr. Griffin never "firmly state[d] to [Ms. Mojaddidi] what he believed Hamid should do."  (Id.  248:1-3).  Mr. Griffin did not pressure Ms. Mojaddidi or urge Hayat to accept the offer.  (Id. at 248:13-19).  Hayat refused the offer, consistent with Ms. Mojaddidi's independent advice. (Id. at 78:8-9).

Notably, at the 2018 hearing Hayat's counsel did not question Ms. Mojaddidi about her independent plea discussions with Hayat.  The reason is easy to conclude.  The facts of Ms. Mojaddidi's independent plea discussions with Hayat demonstrate the absence of the conflict Hayat has alleged. Indeed, if, as Hayat and his advocates insist, Mr. Griffin desired to protect his own client by unduly influencing Ms. Mojaddidi to Hayat's detriment (or by totally usurping her authority as Hayat has claimed), plea discussions were the point at which Mr. Griffin could have exerted the greatest influence in favor of his client over Hayat's interest.  Indeed, if he succeeded in pressuring Hayat to plead guilty, Umer would likely have faced no additional incarceration.  Yet, Mr. Griffin exerted no influence.  He did not pressure Hayat to plead guilty.  He did not pressure Ms. Mojaddidi to persuade Hayat to plead

---

[26] As set forth above, at the time of trial Ms. Mojaddidi was aware of Bruton and its consequences. (Id. at 770:16-23).

guilty. Instead, consistent with their joint defense agreement, Mr. Griffin discussed the facts and law with Ms. Mojaddidi and left her and Hayat to make their best judgments. This fact, on its own, inflicts a mortal wound upon Hayat's conflict allegation.

### f. Ms. Mojaddidi independently represented Hayat during trial, despite her relative inexperience.

As the above facts make clear, Ms. Mojaddidi and Mr. Griffin worked together before and during the course of the trial, consistent with the joint defense agreement, but Ms. Mojaddidi retained authority for Hayat's defense. (See W.M. Depo. 104:13-16, 248:21-249:4; Tr. 694:15-21, 779:12-20). Mr. Griffin was present when Ms. Mojaddidi was in court, and vice versa. (W.M. Depo. 104:13-16). During the trial, Ms. Mojaddidi did all her own preparation for direct and cross-examinations, conducted direct and cross-examinations, and prepared and delivered opening and closing arguments. (W.M. Depo. 249:15-17). Ms. Mojaddidi considered Mr. Griffin's advice at trial but ultimately made the decisions she thought were best for Hayat, based on her training, her modest experience, her consultation with Wedick and other experts, and her independent research. (W.M. Depo. 24:14-24, 132:1-135:17; Tr. 695: 19-21, 696:1-3, 708:14-709:17, 599:10-19). She testified at the 2018 hearing that if Mr. Griffin had given her advice that she believed was against the interest of her client, she "would not have taken the advice," because she understood her "ethical duty to represent [her] client's best interests." (Tr. 779:12-20).

Finally, Hayat's argument that Ms. Mojaddidi could not have provided unconflicted representation because of her relative inexperience fails when weighed against the weight of the evidence. Ms. Mojaddidi testified consistently in her 2014 deposition and at the 2018 hearing that she devoted time to researching issues that arose during Hayat's trial, as well as consulting with Mr. Griffin. For example, she testified that at every decision point she did "independent research and tried to see if it was something that I thought made sense and so I didn't blindly agree on everything." (W.M. Depo. 24:15-17). At the 2018 hearing, Ms. Mojaddidi testified that, concerning issues with which she lacked prior experience, she made decisions "based on the information I received and my own research." (Tr. 19-21). Ms. Mojaddidi conceded her inexperience but testified that she "breathed and lived [Hayat's]

case," while working to learn on-the-job and make the best decisions she could for his defense.[27]  (Tr. 705:20-25, 706:1-8).  During the year between the start of her representation of Hayat and the verdict, Ms. Mojaddidi devoted "at least" 75% to 80% of her professional time to his defense, and 100% of her time to it during his trial.  (Tr. 779:4-11).  In her 2014 deposition, Ms. Mojaddidi testified that she "essentially dedicated my entire practice to [Hayat's] case."  (W.M. Depo. 280:3-5).  The record and Ms. Mojaddidi's consistent testimony establishes that she devoted nearly all of her professional time while representing Hayat to building a basis to make independent and sound strategic decisions on his behalf.  While she consulted with Mr. Griffin and considered his advice throughout her representation, there is no objective evidence that he usurped her decision-making authority.

B.      Nothing in Dennis Riordan's Testimony Demonstrates the Existence of an Actual Conflict.

The only evidence Hayat offers in support of his conflict claim that purports to show an actual conflict is the testimony of his chief advocate, Dennis Riordan.  In his role as Hayat's primary witness supporting his conflict claims, Mr. Riordan asserts that in the emotional aftermath of the guilty verdicts in Hayat's trial, Ms. Mojaddidi "admitted" to him that her representation of Hayat was conflicted and that she was not competent to represent Hayat.  (Def. Ex. B; Tr. 904:18-905:9).  Mr. Riordan also asserts that Mr. Griffin implicitly affirmed Ms. Mojaddidi's admission in a private conversation with him by stating, "I gave her advice and she followed it."  (Pet. at 16, n. 5).  The objective record contradicts both of his allegations, as does Ms. Mojaddidi's consistent testimony and the statements of Mr. Griffin at the time of trial.  Additionally, the method Mr. Riordan used to obtain and record Ms. Mojaddidi's alleged statements deviates so significantly from accepted best practices that it undermines the reliability of Mr. Riordan's recollection and testimony years later.  Mr. Riordan's allegations are not the neutral claims of a disinterested person, they are the inevitably skewed recollection and confirmation bias of an impassioned and interested advocate, which further undermines their reliability in the face of consistent and corroborated denials by the actual participants in the events in question.[28]

---

[27] Before Hayat's trial, Ms. Mojaddidi had appeared in a state criminal matter.  (Tr. 701:3-7).

[28] Despite meeting with Hayat a week before the evidentiary hearing (Tr. 437:19-24), Mr. Riordan failed to obtain a written waiver under Rule 5-210 of the California Rules of Professional Conduct, in spite of the

Furthermore, Mr. Riordan's testimony regarding the statements made to him by Ms. Mojaddidi are not substantive evidence of an actual conflict under the Federal Rules of Evidence.  Pursuant to Rule 801, those alleged statements are hearsay if offered for the truth of the matter asserted.  See Fed. R. Evid. 801(c); see Pizzuti v. United States, 809 F.Supp. 2d 164, 187-88 (S.D.N.Y. 2011) (applying hearsay rules to collateral attack on conviction).  As a result, the Court should consider them only for impeachment purposes, and Hayat has failed to introduce any substantive evidence to meet his burden of establishing an actual conflict. See United States v. Crouch, 731 F.2d 621, 623 (9th Cir. 1984) (impeachment evidence may not be used to present otherwise inadmissible substantive evidence).  Moreover, even if admissible in this proceeding as substantive evidence, the treatment of this type of hearsay under the Federal Rules of Evidence is indicative of its lower level of reliability.

> **1.  Mr. Riordan's interest in this case percolated during the year he tracked Hayat's prosecution before offering to become Ms. Mojaddidi's co-counsel days after Hayat was convicted.**

Mr. Riordan is an appellate lawyer who has been highly invested in this case since its inception. He specializes in habeas cases, and has worked on cases that have attracted significant media attention. (Tr. 787:6-12, 828:11-14; 889:3-7).  He does not avoid such attention and he agreed that Hayat's case has "received a great deal of media attention from its inception."  (Id. at 829:4-12).  He learned of the charges against Hayat and his father in news reports after their arrests in 2005, and he followed their cases through trial in published articles.  (Id. at 787:9-14).  Only days after the jury found Hayat guilty at the end of April 2006, Mr. Riordan contacted Ms. Mojaddidi and offered to help her litigate a juror misconduct allegation by Hayat.  (Id. at 787:6-12, 788:15-22, 833:19-22).

On May 19, 2006, Mr. Riordan entered an appearance and agreed to serve as Ms. Mojaddidi's mentor to permit her appointment, on May 22, 2006, as counsel for Hayat, who had exhausted funds to continue to pay for his defense.  (Id. at 790:3-791:11, 834:1-11).  The District Court's order also appointed Mr. Riordan as counsel for Hayat's appeal, and Mr. Riordan testified the order "triggered" him to begin evaluating Ms. Mojaddidi's representation for potential habeas claims.  (CR 362; Tr.

---

government's request that he comply with the formalities of the Rule.  (Id. at 877:6-878:6).  Mr. Riordan's testimony should have been excluded for the reasons set forth in the government's motion in limine, (CR 648), and his failure to comply with the written waiver requirement in Rule 5-210.

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

42

837:1-10).  By then, Mr. Riordan was aware of Ms. Mojaddidi's relative inexperience, and was "flabbergasted" that she represented Hayat in such complex case.  (Tr. 795:7-796:8, 836:2-24).  As they began work on Hayat's post-verdict litigation, Ms. Mojaddidi informed Mr. Riordan, on May 31, 2006, that she intended to participate in a potential retrial of Umer, at Mr. Griffin's request.  (Tr. 791:19-792:2; Ex. JJJ).  Mr. Riordan testified that, without any other evidence, Ms. Mojaddidi's desire to assist Mr. Griffin's in the retrial of Umer "raised the specter that this was a situation in which Ms. Mojaddidi and Mr. Griffin may have, essentially, engaged in the representation of both Hayats."  (Tr. 792:6-9, 837-14-838:9).

Thus, from the start of his relationship with Ms. Mojaddidi and only days after he agreed to serve as her mentor in Hayat's post-trial litigation and filed an appearance as her co-counsel, Mr. Riordan suspected he might bring a habeas claim alleging professional wrongdoing by Ms. Mojaddidi.  (Tr. 838:10-15, 792:13-21, 836:25-837:10).  Yet, despite being flabbergasted by her inexperience and being armed with his new suspicions about her possibly divided loyalty, Mr. Riordan did not immediately alert Ms. Mojaddidi to his concerns and ask her to withdraw from the case.  (Id. at 840:22-23, 844:5-8).  He did not immediately alert Hayat and suggest he fire Ms. Mojaddidi.  (Id. at 840:16-18).  Nor did he immediately contact Federal Defender Daniel Broderick, who recommended to the District Court Ms. Mojaddidi's appointment under Mr. Riordan's mentorship, to report that his confidence in her was misplaced and that he should not mentor her continued representation of Hayat.  (Id. at 840:7-10).  Instead, after following news of Hayat's prosecution for more than a year and having attached himself to the sensational case, Mr. Riordan embarked on a surreptitious fact-finding mission, characterized by his use of unconventional and unreliable tactics.  (Id. at 842:12-20).  As set forth in more detail below, Mr. Riordan's use of such questionable tactics and his passion for Hayat's case, together with his decision to serve both as Hayat's chief advocate and primary witness, distorted his efforts to collect and record facts, and render his testimony unreliable.

> **2.      Mr. Riordan decision to investigate Ms. Mojaddid's representation of Hayat on his own, and while serving as her co-counsel, and to make himself a fact witness for Hayat, calls into question the reliability of his declaration and testimony.**

In his role as an impassioned advocate, Mr. Riordan elected to make himself a witness for Hayat

by not hiring an investigator to observe his discussions with Ms. Mojaddidi.  That decision significantly impacted his ability to accurately preserve Ms. Mojaddidi's statements in a reliable manner through non-advocate witnesses.  In his prior experience collecting evidence in habeas and other litigation matters, Mr. Riordan had engaged the services of investigators.  (Tr. 841:13-16).  In comments quoted in the San Francisco Examiner he stated, "[a]nybody who is involved in litigation and doesn't have investigators out interviewing witnesses is a complete fool."  (Id. at 841:17-842:11).  Despite his own harsh criticism of the practice, Mr. Riordan did not hire an investigator in May 2006 but undertook to explore Ms. Mojaddidi's conduct himself.  (Id. at 842:17-20).  He testified that he did not hire an investigator who might later serve as a witness because he did not want to "interrupt the candor of those discussions [with Ms. Mojaddidi] by having an investigator in the room."  (Id. at 886:17-887:2).  In other words, Mr. Riordan knowingly hid his investigation from Ms. Mojaddidi—with whom he was serving as Hayat's co-counsel and purportedly mentoring—and elected to place himself in a position to serve as his own witness for Hayat.  (See id. at 848:15-21).  Mr. Riordan's early decision to serve as Hayat's chief advocate and primary witness necessarily distorts all of his claims as a witness.  The two roles are inextricably intertwined but irreconcilable because "an attorney who assumes the burden of a witness while representing his client in a lawsuit does so at a very great detriment to the credibility of his testimony."  Lau Ah Yew v. Dulles, 257 F.2d 744, 746-747 (9th Cir. 1958).  Mr. Riordan's testimony must be discounted because of his interest in the outcome of the litigation.  See Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Corp., Inc., 546 F.2d 530, 539-40 (3d Cir. 1976) (disapproving of use of lawyer-witnesses and "we conclude that the district court erred when it placed controlling weight, as to patent validity, on the opinions of a lawyer associated with defense counsel.").  The result irretrievably undermines the reliability of Mr. Riordan's testimony.

> **a.    Mr. Riordan's decision not disclose the surreptitious investigation of his own co-counsel to her, Hayat, or the District Court calls into question the reliability of his declaration and testimony.**

Between May 2006 and September 2007, even after he "definitely" suspected he would bring habeas claims based on Ms. Mojaddidi's conduct, Mr. Riordan tried to elicit information from her under the guise of working together on Hayat's new trial motion.  (Id. at 796:11-17, 839:10-14, 839:22-840:1, 842:17-843:2, 848:15-18).  He claimed he did not confront Ms. Mojaddidi then because he did not want

to disrupt the working relationship he had with her as they prepared Hayat's new trial motion. (Id. at 882:18-883:12, 842:17-20, 844:11-17). Yet, Mr. Riordan testified that it was "immediately clear" he and his law partner, Mr. Horgan, would write Hayat's new trial motion without Ms. Mojaddidi. (Id. at 844:14-17, 808:14-25, 845:16-846:19). He also testified that Ms. Mojaddidi's only role in preparing that 100-page motion was to summarize Hayat's recorded statement and to call a witness to solicit a declaration. (Id. at 846:4-15).

Moreover, although Mr. Riordan could have brought a Sixth Amendment claim in Hayat's new trial motion, and considered doing so, he elected not to for "practical" reasons.[29] (Id. at 809:22-810:2). Among those practical considerations was the fact that he would have lost the opportunity to continue to surreptitiously elicit information from Ms. Mojaddidi to use against her in Hayat's habeas action. (Id. at 847:10). Mr. Riordan also suggested that forcing Ms. Mojaddidi's withdrawal might have forced him off Hayat's case. (Id. at 883:4-9, 847:2-7). That claim makes no sense. He had more than sufficient experience to apply for appointment to represent Hayat, which he later did. (See CR 350). Additionally, Ms. Mojaddidi was only permitted appointment as Hayat's post-trial counsel because of Mr. Riordan's agreement to mentor her, as he made clear in his testimony. (See id. 844:9-17, 790:11-18). If he had withdrawn his support, and explained why, Ms. Mojaddidi would likely have been required to withdraw. Mr. Riordan could have taken her place then, as he did later, and could have engaged in an honest inquiry of her representation of Hayat in the adversarial manner our system prefers, not in secret and while posing as her mentor.

In light of her allegedly insignificant contributions to Hayat's new trial motions, there was virtually no reason for Mr. Riordan not to immediately act on his increasing concerns about Ms. Mojaddidi's fitness to represent Hayat. Yet, he did not. Instead, driven by his passion for Hayat's case—nurtured then for more than a year at that point—he elected to mislead Ms. Mojaddidi about his intentions and question her indirectly instead of openly and honestly. Moreover, Mr. Riordan's near simultaneous preparation of a habeas petition for Hayat, which he filed shortly after Hayat's new trial

---

[29] Mr. Riordan testified that case law is divided on whether a defendant may allege Sixth Amendment violations in a new trial motion, with some authority permitting it. (Tr. 809:12-21).

motion was denied (CR 482, 494-96) and before Hayat was sentenced, renders transparent the pretense that he did not confront Ms. Mojaddidi earlier because he needed her assistance.[30]  (See Tr. 844:4-9) ("In fact, it was immediately clear that I was going to…draft the new trial motion…").  Only out of procedural necessity, after Hayat's new trial motion had failed and he was preparing for sentencing, did Mr. Riordan finally reveal to Ms. Mojaddidi his plan to attack her representation of Hayat in a habeas action, resulting in her strong emotional reaction.  (Tr. 810:16-812:19).  As the above demonstrates, Mr. Riordan set aside his duty of candor to the Court and to Hayat, and mislead his co-counsel at the time, all in the service of his overheated advocacy.  That conduct fatally undermines the reliability of his claim to be an impartial witness now.

> **b.    The manner in which Mr. Riordan collected and memorialized information rendered his declaration and testimony unreliable.**

Like the manner in which he collected evidence, the manner in which Mr. Riordan wrote his declaration also undermines its reliability and the reliability of his testimony.  For example, Mr. Riordan's failure to preserve notes he took during his discussions with Ms. Mojaddidi made impossible a critical comparison of his assertions to his contemporaneous source writings.  Despite testifying that he "probably" took notes during his conversations with Ms. Mojaddidi, Mr. Riordan did not preserve those notes.  (Tr. 843:3-4).  Upon further questioning, Mr. Riordan retreated to the position that it was "certainly possible" he took notes of those conversations.  (Id. at 843:17-20).  When asked if he preserved his notes, he answered: "I don't -- no."  (Id. at 843:21-22).  He could not recall when he destroyed his notes but did not find them in his case files.  (Id. at 843:23-25).  He agreed that preserving notes is "always important," and changed his position again by stating he did not recall taking "extensive notes" during his conversations with Ms. Mojaddidi.  (Id. at 844:2-4).  What is clear from Mr. Riordan's shifting testimony is that he took *some* notes during his indirect fact-finding discussions with Ms. Mojaddidi, and he destroyed those notes at some point before the evidentiary hearing in this

---

[30] As discussed more below, Hayat's 2007 new trial motion included declarations from two of his cousins, who purported to be alibi witnesses, in which those family members asserted the claim that Hayat rarely left his village and was not away for more than three months.  (See CR 441, Ex. K & L).  Those declarations remain on the public docket and have been available to anyone in the world able to access the Court's electronic filing system (or to associates of such people) since then.  Indeed, those declarations may have provided Hayat's other family members and close friends a roadmap for their own purported alibi declarations in this matter.

matter.  By doing so, he eliminated any chance to test the reliability of the assertions in his declaration against those notes.

          **c.**        **Mr. Riordan's destruction of his notes made it impossible to compare his declaration to contemporaneous writings, and undermined the reliability of his declaration and testimony.**

Mr. Riordan's destruction of his notes also undermined the reliability of his hearing testimony because that testimony consisted of his rehearsal of the assertions in his declaration.  Despite admitting that he took and destroyed some notes of his discussions with Ms. Mojaddidi between May 2006 and September 2007, Mr. Riordan testified that he did not rely on those notes to prepare his declaration. That assertion is, at best confusing, and at worst, strains credulity.  Mr. Riordan's declaration is 11 pages long and purports to memorialize detailed facts collected during a handful of discussions—between approximately three and six—over a period of 16 months (or 488 days).  (Id. at 854:12-22, 800:16-23). On its face, Mr. Riordan's claim that he accurately recalled from memory alone the level of detail he included in his long declaration is unpersuasive.  The claim is even more suspect when compared to his testimony, in which he failed to recall facts or changed his testimony in the short three-days period between his direct and cross-examination.

          **3.**        **Mr. Riordan's testimony undermined his claim that he accurately recorded in his declaration facts from several conversations over 16 months from his memory alone, and undermined the reliability of his declaration and testimony.**

For example, on direct examination Mr. Riordan could not recall whether he first learned of Ms. Mojaddidi's relative inexperience in his May 19, 2006, meeting with her or at some other time.  Yet, on cross-examination, he remembered that he consulted with Mr. Broderick about Ms. Mojaddidi's experience and qualifications when he agreed to serve as her mentor for purposes of her appointment as counsel for Hayat in post-trial proceedings. (Compare Tr. 795:7:14 with 836:2-11).  Mr. Riordan's failure to initially recall such a fact is surprising because, in his role as Hayat's chief advocate, he has offered Ms. Mojaddidi's relative inexperience as a near *per se* justification to reverse Hayat's conviction.  (See Doc. 495; Pet. at 2-6, 11-12;OPHB at 12-13).  Moreover, Ms. Mojaddidi's experience is the focus of nearly an entire page of Mr. Riordan's declaration, which he reviewed "at least five" times and "absolutely" reviewed before his direct testimony at the February 2018 hearing.  (See id. at

858:2-12; Def. Ex. B ¶ 3). Despite those efforts, his memory failed on direct examination.

Similarly, Mr. Riordan could not recall when he first spoke to Ms. Mojaddidi about his suspicions concerning her alleged conflicted representation of Hayat. (Id. at 811:24-812:19). That memory failure is especially perplexing because Mr. Riordan asserted in his declaration that Ms. Mojaddidi admitted granting Mr. Griffin control over all final decisions for Hayat's case, an admission that, if accurately characterized, appears especially memorable. (Def. Ex. B ¶ 8). It is also hard to believe Mr. Riordan would have continued his ruse of mentoring Ms. Mojaddidi after such a purportedly staggering admission. Correcting his faulty memory, Mr. Riordan later asserted he spoke to Ms. Mojaddidi about potential conflict claims between the denial of Hayat's new trial motion and his sentencing, a claim Ms. Mojaddidi disputed.[31] (Id. at 813:7-814:6; W.M. Depo. 95:6-96:10).

Mr. Riordan also could not remember if he alleged conflict claims in Hayat's 2007 habeas action. (Id. 812 at 15-19). He did. (CR 495). That memory failure is also significant. Mr. Riordan filed Hayat's 2007 habeas petition after hearing the alleged admission by Ms. Mojaddidi that she ceded all decision-making authority for Hayat's case to Mr. Griffin. That Mr. Riordan would remember her earlier alleged statements but not his later, more significant, conduct of deploying them in support of Hayat's conflict claims makes no sense.

Mr. Riordan's failure to recall significant facts during his testimony, even after repeatedly reviewing his declaration, upends his claim that he accurately recorded the facts in that 11-page declaration all from his memory alone. More likely, long after the last of his several indirect conversations with her scattered over 16-months, Mr. Riordan sat and tried to write what he recalled Ms. Mojaddidi said. Unable to recall her words, he conferred with others, reviewed his own argument in

---

[31] Mr. Riordan appeared in this case on May 19, 2006. (CR 350). The District Court denied Hayat's new trial motion a year later on May 17, 2007. (CR 482). Mr. Riordan's declaration was signed three and a half months later, on September 7, 2007. (Ex. B at 11). Hayat was sentenced three days after that on September 10, 2007. (CR 500). According to Mr. Riordan's testimony, Ms. Mojaddidi waited more than a year to "admit" to him that she ceded control over Hayat's case to Mr. Griffin. Moreover, he claims she did so *after* her disappointment at learning of Mr. Riordan's plan to attack her representation of Hayat in a habeas action, and in the face of her testimony that he never questioned her about a conflict. Meanwhile, Mr. Riordan also testified the Hayat retainer agreement, which he received on August 26, 2007, formed a "cornerstone[]" of his decision to assert a conflict claim against Ms. Mojaddidi. (Tr. 813:13-16). Yet, that retainer agreement is not mentioned once in his declaration. Mr. Riordan's muddled recollection during his testimony about highly significant events concerning Hayat's conflict claim, including assertions in his declaration, undermines his claim the declaration is accurate.

favor of Hayat's claims, and wrote what, as Hayat's advocate, he wished he heard; what wanted to hear; what he knew he needed to hear for Hayat's claims to succeed. That process cannot have yielded a reliable declaration. It also rendered Mr. Riordan's hearing testimony hopelessly unreliable.

> **a.** **Mr. Riordan's discussions with his law partner to supplement his own memory, and his review of Hayat's legal argument while drafting his declaration, undermined the reliability of his declaration and testimony.**

Other details about the manner in which Mr. Riordan wrote his declaration also undermine its reliability and the reliability of his testimony. Those details include his discussions with Mr. Horgan to supplement his own memory, and his review of Hayat's legal argument as he drafted his declaration. First, Mr. Riordan was "sure" he and Mr. Horgan, who was allegedly present for some discussions with Ms. Mojaddidi, collaborated on the writing of his declaration. (854:17-856:1). Yet, after making that admission, Mr. Riordan asserted that no part of the declaration was based on Mr. Horgan's recollection because "I think my memory is better than his." (Id. at 856:7-17). Mr. Riordan also testified, contrary to common experience, that Mr. Horgan reviewed his declaration and the two men had not a single disagreement about their separate recollections of the details of the 11-page declaration.[32] (Id. at 856:1-11). Neither Mr. Riordan nor Mr. Horgan appears to have applied much scrutiny in his review because both failed to catch and correct clear fact errors, like Mr. Riordan's assertion that Hayat made his initial appearance in 2006 instead of 2007, when it actually happened. (Def. Ex. B ¶ 7). That error survived a process in which Mr. Riordan testified he "might make a hundred revisions."[33] (Tr. 856:21-23).

---

[32] It was Mr. Horgan and not Mr. Riordan who emailed a draft of the declaration to Ms. Mojaddidi on August 30, 2007. (See 815:2-7; Ex. JJJ.3). One minute later, Mr. Horgan emailed confirmation that he did so to Mr. Riordan. (See JJJ.4). The exchange calls into some question exactly how much control Mr. Horgan had over the content of the declaration.

Additionally, the claim that there was no disagreement between Mr. Horgan and Mr. Riordan about the content of the declaration implies Mr. Horgan may have simply deferred to the work of his former boss. Mr. Horgan was Mr. Riordan's associate for as many as ten years before becoming his partner. (Tr. 855:49). Notably, Mr. Horgan did not prepare a separate declaration memorializing his independent recollection of any discussions he and Mr. Riordan had with Ms. Mojaddidi. Nor did Mr. Horgan include his recollections in the declaration he prepared memorializing his conversations with Mr. Reichel. That fact is surprising in light of the many admission Mr. Riordan claims she made to them. Mr. Horgan elected not to bolster Mr. Riordan's testimony with his own.

[33] Mr. Riordan testified that he was unaware whether he preserved any prior drafts of his declaration, and testified he did not disclose any such prior drafts during voluntary discovery in this matter. (Tr. 857:16-858:1). In another example of his poor memory at the hearing, Mr. Riordan forgot that Mr. Horgan disclosed the earlier

Additionally, in the declaration, Mr. Riordan uses the plural "we" to describe alleged questions put to Ms. Mojaddidi, and "us" to describe whomever she allegedly answered.  (Def. Ex. B ¶¶ 8, 12(b), 12(d), 12(e), 15).

Much more troubling, Mr. Riordan also admitted that while revising the substance of his declaration "it was very possible" he used pleadings in Hayat's case as a roadmap.  The following exchange occurred:

> Q.   Aside from grammatical or spelling revisions, did you make
>      significant revisions to the substance of your declaration?
>
> A.   I don't recall making a significant -- well, I -- it is
>      very possible that I was reviewing pleadings in the case at the
>      time I was doing that, and there could have been an instance in
>      which I made a revision based on my review of pleadings.
>      That's certainly possible.
>
> Q.   So, you incorporated your legal arguments into the declaration?
>      …
>
> A.   I -- I could look at this again. I don't believe there are any legal
>      arguments in this declaration.

(Id. at 857:1-15).  A prior draft of Mr. Riordan's declaration, which predates the version he signed, includes several citations to case law among the factual assertions.  Those citations confirm Mr. Riordan's testimony that it was "very possible" that he reviewed Hayat's legal arguments while preparing his declaration.  (Id. See also Def. Ex. JJJ.4 ¶ 8).  Also consistent with Mr. Riordan's testimony, those citations are absent from his final declaration, deleted by him or another who deemed them inappropriate for inclusion in a purportedly neutral statement of facts.  (Tr. 857 3-15; Def. Ex. B ¶ 9).  Needless to say, a witness who relies on a party's legal arguments as a roadmap for crafting a purported declaration of facts supporting that party's claims, raises strong doubt about the reliability of

draft of his declaration that he sent to Ms. Mojaddidi, which was included in two exhibits Hayat sponsored at the hearing.  (See Def. Ex. JJJ.3 and JJJ.4).  Mr. Riordan testified on re-direct that he was able to remember statement he claimed Ms. Mojaddidi made to him in a handful of conversations over 16 months because they were unusual and important, and compared those comments to his experience arguing before the Supreme Court of the United States and participating in the representation of famous clients.  (Tr. 888:17-889:18).  However, as set forth below, Mr. Riordan admitted on cross-examination that his declaration overstated at least one significant accusation against Ms. Mojaddidi, which undermined his claims concerning the accuracy of his memory.

his factual assertions.

    **b.**    **Mr. Riordan's concession on cross-examination that admissions he attributed to Ms. Mojaddidi in his declaration and testimony were overstated is direct evidence of the unreliability of the scope and detail of both.**

The deep flaws in the manner in which Mr. Riordan collected and recorded information is not the only the evidence of the unreliability of his declaration and testimony. During his testimony, Mr. Riordon provided direct evidence that his declaration is unreliable and overbroad in its most critical assertions. On cross-examination, Mr. Riordan retreated from one of the most aggressive claims in his declaration, which he repeated several times during his direct testimony. That retreat exposed the unreliability of his entire declaration and the testimony he based on it. As discussed above, in his declaration Mr. Riordan claimed that:

> Ms. Mojaddidi informed us that Mr. Griffin insisted as a condition of working with Ms. Mojaddidi in this joint effort that, while significant strategic and tactical matters decisions [sic] would be discussed between them, the final decision making power over such decisions in both the cases of Umer Hayat and Hamid Hayat would rest with him. Ms. Mojaddidi agreed to that condition, and while she and Mr. Griffin reached a consensus on various matters made during the trial of their clients, Mr. Griffin retained the final decision power on matters affecting Hamid Hayat throughout her client's trial.

(Ex. B ¶ 8). Hayat quoted most of that passage in his post-hearing brief in support of his conflict clam. (OPHB at 19).

Contrary to the clear meaning of the above-quoted assertion in his declaration, on cross-examination Mr. Riordan objected to the notion that Ms. Mojaddidi ceded "all" of her decision-making authority to Mr. Griffin. (Tr. 850:24-851:9). Rather, he claimed, "it is *not true* that she ceded to Mr. Griffin … control of each and every decision taken during the defense of [Hayat]. [Ms. Mojaddidi's] statements to us were that she did so in regard to a number of significant decisions." (Id. at 851:4-7) (emphasis supplied). But that is not what Mr. Riordan wrote in his declaration and it is not what he said in his direct testimony. He did not use the word "all" in either instance but his meaning was clear; he claimed Ms. Mojaddidi ceded control over all "significant strategic and tactical matters." (Ex. B ¶ 8). He described those matters in his declaration in a list that encompassed every significant litigation

choice presented in the case, including what motions to file, whether to seek a continuance to investigate potential affirmative defenses, whether to seek a security clearance, which witnesses to call, and whether Hayat would testify.  (Id.)  That list reserved for Ms. Mojaddidi decision-making authority over such matters as what color sticky notes to use at trial and where to eat lunch each day.

Mr. Riordan's retreat from the text of his declaration and from his testimony repeating the substance of that text on direct examination is striking.  It is an implicit admission that critical factual assertions in his declaration are overbroad and inaccurate.  It necessarily calls into question the reliability of the scope and detail of the entirety of his testimony but especially his testimony concerning Hayat's alleged conflict claim.  It also adds weight to the other record evidence supporting Ms. Mojaddidi's consistent and credible testimony that, in fact, she never uttered the words Mr. Riordan attributed to her in that passage.

Mr. Riordan had several opportunities before cross-examination to make clear the scope and meaning of the claim in Paragraph 8 of his declaration, which he repeated in his direct testimony.  In each instance, he elected not to.  First, during her 2014 deposition, the prosecutor asked Ms. Mojaddidi about the substance of the claims made in Paragraph 8 and elsewhere in Mr. Riordan's declaration.  (W.M. Depo. 130:17-135-25).  The following exchange occurred:

> Q.    It is alleged that [Mr. Griffin] told you that under this joint defense agreement that *all* final decision-making power over both cases would rest with him.  Is that accurate?
>
> A.    Absolutely not.

(Id. at 131:2-6) (emphasis supplied).  Mr. Riordan, who represented Hayat at the deposition, (id. at 4:21-24), did not object to the question.  He did not explain that the question presumed inaccurate facts, and that his accusation was more limited in scope, as he did at the 2018 hearing.

Second, no fair reading of Paragraph 8 can leave one with the impression that Ms. Mojaddidi's purported admission of blind deference to Mr. Griffin concerned anything other than all significant strategic and tactical decisions.  Mr. Riordan wrote, "the final decision making power over such decisions in both the cases of Umer Hayat and Hamid Hayat would rest with [Mr. Griffin]."  (Def. Ex. B ¶ 8).  Further, as if to avoid any ambiguity about the broad scope of her purported admission, Mr.

Riordan repeated the charge in the same paragraph, stating, "Mr. Griffin retained the final decision power on matters affecting Hamid Hayat throughout her client's trial." (Id.) Nothing in Paragraph 8 conveyed any meaningful limitation on Mr. Riordan's accusation. If he intended to mean something less than all significant strategic and tactical decisions, he could have and should have said so. He did not.

Next, in his direct testimony, Mr. Riordan repeated, several times and without limitation, the same broad charge in his declaration. Testifying about his alleged discussions with Ms. Mojaddidi about a potential conflict, Mr. Riordan referenced his declaration and stated, "[t]here was a description [in it about] the nature of the relationship between [Mr. Griffin] and [Ms. Mojaddidi] during the trial, and, essentially, an assertion that he had control over the decision making for her client." (Tr. 812:8-12). In another instance, he testified, "[Ms. Mojaddidi] said that the understanding was that certainly they would discuss things, but [Mr. Griffin would] be the … team leader and the ultimate decision maker on what strategy to pursue." (Id. 817:18-21). In a third instance, Mr. Riordan testified, "[Ms. Mojaddidi] made clear that if push came to shove on a decision, it was understood that [Mr. Griffin] would make the decision." (Id. at 818:3-4). He made no effort to limit his accusation to the meaning he later asserted on cross-examination, where he abandoned the breadth of his claim in favor of a more narrow assertion.

Mr. Riordan's attempt to re-write his declaration on cross-examination to make his accusations appear more reasonable reveals the unreliability of the claims he asserted in that declaration. Moreover, he testified that he relied heavily on that unreliable declaration to prepare his testimony in this matter, more than ten years later. (Id. at 849:18-850:2). Thus, his testimony simply cannot be relied upon to overcome Ms. Mojaddidi's consistent and credible testimony, in which she denied Mr. Riordan's accusations. Mr. Riordan had ample opportunity to prepare a declaration that was accurate before his cross-examination ten years later. He testified he might have subjected his declaration to as many as "a hundred revisions." (Tr. 856:21-23). If so, that process should have resulted in a declaration that conveyed what he actually heard from Ms. Mojaddidi instead of something he did not. Nevertheless, Mr. Riordan allowed the misimpressions in his overbroad declaration to linger—through years of litigation, through Ms. Mojaddidi's 2014 deposition, and through his direct examination in 2018. It was

not until he was confronted with the absence of any corroboration in the record for his broad charge that, for the first time, he announced a revision and explained it was what he meant all along. (Id. at 850:6-851:25).

That Mr. Riordan attempted in his cross-examination testimony to limit the breadth of his accusations demonstrates that his declaration and testimony did not convey what actually happened but, instead, recounted impressions shaded by an impassioned advocate in a manner best suited to advance Hayat's habeas claims. Mr. Riordan's embrace of the irreconcilable roles of witness and advocate infected his account of the facts and transformed them from whatever he might have heard to an approximation or likely worse, what wanted to hear. If not for his retreat on cross-examination, the misimpression conveyed by the over-broad accusations in his declaration and testimony might persist. His testimony is unreliable.

**c.     Mr. Riordan admitted that no contemporaneous records corroborate his claim that Ms. Mojaddidi ceded control to Mr. Griffin over decision-making for Hayat's defense.**

On cross-examination, Mr. Riordan also conceded that his broad accusation that Ms. Mojaddidi admitted to him that "Mr. Griffin retained the final decision power on matters affecting Hamid Hayat throughout [Hayat's] trial," was not supported by contemporaneous writings in his file or in Ms. Mojaddidi's file. First, while discussing the destruction of any notes he took of his conversations with Ms. Mojaddidi between May 2006 and September 2007, Mr. Riordan acknowledged that he did not otherwise record her alleged admissions in separate writings at the time. He conceded that he did not prepare memos to his file that included his contemporaneous written recollections of his ongoing conversations with Ms. Mojaddidi over that 16-month period. (Tr. 843: 5-7). Additionally, he conceded he did not use the less formal method of summarizing his conversations with Ms. Mojaddidi in e-mails and send those summaries to her to confirm their accuracy. (Id. at 843:8-16).

Mr. Riordan's behavior was puzzling. He was investigating the conduct of his co-counsel at the time, who he was also purportedly mentoring. He knew he might likely end up a witness supporting Hayat's conflict claims at an eventual hearing. Yet, he did not take steps to reduce the strong taint on his eventual testimony resulting from his irreconcilable roles as Hayat's primary witness and chief advocate. One reason Mr. Riordan might not have made contemporaneous notes or other written

records of his discussions with Ms. Mojaddidi is that, at the time, he perceived her words as benign and unremarkable, consistent with her testimony.  However, as time passed and Mr. Riordan's passion for Hayat's habeas claims grew, his after-the-fact memorialization resulted in a declaration infected by his understandable impulse to advocacy, which crowded out his ability to recount facts in the neutral and disinterested manner of a witness.

Second, at the start of Hayat's habeas case, Mr. Riordan obtained and reviewed Ms. Mojaddidi's case file for her representation of Hayat.  (Id. at 850:6-8).  On cross-examination, he conceded that file contained no contemporaneous writings that confirmed Mr. Riordan's allegations that Ms. Mojaddidi ceded authority over Hayat's case to Mr. Griffin.  Specifically, he conceded the file did not contain e-mails between Ms. Mojaddidi and Mr. Griffin that confirmed she ceded to him control over decision-making for Hayat's defense.  (Id. at 850:15-17).  He did recall seeing any letters between Ms. Mojaddidi and Mr. Griffin in which she ceded to him control over decision-making for Hayat's defense.  (Id. at 850:18-23).  He did not recall seeing any notes of phone calls between Ms. Mojaddidi and Mr. Griffin in which she ceded to him control over decision-making for Hayat's defense.  (Id. at 851:10-14).  He did not recall seeing any notes of face-to-face conversations between Ms. Mojaddidi and Mr. Griffin in which she ceded to him authority over decision-making in Hayat's case.  (Id. at 851:10-14).  He also conceded that the file did not contain any formal written agreements between Ms. Mojaddidi and Mr. Griffin in which she explicitly ceded to him authority over decision-making for Hayat's defense.  (Id. at 851:10-14).

The absence of any record in Ms. Mojaddidi's file corroborating Mr. Riordan's claim is a significant gap in Hayat's conflict argument.  If, as Hayat claims, Ms. Mojaddidi was so inexperienced and guileless she did not perceive the ethical problem of giving control of her client's defense to another lawyer, it is unlikely she would have hidden that fact in her records.  Thus, unless Hayat suggests she conspired with Mr. Griffin to hide such evidence, her file should contain emails or other correspondence reflecting that significant decision.  More likely, of course, there was no evidence corroborating Mr. Riordan's assertions in Ms. Mojaddidi's file because, as she testified credibly and consistently, she never made the agreement with Mr. Griffin that Hayat claims.

Additionally, Ms. Mojaddidi rejected the only writing that contained a summary of her alleged

admissions to Mr. Riordan. On August 30, 2007, Mr. Horgan emailed to Ms. Mojaddidi a draft of Mr. Riordan's declaration. (Def. Ex. JJJ.3). By then, the District Court had denied Hayat's new trial motion and Mr. Riordan had discussed with Ms. Mojaddidi his plan to attack her representation of Hayat in a habeas action. (Tr. 810:3-811:16). Although emotional over his decision, she continued to correspond with Mr. Riordan about other matters. (Id. at 811:10-16, 852:14-24). However, she did not respond to his draft declaration with an endorsement of his accusations. (Id. at 852:14-24). Her silence signaled her disagreement with those accusations and not her acquiescence, as confirmed by her consistent testimony at her 2014 deposition and the 2018 hearing.[34] Mr. Riordan must have expected that outcome because he did not bother to prepare and deliver for her signature a draft declaration in which she confessed the allegations against her. (Id. at 852:25-853:17). The absence of any contemporaneous written corroboration of Mr. Riordan's accusations undermines the reliability of his declaration and testimony.

Finally, Mr. Riordan implied that by her silence, Ms. Mojaddidi must have agreed with his accusations. (Id. at 815:23-816:7). To the contrary, her silence signaled her disagreement with his claims, as demonstrated by her later testimony. However, Mr. Riordan contrasted her silence with Mr. Griffin's three-sentence email response to his delivery of a copy of Hayat's 2007 habeas motion, which included a final draft of Mr. Riordan's declaration. (See Def. Ex. D). In his short response, Mr. Griffin corrected Mr. Riordan's misidentification of him as a former member of the Criminal Justice Act panel. (Id. at 816:1-7; Def. Ex. D). However, Mr. Riordan's assertion of Mr. Griffin's implicit agreement with the substance of his declaration stretched Mr. Griffin's words beyond any fair interpretation.

Mr. Griffin's response is not an endorsement of the claims in Mr. Riordan's declaration. Instead, it appears Mr. Griffin may have corrected the erroneous description of himself in the body of the motion papers and not the declaration. Hayat's 2007 motion included a short description of Mr. Griffin in the

---

[34] It appears that Ms. Mojaddidi twice declined to endorse Mr. Riordan's declaration. In additional to the draft version Mr. Horgan delivered to her on August 30, 2007, (Def. Ex. JJJ.3), Mr. Riordan appears to have sent a final version on September 9, 2007. (See Def. Ex. D). The relevant exhibit does not include any attachments. (Id.) The email appears to have contained courtesy copies of Hayat's entire 2007 habeas motion, including Mr. Riordan's declaration. (Id.) Consequently, Ms. Mojaddidi had a single day to respond before Mr. Riordan filed the motion the following day. (CR 496). As with the draft version, Ms. Mojaddidi's silence signaled her rejection of the content of the final declaration, consistent with her deposition and hearing testimony.

introduction. (CR 496-1 at 3:18-20). In his reply, Mr. Griffin first referenced the habeas motion. (Def. Ex. D). Concerning the declaration, he warned, "I may have responses to various statements made in [it]," clearly implying he had not yet even read it and the other attached declarations. (See Def. Ex. D). Moreover, if Mr. Riordan truly expected substantive revisions from Mr. Griffin and Ms. Mojaddidi, he would likely have sent the motion and declaration more than a single day before he filed it. (See Def. Ex. D; CR 496). Neither Mr. Griffin nor Ms. Mojaddidi has ever endorsed the accusations in Mr. Riordan's declaration. The admissions by Ms. Mojaddidi that Mr. Riordan asserts in his declaration and which he repeated in his testimony stand alone and uncorroborated. By contrast, Ms. Mojaddidi has strongly disputed those claims in consistent, credible, and untainted testimony supported by the trial record and other objective facts in the record.

**4.      Mr. Riordan's role as Hayat's lead advocate resulted in the pollution of his testimony with details he did not recall but learned during his preparation of Hayat's petition or his preparation for the 2018 hearing.**

Inadvertently or not, Mr. Riordan supplemented his testimony with details he learned in his role as Hayat's advocate. His resulting testimony is an unreliable amalgamation of facts based, in part, on his personal knowledge and, in part, on hearsay or indirect sources. Such testimony is unhelpful to a trier of fact and cannot overcome consistent, credible, and untainted testimony to the contrary. For example, on direct examination Mr. Riordan testified about his conversation with Ms. Mojaddidi concerning her invitation to add Mark Reichel as co-counsel for Hayat before trial. (Id. at 801:1-25). In that testimony, Mr. Riordan expressly referred to what he recalled Ms. Mojaddidi said to him at the time. (Id. at 801:8). He testified he "believed" she told him then that she offered $10,000 to Mr. Reichel to join Hayat's defense. (Id. at 801:15-802:1).

On cross-examination, Mr. Riordan conceded that his declaration did not include any mention of the particular amount Ms. Mojaddidi offered Mr. Reichel to serve as co-counsel for Hayat. (Id. at 859:13-21). Mr. Riordan then retreated from his claim that he recalled that Ms. Mojadiddi mentioned the amount in one of their discussions ten years earlier. (Id. at 859:23-860:6). Instead, he claimed that he discussed the amount with Mr. Reichel in 2014. (Id. at 860:2-6). He denied that he learned the detail from listening to Mr. Reichel's testimony days earlier during the evidentiary hearing. (Id. at 860:7-11). He also offered a third explanation, and claimed he might have learned the detail in a conversation with

Mr. Reichel, a week earlier, while preparing him to testify at the hearing.  (Id.)

Mr. Riordan's shifting explanations for the basis of his knowledge about the detail in the above example demonstrates the hopeless taint on his testimony from the irreconcilable roles he undertook as Hayat's chief advocate and primary witness.  Whether inadvertent or not, in his role as Hayat's advocate, Mr. Riordan absorbed hearsay, speculation, suggestion, and, in the case of material he learned from James Wedick's testimony, clearly erroneous infomation.  Mr. Riordan necessarily incorporated all of that unreliable material into the assertions in his declaration and in his testimony.  As a result, his testimony is simply too unreliable to support Hayat's burden in this case.

### 5.   Mr. Riordan's allegations concerning visas illustrates how his declaration is more legal wishful thinking than fact.

Hayat finds fault with Ms. Mojaddidi not obtaining visas for Pakistani witnesses and obtaining testimony through Rule 15 depositions, despite habeas counsel's own failures with regard to both of these issue.  Mojaddidi's explanations for why she did not pursue visas or Rule 15 depositions are consistent with the record and litigation through trial.  Mr. Riordan's claimed admissions are out of context and simply contrary to a reasonable and practical litigation strategy given the time and resources available.  See Harrington, 562 U.S. at 107 (trial counsel is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.").

In 2005, Wazhma Mojaddidi was mostly a family law and immigration attorney.  (W.M. Depo. 13:14-20; Tr. 683:6-11).  Yet in Hayat's petition, he claimed that Ms. Mojaddidi's failure to procure witnesses from Pakistan was somehow not only ineffective, but an adverse effect of an alleged conflict.  (Pet. at 29-31).  Post-hearing, Hayat relies on the testimony of Mr. Riordan concerning the supposed admission as his only evidence supporting the claim that Mr. Griffin somehow dissuaded Ms. Mojaddidi from obtaining visas for the Pakistani witnesses.  (OPHB at 43) (citing only Mr. Riordan's testimony).  In his declaration, Mr. Riordan claimed that, "Ms. Mojaddidi stated that she had discussed with Mr. Griffin her belief that the defense should move the court to order the government to provide visas to prospective witnesses in Pakistan so that they could travel to Sacramento for the purposes of testifying as defense witnesses."  (Def. Ex. B, ¶ 12(d), p. 9:4-7; CR 532 at 16:4-7).  Mr. Riordan then claims that,

Case 2:05-cr-00240-JAM-DB   Document 725   Filed 05/25/18   Page 86 of 247

"Mr. Griffin stated to her that such a move would be futile, as the issuance of the visas was within the purview of a different branch of government that was uncooperative." (Def. Ex. B, ¶ 12(d) at 9:7-9; CR 532 at p.16:7-9). Then, according to Mr. Riordan, he lectured Ms. Mojaddidi about Rule 15 depositions, and in response, "Ms. Mojaddidi stated that she had been unaware of the existence of the provision of Rule 15 authorizing such depositions and that Mr. Griffin had not mentioned them to her. (Id. at 9:10-17; CR 532 at p. 16:10-17). None of these alleged discussions would have flowed naturally from a discussion of any of the issues in the new trial motion. (CR 441).

Ms. Mojaddidi has consistently testified that she would not have asked Mr. Griffin for advice concerning visas, because her immigration experience was superior to his. (W.M. Depo. 184:11-19; Tr. 735:24-736:25). Although in her deposition Ms. Mojaddidi testified that she believed she talked to Mr. Griffin about the visas, she did not recall what he said, and stated she came to the conclusion that it would be difficult to obtain visas for the witnesses from Pakistan. (W.M. Depo. 38:21-39:4). Ms. Mojaddidi has consistently testified that Rule 15 depositions did not become an issue because she already determined that the possible alibi witnesses in Pakistan she identified from discussions with Hayat and his family were not viable alibi witnesses.[35] (W.M. Depo. 39:5-40:2; 151:7-152:3, 164:7-166:2, 183:18-184:19; Tr. 733:7-734:6, 736:13-25). Ms. Mojaddidi's statements and testimony are consistent with the actual law concerning attempts to obtain evidence from witnesses in Pakistan. (See CR 581, 584, 640, 678).

In contrast, Mr. Riordan's implication that visas for witnesses from Pakistan are easy to obtain and would be a step that any competent attorney would routinely take has not been his own experience. (CR 639 at 2:23-3:2). The petition and Mr. Riordan's declaration show nothing more than legal wishful

---

[35] With regard to the Rule 15 depositions, they are neither easy to obtain, nor are they simple logistically to arrange. (CR 584, 683). With more than ten years to develop contacts in Pakistan, the advancement of video-conferencing technology, and an additional two months between December 2017 and February 2018 to find a suitable host, Mr. Riordan was able to arrange for the video testimony. In the middle of several months preparing for trial between late 2005 and early 2006, and attempting to prevent the government from strengthening its case, it is unreasonable to expect any attorney to have successfully moved for, and arranged testimony for, witnesses that neither Hayat, nor his family informed Ms. Mojaddidi of prior to trial. Strickland, 466 U.S. at 691 (stating that counsel is entitled to make decisions to save time and resources based on information provided by the client). As discussed below, Ms. Mojaddidi was not ineffective for failing to move for them, nor was Hayat prejudiced because Hayat and Hayat's family never informed Ms. Mojaddidi about the newly proffered alibi witnesses.

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

59

thinking and Mr. Riordan's own plans to attempt to procure testimony from Pakistani witnesses. (See Pet. 29-31; CR 639, 679). Mr. Riordan asked this Court to order the government to provide visas. (CR 639, 679 at 8-9). In support, Mr. Riordan cited nothing more than an American Bar Association Litigation News article as the basis of his request for a court order to facilitate travel of Pakistani witnesses. (CR 639). As the government pointed out, neither this Court, nor the government, has any authority to order the State Department to issue a visa. (CR 640 at 5-6; CR 672 at 3:19-22). With regard to the request for an "S-Visa," this Court concluded that there was no authority to order the government to apply for or obtain such visas. (CR 683 at 11:16-22). Mr. Riordan's claim that Ms. Mojaddidi told Mr. Griffin that she believed they should move the Court for visas for the witnesses, but was dissuaded by Mr. Griffin is inconsistent with how the visas work, and Ms. Mojaddidi's expertise in immigration law. Mr. Riordan's declaration only maps out his legally unsupported strategy to demonstrate that determined counsel could make the visas happen, and his unsuccessful attempts to obtain visas demonstrate that his ineffectiveness argument is far overstated. (Pet. at 29-31; Def Ex. B, ¶ 12(d), p. 9:4-7; CR 532 at 16:4-7). This example demonstrates that the assertions in Mr. Riordan's declaration are hopelessly intertwined with his own developing habeas litigation strategy at the time, and his memories about Ms. Mojaddidi's alleged admissions—which are contrary to her immigration experience, her testimony, and the law—lack reliability. Therefore, this Court should discount Mr. Riordan's bare testimony and declaration and credit Ms. Mojaddidi's credible and consistent testimony, which is corroborated by the evidence in the record.

### C.   Another Court in this District Found a Declaration Mr. Riordan Authored in a Past Habeas Matter "Unfairly" Took Statements by Another Person "Out of Context."

This is not the first time that Mr. Riordan's impassioned advocacy has resulted in his authoring an unreliable declaration that distorted facts to advance the claims of his client. On cross-examination, Mr. Riordan admitted that in a prior habeas matter in this District, before the Honorable Edward J. Garcia, Mr. Riordan authored a declaration for an investigator that Judge Garcia found misleading. (Tr. 878:7-881:14). That past example of Mr. Riordan's over-zealous advocacy in support of a client supports the conclusion that his declaration and testimony in this case are too unreliable to support Hayat's claims.

Specifically, in United States v. Clayton Jackson, CR-93-118-JEG, Mr. Riordan hired an investigator to interview a juror in support of a habeas claim associated with a threatening phone call the juror received during deliberations. (Gov. Ex. 42, attached hereto as Gov. Ex. 1 at 1-14). The investigator prepared reports of his interview of the juror and others that included the juror's impression that the threatening call might have been associated with an employment dispute and not the trial. (Gov. Ex. 43, attached hereto as Gov. Ex. 2 at 14-18). Mr. Riordan prepared a declaration for his investigator, which the investigator signed and adopted as true. (Gov. Ex. 1 at 74-77).

After remand from the Ninth Circuit, the District Court held an evidentiary hearing on December 14, 2000, at which the investigator testified and admitted his declaration did not include the juror's statements concerning his impression that the threatening call might have been associated with an employment dispute and not the trial. (Gov. Ex. 1 at 63-73). The investigator also agreed that the declaration omitted other relevant facts that Judge Garcia characterized as "favorable to the government." (Gov. Ex. 1 at 75-76). In a subsequent hearing on January 22, 2001, Judge Garcia denied the defendant's habeas claim. (Gov. Ex. 2 at 14-25). In doing so, he made factual findings. (Id.) In particular, he found that the declaration authored by Mr. Riordan, which was "the sole basis for the evidentiary hearing," attributed to the juror in question statement "unfairly taken out of context, as can readily be seen by a comparison of the investigator's full report of the interview of [the juror] and his declaration." (Gov. Ex. 2 at 18).

On cross-examination at the 2018 hearing in this matter, Mr. Riordan recalled his participation in the Clayton habeas matter. (Tr. 878:7-14). Mr. Riordan also recalled the evidentiary hearing in that case and that it involved a matter affecting a juror. (Id. at 878:15-18). In addition, Mr. Riordan recalled that he authored the investigator's declaration in the Clayton habeas matter. (Id. at 878:19-21). However, Mr. Riordan did not recall Judge Garcia's specific finding that the declaration he authored for the investigator contained statements attributed to another person that were unfairly taken out of context. (Id. at 878:23-879:4). He agreed that reviewing a transcript of Judge Garcia's ruling might refresh his recollection. (Id. at 879:7-8). After reviewing the transcript, Mr. Riordan testified that it did not provide him with an independent recollection of the ruling but he added, "I accept that the -- Judge Garcia said that a comparison of [the investigator's] full report of a witness and [his] declaration took something

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

61

unfairly out of context."  (Id. at 881:10-14).

The misleading declaration that Mr. Riordan sponsored in the Clayton matter is an example of Mr. Riordan's sharp litigation practices in the service of his clients.  Whether intentional or not, his sharp practice in drafting his investigator's declaration resulted in a recitation of facts that Judge Garcia found, at best, "unfairly" inaccurate.  Mr. Riordan did not dispute Judge Garcia's characterization of the declaration in the Clayton proceedings or at the hearing in this matter.  In this case, the Court need not find that Mr. Riordan's declaration and testimony was intentionally misleading.  Nor does the government urge such a conclusion.

Rather, the record demonstrates that Mr. Riordan's impassioned advocacy on Hayat's behalf clouded his after-the-fact memorialization of his conversations with Ms. Mojaddidi between May 2006 and September 2007.  As a result, Mr. Riordan committed to writing and later asserted in his testimony, a distorted version of Ms. Mojaddidi's emotional ruminations about her representation of Hayat, which she shared in the emotional aftermath of a bruising trial loss.  Mr. Riordan's declaration and testimony expressed what, as Hayat's impassioned advocate, he wished he heard; what wanted to hear; what he knew he needed to hear to successfully advance Hayat's habeas claims.  Both are unreliable.  Neither can overcome Ms. Mojaddidi's consistent, credible, and untainted testimony, which contradicted all of Mr. Riordan's material allegations.  Finally, Mr. Riordan's declaration and testimony cannot support Hayat's burden on any of his habeas claims.

**D.      Hayat's additional facts witnesses did not corroborate the alleged admissions by Ms. Mojaddidi asserted in Mr. Riordan's declaration and testimony.**

At the 2018 evidentiary hearing Hayat also offered the testimony of Mark Reichel and James Wedick to support his conflict and other claims.  Mr. Reichel is a lawyer who Ms. Mojaddidi considered adding to Hayat's defense before trial.  Mr. Wedick served as the investigator for both Hayats before and during trial.  Their testimony was unhelpful.

Neither Mr. Reichel nor Mr. Wedick provided evidence that corroborated any of Mr. Riordan's alleged admissions by Ms. Mojaddidi.  Moreover, neither offered testimony that established the existence of an actual conflict affecting Ms. Mojaddidi's representation of Hayat.  Mr. Reichel's testimony demonstrated that his involvement in Hayat's case consisted of two conference calls with Ms.

Mojaddidi and Mr. Griffin and several later contacts related to his consulting role for both defendants during trial. Ms. Mojaddidi's credible testimony persuasively answered any questions concerning the Reichel affair. She explained how her anxiety before trial led her to consider adding another lawyer to Hayat's defense, how she restored her confidence, and how she abandoned the idea of adding Mr. Reichel to Hayat's defense. His testimony was irrelevant.

Mr. Wedick's testimony stood out for how much it undermined Hayat's claims. On cross-examination, Mr. Wedick retreated from each of the significant assertions he made in his direct testimony about Ms. Mojaddidi's representation of Hayat. In several instances, his erroneous direct testimony was refuted on cross-examination with exhibits that contradicted his assertions. Mr. Wedick also admitted he had virtually no basis to offer any judgment on Ms. Mojaddidi's strategic and tactical decision-making because he was not present for *any* discussions between her and Hayat concerning those topics. He conceded he was only present for some of the strategy discussions between Ms. Mojaddidi and Mr. Griffin. As set forth in more detail below, neither Mr. Wedick nor Mr. Reichel offered testimony sufficient to satisfy Hayat's burden, whether considered in isolation, together, or with the other evidence Hayat offered.

> **1.  Nothing in Mark Reichel's testimony demonstrates the existence of an actual conflict.**

Immediately prior to trial, Ms. Mojaddidi got "cold feet" and considered whether it would be wise to bring in another attorney to assist her at trial. (Tr. 702:9-13; W.M. Depo. 93:5-21, 94:13). Although she felt "some anxiety" and overwhelmed at the thought of representing Hayat on her own, she ultimately decided she could proceed without adding another attorney. (Tr. 702:12-13; W.M. Deop. 93:15-16). Before she reached that conclusion, Mr. Griffin suggested Ms. Mojaddidi consult with Mark Reichel. (W.M. Depo. 94:13-20). After consultation with Mr. Reichel and Mr. Griffin, Ms. Mojaddidi concluded that it would be best to not associate with Mr. Reichel.

> **a.  Ms. Mojaddidi was anxious before Hayat's trial and considered but decided not to bring in Mr. Reichel as co-counsel for Hayat.**

Ms. Mojaddidi had mixed feelings before trial. (W.M. Depo. 98:5-6). On one hand, she felt nervous and experienced "some anxiety" about handling Hayat's trial on her own. (Tr. 702:12-13; W.M.

Depo. 97:13-17).  She explained that she was doing something she had never done before, the case was receiving national attention, and she realized that she would be handling Hayat's trial on her own.  (Tr. 703:2-14, 703: 23-704:1; W.M. Depo. 21:22-22:4, 93:15-21, 97:13-1798:3-11).  Additionally, she typically second-guessed herself, even if she was over-prepared.  (W.M. Depo. 93:15-21, 97:20-98:11).  On the other hand, Ms. Mojaddidi felt confident because she felt she knew the evidence better than any of the attorneys, including the prosecutors, because she had studied the evidence—much of which was written in Urdu, Pashtu and Arabic—"in [its] different languages." (W.M. Depo. 98:6-9; Tr. 702:7-8).

Ms. Mojaddidi initially "really wanted" to bring in another attorney to assist at trial.  (W.M. Depo. 94:14-22, 97:5-10, 241:12-17; Tr. 702:9-12).  She and Mr. Griffin spoke with Mr. Reichel by phone and Mr. Reichel was willing to serve as co-counsel but his schedule limited his availability. (W.M. Depo. 242:3-12, 100:5-9; Tr. 704:4-5).  Later, Mr. Griffin and Ms. Mojaddidi "talked it out" and she concluded she was well familiar with Hayat's case, could handle it on her own, and that adding Mr. Reichel was unnecessary.  (W.M. Depo. 242:20-243:7, 244:24-245:3; Tr. 702:13).  Mr. Griffin also indicated that if Mr. Reichel came into the case, it would not be necessary for Mr. Griffin to assist or advise Ms. Mojaddidi because Mr. Reichel had comparable experience and she could rely on him for advice.  (Tr. 702:18-25; W.M. Depo. 100:10-16, 243:12-22).  Ms. Mojaddidi believed that "made sense." (Tr. 703; W.M. Depo. 100:13-16).  With her confidence boosted, Ms. Mojaddidi decided to do it on her own.  (W.M. Depo. 100:8-9, 242:22-24, 244:2-245:9; Tr. 704:4-6).  However, she recalled consulting with Mr. Reichel about strategy at the start of Hayat's trial.[36]  (W.M. Depo. 245:10-25).

> **b.  Mr. Reichel demanded a long continuance as a condition of entering the case, which conflicted with the strategy chosen independently by Ms. Mojaddidi and Mr. Griffin**

Nothing in Mr. Reichel's testimony contradicted Ms. Mojaddidi's testimony.  Nor did Mr. Reichel's testimony establish any basis to find the existence of an actual conflict between Ms. Mojaddidi and Mr. Griffin, or their clients.  Mr. Reichel summarized his training and experience, which included positive and negative experiences with prosecutors during his long career as a criminal defense lawyer, including approximately twelve years at the Office of the Federal Public Defender in the Eastern District

---

[36] The trial record reflects that the defense "jointly" retained Mr. Reichel "to provide consultation to the defense jointly." (RT 18:19-20:5).

of California. (Tr. 489:1-502:14). Mr. Reichel testified he learned of the initial charges against Hayat from news reports. (Id. at 502:19-22). Mr. Reichel was social friends with Mr. Griffin and learned he was representing Umer. (Id. at 503:1-6, 504:21-23, 505:24-506:6). Mr. Reichel did not know anything about Ms. Mojaddidi at the time, except that she was "of the same nationality or something" as Hayat, and he believed Mojaddidi's hiring was "another instance where a family hires someone based on nationality and not on experience." (Id. at 506:1-20).

Mr. Reichel recalled that he spoke with Mr. Griffin and Ms. Mojaddidi by phone "approximately two weeks before trial," about entering the case on Hayat's behalf with Ms. Mojaddidi, who was feeling overwhelmed. (Id. at 512:19-513:15). Mr. Reichel recalled he was offered $10,000 to enter the case. (Id. at 514:8-10). However, he immediately proposed a continuance of the pending trial and asked "how far out" the trial could be moved. (Id. at 514:17-25). Mr. Reichel explained that his primary motivation for seeking a long continuance of the trial—perhaps as long as 6 months or more—was to permit him time to prepare. He testified:

> I don't think there is any lawyer, I don't care, you know, if you're right out of law school or not, if you think you're going to come into that case, and it's ten days before trial, or two weeks, there is no one who would have -- I think in a conversation between any two lawyers about you coming in to take over, or even help on the case, it's just assumed we're talking about continuing it until you're ready.
>
> So I said, how long are we going to continue it? Because I was already thinking about the summer, and, you know, whether I wanted to commit my summer to prepping or being in the trial.

(Id. at 515:4-13). Mr. Reichel testified that, in response to his request for a months-long continuance of the trial as a condition of joining Hayat's defense, "*they* said, *we're* not going to, you know. That's not what *we're* going to do. It's not going to be continued." (Id. at 514:19-21) (emphasis supplied). Mr. Reichel's testimony demonstrated that Ms. Mojaddidi and Mr. Griffin were both unhappy with his demand for an extreme continuance of a trial set to begin days from their discussion, and both were unwilling to derail their joint defense strategy to add Mr. Reichel to Hayat's defense.

Hayat's counsel then prompted Mr. Reichel for additional reasons he might have asked for a continuance. Yet, Mr. Reichel remained focused on the primary reason: his need for significant

additional time to prepare for trial.  The following exchange occurred:

> Q.    Was there any other reason that you -- that you were interested in a continuance?
>
> A.    You definitely -- I would have to prepare extensively.  Sounds like -- you know, I don't even know what the evidence is. But, you know, if I'm going to take it over, I want to do my job, which is –

(Id. at 515:15-20).  Unsatisfied with that answer, Hayat's counsel interrupted Mr. Reichel with another question that led him to a different answer.  The following exchange occurred:

> Q.    Did you make any references to motions?
>
> A.    Yes. So, you know, I said -- I actually asked, what motions have been filed? At least let me get an understanding of the posture. If all the motions have been extended -- excuse me, expended, if that's been completely done, arguably, you know, then the continuance doesn't need to be that – you know, doesn't need to be *a year*. But if there is no motion work been done, or something, then, you know, that adds more time to the time estimate for the continuance.

(Id. at 515:21-516:4) (emphasis supplied).  After identifying the possibility of filing pretrial motions not already filed, Mr. Reichel expanded his estimate for the length of a potential continuance to as long as "a year."  (Id. at 516:2).

Mr. Reichel also testified that Mr. Griffin explained his and Ms. Mojaddidi's joint defense strategy to him.  He testified, "he told me the strategy was *they* had decided to push it to trial, and not give the government time to prepare."  (Id. at 516:22-24) (emphasis supplied).  Mr. Reichel explained that he and Mr. Griffin had previously discussed how such a strategy was perfectly reasonable in certain cases.  He testified:

> [Mr. Griffin] and I had just, you know, discussed this. We discussed it that sometimes [the government] bring[s] a [criminal] case on the assumption the defense will take a year to prepare, and that gives them time as well.
>
> He said, no, *we're* doing the thing where *we're* demanding a trial. And each time *we* do, Judge Burrell overrules *our* objection and gives them more time, so *we* don't want to be in a position of excluding time, *we* don't want to be in the position on the record to have excluded time, so *we're* not filing any motions, was the phrase.

(Id. at 516:25-517:8) (emphasis supplied). Mr. Reichel testified that Ms. Mojaddidi agreed with Mr. Griffin's summary of the joint defense strategy, and that the two sounded "very much in lockstep and joint unison about the defense."[37] (Id. at 517:10-17).

Hayat's counsel then again attempted to lead Mr. Reichel to a different answer by asking whether Mr. Reichel specifically addressed seeking time to file a motion to suppress Hayat's confession. (Id. at 517:18-21). Mr. Reichel was insistent that his demand for a lengthy continuance as a condition for joining Hayat's defense was to permit himself time to prepare for trial. He testified, "[s]o that we're clear, I wanted to know how much time I was going to get." (Id. 517:22-23). In response to another question about whether he wanted time to file a motion to suppress Hayat's confession, Mr. Reichel reiterated his clear position that—more than any other reason—he needed time to prepare himself for trial. He testified:

> Just so you all – I'm very clear, in that first conversation, I also explained how busy I was, but that wasn't turning down the case. I mean, I was explaining that, look, I'm really busy, but, you know, two weeks to get ready for that case is ludicrous.

(Id. at 518:9-13).

After his call with Ms. Mojaddidi and Mr. Griffin, Mr. Reichel hoped he had not agreed to join Hayat's defense. He testified:

> When I got off the phone, I thought, I feel – you know, I was thinking, my gosh, I hope -- I really hope I didn't commit myself to doing this for [$]10,000. And, you know, doing it right away, and no motions and so forth.
>
> I thought, well, you know, I mean, I was worried they were going to call back and say, yeah, we want to do this, but the conditions were going to be their conditions. And I didn't know what I was going to do.

(Id. at 518:24-519:6). Although Mr. Reichel had just stated that he hoped he had *not* agreed to join Hayat's defense for an immediate trial, Hayat's counsel asked him if the opposite was true, signaling the answer he wanted. Mr. Reichel reversed his position and stated he "would have done it" for $10,000

---

[37] That Mr. Griffin led the discussion is not significant. He and Mr. Reichel had a long and positive professional and personal relationship. They had been adversaries when Mr. Griffin served as a prosecutor, were recent colleagues in the criminal defense bar, and had a social relationship that included attending social events together. (Tr. 504:25-505:23). Mr. Reichel did not know Ms. Mojaddidi. (Id. at 506:5-6).

and under the condition of going to trial immediately, and that a part of him was "gleeful" at the idea, while another part was "not happy." (Id. at 519:10-17). Mr. Reichel's sudden change of position lacked credibility, especially coming as it did on the heels of his repeated and emphatic insistence that *any* lawyer would require months or a year to prepare for Hayat's trial, and that accepting representation in such a case and going to trial in two weeks was a ludicrous idea.

### c.    Mr. Reichel's destruction of his contemporaneous notes rendered him less credible than Ms. Mojaddidi.

Mr. Reichel's credibility was also damaged by his admission on cross-examination that he destroyed notes of his conversations with Ms. Mojaddidi and Mr. Griffin after he learned of Hayat's habeas action and after he gave an interview to Hayat's counsel in August 2007. (Tr. 5233:3-9). In fact, Mr. Reichel admitted he destroyed an entire file of material concerning the Hayat matter, which he discovered in his home or office in approximately 2013. (Id. at 532:10-536:5). Mr. Reichel testified, "I did throw it away, even though I knew this is pending on habeas…I mean, I wasn't under any subpoena or anything." (Id. at 536:6-10). Yet, Mr. Reichel conceded that Hayat's habeas counsel "may have" asked him in 2007 to disclose notes he took during conversations with Ms. Mojaddidi and Mr. Griffin. (Id. at 536:13-17). Those notes may have contradicted Mr. Reichel's testimony or otherwise provided contemporaneous insight and/or revealed discrepancies from his account of his conversations with Ms. Mojaddidi and Mr. Griffin, 12 years after they occurred. By destroying that evidence after he was aware of Hayat's habeas matter, whether inadvertently or not, Mr. Reichel made cross-examination on such potential discrepancies impossible. Moreover, Mr. Reichel's February 2018 testimony purported to recount conversations from February 2006 based only on his recollection and not any written memorialization. (Id. at 536:25-537:6). On cross-examination, Mr. Reichel conceded that his testimony about the details of those conversations were only "impressions," and that he did not recall the precise words of those conversations, with the exception of "a few phrases." (Id. at 537:7-23).

### d.    Mr. Griffin did not bar Mr. Reichel from entering the case as Hayat's counsel.

In any event, Mr. Griffin and Ms. Mojaddidi were, of course, unaware of Mr. Reichel's alleged mixed feelings about their offer. They could only have relied on what he told them during their phone

discussion, which was that he would require a continuance of at least months to join Hayat's defense. Unsurprisingly, when Ms. Mojaddidi and Mr. Griffin called Mr. Reichel back later that night, they told him, while 'laughing amongst themselves" and "interacting" together, that Ms. Mojaddidi would not require his help, in part, because she preferred to forge ahead with Mr. Griffin.  (Id. 520:10-521:18). Like Ms. Mojaddidi, Mr. Reichel testified that Mr. Griffin indicated if Mr. Reichel came into the case as Hayat's lead counsel, it would not be necessary for Mr. Griffin to continue to assist or advise Ms. Mojaddidi because Mr. Reichel had comparable experience and she could rely in him for advice.  (Id. 520:10-521:18).  Ms. Mojaddidi believed that "made sense" but Mr. Reichel testified he thought it was strange, although he conceded that he could have gotten "the wrong impression."  (Id. 703, 521:8-9).

Although Ms. Mojaddidi decided against adding Mr. Reichel as Hayat's lead counsel, she and Mr. Griffin "jointly" retained Mr. Reichel "to provide consultation to the defense jointly."  (RT 18:19-20:5; Tr. 522:7-13).  In announcing Mr. Reichel's role to the District Court on February 14, 2006, Mr. Griffin stated Mr. Reichel "was not expected" to "examine any witnesses," but would "assist in preparing briefs and motions if various issues come up during the course of the trial."  (Id. at 18:24-19:2; Tr. 523:11-14).  Mr. Griffin also stated that if Mr. Reichel's role expanded, he would, "request to substitute in as either co-counsel or association of counsel either for me or Ms. Mojaddidi.  He will not step in as attorney of record for both of us because each defendant has separate counsel."  (RT 19:7-8). Mr. Reichel testified he was paid $500 for his work, attended approximately four hours the first day of trial and two hours the day the jury heard Hayat's confession.[38]  (Id. at 523:17-524:6).

Contrary to Hayat's allegations, the record demonstrates Mr. Griffin did not insist that Mr. Reichel not be retained or bar his participation in the trial of either Hayat or Umer.  Rather, Mr. Griffin originally recommended Mr. Reichel and initiated discussions with him.  (W.M. Depo. 243:8-244:23; Tr. 512:16-513:8).  Mr. Reichel sought to take an approach that was inconsistent with the joint defense strategy Ms. Mojaddidi and Mr. Griffin had decided upon independently and pursued together, and were then in a position to execute, mere days from trial.  (Tr. 515:4-13, 516:25-517:17).  Mr. Reichel testified that Ms. Mojaddidi and Mr. Griffin were "laughing" together when they told him Ms. Mojaddidi would

_____

[38] Mr. Reichel indirectly confirmed Ms. Mojaddidi's assessment of Hayat's confession and the strategy to press for trial and challenge the evidence.  He stated he observed inconsistencies in the portion of the confession he saw and "honestly thought the jury was going to think that it was" not credible.  (Tr. 524:7-20).

not add him to Hayat's team.  (Id. 520:10-521:18).  Such a jovial mood is inconsistent with Hayat's argument that Mr. Griffin forced his will on Ms. Mojaddidi.  The suggestion that she would blindly defer to Mr. Griffin also conflicts with the substance and manner of Ms. Mojaddidi's assertive and self-confident testimony in 2014 and 2018.

Mr. Reichel was simply not available to join Hayat's defense because he could not prepare for trial in 10 days.  By his own testimony, he had limited availability, even if he had dropped his demand for a months-long continuance, and he believed it a ludicrous idea that any lawyer could prepare for Hayat's trial in ten days.  (Id. at 518:9-13).  Finally, neither Hayat nor Mr. Reichel were present during discussion between Ms. Mojaddidi and Mr. Griffin after their conference call with Mr. Reichel.  Neither heard Ms. Mojaddidi find her confidence and decide to press on, as she testified she did.  Nor did Mr. Reichel observe any discussions related to the joint defense that inform Hayat's speculation that Ms. Mojaddidi blindly deferred to Mr. Griffin.  There is no objective evidence disputing Ms. Mojaddidi's consistent testimony that Mr. Griffin never barred Mr. Reichel's retention.  Hayat's argument demands that the Court ignore the objective evidence and credit mere speculation.  To do so would be a misapplication of the law.  Willis v. United States, 614 F.2d 1200, 1203 (9th Cir. 1979) ("while we cannot indulge in nice calculations about the amount of prejudice which results from a conflict of interest . . . neither can we create a conflict of interest out of mere conjecture as to what might have been shown."); see also Carlson v. Nelson, 443 F.2d 21, 22 (9th Cir. 1971) (per curiam) (holding conflict issues are "not to be decided on the basis of speculation, but by a considered determination of whether, in fact, a conflict of interest existed.").  The Court should decline that invitation.

### 2. Nothing in James Wedick's testimony demonstrates the existence of an actual conflict.

At the 2018 hearing, Hayat offered the testimony of James Wedick, a retired FBI agent who served as an investigator for both Hayat and his father before and through trial.  (Tr. 574:14-610:22, 583:6-11; W.M. Depo. 41:9-14).  Wedick was initially retained by Mr. Griffin.  (Tr. 579:4-18).  After a bail hearing, Mr. Griffin informed Wedick that he had entered into a joint defense agreement with Ms. Mojaddidi, and instructed Wedick to treat requests from Ms. Mojadidi as though they came from Mr. Griffin.  (Id. at 583:3-11).  Indeed, Ms. Mojaddidi instructed Wedick to do certain things and he did

them.  (Id. at 599:17-19).

### a.    In certain instances, Wedick's testimony corroborated Ms. Mojaddidi's testimony and contradicted Mr. Riordan's.

Wedick corroborated Ms. Mojadiddi's testimony about some her independent efforts on Hayat's behalf.  He confirmed that Ms. Mojaddidi had authority to direct him to do work to advance Hayat's defense.  (Tr. 583:3-11, 722:20-25).  He confirmed that she directed him to review the video recording of Hayat's confession, and that they worked together to prepare his testimony to challenge the veracity of Hayat's confession.  (Id. at 602:10-16, 604:3-21, 723:21-724:25).  Wedick acknowledged that Ms. Mojaddidi found an investigator in Pakistan.  (Id. at 599:10-13).  Wedick also agreed that Ms. Mojaddidi found an expert on Pakistani culture and other affairs.  (Id. at 599:10-13).  On the question of trial strategy, Wedick confirmed Ms. Mojaddidi's recollection that even after the District Court granted the government's continuance requests, the joint defense strategy continued to be to push the government to trial as fast as possible.  (Id. at 586:7-16, 739:13-22, 753:9-12).

### b.    In other instances, Wedick's testimony was simply wrong.

However, at critical times for Hayat's claims, Wedick's testimony was simply wrong.  For example, despite acknowledging that he performed tasks for Hayat's defense at Ms. Mojaddidi's instruction, Wedick denied ever billing for such services.  (Id. at 599:20-22).  On cross-examination, Wedick was forced to acknowledged invoices he sent to Mr. Griffin memorializing calls with Ms. Mojaddidi in July 2005, at the start of the case against Hayat.  (Id. at 599:20-600:17).  Similarly, Wedick resisted acknowledging that Ms. Mojaddidi investigated the existence of the Balakot camp at issue during Hayat's trial.  (Id. at 600:24-601:1).  Yet, on cross-examination he was again forced to concede error when confronted with an email sent from Ms. Mojaddidi to him and Mr. Griffin in July 2005, at the start of the case against Hayat, demonstrating Ms. Mojaddidi's independent investigation of the location and character of the Balakot camp.  (Id. at 601:2-603:8; Gov. Ex. 40).

In another instance, Wedick testified that, at the time of trial, he was concerned that Ms. Mojaddidi was too inexperienced to represent Hayat.  (Tr. 590:21-25).  Wedick claimed he was surprised that the government did not try to "remove" Ms. Mojaddidi as Hayat's trial counsel "because she had never done a trial before."  (Id. at 590:25-591:14).  Wedick testified about a prior case on which

he had worked, in which the government successfully moved to disqualify a defense lawyer. (Id. at 592:2-11). However, that disqualification had nothing to do with the inexperience of the lawyer at issue. (Id. at 592:12-14). Rather, as Wedick conceded on cross-examination, that case involved a defense attorney who had been a prosecutor and who was directly conflicted from representing his client by his prior exposure to the matter. (Id. at 605:17-606:6). Moreover, in that case, the defense attorney agreed that an actual conflict existed. (Id. at 606:7). Wedick acknowledged that he is not a lawyer. (Id. at 606:17). Thus, his lay opinion about the propriety of an affirmative motion to disqualify a defendant's retained counsel is of no value because he was ignorant of the controlling law, which holds that erroneous deprivation of a defendant's retained counsel is structural error requiring a new trial.[39]

Wedick offered similarly misinformed opinions on direct examination, which he corrected or that were discredited on cross-examination. For example, on direct examination Wedick agreed that it was his "understanding" that Ms. Mojaddidi and Mr. Griffin "would be representing both of the Hayat defendants." (Tr. 583:12-15). He also claimed that based on his observations of Mr. Griffin and Ms. Mojaddidi, that Mr. Griffin was the "default attorney," and that all decisions "went through" him. (Id. at 589:3-18). However, on cross-examination, Wedick admitted that he was not present for any attorney-client discussions between Ms. Mojaddidi and Hayat. (Id. at 605:2-8). Thus, he was ignorant of how Ms. Mojaddidi and Hayat formulated final litigation decisions before and during trial. Wedick also admitted on cross-examination that he was not "privy to every single strategic discussion between [Ms. Mojaddidi and Mr. Griffin,]" only "a majority." (Id. at 605:19-12). Undoubtedly, Wedick's ignorance of the discussions during the many strategy meetings between Ms. Mojadiddi and Mr. Griffin at which he was not present—together with the fact that he is not a lawyer—contributed to his misunderstanding about the nature of the joint defense agreement between them.

**c.      Ms. Mojaddidi selected Hayat's jury, and the record refutes Wedick's erroneous testimony to the contrary and Hayat's misleading claims on the question.**

Finally, the only example Wedick offered of Mr. Griffin's alleged control of all decisions for both defendants was his claim that Mr. Griffin "picked both juries for the trial." (Id. at 589:19-21).

---

[39] See United States v. Gonzalez-Lopez, 548 U.S. 140, 152 (2006).

However, on cross-examination, Wedick retreated from that expansive claim and suggested that Mr. Griffin and Ms. Mojaddidi actually worked in "consultation" with one another to select Hayat's jury. (Id. at 605:13-16). In his written argument, Hayat asserted that the trial record "corroborated" Wedick's claim that Mr. Griffin controlled the selection of Hayat's jury. He bases that unsupportable claim on the facts that the District Court permitted Mr. Griffin to be present at bench conferences while Ms. Mojaddidi selected Hayat's jury. Hayat also erroneously claims that Umer was not present for the selection of his jury. (See OPHB at 18.) Hayat's claim misrepresents the actual trial record.

In fact, Umer *was* present during the selection of Hayat's jury. (RT 192:4-8) ("Let the record reflect … both defendants are present, and … being assisted by the same … interpreter."). He was present at Ms. Mojaddidi's request, and without objection from Mr. Griffin or the government, so that Ms. Mojaddidi could ask whether any prospective Hayat jurors knew him. (RT 43:20-45:2). Moreover, Ms. Mojaddidi was present during the selection of Umer's jury, participated in bench conferences, and the District Court engaged her to consider various questions concerning her later selection of Hayat's jury. (RT 25:13-26:5, 36:13-25, 39:10-24, 42:1-45:10). Hayat was also present for most of the selection of Umer's jury. (RT 42:1-45:10). There is nothing unusual about each attorney being present for the other's jury selection in this case. The essential facts of the government's cases against both defendants were the same, and both attorneys had an interest in identifying all *voir dire* questions that might have effectively inquired into the potential bias of a prospective juror. Hayat grasps to the false notion that such cautious and advisable conduct is somehow evidence of a conflict between Ms. Mojaddidi and Mr. Griffin—and misrepresent the facts to support his argument—because all of the objective evidence refutes his conflict claims.

Contrary to Hayat's argument and Wedick's testimony, Ms. Mojaddidi controlled selection of Hayat's jury. With narrow exceptions unrelated to prospective jurors, only Ms. Mojaddidi addressed the District Court during selection of Hayat's jury, including during bench conferences. (See, e.g., RT 197:23-24, 206:21-15, 214:10-217:16, 224:25-225:9, 237:23-238:10, 262:12-19, 276:4-10). Ms. Mojaddidi also conducted a lengthy, independent *voir dire* of prospective jurors for Hayat's jury.[40] (RT

_____

[40] At her 2014 deposition, Ms. Mojaddidi recalled that she had probably picked a jury in a civil case before Hayat's trial. (W.M. Depo. 104:17-105:24).

320:13-339:7, 349:17-355:19). Thereafter, Ms. Mojaddidi argued that three potential jurors should be excused for cause. The government stipulated to two and the Court granted Ms. Mojaddidi's request concerning the third, over the government's objection. (RT 339:13-342:23). During an hour recess, the parties exercised peremptory challenges and settled on a jury. As that recess concluded, Ms. Mojaddidi updated the District Court on the status of the selection process. (RT 358:5-359:5). The only time Mr. Griffin spoke on the record concerning a prospective juror was when the District Court addressed him about a matter associated with a member of Umer's jury. (RT 227:3-228:10).

Hayat's misleading argument about Mr. Griffin's role at jury selection is troubling. The transcript of Hayat's jury selection in no way supports the argument that Mr. Griffin *controlled* that process. To the contrary, it reflects only that he was present, with his client. The transcript does not even clearly provide support for the argument that Mr. Griffin *participated* in the process, although Ms. Mojaddidi testified at her deposition that she conferred with him during her selection of Hayat's jury. (W.M. Depo. 104:6-11). Wedick's cross-examination corroborated Ms. Mojaddidi's explanation that she merely consulted with Mr. Griffin during her selection of Hayat's jury. Yet, despite the clear record, Hayat asserted Umer was not present during selection of his son's jury, when he was, and argued the transcript demonstrated Mr. Griffin controlled that process, when he clearly did not. This approach— while possibly the result of mere sloppiness and unintentional—is consistent with the distortions of fact that mark the purported evidence Hayat offers in support his conflict and other claims. Nothing in Wedick's testimony supports Hayat's conflict claim.

**E.      Hayat's father made Mr. Griffin unavailable by invoking the attorney-client privilege, preventing his testimony at the hearing and depriving the Court of critical information that could have been dispositive of Hayat's claims.**

Almost as notable as the dearth of evidence supporting Hayat's conflict and other habeas claims is the fact that his affirmative presentation of evidence in this matter omits Mr. Griffin. Mr. Griffin's close, daily interaction with Ms. Mojaddidi placed him in a perfect position to provide key insight in to the operation of the joint defense agreement he pursued with Ms. Mojaddidi. Mr. Griffin could state definitively whether he required Ms. Mojaddidi to cede to him control over all significant defense decisions for Hayat's case. Mr. Griffin could also testify about whether Ms. Mojaddidi had access to the joint defense funds in his custody, and whether he prevented her from spending those funds to advance

Hayat's individual interests so that he could enrich himself.  Indeed, if the facts are as Hayat insists, which they are not, Mr. Griffin represents potential direct evidence that might prove his claims.

However, not only did Hayat not call Mr. Griffin as a witness, his father, Umer, made Mr. Griffin unavailable to all parties by asserting the attorney-client privilege in September 2014.[41]  (See CR 543).  As a result, Umer deprived the Court of evidence potentially dispositive of his son's claims in this habeas action.  To be sure, if Umer believed Mr. Griffin's testimony would advance his son's habeas claims, he would have permitted Mr. Griffin to testify.  That Umer asserted the attorney-client privilege to stop Mr. Griffin from answering questions about facts related to the execution of his joint defense agreement with Ms. Mojaddidi, speaks volumes about what Umer believes Mr. Griffin would say.

At the 2018 hearing, the government subpoenaed Mr. Griffin, who appeared and took the witness stand.  (Tr. 892:15-894:22).  On direct examination, the government posed three questions to Mr. Griffin, each of which Mr. Griffin refused to answer.  Specifically the government asked:

(1)    "…You're an attorney admitted in this district who practices criminal law; is that correct?"

(2)    "Mr. Griffin, in the period between 2005 and 2006, were you aware of the ethical obligations governing attorneys practicing in the Eastern District of California?"

(3)    "…Mr. Griffin, at any time in your legal career have you intentionally violated the rules of professional conduct that govern lawyers in this district?"

(Id. at 893).

In response to all three questions, Mr. Griffin answered with a variation of the following reply:

> …I've been advised by Umer Hayat's current counsel, Dylan Schaffer, that Umer Hayat has refused to waive the attorney-client privilege in connection with my representation of him. And in light of that, I am ethically required to invoke that privilege and refuse to answer any questions in these proceedings.

(Id. at 893:6-11).  The government sought an order compelling Mr. Griffin to answer the questions,

---

[41] The parties scheduled Mr. Griffin's deposition for September 19, 2014.  (CR 540).  Immediately before that date, Mr. Griffin communicated to the parties that, "[w]ithout a written waiver from Umer Hayat, I must and will assert the attorney/client privilege and decline to answer any questions in connection with and/or related to my representation of Umer Hayat."  (See CR 543).  The government shared Mr. Griffin's assertion with the Court and requested that Mr. Griffin's deposition be postponed, which the Court ordered. (See CR 543).

which the Court denied.  (Id. at 894:5-19).  The Court invited the government to brief the legal authority controlling Mr. Griffin's refusal to testify in this memorandum, (Id. at 894:15-19), which it does now.

### 1. The Court should re-open the evidentiary hearing and compel Mr. Griffin's testimony on matters outside the scope of the attorney-client privilege.

The court should have compelled Mr. Griffin to answer the questions posed to him by the government on direct examination, and other questions that did not intrude on the attorney-client privilege.  Because none of the questions asked by the government intruded on any privileged information, the Court should have compelled Mr. Griffin to respond.  The only available remedy is to re-open the evidentiary hearing, permit the government to re-call Mr. Griffin, and compel Mr. Griffin to answer any question that does not intrude on the attorney-client privilege.

"The attorney-client privilege protects confidential communications between attorneys and clients, which are made for the purpose of giving legal advice."  United States v. Richey, 632 F.3d 559, 566 (9th Cir. 2011) (citing Upjohn Co. v. United States, 449 U.S. 383, 389 (1981)).  The privilege attaches when:

> (1) legal advice of any kind is sought,
> (2) from a professional legal adviser in his capacity as such,
> (3) the communications relating to that purpose,
> (4) made in confidence,
> (5) by the client,
> (6) are at his insistence permanently protected,
> (7) from disclosure by himself or by the legal adviser,
> (8) unless the protection is waived.

See Richey, 632 F.3d 559 at 566.  The fact that a person is a lawyer does not make all communications with that person privileged.  United States v. Martin, 278 F.3d 988, 999–1000 (9th Cir. 2002), as amended on denial of reh'g (Mar. 13, 2002).  "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed."  Martin, 278 F.3d 988 at 1000 (quoting Weil v. Inv. Indicators, Research & Mgmt., Inc. 647 F.2d 18, 24 (9th Cir. 1981)).  A party claiming the privilege must identify specific communications and the grounds supporting the privilege as to each piece of evidence over which privilege is asserted.  Martin, 278 F.3d 988 at 1000.  Blanket assertions are "extremely disfavored."  Id. at 1000 (quoting Clarke v. Am. Commerce Nat'l Bank, 974 F.2d 127, 129 (9th Cir.1992)).

Additionally, the work product doctrine does not generally protect facts from discovery.  Rather, the doctrine "protects from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation."  In re Grand Jury Subpoena (Mark Torf/Torf Environmental Management), 357 F.3d 900, 906 (9th Cir. 2004).  To fall within the doctrine, material must be:  (1) "documents and tangible things" (2) "prepared in anticipation of litigation or for trial" (3) "by or for another party or by or for that other party's representative."  California Sportfishing Prot. All. v. Chico Scrap Metal, Inc., 299 F.R.D. 638, 644 (E.D. Cal. 2014); Fed. R. Civ. P. 26(b)(3).  "[B]ecause the work product doctrine is intended only to guard against the divulging of attorney's strategies and legal impressions, it does not protect facts concerning the creation of work product or facts contained within the work product."  Garcia v. City of El Centro, 214 F.R.D. 587, 591 (S.D. Cal. 2003) (citations omitted).  "Only when a party seeking discovery attempts to ascertain facts, 'which inherently reveal the attorney's mental impression,' does the work product protection extend to the underlying facts."  Id.  However, in such cases, "opinion work product," is discoverable only if it is "at issue in the case and the need for the material is compelling."  Holmgren v. State Farm Mut. Auto. Ins. Co., 976 F.2d 573, 577 (9th Cir. 1992) (emphasis in original).

Here, there can be no reasonable dispute that the questions posed by the government to Mr. Griffin could not have elicited answers that intruded on the privilege asserted by Hayat's father.  All of the questions sought information about Mr. Griffin and none directly touched upon his representation of Umer in any way.  Inarguably, the questions posed no risk of eliciting answers that would have forced Mr. Girffin to disclose legal advice sought by Umer from Mr. Griffin (or provided by him to Umer) in the course of any confidential communications between them.  Accordingly, Umer cannot meet his burden to support his invocation of the privilege.[42]

---

[42] To try to meet his burden, Umer may not rely on the California Rules of Evidence or Professional Conduct to expand the scope of the privilege beyond the limits established by controlling federal authority.  See Clarke v. Am. Commerce Nat. Bank, 974 F.2d 127, 129 (9th Cir. 1992) ("Issues concerning application of the attorney-client privilege in the adjudication of federal law are governed by federal common law."); United States v. Ruehle, 583 F.3d 600, 608 (9th Cir. 2009) (rejecting reliance on California Evidence Code for proposition that all communications made in the course of an attorney client relationship are presumed confidential); see also United States v. Blackman, 72 F.3d 1418, 1423 (9th Cir.1995) ("[S]ince the adoption of the Federal Rules of Evidence, courts have uniformly held that federal common law of privilege, not state law applies.").  In any event, not even the broadest reading of any California rule would trigger application of the privilege to the questions Mr. Griffin refused to answer at the hearing.

Finally, the record demonstrates that Hayat's father, Umer, has deployed the attorney-client privilege as a sword and a shield. He permitted Mr. Griffin to speak to Hayat's counsel about the nature and operation of his participation in a joint defense agreement with Ms. Mojaddidi in 2007. (See Def. Ex. B n. 1, n. 2, & n. 4). However, he invoked the privilege on the eve of Mr. Griffin's 2014 deposition, to deny the government from having a fair opportunity to questioning him. While that 2014 invocation also prevented Hayat's counsel from further questioning Mr. Griffin, Hayat's counsel had already memorialized in his declaration statements he claimed Mr. Griffin made to him in 2007. (See Def. Ex. B n. 1; see also Tr. 860:14-862:20). That declaration was filed publicly and available for Umer or an associate to review and assess in the seven years before Umer invoked the privilege to stop Mr. Griffin from testifying at his 2014 deposition. (CR 495).

Moreover, the record demonstrates that Hayat's counsel participated in discussions with Umer about invoking the privilege and arranged for Umer to be represented by his own former associate and friend, Mr. Schaffer. (Tr. 860:14-862:20; see also 866:1-25, 875:7-18). Some of those meetings involved a group of "potential witnesses" in this matter, as well as "relatives of Hamid Hayat," and "relatives of Umer Hayat." (Tr. 866:1-25). At the hearing, the following exchange took place:

Q.    Do you know Mr. Schaffer?

A.    I do.

Q.    How do you know Mr. Schaffer?

A.    Mr. Schaffer worked with me for a number of years before he went out on his own and eventually joined a civil law firm.

Q.    Did you discuss with Mr. Schaffer Mr. Hayat's decision to invoke the attorney-client privilege to stop Mr. Griffin from testifying in this hearing?

A.    My recollection is that -- well, let me be clear. When the issue of Umer Hayat -- well, number one, we have met with -- I have met with Umer Hayat on a couple of occasions between the filing of this 2014 motion and today. The issue of privilege as far as Mr. Griffin was concerned definitely came up in one of those conversations. And I was the person who gave Mr. Schaffer -- there may have been other names -- but gave Mr. Schaffer Umer Hayat's name in terms of getting counsel on this issue.

Q.      You don't -- do you recall having conversations about invoking the privilege with Mr. Schaffer?

(Tr. 862:2-20).  Before Mr. Riordan could answer the last questions, Mr. Shaffer interrupted the proceedings from the gallery to interpose an objection asserting Umer's attorney-client privilege over Mr. Riordan's answer about a conversation between himself and Mr. Schaffer.  (Id. at 862:21-22).  The Court took a recess to permit Hayat's habeas lawyers to confer with Mr. Schaffer.  (Id. at 863:8-16). Mr. Riordan, who was on the stand at the time and under oath, participated in a conference with his co-counsel and Mr. Schaffer.  (Id. at 874:11-875:6).

After the break, the Court questioned Mr. Riordan before ruling on an objection from Hayat's counsel.  (Id. at 866:1-25).  The Court interrupted its questioning of Mr. Riordan to invite Mr. Schaffer to the podium to pose questions to him.  Mr. Schaffer seized the opportunity to deliver a long, unsworn statement that purported to set forth the history of his representation of Umer and sought leave to brief his assertion of the attorney-client privilege on Umer's behalf.  (Id. at 868:1- 25).  The Court inquired of the government about the purpose of additional questioning that might intrude on Umer's assertion of the privilege.  The government explained it intended to ask Mr. Riordan about communications between him and Umer, which pre-dated Mr. Shaffer's participation and Umer's Fall 2014 invocation.  (869:16-874:10).  Upon further questioning, Mr. Riordan denied he advised Umer to invoke the attorney-client privilege. (Id at 875:25-876:17).  However, he did not deny his earlier testimony that in his discussions with Umer "[t]he issue of privilege as far as Mr. Griffin was concerned definitely came up."  (Id. at 875:18-25, 862:13-16).

Mr. Riordan's testimony on the question of Umer's invocation of the attorney-client privilege raises fair concern.  He admitted having on or more meetings a group of "potential witnesses" in this matter, as well as "relatives of Hamid Hayat," and "relatives of Umer Hayat."  (Tr. 866:1-25).  He also admitted that during at least one of those meetings "[t]he issue of privilege as far as Mr. Griffin was concerned definitely came up." (Tr. 862:2-20).  It is perhaps not unusual for a habeas lawyer to convene a meeting of his client's family members and other potential witnesses in a future hearing in the same matter.  It is also certainly possible that Mr. Riordan merely explained the operation of the attorney-

client privilege to Umer, but did not recommend he invoke the privilege.  Indeed, that is consistent with his testimony.  However, Mr. Schaffer interrupted the cross-examination of Mr. Riordan's before Mr. Riordan answered whether he and Mr. Shaffer discussed the question of Umer's invocation.

**2.    The Court should re-open the evidentiary hearing and compel Mr. Riordan's testimony concerning his conversations with Mr. Schaffer and whether Umer should invoke the attorney-client privilege.**

The Court should have compelled Mr. Riordan to answer whether he and Mr. Shaffer discussed the question of Umer's invocation outside of Umer's presence.  Mr. Schaffer insisted such a conversation would have been subject to the attorney-client privilege as "communication privilege" and "work product."  (Id. at 868:22-25, 869:9).  The Ninth Circuit does not appear to have published a case recognizing a generic communication privilege.  As for work product, even if conversations between Mr. Riordan and Mr. Schaffer constitute "opinion work product," facts that inherently reveal the attorney's mental impression are discoverable if they are "at issue in the case and the need for the material is compelling." Holmgren v. State Farm Mut. Auto. Ins. Co., 976 F.2d 573, 577 (9th Cir. 1992) (emphasis in original).

Here, Mr. Griffin's testimony could be dispositive of Hayat's habeas claims.  Whether Mr. Riordan and Mr. Schaffer conferred and agreed Mr. Schaffer should recommend Umer invoke the privilege for the purpose of preventing Mr. Griffin from giving testimony is an issue in the case because Mr. Riordan made himself a witness and admitted discussing the privilege with Umer and referring Umer to Mr. Schaffer.  The need to know the answer to the question is compelling because it could refute assertions in Mr. Riordan's declaration and testimony and undermine Hayat's arguments in support of his conflict and other claims.  The Court should re-open the evidentiary hearing and permit the government to recall Mr. Riordan.

In sum, as the foregoing demonstrates, Ms. Mojaddidi and Mr. Griffin chose to engage in a joint defense.  While it is true that Ms. Mojaddidi looked to the more experienced Mr. Griffin for advice and counsel, she maintained her professional independence and undivided loyalty to Hayat.  The record demonstrates that there was no cognizable conflict.  Accordingly, the Court should deny Hayat's petition.

**F.     There Was No Financial Conflict of Interest**

Hayat also claims that Mr. Griffin had a direct economic interest in minimizing the amount of time and money spent on his defense. (OPHB at 14-16).  Hayat claims that Mr. Griffin influenced Ms. Mojaddidi, directly or indirectly, to cede her independent judgment to Mr. Griffin so that Mr. Griffin might maximize his compensation at the expense of Hayat's Sixth Amendment rights.  (OPHB at 62:6-11).  This allegation is unfounded and without merit.[43]  The evidence reveals that nothing about the financial arrangements prevented Ms. Mojaddidi from investigating, preparing for, or defending Hayat's case.  Therefore, there was no financial conflict and this Court should dismiss Hayat's claims that Ms. Mojaddidi was ineffective because of a financial conflict.

**1.     Mere potential or theoretical conflicts are insufficient to show actual financial conflicts under Ninth Circuit precedent.**

The use of a fixed fee contract for both costs of representation and investigative fees does not create a Sixth Amendment conflict.  See Williams v. Calderon, 52 F.3d 1465, 1473 (9th Cir. 1995).  For example, in Williams, the defendant argued that "the fact that payment for any investigation or psychiatric services could have come from counsel's pocket forced counsel to choose between [defendant's] interests and his own."  Id.  The Ninth Circuit "discern[ed] in this situation no conflict of constitutional dimension."  Id.  "All [defendant] alleges is the same theoretical conflict that exists between an attorney's personal fisc and his client's interests in any pro bono or underfunded appointment case.  Such arrangements, without more, do not require Sixth Amendment scrutiny."  Id. See also Bonin v. Calderon, 59 F.3d at 827 (no actual conflict of interest when a counsel substituted in as retained counsel, depriving defendant of state-funded investigators and expert witnesses, and requiring that retained counsel pay for any investigative experts out of his own pocket).

---

[43] To be clear, in this claim, Hayat accuses Mr. Griffin of breaching his ethical obligations as an officer of the Court and a member of the Bar to enrich himself at the expense of Hayat's Sixth Amendment rights.  See Cal. R. Prof. Conduct 3-300 (avoiding interests adverse to a client) and 3-310 (avoiding representation of adverse interests).  Such a serious allegation should be supported with more than mere conjecture or supposition, especially in the face of Ms. Mojaddidi's sworn testimony that Mr. Griffin *never* indicated any reluctance to expend money in connection with Hayat's defense or worried that spending money on behalf of Hayat would reduce the amount of money that would go to Mr. Griffin.  (See W.M. Depo. 140:4-141:1).  Moreover, Wedick corroborated Ms. Mojaddidi's testimony when he admitted he billed the combined defense funds for work he did related to Hayat's case.  (Tr. 599:20-600:17).

Hayat's allegations of financial conflict fall squarely into the types of financial conflict claims rejected by the Ninth Circuit in <u>Bonin</u>.  <u>See</u> <u>Bonin</u>, 59 F.3d at 827.  The petitioner in that case claimed several potential conflicts based on the profit motive of his attorney.  <u>Id</u>. at 825-26.  The Ninth Circuit commented that the alleged financial conflicts did not necessarily place the attorney in an adversarial position relative to the petitioner, and that "he has only succeeded in showing a remote possibility of a conflict and not an actual conflict."  <u>Id</u>., at 827 (<u>citing</u> <u>United States v. Hoffman</u>, 733 F.2d 596, 601-02 (9th Cir. 1984)).  The court stated that, "[i]f the types of conflicts alleged by Bonin were to be cognizable under <u>Cuyler</u>, the rule would become hopelessly unworkable."  <u>Bonin</u>, 59 F.3d at 827.  The Ninth Circuit also warned, "[h]owever, minor or potential conflicts of interest often exist which might theoretically or conceivably affect an attorney's representation, but are not likely to do so."  <u>Id</u>.  "If a "mere 'potential' or 'theoretical' conflict does affect an attorney's representation in a particular case," the Ninth Circuit held that the defendant "cannot rely on <u>Cuyler</u> and obtain relief merely upon a showing of 'adverse effect,' but must instead make the showing required by <u>Strickland</u> that counsel's performance was objectively unreasonable and that he suffered prejudice as a result."  <u>Id</u>.  Applying that standard, the Ninth Circuit rejected using potential conflicts as a basis for presuming prejudice and bypassing the requirement that a petitioner alleging ineffective assistance of counsel show actual ineffectiveness and prejudice.  <u>Id</u>.  Hayat cannot do more than allege potential financial conflicts, therefore, he must still prove that Ms. Mojaddidi's representation fell below the standards of reasonable professional competence, and that he suffered prejudice.  <u>Id</u>.

The Ninth Circuit then applied the standard to the argument that the attorney refused to "pay for any investigators or experts out of his own pocket."  Following its holding in <u>Williams</u>, the Ninth Circuit arrived at the common sense conclusion that, "an assertion of conflict based on the fact that payment for any investigation or psychiatric services could have come from counsel's pocket forcing counsel to choose between the client's interests and his own is the same theoretical conflict that exists in any pro bono or underfunded appointment case."  <u>Id</u>. (internal punctuation and ellipses omitted).  This is precisely the same allegation raised by Hayat against Mr. Griffin, and the Ninth Circuit has already rejected it as a basis for finding actual conflict in <u>Bonin</u>.  (OPHB at 14-16); <u>Bonin</u>, 59 F.3d at 827.  Moreover, a defendant claiming this type of conflict must establish that the attorney's purported

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

82

professional failure was motivated by the asserted financial conflict, that it "was motivated by his asserted desire to keep for himself funds . . . budgeted for [the] investigation." People v. Doolin, 45 Cal.4th 390, 423 (Cal. 2009) (concluding that defendant had failed to prove that a variety of acts and omissions were motivated by an attorney's asserted desire to maximize his profits under a flat fee agreement covering both attorney's fees and investigative costs).

### 2.    Hayat cannot show an actual financial conflict.

Hayat's petition must fail because he has not and cannot establish any sort of actual financial conflict. Ms. Mojaddidi testified that she and Hayat executed an initial engagement letter but she could not remember when. (W.M. Depo. 27:21-24). She testified that she may have received a retainer between $6,000 and $10,000, but did not remember. (W.M. Depo. 28:1-24, 80:3-10, 81:6-12; Tr. 711:8-15). She recalled she received additional pay beyond those initial payments. (Tr. 7:11-16-21). She could not remember what amount Mr. Griffin received but knew it was a larger amount. (W.M. Depo. 29:8-11). Ms. Mojaddidi understood that Mr. Griffin would receive a larger amount of fee than she would and acknowledged that this was "agreeable." (W.M. Depo. 29:10-14; see also Tr. 7:11-22-24). Ms. Mojaddidi testified that, she just "wanted to take the case" and "would have done it for free." She also knew that Mr. Griffin was more experienced than she and Mr. Griffin would charge accordingly. (W.M. Depo. 29:16-21).

A January 18, 2006, retainer agreement for Umer and Mr. Griffin set forth the terms of representation for both Umer and his son. (W.M. Depo. 137:11-20; Def. Ex. G). Hayat signed an earlier retainer agreement with Ms. Mojaddidi. (Ex. JJJ.2). Ms. Mojaddidi testified that she and Hayat also executed a later agreement. (W.M. Depo. 137:23-138:20; Tr. 712:7-17). At the 2018 hearing, she conceded Hayat did not sign a second agreement after reviewing an email from August 2007, in which she stated she intended for Hayat to sign a second retainer but did not "know why [she] never got the second one signed." (Tr. 712:13-714:15). Later, she testified that Hayat might have signed the second retainer but she might not have been able to locate it. (Tr. 716:2-4).

At her 2014 deposition, Ms. Mojaddidi testified that, pursuant to the later retainer agreement, she was to receive $65,000 and Mr. Griffin was to receive $135,000, less any costs and travel-related expenses. (W.M. Depo. 82:8-25, 138:21-139:14). She did not recall the financial terms of the

agreement at the 2018 hearing. (Tr. 714:16-715:22). Ms. Mojaddidi testified that the contract was negotiated with the understanding that there were going to be costs and travel-related expenses. There was also an understanding that if Ms. Mojaddidi and Mr. Griffin needed additional money, the Hayat family would need to provide it.[44] (W.M. Depo. 42:13-15; Tr. 711:25-712:6). Hayat can only prove that there was a legitimate joint defense agreement between himself and his father. Hayat has not, and cannot, prove there was an actual conflict between Umer Hayat's interests and his own defense. Hayat's proofs fail to even state a claim of ineffective assistance of counsel based on a financial conflict. Consideration of the additional evidence marshalled at the 2018 hearing only reinforces the conclusion that Hayat has not met his burden and the Court should deny his conflict claim.

### 3. Hayat Cannot Show that the Alleged Financial Conflict Prejudiced His Representation.

Hayat cannot demonstrate that any alleged financial conflict led Ms. Mojaddidi to forego any plausible alternative defense choices. Both Ms. Mojaddidi and Mr. Griffin had the right to control defense funds. Mr. Griffin retained custody of the defense money in what Ms. Mojaddidi believed was a firm account, but Ms. Mojaddidi testified she had access to any defense funds she needed, and that she would have deposited checks delivered to her into an account she controlled. (W.M. Depo. 139:25-140:3; Tr. 721:20-722:5, 725:6-10). Ms. Mojaddidi consistently testified that she was never concerned about a lack of defense resources. She stated: "I honestly don't recall the money being the concern." (W.M. Depo. 91:3-14). Money, she noted specifically, was not a consideration when she made decisions about what investigative steps to take, and financial considerations played no role in the decision making regarding what investigative steps to take in Pakistan. (Id. at 91:6-11, 140:4-20, 183:8-12). Money also was not a factor in connection with hiring experts. (W.M. Depo. 91:6-8, 140:10-12; Tr. 725:6-11).

Ms. Mojaddidi testified consistently that Wedick was an investigator for both defendants. (W.M. Depo. 41:12-14; Tr. 722:9-19). She and Mr. Griffin had equal authority to direct Wedick to do tasks and she directed Wedick to do pretrial work. (W.M. Depo. 41:15-18, 182:18-21; Tr. 722:14-16). Ms.

---

[44] Ms. Mojaddidi testified that if she needed money to send an investigator to Pakistan, they would have contacted the family or otherwise figured out how to fund it. (W.M. Depo. 42:13-15).

Mojaddidi did not believe she needed Mr. Griffin's concurrence to send Wedick to Pakistan, if she chose. (W.M. Depo. 41:19-22). Mr. Griffin and Ms. Mojaddidi both directed Wedick to do work to help prepare their clients' defenses, and before trial she directed Wedick to, among other things, review Hayat's confession and work with her to prepare his testimony concerning that confession. (W.M. Depo. 42:16-24; Tr. 722:20-723:724:25). Ms. Mojaddidi was not aware of the specifics of the financial arrangements between Wedick and Mr. Griffin. (W.M. Depo. 43:7-13; Tr. 722:17-19, 725:6-11). In particular, finances were not part of the determination of whether to use defense investigator Wedick as a false confession expert or someone else. (W.M. Depo. at 209:2-5). Ms. Mojaddidi emphasized that point by noting that the defense paid the costs and travel-related expenses for defense witness Dr. Weiss. (Id. at 83:18-84:7; 202:24-205:2). At trial, James Lazor testified that he was paid $500 to cover some of his expenses in Pakistan, and $500 to testify at trial. (RT 3583:17-22). There was never any instance where Mr. Griffin denied Ms. Mojaddidi's request for defense funds. Similarly, Mr. Griffin never indicated reluctance to expend money in connection with Hayat's defense or that he worried that spending money on behalf of Hayat would reduce the amount of money that would go to Mr. Griffin. (W.M. Depo. at 140:4-141:1).

Mr. Griffin was paid over $100,000 for representing Umer, while Ms. Mojaddidi ultimately received approximately $31,000. (Def. Exs. H and I; W.M. Depo. 143:11-144:8). At the 2018 hearing, Ms. Mojaddidi could not recall how much she was paid or the details of the financial arrangement. (Tr. 716:5-8, 717:6-14). She affirmed the $31,000 total pay she reported in 2014 was correct. (Tr. 721:1-19; Def. Ex. I), She recalled her total pay was less than $65,000. (Tr. 716:9-10). Ms. Mojaddidi was asked, at various points, to explain why Mr. Griffin received a larger amount of funds than Ms. Mojaddidi. (W.M. Depo. 85:15-16). Ms. Mojaddidi confirmed that there were at least two other attorneys in the Griffin law firm, Clara Levers and Manolo Olaso, who assisted as part of the joint defense team. (Id. at 141:7-20). Ms. Levers was listed as counsel of record for Umer on the Court's docket. The exact employment and payment relationship between Mr. Griffin and these attorneys is not known. Presumably, Mr. Griffin paid them for their work.

Ms. Mojaddidi testified at her 2014 deposition and at the 2018 hearing that her representation of Hayat "had nothing to do with money," and that during the entirety of her representation, she "wasn't

really interested in" the money.  (Tr. 717:15-17; W.M. Depo. 85:17-18).  She felt compassion for the Hayat family because she knew their living conditions.  (Id. at 85:24-25).  She indicated that she was willing to take whatever they would give her.  Ms. Mojaddidi testified that she "quoted a number" to the family concerning her fee – after probably receiving input from Mr. Griffin as to what was reasonable – and "never complained about it."  (W.M. Depo. 85:21-86:4).  Ms. Mojaddidi stated that ultimately, she was "happy with what she received."  (Id. at 85:18).  In 2014, she stated she forgave the Hayat family for any debt arising out of the second retainer agreement.  (Def. Ex. I).

In sum, Hayat failed to establish that there was any sort of actual financial conflict in connection with his representation by Ms. Mojaddidi.  There is no evidence that the fee agreement had any demonstrable impact on the representation of Hayat by Ms. Mojaddidi or that the disparate fees paid to Mr. Griffin and Ms. Mojaddidi had any impact on the representation of Hayat.  Indeed, the record establishes that the contrary is true: Ms. Mojaddidi testified that financial considerations did not affect her representation of Hayat at all.  As in Williams and Bonin, the fact that payment of costs for Hayat and his father's defense could have come from Mr. Griffin's pocket, and could have forced Mr. Griffin to choose between Hamid's interests and his own, is the same mere theoretical conflict that exists in any *pro bono* or underfunded appointment case.  That theoretical conflict does not constitute a conflict of constitutional dimensions.  The mere allegation of a financial conflict also does not lift Hayat's burden to demonstrate that the alleged conflict of interest adversely affected his counsel's performance, and Hayat cannot meet his burden in this case.  See Mickens v. Taylor, 535 U.S. 162, 173-74 (2002) (affirming denial of habeas relief because petitioner failed to establish an adverse effect on counsel's performance).  Accordingly, because Hayat has not demonstrated the existence of a financial conflict of interest and the record refutes the existence of any act that Ms. Mojaddidi did or failed to do because of financial pressures, this Court should deny the petition and request for an evidentiary hearing.  See Rich v. Calderon, 187 F.3d 1064, 1069 (9th Cir. 1999) (affirming denial of evidentiary hearing where defense counsel submitted affidavit discussing perceived financial pressures, but did "not even suggest that he gave in to those pressures in any way that produced demonstrable harm of any kind to [petitioner]'s defense.").

G.    **Hayat Did not, and Cannot, Allege an Actual Conflict of Interest.**

Hayat cites to general cases discussing actual conflicts of interest in his petition, yet he only makes conclusory allegations that there were actual strategic conflicts between Umer and Hamid Hayat. (OPHB at 4-5).  Even the flawed testimony of Hayat's purported expert on the law of conflict conceded that the existence of a potential conflict, without more, cannot support Hayat's habeas claim.  While Hayat's expert was correct in stating that simple proposition, the remainder of his testimony was unhelpful.

1.    **Doran Weinberg's opinions are unreliable because they lack a proper foundation, and because they attempt to usurp the Court's judgment.**

To support his legal arguments concerning his conflict claims, at the evidentiary hearing Hayat offered the paid expert testimony of his lead counsel's colleague and personal friend, Doran Weinberg. (Tr. 443-48).[45]  On the issue of whether a conflict existed, Mr. Weinberg's testimony focused exclusively on evidence of theoretical or "potential" conflicts.  (Id. at 453-56, 458-59).  He conceded that not every potential conflict results in an actual conflict.  (Id. at 453:8-12).  On cross-examination, he agreed with the fundamental principle that a potential conflict or the mere appearance of a conflict is not grounds for reversal of a criminal conviction.  (Id. at 485:8-20).  Mr. Weinberg also agreed that the determination of whether an actual conflict exists depends on a careful analysis of the specific facts of a case.  (Id. at 485:21-25).  Notably, Mr. Weinberg conceded that there is "nothing inherently wrong with" a joint defense agreement between defense lawyers, even those where one lawyer acts as "lead counsel," which he testified, "happens frequently."  (Id. 485:25-486:9).  Mr. Weinberg also identified only a theoretical conflict in the retainer agreement in this case, which he suggested incentivized Mr. Griffin to minimize expenditures on Hayat's defense solely to enrich himself, a severe claim supported nowhere in the actual record and refuted by Ms. Mojaddidi's consistent testimony.  (Id. at 458:23-459:12).

---

[45] Mr. Weinberg spent nearly all his long legal career as a criminal defense lawyer, with a small percentage of his practice devoted to counseling lawyers in disciplinary proceedings.  (Id. at 442:17-443:15).  He and Hayat's lead counsel, Mr. Riordan, have practiced law out of the same building for thirty years, and are friends who attend social events, dinners, and other events together.  (Id. at 482).  Mr. Weinberg also testified that he and Hayat's co-counsel in this matter, Martha Boersch, represented a husband and wife couple during a criminal investigation.  (Id. at 481).  Mr. Weinberg was paid $1,000 for his testimony on Hayat's behalf.  (Id. at 483).

The basis for the remainder of Mr. Weinberg's opinions was scant, tainted, and insufficient to support testimony capable of providing meaningful guidance to the Court.  According to a declaration outlining his background and proposed testimony, (see Def. Ex. F), to prepare his opinion, Mr. Weinberg reviewed: (i) the Ninth Circuit opinion on direct appeal of Hayat's case; (ii) "a nearly final draft of" Hayat's memorandum in support of his 2255 motion, including the factual recitations and record excerpts contained therein at the time; (iii) the declarations of Mr. Riordan, Quin Denvir, John Cline, Richard Leo, and Donald Horgan; and (iv) the "filings referenced in district court docket numbers 345, 353, 356, and 362, concerning Ms. Mojaddidi's request that the court appoint her as counsel" for Hayat for post-trial proceedings.  (Id. at ¶ 18).

Mr. Weinberg also "discussed the case and the bases for the § 2255 motion at length with Mr. Riordan."  (Id.)  He conceded that the "factual, foundational statements concerning the nature of this case, qualifications of counsel, and developments at trial on which [he] … based [his] opinions are founded upon [his] information and belief."  (Id. at ¶ 19).  At the hearing, Mr. Weinberg testified he read Hayat's complete section 2255 petition and exhibits, the government's opposition, Ms. Mojaddidi's deposition, the retainer agreements, and other unidentified documents.  Mr. Weinberg did not read the complete trial transcript or the many other pleadings the parties filed during trial, appeal, or in this habeas matter. (Tr. 485:12-16).

The Court should reject Hayat's invitation to substitute Mr. Weinberg's opinions for the conclusions compelled by application of controlling legal principles to the facts of this case.  Aside from the concessions recounted above, Mr. Weinberg's opinions were merely restatements of Hayat's claims, cloaked as expert testimony.  By his own admission, Mr. Weinberg's opinions about what a reasonable attorney in Ms. Mojaddidi's position would have done were based on Hayat's particular legal arguments and not on a neutral assessment of the facts and law.  In his declaration and his testimony, Mr. Weinberg admitted he relied principally on Hayat's habeas petition to prepare his opinions.  (See Def. Ex. F ¶ 18).  He also relied on a collection of declarations from other defense witnesses supporting Hayat's claims, including Mr. Riordan, Donald Horgan (another of Hayat's co-counsels), and others recruited by Hayat to assail Ms. Mojaddidi's performance.  (See id.)  Mr. Weinberg also admitted he relied on lengthy discussions with his decades-long friend, Mr. Riordan, about "the bases for [Hayat's] § 2255 motion."

(Id.)

The faulty basis for Mr. Weinberg's opinions renders his testimony fundamentally flawed and unreliable. Mr. Weinberg's opinions are not rooted in an independent evaluation of the trial record and law. He did not study each pleading, consider each Court order, and factor into his opinions Ms. Mojaddidi's explanations for her conduct or the circumstances he identified as the basis of a potential conflict. Mr. Weinberg did not produce an independent, comprehensive report of his findings with citations to facts and law. Rather, he simply studied Hayat's written arguments, conferred at length with Hayat's chief advocate, and studied the declarations of Hayat's other paid witnesses (again, including two of Hayat's several lawyers). To be sure, an expert cannot hope to offer a reliable opinion if he merely repeats the arguments of the party that paid him to offer an opinion. Yet, the record makes clear that is precisely what Mr. Weinberg did.

Moreover, Mr. Weinberg admitted that the existence of a conflict in this or any case turned on a careful analysis of the specific facts of a case. (Tr. at 485:21-25.) However, his knowledge of the details of the case were so tenuously rooted in the record that he included a disclaimer in his declaration that his opinions were based upon his "information and belief." (Def. Ex. F ¶ 19). He demonstrated only a bare knowledge of the rudimentary facts of Hayat's case. (See Tr. 450:18-451:17). He was not even sure of the charges against Hayat. (Tr. 450:10-17). Additionally, Mr. Weinberg appeared ignorant of the extent and details of the incriminating statement Hayat's father, Umer, gave to FBI investigators.

Umer did not merely deny that Hayat went to a militant camp, he affirmatively admitted he knew Hayat went to a camp and he admitted he also traveled to the camp and saw it. (Gov. Sup. Ans. Ex. 21 (4U1.1); 5U1.1-1.6; 4U5.1-4U5.4, 5U5.1-5U5.2; 5U5.2, 5U8.2; RT 1432:8-1433:13; RT 1433:14-21; RT 1434:7-1435:5). Mr. Weinberg did not mention those details as he attempted to distinguish the strengths of the cases against Hayat and his father, based on Hayat's confession only. He testified that without Hayat's confession presented against him, the case against Umer was "very weak" because Hayat's confession was the only evidence proving Hayat went to a camp. (Tr. 459:19-462:25). Of course, Mr. Weinberg could only hold that misimpression if he was unaware of the extent and detail of Umer's affirmative confession that he knew Hayat went to a camp, and he, too, traveled to a militant camp. It is clear from Mr. Weinberg's testimony that he was unaware of the details of Umer's statement

and the extent of his self-incrimination.  He testified:

> I think the strategy for Umer would be to accept the government's own view of its evidence, which is that absent the confession of Hamid, the case is insufficient, and therefore to let the case go to the jury against Umer based on only the very weak *other evidence against Hamid*.

(Id. at 460:13-18).  Had Mr. Weinberg been aware of the extent of Umer's self-incrimination, he would have acknowledge that the interests of Hamid and his father were much more closely aligned than he opined.  That failure undermined his opinion about the alleged divergent interest between Umer and Hayat at trial, which is the crux of Hayat's baseless conflict claim.  (See id. 460:6-463:19).  Umer's confession was as self-incriminating as Hayat's confession, aligning their defense interest and potential strategies—not placing them in conflict.

At trial, the government planned to (and did) present the confessions of each defendant to that defendant's jury.  Thus, the defendants had two primary defense options.  Their first option was to attempt to muster affirmative alibi and other evidence to try to disprove their separate self-incriminating confessions by proving the negative that Hayat did not attend a militant camp.  That approach would necessarily permit the government additional time to bolster its proofs.  Their second option was to push for trial as fast as possible and challenge what they perceived as their "ridiculous" and unbelievable confessions, which were supported by what they assessed as weak and unpersuasive circumstantial evidence.  As set forth below in more detail, the independent decisions by both counsel to choose the latter option was perfectly reasonable and sound strategy.  There is no credible evidence that Ms. Mojaddidi's decision to embrace that strategy was the product of any conflict with Mr. Griffin.  Mr. Weinberg's failure on this key point illuminates the unhelpfulness of his testimony.

Finally, Mr. Weinberg's close friendship with Hayat's chief advocate only compounded the unreliability of his opinions.  Mr. Weinberg testified that he formed his opinions, in part, based on his lengthy discussions with Mr. Riordan about Hayat's claims.  (See Def. Ex. F ¶ 18).  As the Court is aware, Mr. Riordan initially noticed himself as an expert on his own client's conflict and ineffectiveness claims, and planned to offer such testimony at the evidentiary hearing.  (See CR 637 at ¶ 18).  While Mr. Riordan reconsidered that approach, he undoubtedly shared his opinions with Mr. Weinberg during their discussions, hopelessly tainting Mr. Weinberg's opinions.  Indeed, Mr. Weinberg's reliance on Mr.

Riordan's legal arguments about what generated a potential conflict in this case and how Ms. Mojaddidi should have acted (as well as Mr. Weinberg's reliance on the declarations of Hayat's other advocate and defense witnesses), stripped any veneer of independent judgment from his opinions and reduced them to unhelpful mimicry of Hayat's claims.

The Court should reject Hayat's attempt to replace governing caselaw with Mr. Weinberg's unreliable opinion. See United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the [factfinder] what result to reach, this does not *aid* the [factfinder] in making a decision, but rather attempts to substitute the expert's judgment for the [factfinder's].") (emphasis in original). On direct examination, Mr. Weinberg admitted that his opinions would assert, "indirectly," that Hayat was deprived of his Sixth Amendment right to unconflicted and effective counsel.[46]  (Id. at 449:23-450:1).  He largely parroted Hayat's legal claims concerning what Ms. Mojaddidi (or a hypothetical reasonable attorney) should have done during her representation of Hayat.  (Id.  442-481).  Such testimony is unhelpful and cannot provide the Court with more meaningful guidance that the Court's own survey of controlling law.

Notwithstanding Mr. Weinberg's testimony, Hayat has failed to show that any "alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."  See United States v. Wells, 394 F.3d 725, 733 (9th Cir. 2005).  As explained herein, each one of Hayat's claims that Ms. Mojaddidi's decision was motivated by divided loyalties or interests simply has no evidentiary support.  Hayat's attempt to avail himself of a lower standard of prejudice fails because there simply was no actual conflict between his interests and his father's interests, and none of Ms. Mojaddidi's reasonable, strategic decisions were motivated by any imaginary conflict.  The standard for 2255 petitions "requires the defendant to do more than simply allege a 'conflict' or baldly assert that the asserted conflict had an 'adverse effect.'"  United States v. Rodrigues, 347 F.3d 818, 824 (9th Cir. 2003) (quoting United States v. McMullen, 98 F.3d 1155, 1159 (9th Cir. 1996) and affirming denial of evidentiary hearing).  Hayat has not made any showing "that counsel was influenced in [her] basic

_____

[46] The law does not permit Mr. Weinberg to offer opinions on ultimate legal conclusion. See Mukhtar v. Cal. State Univ., Hayward, 299 F.3d 1053, 1063 (9th Cir. 2002) ("[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law."), overruled in part on other grounds by Estate of Barabin v. AstenJohnson, Inc., 740 F.3d 457, 467 (9th Cir. 2014) (en banc).

strategic decisions' by loyalty to another client or former client." Rodrigues, 347 F.3d at 828 (quoting United States v. Shwayder, 312 F.3d 1109, 1118 (9th Cir. 2002) and affirming denial of 2255). Therefore, this Court should deny Hayat's claims based on an actual conflict. Bonin, 59 F.3d at 827 (rejecting Cuyler claim "in the absence of an 'actual' conflict which squarely places the interests of the client in opposition to those of the attorney").

**H.    Hayat Cannot Show an Adverse Effect on Ms. Mojaddidi's Representation of Him Under any Theory.**

The Supreme Court has held that even if an actual conflict is shown, a petitioner must still show a specific harm to his lawyer's advocacy. Burger, 483 U.S. at 785 ("We also conclude that the asserted actual conflict of interest, even if it had been established, did not harm his lawyer's advocacy."). Ms. Mojaddidi's performance at trial demonstrates that Hayat cannot show any adverse effect on his representation from any alleged actual conflict. Id.; see also Shwayder, 312 F.3d at 1119 (9th Cir. 2002) (affirming finding that trial counsel's performance at trial based on "evidence in the record independent of [counsel's] testimony at the evidentiary hearing confirms that [counsel's] conflict did not adversely affect his representation"). "An 'actual conflict' is 'a conflict *that affected counsel's performance* – as opposed to a mere theoretical division of loyalties." Rodrigues, 347 F.3d at 823 (9th Cir. 2003) (quoting Mickens, 535 U.S. at 171 (emphasis in the original). The trial record of Ms. Mojaddidi's representation confirms that even if Hayat could demonstrate an actual conflict, he has failed to establish any adverse effect on Ms. Mojaddidi's representation of him at trial. His conflict claim must fail.

Hayat's several performance-based ineffective assistance of counsel claims each also lacks merit. The Court should all of his claims.

**V.    MS. MOJADDIDI PROPERLY AND ADEQUATELY INVESTIGATED THE SUPPOSED "ALIBI DEFENSE" AND REASONABLY SELECTED A SPEEDY TRIAL AND SUFFICIENCY OF THE EVIDENCE STRATEGY (CLAIMS 1 AND 2/OPHB II)**

Hayat claims that Ms. Mojaddidi's failure to present trial testimony from witnesses located in Pakistan was ineffective. (OPHB at 20-63). He argues that because Ms. Mojaddidi believed he never attended a Pakistani militant camp, she should have traveled to Pakistan or sent an investigator to Pakistan to locate and interview witnesses that could have proven his innocence. (OPHB at 21). Hayat argues that such deficiencies constitute ineffective representation. (Pet. at 37). In support of his

argument, Hayat relies on declarations of seventeen relatives and close friends who claim he did not leave his village for a three-month period between April 2003 and May 2005, and could not have attended a militant camp.  (See Def. Ex. S through JJ).  At the 2018 hearing, six witnesses, five of whom authored a declaration supporting Hayat's habeas petition, presented testimony consistent with their declaration.  (Tr. 123-189, 299-364, 926-982, 994-1045).  Yet, Ms. Mojaddidi effectively investigated the alibi defense, including witnesses in Pakistan, and elected to pursue an alternative defense strategy.  Thus, the unreliable claims of Hayat's purported alibi witnesses are irrelevant, and do not demonstrate prejudice.

Ms. Mojaddidi took on her role as counsel with zeal and conducted an exhaustive review of the evidence.  She personally reviewed all material produced in discovery.  (W.M. Depo. 161:23-162:2).  Ultimately, there were well over 7,000 pages of written discovery (the bulk of which were in foreign languages) as well as scores of hours of audio and video tape (much in foreign languages).  In addition, voluminous records and items seized from the Hayat residence (also primarily in foreign languages) were also made available to counsel for inspection and copying.  In Ms. Mojaddidi's opinion, she knew and studied the evidence much more than Mr. Griffin.  (Id. at 72:4-23, 162:3-11).

Working with Mr. Griffin, Ms. Mojaddidi considered and ultimately determined that the best defense strategy for Hayat was to push the government to trial as rapidly as possible and argue that there was insufficient evidence to establish guilt.  (Id. at 163:5-13, 170:17-171:10, 223:21-22).  Ms. Mojaddidi testified that the defense assessed "the amount of evidence that the government had produced in terms of discovery" and, based on that "limited amount of evidence," the defense believed that "[the government] wouldn't ultimately succeed if they were pushed to trial with what they had and that it was a good idea for [the defense team] to push for a speedy trial."  (Id. at 53:18-24).  In Ms. Mojaddidi's words:  "As the evidence kept coming in, I just didn't think the government was going to meet its burden."  (Id. at 163:19-24; 170:24-171:1).

The defense felt that the government had simply "charged the case" and was "build[ing] it later" with the "evidence . . . just trickling in."  (Id. at 171:8-10).  The defense further believed that, given the perceived weakness of the government's case, "it was a good idea . . . to push for a speedy trial."  (Id. at 53:23-24).  Indeed, the defense was concerned that, if given more time to prepare, "[the government]

would continue to gather evidence and create the case [it needed] against [Hayat]." (Id. at 171:13-14).

Ms. Mojaddidi testified that she never believed that it would have been in her interest to take a separate

strategic path or to change her decision to seek a trial as rapidly as possible and advance a failure of

proof defense. (Id. at 305:21-306:4). Thus, even when the Court granted the government's request for a

continuance of the trial date in August and in November, Ms. Mojaddidi and Mr. Griffin requested the

earliest trial date possible. (Id. at 171:24-172:7).[47]

### A.   Ms. Mojaddidi's Considered and Strategic Decision to Pursue a Speedy Trial and Sufficiency of the Evidence Defense Instead of an "Alibi Defense" Was Well Within the Wide-Range of Competent Representation

In choosing an insufficient-evidence defense and in pressing for a trial as rapidly as possible, Ms.

Mojaddidi selected a well-trodden strategic road. As the Supreme Court has stated: "[t]o support a

defense argument that the prosecution has not proved its case it sometimes is better to try to cast

pervasive suspicion of doubt than to strive to prove a certainty that exonerates." Harrington, 562 U.S. at

109. Courts routinely conclude that challenging the government's case and arguing that the evidence is

insufficient is more than enough to meet the constitutional requirement of effective representation. See,

e.g., Johnson v. Lockhart, 921 F.2d 796, 800 (8th Cir. 1990) ("Since the government has the burden of

proving guilt beyond a reasonable doubt, it may not be necessary for the defense to introduce evidence

to meet the constitutional requirement of effective representation. [Counsel] thought that he was faced

with such a case. Given the tenuous nature of the state's case against [defendant] and given that

[counsel] did interview [defendant]'s alibi witnesses, [Counsel]'s trial strategy was not unreasonable.");

Lema v. United States, 987 F.2d 48, 54-55 (1st Cir. 1993) ("Where the prosecution's case is less than

compelling … the risk of 'rocking the boat' may warrant a decision by trial counsel to forego the

presentation of further defense testimony, even favorable testimony.").

---

[47] Hayat alleges that Ms. Mojaddidi only pursued a Speedy Trial Act tactic that ultimately failed. (Pet. at 18-20; OPHB at 64-65, 71, 81). The argument incorrectly implies that the *only* strategic objective was to force a trial within seventy days under the Speedy Trial Act or to somehow seek dismissal for violation of the Act. Ms. Mojaddidi confirmed that the defense had two separate and distinct objectives: (a) pushing the government to trial as soon as possible; and (b) making sure Hayat received a speedy trial in accordance with the Act. (W.M. Depo. 175:2-8). She explained: "The focus was to push the government to trial and if[,] along the way[,] there was a violation [of the Act], then there was a violation and we could raise it." (Id.) She also confirmed that the objective, even after the Court granted continuances, was to continue to seek a trial as soon as possible. (Id. at 171:24-172:7). The main defense theory was sufficiency of the evidence. (Tr. at 751:13-25, 755:9-20).

Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. Moreover, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Id. "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." Id. "In particular, what investigation decisions are reasonable depends critically on such information." Id.

**1.    Ms. Mojaddidi made a reasonable efforts to investigate any potential alibi witnesses she, Hayat, or his family identified, including witnesses in Pakistan.**

Ms. Mojaddidi considered and investigated an alibi defense but ultimately concluded that it would not be a sound strategy. (W.M. Depo. 172:8-24; Tr. 727:16-19). She based her determination on information Hayat and his family supplied, and she reasonably relied on their knowledge of how and with whom Hayat spent time while he was in Pakistan between April 2003 and May 2005. Ms. Mojaddidi's investigative efforts were reasonable and discharged her duty to consider the viability of an alibi defense at trial. Consequently, the purported alibi witnesses Hayat has proffered are irrelevant to the disposition of his habeas claims. Ms. Mojaddidi was not ineffective. She expended reasonable efforts to investigate an alibi defense, reasonably concluded that the evidence did not support such a defense, and pursued an alternative strategy. That ends the Strickland analysis and the Court need not consider testimony aimed at Hayat's irrelevant allegation of prejudice.

Hayat identified to Ms. Mojaddidi which of his family members and friends he interacted with during his time in Pakistan between 2003 and 2005. (Tr. 727:20-15). He did not provide her with a list of specific people she should talk to as potential alibi witnesses because "he did not seem to have perfect recollection of the whole time that he was there." (Id. at 728:1-19). Rather, Ms. Mojaddidi generally questioned him about his time in Pakistan and assessed from his answers a list of potential alibi

witnesses.[48] (Tr. 728:1-19; see also W.M. Depo. 34:3-12, 150:23-152:18).  By contrast, Ms. Mojaddidi specifically interviewed Hayat's family members, especially his mother, Salma Hayat, about potential alibi witnesses in Pakistan.  (Tr. 728:20-25).  Based on the information she elicited from Hayat, his mother, his older sister, and an uncle, Ms. Mojaddidi was able to compile a list of potential alibi witnesses.  (Tr. 729:1-11).  Ms. Mojaddidi did not speak to Hayat's younger sister, Raheela, at the time because "she was a little girl," between 8 and 10 years old, and neither Hayat nor his family suggested Raheela was a potential alibi witness.  (Tr. 729:18-23, 730:3-8, 185:10-186:21 (Raheela's testimony)).

The potential alibi witnesses Ms. Mojaddidi identified were:  (1) Hayat's mother, Salma Hayat; (2) his cousin, Usama Ismail; (3) his uncle, Attique Ur Rehman; and (4) his grandfather, Saeed Ur Rehman.  (W.M. Depo. 148:18-151:25).  At her 2014 deposition, Ms. Mojaddidi testified that neither Hayat nor his family members mentioned any other potential alibi witnesses.  (W.M. Depo. 154:6-12).  She was certain of that fact, and testified:

> I know what Hamid told me and what the family members told me about the potential people I could have talked to.  And I'm certain that beyond the names that were given to me, and the family members, the names that I had listed, that *there was nobody else that they ever mentioned.  I'm certain of that*.

(Id. at 273:6-12) (emphasis supplied).

Ms. Mojaddidi also reviewed the discovery produced by the government, including FBI reports of investigation and other "documents," for independent sources of potential alibi witnesses.  (Tr. 728:6-8).  She independently identified Hayat's brother, Arsalan Hayat, as a potential witness.  (W.M. Depo. 148:18-149:5).  She also identified Hayat's wife in Pakistan as a potential alibi witness but concluded that because she and Hayat were married "right before" Hayat returned to the United States in May 2005, she would likely not be a useful alibi witness.  (W.M. Depo. 151:24-152:3).

To the best of her recollection, Ms. Mojaddidi either spoke with or reviewed interview reports of Arsalan Hayat (report), Salma Hayat (interview), Usama Ismail (likely report), and Attique Ur Rehman (phone interview), to assess whether they would be good alibi witnesses.  (W.M. Depo. 35:6-17, 148:18-

---

[48] At her 2014 depositions, Ms. Mojaddidi recalled a more directed discussion with Hayat about potential alibi witnesses.  (W.M. Depo. 150:23-151:6).  The variation is a distinction without a difference.  In both instances, she recalled compiling a list of potential alibi witnesses in discussions with Hayat.

154:5, 168:3-170:13, 186:4-17, 189:12-190:7).  She spoke briefly with Saeed Ur Rehman, and also recalled generally speaking with many of Hayat's other immediate family members.  (Id. at 148:18-150:14, 190:8-191:16).  Ms. Mojaddidi asked everyone she spoke to whether he or she could identify additional potential alibi witnesses.  (Id. at 160:23-161:14).  None of those people provided her with any additional names of potential alibi witnesses.  (Id.)  Ms. Mojaddidi would have followed up with any person that any family member or other person identified as a potential alibi witness.  (Id. at 161:15-20)

At the time, the only potential alibi witnesses Ms. Mojaddidi identified who were living in Pakistan were Hayat's wife, his uncle Attique Ur Rehman, and his grandfather Saeed Ur Rahman. (W.M. Depo. 149:19-25, 151:24-152:3; Tr. 729:12-17).  Ms. Mojaddidi spoke to Hayat's uncle by phone.  (W.M. Depo. 149:18-21; Tr. 729:14).  She believed she had one conversation with Hayat's grandfather.  (W.M. Depo. 149:22-25; Tr. 729:15).  And she concluded Hayat's wife would not be a good alibi witness because she and he were married immediately before Hayat returned to the United States in May 2005.[49]  (W.M. Depo. 151:24-152:3).  Accordingly, having considered all of the identified potential Pakistani alibi witnesses, Ms. Mojaddidi did not send an investigator to Pakistan to interview those people again.  (W.M. Depo. 35:18-25; Tr. 729:12-17).

This is not a case where Ms. Mojaddidi made no effort whatsoever to investigate or evaluate a possible alibi defense.  Rather, this is a case where Ms. Mojaddidi reviewed the statements and interviewed the witnesses identified by Hayat and his family (including witnesses in Pakistan), identified other potential alibi witnesses based on her independent review of the evidence, and came to a professional judgment that the witnesses had credibility issues and other defects that undermined their persuasiveness in light of the evidence at trial.  (W.M. Depo. 34:3-12, 148:18-149:5, 150:23-152:18; 172:8-24; 273:6-12; Tr. 731:4-733:6).  Ms. Mojaddidi had a fair knowledge of what these witnesses had to say, and her choice not to personally interview those whose statements were captured in reports cannot be ineffective.  See LaGrand v. Stewart, 133 F.3d 1253, 1274 (9th Cir. 1998) (rejecting argument that counsel must personally interview each witness); Eggleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986) (stating trial counsel does not need to interview witness if witness's account is fairly known

[49] Ms. Mojaddidi was correct in that determination.  Hayat's wife did not provide a declaration in support of his alibi claim.  (See CR 532; Def. Exs. S-JJ).

to counsel).

A strategic decision to reject an alibi defense in favor of pursuing an alternative defense does not constitute ineffective assistance of counsel and is not a basis for granting habeas relief. The "duty to investigate and prepare a defense is not limitless; it does not necessarily require that every conceivable witness be interviewed." Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) amended on denial of rehearing, 253 F.3d 1150 (9th Cir. 2001); see also Lawson v. Caspari, 963 F.2d 1094 (8th Cir. 1992) (counsel's decision not to call alibi witnesses based on reasonable trial strategy, including extensive cross-examination of government witnesses); Brown v. Hall, 2006 WL 3524503 at *9 (E.D. Cal. October 23, 2006). In assessing such a decision, court should apply "a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691. Once defense counsel makes a reasonable tactical decision to pursue one defense strategy, "the need for further investigation [of the other theory] may be considerably diminished or eliminated altogether." Id. See also Turk v. White, 116 F.3d 1264, 1267 (9th Cir. 1997) (finding counsel reasonably selected self-defense theory, discharging his duty to investigate competency defense). In this case, Ms. Mojaddidi reasonably investigated the alibi defense, including considering witnesses in Pakistan, determined it was not viable, and adopted an alternative defense strategy. No more was required.

### 2. Ms. Mojaddidi considered and rejected as problematic all potential alibi witnesses she, Hayat, or his family identified, including witnesses in Pakistan.

Ms. Mojaddidi testified that the witnesses Hayat identified, or who the defense thought might offer alibi testimony, "all seemed to have different levels of problems." (W.M. Depo. 164:10-13; see also Tr. 731:7-20). For example, Ms. Mojaddidi initially thought that Hayat's uncle, Attique Ur Rehman, an attorney, and Hayat's grandfather, Saeed Ur Rehman, might offer helpful testimony. (W.M. Depo. 35:22-37:14). However, she concluded that they would not be good witnesses. (W.M. Depo. 36:7-8; Tr. 731:7-20). Ms. Mojaddidi testified that the names of Hayat's grandfather and uncle were "all over all the evidence," referring to Hayat's statements and some of the documentary evidence.[50]

---

[50] This is reinforced by Umer Hayat's confession, in which he stated that Hayat's grandfather sent students from his madrasa to training camps, and also that Hayat's uncle Attique Ur-Rahman, also trained at a camp and encouraged Hayat to go to a militant camp. (Gov. Sup. Ans. Ex. 21, 5U1.1, 5U1.3). Umer Hayat stated that Attique Ur-Rahman fought in the Afghan – Soviet War. (Gov. Sup. Ans. Ex. 21, 5U1.3)

(W.M. Depo. 164:14-21; RT 2806:6-15 (testimony about article documenting meeting between Saeed Ur-Rehman and Mullah Omar); Tr. 733:7-15, 734:17-735:5).

The allegations, Ms. Mojaddidi pointed out, were that these two relatives "guid[ed] [Hayat] to do what he was doing" in connection with the camps. (W.M. Depo. 164:16-18). As for the grandfather, Ms. Mojaddidi knew that it was alleged that the grandfather "had the [jihadi] madrassa [in Pakistan] that was helping to train … people." (W.M. Depo. 36:2-4; Tr. 731:16-20). She testified in 2018 that "from everything [she and Mr. Griffin saw,]" the government considered Hayat's uncle and grandfather "terrorists." (Tr. 731:9-11; 735:1-5). In short, she determined that it "might hurt [Hayat's] case if they testif[ied]." (W.M. Depo. 164:18-21).

Ms. Mojaddidi also reasonably concluded that Hayat's mother, Salma Hayat, would be a poor witness because she had difficulty responding to questions even in her native language, and was a quiet and timid person. (W.M. Depo. 165:8-12; Tr. 729:5-8, 737:18-23). Although she could not remember the precise reasons, Ms. Mojaddidi also determined that Usama Ismail and Arsalan Hayat were not going to be good witnesses. (W.M. Depo. 165:13-166:2, 168:25-169:11; see Tr. 737:21-738:9). Additionally, Ismail had Fifth Amendment concerns with respect to testifying. (W.M. Depo. 166:23-167:4, 187:2-22).[51]

        **a.**     **Ms. Mojaddidi believed others in Pakistan might have seen Hayat engaged in innocent activities but she did not believe she could construct an effective alibi defense for the entire relevant period Hayat was in Pakistan.**

Ms. Mojaddidi did not believe she could construct an alibi defense for the entire relevant period Hayat was in Pakistan between April 2003 to May 2005. She acknowledged that there were likely people in Pakistan who observed Hayat doing all the daily innocent activities that Hayat claimed he did while in Pakistan, such as playing cricket, visiting his mother in Rawalpindi, and hanging out at a store

---

[51] Ms. Mojaddidi was not aware of any evidence suggesting that the government intentionally caused Ismail to invoke the Fifth Amendment right against self-incrimination for the purpose of distorting the fact-finding process. (W.M. Depo. 191:18-192:24). In an FBI interview in 2005 Ismail offered favorable information concerning Hayat's activities while Hayat was in Pakistan. (Def. Ex. J). In the same interview, however, Ismail agreed to submit to an FBI polygraph test under conditions he demanded but when the FBI agreed to his conditions, Ismail refused to participate in the polygraph, calling into question the veracity of his earlier statements. (Id.) Ismail hasdid not submittedsubmit an affidavit in support of Hayat's 2255 claim.

in Behboodi.  (W.M. Depo. 268:4-17; Tr. 727:16-19).  She explored the possibility of presenting an alibi defense relying on such witnesses.[52]  (Tr. 727:16-19).  However, she concluded that it would not "work" for any of these Pakistani individuals to serve as alibi witnesses.  (W.M. Depo. 37:4-14, 269:1-16).  Ms. Mojaddidi explained that the testimony of such potential alibi witnesses would not be helpful "because the argument could have been that just because [Hayat] did those things [such as play cricket or hang out at a store] doesn't mean that he could not have attended a camp at some point when he wasn't doing those things."  (W.M. Depo. 270:5-13; see Tr. 730:9-15).  Ms. Mojaddidi concluded that she would likely not be able to find an alibi witness for every single day Hayat was in Pakistan.[53]  (W.M. Depo 270:10-13; Tr. 730:14-15).  She believed that because of the length of time of Hayat's stay between 2003 and 2005, finding an alibi witness for every day was "a difficult argument to make."  (Tr. 730:20-22).   Informed by all of these factors, Ms. Mojaddidi made strategic decisions not to send an investigator to Pakistan to rove about in an unfocused, wasteful, and likely fruitless effort to locate other unidentified alibi witnesses.  (W.M. Depo. 35:18-20).

**1)      Any alibi defense would have had to account for shorter periods than the three months charged in the indictment.**

Having reviewed the evidence while preparing for trial, Ms. Mojaddidi correctly concluded that any successful alibi defense would have had to account for all of the various time-periods the evidence established as possible periods during which Hayat undertook militant training.  The evidence supported periods as short as forty days and as long as six months or more.  It did not only support a period of three months.  Ms. Mojaddidi knew that, and considered that in assessing the viability of an alibi defense.  (See Tr. 732:3-10) (explaining the joint defense strategy "morphed" in response to the ongoing disclosure of discovery).  Aware of that reality, Hayat devotes nearly seven pages of his argument on this issue to insisting that Ms. Mojaddidi needed alibi testimony for no less than a three-month period, only.  (OPHB at 20-27).  His argument ignores the totality of the evidence and focuses only on the evidence that he prefers to consider.  It also requires the conclusion that his jury found him guilty of

---

[52] Neither Hayat nor his family ever provided Ms. Mojaddidi with a list of people with whom Hayat played cricket.  (Tr. 783:1-13).

[53] Ms. Mojaddidi acknowledged that she did not consider whether depositions or affidavits from potential witnesses in Pakistan might have been useful in negotiations with the government.  (W.M. Depo. 40:3-25).

attending a militant camp for absolutely no fewer than three months within the period charged in the second superseding indictment. Of course, there is no way for Hayat to know that, and the totality of the evidence requires no such a conclusion.

In a recorded call in March 2003, Hayat told Naseem Khan that training at a jihadi camp about which Hayat was aware could take as few as forty days or successive forty-day periods, a fact the jury heard at trial. (Gov. Sup. Ans. Ex. 2 at 7-8; RT 940). Based on that evidence alone, the jury could have convicted Hayat if jurors concluded he attended a militant camp for only forty days, instead of three months. Similarly, a period of eighty days would have also satisfied the allegation in the second superseding indictment that Hayat attended a camp "during a period of months sometime between in or about October, 2003 and in or about November, 2004," and would have been consistent with the evidence presented at trial. (See CR 162 ¶ 7; Gov. Sup. Ans. Ex. 2 at 7; RT 940). Hayat ignores this evidence now but the jury heard it in trial and during closing argument.

In the government's closing at Hayat's trial, the prosecutor reminded the jury of Hayat's March 2003 claim that militant training, at a camp in a region that included Balakot, could take a little as forty days, using the specific charging language of the second superseding indictment:

> Focus your attention first, ladies and gentlemen, on the March 11, 2003 recorded conversation with Naseem Khan. On that date, Hamid Hayat explained to Naseem Khan that training now was in Mansehra, Pakistan. Naseem Khan asked Hamid Hayat where he would go for jihad training, "In the Kashmir," he asked. Hamid Hayat stated, a number of times, "Mansehra. In the North West Frontier Province." *Hamid Hayat indicated that the camp was there even at that time, and that it involved 40 days of training, including training in weapons, training in physical fitness.*
>
> This, ladies and gentlemen, is significant, this statement of Hamid Hayat on March 11, 2003, because, remember this, Mansehra, Mansehra is a district in the North West Frontier Province, and that district includes the town of Balakot.

(RT 4245:5-19) (emphasis supplied). In another passage, the government also focused the jury on Hayat's statement to Khan about the length of militant training. The prosecutor argued, "Take a look at the conversation on March 11th. Hamid Hayat admiringly described the older brother of Qari Yaqoob *who went for 40 days of training* in Afghanistan." (RT 4232:12-13) (emphasis supplied).

The prosecutor also reminded the jury of the "various" time periods Hayat described for the

militant training he undertook, and argued that the evidence proved he attended militant training "sometime no early than October '03 and no later than November '04." (RT 4255:14-21, 4259:16-20). The prosecutor did not insist that Hayat trained for no less than three months, and even if he had, the jury was entitled to rely on the evidence it heard and saw to determine Hayat's guilt, notwithstanding any particular argument. After summarizing the evidence supporting the conclusion that Hayat attended a camp, the prosecutor argued: "All of that evidence, in combination, points to the inescapable conclusion that Hamid Hayat attended a jihadi camp in Balakot in the 2003-2004 time period…." (RT 4266:13-16). The prosecutor did not insist the training period was no less than three months. In his final summary of the evidence, the prosecutor argued:

> In sum, the government has proven that Hamid Hayat had a jihadi heart and had a jihadi mind. Hamid Hayat pledged his belief in violent jihad. *He pledged to go to a jihadi training camp. And he went to a jihadi training camp in Pakistan*. When defendant did that, he knew and intended that his training and his person would be used to prepare for violent jihad in the United States. And when he came back to the United States, he concealed what he had done from the FBI with that same knowledge and with that same intent.

(RT 4284:3-11) (emphasis supplied). The prosecutor did not insist that the jury was required to find Hayat attended a camp for any specific period. Rather, he left them to decide whether the evidence proved that he attended a militant camp during the charged period. That included a period of forty days, which is more than one month, or eighty days, which is less than three-months.

The arguments made by the prosecutor in his closing were precisely the arguments Ms. Mojaddidi knew an alibi defense had to rebut but could not. Like Hayat's purported expert Daniel Broderick, Ms. Mojaddidi understood that presenting an effective alibi defense to cover a two-year period would "be almost impossible to do."[54] (Tr. 399:1-3; 730:11-15). She knew that trying to prove the negative that Hayat did not attend a militant camp for one and a half months, or eighty days, during a fourteen-month period was no easier task. She knew the evidence well. (W.M. Depo. 98:6-8). She knew Hayat described a training-period of less than three months to Khan. (See, e.g., 734:25-735:2). In

---

[54] Cued by Hayat's habeas counsel, Mr. Broderick retreated from his bold position, and asserted presenting an alibi defense for a three-month period would be "moderately easy," which he then shifted to "very easy." (Tr. 402:15-25). He did not opine on the difficulty of presenting an effective alibi defense for a 40-day or 80-day period. In any case, Mr. Broderick's flawed opinions asserted a standard in the "perfect situation." (Tr. 396:23).

her 2014 and 2018 testimony, she tried to express the consequence of that knowledge.  (See W.M. Depo. 270:2-13; Tr. 730:11-15).  She understood the government's written accusation did not define the proof at trial.  Rather, she understood the reverse was true, and the evidence at trial either satisfied the written accusation or not.  The government charged the offense using an approximate period that accounted for the conflicting evidence, and crafted its closing arguments to avoid insisting on a particular period, leaving the jury to make that determination.  In light of all of the evidence and Ms. Mojaddidi's reasonable efforts to investigate a potential alibi defense, her independent decision to pursue an alternative defense strategy was sound and well within the scope of competent representation.

> **b.**     **Ms. Mojaddidi discussed with Mr. Griffin the value of a potential alibi defense for both defendants but both attorneys ultimately agreed that it was not a sound defense strategy.**

Ms. Mojaddidi exercised her own independent judgment in making the decision to pursue an alternative defense strategy over an alibi defense, based on the totality of facts known to her and based on her belief that it would be in the best interests of Hayat.  (W.M. Depo. 172:5-174:1; Tr. 734:3-6, 732:8-15).  She spoke to Mr. Griffin about the possibility of pursuing an alibi defense.  (Tr. 731:23-732:15).  She testified that Mr. Griffin "obviously" thought that an alibi defense might help Umer because in Umer's videotaped confession Umer admitted taking Hayat to a militant camp.  Thus, alibi witnesses who could help prove the negative that Hayat did not attend a militant camp could have helped Umer's defense as well as Hayat's.  (Tr. 732:1-733:6; W.M. Depo. 51:5-23).

Ms. Mojaddidi also testified that the evidence disclosed by the government influenced her considerations about which defense strategy to pursue and her conclusions "may have morphed over time."  (Tr. 732:2-7).  She and Mr. Griffin discussed defense strategy in light of the evidence and their assessment of the soundness of potential alibi witnesses.  (Tr. 732:1-15).  After they received most of the discovery from the government, they concluded the evidence "was lacking," and that pursuing as fast a trial possible and challenging the sufficiency of the evidence "made sense."  (Tr. 735:6-13).  Ms. Moajddidi also noted that recordings made by Khan included mention of Hayat's uncle and grandfather, two of the potential alibi witnesses she considered who also lived in Pakistan, and "certainly affected her decision" to pursue an alternative defense strategy.  (Tr. 734:15-735:5).  Thereafter, she and Mr. Griffin independently elected to shift to a sufficiency of the evidence defense strategy and committed to pushing

for as fast a trial as possible.  (Tr. 735:10-13, 732:1-15).  Ms. Mojaddidi's decision was sound

### 3.    Ms. Mojaddidi decided to concentrate on a constitutionally effective challenge to the government's evidence and burden of proof.

In making the decision to employ an insufficient evidence strategy, pursue a trial as soon as possible, and to reject an alibi defense, Ms. Mojaddidi considered advice from Mr. Griffin, but ultimately exercised her own independent judgment.  (W.M. Depo. 172:5-173:22; Tr. 734:3-6).  She did not make that decision because Mr. Griffin told her to do so and she did not feel compelled to follow Mr. Griffin's advice.  She made her own independent professional decision based on the totality of facts known to her and based on her belief that it would be in the best interests of Hayat.[55]  (W.M. Depo. 173:23-174:1; Tr. 732:1-15, 735:6-13).

Ms. Mojaddidi reasonably concluded, based on investigation and her professional judgment, that pursuit of an alibi defense was not the best strategic course.  Ms. Mojaddidi appropriately turned to Hamid and his family to identify potential alibi witnesses and she followed-up and assessed those identified alibi witnesses.  See Strickland, 466 U.S. at 691 ("Counsel's actions are usually based, quite properly, on … information supplied by the defendant … In particular, what investigation decisions are reasonable depends critically on such information.").  Ms. Mojaddidi spoke with the identified alibi witnesses and concluded they would not make good witnesses and might even be harmful to Hayat's defense.  See id.  (counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

Ms. Mojaddidi was "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."  Harrington, 562 U.S. at 107.  Strickland's approach toward investigation "reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources."  Rogers, 13 F.3d at 387.  "[G]iven the finite resources of time and money that face a defense attorney, it simply is not realistic to expect counsel to investigate substantially all plausible lines of defense."  White v. Singletary, 972 F.2d 1218. 1224 (11th Cir. 1992).  "A reasonably competent attorney often must rely on his own experience and judgment,

[55] At her deposition Ms. Mojaddidi denied that she ever told Mr. Riordan she believed Hamid "ought to go on the offense and prove his innocence through affirmative alibi witnesses."  (W.M. Depo. 265:14-18).  In 2018, she testified she initially considered an alibi defense but changed course after reviewing the evidence.  (Tr. 732:1-15).

without the benefit of a substantial investigation, when deciding whether or not to forego a particular line of defense. . . ." Id.  In addition, "[o]nce counsel reasonably selects a defense, it is not deficient performance to fail to pursue alternative defenses." Rios v. Rocha, 299 F.3d 796, 807 (9th Cir. 2002); Phillips v. Woodford, 267 F.3d 966, 980 (9th Cir. 2001).  "The law does not require counsel to raise every available nonfrivolous defense." Knowles v. Mirzayance, 556 U.S. 111, 127 (2009). "[C]ounsel's reliance on particular lines of defense to the exclusion of others--whether or not he investigated those other defenses--is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable." Chandler v. United States, 218 F.3d 1305, 1318 (11th Cir. 2000) (en banc).

Here, Ms. Mojaddidi made a reasonable professional judgment to forego further efforts to identify and interview unidentified and undisclosed potential alibi witnesses in Pakistan to pursue a speedy trial/reasonable doubt defense.  Her judgment is entitled to "a heavy measure of deference" by this Court. See Strickland, 466 U.S. at 691.  "[T]he relevant inquiry under Strickland is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998) (rejecting "several arguments predicated upon showing what defense counsel could have presented, rather than upon whether counsel's actions were reasonable."); Siripongs v. Calderon, 133 F.3d 732, 736 (9th Cir.1998) (same). Moreover, "[t]he test [under Strickland] has nothing to do with what the best lawyer would have done. Nor is the test even what most good lawyers would have done." Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995).  Rather, courts ask "only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial."  Courts have generally rejected ineffectiveness claims based on alibi witnesses who never came forward until after the conviction, and who the defendant did not identify as alibi witnesses. See Bieghler v. McBride, 389 F.3d 701, 708 (7th Cir. 2004) (rejecting ineffective assistance claim when alibi witness "did not come forward before or during trial and that she was discovered by chance later on."); Williams v. Armontrout, 912 F.2d 924, 933 (8th Cir. 1990) (denying ineffectiveness claim when alibi witness "did not come forward until ten months after Williams was convicted.").  Here, the decisions by Ms. Mojaddidi fell well within the spectrum of reasonable decision-making.

Finally, it is irrelevant that Hayat has now proffered declarations from relatives and close friends—well after he was publicly convicted and sentenced to more than twenty years of imprisonment—who purportedly would now testify in support of his alibi defense.  (See Def. Exs. S-JJ).  The relevant legal question is whether Ms. Mojaddidi's decision was reasonable at the time she made it:

> Once we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced. Nor do we need to decide whether the information that would have resulted from further investigation would have necessarily been used at trial by every reasonable lawyer who was armed with such information. If the act of conducting no investigation of a particular defense is reasonable, the matter is closed; there can be no question about the reasonableness of having failed to present evidence of which the lawyer was unaware as a result of a reasonable decision to investigate no further.

Rogers, 13 F.3d at 388; see also Chandler, 218 F.3d at 1317 n. 20 ("basing the inquiry on whether an investigation (if one had been undertaken) would have uncovered mitigating evidence (or witnesses) is an example of judging counsel's acts from the benefit of hindsight"); Waters, 46 F.3d at 1514 (en banc) (noting that "[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel" and that "with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings").

Ms. Mojaddidi made an informed and reasonable decision to cease further investigation of a potential alibi defense based on the information Hayat provided to her and to pursue an insufficient evidence strategy.  That being the case, what she might have discovered had she decided to send an investigator to Pakistan is legally irrelevant to a determination of her constitutional effectiveness.  The record establishes that Ms. Mojaddidi's decisions were reasoned and strategic given what Hayat told her about potential alibi witnesses.

Accordingly, this Court should deny Hayat's ineffective assistance of counsel claim and need not even consider evidence of alleged prejudice.

B.       **Hayat Has Not Established Prejudice from Ms. Mojaddidi's Failure to Investigate the "Alibi Defense" in Pakistan**

Even if the Court considered Hayat's prejudice argument, which it need not, he cannot

demonstrate that the outcome of his trial would have been any different if Ms. Mojaddidi had called a succession of his family members and close friends to offer inconsistent and unbelievable "alibi" testimony on his behalf.  The substance of the declarations Hayat has proffered and the process by which they were collected, along with the bias of the declarants, reveal the hearsay writings as hopelessly unreliable.  Hayat cannot demonstrate prejudice and his claim must fail.

Hayat bears the burden of establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 669.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Strickland asks "whether it is 'reasonably likely' the result would have been different."  Harrington, 562 U.S. at 111.  This does not require a showing that counsel's actions "'more likely than not altered the outcome,' but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'"  Id. at 112.  "The likelihood of a different result must be substantial, not just conceivable."  Id.  Hayat cannot meet his burden.

### 1. The 2014 declarations are the product of a process focused on generating evidence to advance Hayat's habeas claims and are inherently unreliable.

Nearly ten years after Hayat's arrest, Hayat's family convened meetings in Rawalpindi and Behboodi, Pakistan, for the express purpose of organizing and collecting declarations from witnesses they never mentioned to Ms. Mojaddidi before Hayat's trial.[56]  (Tr. 194:12-195:11, 198:17-199:5).  At the gatherings, Hayat's family members and friends proceeded through an assembly line in which Hayat's paid advocates read them scripts that included "guiding questions."  (Tr. 226:24-227:9).  Even if that process had not been initiated for the specific purpose of generating evidence to advance Hayat's habeas claims, it could not have produced reliable evidence, especially about facts that occurred more than ten years earlier while more than half of the declarants were teenagers.  Undoubtedly, the shared goal of Hayat's family and friends—to try to free Hayat—was discussed among the declarants, alongside the substance of their faded memories, before anything was memorialized in writing.  That intermingling of those decade-old memories among individuals all biased in Hayat's favor, hopelessly

---

[56] Except for Hayat's uncle Attique Ur Rahman, who Ms. Mojaddidi spoke to and excluded as an alibi witness.  (See Tr. 192:12-19, 193:1-4, 194:12-195:25; W.M. Depo. 154:13-160:23).

tainted the substance of the declarations.  The unreliability of any results of such a process is self-evident.  The declarations are woefully insufficient to demonstrate prejudice.

>    **a.    The failure by Hayat and his family to identify in 2005 more than a dozen relatives and close friends who claim they spent time with Hayat daily, weekly, or monthly over a two-year period undermines the reliability of the declarants' claims.**

The after-acquired assertions of Hayat's interested family and close friends, as set forth in the unreliable hearsay declarations, cannot support the conclusion that their testimony at Hayat's trial would have created a substantial likelihood of a different outcome.  First, as described above, the government presented evidence establishing Hayat's guilt beyond a reasonable doubt.  Second, it is highly unlikely that testimony from any of the recently discovered purported alibi witness would have been afforded great weight by an objective trier of fact.  Indeed, *none* of the seventeen witnesses proffered by Hayat was or is a disinterested, objective third-party witness.  All of the witnesses are either blood relatives of Hayat, relatives through marriage, or friends who have known Hayat for all or most of his life.[57]  See Romero, 46 F.3d at 1030 (discounting alibi testimony proffered by relatives after conviction).  Most were teens at the relevant time, who now claim to have socialized with Hayat on a regular basis while Hayat was in Pakistan between April 2003 and May 2005.

Thus, significant reliability concerns exist.  Each of Hayat's proffered declarants claims to have spent near-daily or otherwise frequent time with Hayat during his visit to Pakistan between 2003 and

---

[57] Specifically, the Pakistani declarants include:  (1) Attique Ur Rahman, Hayat's maternal uncle, age 31 in 2004 (Def. Ex. S); (2) Muhammad Anas, Hayat's maternal uncle, age 29 in 2004 (Def. Ex. T); (3) Muhammad Daud, Hayat's friend since 1997, age 24 in 2004 (Def. Ex. U); (4) Muhammad Usman, Hayat's brother-in-law (married to Hayat's older sister), age 14 in 2004 (Def. Ex. V); (5) Hammad Ishfaq, Hayat's cousin on his mother's side, age 16 in 2004 (Def. Ex. W); (6) Muhammad Qasim, grocer who has known Hayat since he was a child, age 48 in 2004 (Def. Ex. X)[57];  (7) Sajjad Ishfaq, Hayat's second cousin, age 16 in 2004 (Def. Ex. Y); (8) Rafaqat (no other name declared), Hayat's friend since childhood, age 24 in 2004 (Def. Ex. Z); (9) Salahuddin (no other name declared), second cousin on Hayat's mother's side, age 14 in 2004 (Def. Ex. AA); (10) Muhammad Saeed, Hayat's friend since childhood, age 18 in 2004 (Def. Ex. BB); (11) Nisar Ahmad, Hayat's cousin on his father's side, age 13 in 2004 (Def. Ex. CC); (12) Shakeel Ahmad, Hayat's friend since childhood and his wife's cousin, age 21 in 2004 (Def. Ex. DD); (13) Fahim Ud Din, Hayat's uncle (married to Hayat's maternal aunt), who has known Hayat since his childhood, age 41 in 2004 (Def. Ex. EE); (14) Pashmina (no other name declared and declaration signed with a thumbprint), Hayat's maternal grandmother who cared for Hayat for a decade, age 67 in 2004 (Def. Ex. FF); (15) Muhammad Nauman, Hayat's cousin, now brother-in-law age 17 in 2004 (Ex GG); (16) Malik Ihtesham Mumtaz, Hayat's friend since childhood, age 24 in 2004 (Ex. HH); Tayyaba Fahim, Hayat's maternal aunt, age 34 in 2004 (Def. Ex. II); (17) Bibi Asama, Hayat's maternal aunt and the mother-in-law of Hayat's brother, Arslan, age 43 in 2004 (Def. Ex. JJ).

2005. Yet, neither Hayat nor his family ever identified any of them to Ms. Mojaddidi as a potential alibi witness after Hayat's 2005 arrest. Rather, the declarants did not emerge until *nine years* after Hayat was arrested, and later tried, convicted, and sentenced to prison. Moreover, Hayat's confession contradicts the declarants' proffered assertions, as does the confession of Hayat's father, along with the other record evidence.

Indisputably, in June 2005, Hayat and his family were in the best position to know everyone Hayat spent time with while he was in Pakistan at the relevant time. Yet they only identified the four people Ms. Mojaddidi assessed and rejected as viable alibi witnesses. Thirteen of the purported alibi witnesses Hayat now proffers are related to him by blood or marriage. The rest are close friends who have known him all or most of his life. That Hayat and his family failed to earlier identify those witnesses—all of whom were well-known to him and his family in summer 2005—undermines the credibility of their after-the-fact declarations. See Watts v. United States, 841 F.2d 275, 278 (9th Cir. 1988) (affirming credibility determination on affidavits and without hearing and finding that defendant's earlier silence about allegedly exonerating facts refuted his present claims). Hayat does not and cannot credibly argue that he did not know the declarants at the time of his arrest. Nor can he credibly claim that Ms. Mojaddidi should not have relied on him to identify eleven people who claim they spent time with Hayat every single day, every other day, or every week for more the two years while Hayat was in Pakistan from April 2003 through May 2005—and six more who claimed to have monthly or other regular contact with Hayat during the same period. (See Def. Exs. S through JJ).

### b.    The process by which Hayat's advocates collected the declarations rendered them unreliable.

The process by which the declaration were collected was deeply flawed and rendered the resulting declarations unreliable. At the 2018 hearing, Hayat called Maryam Ahmed, who testified about the process by which she and Syeda Amna collected declarations from the purported Pakistani alibi witnesses. (See Tr. 190-243). Ahmed's testimony and the testimony of others demonstrates that the collection process was fundamentally flawed, and could not have produced reliable results. Upon the foundation Ahmed laid, the Court admitted into evidence the hearsay declarations of seventeen

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS                    109

alleged alibi witnesses.  (Tr. 191-220; see also Def. Ex. S-JJ).[58]  Ms. Mojaddidi testified at her 2014 deposition that, before Hayat's trial, neither Hayat nor his family identified any of those relative and close friends as potential alibi witnesses, except for Hayat's uncle, who Ms. Mojaddidi ruled out as set forth above.  (W.M. Depo. 154:13-160:23, 164:14-21, 35:22-37:14, 36:7-8; Tr. 731:7-20, 733:7-15, 734:17-735:5).

Ahmed and Amna were more like advocates than objective investigators.  Ahmed and Amna were paid $2,000 to travel to Pakistan to collect evidence to advance Hayat's habeas claims.  (Tr. 192:20-25).  Ahmed was formerly a lawyer in Pakistan and currently promotes "social entrepreneurship" in Lahore.  (Tr. 190-18-25).  Amna is a journalist who, at the request of Hayat's lead habeas counsel, was writing a story about Hayat's conviction and habeas efforts when she told Ahmed about Hayat's case.  (Tr. 191:16-192:6).  Neither is a professional investigator.  The group went in with a set of questions to ask everyone, and apparently took no notes and had no disagreements on what the witnesses said.  (Tr. 226:24-227:9, 227:21-228:10).  In January 2014, Ahmed and Amna traveled to Pakistan.  (Tr. 192:10-19).  Hayat's lead habeas counsel put them in touch with Hayat's maternal uncle, Muhammad Anas, who resided in Rawalpindi, Pakistan.  (Tr. 194:12-25; see Def. Ex. T).  Ahmed and Amna visited Anas, along with Amna's aunt, Mrs. Shah.  (Tr. 194:23-195:15).

### 1) The declarations are unreliable because they were tainted by hearsay discussions among the declarants.

Conversations among the declarants about the subject of their declarations before Ahmed and her team arrived to meet with them irretrievably tainted the resulting declarations.  At Anas's residence, Ahmed, Amna, and Mrs. Shah met with Anas and four or five of the declarants, who were already gathered at his home when they arrived.  (Tr. 196:1-4, 198:11-15).  On cross-examination, Ahmed claimed Anas had not spoken to the assembled declarants about their memories of Hayat's activities between April 2003 and May 2005 before she arrived.  (Tr. 235:9-236:4, 236:14-25).  Obviously, there

---

[58] Ahmed identified Defense Exhibit Y as the declaration of Sajjad Ishfaq, however that exhibit in the materials supplied to the government is a duplicate of Defense Exhibit W, the declaration of Hammad Ishfaq.  (See Tr. 210:16-25).  Several of Hayat's other defense exhibits were in disarray at the hearing.  (Tr. 57:20-60:25, 65:20-71:9).  It is unclear what declaration Hayat submitted to the Court as Defense Exhibit Y.  Of course, if the witness testified about one exhibit but the Court admitted another, the omitted exhibit is not in evidence.  The witness did not testify at all about the content of the declaration.  (See Tr. 210:16-25).

is no way she could have known that because she was not present.  There is almost no possibility that Hayat's assembled friends and family did not speak about the topic they were gathered to discuss before Ahmed arrived.  Further straining credulity, Ahmed claimed that Anas could not have spoken to the declarants about the subject of their declarations because he did not know what she planned to ask.  (Tr. 235:16-24).  That she would make such an unsupportable claim demonstrated her awareness of the flawed collection process in which she engaged.  Ahmed also asserted that she "asked [the declarants] if anyone talked to them [about the subject of their declarations], and no one did."  (Tr. 235:25-236:25).  None of the declarations includes such a specific denial.[59]

Anas also helped arrange similar interviews of Hayat's family and close friends at Hayat's grandmother's house in Rawalpindi, and at a community center in Behboodi.  (Tr. 195:19-25, 198:17-25, 200:19-25).  Arslan Hayat and Muhammad Nauman helped arranged interviews and the venue in Behboodi.  (Tr. 240:2-22).  Ahmed did not take any steps to prevent them from discussing the subject of the interviews with the declarants.  (Id.)  The interview process was the same at all three locations.  (Tr. 199:3-5).  Ahmed and Hayat's other advocates interviewed each declarant individually, while the remaining declarants waited together (and free to discuss their memories among themselves).  (Tr. 196:7-21).  Ahmed asked questions from a scripted list that included "guiding questions" that she, Amna, and Mrs. Shah created after being given instructions about the "kind of information that [they] had to gather."  (Tr. 225:5-9).  Ahmed's testimony demonstrated that her mission in Pakistan was less like that of an objective investigator and more like that of an advocate working to generate precisely the kind of testimony Hayat needed to support his habeas claim.

> **2)    The declarations are unreliable because they were tainted by the synthesis of the recollections of three note-takers, their accuracy cannot be tested because the underlying notes were destroyed, and Maryam Ahmed's testimony was unreliable.**

Ahmed's failure to preserve the raw notes from interviews of the declarants and her other errors, undermined the reliability of the resulting declarations.  The interviews were conducted in Urdu, except

---

[59] The declarations include only a general, boilerplate claim that they are based on personal knowledge.  They do not address the specific, taint-ridden circumstances under which they were collected.  Assuming the declarants did not already know that discussing their testimony would taint it and render it unreliable, Ahmed did not tell Anas to prohibit such discussions.  (Tr. 235:21-24).

for one. (Tr. 198:7-10). During the interviews, Ahmed, Amna, and Mrs. Shah took notes, which they later "compared, compiled, and condensed into a single statement." (Tr. 197:7-18). Mrs. Shah then handwrote the statements in Urdu. (Tr. 202:23-203:2). Ahmed claimed that although they "synthesized" their separate notes concerning each interview, there were no disagreements about the content of any of the statements resulting from that synthesis. (Tr. 227:21-228:10). Her assertion could not be tested because she admitted that she destroyed the notes of all seventeen interviews. (Id.) Amna later translated the Urdu to English, a process Ahmed claimed she "peer-reviewed." (Tr. 201:19-22). Ahmed testified that she spoke Urdu, (Tr. 191:12-13), but Hayat offered no evidence that the Urdu-to-English translations she and Amna undertook were accurate, or that Mrs. Shah was able to accurately record the statements in Urdu.

The reliability of the declarations was further undermined by an error in one that Ahmed could not persuasively explain at the hearing. The error called into question Ahmed's claim that the declarants did not speak to each other about their memories before being interviewed. It also called into question her claim that the declarants reviewed their synthesized statements for accuracy and found no mistakes. Ahmed testified that the interview of Dr. Fahim ud Din was conducted in English. (Tr. 207:22-209:9). Yet, she also produced an English "translation" of his declaration. (Id.) Ahmed denied on direct examination that there was any error in Dr. Fahim's declaration. (Id.) However, Hayat's counsel directed her attention to a passage in the fourth paragraph of the "translated" declaration, and Ahmed agreed, contrary to her earlier testimony, that the declaration contained an error after all. (Id.) Specifically, the declaration stated Dr. Fahim met with Hayat weekly between April 2003 and May 2005, so it was not possible Hayat left his village of "Balakot" for more than two weeks. (Id. See also Def. Ex. EE).

Ahmed characterized the error as a "typo." (Id.) However, Ahmed admitted she did not author Dr. Fahim's type-written declaration, and used the pronoun "we" to describe who recorded it, before claiming it was Amna.[60] (Tr. 228:18-230:19). Nor did Ahmed review the finished declaration with Dr.

---

[60] Dr. Fahim's testimony contradicted Ahmed's testimony and claimed a man typed his declaration. (Tr. 1012:7-15). In her testimony, Ahmed did not mention receiving assistance during her work in Pakistan from any man other than Hayat's family members or friends.

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

112

Fahim. (Id.) She could not recall the circumstances of that review, assuming it happened at all, and suggested she would "have to check exactly…what happened." (Id.) She used words like "maybe," "I guess," and probably in response to questioning about the purported review, revealing her poor recollection, generally. (Id.) Despite not being present for any review, Ahmed claimed that Dr. Fahim reviewed his declaration with Amna but conceded that neither Amna nor Dr. Fahim detected the substantial error in the declaration, which confuses Hayat's home village for the location of the jihadist camp he was convicted of attending. (Id.)

The error Ahmed identified carries significant consequences. First, the error reveals the unreliability of Ahmed's testimony overall. It also reveals the unreliability of Ahmed's claim that each declarant reviewed the statements she, Amna, and Mrs. Shah synthesized from their notes, and that any such review resulted in the correction of any errors in the declarations. Indeed, the mistake in Dr. Fahim's declaration reveals that even a major error in a typed declaration (in English), was not detected and corrected by the (apparently ineffective) quality-control process Ahmed claimed she used during the collection of the declarations. Ahmed's testimony begs the question of how many other errors went undiscovered in the declarations she collected, including errors associated with the frequency that the declarants claimed they saw Hayat or other key facts.

Second, the "Balakot" error in Dr. Fahim's declaration reveals there were discussions among the declarants and/or with Ahmed about Hayat's conviction and his habeas claims. That revelation makes clear the process of collecting the alibi declarations was not an objective fact-finding mission but, rather, an organized effort to generate helpful evidence. The resulting taint hopelessly undermines the reliability of all of the declarations. Dr. Fahim's declaration does not include a discussion of the charges against Hayat. Nor does it directly mention Hayat's conviction or the underlying details. Yet, Dr. Fahim mentions Balakot three times in his declaration, including in his claim that Hayat could not have traveled to Balakot alone. (Def. Ex. EEE). Dr. Fahim also claimed Hayat was too easily intimidated to play with a toy gun. (Id.) The reason Dr. Fahim mentioned Balakot and guns, was that he was thinking about Hayat's conviction from recent discussions with someone about those facts. The "Balakot" error is not just a simple typo. It is a window into the deeply flawed process by which his and the other declarations were collected, and the fundamental unreliability of those declarations.

**3)      The use of stamp paper did nothing to remedy the unreliability of the declarations because Hayat's witness could not offer evidence of the quality of the oath commissioner process in general or in this case.**

The use of "stamp paper" by Ahmed and her team did nothing to improve the reliability of the declarations.  Ahmed and her team recorded the statements on stamp paper, which Ahmed claimed is used for legal documents in Pakistan.  (Tr. 199:6-13).  Amna, and not Ahmed, took the finished declarations to an oath commissioner to be stamped in the manner of a notary—except that the declarants were not present, no fingerprints were taken, and the oath commissioner purportedly compared the signatures on the declarations to copies of the declarants' signatures from their national identification cards.  (Tr. 200:12-18; 224:1-226:20).  Amna did not testify and Ahmed offered only her hearsay-based belief about how the oath commission process unfolded.  (Tr. 223:18-226:20).

Ahmed did not know whether the oath commissioners were subject to the same kinds of regulations as notaries in the United States.  (Tr. 226:2-4).  She did not know whether oath commissioners were required to keep records of the stamp paper they signed.  (Tr. 226:5-10).  She "believed" Amna took copies of the declarants' identifications cards with her to the oath commissioner but did not know and was unable to produce copies of those identification cards during her testimony, and Hayat did not otherwise produce copies.  (Tr. 223:8-23).  Accordingly, the use of stamp paper did nothing to cure the unreliability of the declarations.

**4)      The declarations are unreliable because Hayat's family and close friends faced no consequence for making false statements.**

The declarations also raise the significant specter of sanction-free perjury.  They lack the indicia of reliability that comes with an enforceable penalty for perjury.  While the declarations state they were made under penalty of perjury under United States law, none of the declarants made their claims in the United States, while subject to its law.  Thus, the declarations are "so incompatible with our fundamental principles of fairness or so prone to inaccuracy or bias as to render the testimony inherently unreliable."  See United States v. Salim, 855 F.2d 944, 953 (2d Cir. 1988) (concerning the unreliability of Rule 15 deposition testimony not subject to penalty for perjury).  That is, in large part, because the "the absence of a sanction for perjury" renders them "suspect."  See Alvarez, 837 F.2d at 1029; accord

United States v. Feijoo-Tomala, 751 F. Supp. 40, 43 (E.D.N.Y. 1990) (concerning the unreliability of Rule 15 deposition testimony not subject to penalty for perjury).

Unlike the domestic witnesses Hayat called at the 2018 hearing, the Pakistani declarants are beyond the reach of United States law and would bear no legitimate fear of perjury sanctions (apart from individual conscience).[61]  Hayat proffered no evidence concerning the existence of a testimonial oath or its administration or enforcement in Pakistan.  Ahmed testified that she did not place any of the declarants under oath, under Pakistani civil law or Islamic law.  (Tr. 230:20-233-7).  Rather, she claimed she merely told them they had to tell the truth and that lying "is illegal."  (Id.)  She did not describe any penalty that applied if a declarant was untruthful.  Ahmed acknowledged that she was aware that perjury occurs in Pakistan.  (Tr. 233:25-234:2).  Ahmed did not challenge any of the assertions made by the declarants.  (Tr. 236:23-25).  Hayat's failure to insure the declarants were subject to, and aware of, a meaningful penalty for perjury undermines the reliability of the declarations, who had a strong incentive—subconscious or otherwise—to say whatever necessary to help Hayat.  As a result, the declarations are too unreliable to satisfy Hayat's substantial burden.

**2.      The substance of the declarants' claims of then-current recollections of seeing Hayat ten years earlier on a daily, weekly, or monthly basis more than strains credulity and renders the declarations unreliable.**

The substance of the claims made by the declarants concerning their interactions with Hayat between April 2003 and May 2005 are inherently unreliable because of the close relationships between Hayat and the declarants.  Moreover, the declarants' assertions that each recalled—ten years after the fact—daily, weekly, or otherwise routine interactions with Hayat in Behboodi or Rawalpindi, without any absences is risible.  It is not how memory works.  People do not commit to memory every ordinary interaction with another person, whatever the frequency.  Even if a person was particularly memorable, the passage of ten years (especially from adolescence to adulthood) typically erodes detail from memory and leaves only impressions and outlines.  People do not naturally recall the absence of activity with

---

[61] While an extradition treaty exists between the United States and Pakistan, 47 Stat. 2122 (U.S.-U.K. treaty) the four proposed witnesses could not be prosecuted in the United States for perjury committed in Pakistan.  Also, the four Rule 15 deponents Hayat called at the hearing, all of whom were also declarants, were not truly subject to any meaningful penalty for perjury because the oath they took under United States law cannot be enforced in Pakistan.

another person for 40 days, 60 days, or 90 days, particularly when that absence of activity occurred ten years earlier.  The declarants' claims defy common sense.  They are vague, generic, lack particular detail, and omit mention of any specific triggers that support their broad assertions.[62]  They cannot carry Hayat's burden.

Additionally, that the declarants consistently described observing Hayat engaged in innocent activities like playing video games or cricket while he was in Pakistan during the relevant period is not significant.  Hayat's videotaped confession was played in open court and he claimed he engaged in those activities and others during that confession.  He likewise discussed visiting Rawalpindi, getting married, and making other excursions from Behboodi during his confession.  Moreover, Hayat's 2007 new trial motion included declarations from two of his cousins, Usama and Jaber Ismail, who purported to offer alibi evidence of Hayat's innocent conduct in Pakistan, including that Hayat played cricket and video games, rarely left his village, and was not away for more than three months between April 2003 and May 2005.[63]  (See CR 441, Ex. K & L).  Those declarations remain on the public docket, available to anyone in the world able to access the Court's electronic filing system or associates of such people.  Indeed, those declarations offer a roadmap on which the 2014 declarants could have based their consistent claims.  The declarations are unreliable and cannot satisfy Hayat's burden to demonstrate prejudice.

---

[62] As Mr. Riordan testified, people recall facts that are unusual and important, like arguing before the Supreme Court of the United States or representing famous clients.  (Tr. 888:17-889:18).  The declarants claim the opposite: that they recall in detail, after the passage of ten years, typical, ordinary, and mundane facts.  Their claims defy common sense.

[63] Curiously, the 2007 declarations of Hayat's cousins make no mention of his bout with meningitis in 2000, a matter addressed directly or indirectly in nine of the seventeen 2014 declarations.  (See Def. Ex. W, X, DD, EE, FF, GG, HH, II, JJ).  Those declarants describe Hayat as "simple," "easy to intimidate," "timid," weak-minded, senseless, and afraid of loud sounds.  (See id.)  Hayat's meningitis is also not mentioned in his 2007 new trial motion.  (See CR 441).  Nor is it mentioned in the initial habeas petition he filed in 2007.  (See CR 496).  It remained unmentioned until these declarations in support of Hayat's 2014 habeas petition, which featured the alleged effects of Hayat's meningitis among its ineffectiveness arguments.  In any event, Hayat's recorded conversations with Naseem Khan, in which he is boastful and self-confident, refute the claims of the declarants about his mental condition.  Likewise, Ms. Mojaddidi's testimony that she never detected that Hayat was unable to understand her during their many meeting also contradicts the declarants' claims, as does Hayat's recorded confession.

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

116

### a.    The District Court's critique of the purported alibi declarations as unreliable and insufficient to satisfy Hayat's burden on summary judgment also applies on the merits.

In its order denying Hayat's summary judgment motion on his ineffectiveness claim related to the declarants, the District Court found the declarations unreliable and insufficient to demonstrate prejudice.  The District Court's critique of the vagueness and lack of personal knowledge that characterized the declarations applies on the merits and requires the same conclusion now as the District Court reached earlier:  the declarations cannot support Hayat's burden to demonstrate prejudice.

After reviewing the declarations of Hayat's purported alibi witnesses, the District Court found that "[n]one of [the] declarations . . . squarely contradict Hayat's confession."  (See CR 600 at 17-18).  The District Court concluded, "[t]he evidence Hayat's [habeas counsel] provides in support of Hayat's motion does not alter the 'evidentiary picture' involved with his conviction, which includes Hayat's confession that he trained at the Balakot camp ….'"  Id.  the District Court also observed that "the individuals declaring they spent time with Hayat while he was in Pakistan fail to provide specifics such as actual dates on which they saw Hayat, and personal knowledge about Hayat's activities when they were not with him."  Id.  Thus, the District Court found the potential alibi testimony was "insufficient to satisfy Hayat's 'burden of showing that the decision [the factfinder] reached would reasonably likely have been different absent the [trial counsel's failure to more extensively investigate alibi witnesses]."  Id.

Even if the District Court focused in its summary judgment order on Hayat's time training during his 2000 attendance at a jihadist camp, and not his time training during his 2003-2004 attendance at a jihadist camp, its overall reasoning still holds.  The declarations do not alter the "evidentiary picture" supporting his conviction.  The trial evidence demonstrated Hayat might have trained for as little as 40 days.  Thus, the jury would have had to conclude that the feats of extraordinary memory[64] claimed by the declarants, each of whom had a strong bias in Hayat's favor because of their close relationships to

---

[64] In 2006 the declarants would have been asserting the still unbelievable claims of a then-current recollection that Hayat was never absent from Behboodi or Rawalpindi for 40, 60, or 90 days—two years after the fact.  The claim of a perfect recollection of the absence of activity, whether asserted two year or ten years after the fact, defies common sense and is inherently unbelievable, especially when asserted by biased witnesses with an interest in protecting a family member or friend.  The testimony would not have altered the evidentiary picture at trial.

him, outweighed Hayat's confession and the other evidence of his guilt.  The declarations lack sufficient indicia of reliability to make the question a close one.  In light of the above factors, the purported alibi witnesses would have been viewed with extraordinary skepticism by any objective trier of fact, and the impact of their testimony on the jury's deliberation and verdict would have been minimal.[65]  The declarations cannot carry Hayat's burden to demonstrate prejudice.

### 3. The testimony of the live "alibi" witnesses and deponents was also unreliable, would not have altered the evidentiary picture at trial, and cannot carry Hayat's burden on his habeas claim.

At the 2018 hearing, Hayat presented testimony from six purported alibi witnesses.  Two of those witnesses testified in person, his younger sister Raheela Hayat, and his first cousin Jaber Ismail.  (Tr. 123-189, 299-364).  The other four testified in Rule 15 depositions held during evening court sessions via live videoconference from Pakistan.  (Tr. 926-982, 994-1045).  The government properly impeached all six with testimony that, knowing the charges, they failed to come forward as alibi witnesses until the new trial motion (Jaber Ismail) or the filing of the habeas petition.  See Cuevas v. Henderson, 801 F.2d 586, 591 (2d Cir. 1986) (approving of impeachment of purported alibi witnesses at trial with failure to come forward); Thomas v. Scully, 854 F.Supp. 944, 959-60 (stating that alibi witness's "failure to disclose such information until the time of the trial is a factor a jury should consider in assessing the weight to be given to the testimony") (internal quotations and citation omitted).  All four of the deponents earlier submitted one of the unreliable declarations discussed above.  (See Def. Ex. T, Z, EE, and II).  The deponents were Muhammad Anas, Rafaqat, Dr. Fahim, and Tayyaba Fahim.  Their testimony, based on their flawed 2014 declarations, was no more reliable in 2018.  While the Court

---

[65] Four of the seventeen witnesses do not offer alibi testimony, or do not offer any meaningful alibi testimony because they do not describe the dates, frequency or duration of their various purported encounters with Hayat.  Those witnesses are: (1) Muhammad Nauman (Def. Ex. GG) (recounted visits with Hamid in Behboodi between 2003 and 2005 with no reference to dates, frequency, or duration); (2) Malik Ihtesham Mumtaz (Def. Ex. HH) (without reference to dates, frequency, or duration, recalled going out with Hayat when he visited Rawalpindi and visiting Hayat in Behboodi); (3) Tayyaba Fahim (Def. Ex. II) (no alibi testimony proffered); and (4) Bibi Asama (Def. Ex. JJ) (no alibi testimony proffered).

Three other witnesses offered vague and generalized  recollections of seeing Hayat from time to time but offered few precise recollections:  (1) Muhammad Anas (Def. Ex. T) ("[Hayat] came to [Rawalpindi] around two times every month, and stayed at our place for three or four days"); (2) Muhammad Daud (Def. Ex. U) ("We met at least once or twice a month [in Rawalpindi for a meal]" … "We also went to his village [Behboodi] countless times."); (3) Pashmina (Def. Ex. FF) (when Hayat returned to Pakistan for his wedding, "he came to Rawalpindi once or twice a month with his mother and stayed for two to four days.").  All of the declarations were generally unreliable for the reasons set forth herein.

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

118

swore all four deponents under United States law, none was actually subject to its reach because each was testifying via videoconference from Pakistan and was effectively immune from perjury charges.  In sum, all four deponents claimed to have seen Hayat too frequently between April 2003 and May 2005 for Hayat to have left Behboodi for months of training at a jihadists camp.  However, their incredible claims failed on cross-examination.

**a.    The deponents claimed firm memories of ordinary interactions with Hayat nearly 15 years earlier, frequently contradicted their own testimony and that of others, admitted their bias, and conceded their poor recollection of other facts from the same period.**

**1)    Muhammad Anas.**

Muhammad Anas is Hayat's maternal uncle.  His testimony provided no true alibi because he admitted his memory of seeing Hayat between April 2003 and May 2006 was only approximate.  Thus, nothing he said rebutted Hayat's confession that he trained at a jihadist camp between November 2003 and December 2004.  Such testimony could not have changed the evidentiary picture at trial and cannot demonstrate prejudice to support Hayat's habeas claim.

Anas claimed on direct examination that between 2003 and 2005—15 to 13 years earlier—he recalled that the longest period of time that passed in which he did not see Hayat was one week.  (Tr. 936:8).  At the time, Anas was a busy teacher, instructing courses in "Islamic studies and Urdu language."  (Tr. 942:2-19, 941:2-25).  He taught "five days or six days" per week.  (Id.)  He was also recently married and had young children.  (Tr. 943:1-25).  Despite the demands on his time, Anas claimed he made a weekly, 90-minute round trip drive from Rawalpindi to Behboodi, for no special purpose, where he saw Hayat.  (Tr. 935:3-7, 942:20-943:12).  He testified his children would not always accompany him on those trips because they were in school.  (Tr. 942:24-943:19).  However, he later corrected himself after remembering that his children were not yet in school in 2003, so they must have accompanied him.  (Tr. 943:23-945:9).  The exchange emphasized what Anas would later admit: his memory of how he spent each day or week between April 2003 and May 2005 was unclear and could not support his claim that he remembered, in 2018, seeing Hayat weekly during that period 15 years earlier.

On cross-examination, Anas conceded that his memory was worse in 2018 than it was in 2014 or

earlier, admitting, "the age, you know, your memory goes down." (Tr. 954:1-4). Concerning his claim that he saw Hayat every week between 2003 and 2005, without fail, Anas admitted that his recollection was only approximate. (Tr. 955:9-956:8). He admitted that he did not remember every week of the period, and that it was "possible" that he "might have missed a week." (Tr. 955:17-19). Struggling to answer whether he might have missed more than one week, Anas admitted that he could not be sure, and explained, "[l]ook, look, so much time has passed. It – look, so much time has passed in-between, so I cannot give you the exact. But I can say a week, ten days, not more than that." (Tr. 955:25-956:2). Hayat's counsel objected to the next question, claiming it was asked and answered. The question was, "[s]o is it fair to say that you don't remember every week between 2003 and 2005 seeing Hamid Hayat?" (Tr. 956:3-8). The Court sustained the objection and instructed the witness not to answer. (Id.) It is clear from Anas's prior answers that if permitted to respond, he would have conceded he did not remember seeing Hayat every week for two years.

Anas also admitted facts that demonstrated his bias in favor of his nephew. (Tr. 956:9-18). He admitted he is married to Hayat's mother's sister. (Id.) He admitted he wanted to help Hayat with his testimony. (Id.) He admitted that he "absolutely" did not want Hayat to be in prison any longer. (Id.) He insisted that Hayat was not guilty of any crime. (Id.) He admitted that he would do "whatever is in [his] control" to help Hayat. (Id.)

Anas admitted that he learned that Hayat had been arrested and charged in summer 2005. (Tr. 949:9-950:20). He admitted he spoke to Hayat's mother every 10 or 15 days after Hayat was charged, "and sometimes more than that too." (Tr. 951:12-18). Anas admitted he discussed Hayat's case with Hayat's mother after Hayat was charged, and that he expressed interest in Hayat's case. (Tr. 952:1-10). Bizarrely, Anas claimed that he would "especially" not discuss Hayat's lawyer with Hayat's mother.[66] (Id.)

### 2) Rafaqat

Like Anas, Rafaqat claimed on direct examination that between 2003 and 2005—15 to 13 years

_____

[66] Anas's testimony that he spoke to Hayat's mother frequently about the charges against Hayat makes clear that either (1) Hayat and his family were aware of potential alibi witnesses and failed to share them with Ms. Mojaddidi, despite her requests; or (2) the purported alibi evidence offered by Anas in his 2014 declaration and his 2018 testimony was simply made up long after Hayat was convicted.

earlier—he recalled that the longest period of time that passed in which he did not see Hayat was one week. (Tr. 964:3-9). Rafaqat also testified that he saw Hayat every day he was in Behboodi between 2003 and 2005 and that Hayat never left the village for more than three months. (Tr. 960:12-14, 964:3-9). However, also like Anas, Rafaqat's claims did not withstand cross-examination. Rafaqat admitted he was unable to recall facts about significant events, which undermined his memory claims concerning his ordinary, daily interactions with Hayat. His testimony could not have changed the evidentiary picture at Hayat's trial and cannot demonstrate prejudice to support Hayat's habeas claim.

On direct examination, Rafaqat testified that Hayat did not play cricket every day, but "we would play, normally, every day, because that was our routine." (Tr. 963:1-5). On cross-examination Rafaqat undermined his claim that he remembered seeing Hayat every week he was in Behboodi from 2003 to 2005 by being unable to recall other, more significant events and by contradicting the testimony of others who claimed they saw Hayat every day during the same period. For example, Rafaqat could not recall whether he attended Nawaz's wedding with Hayat in 2003 or 2004. The wedding was a destination affair that involved travel to Multan, where Rafaqat and Hayat stayed with Rafaqat's uncle. (Tr. 967:6-968:8). Rafaqat struggled to recall the year of that destination wedding, and explained, "I do not remember the confirmed date but I remember that we did go to" the wedding. (Tr. 967:15-17). That Rafaqat could not recall the year of a destination wedding he attended with Hayat undermined his claims that he recalled seeing Hayat every day during the two-year period in which the wedding took place, and his claim that Hayat never left Behboodi during that period. If Rafaqat could not recall an unusual event like a destination wedding, it is far less likely that he could recall ordinary day-to-day interactions with Hayat, especially after the passage of 13 to 15 years.

Rafaqat also admitted that, before 2003, he hardly knew Hayat. (Tr. 965:10-967:5). Rafaqat was a friend of Hayat's brother in law, and did not become close friends with him until 2003, when they met again at Usman's wedding. (Tr. 965:1-9, 965:12-966:11). Rafaqat claimed that was not aware that Hayat was a hafiz, or that he had been an imam. (Tr. 971:8-24). However, Rafaqat's claim that he became such good friend with Hayat, so quickly after a 2003 wedding, that he spent every day with Hayat for the next two years, strains credulity. At the time, Rafaqat operated a full-time tailoring business that was open during regular business hours, six days per week. (Tr. 972:3-17). Rafaqat also

got married in 2002, and had a newborn child in 2003, significantly diminishing the amount of time available to him to spend with Hayat, who was unemployed during the entire period. (Tr. 972:18-973:2, 978:17-24).

Rafaqat also challenged the accuracy of his declaration (necessarily calling into questions the others as well). He claimed on cross-examination that he played cricket with Hayat in the evenings and not in the afternoons, as his declaration erroneously stated. (Tr. 975:9-19; Def. Ex. Z). Rafaqat contradicted the testimony of Hayat's cousin Jaber Ismail, who claimed he would watch Hayat play cricket most evenings. (Tr. 310:9-12). Rafaqat claimed he did not remember seeing Ismail at the cricket fields, and guessed that Ismail "may have seen" he and Hayat play cricket.[67] (Tr. 976:3-21). Rafaqat also did not recall seeing Ismail at the baithak, which contradicted Ismail's testimony that he visited the baithak at least every Thursday. (Tr. 311:5-11, 976:1-21). Also, Rafaqat testified that Hamid would come by his shop at around 10 to 11 in the morning, and stay for one or two hours, usually parting ways for lunch. (Tr. 978:3-16) This also contradicts Jaber Ismail's testimony that Jaber would meet up with Hayat every day for an hour at 11 o'clock, which he would spend with Hayat. (Tr. 305:4-307:23, 309:25-311:4). In addition, Rafaqat denied meeting or seeing Raheela Hayat in any of his interactions with Hamid. (Tr. 968:9-15, 969:9-970:4, 978:1-2). Rafaqat also noted that the baithak is for men only, therefore Raheela's testimony concerning Hamid going to the baithak is necessarily hearsay. (Tr. 973:11-974:13).

Rafaqat learned of Hayat's arrest and claimed that the entire village "was kind of in [a] very serious state about" it. (Tr. 977:1-25). Rafaqat testified he spoke to Hayat's maternal uncle "Attique" and others in Hayat's family about his "sorrow" over Hayat's arrest.[68] (Id.) He denied, however, that he

---

[67] Jaber claimed he saw Rafaqat "every day" with Hayat between 2003 and 2005. (Tr. 349:5-8).

[68] Ms. Mojaddidi spoke to Attique to determine whether he would make a reliable alibi witness. She asked him (and everyone else she spoke to) whether he could identify additional potential alibi witnesses. (Id. at 160:23-161:14). Neither he nor anyone else provided her with any additional names. (Id.) Ms. Mojaddidi would have followed up with any person that any family member or other person identified as a potential alibi witness. (Id. at 161:15-20). Rafaqat's testimony that he spoke to Hayat's uncle about the charges against Hayat makes clear that either (1) Hayat and his family were aware of potential alibi witnesses and failed to share them with Ms. Mojaddidi, despite her requests; or (2) the purported alibi evidence offered by Rafaqat in his 2014 declaration and his 2018 testimony was simply made up long after Hayat was convicted.

spoke to Hayat's mother or other Hayat family members about the charges, despite claiming that the "whole world came to know about the charges" against Hayat. (Id.)  The denial rang hollow in light of the close relationship Rafaqat described having with Hayat, and the light of the worldwide public interest in the charges against Hayat that he described.  Rafaqat also testified that he knew Hayat's uncle Attique and his grandfather Saeed were important political figures associated with JUI.  (Tr. 970:10-23).  A simple tailor such as Rafaqat would be susceptible to intimidation, particularly by a politically powerful family with ties to militant groups.  Like Anas, Rafaqat admitted his bias in favor of Hayat.  He admitted he considered Hayat a "close friend," and that he wanted to help Hayat.  (Tr. 981:4-12).  He admitted he was willing to do whatever he could to help Hayat.  (Id.)

### 3)    Dr. Fahim

Much of Dr. Fahim's direct testimony addressed his recollection of Hayat's 2000 bout of meningitis.  (Tr. 997-1001).  When asked how frequently he saw Hayat between 2003 and 2005—13 to 15 years earlier—Dr. Fahim admitted his memory was not reliable because of the passage of time.  (Tr. 1002:14-25).  He testified, "[i]t's been such a long time, I don't remember exactly," and guessed that he saw Hayat every week or ten days, "or maybe every two weeks."[69]  (Id.)  Thus, like Anas and Rafaqat Dr. Fahim's admissions undermined his initial memory claims concerning his ordinary, daily interactions with Hayat.  Dr. Fahim's testimony could not have changed the evidentiary picture at Hayat's trial and cannot demonstrate prejudice to support Hayat's habeas claim.

Dr. Fahim's shift from acknowledging his faulty memory for very old facts to near total certainty about the same very old facts was jarring, and punctuated by his suddenly emphatic response: "Oh, for God's sake, no."  (Id.)  When asked to explain his certitude, he contradicted his earlier answer and stated he was now certain that he saw Hayat every week or ten days.  (Id.)  He did not explain why he had grown certain in the span of five questions.  Nor did he link his refreshed memory to any particular triggering facts.  He simply reversed course from being uncertain to being emphatically certain.  Responding to a question about whether Hayat "liked to travel alone," Dr. Fahim again swore to "God as the witness," and declared that he had never seen Hayat alone "anywhere," and had not seen him

___

[69] However, after admitting the unreliability of his memory, Dr. Fahim later claimed it was not possible that a three-month period passed between 2003 and 2005 in which he did not see Hayat.  (Tr. 1003:11-24).

alone on "any public transportation." (Tr. 22-1004:1).

On cross-examination, Dr. Fahim once again admitted his faulty memory. Dr. Fahim testified that some weeks he saw Hayat in Behboodi and some weeks he saw him in Rawalpindi. (Tr. 1009:1). When asked to identify which weeks he recalled seeing Hayat in Behboodi and which weeks he recalled seeing him in Rawalpindi, Dr. Fahim answered: "It's been 12 or 14 years, I have no recollection of which times [he saw Hayat in which locations]." (Tr. 1008:2-23). Asked to identity which weeks in the month of April 2003 he saw Hayat in Rawalpindi and which weeks in the same month he saw Hayat in Behboodi, Dr. Fahim admitted: "[s]o the truth is this, that it's been a long time, I cannot remember accurately." He nevertheless claimed he saw Hayat during those weeks, even if he could not recall where. He did not explain his certainty. (Id.) Dr. Fahim conceded that if asked the same question concerning every month between April 2003 and May 2005, he would not be able to identify where he saw Hayat in each week of each month. (Id.)

Dr. Fahim struggled to recall what activities he observed Hayat engage in during their weekly encounters between 2003 and 2005, and who he saw with Hayat. (Tr. 1014:8-1015:4). He again admitted his weak memory of old facts. (Id.) During the exchange, he also appeared to not want to answer the question he was asked and gave non-responsive answers concerning other topics. (Id.) For example, the following exchange took place:

> Q.    What kinds of things did you observe him doing during that period?
>
> A.    Even before, his thinking was less. And after the illness, it was even less.
>
> Q.    What kinds of things did you observe Hamid Hayat do between 2003 and 2005 when you would see him?
>
> A.    *It's been a long time, so I don't remember that many things,* but his memory had reduced, and he always appearing like he was like scared.
>
> Q.    Dr. Fahim, what kinds of activities did you observe Hamid Hayat do during the times you saw him between 2003 and 2005?
>
> A.    Believe me, that even at that time I remember he would be in the house, and he was playing video games. And then – and then, if he

was bored, like, he would play cricket with his friend or, you know, chat. And God as a witness for this.

(Id.) (emphasis supplied).  Dr. Fahim could not name any specific people he observed Hayat play cricket or video games with, even though almost a dozen declarants asserted they were with Hayat everyday between 2003 and 2005.  (Id.)  Dr. Fahim claimed he only ever saw Hayat play video games or cricket with his "brother, sister, cousin, these people."  (Id.)  His answers to those easy questions undermined his claims to have spent as much time as he claimed with Hayat between 2003 and 2005, and his claim that he was sure Hayat was never away from Behboodi for a three-month period.

Dr. Fahim also admitted that he and his wife, Tayyaba Fahim, who was also a deponent, traveled together the morning of their testimony and discussed the substance of their testimony with one another. (Tr. 1012:2-6).  Despite admitting to conversations that likely tainted both their testimony, Dr. Fahim immediately asserted that he and his wife knew they had to "give [their] own individual testimony."  Dr. Fahim conceded that he reviewed "carefully" the declaration he gave in 2014 and did not catch or correct the "Balakot" error.  (Tr. 1012:7-23).  Furthermore, Dr. Fahim testified that a man typed up his statement, contradicting Ms. Ahmed's account.  (Compare Tr. 228:18-230:19 with 1012:7-23).

Dr. Fahim testified that he learned of Hayat's arrest within two or three days of Hayat's return to the United States in May 2005. (Tr. 1012:24-1014:7).  He was not sure who told him about the charges against Hayat but recalled it was a Hayat family member. (Id.)  He denied, however, that he spoke to Hayat's mother or anyone else in the United States about the charges, despite claiming that the "whole world came to know about the charges" against Hayat. (Id.)  The denial rang hollow in light of the close family and doctor-patient relationship Dr. Fahim described having with Hayat, and in light of the worldwide public interest in the charges against Hayat that he described.  Dr. Fahim claimed that he did not offer himself as an alibi witness in 2005 to Hayat's mother or Hayat's other family members because "he did not talk on the phone." (Tr. 1013:13-18).  The nonsensical answer contradicted Dr. Fahim's direct testimony that he used the phone days earlier to arrange his testimony with Mr. Gilani, Hayat's local counsel in Pakistan, and that he used the phone in 2000 to receive the report of Hayat's meningitis

from Hayat's aunt Asma.[70] (Tr. 1011:20-24, 997:1-25). Dr. Fahim also asserted that he did not speak to Hayat's family in the United States about the charges against Hayat by any other means. (Tr. 1014:3-7).

Finally, Dr. Fahim admitted his bias in favor of Hayat. (Tr. 1015:5-22). He admitted he loved his nephew, Hayat—although he initially refused to acknowledge his love for Hayat and declared his love for "all the children," explaining, "[c]hildren are my love." (Id.) He refused to acknowledge that he did not want anything bad to happen to Hayat, claiming instead that he did "not want anybody to be in harm." (Id.) He agreed that he did not want Hayat to remain in prison, insisting that Hayat is "innocent, and he should spend time with his family." (Id.) However, he denied he would say anything to help Hayat, and claimed he would only "speak the truth." (Id.)

#### 4)    Tayyaba Fahim

Tayyaba Fahim is Hayat's aunt and his mother's sister. (Tr. 1017-1045). Mrs. Fahim is married to Dr. Fahim. (Tr. 1018:20-23). Her testimony about her interactions with Hayat between 2003 and 2005 was vague and limited to her recollection of seeing him and eating with him "many times." (Tr. 1022:5-1023:14, 1038:2-11). Her testimony was also inconsistent with that of others and she admitted that she could not remember if Hayat ever traveled anywhere other than Rawalpindi or Behboodi during the relevant period. Like the other deponents, Mrs. Fahim's admissions undermined her other memory claims. Her testimony could not have changed the evidentiary picture at Hayat's trial and cannot demonstrate prejudice to support Hayat's habeas claim.

On direct examination, Mrs. Fahim testified about Hayat's 2000 bout of meningitis. (Tr. 1019:25-1021:13). She confirmed that between 1993 and 2000, Hayat memorized the Koran and became a hafiz, and also attended a madrasa run by his grandfather before transferring to another madrasa. (Tr. 1039:6-13). Without additional detail, Mrs. Fahim claimed that between 2003 and 2005, she saw Hayat "many times" when he visited Rawalpindi with his mother. (Tr. 1022:5-1023:14). She also claimed she ate with Hayat "many times" in Rawalpindi but she could not recall any particular meals or special meals. (Tr. 1022:5-1023:14, 1038:2-11). She testified that she "absolutely saw

---

[70] It is possible that Dr. Fahim used the phone in 2000, stopped doing so in summer 2005, and then returned to using the phone in 2018. Such inconsistent conduct would match his testimony in this case. More likely, Dr. Fahim was being transparently disingenuous.

[Hayat]" in Behboodi during that period but did not identify any frequency or provide any other detail about the alleged encounters. (Tr. 1022:5-1023:14). She testified that when she saw Hamid in Behboodi he was always at home, which contradicts the testimony of others that Hamid visited shops, went to baithaks, and spent a lot of time outside of the house. (Tr. 1032:10-1033:4). Mrs. Fahim could not remember if Hayat ever traveled anywhere other than Rawalpindi or Behboodi during the period between 2003 and 2005. (Id.) Specifically, Mrs. Fahim testified that she never saw Hamid leave to go to Islamabad, (Tr. 1032:3-4), contradicting the testimony of Raheela (Tr. 136:4-137:25, 138:5-17), and Jaber (Tr. 313:11-24, 316:2-9).

Despite being unable to recall if Hayat ever traveled beyond Rawalpindi or Behboodi, or how frequently they were together in either location, Mrs. Fahim insisted that she recalled for sure, after 13 to 15 years, that no three-month period passed in which she did not see Hayat in either location. (Tr. 1024:3-6). She insisted, without explanation for her certainty, that "[t]his never happened." (Id.) However, on cross-examination, Mrs. Fahim admitted she could not identify seeing Hayat on particular days during particular weeks in either Rawalpindi or Behboodi. (Tr. 1030:3-1031:7). She also admitted she could not recall the first time she saw Hayat in 2003. (Id.) She also admitted that she could not recall what she did on several Pakistani national holidays between 2003 and 2005, or which holidays she traveled to Behboodi. (Tr. 1033:5-1034:18).

On direct examination, Mrs. Fahim asserted that she reviewed her 2014 declaration for accuracy and found no mistakes. (1024:7-18). However, on cross-examination, she admitted that the declaration erroneously listed her residence as Hazro instead of Rawalpindi, and that she never lived in Hazro. (Tr. 1025:8-25). Mrs. Fahim conceded that her brother Attique Ur Rehman is a JUI leader in Punjab, and that her father (Hayat's grandfather) Saeed Ur Rehman was a government minister in Punjab and ran a madrasa in Rawalpindi. (Tr. 1026:11-1029:12). Mrs. Fahim testified that in Rawalpindi she practiced "purdah," the separation of the sexes and wore a burqa and niqab. (Tr. 1036:4-18). Mrs. Fahim testified that she did not see Jaber and Usama Ismael with Hayat during her encounters with him in Behboodi or Rawalpindi, contradicting assertions in their 2007 declarations, and Jaber's 2018 testimony that he saw Mrs. Fahim "a lot" with Hayat in Behboodi. (Tr. 1042:7-17, 309:12-313:18, 333:24-334:6; See CR 441, Ex. K & L). Mrs. Fahim testified that she did not see Jaber and Usama between 2003 and 2005, at all.

(Id.)  Jaber testified he saw Mrs. Fahim every day with Hayat during the period.  (Tr. 349:18-25).

Finally, Mrs. Fahim admitted her close relationship with Hayat, and that she "absolutely" did not want him to be in prison.  (Tr. 1043:1-1045:11).  She also testified that she wanted to help Hayat, and that "whatever [she] can do, [she] will."  (Id.)  Unlike Dr. Fahim, who dubiously claimed he did not use the telephone to call Hayat's family in the United States after learning of Hayat's arrest, Mrs. Fahim admitted she learned of Hayat's arrest in a telephone discussion with his family.  (Id.)  She could not recall exactly who told her about Hayat's arrest.  (Id.)  Mrs. Fahim said she did not know if she ever offered to tell Hayat's trial attorney what she remembered about Hayat's time in Pakistan between 2003 and 2005.  (Id.)  She also claimed she had no recollection whether she offered to tell Hayat's family about what she remembered of Hayat's time in Pakistan between 2003 and 2005.  (Id.)

    **b.**   **The two live "alibi" witnesses also claimed firm memories of ordinary interactions with Hayat nearly 15 years earlier, frequently contradicted their own testimony and that of others, admitted their bias, and conceded their poor recollection of other facts from the same period.**

At the 2018 hearing, Hayat also presented testimony from two in-person alleged "alibi" witnesses, his younger sister Raheela Hayat, and his first cousin Jaber Ismail.  (Tr. 123-189, 299-364). Like the four deponents, the two live "alibi" witnesses claimed to have seen Hayat too frequently between April 2003 and May 2005 for Hayat to have left Behboodi for months of training at a jihadists camp.  Also like the deponents, the incredible claims asserted by the live witnesses failed on cross-examination.

    **1)**  **Raheela Hayat**

Raheela Hayat is Hayat's younger sister.  (Tr. 122:8-9).  Her testimony was unbelievable on its face because she was too young to have formed memories like those she claimed during her testimony. She never authored a declaration in which she committed her memory to writing to later refresh her recollection if necessary.  (Tr. 186:8-21).  Instead, as she ultimately admitted, Raheela's memories were actually based on hearsay stories told to her by her parents.  Her testimony was unreliable.  It cannot demonstrate prejudice in support of Hayat's habeas claim.

Raheela was born on February 2, 1995, which means that in April 2003, she had been 8 years old for two months.  (Tr. 122:17-18).  During her testimony, she claimed to have a present recollection of a

car ride between her grandparents' home in Rawalpindi and Behboodi in 1997, when she was 2 years old, although she testified she did not remember the airplane ride that took her to Pakistan weeks earlier.[71] (Tr. 168:6-25). That impossible claim represents the many additional unbelievable memory feats Raheela claimed during her testimony.

Raheela claimed to recall Hayat's bout with meningitis in 2000, when she would have been approximately 5 years old. (Tr. 169:3-18, 169:7-8). She claimed she remembered the name of the hospital where Hamid was treated, "Shaifa International," and claimed that as a 5-year-old, she could read that name from the wall of the building. (Tr. 171:3-172:17). Despite claiming to remember the name of that Pakistani hospital, Raheela admitted she could not name the clinic where Hayat was treated after he returned to the United States the same year. (Tr. 173:12-174:22). More important, Raheela later admitted that she *did not*, in fact, recall the name of the Pakistani hospital from her memory as a 5-year-old. (Tr. 172:3-17). Rather, she admitted that her mother told her the name of the hospital and that is how she remembered it. (Id.)

Similarly, Raheela admitted that most of the childhood memories about which she testified at the 2018 hearing were based on a hearsay foundation and not her personal, independent recollection. (See Tr. 172:18-25). She testified that, since 2006, she spoke to her parents about the events in the life of their family between 1997 and 2006, including Hayat's 2004 wedding. (Tr. 173:1-11). After first admitting that her conversations with her parents included discussions of her first trip to Pakistan, between 1997 and 2000, she later backtracked and testified that she only spoke to her parents about the second trip she took with them to Pakistan, between April 2003 and May 2005. (Id.) On that hearsay foundation, Raheela claimed that, as she sat in the witness box at the hearing, she had a present recollection of seeing Hayat every day between April 2003 and May 2005—when she was between ages 8 and 10. (Tr. 177:19-178:25). She later clarified that she saw Hayat every day in that period except for a few days in 2004 when he went to Multan for a wedding. (Id.)

Aside from being vastly overstated and based on a hearsay foundation, Raheela's memory claims contradict the 2007 declarations of Jaber and Usama Ismael, as well as Jaber's 2018 testimony. Raheela

---

[71] Although she claimed to remember driving between Rawalpindi and Behboodi as a two-year-old, Raheela could not recall how she spent her third birthday while she was in Pakistan. (Tr. 169:10-20).

testified that she did not see Jaber and Usama regularly in Behboodi, both Jaber and Usama said they saw Hayat nearly every day. (Id. See also 308:18-25, 311:25-312:14; See CR 441, Ex. K & L). Both claims cannot be accurate, although both can be false. Raheela also testified that Hayat picked her up from school every day he was in Behboodi between April 2003 and May 2005. (Tr. 179:1-180-13, 148:14-25). She claimed that he engaged a driver to make the 40-minute round trip between Hazro, where her school was located, and their home in Behboodi. (Id.) However, Raheela did not explain how Hayat, who was unemployed at the time, was able to pay for a car and driver to pick her up every day.

On cross-examination Raheela admitted that photos she identified during her direct examination were date-stamped. (Tr. 181:25-185:9). She initially claimed that she recalled the specific dates on the photos from her own memory. (Id.) However, she retreated from that position and claimed she recalled the year the photos were taken but not the month and day. (Id.) Raheela also admitted the camera used to take the photos did not belong to her because she was eight years old at the time. (Id.) She agreed that she did not set the date-stamp feature in the camera and could not be sure if any of the dates on the photos were accurate. (Id.)

Raheela also admitted that, in 2005 when she was 10 years old, her mother never asked her to be a witness for Hayat or her father at their trials. (Tr. 185:10-186:21). Raheela admitted that, in 2005, her father never asked her, during her visits to the jail, to be a witness for him or Hayat at their trials. (Id.) Raheela also admitted that, in 2005, Hayat never asked her, during he visits to the jail, to be a witness for him or their father. (Id.) Raheela also conceded that, in 2005, she never told her parents that she wanted to testify for her brother or father. (Id.) Of course, even if Ms. Mojaddidi had been informed by Raheela's parents of Raheela's alleged "alibi" testimony, Ms. Mojaddidi would have had a strong basis to consider whether it was wise to call the defendant's 10-year old sister as a witness and subject her to cross-examination about the strength, basis, and independence of her memory.

Finally, Raheela admitted her bias in favor of her brother. (Tr. 187:4-20). She admitted she loved her brother and did not want him to be in jail. (Id.) She admitted that she would do whatever she could to help Hayat, although she claimed she would not lie for him. (Id.)

### 2)    Jaber Ismail

Like Raheela, Jaber Ismael's testimony was unbelievable.  Jaber made extreme assertions about the strength of his memory without explanation for his claims.  More important, Jaber also tainted his testimony by reviewing the declarations of other witnesses to prepare for the 2018 hearing.  Finally, Jaber was simply not available to testify as a witness at Hayat's trial because he was in Pakistan until October 2006, and did not attempt to return to the United States until after the jury reached a verdict in Hayat's trial.  Jaber's testimony cannot demonstrate prejudice.

Jaber is Hayat's first cousin.  (Tr. 335:16-25).  His mother is Hayat's father's sister.  (Id.)  In 2003, Jaber was 15 years old.  (Tr. 336:10-21).  Like Raheela, Jaber made unsupportable claims about his memory.  For example, he claimed that he recalled the precise date he traveled to Pakistan in 2001.  (Tr. 337:7-338:11).  Jaber initially explained that he was excited in 2001 to start the process of memorizing the Koran and becoming a hafiz.  (Id.)  He said he was pleased at the prospect of fulfilling his mother's dream for one of her kids to become a hafiz.  (Id.)  However, when asked if those memories were the reasons he was able to recall the precise date he traveled to Pakistan in 2001, Jaber said they were not.  (Id.)  Instead, Jabber claimed he recalled the date he traveled in 2001 because he simply remembered it—17 years later.  (Id.)  The claim defied reason and undermined the credibility of the remainder of Jaber's claimed memory feats.

Jaber admitted discussing his testimony with Hayat's habeas lawyers as many as seven times before his testimony.  (Tr. 340:24-343:20).  He admitted that during those seven sessions, Hayat's habeas lawyer worked with him to rehearse his testimony and he practiced giving answers to questions as he would give then in court.  (Id.)  Jaber practiced his answers about the people he spent time with in Bebhoodi and Rawalpind, and how much time he remembered they spent with Hayat.  (Id.)

Jaber candidly admitted that during his preparation sessions with Hayat's habeas counsel, he reviewed the declarations of other witnesses.  (Id.)  He claimed that he only "glimpsed over" those declarations, then he agreed that he "skimmed" them.  (Id.)  He claimed that he reviewed the declarations only to confirm the names of certain people.  (Id.)  Yet, he ultimately agreed that he "reviewed many of" the declarations submitted by other witnesses.  (Id.)  Jaber admitted that, while reviewing the declarations of other witnesses, he "was more focused on the time that he spent with

[Hayat],” appearing to imply he reviewed the declarations to sharpen his own recollection of how much time he spent with Hayat. (Id.) In light of the discussion above about the deep flaws in the declarations Ahmed collected, Jaber’s reliance on them to prepare for the 2018 hearing hopelessly tainted his testimony.

Jaber claimed that he spent nearly every day with Hayat during 2001, when they were neighbors in California, and when Jaber was 14 and Hayat was approximately 20. (Tr. 343:22-344:25). Jaber claimed he was unaware of the exact age difference between himself and Hayat. (Id.) He also claimed that, except for time Hayat was away from home, he spent nearly every day with Hayat between April 2003 and May 2005, while they both lived in Behboodi, Pakistan. (Id.) Jaber made the unbelievable claim that, as he sat in the witness box in January 2018, he had a *present recollection* of seeing Hayat every day he was in Behboodi between April 2003 and May 2006—between 13 and 15 years ago. (347:24-348:14). He claimed his sharp memory of such a long stretch of time, so many years ago, arose out of his shared interests with Hayat. (347:24-348:14). However, he did not explain how their shared interest in “Bollywood movies” and discussions of “girls” imprinted his alleged interactions with Hayat so permanently in his memory as to permit Jaber a detailed recollection of his ordinary, daily encounters with Hayat 15 years later.[72] (See id.)

Jaber also conceded he did not travel with Hayat to Rawalpindi and did not know if Hayat actually went there or someplace else when he was away from Behboodi. (Tr. 345:1-25). Although he insisted that Hayat was honest with him, Jaber admitted that Hayat was *untruthful to others*. (Tr. 345:21-346:25). Jaber and his friends warned Hayat, several times, that his dishonesty was “going to catch up with [him].” (Id.) Jaber offered an example of Hayat’s dishonesty, which involved Hayat lying to a physician who visited Hayat’s grandparents’ home. (Id.) Without prompting, Hayat began to lie to the physician about his family background, including claiming his father owned a K-Mart in the United States. (Id.) Jaber testified that Hayat’s display of dishonesty appeared to trouble Hayat’s brother Arslan and Hayat’s cousin Usama, who “were sitting in the living room just looking at [Hayat].” (Id.)

---

[72] Additionally, Jaber conceded that he did not share Hayat’s strong interest in cricket, but would sometimes tag along with Hayat to games at Hayat’s request. (Tr. 348:11-14). That significant gap in their interests would more likely than not have created distance between the two and not fostered closeness, undermining Jaber’s memory claims.

After the physician left, Hayat's cousin Usama scolded Hayat for his dishonesty and warned Hayat that "one day, this bullshit is going to catch up to you." (Id.)

Jaber's memory claims were also undermined on cross-examination by his failure to recall the people he claimed Hayat spent time with in Pakistan between 2003 and 2005, after Jaber affirmed a list of those same people on direct examination. (Compare Tr. 326:6-334:22 with 348:15-350:9). Jaber was asked about all seventeen declarants on direct and offered his alleged memory of them. (Id.) On cross-examination, only minutes later, he claimed he only mentioned twelve people. (Id.) When asked to name all twelve of those people, he could only list eight. (Id.) Jaber admitted that he simply could not remember the other people, despite seeing them every day or regularly between 2003 and 2005, and despite discussing them with Hayat's counsel only minutes earlier. (Id.) During this exchange, Jaber claimed he saw Dr. Fahim every day with Hayat. (Tr. 349:18-25). However, minutes later, he admitted that was impossible because Dr. Fahim lived in Rawalpindi at the time. (Tr. 350:12-21, 351:3-21). Despite admitting he overstated his memory of seeing Dr. Fahim's with Hayat, in the same sentence Jaber insisted he could recall seeing Hayat between 2003 and 2005 every day.[73] The entire exchange demonstrated Jaber's false memory claims.

Jaber was also unable to recall how he spent significant holidays during the same period he claimed to have total recall of seeing Hayat. (Tr. 354:11-356:8). Jaber could not recall how he spent the Fourth of July in 2003. (Id.) He explained that he did not celebrate that holiday while visiting Pakistan. (Id.) He also could not recall if he celebrated the Fourth of July at any time in his life while he lived in the United States. (Id.) He claimed he was too focused on school to recall. (Id.) Jaber also could not recall how he spent his birthday in 2003. (Id.) He explained that "[b]irthdays are not a big thing in our culture," and that he also did not celebrate his birthday while living in the United States. (Id.) Jaber could not remember how he spent New Year's Eve in 2003, 2004, or 2005. (Id.) he explained that New Year's Eve is "not a big thing" for his family. (Id.)

Jaber testified he believed Hayat would have told him about wanting to attend a jihadist training. (Tr. 357:12-24). He admitted he learned at some point that Hayat told Naseem Khan, on multiple

---

[73] Jaber also claimed that after Hayat's wedding in December 2004, "nothing changed," and he would still see Hayat every day. (Tr. 356:21-357:11).

occasions, that Hayat planned to attend a jihadist camp. (Id.)  He admitted that Hayat never shared that desire with Jaber. (Id.)  The exchange demonstrates that Jaber, like all of the family and close friends who have emerged as purported alibi witnesses long after Hayat's conviction, did not know Hayat as well as they claimed because Hayat kept his desire to train at a jihadist camp a secret from them, as he hid from them the jihadi scrapbook he made.  The exchange also reveals that Jaber knew some of the details of the evidence against Hayat, which may have influenced his after-the-fact testimony.

Jaber testified he learned of the charges against Hayat in an internet café before he returned home to the United States from Pakistan in October 2006.  (Tr. 357:25-360:24).  While struggling to recall exactly when he learned of the criminal charges against Hayat, Jaber admitted, "[i]t's so long ago, it's hard to remember stuff." (Tr. 358-21-22).  Jaber then reversed his earlier testimony and claimed he did not know of the charges against Hayat before he left Pakistan. (Tr. 359:7-360:11).  Immediately thereafter, he reversed his testimony again and agreed that he did know of the charges against Hayat before he left Pakistan because he learned of them at an internet café in April 2006. (Id.)  During the exchange, he appeared to be struggling to select the answer he believed might best help Hayat and not the answer that he actually remembered.

Finally, Jaber admitted that he spoke to Hayat's mother from Pakistan about the charges against Hayat. (Tr. 360:16-364:3).  He testified he was heartbroken over the charges against Hayat and felt like he "couldn't do anything." (Id.)  Yet, he claimed that he did not talk to Hayat's mother about his potential alibi testimony. (Tr. 361:10-362:4).  He claimed he did not share with Hayat's mother that he could testify that he was with Hayat every day from April 2003 to May 2006 (which she would have presumably already known from being in Behboodi at the same time and living with Hayat). (Id.)  Jaber testified that after he had difficulty returning to the United States from Pakistan in May 2006, Ms. Mojaddidi called him after someone in the United States gave her his phone number. (Tr. 363:11-364:4, 325:18-25).  Jaber did not explain why, in April 2006 or earlier, he did not ask Hayat's mother to speak to Ms. Mojaddidi about testifying on Hayat's behalf. (Id.)  Nor did he explain why Hayat's mother or other family member did not give Ms. Mojaddidi Jaber's contact information earlier than May 2006. (Id.)  Jaber insisted that he and Hayat's mother "didn't talk about the case." (Tr. 363:22-24).

Jaber's claims about his conversations with Hayat's mother conflict with Ms. Mojaddidi's 2007

affidavit in support of Hayat's new trial motion.  (See CR 441-2).  There, Ms. Mojaddidi asserted that Jaber called *her* in April 2006 while Hayat's jury was deliberating.  (Id. at ¶ 8).  Consequently, either Jaber *did* discuss Hayat's case with Hayat's mother, who put him in touch with Ms. Mojaddidi or Jaber discussed Hayat's case with someone else who did so.[74]

### 4.     The testimony of the declarants and live witnesses cannot demonstrate prejudice.

None of the testimony outlined above supports a finding of prejudice on Hayat's "alibi" claim. All of that testimony was unbelievable, and would have been disregarded by a neutral factfinder. Moreover, all of the witnesses were hopelessly biased because they are Hayat's family members and close friends.  Numerous courts have found that failure to call family members or friends with close relationships to the defendant as alibi witnesses does not give rise to an ineffective assistance of counsel claim.  See Seymour v. Walker, 224 F.3d 542, 556 (6th Cir. 2000) (counsel not defective for failing to call witness/sister who "would likely be considered by the jury to be biased"); McCauley–Bey v. Delo, 97 F.3d 1104, 1106 (8th Cir. 1996) (finding no prejudice from counsel's failure to call witnesses because impact of uncalled witness would have been negligible due to their close relationship to defendant); Bergmann v. McCaughtry, 65 F.3d 1372, 1380 (7th Cir. 1995) (counsel not ineffective for failing to call family members who would easily have been impeached for bias); Romero, 46 F.3d at 1030 (testimony by defendant's family members is of "significantly less exculpatory value than the testimony of an objective witness"); United States ex rel. Maxwell v. Gilmore, 37 F.Supp.2d 1078, 1089 (N.D.Ill. 1999) (trial counsel reasonably could have thought petitioner's mother and girlfriend would not be credible alibi witnesses given their "obvious personal interest in his acquittal").

Hayat has failed to prove that any failure to investigate undisclosed alibi witnesses was prejudicial.  The record establishes that Hayat's newly proffered alibi witnesses are primarily Hayat's family and friends, whose testimony would not have been sufficiently credible to cause the jury to have reached a different verdict.  Accordingly, this Court should deny the Petition and Hayat's other requests concerning the alibi witnesses.

---

[74] She also asserted that Hayat told her he spent time with Jaber in Pakistan but she was unable to subpoena him because he was out of the country.  (Id. at ¶ 7).  She did not state when she learned about Jaber, who was unable to return to the United States until clearing the No Fly List.  (See id. at ¶ 8).

## VI.   MS. MOJADDIDI'S INVESTIGATION OF THE BALAKOT EVIDENCE WAS PROPER AND ADEQUATE (CLAIM 3 / OPHB III)

Hayat alleged that Ms. Mojaddidi "did not attempt to initiate any investigation in Pakistan concerning the Balakot camp issue" while describing the initial steps Ms. Mojaddidi took to attempt to investigate the existence of the camps.  (Pet. at 39-40).  Hayat also alleged that Ms. Mojaddidi could have called journalists to introduce hearsay, thereby depriving him of his right to counsel.  (Pet. at 40-41, 73-80).  During the course of litigating the petition, Hayat has not proven any ineffectiveness by Ms. Mojaddidi in attempting to investigate the situation in the Balakot region, but instead relies on counter-factual speculation and hypotheticals to argue ineffectiveness. (OPHB at 63-71 (failing to cite a single case finding failure to uncover non-existent facts ineffective)).  Freedom of Information Act ("FOIA") documents that Hayat obtained establish that militant camps, including the Balakot camp specifically, were operational and producing militants between 2003 and 2005.  (CR 608-2, Exh. B at p. 4 (3,500 fighters graduated from Balakot camp and sent to Afghanistan in December 2003); pp. 39 and 42 (3 Pakistani airmen court martialed for receiving small arms training at JEM camp in Balakot in January 2005); p. 41 (February 2004 crackdown on militant group whose leader frequently visited training camp in Balakot)).  Hayat acknowledges that this is now the state of the evidence.  (OPHB at 68:23-69:24).  Because there is no evidence that different, or more effective investigation would have produced different evidence that would have changed the verdict, this Court should deny the petition.

### A.   Ms. Mojaddidi Did Not Provide Ineffective Assistance by Not Calling a Journalist Because Hearsay Testimony Would Not Have Undermined Abbas' Expert Testimony, and Was Inadmissible and Excludable.

This Court found that Mr. Aaser does not qualify as an expert under Federal Rule of Evidence 702.  (CR 685 at 4:14-5:11).  To the extent Hayat continues to ask that this Court consider his declaration as establishing facts, the government objects and requests that this Court strike his declaration from the record.  (See OPHB at 70, 70 n. 27).  Furthermore, the FOIA documents from the NGIA established that, far from the Pakistani government's official line and whatever access Mr. Aaser may have been given by another militant group, militant camps were active throughout the Mansehra District, which contains Balakot and surrounding regions.  (CR 608-2, Exh. B at p. 4 (3,500 fighters graduated from Balakot camp and sent to Afghanistan in December 2003); pp. 39 and 42 (3 Pakistani

airmen court martialed for receiving small arms training at JEM camp in Balakot in January 2005); p. 41 (February 2004 crackdown on militant group whose leader frequently visited training camp in Balakot)).

### B.    Hayat Has Not Established Prejudice Because the Balakot Jihadist Camps Were Operational and Producing Militants.

To meet his burden of establishing prejudice, Hayat must show that "[t]he likelihood of a different result [is] substantial, not just conceivable." Harrington, 562 U.S. at 112. He cannot meet this burden. First, this Court found that Aaser's proffered expert testimony was not expert testimony and excluded it from the hearing. CR 685. Thus, it could not have affected the jury at all and cannot assist Hayat meet his burden now. Second, Ms. Mojaddidi challenged the evidence concerning the Balakot camp through thorough cross-examination and additional witnesses would not have tipped the scales toward a different verdict. Third, as described above, Ms. Mojaddidi investigated the existence of militant camps in the Balokot region and arranged for James Lazor to personally visit the area of the camp and testify at trial about what he observed when he visited the coordinates in February 2006.

The credibility of Lazor's attempted assertion that the Pakistani government or the Pakistani military had eliminated militant and terrorist camps is completely undermined by the judicially noticeable fact that in 2011, American forces located and killed Osama Bin Laden in a fortified compound only two miles from the principal Pakistani military training center (the equivalent of the United States' West Point Military Academy), and seventy-five miles from Islamabad.[75] Hayat attempts to criticize Ms. Mojaddidi's decision to take advantage of Mr. Lazor's availability and access[76] to

---

[75] Ahmed and Toihid, "Osama bin Laden killed Near Pakistan's West Point. Was he really hidden," Christian Science Monitor (online edition), May 2, 2011 (http://www.csmonitor.com/World/Asia-South-Central/2011/0502/Osama-bin-Laden-killed-near-Pakistan-s-West-Point.-Was-he-really-hidden) (last visited May 22, 2016).

[76] Before trial, the defense received longitude and latitude data for the location in Pakistan where the government believed Hayat had attended camp. (W.M. Depo. 177:22-178:5, 302:11-24). When she became aware of the government's "Balakot theory," Ms. Mojaddidi tried to figure out where the camp was and how to counter the government's theory. (Id. at 302:11-24; Tr. 767:5-768:3). She thought it would be great to send somebody to inspect the location. (Id. at 178:4-5). Ms. Mojaddidi contacted James Lazor, who was visiting Pakistan for humanitarian reasons, and Lazor, agreed to go to the site and testify about what he saw. (Id. at 43:23-44:1, 178:6-16, 180:5-11, 301:5-24; Tr. 768:7-16; RT 3580-3613). On February 17, 2006, Lazor visited the coordinates in Pakistan and, based on his observations and conversations he had with uniformed individuals, Lazor believed the location was a former Pakistani military base and not a terrorist training camp. (Id. at 180:12-181:9). Ms. Mojaddidi believed that she would be able to use Lazor's testimony to counter Abbas' testimony. (Id. at 203:2-24). Ms. Mojaddidi called Lazor as a defense witness. (RT 3580:20-3612:12). Lazor testified that his traveled to the coordinates Ms. Mojaddidi had provided and observed what he believed to be Pakistani

Balakot.  (OPHB at 64, 66-67).  Yet despite Mr. Wedick's continued availability, and marshalling significant resources, Hayat's counsel have failed to procure any witness that could testify to any helpful evidence concerning the operation of the camps, let alone testimony equivalent to what Mr. Lazor testified to at trial.[77]  (OPHB at 63-71).  Bare speculation about potential witnesses' testimony, without actual evidence that the witness would testify cannot show ineffectiveness or prejudice.  United States v. Harden, 846 F.2d 1229, 1231-32 (9th Cir. 1988); Gallegos v. Schriro, 583 F.Supp.2d 1041, 1066-67 (D. Ariz. 2008) (rejecting ineffectiveness claim where trial counsel tried, but failed to secure a contradictory opinion, stating that "[p]etitioner offers nothing but speculation that an expert witness could have been found whose testimony would have supported the defense theory. . . .particularly in light of counsel's efforts to locate such an expert and his substantial cross-examination of [prosecution expert]").

In light of the FOIA documents and Hayat's failure to procure evidence, Hayat cannot show prejudice as a matter of law.  See Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation about what an expert could have said is not enough to establish prejudice.").  In addition, Umer specifically stated that although President Musharaf and the Pakistani government claimed the camps had been dismantled, Umer still visited a camp (actually four camps) after that declaration.  (Gov. Sup. Ans. Ex. 21; 5U5.2 (stating that "the government in Pakistan say I destroyed all the camp…. That's what Musharraf (ph) said. But no it's still there because I saw with my own eyes."); 4U9.1 (stating "They want the camp, that's why they don't destroy those camp. You know, still Musharraf is telling on TV, I destroy all the terrorist camp, but no, they're still there."; 4U5.4-5.6 (Umer's statement that he visited the camp Hamid went to, and three other camps)).  Hayat's recorded statements, his recorded confession, his collection of militant materials, his stated ties to precisely the groups that ran the camps in the Balakot and Mansehra regions all established Hayat's guilt beyond a reasonable doubt.  Accordingly, Hayat cannot meet his burden to demonstrate prejudice and the Court should deny his

---

military facilities nearby but admitted that a huge earthquake had caused widespread damage to the Balakot area in October 2005 and that he did not know what the area looked like before the earthquake. (RT 3592:4-3598:20, 3603:12-3606:12).

[77] The most credible evidence on attempting to send Mr. Wedick to an active anti-American militant camp is Ms. Mojaddidi's testimony about why she did not send Mr. Wedick to Pakistan, and her assessment that, "I don't know if I think he would have survived out there." (Tr. at 725:16-25).  This assessment is reinforced by the State Department's advisements regarding travel to Pakistan. (CR 678 at 17-21, Exhs 1-7).

motion.

### C.    Ms. Mojaddidi's Considered and Strategic Decision to Address the Government's Camp Evidence Through Cross-Examination of the Government's Expert Witnesses, Satisfies Strickland.

Ms. Mojaddidi investigated whether a terrorist camp was functioning in Pakistan at the time Hayat was accused of, and admitted to, attending such a camp. (W.M. Depo. 43:14-18; Tr. 747:17-749:14, 767:5-768:3). During 2005, she did "a lot" of reading and research regarding the Pakistani camp issue.[78] (W.M. Depo. at 43:19-44:1, 302:4-7; Tr. 747:17-749:14, 767:5-768:3). On or about January 13, 2006, the government sent Ms. Mojaddidi an expert disclosure for the proposed testimony of Hassan Abbas ("Abbas"). According to the disclosure, among other things, Abbas would testify: that jihadi training camps, in fact, existed in Pakistan for the time period from 2000-2005; about various characteristics of those camps and attendees; and about the regions where these camps are known to be located, including camps in the Mansehra/Balakot "belt." Of note, this was the first time that Ms. Mojaddidi was informed that the government intended to offer affirmative evidence regarding the operation of Pakistani militant training camps during the relevant time period, other than Hayat's own admissions. (See Gov. Sup. Ans. Ex. 17 at 4-5).

Ms. Mojaddidi did not remember what research, she did regarding obtaining an expert to counter the testimony of Abbas, including whether she discussed potential experts with Dr. Weiss, a defense expert on Pakistani culture. (W.M. Depo. 198:20-202:7; Tr. 767:5-768:3). She clearly recalled, however, that she reviewed the Abbas testimony, believed that it had many "weaknesses," and concluded that she could "sufficient[ly]" counter that evidence through cross- examination. (Id. at 203:18-24). Tactics, thus, motivated Ms. Mojaddidi's decision to address the camp evidence through cross-examination, rather than calling an expert other than Dr. Weiss. Ms. Mojaddidi specifically denied that Mr. Griffin told her that investigation in Pakistan would take too much time and should not

[78] Ms. Mojaddidi recalled reading an article quoting the Pakistani Prime Minister as stating that the Pakistani governmentcamps had been closed the militant camps.. (W.M. Depo. 43:23-44:14, 302:4-7, Tr. 708:14-709:17). She contacted officials at the Pakistani embassy to investigate what the Pakistani government was saying about the camps' existence. (W.M. Depo. at 43:23-44:14). For reasons she did not recall, she abandoned efforts to communicate further with the embassy after speaking with Mr. Griffin.  (Id. at 44:15-45:13). She denied that Mr. Griffin directed her to cease communications with the embassy. (Id. at 194:10-195:6; Tr. 708:14-709:17). Ms. Mojaddidi used the information she heard about Pakistani governmental camp closures as part of her cross-examination of Abbas. (W.M. Depo. at 193:23-194:8).

be pursued for that reason.  (W.M. Depo. at 181:10-24; Tr. 708:14-709:17).  Moreover, Ms. Mojaddidi did not believe that she lacked investigative resources to conduct investigation regarding the camp issue and confirmed that finances were not a reason or factor for her decision making.  (W.M. Depo.at 182:4-183:12; Tr. 722:20-724:5, 724:6-725:3, 725:12-15).

### 1.    Ms. Mojaddidi Vigorously Cross-Examined Abbas at Trial

Ms. Mojaddidi and Mr. Griffin each extensively cross-examined Abbas in the presence of the Hayat jury.  Ms. Mojaddidi pursued a line of questioning which suggested that Abbas lacked reliable firsthand information related to jihadi training camps in general.  During that questioning, Abbas admitted that he never personally met or interviewed an attendee at a camp (RT 2829:10-2830:22), and never visited a camp when he conducted field research related to training camps.  (RT 2830:7-10).  Ms. Mojaddidi also asked Abbas a series of questions to emphasize that Abbas lacked firsthand data regarding the camp in Balakot, known as the madrasa Ahmed Shaheed, including that: he never saw a picture of the camp (RT 2848:10-11), he never visited the camp (RT 2830:23-25), and that he had no specific information regarding the types of training that took place or weapons used at the camp (RT 2842:16-2844:2).

Ms. Mojaddidi and Mr. Griffin also elicited testimony from Abbas that supported various defense theories.  For example, one major defense theme was that Pakistan was allied with the United States in the fight against terrorists and, in fact, had taken measures after the September 11, 2001, terrorist attacks on the United States to shut down jihadi madrasas and camps.  In response to defense questioning, Abbas admitted that: an earthquake in October 2005 in Balakot likely disrupted any potential camps (RT 2850:24-2851:17); the United States has given support to and considers Pakistan an ally in the fight against terrorists (RT 2858:5-2859:19; 2863:5-22; 2915:17-2916:1; 2925:10-2927:4); the United States gave $3.5 billion to Pakistan, approximately half of which was to be used to fight against terrorists (RT 2858:9-12; 2915:12-16; 2927:11-14); the government of Pakistan has worked with the United States in trying to apprehend Osama Bin Laden and members of al-Qaeda (RT 2916:7-13); Pakistan has utilized some 70,000 troops in the Waziristan area of Pakistan since the September 11, 2001 terrorist attacks on the United States, to assist in the fight against terrorists (RT 2860:10-16); Pakistan turned over in excess of 700 Al-Qaeda operatives to the United States and lost over 300

soldiers in the fight against terrorists (RT 2861:1-10); Pakistan announced clamp-downs on militant groups and terrorist training camps after the September 11, 2001 terrorist attacks on the United States (RT 2860:1-9; 2916:2-5; 2922:11-22); and Pakistan ordered madrasas to register with the government and some did so (RT 2867:21-2868:4; 2869:23-2870:6).

Ms. Mojaddidi also vigorously cross-examined Abbas about his potential bias and motive, asking him a series of questions designed to suggest that Abbas was predisposed and motivated to testify favorably for the government and against Hayat.  Ms. Mojaddidi asked Abbas numerous questions related to the compensation Abbas received in this case – all designed to suggest that Abbas might have skewed his opinions in favor of the government because of his compensation.  (RT 2875:11-13 (rates); RT 2877:22-2878:4 (total compensation); RT 2877:20-21 (reimbursement for travel); RT 2878:22-2878:7 (additional compensation for testimony)).  Ms. Mojaddidi asked Abbas a series of questions regarding his Shia background – suggesting that he might have skewed his opinions because he was a member of a minority sect of Islam that proponents of violent jihad perceive as the "enemy."  (RT 2873:14-18; 2920:19- 2921:10).  Ms. Mojaddidi also pointed out that Abbas had resigned from the Pakistani government, (RT 2809:2-24), and questioned his book's popularity in Pakistan.  (RT 2873:21-2874:14).

During closing, Ms. Mojaddidi argued that Abbas was biased and untrustworthy, in part, based on his compensation.  (RT 4324:11-12; 4325:22-23).  Ms. Mojaddidi noted that Abbas was "paid over $34,000 for just three months work on this case" and that Abbas was "paid an extraordinary amount of money by the government."  (RT 4324:11-12; 4325:18-19).  Ms. Mojaddidi also drew a stark contrast between defense expert Dr. Weiss, who was paid $1,000, and Abbas, stating that "[a]n expert who is asked to testify about their expertise shouldn't be paid for hundreds of hours of research, he should know what he's going to testify to."  (RT 4324:12-18).  During closing, the defense argued that Abbas was "clearly biased against Pakistan" and biased as a result of his membership in the Shia sect.  (RT 4324:3-10, 23-24).

Ms. Mojaddidi's decision to rely on cross-examination, rather than Dr. Weiss or some other expert, was well within the bounds of reasonable and competent lawyering.  Strickland permits counsel to "make a reasonable decision that makes particular investigations unnecessary."  Harrington, 562 U.S.

at 106. "Strickland does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." Harrington, 562 U.S. at 111 (rejecting argument that "attorney rendered constitutionally deficient service because he did not consult blood evidence experts in developing the basic strategy for [the] defense or offer their testimony as part of the principal case for the defense). "An attorney can avoid activities that appear 'distractive from more important duties,'" and is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." Id. at 107. "In many instances cross-examination will be sufficient to expose defects in an expert's presentation." Id. at 111.

It was wholly reasonable for Ms. Mojaddidi, as a matter of strategy, to choose to counter Abbas' testimony primarily through vigorous cross-examination. See Bower v. Quarterman, 497 F.3d 459, 470-72 (5th Cir. 2007) (affirming findings that trial counsel who considered expert testimony "was weak" and who "planned to bring out those weaknesses on cross-examination" was not ineffective for failing to call a defense expert, and effectively cross-examined prosecution experts so there was no prejudice). Ms. Mojaddidi represented Hayat with vigor, conducted a skillful cross-examination, elicited concessions from the government's expert, and was able to draw attention to weaknesses in his conclusions. See id. That Hayat's current attorneys might have chosen other means to address this evidence is of no consequence. "Even the best criminal defense attorneys would not defend a particular client in the same way." Id. at 106. "Rare are the situations in which the 'wide latitude counsel must have in making [strategic or] tactical decisions' will be limited to any one technique or approach." Id. Hayat has failed to muster facts sufficient to overcome the strong presumption that Ms. Mojaddidi's conduct fell within the wide range of reasonable professional assistance. The Court should deny his petition.

### 2. Hayat Cannot Articulate How a Bill of Particulars Would Have Affected His Trial.

Hayat now attempts to argue that a bill of particulars would have helped, seeking to find some use for Daniel Broderick's testimony on the issue. (OPHB at 64-65, 71). Hayat has made no showing "that failure to seek a bill of particulars deprived [him] of the opportunity to litigate" any issue. United States v. Buffington, 815 F.2d 1292, 1304 (9th Cir. 1987). In general, failure to seek a bill of particulars

is unlikely to have any effect on a trial.  See United States v. Royal, 972 F.2d 643, 650-51 (5th Cir. 1992) (noting even a successful motion for a bill of particulars would have lead to a more specifically plead indictment); Jelinek v. Costello, 247 F.Supp.2d 212, 274 (E.D.N.Y. 2003) ("Counsel's failure to request a bill of particulars is not per se ineffective" and rejecting claim).  Hayat fails to identify a specific issue that could have been litigated successfully if a bill of particulars had been requested.  (OPHB at 64-65).  To the extent he now wishes to claim that he would have argued an unconstitutional variance, his counsel waived that argument by failing to raise it on direct appeal.  See United States v. Payne, 741 F.2d 887, 894 n7 (7th Cir. 1984) (rejecting argument regarding more specific bill of particulars and noting waiver because underlying legal claim was not raised on appeal).  Furthermore, the fact that Hayat was informed of the existence of other camps, and given the coordinates of the Balakot camp reach the limits of what a bill of particulars could do for the defendant.[79]  Hayat has not made any showing that a bill of particulars would not have been a futile motion, nor that it prejudiced him by depriving him of the opportunity to litigate a meritorious, dispositive motion, therefore, this Court should deny Hayat's ineffectiveness claim based on failure to investigate the Balakot camp.

**VII.   MS. MOJADDIDI'S EFFECTIVELY HANDLED ERIC BENN'S TESTIMONY AND HAYAT HAS NOT ESTABLISHED PREJUDICE (CLAIM 10/ POHB VIII)**

Hayat alleged that Ms. Mojaddidi was ineffective for her "failure to raise Daubert and 702 objections to Benn's testimony."  (Pet. at 80).  In particular, Hayat claims that Ms. Mojaddidi's decision not to file a motion to exclude testimony that Benn was up to 70% certain the camp shown in satellite photography was a militant training camp rendered her representation constitutionally defective.  (Id.; OPHB at 125).  Post-hearing, Hayat contends that Eric Benn actually rendered an opinion regarding the credibility of the confession.  (OPHB at 123-127).  Hayat additionally contends that Ms. Mojaddidi was ineffective for failing to exclude Benn's testimony because it bolstered Hayat's confession.  (OPHB at 121, 123, 127).

---

[79] "In determining if a bill of particulars should be ordered in a specific case, a court should consider whether the defendant has been advised adequately of the charges through the indictment and all other disclosures made by the government. Full discovery will obviate the need for a bill of particulars."  United States v. Long, 706 F.2d 1044, 1054 (9th Cir. 1983) (citations omitted); see also United States v. Ayers, 924 F.2d 1468, 1484 (holding discovery materials may make a bill of particulars unnecessary). A bill of particulars is not a tool to obtain discovery.  Cooper v. United States, 282 F.2d 527, 532 (9th Cir. 1979).

UNITED STATES' POST-HEARING OPPOSITION TO MOTION FOR WRIT OF HABEAS CORPUS

143

Ms. Mojaddidi was not ineffective for failing to make a frivolous objection and, instead, correctly understood that the appropriate way to dispute a properly qualified expert's conclusions was through cross-examination.  Mr. Benn's testimony was limited to his area of expertise – imagery analysis – and he did not testify to any opinion regarding the reliability of Hayat's confession or about the reputation of other witnesses.  Even if there were some basis for objection, it was within Ms. Mojaddidi's professional discretion not to object and use the testimony to assist the defense's case of reasonable doubt.

### A.      Benn Properly Rendered an Opinion that the Site Had Features Consistent with a Militant Camp, not a Military Base.

The petition originally focused on Ms. Mojaddidi's failure to object to Benn's testimony primarily on Daubert grounds.  (Pet. at 76-80).  Hayat's asserted in his 2255 motion that Benn was not qualified to offer expert testimony and failed to explain the bases for his initial opinion that he was 50% certain that trial exhibits showed a militant camp.  (Pet. at 74-75).  Hayat has apparently abandoned these claims.[80]  Regardless, Mr. Benn was qualified, in his capacity as an expert witness in imagery analysis, and specific expertise related to Pakistan and militant camps, to render an opinion on whether the area depicted in the trial exhibits was a militant camp between 2001 and 2004.  See FRE 702; Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); and Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 142 (1999).  Therefore, there was no clear basis for Ms. Mojaddidi, or any competent attorney, to exclude his expert testimony.

### 1.      Benn was a qualified imagery analysis expert.

At the time Benn testified, he had been a senior analyst "producing intelligence and geospatial intelligence information for the Department of Defense, and others in the national policy community, the national security community" at the Department of Defense for over twenty years, a career that was preceded by military service.  (RT 2988:2-14).  He was "personally responsible for overseeing the substantive content of the work [the agency's] analysts do"—including reviewing for accuracy.  (RT

---

[80] Hayat's Post-Hearing Opening Brief focuses on the credibility/bolstering argument.  (OPHB at 124-127). Although the government's position is that Hayat abandoned the Daubert admissibility argument/ineffective assistance for failing to exclude Benn's expert testimony entirely allegation, the government contends that Benn's testimony was entirely proper and unobjectionable.

2988:18-2989:10).  Mr. Benn had significant technological, intelligence, military, and academic qualifications in addition to his experience.  (RT 2989:11-24; RT 2990:2-2291:2; RT 2992:17-2993:4; RT 2993:5-2994:5; RT 2995:24-2995:7).

Benn rose through the ranks to become "the office senior analyst of the entire organization of over 300 imagery analysts," equivalent, roughly, to a two-star general (RT 2996:2-2997:20).  Benn received numerous awards for his work in imagery analysis, including for work in Afghanistan and surrounding countries, such as Pakistan.  (RT 2998:4-3001:8).  Benn had reviewed "many thousands" of mapping images in his career (RT 3001:9-12); including being called upon to make distinctions between militant training camps and foreign military run camps (RT 3003:20-3004:19).  Plainly, Mr. Benn was "a witness qualified as an expert by knowledge, skill, experience, training, or education" within the meaning of Federal Rule of Evidence 702; see United States v. Bynum, 604 F.3d 161, 168-69 (4th Cir. 2010) (affirming district court's discretion to allow FBI agent to testify as a "forensic photographic investigator").

### 2. Benn properly explained the basis for his opinions.

Benn testified about his analysis of four images: Exhibit 1, an overview acquired in August 2004 (RT 3008:3-21), Exhibit 2, a magnified image of the same area that zoomed in on various structures (RT 3019:7-3020:13), Exhibit 3, an overview of the same area acquired in October of 2001 (RT 3048:10-3049:23), and Exhibit 4, a zoomed in view from October 2001 (RT 3054:13-3055:15).  All the exhibits showed the same area, located in the Northwest Frontier Province of Pakistan, about ten kilometers from the town of Balakot.  (RT 3018:14-21).  As Benn explained, part of his job is to try to determine whether a site may be a militant camp.  (RT 3030:11-16).  When evaluating whether satellite images of camps show militant camps, he relies on particular identifiers or "signatures" (RT 3030:17-23), such as remote location, (RT 3031:3-8), infrastructure for the running of a camp, such as barracks, places to make meals, and facilities for training (RT 3032:4-3033:12).

Benn testified that the camp in Exhibit 1 was in "very rugged terrain in northeastern Pakistan" (RT 3011:5-21), which was "[r]elatively remote terrain," (RT 3013:18-20), and had ridges running north-south around the camp (RT 3012:11-18).  The camp was set in a national forest in Pakistan with "heavy tree cover on these rugged slopes."  (RT 3013:10-20).  Benn also showed the jury a winding

trail, with "switchbacks" that were "too rough, too steep" for driving a bus.  (RT 3014:1-3015:14).
Benn showed the jury a map of a rectangular building fit for barracks.  (RT 3025:6-17).  There were
small storage buildings and a parking area.  (RT 3026:12-24).  Benn also described a large, square
structure used as an assembly hall, with several outbuildings.  (RT 3028:10-3029:22).

Benn testified that an official military camp would have some different signatures.  It would be
considerably more formal and rigid, large and spread out, with fences and security guards.  (RT
3036:10-25).  There would be "flags and banners and guards at the gate" as well as "ceremonial areas
for dress and presentation and parades," (RT 3037:1-3), and an organized, formal weapons range (RT
3037:4-16).  Benn told the jury that formal military training camps "tend[] to be very conspicuous and
structured."  (RT 3037:17).  Benn thus concluded that the camp shown in the image he presented to the
jury "does not resemble [a facility for] the training of a national Army."  (RT 3037:18-21).  Exhibit 2
showed many signatures consistent with a militant training camp including: remote location; a
concentrated location on the ridge line that was difficult to get to; and a single controlled access point.
(RT 3038:1-3042:25).  Benn noted that the buildings were not simple residences for families, there was
a large meeting hall, the absence of formal weapons ranges, and that the buildings could support
hundreds of residents in a small, rustic setting.  (RT 3038:1-3045:6).  Benn also testified that there were
differences between the buildings and condition of the location between 2001 and 2004, based on
comparisons between Exhibit 2 and Exhibit 4.  (RT 3055:23-3061:1).  The summary of those changes
was that the site became "less a temporary kind of – and field setting, and they've made it somewhat
more structured and more permanent" (RT 3060:13-3061:1).  On balance, Benn reported he would
confirm to his supervisors the "possible" presence of a militant training camp.  (RT 3064:24-3065:25).
Benn explained that when an analyst used the term "possible" it was not a layperson's meaning, the
word "possible" would refer to about a 50% likelihood.  (RT 3061:2-3062:19).

Benn also explained that to raise his estimate of whether a particular camp was a militant camp
beyond possible, outside reporting might be necessary.  (RT 3063:2-3064:25).  Benn confirmed that he
reviewed Hayat's statement, in which Hayat described a camp substantially similar to the image Benn
showed the jury.  (RT 3067:8-3073:25).  This description included the following consistencies with the
exhibits: that the camp is three to four miles from Balakot (RT 3069:5-12); that Hayat walked up a

mountain and then through a field (RT at 3070:7-10); the foliage and plant life (RT 3070:22-3071:8-12); the layout of the camp (RT 3071:13-3072:10); and that the camp changed substantially between 2001 and 2004 (RT 3072:11-23).  Benn testified that an outside account that a camp so similar to the exhibits was, in fact, a training camp raised his confidence in his assessment the location was a militant training camp.  (RT 3073:9-19) ("And it's not just [that Hayat's account is] consistent with a single thing of what I saw, but essentially multiple parameters or attributes of the place.  And so it very much influences the confidence of my judgment…").  Benn testified that this increased his confidence level to a 60-70% chance that the image was that of a militant camp.  (RT 3074:12-15).[81]

From these facts, it is clear that Benn was an expert in imagery analysis and that he had considerable depth of experience in the region, as well as in the identification of militant camps, having reviewed thousands of images over a decades-long career.  See United States v. Hayat, 710 F.3d at 900-901 (rejecting challenge to qualifications and opinions of expert because expert was qualified and used reliable methods to reach opinion).

### 3.   Benn did not opine on the credibility of Hayat's confession.

Benn did not testify that he took the credibility of Hayat's confession into account when forming his opinion, nor did he opine on the general credibility of the confession.  (RT 2987-3119).  Under cross-examination, Benn stated that he discounted internally inconsistent statements about Afghanistan and Tora Bora (RT 3118:1-7), and statements describing the camp as being in the city of Balakot (RT 3118:8-14).  In response to follow-up questions on cross-examination, Benn stated that he focused on aspects of Hayat's statement regarding location, parts that were consistent with the imagery evidence, and other details consistent with the imagery.  (RT 3118:17-3119:7).

It is entirely proper for the government to use expert testimony to corroborate a confession.  See

[81] Hayat claims Ms. Mojaddidi should have objected to Benn's quantification of the likelihood that the structure was a training camp.  Benn was 50% sure based on the map alone, and 60% to 70% certain after considering Hayat's corroborative statements.  As a legal matter, there is nothing objectionable about Benn quantifying his certainty in his expert opinion in percentage terms.  See, e.g., Cuen v. Evans, 390 Fed.Appx. 721, 723 (9th Cir. 2010) (government witness testifying that he was "95% sure" of his judgment that subject was competent); United States v. Smart, 135 Fed.Appx. 337, n.1 (11th Cir. 2005) (a government witness who testified as an expert in handwriting analysis, testified that he had a "90 percent confidence level" that the note was written by the defendant).  Hayat, on the other hand, has cited absolutely no authority for the proposition that an expert cannot quantify his certainty in his opinion in percentage terms for the benefit of the jury.

United States v. Niebla-Torres, 847 F.3d 1049, 1050 (9th Cir. 2017) (rejecting *corpus delicti* argument in part because expert testimony regarding smugglers was consistent with estimate in confession). Expert testimony that undercuts or rebuts a defendant's denial of certain facts, or defendant's innocent explanations for behavior are admissible.  See Briceno v. Scribner, 555 F.3d 1069, 1077 (9th Cir. 2009) (concluding "testimony that the hypothetical robberies would have been gang-related" was not excludable); United States v. Alonso, 48 F.3d 1536, 1540-41 (9th Cir. 1995) (allowing expert testimony defendant's "behavior was consistent with that of someone engaged in counter-surveillance"); United States v. Lockett, 919 F.2d 585, 590-91 (9th Cir. 1990) (rejecting 704 challenge to expert testimony that only people intimately involved with cocaine packaging are allowed at a packaging site).

Benn did not improperly comment on the credibility of a witness when he testified that Hayat's statements were consistent with features in the image.  The cases Hayat cited in his petition at pages 78 and 79 are distinguishable.  Virtually all of the cases he cites concerning improper credibility evidence are cases in which a psychiatrist or psychologist testified directly as to whether a person was credible. See, e.g., United States v. Binder, 769 F.2d 595, 602 (9th Cir. 1985) (because credibility is issue for jury, psychiatric experts may not testify specifically as to credibility or buttress credibility improperly), overruled on other grounds by, United States v. Morales, 108 F.3d 1031, 1035 n. 1 (9th Cir. 1997); United States v. Awkard, 597 F.2d 667, 671 (9th Cir. 1979) (error to permit an expert to testify to the ability of a witness to recall a stabbing, and noting that under the FRE, opinion testimony on credibility is generally limited to character, and all other opinions on credibility are for the jury to form); United States v. Barnard, 490 F.2d 907, 912-13 (9th Cir. 1973) (upholding, in the absence of unusual circumstances, the trial court's exclusion of the opinion of a psychiatrist and psychologist that a government witness was a sociopath who would lie when it was to his advantage to do so).  These cases involve actual opinions on whether a witness is telling the truth, as opposed to whether the physical evidence corroborates a witness's (or the non-testifying defendant's) version of events.

        **a.**        **United States v. Scop is distinguishable because in that case, the expert stated a legal conclusion explicitly using statutory and regulatory language, the expert directly assessed the credibility of key trial witnesses, and the expert was the investigator.**

The case cited by Hayat's Post-Hearing Opening Brief, United States v. Scop, 846 F.2d 135 (2d

Cir. 1988), is distinguishable in several aspects.  First, the expert witness's opinion was, in essence, a legal conclusion, rendered using "the language of the statute and accompanying regulations concerning 'manipulation' and 'fraud.'"  Id. at 140, 140-41.  If the witness in Scop, a securities case, had "merely testified that controlled buying and selling of the kind alleged here can create artificial price levels to lure outside investors, no sustainable objection could have been made."  Id. at 140.  The Second Circuit noted that even government investigators are allowed to testify as experts concerning their opinion that conduct they observed was consistent with criminal activity.  Id. at 141 (collecting cases).  What made this investigator's expert testimony improper, however, was his "repeated use of statutory and regulatory language indicating guilt."  Id. at 142.  Mr. Benn did not testify to any legal conclusions, but rather testified to his opinion that a site in the general location mentioned by Hayat, had features consistent with a militant camp.  (RT 3073:9-19, RT 3074:12-15).

Second, the expert / investigating agent in Scop testified that his opinions "were based on his positive assessment of the trustworthiness and accuracy of the testimony of the government's witnesses, in particular that of Sarcinelli."  Scop, 846 F.2d at 142.  As noted earlier in the opinion, Sarcinelli was "a key government witness" who had felony convictions and "had been barred by the SEC from dealing in securities and that he had lied under oath to the SEC in 1980."  Id. at 137.  In Scop, the expert witness explicitly vouched for the credibility of the government's trial witnesses, and particularly Sarcinelli, who introduced the defendants to the scheme and was a co-conspirator.  Id. at 142.

In this case, Mr. Benn did not opine about the credibility of a trial witness such a Naseem Khan, SA Sweeney, or the investigating agents.[82]  Rather, Mr. Benn simply stated what evidence he based his opinion on, and what evidence appeared consistent with the images he was asked to analyze.  (RT 3073:9-19, RT 3074:12-15, 3118:1-3119:7).  Even Ms. Mojaddidi understood Mr. Benn's final two answers to be regarding the bases for his opinion, rather than an opinion on the credibility of Hayat's

---

[82] In United States v. Strem, 959 F.2d 243, 243 (9th Cir. 1992), an expert witness identified the portions of the other government witness's testimony, on which he had based the figures in the summary charts he had prepared for his testimony.  The court found that the expert's testimony did not take away from the jury the ultimate determination of the credibility of the witnesses, nor did it prevent the jury from weighing the evidence presented by the defendants.  Benn's testimony was not offered merely to assess the credibility of other witnesses, nor did his testimony have the effect of improperly buttressing their credibility.  See also United States v. Marchini, 797 F.2d 759, 765-66 (9th Cir. 1986) (finding that an expert witness may testify based on the expert having heard the testimony of the other witnesses and having reviewed the government's exhibits.).

confession, as evidenced by her only reference to his testimony in her closing statement that, "He [Eric Benn] ultimately decided what he wanted to believe about the description Hamid gave." (RT 4326:13-14). Instead, Ms. Mojaddidi concentrated on pointing out inconsistencies between the exhibits, James Lazor's testimony, and common sense on the one hand, and portions of Hayat's confession on the other, (RT 4326-4330) or internal inconsistencies in Hayat's statement (RT 4312-4320). Neither attempting to undercut an expert's reliance on a witness's statement nor opening the door to rebuttal of the inference that the expert relied on an unreliable statement is improper. See United States v. Rivera, 43 F.3d 1291, 1295 (9th Cir. 1995) (concluding that defense attempt to demonstrate that victim provided a false history opened the door for rebuttal of inference). Either way, such evidence does not affect substantial rights. Id. (affirming denial of motion for mistrial under plain error); see also United States v. Candoli, 870 F.2d 496, 504-506 (9th Cir. 1989) (finding refusal to strike reference to a polygraph of a testifying witness and improper favorable reputation evidence harmless error).

Finally, Mr. Benn was not the investigating officer or agent. In Scop, the fact that the expert witness "had spent years investigating this case" lead the court to "believe it to be virtually impossible for an investigator so deeply involved in a case to put aside previous judgments regarding the credibility of witnesses and to render de novo judgments on their credibility after listening to the trial."[83] Scop, 846 F.2d at 142-43; accord United States v. Haber, 53 F.3d 236, 241 (9th Cir. 1995) (discussing prejudice of introducing investigating agent's report with recommendation of indictment because of guilt).

### b.    Mr. Benn's testimony was not otherwise excludable.

It was proper for Mr. Benn to assume the truth of certain aspects of Hayat's confession when analyzing the evidence and forming an opinion. See Williams v. Illinois, 567 U.S. 50, 67-68 (2012) (discussing common law hypothetical approach where "the expert would be asked to assume the truth of certain factual predicates, and was then asked to offer an opinion based on those assumptions."). Even in Scop, the Second Circuit stated, "[w]here the credibility of a witness is an issue, the expert may

---

[83] This passage re-emphasizes that this applies to trial testimony, and the ability of experts to listen to and comment on the credibility of trial witness testimony. Scop, 846 F.2d at 143; see also id. ("[Rule 703] in no way purports to allow witnesses to assess the trustworthiness or accuracy of *testimony given in the same case* or to offer opinions based on such an assessment.") (emphasis in the original).

assume the truth of his or her trial testimony and thereafter offer an opinion based on the substance of the testimony." 846 F.2d at 143. In other words, Mr. Benn was entitled to assume the truth of Hayat's statements that had a direct bearing on the subject of his testimony and defense counsel was entitled to attempt to undermine Mr. Benn's opinion by calling into doubt the bases for that opinion. Accord Ninth Circuit Model Criminal Jury Instruction 4.14, (2010 ed. Approved 3/2018) ("Such opinion testimony should be judged like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case."). Ms. Mojaddidi was not ineffective for failing to exclude this testimony on the ground that Mr. Benn assumed the truth of Hayat's confession, given that such a motion should fail. See Lowry v. Lewis, 21 F.3d 344, 346-47 (9th Cir. 1994) (not ineffective to fail to assert motion to suppress that counsel knew would not succeed). Therefore, there was no clear basis for Ms. Mojaddidi, or any competent attorney, to have objected to his expert testimony, and she was not ineffective for failing to move to exclude Mr. Benn's opinion.

**B.    Ms. Mojaddidi Effectively Addressed and Used Eric Benn's Expert Testimony.**

Ms. Mojaddidi testified that she did not object to Benn's estimates because the numbers were favorable to Hayat, and she was "happy" when Benn testified to the 50% and 60% to 70% estimates. (W.M. Depo. 299:2-4; Tr. 763:9-764:2). It was a completely reasonable strategic decision for Ms. Mojaddidi to allow the government to admit relatively low confidence estimates of the value of the evidence. The strategic advantage of declining to object is obvious, 50% or even as high as 70%, may not be sufficient in the evaluation of some jurors to overcome reasonable doubt. Ms. Mojaddidi rendered this point in stark relief in her closing when she argued:

> When Eric Benn told you that after watching Hamid Hayat's video that he was now 60 to 70 percent sure it was a militant training camp, he left a 30 to 40 percent chance that it wasn't. And that, in itself, is enough for reasonable doubt.

(RT 4327:20-24).

Ms. Mojaddidi also thoroughly cross-examined Benn, which is the appropriate way to examine and undermine an expert's conclusions. See United States v. Hirokawa, 342 Fed.Appx. 242, 246 (9th Cir. 2009) ("The district court also did not abuse its discretion in finding [the expert's] estimation

methods to be sufficiently reliable.  Appellants' criticisms of those estimations … go to the probative weight, rather than the admissibility, of the evidence and were properly the subjects of '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.") (quoting <u>Daubert</u>, 509 U.S. at 596).  Ms. Mojaddidi asked Benn whether he had reviewed any other relevant images of the camp, and elicited the fact that Benn had based his opinion on nothing other than the images of the camp and Hayat's statements.  (RT 3081:17-3082:5).  She cross-examined Benn as to any prejudice he might have had from having heard about the nature of the case before reviewing the images.  (RT 3085:2-3086:5).  She cross-examined Benn regarding the conflicting descriptions Hayat gave of the camp in his interview and elicited testimony that many of Hayat's descriptions did not match the images of the camp admitted into evidence.  (RT 3086:6-3098:5).  For example:

Q.     In viewing the video, do you recall Hamid Hayat stating that the camp that he allegedly attended was located in Afghanistan?

A.     Late in the tape he did describe that it was in Afghanistan.

Q.     Do you recall him also stating that it was in Kashmir?

A.     I believe late in the tape he described it was in Kashmir as well.

Q.     Do you recall him stating that it was in Tora Bora?

A.     I believe I recall that he was describing a series of places which included Tora Bora.

(RT 3086:6-16).

Q.     Do you recall him stating that he saw a black gate?

A.     I do recall that, yes.

Q.     And in viewing the images, do you recall seeing a black gate at the beginning of that trail somewhere?

A.     I do not recall seeing a black gate, no.

(RT 3096:6-8).  Ms. Mojaddidi also cross-examined Benn about how low his probability estimates were:

Q.     And then you stated that after you actually watched Hamid Hayat's video that that went from a possible, about 50 percent, to a more probable, 60 to 70 percent, correct?

A.    Yes. I really am uncomfortable with putting more weight to those numbers. But yes, generally the strength of the -- the assessment is considerably stronger when you have that additional information -- when I have that additional information.

Q.    And that leaves the probability, 30 to 40 percent, that it may not actually be a militant training camp, correct?

A.    That's correct.

(RT 3102:30-3003:6).

Ms. Mojaddidi cross-examined Benn regarding his assessment that official military camps would appear formal, eliciting the concession that in many countries, such as Sudan and Somalia, official military camps often appear informal.  (RT 3103:10-19).  Under cross-examination by Ms. Mojaddidi, Benn admitted that there are paramilitary camps run by the Pakistanis that appear less formal, and that it's "possible" they exist in the Balakot region.  (RT 3104:3-13).  Benn also admitted under cross-examination that official military camps may be disguised for secrecy (RT 3104:21-3105:3), and he conceded he had never personally visited the Balakot camp location.  (RT 3105:4-6).

### C.    Hayat Has not Shown a Specific Prejudicial Effect of any Alleged Ineffectiveness from Benn's Testimony.

Hayat has not alleged any purported prejudice, offering speculative guesses concerning how the jurors may have weighed Benn's testimony.  (Pet. at 80, OPHB at 127).  For these reasons, Hayat has failed to show any ineffectiveness and any resulting prejudice and the Court should deny the related claims in the petition.

### VIII.    HAYAT WAIVED HIS RIGHT TO TESTIFY, AND MS. MOJADDIDI ADEQUATELY AND INDEPENDENTLY ADVISED HAYAT NOT TO TESTIFY (CLAIM 8/NOT ADDRESSED IN OPHB).

### A.    Hayat waived his right to testify, precluding a direct claim that Ms. Mojaddidi was ineffective.

"When a defendant is silent in the face of his attorney's decision not to call him as a witness, he has waived his right to testify." United States v. Nohara, 3 F.3d 1239, 1244 (9th Cir. 1993) (citing United States v. Edwards, 897 F.2d 445, 447 (9th Cir. 1990)).  This waiver precludes a subsequent ineffective assistance of counsel claim.  Nohara, 3 F.3d at 1244.  In this case, the defendant never

informed the Court or the government that he intended to testify, and Hayat's petition does not allege that he notified the Court of any desire to testify.[84]  Pet. at 68:11-69:17.  "[T]he advice provided by a criminal defense lawyer on whether his client should testify is 'a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance.'"  Carter v. Lee, 283 F.3d 240, 259 (4th Cir. 2002) (quoting Hutchins v. Garrison, 724 F.2d 1425, 1436 (4th Cir. 1983)).

### B.   Any claim of conflict is speculative.

The case Hayat cites in an effort to use Ms. Mojaddidi's sound advice as evidence of a conflict, United States v. Gallegos, 108 F.3d 1272 (10th Cir. 1997), is distinguishable.  In that case, the defendant's attorney had previously represented a witness with possible exculpatory testimony favorable to his current client.  Id. at 1276-77.  The Court was made aware that there was a direct conflict between his duties to the witness, who asserted the Fifth Amendment and did not testify, and his duty to his client, who could have benefitted from the testimony of the witness.  Id. at 1281-82.  In this case, other than a conclusory and speculative allegation that there could be a conflict with Umer Hayat's interests, there is no evidence supporting Hayat's claim that Ms. Mojaddidi's advice was motivated or logically followed from any alleged conflict.  Pet. at 687:19-69:17.

### C.   Ms. Mojaddidi's advice to Hayat not to testify was independent and sound.

Ms. Mojaddidi testified in her deposition that she discussed the pros and cons of whether to testify with Hayat, and advised him that it was not a good idea because of his inconsistent, videotaped statements, the danger of making the case worse, and that Ms. Mojaddidi was able to highlight his innocent conduct and draw out his claims of innocence through other witnesses.  (W.M. Depo. 229:7-230:20).  Ms. Mojaddidi testified that she exercised her own independent professional judgment when she advised Hayat not to testify.  (W.M. Depo. 230:21-25).  Johnny Griffin did not attempt to influence Ms. Mojaddidi's advice, did not recommend against having Hayat testify, and when asked about Hayat's allegation in the Petition that Mr. Griffin pressured Ms. Mojaddidi to keep Hamid Hayat off the stand, Ms. Mojaddidi stated that the allegation was "[a]bsolutely not" accurate.  (W.M. Depo. 231:1-232:5; 232:12-19).  Therefore, there is no support for the allegation that Ms. Mojaddidi failed to exercise her

---

[84] Hayat appears to have abandoned this claim, because he failed to raise this in the post-hearing brief, but the government addresses the issue nonetheless.

independent judgment to properly advise Hayat not to testify. Furthermore, there is no evidence to support the argument that Ms. Mojaddidi's advice is evidence of a conflict of interest that rendered her ineffective. This Court should therefore dismiss this claim when denying the petition.

### IX.   THE LOCATION OF A CAMP IS NOT AN ELEMENT OF PROVIDING MATERIAL SUPPORT FOR TERRORISM, AND MS. MOJADDIDI WAS NOT INEFFECTIVE BY NOT MAKING A FRIVOLOUS OBJECTION TO A NON-EXISTENT AMENDMENT (CLAIM 9/NOT ADDRESSED IN OPHB).

In rebuttal, the government asserted that it does not "have a burden to prove that [Hayat] attended a particular camp." (RT 4361:5-9). Hayat claims this "radically broadened the theory of the case."[85] Pet. at 70. However, government counsel's statement of law was accurate. Ms. Mojaddidi was not ineffective for failing to make a frivolous objection to an accurate statement of law, nor can Hayat demonstrate any prejudice from her withheld objection.

To convict a defendant in any criminal case, the government must prove all elements of the alleged crime. Hayat acknowledged that the indictment did not allege a specific location. Pet. at 69. The charged statute, 18 U.S.C. § 2339A, does not contain any language suggesting that, where a defendant receives training, the location of the training shall be an element of the crime. Hayat has cited no authority for reading such a requirement into a statute where it simply does not appear. Although the government's presentation at trial included a specific camp at specific coordinates, if the jury found that they were not certain Hayat had attended that exact camp beyond a reasonable doubt, they would still be able to convict the defendant if all elements were proved. There is no error in Ms. Mojaddidi's failing to object to an accurate statement of law.

"A constructive amendment occurs when the defendant is charged with one crime but, in effect, is tried for another crime." United States v. Pang, 362 F.3d 1187, 1194 (9th Cir. 2004). In other words, a constructive amendment "occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." United States v. Ward, 747 F.3d 1184, 1189 (9th Cir. 2014) (internal quotation marks and citations omitted). The Ninth Circuit has "found constructive amendment of an indictment where (1) there is a complex of facts

---

[85] Hayat appears to have also abandoned this claim, because he failed to raise this in the post-hearing brief, but the government addresses the issue nonetheless.

[presented at trial] distinctly different from those set forth in the charging instrument, or (2) the crime charged [in the indictment] was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." United States v. Adamson, 291 F.3d 606, 615 (9th Cir. 2002) (alterations in original) (internal quotation marks omitted), modified on other grounds by United States v. Larson, 495 F.3d 1094 (9th Cir. 2007). "[W]here a generally framed indictment encompasses the specific legal theory or evidence used at trial," there is no constructive amendment. United States v. Milstein, 401 F.3d at 65 (quoting United States v. Salmonese, 352 F.3d, 608, 620 (2d Cir. 2003)). As a result, "an indictment drawn in more general terms may support a conviction on alternate bases, even though an indictment with specific charging terms will not." United States v. Zingaro, 858 F.2d 94, 99 (2d Cir. 1988). See also United States v. Brosnan, 484 Fed.Appx. 167, 169 (9th Cir. 2012) ("The statute under which [the defendant] was charged for wire fraud … prohibits fraudulent transmissions in 'interstate or foreign commerce.' Thus, the government was required to prove only that the notices [the defendant] triggered through his electronic court filings crossed state lines; where they actually traveled was 'mere surplusage that need not be proved.'") (internal citations omitted); United States v. Patino, 962 F.2d 263, 266 (2d Cir.1992) (noting the case law regarding constructive amendment "permit[s] significant flexibility of proof, provided that the defendant was given notice of the 'core of criminality' to be proven at trial").

Here, location was not an element of the charged crime, nor was it alleged in the indictment. Thus, the prosecutor did not "substantially alter" the indictment in his rebuttal by correctly stating that the government was not required to prove that Hayat attended a particular camp. The indictment in this case provided Hayat with notice of the "core of criminality" to be proved at trial and its general framing encompassed the specific legal theory and evidence presented at trial. Consequently, it was not ineffective for Ms. Mojaddidi to withhold a frivolous objection to an accurate statement of law and this Court should dismiss any claims based on constructive amendment or failure to file a bill of particulars.[86]

_____

[86] In addition, the Court's endorsement of the government's statement of the elements as reflected in the jury instructions invalidates any claim that Ms. Mojaddidi should have filed a bill of particulars because the Court agreed that the government did not need to prove the exact location of any camp. See United States v.

**A.** **Even if Ms. Mojaddidi Was Somehow Deficient by Failing to Make a Frivolous Objection to a Non-Existent Amendment, Hayat Has Not Established Prejudice**

Location of material support activity is not an element of § 2339A.  See 18 U.S.C. § 2339A.  Therefore, there can be no constructive amendment of the charging terms where the government alleges the crime could have occurred at another particular location.  Even if Hayat could somehow show that a constructive amendment occurred, he cannot show any prejudice from it.  Consequently, his claim must fail.

In United States v. Von Stoll, the indictment charged the defendant with transporting in interstate commerce $10,000 that was taken from a particular victim.  726 F.2d 584, 585 (9th Cir. 1984).  The evidence presented at trial, however, showed that the defendant met with that victim and that victim's partner, and had taken the $10,000 from the victim's partner.  Id. at 585-86.  The jury charge allowed jurors to find the defendant guilty if they found that the $10,000 was taken from "the owner."  Id. at 586.  The court found that there was no prejudice, reasoning that the identity of the victim was irrelevant to the defendant's culpability.  Id. at 586-87.  The Ninth Circuit has reached similar conclusions in other cases.  See United States v. Crape, 472 Fed.Appx. 581, 583 (9th Cir. 2012) (finding no constructive amendment where indictment alleged the defendant stole Border Patrol's border-monitoring sensor but proved the sensor was owned by the Marine Corps because the precise governmental owner is irrelevant to a conviction under § 641) (internal citations omitted); United States v. Swaid, 458 Fed.Appx. 676, 679 (9th Cir. 2011) (finding no constructive amendment when government presented evidence concerning a separate source of stolen merchandise but constituted only "a single divergence and did not result in any material change in the complex of facts.").

The Ninth Circuit has rejected constructive amendment claims when no evidence was introduced at trial that would enable the jury to convict the defendant only for uncharged conduct.  In Hartz, for

Buffington, 815 F.2d 1292, 1304 (9th Cir. 1987) (rejecting ineffective assistance of counsel claim based on failure to file a bill of particulars because the district court denied defendant's request for particularity regarding informant). Regardless, a bill of particulars was not necessary for Ms. Mojaddidi to pursue the strategy she chose – to try to prove that the defendant did not attend any camp at all. See United States v. Dicesare, 765 F.2d 890, 897 (9th Cir. 1985) ("A bill of particulars is appropriate when the indictment is insufficient to permit the preparation of an adequate defense.").

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

157

example, the defendant was indicted for use of a firearm during the robbery of a jewelry store. 458 F.3d at 1015-16. The indictment alleged that the defendant had used two specific weapons—a Smith and Wesson .357 and a Chinese model 9mm. The evidence at trial matched the allegations in the indictment, but a verdict form asked simply that the jury find whether the defendant brandished "a firearm." Id. at 1016. The court declined to find a constructive amendment because the verdict form did not alter the behavior on which the defendant could be convicted, as no evidence was introduced that the defendant had used a weapon other than the two referenced in the indictment, and use of either firearm would have been sufficient to support conviction of the offense charged in the indictment. Id. at 1021; see also United States v. Lopez, 576 Fed.Appx. 680, 683 (9th Cir. 2014); Swaid, 458 Fed.Appx. at 679 (finding no constructive amendment when government presented evidence concerning a separate source of stolen merchandise but constituted only "a single divergence and did not result in any material change in the complex of facts.")

In sum, there is simply no support in the law for Hayat's claim that a constructive amendment of the Second Superseding Indictment occurred, and therefore Ms. Mojaddidi cannot have been deficient for failing to object to the non-existent amendment. Hayat has shown no prejudice that could have resulted from Ms. Mojaddidi withholding a frivolous objection to the government's correct statement of law. [87]

**X.   MS. MOJADDIDI WAS NOT INEFFECTIVE FOR NOT FILING MOTIONS TO SEVER THE TRIALS AND SUPPRESS HAYAT'S CONFESSION BECAUSE THERE WAS NO LEGAL BASIS FOR EITHER MOTION (CLAIMS 5 AND 6/ OPHB IV)**

Hayat argued that Ms. Mojaddidi's failure to seek severance on Bruton grounds and failure to move to suppress Hayat's confessions constituted ineffective assistance of counsel. (Pet. at 49-50, 50-66). Hayat renews the claims, pointing to the opinion of Daniel Broderick, despite the case law that holds that filing frivolous motions cannot be ineffective, and that because there were two juries there can be no prejudice as a matter of law. (OPHB at 71-73, 73-74). Both claims are without merit and Hayat demonstrates no prejudice arising out of Ms. Mojaddidi's strategic decisions not to pursue such motions.

---

[87] Although Hayat argues that Ms. Mojaddidi's representation was defective for failing to object at trial to this purported constructive amendment, he has yet to fault his current counsel for not raising such an argument in his direct appeal, where, if correct, Hayat might have obtained some relief if the omission was a plain error. See Hartz, 458 F.3d at 1019.

**A.      The Use of Separate Juries for Hayat and his Father Eliminated any Bruton Issues, Thus Ms. Mojaddidi's Failure to File a Frivolous Motion to Sever Was Not Ineffective and Did Not Prejudice Hayat (Claim 5 / OPHB IV)**

As to severance, Hayat claims that there was a risk of Hayat's father's confession being admitted and incriminating Hayat. (Pet. at 49; OPHB 71-73). He also claims that Ms. Mojaddidi was ineffective for failing to move to suppress Hayat's own statements. (Pet. at 51, 65-66; OPHB 73-74). Hayat asserts that "[t]he circumstances of the lengthy and exhausting interrogation were coercive. Pet. at 65. Ms. Mojaddidi could not have been ineffective for failing to file frivolous motions. The supposed risk of inadmissible statements by Hayat's father being entered into evidence against him was completely nullified by the empaneling of separate juries for each defendant. See Gray v. Maryland, 523 U.S. 185, 192 (1998) (approving the use of separate juries to eliminate Bruton issues). Furthermore, separate juries "significantly reduced the potential for a divergence in [the defendants'] interests." Cuyler, 446 U.S. at 347; see also Burger, 483 U.S. at 784, 786 ("As the State conducted the prosecutions, however, each defendant's confession was used in his trial but neither was used against the coindictee" and noting separate trials made argument of actual conflict less persuasive.). In addition, contrary to Hayat's assertions, there were absolutely no grounds for his confession to be suppressed.[88]

Hayat faults Ms. Mojaddidi for failing to file a motion to sever his trial from that of his co-defendant and father. This claim is meritless. The Court empaneled a separate jury for each defendant, Pet. at 50 n.40, and no evidence which was admissible as to Umer, such as his confession, but inadmissible against Hayat was admitted against Hayat, nor has Hayat claimed this occurred. Given the considerable quantity of shared evidence against the defendants, and the overall preference for joint trials, where possible, in furtherance of judicial economy, United States v. Armstrong, 621 F.2d 951, 954 (9th Cir. 1980); United States v. Sandoval-Medoza, 213 Fed.Appx. 624 (9th Cir. 2006) ("A trial court must sever a trial only if joinder is so manifestly prejudicial that it outweighs the dominant concern with judicial economy." (internal quotations omitted)), any motion filed by Ms. Mojaddidi to sever the trials instead of continue with separate juries would surely have failed. As a matter of law, the

[88] The petition itself acknowledges that "the motion was not guaranteed to succeed," but continues to argue that the motion should have been litigated "to support the testimony of a false confession expert." Pet. at 65. The Supreme Court rejected this "nothing to lose" standard for ineffective assistance of counsel claims in Knowles v. Mirzayance, 556 U.S. at 121-22.

government eliminated any prejudice from a joint trial by using separate juries.  Therefore, Hayat cannot show prejudice as a matter of law, and this Court should deny his claims regarding severance.

Ms. Mojaddidi's deposition testimony demonstrates that she understood that parts of the trial of Umer and Hayat were separated in order to avoid the danger that Umer's statements would come into evidence against Hayat.  (W.M. Depo. 51:8-52:4; Tr. 740:19-741:15).  Indeed, she confirmed that, at the suggestion of the government, the parties utilized separate panels to avoid potential Bruton[89] issues.  Moreover, she believed this was a potential way to protect her client's rights against potential Bruton problems.  (Id. at 225:3-13).  Therefore, not only has Hayat failed to show prejudice, he had failed to show any ineffectiveness.

### B. Ms. Mojaddidi's Did Not Provide Ineffective Assistance by Not Filing a Frivolous and Futile Motion to Suppress Hayat's Confession, and Hayat Cannot Establish Prejudice (Claim 6 / OPHB IV)

Hayat also asserted that, Ms. Mojaddidi's decision not to file a motion to suppress was ineffective because the case depended entirely on his confessions.  (Pet. at 50-51; OPHB at 73-74).  Hayat claims this is because Ms. Mojaddidi was not aware of federal law concerning involuntary or coerced confessions.  Pet. at 65-66.  What Hayat omits is the fact there are no grounds on which such a motion could have succeeded.  Post-hearing, Hayat relies on Daniel Broderick's speculative opinions and proffers no actual ground for suppression of Hayat's statements.  (OPHB at 73-74).  Before his confession to FBI investigators, Hayat was advised of his Miranda rights more than once and knowingly and voluntarily agreed to answer questions.  (RT 493:11-494:10, 782:1-783:8).  Further, Hayat's confession was videotaped, which captured the particular nature and characteristics of the interviews.[90] The recording depicts the absence of coercion by investigators and demonstrates the voluntariness of Hayat's statements.  (See Gov. Sup. Ans. Ex. 19; RT 782:1-783:8).  Ms. Mojaddidi did not provide ineffective assistance by failing to file a frivolous motion to suppress Hayat's confession when that motion would have failed as a matter of law.  See Lowry, 21 F.3d 344 at 346-47 (not ineffective to fail to assert motion to suppress that counsel knew would not succeed).

---

[89] Bruton v. United States, 391 U.S. 123 (1968) (holding that admission of the confession of one defendant against another violated the Confrontation Clause of the Sixth Amendment).

[90] Concurrent with the filing of its opposition to the motion to suppress, the government lodged with the Court a copy of Hayat's recorded confession.  (See Gov. Sup. Ans. Ex. 19).

To be valid, a Miranda waiver must be voluntary, knowing, and intelligently made. Miranda v. Arizona, 384 U.S. 436, 479 (1966); United States v. Binder, 769 F.2d 595, 599 (9th Cir.1985). Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of defendant. North Carolina v. Butler, 441 U.S. 369, 374–75 (1979); Frazier v. Cupp, 394 U.S. 731, 739 (1969). The United States bears the burden of proving by a preponderance of the evidence that a defendant's Miranda waiver was voluntary. Colorado v. Connelly, 479 U.S. 157, 168 (1986). "To solicit a waiver of Miranda rights, a police officer need neither use a waiver form nor ask explicitly whether the defendant intends to waive his rights." United States v. Cazares, 121 F.3d 1241, 1244 (9th Cir. 1997); Terrovona v. Kincheloe, 912 F.2d 1176, 1180 (9th Cir. 1990). Post-Miranda statements are not suppressed where a defendant's actions sufficiently indicated his desire to waive his Miranda rights. Id. The Supreme Court has held police coercion is required for a Miranda waiver to be found involuntary. See Connelly, 479 U.S. at 167-170 (holding that coercive police activity is a necessary predicate to finding that a confession is not "voluntary").

In Cazares, the Ninth Circuit held that recitation of the Miranda warnings in Spanish, to a defendant who spoke limited English, "accompanied by the officer's confirming that [the defendant] understood his rights, [was] sufficient to establish that [the defendant] knew his rights." 121 F.3d at 1244. In Terrovona, the defendant never signed a Miranda waiver form, was never asked whether he wished to waive his Miranda rights, and never stated that he wished to waive his Miranda rights. See Terrovona, 912 F.2d at 1180. Nevertheless, the Ninth Circuit affirmed the district court's finding that the defendant had knowingly, voluntarily, and intelligently waived his Miranda rights because his background, experience and conduct showed a valid implied waiver. Id.

In this case, Hayat's confession followed a valid written waiver and his recorded interview demonstrates no indicia of coercion whatsoever. Hayat alleges that the following facts show that his confession was involuntary: (i) he yawned thirteen times during the interview; (ii) answered "I don't know" ten times; (iii) answered "I don't remember" six times; and (iv) answered "uh huh," instead of "yes," twenty times. Pet. at 56:23-28. Hayat fails to cite legal precedent that supports the idea that any of these facts, taken together or in isolation, makes his confession involuntary. Pet. at 65-66. That Hayat did not know certain answers or could not recall other answers, or answered using slang rather

than offering more formal responses does nothing to demonstrate that investigators coerced his confession.  Nor does the fact that investigators used ruse questions while interviewing Hayat render his confession involuntary.  See, e.g., Frazier, 394 U.S. at 739 (holding that interrogating officers can make false representations concerning the crime or the investigation during questioning without rendering an ensuing confession coerced).

As set forth above, investigators interviewed Hayat between 4:45 p.m. and 7:00 p.m., on June 4, 2005, and between approximately 12:37 a.m. and 3:00 a.m., on June 5, 2005.  (RT 582:19-584:1).  Excluding breaks, each interview lasted approximately two hours.  (Id.)  When investigators were not interviewing him, Hayat spent time "hang[ing] out" at the FBI office, eating pizza and drinking soda, and "rest[ing] in the lounge area" of the offices.  (RT 584:12-16).  When Hayat complained that he was cold, SA Sweeney found a blanket for Hayat to use to keep warm.  (RT 584:14-15).  During the interviews, Hayat complained of being tired, being sleepy, and of having a headache.  (RT 768:9-17).  By the end of the interview, Hayat was fatigued.  (RT 769:1-5).  Additionally, during certain points in the interview, agents grew frustrated with Hayat and, at least five times, told Hayat that his statements did not make any sense.  (RT 770:18-771:3).  Hayat also contradicted himself several times, as the government argued at trial, presumably to deflect responsibility or protect his cohorts.  See Pet. at 59-65. None of those facts offers support for a colorable motion to suppress Hayat's confession.

Although Hayat claims that Ms. Mojaddidi had "nothing to lose," (Pet. at 65; OPHB at 73), by moving to suppress his confession, that is not the standard for constitutionally effective performance— pursuing every motion in which the attorney has "nothing to lose," no matter how baseless.  See Knowles, 556 U.S. at 121-22 ("This Court has never established anything akin to the Court of Appeals' 'nothing to lose' standard for evaluating Strickland claims.").  As a matter of law, it is simply not ineffective to fail to file a frivolous and futile motion.  See James v. Borg, 24 F.3d at 27 ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel"); Shah v. United States, 878 F.2d 1156, 1162 (9th Cir. 1989) ("The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel."); see also United States v. Nolan, 910 F.2d 1553, 1564 (7th Cir. 1990) ("It is not ineffective assistance for counsel to not file a meritless (Miranda) motion.").  In the context of assessing an actual conflict claim, the Ninth Circuit has specifically rejected this "nothing to

lose" argument as a basis for finding an actual conflict of interest. Willis v. United States, 614 F.2d at 1205 (9th Cir. 1979) ("While it might be argued that Willis had nothing to lose by raising the proposed defense, we are unable to conclude that only impermissible considerations of conflicting loyalties can explain counsel's decision to concentrate his energies on the defense with which he thought Willis had a chance to win.").

Hayat makes much of alleged "cognitive difficulties" from childhood meningitis but he fails to demonstrate the actual existence of such difficulties, how they affected his confession, or how they would have supported a motion to suppress. See Shackleford v. Hubbard, 234 F.3d 1072, 1080 (9th Cir. 2000) (denying a request to expand the certificate of appealability to counsel's alleged ineffectiveness in failing to file a motion to suppress on the basis that the defendant was mentally deficient, fatigued, and on drugs because the defendant was lucid and responsive to questions). The fact that a suspect is under the influence of drugs or medication is irrelevant if the suspect's statement was "the product of a rational intellect and a free will." Mincey v. Arizona, 437 U.S. 385, 398 (1978) (quoting Townsend v. Sain, 372 U.S. 293, 307 (1963)); see also United States v. George, 987 F.2d 1428, 1430-31 (9th Cir. 1993).

Dr. Fahim testified that Hayat's illness affected his memory and that Hayat's "ability to think" "was weak before" his illness, and was "weaker" after. (Tr. 1001:2-7). However, Dr. Fahim is Hayat's uncle, and has known Hayat for most of his life. He is not a disinterested observer of facts. Hayat did not call as a witness the presumably unrelated doctor who treated him in California after he returned to the United States in 2000. (Id. at 1009:12-22). Instead, he presented only the testimony of family members about the effects of his past illness. Moreover, the fact that Hayat successfully memorized all 6,332 verses of the Koran before 2000, and became a hafiz, directly contradicts Dr. Fahim's testimony about the long-term effects of Hayat's illness. (Tr. 1039:6-15). Hayat served as an imam at a mosque in Sacramento. (RT 1076:18-20). Likewise, Ms. Mojaddidi knew Hayat suffered a bout of meningitis years earlier but she detected no evidence in the "more than dozens of times" she met with Hayat that caused her to question his competence, his ability to understand the charges against him, or his ability to assist her in his defense. (W.M. Depo. 46:3-19; 260:1-3, 260:25-261:8, Tr. 726:2-8, 681:2-4, 691:16-19). She did not view his past illness as a basis to challenge Hayat's confession because he never mentioned suffering any continued effects from it. (Tr. 726:2-8, 681:2-4).

Finally, Hayat argues that even an unsuccessful motion would have resulted in additional discovery. (Pet. at 65; OPHB at 73). This assertion is puzzling. Any evidence the government possessed relating to the viability of Hayat's confession would have been discoverable and disclosed regardless of whether Hayat filed a motion to suppress. Additionally, any information that "might have supported the testimony of a false confession expert," (Pet. at 65), would have been captured on the video recording of Hayat's confession and available to such an expert. Contrary to Hayat's argument, there was nothing to be gained by filing a futile motion to suppress and, instead, such a motion would have undermined the overall joint-defense strategy of pushing the government to trial before it could gather more or better evidence. (Tr. 743:2-745:7). Hayat has not established ineffectiveness or prejudice from Ms. Mojaddidi's decision not to file a futile motion to suppress his confession, therefore the Court should deny claims relating to the certain to be unsuccessful motion to suppress.

## XI.   MS. MOJADDIDI WAS NOT INEFFECTIVE MERELY BECAUSE THE COURT EXCLUDED HER PROFFERED "FALSE CONFESSION" EXPERT AND HER DECISION TO RELY ON DIRECT AND CROSS-EXAMINATION TO CHALLENGE THE RELIABILITY OF HAYAT'S CONFESSION WAS WITHIN THE WIDE RANGE OF COMPETENT REPRESENTATION (CLAIM 7/OPHB V)

Ms. Mojaddidi reviewed all of Hayat's FBI interviews and believed that the most important piece of evidence to be offered against her client was his confession. (W.M. Depo. 49:5-14, 68:16-18, 162:18-19, 207:6-11; Tr. 743:2-4). Ms. Mojaddidi was familiar with methods to challenge purported false confessions, had "learned about" the law governing voluntariness of a confession, and had discussed it with Mr. Griffin and Wedick. (W.M. Depo. 70:4-16; Tr. 744:2-15). Ms. Mojaddidi originally intended to challenge the confession testimony by presenting a defense expert on false confessions and through cross-examination of government witnesses about the interviews. (W.M. Depo. 207:12-209:17). Contrary to Hayat's argument otherwise, (OPHB 73:23-27), Ms. Mojaddidi "certainly" knew that a challenge to the "voluntariness" of a confession was a legal basis for a motion to suppress. (Tr. 744:18-20).

The defense intended to call Wedick as an expert to explain why Hayat's confession was unreliable. (W.M. Depo. 70:9-16; Tr. 594:6-9). Wedick was a former FBI agent who, in his 35 years of experience, had conducted hundreds of interviews and interrogations, and agreed to serve as an expert to

offer an opinion on the techniques used to elicit Hayat's confession, among other things.  (W.M. Depo. 207:16-208:4; Tr. 575:12, 604:6-21, 724:9-25; Gov. Sup. Ans. Ex. 18).  Ms. Mojaddidi was aware that Wedick had never previously qualified as an expert in the field of false confessions, but she believed that Wedick would be "good" and would be deemed qualified to testify.   (W.M. Depo. 70:21-23, 71:5-7, 208:16-17, 286:4-6).  Ms. Mojaddidi was aware that there were other potential false confession experts, and considered information sent to her by other experts in the field but did not contact them. (Id. at 70:24-71:7, 208:7-17).  Ultimately, she made the decision to utilize Wedick as an expert on behalf of Hayat.[91]   (W.M. Depo. 208:18-209:1; Tr. 594:6-9).

To prepare for his testimony, Wedick reviewed the tapes of the interview and had a series of meetings with Ms. Mojaddidi and Mr. Griffin.   (W.M. Depo. 209:21-25; 592:17-24, 594:12-14, 604:3-605:1).  Wedick prepared a draft expert disclosure that Ms. Mojaddidi and/or Mr. Griffin reviewed and edited.  (W.M. Depo. 209:23- 210:12, 285:16-25; Tr. 604:18-21).  According to the March 22, 2006, disclosure, Wedick intended to opine that:

> [T]he interviewing agents did not consider but should have considered [Hayat's] vulnerabilities as an interviewee.  Specifically, ... the agents should have considered [Hayat's] age, intelligent (sic) quotient, level of education, mental handicap, language barrier, health, marriage and/or family status, occupation and employment status, religion and/or belief in God, illiteracy, fatigue, social isolation, and inexperience with the criminal justice system.  [A]ll of these factors should be considered by FBI agents in conducting interviews to insure the validity of any elicited 'confessions.'
> [The agents] all used leading questions during the interviews of [Hayat], [listing purported examples]. [T]he agents did not ask sufficient open-ended questions.  [T]he agents' use of leading questions throughout the interview contaminated the 'confessions' to render them unreliable.

 (Gov. Sup. Ans. Ex. 18 at 8).

---

[91] Ms. Mojaddidi and Mr. Griffin thought Wedick was the best person to testify about the confessions of both defendant's  because of his thirty-four years of experience as an FBI agent and because he "had come out of" the Sacramento Division of the FBI.  (W.M. Depo. 286:19-287:5).  Wedick was paid $4,000 for his work in the Hayat cases, four times more than the attorney experts Hayat called in support of his habeas action, each of whom were paid $1,000, including for their testimony.  (See Tr. 594:24-595:1, 483).  More important, there is no evidence in the record that Mr. Griffin forced Ms. Mojaddidi to use Wedick as a witness instead of an alternative expert, or that he did so to avoid a more expensive expert and enrich himself, as Hayat asserts without evidence (OPHB at 79).  Wedick testified he became convinced of Hayat's innocence and refused to accept additional pay.  (Tr. 595:2-6, 725:12-15).  He urged Mr. Griffin to also work for free.  (Tr. 595:2-6).  No actual financial conflict results if an expert *declines* pay and elects to work pro bono.  If Wedick had asked to be paid more, the record reflects that Mr. Griffin and Ms. Mojaddidi would have sought additional funds from the Hayat family, if necessary.  (See W.M. Depo. 42:13-15; Tr. 711:25-712:6).  Hayat's claim on this point is meritless.

The government moved to exclude Wedick's testimony (CR 251), and the defense opposed (CR 271). On March 31, 2006, the Court excluded Wedick's opinions during trial, finding that the opinions "would not assist the trier of fact, that is, the jury, with understanding the evidence, or with determining a fact in issue." (RT 3521:17-3552:21). Contrary to Hayat's assertion, (OPHB 79:16-19), the Court's ruling did not concern, and specifically excluded consideration of Wedick's qualifications. (RT 3552:21) ("My tentative ruling didn't cover his qualifications."). After the Court's in-trial ruling, and in light of the state of law at the time and since, as discussed further below, it was reasonable for Ms. Mojaddidi to conclude that it was strategically unwise to spend time attempting to procure testimony from an alternative false confession expert and, instead, to focus on demonstrating the unreliability of Hayat's confession by playing his recorded confession for jurors and using direct and cross-examination of FBI interrogators to reveal the purported flaws in their techniques which, from the defense perspective, produced Hayat's unreliable statements.[92]

More than a year after Hayat was convicted, the Court issued a written order, on May 17, 2007, denying Hayat's motion for a new trial. (CR 482). One of the issues Hayat raised in his new trial motion was the claim that the Court erred in excluding Wedick's testimony at trial. (Id.) The Court rejected that argument and confirmed its earlier holding that Wedick's "testimony would have had little probative value and would not have assisted the jury as contemplated by Rule 702," (id. at 51-55), and noted that "the circumstances of Hayat's interrogation and confession were readily apparent to the jury through the testimony of the interviewing FBI agents and the videotapes, and therefore, Wedick's testimony was not necessary to inform the jury about the circumstances surrounding Hayat's confessions." (Id. at 47-48). Additionally, the Court supplemented the basis of its earlier ruling with the finding that Wedick was not "qualified as an expert in the field of psychology or psychiatry," nor "otherwise had the qualification to give expert testimony regarding Hayat's alleged susceptibility to

___

[92] Any new expert would surely have been excluded because Hayat could not have complied with his discovery obligations to permit the government pre-trial notice of the experts opinions and qualifications, and the right to challenge the expert under the rules of evidence. See Fed. R. Crim. P. 16(b)(1)(B) & (C); FRE 702-705. Ms. Mojaddidi fulfilled her duty by retaining an expert who she and her co-counsel believed would be permitted to testify on the subject of improper interrogation techniques. The Court's disagreement with them, on the basis that the proposed expert testimony would not assist the jury because the circumstances of the interrogation were visible in the recording, does not make the decision unreasonable.

suggestion and coercion." (Id. at 50).  The Court also held that "any connection that Hayat wanted Wedick to make between the factual circumstances of Hayat's confession and factors that may lead to unreliable confessions could have been and was ultimately made by defense counsel during closing arguments." (Id. at 52).  The Court's later ruling on Hayat's argument in his motion for a new trial does not transform the reasoning of the Court's ruling during Hayat's trial.  See United States v. Hayat, 710F.3d 875, 903 (9th Cir. 2013) ("The district court excluded Wedick's testimony in its entirety, finding that much of the testimony was of "marginal probative value" and that its value was outweighed by the risk of confusing the jury, wasting time, and presenting needless cumulative evidence. The court also concluded that Wedick's testimony "would not assist the trier of fact."  The District Court did not abuse its discretion in so ruling.")

**A.      Ms. Mojaddidi Vigorously Cross-Examined Government Agents and Elicited Testimony in Support of the Defense Theory that Hayat's Confession Was Unreliable and He Did Not Attend a Jihadist Camp**

Ms. Mojaddidi vigorously challenged the reliability of Hayat's confession through questioning of agents involved with the interviews.  Specifically, she vigorously cross-examined FBI special agents called by the government as part of its case, including SA Lawrence Futa, SA Harry Sweeney, SA Tenoch Aguilar.  Ms. Mojaddidi also called SA Gary Schaff as part of the defense case.  As demonstrated below, Ms. Mojaddidi questioned each of those witnesses in a fruitful effort to elicit testimony in support of Hayat's contentions that: (i) Hayat had not attended a camp; (ii) Hayat truthfully denied that he attended a camp in initial interviews with the FBI; and (iii) Hayat was induced to offer false admissions by the FBI in later interviews.

**1.      May 30, 2005 Interview**

SA Futa interviewed Hayat on May 30, 2005, when Hayat's inbound plane from Pakistan was diverted to Tokyo because Hayat was on the "No-Fly" list.[93]  During cross-examination by Mojaddidi, SA Futa confirmed that Hayat was cooperative, friendly, and not in any way argumentative or resistant during the course of a one-hour interview.  (RT 470:18-23, 474:19-20, 476:3-4).  Hayat's relatives were

---

[93] Before the interview, SA Futa confirmed with SA Aguilar that Hayat was on the No Fly List, (RT at 466:12-18), and had received information indicating that Hayat potentially had ties to terrorism and might have participated in a terrorist training camp.  (RT at 482:5-18).

also interviewed and, according to SA Futa, were also cooperative and not resistant in any way.  (RT 470:24-25, 471:1-4).

SA Futa conceded that Hayat denied attending any meetings related to terrorism, denied being a member of any terrorist group, and denied ever participating in any terrorist training.  (RT 472:22-473:8).  SA Futa testified that Hayat told him the main reason Hayat went to Pakistan was to care for his mother while she was undergoing treatment for Hepatitis C.  (RT 474:9-12).  SA Futa testified that Hayat claimed while Hayat was in Pakistan he cared of his ill mother, played cricket, went to the mosque, went to Islamabad for vacation, and got married.  (RT 473:9-23).  SA Futa also testified that Hayat stated that when Hayat returned to the United States, he intended to become a truck driver like his uncle, and that he wanted to attend school to improve his English.  (RT 473:24-474:8).  SA Futa acknowledged that, based on his interview and observations, Hayat did not appear to be someone who would have recently attended anything involving rigorous training.  (RT 474:24-475:12).  Moreover, based on SA Futa's observations and the interview, SA Futa and others came to the conclusion that Hayat did not pose a threat to the aircraft, could be removed from the No Fly List, and allowed to return to the United States.  (RT 470:6-12, 478:8-23).

### 2.      June 3, 2005 Interview

Under cross-examination by Ms. Mojaddidi, SA Aguilar confirmed that, during the June 3, 2005 interview of Hayat at his home in Lodi, Hayat was cooperative, pleasant, and did not show any signs of resistance.  (RT 690:10-14, 697:6-9).  SA Aguilar testified that Hayat told him Hayat went to Behboodi, Pakistan, about two years prior – approximately April 2003 – and that the purpose of his trip was to care for his ailing mother who was suffering from Hepatitis C.  (RT 692:14-20).  Hayat stated that he did not work while in Pakistan because he would have earned only approximately $1 for twelve hours of work, and he did not go to school because the schools were not very good.  (RT 692:24-693:7).  Hayat stated that, instead, he played cricket, hung out with his cousins, played Playstation, and every other weekend he and his mother traveled to Rawalpindi to obtain medical treatment for her.  (RT 693:11-20).  The other weekends he would visit Islamabad with friends to eat American food, watch movies, and go cruising.  (RT 693:21-694:1).  SA Aguilar testified that Hayat claimed that he married while in Pakistan.  (RT 694:2-3).  SA Aguilar conceded that Hayat denied that Hayat had ever attended a training camp in

Pakistan, that Hayat would ever be involved in anything related to terrorism, and that Hayat went to a jihadi madrasa. (RT 694:13-696:13).

### 3.      June 4 and 5, 2005 Interviews

Under cross-examination by Ms. Mojaddidi, SA Sweeney confirmed that he interviewed Hayat from noon until 4:15 on June 4, 2005. (RT 515:9-14, 518:25-519:3). SA Sweeney conceded that for the first three and one-half hours of the interrogation, Hayat denied that he attended a terrorist training camp in Pakistan at least five or six times, and also denied any connection to jihadi training. (RT 519:15-520:17).

During cross-examination of SA Sweeney, Ms. Mojaddidi elicited testimony about contradictory answers that Hayat gave during the June 4 and 5, 2005 FBI interviews, which supported the defense theory that Hayat's confession was unreliable. SA Sweeney confirmed that Hayat denied wrongdoing during hours of questioning until SA Sweeney asked Hayat two ruse questions. SA Sweeney confirmed that he first asked Hayat: "Is it possible, Hamid, that you didn't know that you were going to a jihadi training camp? Is it possible that you may have thought it was something else, like a religious education camp?" (RT 520:24-521:3). In response, Hayat made his first admission. (RT 531:3-9). Next, even though the FBI did not possess satellite photographs of Hayat attending a training camp, SA Sweeney suggested to Hayat that "the FBI had technical capabilities," and asked Hayat another ruse question: would there be any reason why Hayat's image would be on a satellite photograph during his most recent visit to Pakistan. (RT 534:6-14, 535:1-24; RT 3715:1-8). Thereafter, Hayat admitted that he was, in fact, at a camp in 2003 for a much longer period of time. (RT 525:15-20). SA Sweeney also confirmed to Ms. Mojaddidi that the initial interview he conducted with Hayat, including his admissions and denials, was not recorded. (RT 528:3-529:24, RT 3635:4-11).

During SA Aguilar's testimony, the defense published the June 4 and June 5, 2005 videotaped interviews of Hayat in their entirety, totaling four hours of interviews. (RT 716:11-719:9, 750:2-752:3, 757:5-21). Ms. Mojaddidi then led SA Aguilar through a series of questions to demonstrate that Hayat had given different answers to many questions throughout the interviews, and that many of Hayat's statements about the camp were not confirmed by law enforcement investigation. SA Aguilar conceded that Hayat made different statements about when he attended camp indicating, at one point, that he

attended camp in roughly October or November 2003 (RT 760:9-11), and at another point that he attended in October or November of 2004.  (RT 760:12-761:6).  SA Aguilar conceded that he was unable to confirm that Hayat attended a camp on either of those dates without Hayat's statements.  (RT 762:9-12).

Under cross-examination by Ms. Mojaddidi, SA Aguilar also conceded that Hayat made a variety of statements about the camp location, indicating at various times that it was in Balakot, in the Kashmir, in Afghanistan, near Islamabad, in Tora Bora or Dorhum, in the Northwest Frontier Province, and near his village of Behboodi.  (RT 762:17-763:25).  SA Aguilar testified that he was not able to confirm that Hayat attended camps in any of those locations, "minus [Hayat's] statements."  (RT 764:10-14).  SA Aguilar confirmed that Hayat gave varying testimony about the length of his stay at the camp, once indicating that he was there for three to four months and later stating he was there for six to seven months.  SA Aguilar conceded that the FBI was unable to confirm the length of Hayat's stay.  (RT 764:15-765:2).

Ms. Mojaddidi also cross-examined SA Aguilar about Hayat's account of camp leadership.  SA Aguilar conceded that Hayat gave conflicting answers on the subject, claiming at various points in the interviews that: there was no leadership, it was led by Harakat-ul-Ansar, Hayat's grandfather ran the camp, Hayat's uncle ran the camp, and al-Qaeda ran the camp.  SA Aguilar acknowledged that the FBI was unable to confirm that Hayat attended a camp run by any of these people or groups.  (RT 766:1-3).  Additionally, SA Aguilar confirmed that Hayat made varying statements concerning the number of people attending camp, at one point claiming that there were between thirty-five and fifty people and at another, claiming there were over 200 attendees.  (RT 766:4-12).  SA Aguilar also confirmed that Hayat made conflicting statements about the training he received at camp.  At one point, Hayat stated that he received pistol training and at another point he stated that he did not receive much training at all.  (RT 767:3-7).  SA Aguilar testified that without Hayat's statements, law enforcement agents were not able to confirm what training Hayat received.  SA Aguilar also conceded that Hayat gave varying responses concerning the length of a camp stay for an attendee, stating at different times during the interview that it was five months to a year, six to seven months, and that one could stay for as long as one wanted.  (RT 767:8-21).  SA Aguilar conceded that the FBI was not able to confirm the typical duration.  (RT 767:22-

768:1).

Ms. Mojaddidi elicited a series of additional concessions from SA Aguilar to support the defense theory that Hayat's confession on June 4 and 5, 2005 were unreliable. SA Aguilar acknowledged that, over sixty times, Hayat answered questions or premised his answers with statements like: "I'll say," or "I'll say that." (RT 768:2-8). SA Aguilar confirmed that Hayat complained of being tired during the interview, complained of being sleepy during the interview, complained of having a headache during the interview and stated at one point that his mind "was not working." (RT 768:9-20). SA Aguilar conceded that fatigue appeared to affect Hayat's responses to the questions asked at the end of the interview. (RT 769:1-5). Additionally, SA Aguilar did not dispute that, at certain times during the interviews, agents grew frustrated and, at least five times, told Hayat that his statements did not make any sense. (RT 770:23-771:3). SA Aguilar testified that, even though Hayat twice asked if he could go home, Hayat was never told he could go home if he wanted to. (RT 771:4-22).

Ms. Mojaddidi also elicited a series of concessions from SA Schaaf to support the defense theory that Hayat's confession during the June 4 and 5, 2005 interview was not reliable. SA Schaaf conceded, in substance, that he used leading questions when he asked Hayat: (1) whether he attended "jihadi" training camps (RT 3638:9-3639:7); (2) whether he had traveled by bus to the camp from Pindi (RT 3639:9-18; (3) whether he had gone to the Northwest Frontier Province while he traveled to the camp (RT 3643:3-8, 3644:3-12); (4) whether Hayat arrived at camp in the dark (RT at 3644:13-3645:2); (5) whether weapons and explosives training was offered at camp (RT at 3645:3-9); (6) whether there were different functions going on in the camp (RT 3645:14-20); (7) whether individuals took supplies up the trail to the camp (RT 3645:17-24); (8) whether there was rifle training, other weapons training, and explosives training at the camp (RT 3646:1-24); (9) whether there were Kalishnikovs – Russian-made machine guns – at the camp (RT 3647:2-4); (10) whether there were buildings at the camp, (RT 3648:19-3649:21); (11) whether Hamid had been at the camp for multiple months (RT 3650:2-17); (12) whether various militant groups were associated with the camp, including Harakuat ul-Mujaheden, Harakat ul-Ansar, Sipah-e-Sahaba, and JUI (RT 3650:18-3651:18); and (13) whether they were "teaching people how to kill American troops" at the camps. (RT 3661:17-3662:10). SA Schaaf testified that he could not recall whether there was an FBI protocol concerning when to ask leading

questions or whether he had ever received training with respect to leading questions.  (RT 3640:4-3641:10).  He conceded that open-ended questions were preferred and that he had asked leading questions of Hayat.  (RT 3641:7-10, 3666:21-3667:4).

Ms. Mojaddidi also highlighted a series of seemingly incredible statements by Hayat.  Indeed, SA Schaaf conceded that there were some statements Hayat made that he simply did not believe.  (RT 3719:18-25).  For example, at one point Hayat said that there were no knives anywhere in the camp, not even in the kitchen.  (RT 3647:5-19).  Hayat claimed that he washed vegetables at the camp on most dates, implying that he did nothing else.  (RT 3659:4-16).  Hayat suggested that he had been fooled into going to a camp and later that he had run away from camp.  (RT 3659:17-3661:9).  At one point, SA Schaaf told Hayat: "That's your story but it doesn't mean it's true."  (RT 3667:5-8).

Ms. Mojaddidi led SA Schaaf through a series of questions to demonstrate that Hayat gave different answers to many questions throughout the interviews.  In response to Ms. Mojaddidi's questioning, SA Schaaf confirmed that Hayat made inconsistent statements about the camp location, suggesting that it was located in Afghanistan, Kashmir, Tora Bora, Dorhum, near Islamabad, and near his village, Behboodi.  (RT 3715:17-3716:1).  SA Schaaf confirmed that, in discussing the number of camp attendees, the number of attendees reported by Hayat "changed as it went along."  (RT 3716:12-18).  SA Schaaf also confirmed that he never told Hayat he was free to go home.  (RT 3719:4-9).  Even though Hayat told SA Schaaf he was jet-lagged and tired, SA Schaaf admitted that he continued the questioning.  (RT 3719:13-18).

In sum, it is clear that Ms. Mojaddidi, through direct and cross-examination, was able to elicit evidence to support the defense theory that Hayat's confession was unreliable, and indeed, she powerfully argued the same in closing.  Ms. Mojaddidi's effective direct and cross-examinations of government witnesses strongly challenged the reliability of Hayat's confession, addressing specific interrogation techniques used by his interrogators.  She reasonably expected to present Wedick's expert testimony addressing the same issues and to supplement her effective examinations and argument.  It was not ineffective for her to make that informed strategic choice.  That the Court ruled Wedick's testimony would not assist the jury to evaluate a four-hour videotaped confession that they watched in its entirety, does not transform Ms. Mojaddidi's competent representation on this point into

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

172

ineffectiveness.

**B.    Ms. Mojaddidi Did Not Provide Ineffective Assistance by Not Calling an Alternative Expert Witness to Support Hayat's Defense Theory That His Confession Was Unreliable and That He Did Not Attend a Jihadist Camp (Claim 7/OPBH V)**

At the 2018 hearing, Hayat presented the testimony of Dr. Richard A. Leo ("Dr. Leo") who offered his opinions "on risk factors that can occur in an interrogation." (Tr. 18:22-25).  Dr. Leo's testimony did not advance Hayat's effort to meet his burden to show Ms. Mojaddidi was ineffective for relying on vigorous direct and cross-examination, and argument, to challenge the reliability of his confession.  To the contrary, Dr. Leo's testimony confirmed that Ms. Mojaddidi's efforts were effective. Moreover, in his testimony, Dr. Leo demonstrated that, if he had been called at Hayat's trial, he would have merely told the jury what they could already see by watching the video-recording of Hayat's confession.  He also admitted his flawed methodology is not predictive of any outcome, and that the presence of all or none of the risk factors he identified in any given interrogation could produce either a true or a false confession.  Such testimony could not have aided Hayat's jury.  Indeed, it would have suffered the same fate as Wedick's testimony, and been excluded as unhelpful and because it risks usurping the judgment of the jury.  It fares no better in this habeas action, and cannot help Hayat meet his burden on this claim.[94]

**1.    Dr. Leo's testimony confirmed the effectiveness of Ms. Mojaddidi's efforts to challenge the reliability of Hayat's confession and revealed his own work to be unreliable and unhelpful to a jury.**

After discussing his training and research on direct examination, Dr. Leo described what he claimed are risk factors that correlate to the possibility of false confessions.  (Tr. 26:11-39:9).  He went on to identify whether certain of those purported risk factors were present in Hayat's video-recorded confession.  (Id. at 53:13-73:14).  He summarized his testimony by noting that he believed that there was

---

[94] Hayat relies on Mr. Weinberg's parroting of his legal claims to argue that "every competent attorney knows that one of the best ways to attack a false confession is with expert testimony on the possibility of false confessions." (OPHB at 78).  Of course, Mr. Weinberg's testimony about what "best" practices might be do not illuminate the Strickland analysis, which evaluates whether particular decisions were within the broad range of effective representation.  See Waters, 46 F.3d at 1512 ("The test [of effective counsel] has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.").  Mr. Weinberg's unreliable opinion on this question, like the other areas in which Hayat attempts to use his testimony to replace the applicable legal standard, is irrelevant.

a false evidence ploy, inducement regarding leniency / threat of worse consequences, and sleep deprivation.  (Id. at 72:22-73:11).

On cross-examination, Dr. Leo answered questions about his background and credentials.  He admitted that the "overwhelming majority" of the cases he listed on his 56-page curriculum vitae cited to articles he had written or co-written and did not affirm his conclusions in any particular case, including the three citations by the United States Supreme Court.  (Tr. 76:1-78:18, 99:14-101:19).  He also admitted that he did not compile the list or review it for accuracy.  (Id.)  He admitted that only 10% of his appearances as a witness were in federal court, and that he was paid $250 per hour to testify on Hayat's behalf.  (Id. at 79:8-80:11).  Dr. Leo also conceded that although he earned a law degree, he has never practiced law, and had only observed legal proceedings.  (Id. at 89:12-19).

Dr. Leo discussed the goals of his testimony in a given case.  He testified he viewed his role as working to give jurors a "framework" and "specific context" in which to undertake their deliberations about the reliability of a defendant's statement.  (Id. at 82:5-83:12).  He explained that he worked to help people understand that false confessions happen and consider their internal bias against the belief that innocent people do not falsely confess to crimes.  (Id. at 82:12-20).  He also admitted that he viewed the purpose of his testimony as helping "effect the jurors' review of a particular…defendant's statement." (Id. at 83:3-12).

Dr. Leo also answered questions about the substance of his evaluation of Hayat's interrogation on cross-examination.  He agreed that nearly all of the factors about which Wedick planned to testify, (and which Wedick listed in his pretrial expert disclosure), were among the factors he typically considered as relevant to his evaluation of purported risk factors present in an interrogation.  Those co-extensive factors included age, intelligence, level of education, mental handicap, language barrier, health, marriage and/or family status, employment status, inexperience with the criminal justice system, use of leading questions, insufficient open-ended questions, and contamination.  (Compare Tr. 84:6-89:9 with Gov. Sup. Ans. Ex. 18 at 8).  Dr. Leo also conceded the truism that there is nothing illegal or immoral about law enforcement officers' use during interrogations of the techniques he characterized as risk factors for producing an unreliable confession.  (Id. at 80:12-81:6).

However, Dr. Leo's most important admission was his concession that his research predicts no

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

174

outcome in any case in which all, some, or none of the purported risk factors he identified are present during an interrogation. (Id. at 107:17-108:17, 102:7-15). He conceded that *all* of the so-called risk factors he identified could be present in an interrogation and the resulting confession could nevertheless be true. (Id. at 102:2-22). He also conceded that *none* of the risk factors he identified could be present in an interrogation and the resulting confession could be false. (Id. at 108:2-10). Moreover, Dr. Leo conceded the correlation between the presence of those risk factors and a false confession has not been subjected to direct testing beyond academic laboratory experiments involving role-playing volunteers, and that he had never conducted any research on that correlation. (Id. at 107:3-16, 102:2-6).

Dr. Leo also conceded that calling him or an expert like him at trial is not the only effective method of challenging the reliability of a confession. (Id. at 90:23-91:4). He agreed that a lawyer could question interrogators about their training and techniques to challenge the reliability of a confession. (Id. at 91:2-94:4). He conceded that a long list of potential direct or cross-examination questions could be effective in challenging the reliability of a confession.

Specifically, he agreed a lawyer could question interrogators on the use of leading questions to challenge the reliability of a confession. (Id. at 91:8-11). He agreed a lawyer could question interrogators on the use of ruses and evidence ploys to challenge the reliability of a confession. (Id. at 91:12-16). He agreed a lawyer could question interrogators about their training to challenge the reliability of a confession. (Id. at 91:19-22). He agreed a lawyer could question interrogators about inconsistent answers a subject gave during an interrogation to challenge the reliability of a confession. (Id. at 91:23-92:1). He agreed that, to challenge the reliability of a confession, a lawyer could question interrogators about whether other investigative work confirmed any incriminating statements. (Id. at 92:2-5). He agreed a lawyer could also question interrogators to show that a subject answered questions with prefatory statements like, "I'll say," or, "I guess," to challenge the reliability of a confession. (Id. at 92:12-16). He agreed a lawyer could also question interrogators about a subject's complaints of having a headache or being tired to challenge the reliability of a confession. (Id. at 92:17-22).

Dr. Leo also admitted that courts have rejected and criticized his methodology. Specifically, he conceded that the Supreme Court of Michigan called the methodology and application of his research and the basis of his conclusions into question in People v. Kowalski, 821 N.W.2d 14, 31-32 (Mich.

2012). (Tr. 95:2-97:20). He conceded the Michigan Supreme Court affirmed findings that his methodology was "unreliable at every stage[,]" the underlying data "were prone to inaccuracy or bias and, in nearly all instances, had not been subjected to the rigorous standards of scientific peer-review," and that his unreliable methodology "resulted in conclusions consistent with Leo's own preconceived beliefs rather than testable results consistent with an objective, scientific process." (Tr. 96:3-97:20). Notably, Dr. Leo testified that in the wake of the Michigan Supreme Court's harsh criticism of his work, he did nothing to adjust his methodology, data collection, or any other aspect of his work. (97:21-98:10). Instead, Dr. Leo simply declared that the Michigan Supreme Court and the lower courts it affirmed were "wrong." (Id.) Dr. Leo conceded that other courts have also rejected his conclusions and excluded his testimony. (Tr. 98:11-100:12).

### 2. Ms. Mojaddidi's efforts to challenge the reliability of Hayat's confession were effective.

The techniques Ms. Mojaddidi deployed in her vigorous direct and cross-examinations during Hayat's trial were effective methods of challenging the reliability of Hayat's confession. See Hayat, 710 F.3d at 903 (finding in considering whether the court erred by excluding Wedick that "Hayat's counsel thoroughly explored the conduct of the agents who participated in [his] interview, including the improper use of leading questions, during her cross-examination of those agents," and jurors "could see for themselves whether Hayat appeared tired, isolated, or naive during the videotaped interview sessions."). It would have been wholly reasonable for a competent attorney to elect not to present Wedick or any alternative expert testimony concerning the phenomenon of false confessions in this case. See Harrington, 562 U.S. at 108 ("Even if it had been apparent that expert blood testimony could support [the defendant's] defense, it would be reasonable to conclude that a competent attorney might elect not to use it."). Ms. Mojaddidi's effort to plan and execute effective direct and cross-examinations of Hayat's interrogators, and to call Wedick to provide a framework though which the jury could evaluate the techniques that elicited Hayat's confession, exceeded the Strickland standard of competent representation. She was not ineffective because the District Court disagreed with her about whether Wedick's testimony would assist the jury.

First, as explained above, Ms. Mojaddidi elected to play the entire, four-hours of videotape of

Hayat's confession for jurors. (RT 713:10-718:20, 750:2-752:3, 757:4-21). That decision provided a foundation for her to weave together concessions she elicited from his FBI interrogators with her effective arguments assailing the reliability of Hayat's confession. Even without Wedick's testimony, Ms. Mojaddidi knew she would be able to – and ultimately did – present a full record of the circumstances of Hayat's various interviews by the FBI, including a trove of helpful testimony to advance the defense theory that Hayat's confession was not reliable. See Crane v. Kentucky, 476 U.S. 683, 690 (1986) (noting playing of full confession allows defense to attack reliability of confession). Wedick's testimony may have enhanced that approach but was only a supplement to her baseline approach, which, on its own, was effective.

Second, by the time of Hayat's trial, numerous federal and state courts had held that when the full circumstances of a confession are in the record for examination by the jury, expert testimony about the phenomenon of false confessions, even from a qualified expert, may properly be excluded because it would usurp the jury's function in making credibility findings and because of its minimal probative value and substantial improper prejudicial value. See United States v. Miller, 874 F.2d 1255, 1266 (9th Cir. 1989) (affirming exclusion of testimony by a psychology professor regarding purported false admissions as unhelpful); United States v. Adams, 271 F.3d 1236, 1245-46 (10th Cir. 2001) (affirming exclusion of psychologist's expert testimony on false confession because it "necessarily touches upon witness credibility, invades the province of the jury and exceeds the scope of the witness's expertise."); Ritt v. Dingle, 142 F.Supp.2d 1142, 1145 (D. Minn. 2001) (affirming exclusion of psychologist's expert testimony on false confessions concerning law enforcement agent's interrogation technique because petitioner "was allowed to present the jury a videotape of her interrogation by [a police detective,] which showed the circumstances of her confession."); State v. Ritt, 599 N.W.2d 802, 812 (Minn. 1999) (holding that a psychologist's expert testimony about potential coercive effect of a detective's interrogation techniques during a videotaped interview was not helpful when jury had sufficient information to evaluate whether interrogation technique was coercive enough to make an ordinary innocent person confess).

In sum, given the state of the law and the basis offered by the Court in excluding Wedick's testimony (not Hayat's re-writing of that basis), it was reasonable for Ms. Mojaddidi to conclude, as a

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS
177

matter of strategy and tactics, that it was not worthwhile to spend additional time to seek and present the type of general false confession testimony described by Dr. Leo, especially given the very real possibility that it, too, might have been excluded, as in the above-cited examples.[95]  Instead, Ms. Mojaddidi took advantage of the ample opportunities to challenge the reliability of Hayat's confession through direct and cross-examination, and argument.  Her fruitful effort, demonstrates why, on the facts of this case, any competent counsel might have reasonably elected not to utilize the testimony of an alternative expert witness to assail the reliability of Hayat's confession.

### 3. Ms. Mojaddidi Did Not Act Based on Ignorance of the Law and This is Not a Situation in Which Any Competent Counsel Necessarily Would Have Retained a False Confessions Expert

Hayat alleges that Ms. Mojaddidi's attempt to have Wedick testify about false confessions can be traced both to Mr. Griffin's control over the case and its finances, and to Ms. Mojaddidi's "tragic inexperience."  (OPHB at 79-80).  Hayat offers no proof to substantiate this broad allegation and the record fails to support it.  Ms. Mojaddidi believed that Wedick would be qualified to offer an expert opinion concerning the defense theory of Hayat's purportedly unreliable confession.  (W.M. Depo. 70:21-23, 71:5-7, 208:16-17, 286:4-6).  Ms. Mojaddidi and Mr. Griffin[96] opposed the government's

---

[95] Hayat states in conclusory fashion that "it was essential that Ms. Mojaddidi locate and retain a qualified false confession expert."  (OPHB at 68).  This ignores the basis for Wedick's exclusion and cases specifically excluding psychologists and psychiatrists, including Dr. Leo himself.  See Vent v. State, 67 P.3d 661, 670 (Alaska Ct. App. 2003) (affirming exclusion of Dr. Leo's expert testimony as unreliable and an invasion of the province of the jury); State v. Cobb, 43 P.3d 855, 869 (Kan. Ct. App. 2002) (affirming exclusion of Dr. Leo's expert testimony because it "invades the province of the jury"); State v. Free, 351 N.J.Super. 203, 798 A.2d 83, 95-96 (App. Div. 2002) (holding that trial court abused its discretion in admitting expert testimony on false confessions and interrogation techniques because it was it was of no assistance to the jury, and the jury would recognize that coercive methods have the potential for causing a false confession); State v. Davis, 32 S.W.3d 603 (Mo. App. 2000) (affirming exclusion of Dr. Leo's expert testimony, finding his testimony was "specific credibility testimony that encroaches upon the jury's duty to determine the reliability of defendant's statement," and noting adequate cross-examination); People v. Gilliam, 670 N.E.2d 606, 619 (Ill. 1996) (affirming limitation of psychologist's expert testimony on false confession when the jury heard testimony of other witnesses and because false confessions are "not a concept beyond the understanding of ordinary citizens"); State v. Tellier, 526 A.2d 941, 943-44 (Me. 1987) (affirming exclusion of expert testimony on false confessions "because its probative value was substantially outweighed by the danger of confusing the issues and of misleading the jury").

[96] Mr. Griffin argued the motion on behalf of both defendants.  (RT 3515:-3552:21).  Notably, Mr. Griffin's client, Umer, similarly confessed on videotape and Mr. Griffin made the same strategic choice to attempt to use Mr. Wedick to undermine the impact of the confessions.  Given the alignment of their client's interests on this issue, it cannot reasonably be argued that these choices were the result of a conflict between Umer and Hamid Hayat.  At the 2018 hearing, Wedick implied that since the Hayat trial, he has been qualified as an expert witness

challenge to the admissibility of Wedick's testimony and made clear that the defense understood the relevant law in this area.  (See CR 271).  That the Court disagreed and excluded Wedick's testimony does not prove Ms. Mojaddidi was ignorant and deficient.  At the time of trial, a number of other courts had excluded false confession expert testimony – especially when, as in this case, the confession was videotaped – because such testimony simply did not aid a trier of fact.  Nevertheless, defense counsel in this case dutifully attempted to persuade the Court to exercise its discretion to admit Wedick's false confession testimony.  The failure of that effort to win an uphill legal battle cannot be fairly branded a product of ignorance or incompetence.

Hayat also contends that Ms. Mojaddidi should have "aggressively attacked" the "validity" of Hayat's confessions.  (OPHB at 75).  He cites to a concurrence by Judge Hawkins,[97] ignoring the case law that suggests that it is difficult to admit false confession testimony.  See United States v. Redlightning, 624 F.3d 1090, 1110-15 (9th Cir. 2010) (extensively discussing and affirming district court's exclusion of false confessions expert); United States v. Antone, 412 Fed. Appx. 10, 10 (9th Cir. 2011) (affirming exclusion of false confessions expert); United States v. Benally, 541 F.3d 990, 994-96 (10th Cir. 2008) (affirming exclusion of false confessions expert because it would usurp a critical function of the jury). His argument ignores the law, which makes clear that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way."  See Harrington, 562 U.S. at 106.  "Rare are the situations in which the 'wide latitude counsel must have in making [strategic or] tactical decisions' will be limited to any one technique or approach."  Id. at 106.

Here, the record establishes that Ms. Mojaddidi chose a reasonable technique to challenge the reliability of Hayat's confession.  When Wedick's testimony was excluded during trial, Ms. Mojaddidi focused her efforts on challenging the reliability of Hayat's confession with vigorous cross-examination of his FBI interrogators and powerful argument in closing.  She made a strategic and tactical choice to avoid distraction and potential delay by seeking an alternative expert, whose opinion would have been

concerning interrogation techniques.  (See Tr. 593:4-12).

[97] The dicta concerning the false confessions expert in the main opinion of Lunbery v. Hornbeak, 605 F.3d 754,760 (9th Cir. 2010) cites to the Ninth Circuit's en banc opinion in Richter v. Hickman, which was later unanimously reversed by the Supreme Court in Harrington v. Richter, 562 U.S. at 91 ("That judicial disregard is inherent in the opinion of the Court of Appeals for the Ninth Circuit here under review…. This was clear error.").

vulnerable to exclusion for discovery violations, see Fed. R. Civ. P. 16(b)(1)(B) & (C), and for the same reasons the Court excluded Wedick's testimony, namely: that it would not assist the jury in understanding the evidence, which included a videotape of Hayat's interviews. Hayat has failed to overcome the strong presumption that Ms. Mojaddidi's conduct fell within the wide range of competent representation. His claim must fail.

## C.     Hayat Has Not Established Prejudice as a Result of Ms. Mojaddidi's Purported Failure to Admit Testimony of a False Confession Expert

Even if Ms. Mojaddidi's purported failure procure an alternative false confessions expert to testify about the phenomenon of false confessions was somehow defective, Hayat cannot demonstrate a substantial likelihood of a different outcome and his claim must fail.

First, as described above, Ms. Mojaddidi elicited substantial evidence from a variety of witnesses to support her argument that Hayat's confession was unreliable, including testimony concerning: (i) Hayat's initial, persistent denials; (ii) agents' use of leading questions; (iii) Hayat's conflicting answers about camp location, his manner of travel, when he attended camp, how long he attended camp, how many others attended camp, the duration and composition of training; (iv) answers from Hayat that agents found unbelievable; (v) that Hayat complained of being tired, jet-lagged, having a headache, and that his mind "was not working"; (vi) that interrogators grew frustrated with Hayat and told him several times that his answers did not make sense; and (vii) that interrogators never told Hayat he was free to go home during the interview. Ms. Mojaddidi relied on that evidence to zealously argue in her closing that Hayat's confession was unreliable. (RT 4308:5-4320:17). The additional background testimony of an expert witness would not have meaningfully enhanced the jurors' common-sense evaluation of the circumstances of Hayat's confession or their conclusions about its credibility.

Second, Dr. Leo's proposed expert testimony regarding the phenomenon of false confessions would likely have been excluded for the same reason the Court excluded Wedick's testimony, namely that it would not assist the jury in understanding the evidence, which included a videotape of Hayat's interviews. Indeed, Dr. Leo's testimony would have addressed nearly all of the same factors about which Wedick planned to testify. (Compare Tr. 84:6-89:9 with Gov. Sup. Ans. Ex. 18 at 8). Dr. Leo also conceded that there is nothing illegal or immoral about investigators deploying the interview

techniques Dr. Leo characterized as risk factors.  (Tr. 80:12-81:6).

Moreover, Dr. Leo conceded the unhelpfulness of his research, which predicts no outcome in any case in which all, some, or none of the his risk factors are present.  (Id. at 107:17-108:17, 102:7-15).  He admitted that all of the so-called risk factors could be present and the resulting confession could still be true, and that none of the risk factors could be present and the resulting confession could be false.  (Id. at 102:2-22, 108:2-10).  Dr. Leo also conceded the correlation between the presence of those risk factors and a false confession has not been subjected to direct testing beyond academic laboratory experiments involving role-playing volunteers, and that he had never conducted any research on that correlation.  (Id. at 107:3-16, 102:2-6).  Dr. Leo also conceded that calling him or an expert like him at trial is not the only effective method of challenging the reliability of a confession, and agreed that a lawyer could question interrogators about their training and techniques to challenge the reliability of a confession.  (Id. at 90:23-94:4).

Finally, Dr. Leo also admitted that he did nothing to revise his methodology, data collection, or any other aspect of his work, after the Supreme Court of Michigan found and affirmed findings by lower courts in People v. Kowalski, 821 N.W.2d at 31-32, that his methodology was "unreliable at every stage[,]" the underlying data "were prone to inaccuracy or bias and, in nearly all instances, had not been subjected to the rigorous standards of scientific peer-review," and that his unreliable methodology "resulted in conclusions consistent with Leo's own preconceived beliefs rather than testable results consistent with an objective, scientific process."  (Tr. 95:2-98:10).

Additionally, as described above, at the time of Hayat's trial numerous courts had already recognized that general expert testimony about the phenomenon of false confessions, even from a qualified expert, was subject to exclusion because the testimony would usurp the jury's function in making credibility findings and because of its minimal probative value and substantial improper prejudicial effect.  Since then, courts including the Ninth Circuit have reached similar conclusions.  See Antone, 412 Fed.Appx. at 10 (holding that although expert testimony regarding false confessions met the Daubert reliability test, the district court properly excluded it because of the danger that it would usurp the jury's function of resolving the credibility of the witnesses); see also Loza v. Mitchell, 766 F.3d 466, 485 (6th Cir. 2014) (affirming exclusion of false confession expert during guilt phase because

the defendant presented other evidence on the credibility of his confession, jury viewed defendant's videotaped confession and observed the "tone and manner of the interrogation, the number of officers present, the physical characteristics of the room, and the length of the interrogation."); Benally, 541 F.3d at 994-95 (affirming exclusion of false confession expert because its prejudicial effect substantially outweighed its probative value, the testimony would encroach upon jury's credibility evaluation, and because expert did not examine defendant and did not "identify a medical condition that contributed to his decision to confess").

Dr. Leo's proposed testimony, which is little more than his opinion on Hayat's credibility, is exactly the type of testimony courts have excluded because it usurps the jury's exclusive duty to make credibility determinations and because of its minimal probative value and substantial improper prejudicial value. See Adams, 271 F.3d at 1245-46 (affirming exclusion false confession psychologist because it "necessarily touches upon witness credibility, invades the province of the jury and exceeds the scope of the witness's expertise"); see also Commonwealth of Pennsylvania v. Alicia, 92 A.3d 753 (Pa. 2014) (holding that "expert testimony such as the proposed testimony of Dr. [Richard A.] Leo constitutes an impermissible invasion of the jury's role as the exclusive arbiter of credibility" and "the matter of whether [a defendant's] confession is false is best left to the jury's common sense and life experience, [after proper development of the particular circumstances in which confession was elicited] using the traditional and time-honored techniques of cross-examination and argument."); Kowalski, 821 N.W.2d at 31-32 (affirming exclusion of expert false confession testimony of Dr. Leo because its prejudicial effect substantially outweighed its probative value).

Accordingly, even if Ms. Mojaddidi's proffer of Wedick as an expert witness was somehow defective, Hayat cannot show that the Court would have permitted any other expert, including Dr. Leo, to testify and, if so, that the testimony of such an alternative expert would have caused the jury to reach a different outcome. See David A. Perez, Comment, The (In)Admissibility of False Confession Expert Testimony, 26 Touro Law Review 23, 59 (2010) (surveying law concerning expert testimony on false confessions and observing that "there is no need for expert testimony that tells the jury what it already knows" because "[a]s it stands, most jurors have a nuanced understanding that false confessions occur, but only rarely. An expert witness that simply repeats this fact is not 'assisting the trier of fact.'").

Therefore, Hayat's claim must fail.

**XII.   MS. MOJADDIDI DID NOT PROVIDE INEFFECTIVE ASSISTANCE BY DECIDING NOT TO OBTAIN A SECURITY CLEARANCE BECAUSE SUCH A CLEARANCE WOULD NOT HAVE ENHANCED HAYAT'S DEFENSE, AND HAYAT CANNOT ESTABLISH PREJUDICE (CLAIM 4 / OPHB VI)**

Hayat claims Ms. Mojaddidi was ineffective for failing to obtain a security clearance in a prosecution that involved classified information. (Pet. at 41-49; OPHB at 80-97). Ms. Mojaddidi's decision was entirely reasonable and strategic. Under the procedures established in the Classified Information Procedures Act ("CIPA") and the applicable case law, a defense attorney's involvement in the litigation is often limited. This is especially true in the discovery phase of a case involving classified information. Rather than submit to the months-long delay associated with obtaining a clearance and surrender what she believed to be a strategic advantage in the case, Ms. Mojaddidi agreed to stipulate to the admission of the satellite images, waive her presence at CIPA proceedings in the case, and press the government for a speedy trial on evidence that she considered weak and that she did not want to permit the government additional time to strengthen. Hayat explicitly endorsed this strategy and signed the stipulation. Ms. Mojaddidi's decision not to seek clearance was reasonable because even cleared defense counsel's role in CIPA proceedings is often limited under the statute and case law.

Post-hearing, Hayat contends that this Court should simply adopt the opinions of Mr. Cline, rather than applying the legal standard set forth in Strickland. (OPHB at 86-97) (relying on Mr. Cline's opinions, stating conclusion that actions ineffective under Strickland, and arguing for cumulative error). Despite Mr. Cline's opinions, this Court must still apply, and Hayat must still overcome, "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." 466 U.S. at 689. The standard remains "not whether another lawyer, with the benefit of hindsight, would have acted differently, but 'whether counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment.'" Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998) (quoting Strickland, 466 U.S. at 687). Hayat claims that he need not show that Ms. Mojaddidi's decision not to obtain a security clearance prejudiced him because he alleges her decision was the result of a conflict of interest. (Pet. at 46; OPHB at 92-93). As established above, Hayat has not presented any evidence to carry his burden to show that Ms. Mojaddidi operated under an

actual conflict of interest.  Even if he did establish a conflict that rendered his counsel ineffective, he must allege some adverse effect resulting from this purported misstep by his trial counsel.  There is no possible prejudice or adverse effect regarding the security clearance, therefore, this Court should deny claim 4 as a ground for relief.

### A.   Ms. Mojaddidi Understood, and the Court Correctly Applied, the CIPA Procedures.

Hayat's bare speculation that information helpful to his defense could have been excluded by CIPA proceedings betrays ignorance of the most basic features of CIPA.  CIPA does not modify the government's discovery obligations.  See United States v. Johnson, 139 F.3d 1359, 1365 reh'g and suggestion for reh'g en banc denied (11th Cir. 1998), 149 F.3d 197, cert. denied, 527 U.S. 1021 (1991); United States v. Baptista-Rodriguez, 17 F.3d 1354, 1364 (11th Cir. 1994); United States v. Yunis, 867 F.2d 617, 623 (D.C. Cir. 1989) (CIPA "creates no new rights of or limits on discovery"); United States v. Varca, 896 F.2d 900, 905 (5th Cir. 1990) ("CIPA was not [] intended to expand the traditional rules of discovery under which the government is not required to provide criminal defendants with information that is neither exculpatory nor, in some way, helpful to the defense.") (Tr. 253:6-254:3).  CIPA Section 4 permits the government to delete from discovery information that is not relevant and helpful to the defense.  18 U.S.C. App. 3 § 4 (1980); See also Yunis, 867 F.2d at 623; Klimavicius-Viloria, 144 F.3d at 1261.  It also allows information to be disclosed in a substituted form, or summarized.  18 U.S.C. App. 3 § 6(c)(1); (Tr. 264:6-16; 275:21-277:1).  Deletion, substitution, and summarization commonly occur in national security cases, so that the government may provide any discoverable information to the defense in an unclassified form that can be more easily shared with the defendant and used to impeach a witness at trial.  Baptista-Rodriguez, 17 F.3d at 1363-64.  Neither CIPA, nor any other law, allows the government to refuse to provide exculpatory information to the defense because that information is classified.  Id. at 1364.  To the contrary, information can only be deleted from discovery when it is irrelevant or unhelpful to the defense.  See Yunis, 867 F.2d at 623-24.  Any deletion, substitution, or summary which occurred in this case pursuant to CIPA Section 4 would have been submitted to the trial court for the trial judge's review and approval.  See id.; see also 18 U.S.C. App. 3 § 4 and (6)(c)(1).

Although Hayat has repeatedly quoted the trial judge's initial observation that he found the decisions by both counsel to elect not to pursue security clearances before trial "incredible," (Def. Ex.

EEE.5 at 8), at the time the Court offered that opinion, government counsel had not fully briefed and set forth the CIPA process for the Court.  (See CR 684 at 8:1-16).  It is not always desirable or sensible for defense counsel to obtain a security clearance in every case that might implicate classified material.  See In re Terrorist Bombings, 552 F.3d 93 (2d Cir. 2008) (classified information passed to cleared counsel could not be shared with the defendant or used directly in open court without further proceedings).  Indeed, classified discovery passed to cleared defense counsel cannot be shared with a client, which may create tension and difficulty in certain instances.  It has become relatively common practice to use CIPA to substitute or summarize classified information in an unclassified form and pass that information to defense counsel so that it can be readily shared with the client, used to impeach a witness, and for other litigation purposes.  See United States v. Baptista-Rodriguez, 17 F.3d 1354, 1363-64 (11th Cir. 1994) (Tr. 258:16-25, 262:14-25, 264:6-11, 293:11-17).  This practice is contemplated by the provisions of CIPA to honor the defendant's right to discovery of relevant information while protecting the national security interests of the United States that would be jeopardized by the unauthorized disclosure of classified information.  See 18 U.S.C. App. 3, §§ 4, 5, 6, 8.  Such summaries and substitutions were provided to defense counsel in this case.  (Tr. 286:4-288:1).

> **1.  Mr. Cline's testimony specifically confirms Ms. Mojaddidi's understanding that the government could present classified material to the District Court in ex parte proceedings, and the Court could order any exculpatory or helpful material to be disclosed through substitutions or unclassified summaries as happened in this case.**

Mr. Cline testified that CIPA confers no benefits to defense counsel.  (Tr. at 252:4-7).  The only possible benefit to a criminal defendant are to obtain some concessions and possible sanctions from the government.  (Tr. 252:8-12).  CIPA makes no substantive changes to the rules of evidence, to the government's discovery obligations, and courts have required a heightened showing for defense counsel to obtain discovery in CIPA cases. (Tr. at 253:6-254:3).  Discovery sanctions are available only in the event that the court determines that classified information is relevant or exculpatory, that there is no adequate, unclassified substitution for the classified information, and the government decides not to declassify or provide access to the classified information.  (Tr. at 259:11-19, 260:7-12, 264:6-265:3).

Mr. Cline testified that Section 4 is generally an *ex parte* proceeding where the government presents classified information to the court for a judicial determination of relevance or exculpatory

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

185

value, and court approval for unclassified substitutions for relevant or exculpatory classified information. (Tr. 262:14-25, 264:6-16; 285:2-286:3, 286:9-13). Even defense counsel with a security clearance are not allowed to participate. (Tr: 263:1-7). Mr. Cline acknowledged that the government proceeded under Section 4 in this case. (Tr. 264:6-16; 285:2-286:3, 286:9-13). Mr. Cline also acknowledged that obtaining a security clearance is "a cumbersome process" that "can be as long as several months." (Tr. 252:15-253:4; 261:1-20).[98] Finally, Mr. Cline recognized, and understood, that the government took the time to do a search, obtain information from the various agencies under Rule 16 and pursuant to Ms. Mojaddidi's discovery requests, and used Section 4 to discharge their discovery obligations. (Tr. 286:4-288:1). This eliminated the need for a security clearance to conduct discovery pursuant to Rule 17. (Tr. 287:8-288:1).

**2.    Ms. Mojaddidi's actual litigation in this case establishes that she was effective in her handling of CIPA issues even without a clearance.**

Ms. Mojaddidi testified that she read the Classified Information Procedures Act and correctly understood that the government's obligation to provide exculpatory information would not be changed or reduced simply because CIPA motions were being filed in the case. (W.M. Depo. 210:13-20). She also correctly understood that there was only one item implicating classified information that the government intended to present at trial, and that she herself had no classified information to present at trial. (Def. Ex. EEE.5 at 9-11, 16; W.M. Depo. 214:12-24, 218:7-20; Tr. 741:24-742:9). Ms. Mojaddidi also recalled visiting FBI offices to examine certain images [satellite images depicting militant camps in the Balakot area]. (W.M. Depo. 214:12-15). Ms. Mojaddidi also correctly stated that the ex parte process under CIPA Section 4 for the government to seek court approval for unclassified substitutions as

---

[98] Mr. Cline testified extensively about Section 5 proceedings, that allow for the defense to file ex parte notice of classified information that it reasonably expects to disclose. (Tr. 255:12-257:17). Specifically, in order to file a Section 5 notice, the defense would have to have the defendant disclose classified information to his lawyer (usually in a SCIF), or inferring that classified information exists and speculatively filing a notice. (Tr. 256:11-257:1). In this case, there is no evidence that Hayat ever had access to classified information that he wished to disclose at trial, or that he was in a similar situation to Mr. Cline's client in the Holy Land Foundation case. (Tr. 285:2-286:3, 288:24-289:19). In fact, Hayat fails to even argue that Ms. Mojaddidi was ineffective because of anything having to do with Section 5. (OPHB at 80-97). Hayat does note in a footnote that Ms. Mojaddidi did not file a notice of intent to introduce evidence *that her client never had access to, and that Judge Burrell never ordered the government to disclose in a classified form*, completely contrary to the narrow circumstances a Section 5 notice would be appropriate in an outsider case as outlined by Mr. Cline. (OPHB at 89 n. 31).

one of the main reasons she thought a security clearance was not necessary.  (Tr. at 750:19-751:7).  In a December 16, 2005 letter, government counsel reminded Ms. Mojaddidi that government counsel possessed and had shown that evidence to Ms. Mojaddidi, intended to offer it at as evidence at trial, and intended to establish a foundation for the evidence in a Section 6 CIPA hearing for classified information.  (See Def. Ex. 00).  Ms. Mojaddidi considered the images weak evidence.  (W.M. Depo. 214:25-215:6).  The government provided Ms. Mojaddidi in discovery with the coordinates of the camp depicted in the satellite image.  (Id. at 258:11-259:6).  Ms. Mojaddidi was able to use Google Earth to verify that the structures in the image did, in fact, exist at the coordinates provided by the government.  (Id. at 177:22-178:5, 259:10-21; Tr. 767:5-768:3).

The speculative and counter-factual nature of Hayat's arguments are demonstrated by the reliance on Mr. Cline's opinion that the Court cannot make determinations whether classified information is relevant or exculpatory without a presentation by the defense.  (OPHB at 88, 91-92).  As Ms. Mojaddidi testified, Judge Burrell was well aware that Hayat's defense was that he never went to a camp.  (Tr. 751:13-25 ("Well, I thought that the allegation was pretty straightforward. He attended a camp, that was the allegation.  If there was any evidence that would show that he didn't attend the camp, then that would be exculpatory. So, I think Judge Burrell should have been able to make that assessment pretty easily with the nature of the charges."), 755:9-20).  The argument that Ms. Mojaddidi waived Hayat's right to argue for disclosure of classified Brady material is rebutted by the government's use of Section 4 and 6, and the District Court's presumed ability to make such determinations.  (Tr. 285:2-286:3, 286:9-13; CR 684 at 10:14-28).  The alleged of the waiver of "the right of the defense to participate in Section 8 hearings at trial" was not actually the language of the stipulation, and rebutted by the fact that neither the government, nor the Court actually requested a Section 8 proceeding.  (OPHB at 91; (Tr. at 297:10-298:25 (Mr. Cline misremembering that at least one Section 8 type hearing that was held, but unable to recall circumstances because it didn't happen)).

### 3. Both Umer and Hamid Hayat stipulated and endorsed the decision not to seek clearance.

At no point before, during, or after trial, did the district court order the government to disclose

classified information that would have required defense counsel to have a clearance to review and analyze.  (Tr. 288:5-15, 289:16-19).  The district court was presumably aware that CIPA does not affect discovery standards when it made its rulings under Section 4 and Section 6.  (Tr. 285:9-286:3, 9-13).  To the extent that Hayat claims that no CIPA protective order was in place, or that a court security officer was not appointed, those claims are patently false and either side may move for these actions.  (CR 126, 127, 128, 169, 170, 171, 177, 184).

Ms. Mojaddidi and her client ultimately agreed to stipulate to the foundation for the satellite images, (CR 180-183), and to stipulate that Ms. Mojaddidi and Mr. Griffin would not participate in any ex parte and in camera CIPA hearings that might arise during trial.  (CR 179).[99]  The latter stipulation stated, among other things, that:

> Counsel for the defense presently do not have security clearances and, as such, cannot participate in any proceedings involving classified information.  Defense counsel have fully discussed this issue with defendants, including the likelihood, if any, that such in camera proceedings will become necessary, advantages and disadvantages of counsel obtaining clearances, and advantages and disadvantages of counsel participating in any such proceedings.  As a matter of strategy, defendants, with the advi[c]e and consent of their counsel, have concluded that: it is in their best interests to proceed to trial at present, they do not wish to have cleared defense counsel, and they do not wish to participate, through their counsel, in any in camera proceedings that may be necessary under the Classified Information Procedures Act.  Defendants, with the advi[c]e and consent of counsel, specifically agree that, as necessary, the government may participate, ex parte, in any in camera proceedings that may be necessary during trial under the Classified Information Procedures Act.

(CR 179; W.M. Depo. 216:1-221:2).  The Court went through an extensive colloquy with the defendants to make sure that they understood what they were stipulating to, and that the stipulation was knowing, intelligent, and voluntary.  (Gov. Sup. Ans. Ex 23, RT 9:6-32:8).

Ms. Mojaddidi knew, in general, that there were circumstances under which classified Brady information could be declassified and produced to the defense as part of discovery.  (W.M. Depo. 55:2-56:22; Tr. 750:19-751:7).  She testified that was one of the primary reasons why she and Mr. Griffin did not seek to obtain security clearances.  (W.M. Depo. at 56:18-22, 218:2-5; Tr. 750:19-751:7).  Mr. Griffin believed, and Ms. Mojaddidi agreed, that they did not need clearances "to proceed."  (W.M.

---

[99] Mr. Cline testified that capabilities, sources, and methods of intelligence gathering (essentially foundation) can be substituted in CIPA cases.  (Tr. 293:11-17).

Depo. at 57:9-20).  Ms. Mojaddidi believed that obtaining security clearances "was an extensive process" that "was going to cause further delays in the case," and that by raising the matter of potential CIPA proceedings, the government was merely attempting to "buy time" when there really "wasn't much classified stuff out there."  (Id. at 56:22-57:4, 218:21-219:21).

Ms. Mojaddidi did not waive her right to all CIPA evidence, did not agree to forego reliance on all classified information, and did not waive her right to exculpatory evidence that might have been classified.  (Id. at 220:21-221:17).  Ms. Mojaddidi also did not agree to waive her right to pursue any line of questioning that potentially implicated classified information.  (Id. at 221:11-14).  The stipulation was solely a waiver  of her right to participate in any *in camera* CIPA proceedings, including *in camera* argument about CIPA evidence.  (Id. at 76:24-77:4, 217:11-14, 220:21-221:17).  The stipulation did not, in any way, limit Ms. Mojaddidi's right to argue that a particular question or answer in connection with a witness or item of evidence should or should not be admitted into evidence.  (Id. at 217:2-10, 220:21-221:17).

**B.**     **Hayat cannot show prejudice.**

The record establishes that Ms. Mojaddidi's decision not to obtain a clearance in this case was considered, strategic, and well within the wide range of competent representation.  Despite Mr. Cline's conclusory opinions about what competent counsel should have done or if there is any tactical reason not to seek a clearance, Hayat has not shown how Ms. Mojaddidi was ineffective for reasonably and strategically choosing to stipulate to the admission of a single piece of clearly admissible evidence, while simultaneously pursuing the joint defense effort to pressure the government to trial on what she considered weak evidence.  Ms. Mojaddidi's decision not to seek a security clearance cannot be ineffective because CIPA explicitly contemplates that the district judge may conduct an ex parte, in camera review of the classified information to decide relevance and whether the material would be helpful to the defense.  See CIPA § 4, 18 U.S.C. app. 3 § 4 (providing for "a written statement to be inspected by the court alone."); see also Fed. R. Crim. P. 16(d)(1) (allowing for showing of good cause to modify discovery through "a written statement that the court will inspect ex parte.").  This Court has already concluded that Hayat failed to show that even with a clearance, she would have been allowed to participate in the various Section 4 and Section 6 ex parte hearings.  (CR 684 at 8:1-21).  Furthermore,

this Court found that the District Court's determinations under Section 4 would not have been different if Ms. Mojaddidi had a security clearance.  (CR 684 at 8:22-11:6).

As the Ninth Circuit stated in Klimavicius-Viloria, "[i]n a case involving classified documents, however, ex parte, in camera hearings in which government counsel participates to the exclusion of defense counsel are part of the process that the district court may use in order to decide the relevancy of the information." 144 F.3d 1249, 1261 (9th Cir. 1998), cert. denied sub nom. Payan-Solis v. United States, 528 U.S. 842 (1999) (citing Yunis, 867 F.2d at 620). "The legislative history [of CIPA] emphasizes that 'since the government is seeking to withhold classified information from the defendant, an adversary hearing with defense knowledge would defeat the very purpose of the discovery rules.'" United States v. Sarkissian, 841 F.2d 959, 965 (9th Cir. 1988) (quoting H.R.Rep. No. 831, 96th Cong., 2d Sess. 27 n. 22).  In this case, Hayat cannot show ineffectiveness or prejudice because the Ninth Circuit has "reviewed the classified material that the district court reviewed when it granted the government's motion for a protective order under CIPA, and conclude[d] that the information it contains would not have been helpful to the defense."[100]  United States v. Hayat, 710 F.3d at 900.  Having a security clearance is not a cure-all in national security cases.  See United States v. Daoud, 755 F.3d 479, 484-85 (7th Cir. 2014) (reversing district court's order for disclosure to counsel with top secret security clearance).  Therefore, even if Ms. Mojaddidi had been able to obtain a security clearance, the district court still would have been authorized to conduct an ex parte, in camera review of the classified material and entered orders accordingly and Hayat suffered no prejudice as a matter of law.[101]  Accordingly, Hayat cannot state a claim of ineffective assistance of counsel for failure to seek a security clearance, and this Court should deny claim 4.

---

[100] The Ninth Circuit's review also distinguishes this case from United States v. Sedaghaty, 728 F.3d 885, 906 (9th Cir. 2013), where on direct appeal, Ninth Circuit concluded that the substitution was inadequate.  Regardless, the Ninth Circuit affirmed the other procedural aspects of the CIPA litigation, including the *ex parte*, *in camera* review of the materials.  Id. at 908-10.

[101] Hayat's ineffectiveness / prejudice arguments based on speculation regarding participation in CIPA proceedings are speculative and contrary to the record.  Mr. Cline testified that the government presented the 2,000 documents to Judge Burrell under Section 4 and 6, eliminating any additional discovery claims.  (Compare OPHB at 93:12-17 with (Tr. 286:4-288:1)).  Furthermore, this Court has rejected Hayat's speculative argument about due process rights to challenge the *ex parte* presentations.  (Compare OPHB at 93:17-21 with CR 684 at 8:17-21).

**1.    Ms. Mojaddidi properly and effectively used the summarized and substituted evidence at trial, therefore Hayat cannot show prejudice.**

Hayat's attempts at showing prejudice by focusing on trial objections and "what Ms. Mojaddidi might have learned" are speculative and not supported by any evidence. (OPHB at 94-97). Primarily, Ms. Mojaddidi concentrated on showing that the images did not advance the government's case against Hayat and actually undermined it because Benn conceded that there was uncertainty whether the image depicted a military installation and not a militant camp. (See RT 3062:2-3063:10, 3073:20-3074:15, 4326:1-4327:24). Although ultimately unsuccessful, this strategy was entirely reasonable, as was Ms. Mojaddidi's decision not to seek a security clearance to pursue vague and speculative actions before trial. (Pet. at 47-49; OPHB at 88-91, 89 n.31). Hayat also claims that Ms. Mojaddidi failed to pursue important questions because she did not obtain a security clearance. (Pet. at 47-49; OPHB at 94-96). An inspection of the record reveals that Hayat's claims are unsupported. Ms. Mojaddidi posed two questions during her cross-examination of Benn to which the government objected, in part, based on the possibility that the question might call for classified information. (Pet. at 48-49, OPHB at 95-96). The first objectionable question was too confusing for Benn to answer and was withdrawn. (RT 3083:2-9). The second objectionable question was outside of Benn's personal knowledge but he answered it on the record before the jury. (RT 3105:10-15).

Building toward the first objectionable question, Ms. Mojaddidi initially asked Benn how many images of Balakot, Pakistan, Benn had reviewed in his career. Benn responded: "dozens." (RT 3082). Ms. Mojaddidi then asked:

> Q.    And do you recall, in reviewing those dozens of images, what your opinion was, whether or not it was possible, probable, or confirmed existence of military -- I'm sorry, militant training camps in that vicinity?
>
> [Government Counsel]: Objection. Under Rules 401 and 403. And it also may call for the disclosure of classified information.
>
> Q.    That's fine. I'll move on.

(RT 3083:2-9). Ms. Mojaddidi withdrew the confusing question before the Court could sustain the government's objection on 403 grounds. She continued to cross-examine Benn about his knowledge of

camps in Pakistan and asked Benn about whether he had actually traveled to Pakistan.  (RT 3083:24-3084:2).

Thereafter, Ms. Mojaddidi followed-up on the question and asked Benn whether most of the images Benn reviewed were formal military installations and not militant training camps.  (RT 3084:3-18).  Benn answered that he had seen up to five images of official military training camps in the vicinity of Balakot, and hundreds of images of military training camps in Pakistan overall.  (Id.)  The question was confusingly worded and, therefore, it is difficult to ascertain exactly what information Ms. Mojaddidi was seeking.  Ms. Mojaddidi's agreement to move on from a confusing, irrelevant question about terrorist activity in the Balakot area cannot have prejudiced her client, especially where it seems that any answer offered by the witness would be harmful to his case.  Moreover, in a follow-up question, Ms. Mojaddidi elicited information about the existence of military camps in the Balokot region.

The second objectionable question sought an answer outside Benn's personal knowledge.

> Q.    Okay. You, yourself, have not personally visited this location, have you?
>
> A.    That's correct, I have not.
>
> Q.    Do you -- have you spoken to anyone personally who has visited this location?
>
> A.    I have not.
>
> Q.    Do you know if anyone from the United States government has visited this location?
>
> A.    I'm not aware --
>
> [Government Counsel]: Objection. Relevance. 403. And may call for the disclosure of classified information.
>
> THE COURT: Sustained.

(RT 3105:10-15).

The Court properly sustained the government's objection to this question under FRE 401 and FRE 403 because it Benn's knowledge about whether other government officials had visited the location was irrelevant.  Mr. Cline acknowledged that the Court did not explicitly sustain the objections on CIPA

grounds, and explicitly acknowledged that one of the objections was likely sustained on foundational grounds. (Tr. 297:10-298:25). In any event, Hayat's supposition that Benn might have confirmed that there was such a visit is not supported by the record. Benn began to answer Ms. Mojaddidi's question before government counsel proffered an objection, and stated that he was "not aware" of any such visit. Benn's answer was audible to the jury and not contradicted by any other evidence presented to the jury by either party. There is no basis to support Hayat's claim that Benn would have revealed classified and somehow exculpatory information if he had completed his answer to this question (or the first objectionable question).[102] What Benn stated before the government objected is not subject to wide interpretation – "I am not aware," is not ambiguous. Moreover, Benn's answer is consistent with the common-sense conclusion that the United States would likely not risk sending personnel within the close vicinity of a terrorist militant training camp. To the extent Hayat attempts to argue, post-hearing, that his response would have lead to discovery and Brady material, that contention is misleading and contradicted by trial testimony showing that Ms. Mojaddidi knew that the government had not actually attempted to inspect the camp, and elicited that testimony during trial. (Compare OPHB at 95-96 with (RT 683:1-6, SA Aguilar; RT 3618:4-10, SA Schaaf; RT 3105:4-9, Mr. Benn)). Regardless, these speculative claims have no merit. Bragg, 242 F.3d at 1088 (ineffective assistance claim fails when petitioner did "nothing more than speculate that" witness might have given helpful information"); Dows v. Wood, 211 F.3d 480, 486 (9th Cir. 2000) (no ineffective assistance where there was no evidence that helpful witness actually existed or what witness would have testified about).

Hayat points to two other questions that Ms. Mojaddidi asked and to which the government objected on the basis of CIPA. (See Pet. at 48-49; OPHB at 94-95). While conducting her direct examination of SA Schaff, Ms. Mojaddidi asked whether SA Schaaf knew of "any other secretly recorded conversations besides those that Naseem Khan recorded of Hamid Hayat." (RT 3628:9-12). The prosecutor objected "on 401, 403 grounds, and also CIPA." (Id.) The Court observed that, as

---

[102] Hayat raises this argument in support of his unfounded claim that "Ms. Mojaddidi bestowed upon the government unfettered veto power over [Hayat's] Sixth Amendment right to confrontation," by abandoning these questions after government objections. (See Pet. at 48-49; 77 n. 46). As the record makes clear, the first question was unintelligible and unanswerable as asked but was later addressed and answered in a follow-up question. The second was answered before the government could object to its lack of relevance. Neither example supports Hayat's overstated argument.

phrased, the question potentially implicated "all of the investigations that the FBI may be engaged in," and "sustained [the objection] on 403 grounds because of the way it's worded." (RT 3628:13-3629:5). That ruling was proper because of the vastly overbroad nature of the question. Ms. Mojaddidi's lack of a security clearance was absolutely irrelevant.

Ms. Mojaddidi also asked SA Schaaf whether Hayat had been the "target of any other FBI investigation besides the investigation that led to the interviews on June 4th," to which the prosecutor interposed the "same objection."[103] (RT 3629:6-13). Ms. Mojaddidi withdrew the question. (Id.) Had she not, this question also would have been properly excluded under FRE 401 and FRE 403, as irrelevant and confusing to the jury or wasteful of the jury's time. Any other investigations that targeted Hayat, assuming their existence, were not relevant to this case, nor was there any reason to waste the jury's time or confuse them with the details of irrelevant information. Ms. Mojaddidi's lack of a security clearance was completely irrelevant to the resolution of these objections.

Hayat claims that Ms. Mojaddidi's decision not to obtain a security clearance somehow prevented her from pursuing lines of questions that would have helped Hayat's defense, citing four questions presented to two witnesses from among countless questions asked of twenty-three total witnesses during a trial that began on February 14, 2006 and was received by the jury for deliberations on April 12, 2006. (Pet. at 47-49; OPHB at 94:97). Among the four questions Hayat cites, the Court sustained objections that included CIPA as a possible basis in only two instances, and in one of those instances, the Court expressly sustained the objection on a *non*-CIPA basis. What remains is a single question to Benn, concerning whether Benn knew whether any other government officials had visited a location depicted in a map about which Benn testified. The Court sustained a government objection that included CIPA as a possible basis but only *after* Benn answered that question by stating he was "not

---

[103] Additionally, the two questions posed by Ms. Mojaddidi to SA Schaaf appear to be little more than fishing expeditions. Whether Hayat was the subject of any other investigations known by SA Schaaf was irrelevant. Likewise, Ms. Mojaddidi's question about whether SA Schaaf was aware of other recorded conversations concerning Hayat was irrelevant because she would have been entitled to and already had received such information under Rule 16 and the government's other discovery obligations, unless the district court specifically found such material irrelevant or unhelpful to the defense pursuant to a CIPA Section 4 motion, and ordered the information deleted. In that case, such material would not have been exculpatory. See Varca, 896 F.2d at 905 ("CIPA was not [] intended to expand the traditional rules of discovery under which the government is not required to provide criminal defendants with information that is neither exculpatory nor, in some way, helpful to the defense.").

aware" of any such visit.

On that meager basis, Hayat argues this Court should find Ms. Mojaddidi ineffective and vacate his conviction.   (Pet. at 47-49, OPHB 88-92).  His claim must fail because Hayat fails to meet his burden to show that Ms. Mojaddidi was ineffective or that Ms. Mojaddidi's inability to pursue these lines of inquiry somehow resulted in prejudice.  Hayat has made no showing that he was denied information known by Benn or anyone else that could have assisted Hayat's defense and, as he must show, that he was denied information that would have caused the jury to reach a different verdict.  On this claim, the only conclusion supported by the record is that Ms. Mojaddidi's decision not to obtain a security clearance was irrelevant, effective given the limited amount of classified information at issue and the government's use of *ex parte* proceedings, and did not result in prejudice to Hayat. Accordingly, Hayat's claim is without merit and this Court should deny the petition.

## XIII.   MS. MOJADDIDI'S CROSS-EXAMINATION OF NASEEM KHAN WAS EFFECTIVE (CLAIM 12 / OPHB IX)

### A.      The District Court Correctly Ruled to Exclude Hearsay.

Hayat argues that "[n]o reasonably competent attorney seeking to gain admission of a critical piece of exculpatory evidence would fail to preserve the legal grounds for its admission." (Pet. at 100). In essence, Hayat alleges that Ms. Mojaddidi's failure to attempt to argue after a sustained objection was ineffective. (Pet. at 99-100 ("Inadequate cross of Khan")).  During her cross-examination of government cooperating witness Naseem Khan ("Khan"), Ms. Mojaddidi asked Khan about an October 7, 2003 telephone conversation between Hayat, who was in Pakistan at the time, and Khan, who was in California.  (RT 1321:4-6, 1802:2-13).  Ms. Mojaddidi asked if, in Hayat's very last conversation with Khan, Hayat had told Khan that Hayat never intended to go to a training camp, and had been lying all along to Khan about his intention to go to a training camp.  (Id.)  The Court correctly sustained the government's objection that any response would be hearsay, whatever substance of the answer. (1321:4-24, 1802:2-13).  Although Hayat faults his counsel for failing to press forward with a successful legal basis for admitting this inadmissible hearsay, the Court's rulings were correct.  Moreover, with her questions, Ms. Mojaddidi was able to plant in the minds of the jurors the idea that, had Khan responded, the answer would have been "yes," even though there is no support in the record that Khan would have

agreed with her characterization.  In fact, the evidence in the record runs to the contrary.  Indeed, during her cross-examination, Ms. Mojaddidi asked Khan: "When [Hayat] told you that he was going to a training camp, did you believe he was lying?" (RT 1807:9-15).  Khan answered: "No, I believed the opposite, that he was telling the truth." (Id.)

Many of the conversations between Khan and Hayat were recorded. (RT 847:20-851:4, 1799:1-22).  Some, including the one on October 7, 2003, were not. (RT 850:11-16, 1201:4-13).  Khan created a report on the substance of nearly all his conversation, whether recorded or not. (RT 849:22-850:10). When Hayat reviewed discovery with his attorney, he would have seen that there was no tape-recording of the October 7, 2003 conversation.  Ms. Mojaddidi testified at her deposition that Hayat told her he had made a self-serving and exculpatory statement to Khan during the October 7, 2003 phone call and that, at trial, she duly followed up on by questioning Khan about the statement. (W.M. Depo. 250:3-25). Specifically, at trial Ms. Mojaddidi's attempted to and, later, succeeded in asking Khan if, in an unrecorded conversation shortly before Hayat terminated all contact with Khan, Hayat had denied he ever planned to go to a training camp. (RT 1321:4-6, 1802:2-13).  The government objected on both occasions and argued that even if true, Hayat's statements amounted to inadmissible, self-serving hearsay. (RT 1321:4-24, 1323:1-1324:10, 1802:2-13)  The Court sustained both objections and, in the second instance, struck the question. (Id.)

On direct appeal, Hayat argued that his purported statement that "he never intended on going to a camp" should have been admitted to show his then-existing intent under FRE 803(3) or under the rule of completeness, FRE 106.  See Hayat, 710 F.3d at 896.  Because Ms. Mojaddidi objected on different grounds at trial, the Ninth Circuit reviewed only for plain error.  Id.  With respect to Hayat's argument that the purported statement was admissible under FRE 803(3), the majority noted, that Hayat "never intended" to go to a camp is "backward-looking" "[o]n its face," and found Hayat's contention that his purported statement represented present intent "far from obvious, as it is inconsistent with ordinary grammar." Id. at 895-96.  The majority noted such a statement could only be admissible with a strong limiting instruction and the Ninth Circuit also rejected Hayat's argument that the statement was admissible under FRE 106.  Id. at 896.  The panel found that Hayat's argument misinterpreted Ninth Circuit precedent because the rule of completeness only applied to written and recorded statements and

"does not compel admission of otherwise inadmissible hearsay evidence." Id.

Ms. Mojaddidi was not ineffective for failing to object on either of these grounds because, as a matter of law, FRE 106 was clearly inapplicable and, under FRE 803(3), the clearly backward-looking nature of Hayat's statement renders the "then-existing mental condition" exception inapplicable.  Rule 803(3) provides for the admission of:

> A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Hayat's purported statement that he "never intended" to go to a training camp is clearly "a statement of memory or belief to prove the fact remembered or believed" rather than a statement of his current motive, intent, or plan.[104]  Hayat has not established that it was a statement of his then existing state of mind.  See United States v. Kahre, 737 F.3d 554, 577 (9th Cir. 2013) (affirming exclusion of "contemporaneous statements regarding their good faith belief"); United States v. Bishop, 291 F.3d 1100, 1111 (9th Cir. 2002) (rejecting 803(3) argument because "as a second-hand 'statement of memory or belief to prove the fact remembered,' as the government points out, it is not only hearsay, but irrelevant hearsay."); United States v. Sayakhom, 186 F.3d 928, 937 (9th Cir. 1999) (holding statements of belief and to prove the fact believed do not fall within 803(3)); see also United States v. Kadir, 718 F.3d 115, 125 (2d Cir. 2013) (concluding that defendant failed to show that statement fell under 803(3) exception).  Accordingly, FRE 803(3) would not have facilitated its admission.  See United States v. Emmert, 829 F.2d 805, 809-10 (9th Cir. 1987) (rejecting argument for admission of defendant's statement to co-conspirator under Rule 803(3).

The dissenting opinion suggested that Ms. Mojaddidi might have argued that Hayat's purported "intent" hearsay statement was admissible as impeachment evidence under FRE 607.  See Hayat, 710

---

[104] Even if the evidence were somehow admissible under Rule 803(3), in the full context of the record, Ms. Mojaddidi made these arguments through cross-examination of Khan's handlers and specifically in her closing argument.  (RT 4301:10-21).  Therefore, even if it was erroneous, the error was harmless, even in the Second Circuit.  See United States v. Coplan, 703 F.3d 46, 85-86 (2d Cir. 2012) (noting "in the full context of the record, it is clear that the defendants had ample opportunity to make these arguments through their cross-examination of the IRS agent and their closing arguments.").

F.3d at 907-08.  The majority noted, however, that Hayat did not raise the argument at trial *or* on appeal and did not address it.  Id. at 896.  In United States v. Bao, the Ninth Circuit affirmed the exclusion of a defendant's statement that he did not know what he was doing was illegal when it was offered to impeach the investigating officer and an interpreter who testified to his admissions.  189 F.3d 860, 866 (9th Cir. 1999).  While a witness may be impeached with a prior inconsistent statement, "[i]t is an entirely different matter to offer one declarant's statement to impeach the credibility of another witness.  Merely offering a contradictory account offered by one witness does not go to another witness's credibility unless the first witness' account is offered as true.  Only the declarant of the prior inconsistent statement, and not another witness, may be impeached with the statement."  Id.  Therefore, the impeachment of Khan with a statement by Hayat seems dubious at best.  See United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000) (affirming exclusion of defendant's own statements).  Nevertheless, Hayat now argues that because Khan had previously called Hayat a liar in conversations – but denied he thought Hayat was lying about going to the camp – an instance in which Hayat purportedly admitted lying should have been admitted to somehow impeach Khan.[105]  As noted, this novel argument was not advanced by trial counsel or Hayat's team of learned appellate counsel on direct appeal.  Therefore, it scarcely seems logical to conclude that Ms. Mojaddidi, who offered other justifications for admission of the obvious hearsay statement at trial, was constitutionally ineffective because she did not, in the heat of trial, offer an innovative, sophisticated, and nuanced basis to justify admission the "intent" hearsay statement which, in the tranquil environment of direct review, was not unearthed and advanced by appellate counsel.[106]  See Waters, 46 F.3d at 1512 ("The test [of effective counsel] has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.").

Moreover, as the Ninth Circuit acknowledged, impeachment was not the true value and purpose

---

[105] There is no evidence that Mark Reichel would have made this argument other than Hayat's bare speculation that he would have.  (OPHB at 130); see Cooks v. Spalding, 660 F.2d 738, 740 (9th Cir. 1981) ("His claim of prejudice amounts to mere speculation").

[106] Hayat raised the FRE 803(3) and 106 theories for the first time on direct appeal.  See Hayat, 710 F.3d at 893.

of the "intent" hearsay statement.  Rather it "primarily served the purpose of furthering the theory of the defense and not of impeaching the prosecution's witness."  Hayat, 710 F.3d at 898 (internal quotations omitted).  Admitting the "intent" hearsay statement for such a purpose would have been impermissible and carried a great risk of prejudicing and confusing the jury.  The purported statement was obviously "exculpatory" and Hayat could point to no "evidence corroborating the excluded statement." Id. at 899.  The majority also noted that Hayat could likely have made a conscious decision to mislead Khan during the October 7, 2003 conversation that purportedly included the "intent" hearsay statement because "Hayat had grown suspicious of Khan … and so cut off the relationship." Id.  "In that case, Hayat could have lied when he said he never intended to go to a camp, hoping to throw Khan off his trail before he stopped speaking with him entirely." Id.  The Ninth Circuit's holding that the statement was inadmissible eliminates any possible ineffectiveness or prejudice.

Since the only plausible, but unlikely[107], theory supporting admission of the "intent" hearsay statement was as impeachment evidence under FRE 607 and not as substantive evidence, it is clear that the only potential prejudice that could have accrued to Hayat by Ms. Mojaddidi's failure to raise FRE 607 is the loss of a small amount of cumulative impeachment evidence as to Khan.  See, e.g., United States v. Parra-Perez, 127 Fed.Appx. 241, 242-43 (9th Cir. 2005) (affirming district court's determination that excluding a foreign-language videotape to avoid inaccurate interpretation and confusion outweighed the defendant's interest in admitting the tape to further impeach a witness); United States v. Rowe, 92 F.3d 928, 933 (9th Cir. 1996) (affirming district court's refusal to permit defendant to impeach car-jacking victim with her seven-year old automobile theft conviction to avoid an improper inference that the victim had stolen the car she was driving on the night of the car-jacking when the car's owner told police he gave victim consent.).

Moreover, despite the fact that the Court sustained the government's objections to her two questions concerning Hayat's purported "intent" hearsay statement and struck the question from the record when it included Hayat's self-serving denial, Ms. Mojaddidi referred to the statement in her closing argument to advance her attack on Khan's credibility and in support of Hayat's claim of

---

[107] Given the great risk that the "intent" hearsay statement would be used by the jury for an improper purpose, the court should not have admitted it even if Ms. Mojaddidi had articulated FRE 607 as a basis.

innocence:

> During trial, you heard conversations, there were seven conversations, and I believe you have the transcripts in front of you, they were recorded conversations between Hamid and Naseem Khan. And you heard me ask Naseem Khan about at least 20 total conversations that he had with Hamid Hayat, but those are 20 conversations that I know about. And I submit to you that there are many more conversations that Naseem Khan did not report to the FBI. Remember, he was in control. How many of those conversations are out there where Hamid talks positively about the United States? How many of those conversations are out there when Hamid tells Naseem Khan he has absolutely no intent of going to a terrorist training camp? We'll never know.

(RT 4301:10-21).  Not only was Ms. Mojaddidi competent in her performance concerning this issue, Hayat has not demonstrated how introduction of his purported self-serving hearsay statement of denial, which the trial court and the Ninth Circuit found was inadmissible and which remains inadmissible even when cloaked as improper impeachment evidence, prejudiced his defense.  There is no factual support to substantiate Hayat's argument that his self-serving denial, about which the jury heard and to which Ms. Mojaddidi explicitly referred in her closing argument, would have, alone, been sufficient to tip the scale in favor of acquittal.  The argument lacks merit.

## XIV.    MS. MOJADDIDI EFFECTIVELY CROSS-EXAMINED AND HANDLED THE TESTIMONY OF KHALEEL MOHAMMED (CLAIM 11 / OPHB VII)

Hayat asserts several arguments in his claim concerning the expert testimony from government witness Dr. Khaleel Mohammed ("Dr. Mohammed").  First, Hayat claims that Ms. Mojaddidi failed to object to Dr. Mohammed's qualifications and his testimony, including testimony about the "jihadist mental state" of a person carrying the ta'wiz, or supplication, that FBI agents found in Hayat's wallet. (Pet. at 80-99; OPHB at 98, 105-110).  The Ninth Circuit already rejected the legal theory underlying these arguments on direct appeal.  See Hayat, 710 F.3d at 900-02.  Second, Hayat alleges Ms. Mojaddidi failed to properly cross-examine Dr. Mohammed, generally, and on certain discovery materials.  (Pet. at 93-95, OPHB at 111-112).  Ms. Mojaddidi conducted a thorough cross-examination and was not ineffective for not asking a single question concerning a speculative "guess" from a student with whom Dr. Mohammed conferred about Hayat's ta'wiz.  Third, Hayat faults Ms. Mojaddidi for not obtaining a more authoritative expert than she did to counter Dr. Mohammed's testimony, despite her diligent

efforts to do so.  (Pet. at 95-98; OPHB at 112-113).  Finally, Hayat faults Ms. Mojaddidi for failing to admit additional testimony from her expert, Anita Weiss, concerning the ta'wiz.  (Pet. at 95-98; OPHB at 113).

**A.      Dr. Mohammed was a Properly Qualified Expert and Ms. Mojaddidi Provided Effective Assistance by Not Making a Frivolous Objection to his Testimony.**

Dr. Mohammed was properly qualified as an expert.  On direct appeal, the Ninth Circuit concluded that Dr. "Mohammed's analysis of the meaning of the supplication was well within the scope of his expertise."  Hayat, 710 F.3d at 900.  The Ninth Circuit's rejection of Hayat's objections to his qualifications and testimony establishes that there was no basis for Hayat to object to Dr. Mohammed's testimony.  Dr. Mohammed was clearly an expert in Arabic translation and Islamic theology.  See Hayat, 710 F.3d at 900 (holding Dr. Mohammed's analysis "squarely within his expertise," that he "used reliable methods," and rejecting Hayat's arguments that because Dr. Mohammed "was not an expert on Pakistani culture and did not speak Urdu … he was unqualified to offer his opinions.").  This Court should therefore reject any claims based on a theoretical objection that the Ninth Circuit expressly rejected.  See United States v. Redd, 759 F.2d 699, 701 (9th Cir. 1985) (stating "[petitioner] raised this precise claim in his direct appeal, and this court expressly rejected it.  Therefore this claim cannot be the basis of a § 2255 motion" and rejecting ineffective assistance claim based on failure to raise issue rejected by the Ninth Circuit).

**B.      Dr. Mohammed's Expert Testimony Did Not Violate FRE 704(b), and Ms. Mojaddidi Did Not Provide Ineffective Assistance by Making a Frivolous Motion to Exclude.**

Hayat also raises the familiar and specific argument that Dr. Mohammed impermissibly commented on Hayat's mental state, in violation of FRE 704(b), when he testified that the type of person who would carry the kind of supplication Hayat carried would be a jihadist.  (Pet. at 94; OPHB at 111).  The Ninth Circuit rejected that argument when Hayat advanced it in his direct appeal.[108]  See

---

[108] Normally, when the Circuit Court has decided an issue on direct appeal, the "law of the case" doctrine bars courts from reconsidering those issues in further post-conviction proceedings. See United States v. Scrivner, 189 F.3d 825, 827 (9th Cir. 1999).  A subsequent court may depart from the law of the case doctrine only under circumstances not present in this case. See id.  In the absence of one of these circumstances, failure to apply the law of the case is an abuse of discretion. Id.

Hayat, 710 F.3d at 902. The majority found that an expert could offer testimony "supporting an inference or conclusion that a defendant does or does not have the requisite mental state, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony." Id. at 901 (citing United States v. Younger, 398 F.3d 1179, 1189 (9th Cir. 2005) (internal quotations omitted)). This is long-standing case law in the Ninth Circuit. See United States v. Morales, 108 F.3d 1031, 1038 (9th Cir. 1995) (en banc) (overruling prior precedent and allowing testimony supporting an inference or conclusion about mental state). For example, an expert's opinion that a large volume of cocaine was possessed for distribution did not run afoul of the rule. Id. at 901 (citing United States v. Gomez-Norena, 908 F.2d 497, 501-02 (9th Cir. 1990)). Although Hayat attempts to characterize the appellate decision as depending solely on plain error (OPHB at 98, 109-110), in ruling that Mohammed's testimony was proper, the Ninth Circuit specifically concluded that "he never commented directly on Hayat's mental state." Hayat, 710 F.3d at 902. Therefore, the testimony fell squarely within the type of expert testimony allowed under Rule 704(b) in the Ninth Circuit, and this Court cannot conclude that Ms. Mojaddidi was ineffective for failing to file a futile motion to exclude Mohammed's testimony.

Hayat has not explained how Ms. Mojaddidi's failure to object to testimony that was permitted under controlling law, could either be ineffective or prejudicial, because he cannot. Instead, Hayat invites this Court to adopt the position advanced in the dissenting opinion on direct appeal and overrule settled law of the Ninth Circuit on this issue. The majority opinion noted its disagreement with the law on this issue but upheld it, as required. Hayat, 710 F.3d at 902 ("Thus, while we might like to agree with [the dissent] that the expert evidence in this case crossed the Rule 704(b) line, we are prevented from doing so by this court's caselaw."); cf Hart v. Massanari, 266 F.3d 1155, 1171 (9th Cir. 2001) ("Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court."). "When a defendant has raised a claim and has been given a full and fair opportunity to litigate it on direct appeal, that claim may not be used as a basis for a subsequent § 2255 motion." United States v. Hayes, 231 F.3d 1132, 1139 (9th Cir. 2000). This is true "if the basic thrust or 'gravamen' of the legal claim is the same, regardless of whether the basic claim is supported by new and different legal arguments." Molina v. Rison, 886 F.2d

1124, 1129 (9th Cir. 1989).  Therefore, this Court should deny all claims based on Dr. Mohammed's and Dr. Weiss's testimony.

**1.    Ms. Mojaddidi's Cross-Examination of Dr. Mohammed was Vigorous, Robust, Fruitful, and Well Within the Wide Range of Competent Representation, and Therefore There Was also no Prejudice**

Even if there were mistakes, overreaches, or omissions in the expert's testimony, such errors should be pointed out by cross-examination, rather than excluded by objection, as errors go to the weight, rather than the admissibility of expert testimony.  Murray v. Schriro, 746 F.3d 418, 428 (9th Cir. 2014) ("Any issue of proper methodology went to the weight rather than admissibility.") (internal quotations omitted); Education Logistics, Inc. v. Laidlaw Transit, Inc., 583 Fed.Appx. 624, 624 (9th Cir. 2014) (holding that an expert's "testimony was not misleading or wholly unsupported by the facts" and "[a]ny flaws went to the weight rather than the admissibility of the testimony."); Atlas Flooring, LLC v. Porcelanite S.A. DE C.V., 425 Fed.Appx. 629, 633 (9th Cir. 2011) (holding that defendant's complaints about plaintiff's expert's testimony "went to the weight, not the admissibility, of the expert testimony."). See also McDonald v. North America Specialty Ins. Co., 224 Fed.Appx. 761, 767 (10th Cir. 2007) ("[The expert's] admissions during cross-examination only go to the weight of his opinion … and have no bearing on the admissibility."); Currier v. United Technologies Corp., 393 F.3d 246 (1st Cir. 2004) (affirming lower court's "decision to view … weakness in [the expert's] analysis as a matter of weight rather than admissibility."); Sphere Drake Ins. PLC v. Trisko, 226 F.3d 951, 954-55 (8th Cir. 2000) (holding that doubt about whether an expert's testimony will be useful should be resolved in favor of admissibility and attacks on the foundation for an expert's opinion and conclusions, go to weight rather than admissibility).

Ms. Mojaddidi understood this, and focused on cross-examining Dr. Mohammed as well as offering rival expert testimony.  Ms. Mojaddidi decided that she would counter Dr. Mohammed's testimony about the supplication first through "solid cross-examination."  (W.M. Depo. 199:24-200:6). She enlisted an individual knowledgeable in Arabic and Islam, Shibili Zaman, to help her understand the supplication and prepare her cross-examination.  (W.M. Depo. 198:16-202:7).  Among other things, she tried to get Dr. Mohammed to concede that the supplication was actually a common supplication carried by travelers and not a jihadi supplication.  (W.M. Depo. 281:10-15).  She also decided to offer the

testimony of Dr. Anita Weiss ("Dr. Weiss") to counter Dr. Mohammed's testimony. (W.M. Depo. 205:12-206:7).

Under cross-examination by Ms. Mojaddidi, Dr. Mohammed admitted that, while he spoke English, Arabic, Malay, French, and Akawai, he did not speak Urdu or Pashto fluently and that he had never been to Pakistan, or even India or Afghanistan. (RT 2020:20-2021:13). Ms. Mojaddidi asked Dr. Mohammed whether he had done a word-for-word translation, which he had, and Dr. Mohammed admitted that sometimes a word-for-word translation is not appropriate. (RT 2029:5-20). Ms. Mojaddidi cross-examined Dr. Mohammed on other translations that rendered the supplication as: "Oh Allah we make thee our shield against them and take refuge in thee from their evils," and "Oh Allah we ask you to face them and seek your protection against their evil."[109] (RT 2034:3-15; Tr. 570:11-571:16, 651:11-652:5). Dr. Mohammed responded that these interpretations were not accurate translations. (Id.) Ms. Mojaddidi pointed to another published translation: "Oh Allah we put you in front of them and we seek refuge in you from their evils." (RT 2043:23-2044:10; Tr. 652:6-13). Dr. Mohammed pointed out that the commentary was not influential in the Muslim community. (RT 2044:11-22). Ms. Mojaddidi pointed out that some Muslims consider Dr. Mohammed's thesis regarding early Islamic law as controversial. (RT 2046:3-20). She also pointed out that the purpose of the supplication could have been to protect Hayat for a safe journey back to the United States. (RT 2054:1-17). She pointed out that it appeared in a chapter on travel in one of the religious books. (RT 2055:18-23). Dr. Mohammed also conceded under cross-examination that he was not familiar with the practice of ta'wiz use in Pakistan. (RT 2056:10-2057:9). He also conceded that he had never known a warrior to carry the particular ta'wiz Hayat carried. (RT 2079:4-6).

Ms. Mojaddidi also explicitly cross-examined Dr. Mohammed on the other scholars and experts with whom he consulted. (RT 2069:19-25). She confirmed that he spoke to seven such others, including Dr. Mohammed Farouk, who had never heard of the supplication (RT 2070:1-23); Omar Huda, who had also never heard of the supplication (RT 2070:24-2071:15); Abdur Rahmaan Saaleh, located in Pakistan, who told Dr. Mohammed: "I have not noticed any special importance given to the

---

[109] Ms. Mojaddidi also got Dr. Mohammed to acknowledge other interpretations of the du'a. (RT 2060:22-2061:18; Tr. 652:17-23).

du'a [supplication] in any of the regions of Pakistan," and had confirmed the same with students and imams of various traditions within Pakistan (RT 2071:16-2172:20); Dr. Mehmood Chatta, who knew of no groups in Pakistan that used the supplication for any purpose (RT 2072:21-2073:16); Zafar Ishaq Ansari, highly respected in Pakistan, who responded the supplication often appears in Friday prayer (RT 2074:1-21); Gulfiya, who on behalf of the number two of a mufti in Uzbekistan stated the supplication was commonly used for protection against enemies (RT 2074:22-2076:7); and Ahmed Subhy, who said it would be used by Wahhabists and the Muslim Brotherhood (RT 2076:8-2077:6).  Ms. Mojaddidi pressed Dr. Mohammed further on these other experts, their location, biases; and asked Dr. Mohammed about scholars with whom he had failed to consult.  (RT 2109:11-2113:11).

Ms. Mojaddidi deftly attacked Dr. Mohammed's expert testimony in her closing argument:

> The government also showed you a piece of paper that was found in Hamid Hayat's wallet when he was arrested. The government's expert, Dr. Mohammed, testified that it was a prayer carried by a warrior.  Dr. Mohammed admitted on the stand that his views were controversial amongst Muslim scholars.  He admitted on the stand that he dismissed the accuracy of translations of that exact prayer that were translated by published Muslim scholars.  He also admitted that he, himself, has not published regarding that prayer.
>
> Dr. Mohammed has never been to Pakistan and he doesn't understand the culture. In fact, he had to send e-mail asking former students of his, who are not scholars, what the significance of carrying such a prayer was in Pakistan.  He didn't know himself.  And he ultimately based his opinion about that prayer on a person he's never met in Uzbekistan, and on a man who no longer works for an Egyptian university because of his radical views.
>
> Honestly, ladies and gentlemen, I don't know where the government found this expert, because he definitely didn't come from a list of any respected Muslim scholars. He himself said that he didn't contact Muslim scholars in the United States because he thought they all -- he said they all served issues of public relations versus academic integrity.  He essentially called random people who he knew would agree with him.  And he catered his testimony to draw one conclusion.  Even when I asked him about the two major sources that he relied upon, and I pointed out that one of those sources had this prayer in the Book of Traveling, he attempted to put that in the context of jihad.  He had one goal.  That was the conclusion he wanted to draw, and he was going to draw it however he had to.  He also gave a literal translation, and admitted that literal translations can often change the meaning of the words.

> See, the problem with Dr. Mohammed's testimony about that prayer is that he has no idea of the cultural context of carrying such a prayer in Pakistan.  He can't possibly because he just doesn't know about Pakistani culture.  Dr. Anita Weiss, however, is an expert on Pakistani culture.  You heard her tell you that carrying prayers in Arabic is a very common practice in Pakistan, especially by travelers for safety reasons.  The government either doesn't understand the cultural significance of carrying a ta'wiz or it didn't want you to know about it.  Because had they asked their other expert, Mr. Abbas, who knows about Pakistani culture, he would have told them that Dr. Mohammed's conclusions were wrong, and that prayers like those are commonly carried by travelers and not warriors.  So Dr. Mohammed's testimony itself was problematic.  And the existence of that prayer in Hamid's wallet doesn't prove that he went to a terrorist training camp.

(RT 4322:1-4324:2).  Ms. Mojaddidi's powerful closing argument challenging the basis and substance of Dr. Mohammed's expert testimony was made possible by her thorough and fruitful cross-examination of Dr. Mohammed.  Her efforts were well within the broad range of competent representation.

### 2.    Ms. Mojaddidi Did Not Provide Ineffective Assistance by Not Cross-Examining Dr. Mohammed About a Speculative "Guess" by a Student with Whom Dr. Mohammed Conferred Concerning Hayat's Ta'wiz

Hayat claims that Ms. Mojaddidi was ineffective for failing to cross-examine Dr. Mohammed with a single question regarding an email from Bariza Umar ("Umar") to Dr. Mohammed, in which Umar stated: "I would guess that most people don't know what is written in a taweez."  (Pet. at 94-95; OPHB at 103, 112).  In the full context of Ms. Mojaddidi's cross-examination of Dr. Mohammed, adding a question about Umar's very weak statement, which was clearly speculative and lacked indicia of reliability on its face, would have, at best, been cumulative of other damaging testimony Mojaddidi elicited during her cross-examination of Dr. Mohammed.[110]  Hearing testimony about Umar's "guess" about what "most people" might know about a ta'wiz would not have significantly impacted jurors' evaluation of Dr. Mohammed's testimony.

---

[110] Among those seven other scholars and students nearly all provided statements, like Umar's, which tended not to support Dr. Mohammed's opinion about the ta'wiz: (a) two had never heard of the supplication; (b) one did "not noticed any special importance given to the [supplication] in any of the regions of Pakistan"; (c) another knew of no groups in Pakistan that used the supplication for any purpose; (d) one stated the supplication often appears in Friday prayer; (e) another stated that it was commonly used for protection against enemies; and (f) one stated it was used by Wahhabists and the Muslim Brotherhood.  (See Pet. at 91-92).

It was within Ms. Mojaddidi's wide latitude of professional judgment not to ask about Umar's "guess," especially in light of Ms. Mojaddidi's overall extremely thorough and fruitful cross-examination of Dr. Mohammed. Indeed, even if Ms. Mojaddidi had elicited testimony about Umar's speculation, at best she could have added it to the list of arguments she asserted to assail Dr. Mohammed's testimony in her closing. There is no basis to conclude, however, that Umar's speculative opinion about what "most people" might know of a ta'wiz would have somehow been the missing needle in the haystack of defense evidence that would have caused the jury to reach a different outcome at trial. In addition, Dr. Weiss did testify about the cultural significance of a ta'wiz, that it is commonly carried by travelers, and that they are given by religious leaders, which was the main thrust of Umar's opinion. See Hayat, 710 F.3d at 902-03 (discussing ta'wiz testimony), (RT 4178:21-4180:2, 4184:24-4185:4, 4185:18-24, 4186:10-4187:11, 4192:9-19, 4194:1-7, 4194:21-4195:14). The choice not to cross-examine an expert on a point that will later be presented through a defense expert is a classic decision that must be given deference. See Sisco v. Huskey, 73 Fed.Appx. 911, 912, 2003 WL 21801543 (9th Cir., Aug. 5, 2003) (unpublished) (Stating, "[c]ounsel's failure to press the expert on the alleged inconsistency in his testimony was likely a tactical decision, given that the defense later presented its own expert witness to address that very point," giving deference to the tactical decision, and finding petitioner "cannot show prejudice"). Hayat's unsupported conjecture that Ms. Mojaddidi was somehow ineffective for failing to ask a single question in an intense cross-examination and recross-examination, which, with the benefit of years of hindsight he would now ask, is simply not a basis to conclude Ms. Mojaddidi was ineffective. Not only was Ms. Mojaddidi's cross-examination of Dr. Mohammed well-within the broad range of effective representation, even if she was somehow ineffective for not asking about Umar's "guess," Hayat has not established prejudice.

C. **Ms. Mojaddidi Did Not Provide Ineffective Assistance by Using Dr. Weiss to Counter Dr. Mohammed's Testimony, and Hayat Cannot Establish Prejudice**

Ms. Mojaddidi went further than offering a thorough cross-examination, re-cross-examination, and closing argument concerning Dr. Mohammed and the weaknesses in his testimony. She offered the testimony of Dr. Weiss as an expert on Pakistani culture to counter Dr. Mohammed's testimony. (W.M. Depo. 198:25-199:14). Ms. Mojaddidi, or Dr. Weiss acting on her behalf, also contacted a series of

other experts recommended by Dr. Weiss and Ms. Mojaddidi's contacts across the country who they thought might potentially testify about the meaning of Hayat's ta'wiz. (Id. at 199:14-201:7). Ms. Mojaddidi testified in her deposition that, even though she "desperately" look[ed] for "a lot" of experts, she was not successful. (Id. at 199:14-201:7, 206:9-25). Of the "at least ten" individuals contacted, she found "nobody . . . who would help." (Id. at 199:14-201:7, 239:6). Ms. Mojaddidi explained that there were a lot of people who did not want to be involved in a federal terrorism trial and that she ran into that issue a lot in seeking experts and help. (Id. at 197:7-11). She explained: "[i]n 2005 things were different, and these Muslim leaders or scholars weren't as willing to go up against the government." (Id. at 200:19-21). Hayat cannot assert that such diligent efforts were ineffective simply because they were not successful. Dr. Weiss was allowed to testify that the general population in Pakistan would carry a ta'wiz in the following exchange:

> Q.    And it's also common for travelers to carry ta'wiz in Pakistan?
>
> A.    Very, yes.
>
> Q.    And are you aware of it being common for warriors to carry ta'wiz in Pakistan?
>
> A.    Not -- they wouldn't -- not any more than the general population, I wouldn't assume.

(RT 4194:1-7).

Hayat claims that the Court struck part of Dr. Weiss's expert opinion because Ms. Mojaddidi violated her discovery obligations. Pet. at 86. This is not supported by the record. The Court struck a part of Dr. Weiss' answer to Ms. Mojaddidi's question: "And can you explain to the jury what a ta'wiz is." After a long explanation of the definition of a ta'wiz, Dr. Weiss opined that carriers of a ta'wiz "really don't know what's written in them." The Court struck that portion of the answer after a government objection that the answer was non-responsive and speculative. (RT 4183:7-4184:15). Indeed, the Court stated: "I'm not sure that it's fully responsive, frankly, and that part of the answer contains speculation." (RT 4183:9-11). Hayat has not demonstrated how such a statement was admissible, or could have had any significant effect on his defense. The jury knew from Dr. Mohammed's testimony that the ta'wiz was in Koranic Arabic and could not be accurately translated by any ordinary Muslim, as well as that Arabic is not the language spoken in Pakistan. Therefore, the jury

would have already been aware that Hayat could likely not read the supplication. Dr. Weiss' additional, inadmissible speculative testimony that some people do not know the meaning would have added nothing further. Even if it would have, despite the Court's striking the testimony, the jury had already heard Dr. Weiss's testimony to that effect. Hayat's argument on this claim must fail.

Hayat also suggests that Dr. Weiss would have offered an expanded opinion about the particular ta'wiz he carried if the Court had not excluded part of her testimony because of a late, supplemental expert disclosure filed by Ms. Mojaddidi. (Pet. at 86). However, Hayat makes no argument about what additional expert opinion Dr. Weiss would have offered if the Court had not limited her testimony, nor how such exclusion resulted in any prejudice. Further, Hayat fails to mention that, while the Court excluded certain parts of Dr. Weiss' testimony because of late disclosures (RT 3555:7-3578:19), the excluded portion was beyond Dr. Weiss's expert knowledge (RT 3558:7-3560:7), and would have been otherwise excluded pursuant to a government motion in limine under FRE 702 if the Court had not excluded it on the basis of the late disclosure. (See RT 4180:12-4182:8). Indeed, despite the Court's earlier order excluding this testimony under Rule 16, at trial Ms. Mojaddidi nevertheless attempted to elicit testimony from Dr. Weiss about translations of the ta'wiz Dr. Weiss obtained from others. (RT 4187:7-13). The Court sustained the government's FRE 702 objection on the basis that Dr. Weiss did not speak or read Arabic. (RT 4187:14-4192:6). The government is at a loss to defend conduct that Hayat neither describes with sufficient clarity to be meaningful nor alleges resulted in any prejudice, much less prejudice sufficient to warrant relief on this motion. On this claim, Hayat has failed to meet his burden to show ineffective assistance of counsel or any prejudice from Ms. Mojaddidi's handling of Dr. Mohammed's testimony or Dr. Weiss's testimony. See Grisby, 130 F.3d at 373 ("Speculation about what an expert could have said is not enough to establish prejudice."). Accordingly, the Court should deny all claims relating to Dr. Mohammed and Dr. Weiss's testimony.

## D.    Counsel Is not Ineffective for Failing to Find a Better Expert.

Ms. Mojaddidi could not obtain an Arabic-speaking expert to opine on the correctness of Dr. Mohammed's translation and focused instead on effectively cross-examining him, as detailed above. However, even if Ms. Mojaddidi had retained at trial the experts Hayat now proffers, the result would not have been different. With regard to the use of expert witnesses, "Strickland does not enact Newton's

third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." Harrington v. Richter, 562 U.S. 86, 111 (2011); see also Hinton v. Alabama, 571 U.S. 263, 134 S.Ct. 1081, 1089 (2014) (cautioning against "examination of the relative qualifications of experts hired and experts that might have been hired."). Failure to obtain a perfect, or even better, expert is not a proper basis to find counsel constitutionally ineffective. See Murtishaw v. Woodford, 255 F.3d 926, 943-49 (9th Cir. 2001) (rejecting myriad of theories that counsel were ineffective for failure to secure better expert testimony). Indeed, the Ninth Circuit strongly adheres to the Supreme Court's admonishments not to use hindsight or speculation when analyzing what counsel could have done regarding expert testimony. Id. at 946 ("However, counsel's actions are not deficient just because, through 'the fabled twenty-twenty vision of hindsight,' a better course of action becomes apparent.") (quoting Campbell v. Wood, 18 F.3d 662, 673 (9th Cir. 1994)).

**E.      Dr. Haykel's testimony does not establish ineffectiveness or prejudice because, he substantially agreed with Dr. Mohammed's testimony except for the conclusion and cannot eliminate that Hayat's interpretation was not a benign interpretation.**

Dr. Bernard Haykel ("Dr. Haykel") could not have fully rebutted Dr. Mohammed's testimony. (See Def. Ex. BBB). Dr. Haykel declared that a supplication like the one Hayat possessed could have, in fact, been carried by a jihadist. (Id.; CR 694 at ¶ 5; see also Pet. at 88). Thus, even if Dr. Haykel had testified, his concession that a jihadist might carry Hayat's ta'wiz would have necessarily left the jury in nearly the same position during deliberations: with substantial basis to credit Dr. Mohammed's testimony and some evidence to refute it. Because Haykel's testimony, at best, only narrows but still admits the possibility of Dr. Mohammed's conclusion, it does not follow that the jury would have reached a different verdict.

Dr. Haykel agreed with Dr. Mohammed's literal translation of the du'a as "Oh, God, we ask you to be at the throats – and here it's not mentioned, our enemies, that's the implication. And we seek your help and assistance from their evils or their misdeeds." (Tr. 638:17-639:6, 645:16-21). Dr. Haykel, consistent with his declaration, testified that "jihadists can also use this supplication," and that it is "not necessarily" a warrior prayer. (Tr. 651:14-22). When asked if this supplication was defensive or offensive, Dr. Haykel's answer was not definitive, stating: "It's associated with travel in the lifetime of the Prophet, but it can be used against fellow Muslims. So, an offensive invocation would never be used

against other Muslims, because you're not supposed to fight Muslims, whereas this can be used against Muslims, or to ward off the harm that Muslims can inflict on you, but also the harm non-Muslims can inflict on you."[111]  (Tr. 641:21-642:19).  Agreeing with Dr. Mohammed, Dr. Haykel testified that the paper found in Hayat's wallet was a supplication or du'a (RT 1973:23-1974:3; Tr. 635:5-18), is a Hadith (RT1933:24-1934:20; Tr. 635:19-24), that Abu Musa Al-Ashari was the relator of the Hadith (RT 1979:14-17; Tr. 647:5-648:8; CR 694 ¶ 2), that it is found in several different compilations of Hadiths (RT 1979:18-1980:4, 1981:23-1983:17, 1985:24-1987:10, 1991:20-1995:21; Tr. 636:15-637:6), and that this particular Hadith is found in two places in the Riyadh al-Salih compilation: in the Book of Etiquette of Prayer, and the Book of Jihad (RT 1987:5-1988:25; Tr. 646:17-647:4).

Some Hadiths, the words and deeds of the Prophet Muhammad, are difficult to interpret.  (Tr. 635:19-24).  Dr. Haykel acknowledged that Hadiths can be interpreted differently by people with ideological agendas.  (Tr. 645: 25-646:4). The Saudi Arabian government has created a special institute to try to standardize interpretation of the Hadiths to prevent their abuse by terrorist movements.  (Tr. 646:5-16).  After agreeing that this supplication is found in the Book of Etiquette of Travel and in the Book of Jihad in the Riyadh al-Salihin, Dr. Haykel provided additional context to the circumstances under which the Prophet Muhammad said the supplication, and why.  (Tr. 646:17-647:4).  The relator of this Hadith, Abu Musa al-Ashari, was an early convert to Islam and a companion of the Prophet.  (Tr. 647:23-648:8).  The Prophet sent al-Ashari on mission trips to Ethiopia and Africa, but he returned to the Prophet at some point.  (Tr. 648:9-24).  When al-Ashari returned, Muhammad was about to begin the [military] expedition of Dhat al-Riqa.  (Tr. 648:25-649:1).  At around the same time, the Prophet Muhammad instituted rules allowing the shortening of prayers in times of war.  (Tr. 649:5-8).  Between when al-Ashari returned to Muhammad and when he left for Yemen, Muhammad engaged in a series of military campaigns.  (Tr. 649:9-650:12).  Several of these campaigns were offensive campaigns into enemy territory.  (Tr. 650:13-15).  As a result, several Hadiths from this time say terrible things about polytheists and Jewish people.  (Tr. 650:16-24).

---

[111] The government notes that Dr. Haykel did not testify that Exhibits 26.6 and 26.7 were, in fact, a ta'wiz. Dr. Mohammed explained what a ta'wiz is, as did Dr. Weiss. (RT 2006:21-2007:12, 4178:3-4180:3, 4192:8-21, 4194:4-7)

Contrary to Hayat's argument, Ms. Mojaddidi was able to get Dr. Mohammed to acknowledge other interpretations of the supplication before the jury.  (Tr. 651:11-652:5, 652:6-13, 652:17-23).  Dr. Haykel testified that he did not recall Dr. Mohammed testifying about beheading videos or al-Qaeda, yet his declaration speculates that is the motive of Dr. Mohammed's translation. [112]  (Tr. 653:2-11; Haykel Decl. ¶ 16).  Dr. Haykel testified, consistent with his declaration, that jihadists would be familiar with this du'a and no doubt use it, too.  (Tr. 657:19-25; CR 694 ¶ 5 ("Jihadis would be familiar with this invocation and no doubt use it, too.")).  Specifically, Dr. Haykel testified:

> Q.   And you stated in your direct testimony that jihadis would be familiar with this du'a, and no doubt use it, correct?
>
> A.   Yes.
>
> Q.   How would they use it?
>
> A.   They would use it whenever they were threatened and they felt an enemy was to harm them. They would use it just like other Muslims use it.
>
> Q.   But their interpretation overall would be a little more offensive, correct?
>
> A.   Well, they're involved in war. They're engaged in war. So, they're engaged in an offensive war. When they use du'a offensively, it's fairly clear. They don't hide what du'a they use.
>
> Q.   And you agree that this could also apply to the situation where someone is venturing into enemy territory, correct?
>
> A.   Where you would use this du'a, yes, absolutely.

(Tr. 657:19-658:8).  Dr. Haykel went on to testify that the Islamic State (aka ISIS) interprets Hadiths in a very aggressive manner, in that "[t]hey cherry-pick the Hadiths and in the Koran to justify their behavior and their actions."  (Tr. 658:17-18).  Dr. Haykel acknowledged that Jamiat Ulema-e-Islam is a political party in Pakistan that supports militant movements, including a militant group called Jaish-e-Muhammad.  (Tr. 659:5-660:1).

In his supplemental disclosure, Dr. Haykel stated, "As for proof to establish that someone is

---

[112] Dr. Haykel also acknowledged that he may have been premature in attacking "Subhi" in his declaration at paragraph 21.  (Tr. 655:15-657:18).  It is unclear whether he was given an incomplete transcript to review, or what his motivation was for attacking "Subhi" in his declaration.  Regardless, there are at least two well known Hadith scholars named Subhi who are not polemicists.  (Tr. at 656:12-657:18).

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

212

partaking in jihadi ideological thought and belief, one would need to obtain considerably more than this invocation to assert that a person is a jihadi. Jihadis have a considerable repertoire of ideas, books, authorities that they invoke and cite openly, and which mark them off from the rest of the Muslim community as jihadis. To label someone a jihadi, or as someone who partakes in the jihadi ideological system of beliefs, one needs to adduce the ideas and references that jihadis use and invoke.  (CR 694 ¶ 8).  Dr. Haykel reaffirmed this testimony at the hearing.  (Tr. 658:25-659:4).  Dr. Haykel then began analyzing some of the materials found in Hayat's possession, his statements to Naseem Khan, and evidence from his confession.  (Tr. 660:2-664:2, 664:3-665:20, 665:21-666:23).  Dr. Haykel agreed that these materials showed an interest in jihadi movements.  (Tr. 660:25-661:11).  Dr. Haykel also tried to make light of the situation, noting that "if you were to look at my computer, you would think that I'm also a member of these movements, because I follow them and I have all these documents on my computer."  (Tr. 661:12-15).  Dr. Haykel also noted that it would be a fair inference that Hayat's reference to men from the madrasa volunteering to go to jihad in 2003 (or in the 2000s) meant men going to fight Americans.  (Tr. 665:21-666:23).  All of these items involved materials consistent with anti-American militant groups, groups interested in militancy or jihad, or other violence.  (Tr. 660:2-664:2, 664:3-665:20, 665:21-666:23).

Counsel is entitled to "great deference" in matters relating to how to handle expert witnesses. Murray v. Schriro, 745 F.3d 984, 1018 (9th Cir. 2014) ("we note that many of these decisions are likely to have been strategic in nature, requiring us to provide trial counsel with great deference." citing Strickland, 466 U.S. at 690)).  It is permissible to use trial evidence "to test the knowledge, accuracy, and credibility of the witness." Am. Pac. Whaling Co. v. Kristensen, 93 F.2d 17, 20 (9th Cir. 1937). "Experts may be asked hypothetical questions on cross-examination, but such questions 'must not require the expert to assume facts that are not in evidence.'"  United States v. Stinson, 647 F.3d 1196, 1214 (9th Cir. 2011) (quoting Taylor v. Burlington Northern R. Co., 787 F.2d 1309, 1317-18 (9th Cir. 1986).

In this case, Dr. Haykel's testimony is consistent with the testimony of Dr. Mohammed other than the final conclusion or opinion.  Both agree about the technical, word-for-word translation of the du'a, that there are competing interpretations, that Muhammad is reported to have uttered the

supplication during wartime, and that the du'a appears in the Book of Etiquette of Prayer and the Book of Jihad in the Riyadh al-Salihin. (RT 1970:1-3; Tr. 638:17-639:6, 645:16-21; RT 1973:23-1974:3; Tr. 635:5-18; RT1933:24-1934:20; Tr. 635:19-24; RT 1979:14-17; Tr. 647:5-648:8; CR 694 ¶ 2; RT 1979:18-1980:4, 1981:23-1983:17, 1985:24-1987:10, 1991:20-1995:21; Tr. 636:15-637:6; RT 1987:5-1988:25; Tr. 646:17-647:4; RT 1984:7-1998:9; Tr. 647:23-650:15).  Furthermore, Dr. Haykel's supplemental declaration stated that it is possible "to establish that someone is partaking in jihadi ideological thought and belief," by analyzing their "considerable repertoire of ideas, books, authorities that they invoke and cite openly, and which mark them off from the rest of the Muslim community as jihadis."  CR 694 ¶ 8.  At the hearing, the government cross-examined Dr. Haykel on whether knowing that Hayat had certain material in his scrapbook, what he said to Naseem Khan, his ties to groups that Dr. Haykel testified were militant groups, and other trial evidence might increase, or decrease the likelihood that someone has "jihadi ideological thought" or ideas that "mark them off from the rest of the Muslim community."  (Tr. 658:10-666:23, 667:12-673:19, 673:21-674:1).  Although the government was not allowed to finish its cross-examination, the government argues that Dr. Haykel would have eventually have had to concede that, given Hayat's recorded statements to Naseem Khan, his scrapbook, his statements of intent, his direct ties to militant political parties that support extreme militant groups, and other trial evidence all together, that the inference could be drawn that Hayat had "jihadi ideological thought" or ideas that mark him "off from the rest of the Muslim community," or lose credibility with the jury.[113]  (CR 694 ¶ 8).  Dr. Haykel agreed that Ms. Mojaddidi introduced interpretations more consistent with mainstream Islamic thought during cross-examination.  (Tr. 651:11-652:5, 652:6-13, 652:17-23).  Therefore, in this case, the contrary evidence was before the jury, and Ms. Mojaddidi pointed out the other interpretations as well as the testimony of Dr. Weiss when she attacked Dr. Mohammed's testimony.  (RT 4322:1-4324:2); see Roybal v. Davis, 148 F.Supp.3d 958, 1075 (S.D. Cal.

---

[113] Dr. Haykel's jest, and Mr. Yang's counter-jest do not allow a contrary conclusion.  Dr. Haykel has an academic interest in jihadist materials, and Mr. Yang was preparing for a cross-examination.  The trial evidence was that: Hayat was studying at his grandfather's madrasa, which was directly linked to JUI and JEM between 1993 and 2000, that Hayat collected the scrapbook materials and obtained the militant magazines during that time period, that Hayat brought the scrapbook back to the United States and kept it for three years, that Hayat showed Naseem Khan the scrapbook in the context of discussing an interest in militant training and anti-American militant groups, and that Hayat was not in community college or working in a field where he would need to collect and keep these materials.  (RT 473:9-23, 563:18-21, 838-1385, 1758-1846; 2935-87).

2015) ("Petitioner now asserts that had additional records been obtained, and had additional tests been performed, the expert testimony would have been stronger and would have withstood cross-examination and rebuttal testimony, that is not the standard."). Therefore, Dr. Haykel's testimony does not establish a reasonable probability that the result of the proceeding would have been different.

**F.      Imam Anwar's Testimony Would not Have Been Admissible, and also Acknowledged that Ms. Mojaddidi Elicited the Substance of His Testimony on Cross-examination.**

The affidavit of Tahir Anwar ("Anwar") does not support Hayat's ineffectiveness claim or satisfy his burden to demonstrate prejudice. (See Def. Ex. CCC.) His testimony was not expert testimony. (CR 685 at 7:23-8:25). It would also have been inadmissible at trial because he was not a percipient witness and therefore could not offer a lay opinion about facts he did not perceive.[114] Fed. R. Evid. 602; United States v. Lopez, 762 F.3d 852, 863-64 (9th Cir. 2014) (ruling witness did not have personal knowledge when "Agent Harris was not in Nogales when Lopez was deported, and he did not witness the deportation."). Imam Anwar testified that he was not a percipient witness to the creation of the ta'wiz, that he did not write it or give it to Hayat, and he did not directly witness anything relevant to Hayat's case. (Tr. 563:10-21). Therefore, Ms. Mojaddidi cannot be ineffective for failing to find a

---

[114] A lay opinion witness "may not testify based on speculation, rely on hearsay or interpret unambiguous, clear statements." United States v. Lloyd, 807 F.3d 1128, 1154 (9th Cir. 2015). Rather, a lay person may offer testimony in the form of an opinion if it is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Rule 701(a) contains "the familiar requirement of first-hand knowledge or observation." Fed. R. Evid. 701 Advisory Committee notes (1972); see also Lopez, 762 F.3d at 863–64. The personal knowledge requirement under Rule 602 is the same as that under Rule 701(a). Lopez, 762 F.3d at 864. The Ninth Circuit has made clear that Rule 701 prohibits opinions based on a foundation that exceeds the witness's personal experience. See, e.g., United States v. Freeman, 498 F.3d 893, 904 (9th Cir. 2007) ("If [the witness] relied upon or conveyed hearsay evidence when testifying as a lay witness or if [the witness] based his lay testimony on matters not within his personal knowledge, he exceeded the bounds of properly admissible testimony."). Imam Anwar's proposed expert opinion about the meaning and implications of Hayat's ta'wiz was based on his hearsay and anecdotal experience leading a congregation of which Hayat was not a member, in a city in which Hayat did not reside. This Court correctly determined he was not a proper expert under Rule 702. (CR 685 at 8). However, permitting Imam Anwar to offer a lay opinion was error. (CR 693). Imam Anwar's testimony was not proper expert testimony but was based, in part, on "specialized knowledge not available to the average juror." (CR 685 at 8). Yet, Rule 701(c) is meant to exclude disguised expert testimony through purported lay witnesses, and expressly permits only testimony "not based on scientific, technical, or other specialized knowledge within the scope of" expert testimony. Cf. Lloyd, 807 F.3d 1128, 1157 ("the record does not present a basis to excuse the failure to provide … timely notice of [the witness's] Rule 702 expert testimony by holding it admissible as lay opinion testimony under Rule 701."). At trial, Imam Anwar's improper testimony would have been excluded.

witness whose testimony would not have been admissible at trial. See United States v. Smith, 415 F.Appx. 826, 828 (9th Cir. 2011) (denying petition because failure "to investigate, obtain, and present" evidence that "was plainly inadmissible" cannot be ineffective).

Nor could any prejudice result from Ms. Mojaddidi's failure to present Imam Anwar's testimony. Even in the unlikely event Imam Anwar would have been permitted to testify, like Dr. Haykel, he conceded the existence of militant "fringe groups"—like those with which Hayat demonstrated strong affinity and to which he had direct family ties—that held "a misconstrued view of Islam" in Pakistan. (Tr. 566:14-567:6). Imam Anwar agreed with Dr. Mohammed's word-for-word translation of Hayat's du'a, (Tr. 568:16-21), that fringe groups may have a different interpretation of that du'a (one consistent with Dr. Mohammed's testimony), (Tr. 569:8-10), and that some of the Hadiths happened during wartime (Tr. 569:11-21). Imam Anwar also conceded that, on cross-examination at Hayat's trial, Ms. Mojaddidi elicited concessions from Dr. Mohammed in which he acknowledged more mainstream interpretations of the du'a to the jury. (Tr. 570:11-571:16, 572:22-573:3). Imam Anwar's testimony concerning the use of the ta'wiz generally coincided with Dr. Weiss's testimony concerning the cultural use of the ta'wiz. (See Tr. 549:23-16, 559:3-561:25). Accordingly, no prejudice could have resulted from Ms. Mojaddidi not presenting Imam Anwar's improper testimony. That testimony could not have altered the outcome of Hayat's trial and it does not aid his claims now.

**G.     Hayat Fails to Establish Ineffectiveness or Prejudice with regard to the Handling of Dr. Mohammed's Testimony.**

Ms. Mojaddidi effectively prepared for, and cross-examined Dr. Mohammed. (W.M. Depo. 198:16-202:7, W.M. Depo. 281:10-15). She also effectively used Dr. Weiss to counter Dr. Mohammed's testimony. (RT 4178:21-4180:2, 4184:24-4185:4, 4185:18-24, 4186:10-4187:11, 4192:9-19, 4194:1-7, 4194:21-4195:14, W.M. Depo. 205:12-206:7). Dr. Haykel testified that jihadists and militants would use this du'a, that it is susceptible to offensive or more aggressive interpretations by jihadists and militants. (CR 694 ¶¶ 5, 8; Tr. 641:14-642:19, 657:19-658:8, 658:10-23). Furthermore, based on his declaration, his supplemental disclosure, and common sense, Dr. Haykel likely would have testified that Hayat's ideas, books, and authorities as well as his statements would place him closer to jihadist or militant interpretation of this du'a and outside of mainstream Muslim interpretation of this

UNITED STATES' POST-HEARING OPPOSITION TO
MOTION FOR WRIT OF HABEAS CORPUS

216

du'a. (Tr. 658:25-666:23). That testimony, and other testimony where Dr. Haykel and Dr. Mohammed agree, eliminates any prejudice, and therefore, this Court should deny Hayat's petition based on his claim regarding the handling of Dr. Mohammed's testimony.

**XV.   HAYAT'S BRADY CLAIMS ARE SPECULATIVE AND LACK MERIT**

Hayat alleges that the government failed to disclose information in discovery before and after trial that violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963). Pet. at 102-116. The district court has denied discovery concerning potential Brady claims, finding that they were conclusory, speculative and unsupported. CR 686 at 12:5-22, 14:5-16. Therefore, Hayat did not establish good cause for discovery related to militant training camps, or that there is a Brady violation to justify discovery. In addition, the District Court necessarily decided there was no Brady violation when it determined that there was no reason to re-visit its prior CIPA rulings. See Thomas v. Bible, 983 F.2d 152, 154 (9th Cir. 1993) (discussing application of law of the case doctrine); Milgard Tempering, Inc. v. Selas Corp. of America, 902 F.2d 703, 715 (9th Cir. 1990) (same). There is no evidence to support petitioner's allegations of Brady violations, therefore, this Court should find and recommend denial of the petition on the Brady claims. See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

**A.   The District Court Ruled that Petitioner Has not Shown Sufficient Cause for Discovery Regarding the Existence of Training Camps.**

Hayat alleged that information concerning the potential existence of terrorist training camps located in other areas in Pakistan should be considered materially exculpatory Brady information that was key evidence withheld by the government at trial. Pet. at 102-107. Hayat conceded that his defense at trial was that he never attended a jihadi training camp while in Pakistan in 2003 and 2004, and therefore, he should not be convicted of providing material support to terrorists, in violation of 18 U.S.C. § 2339A. CR 608 at p.9.

In its order denying discovery, the District Court found that, "Petitioner has not shown that the requested discovery information in Interrogatory One [seeking steps taken by the government "to determine whether Balakot was functioning as a jihadi training camp in 2003 and 2004] is supported by 'any facts which would tend to show that the government was in possession of information that would

be material to the defense.'"  CR 686 at 8:27-9:4 (quoting United States v. Little, 753 F.2d 1420, 1445 (9th Cir. 1984)). Regardless, Hayat attempts to claim that the government's response to Interrogatory One is a concession, and that it was somehow prejudicial.  (OPHB at 96:9-24).  That the government did not take steps to travel to Balakot and inspect the Balakot camp was well-known to the defense attorneys at trial.  First, common sense dictates that United States government officials cannot waltz into an anti-American militant camp.  Second, the FBI has limited powers, and resources, especially when operating in foreign jurisdictions (RT 1555:5-19, 1573:22-1574:1, SA Aguilar; RT 37:53:24-3754:20, SA Schaaf).  Third, the trial record refutes this claim because defense counsel specifically questioned the government's witnesses about whether they went to Pakistan and the Balakot camp, and they truthfully answered that they had not (RT 683:1-6, SA Aguilar; RT 3618:4-10, SA Schaaf; RT 3105:4-9, Mr. Benn).[115]  Because Hayat and his counsel knew these facts during trial, they were not "suppressed" under Brady.  See United States v. Aichele, 941 F.2d 761, 764 (9th Cir. 1991) ("When a defendant has the opportunity to present impeaching evidence to the jury, [], there is no prejudice in the preparation of his defense.").  This Court should deny these unsupported and refuted claims.  See United States v. Espinoza, 866 F.2d 1067, 1069 (9th Cir. 1988), (explaining court's power to dismiss claims "'conclusively decided on the basis of documentary testimony and evidence in the record'" quoting Watts v. United States, 841 F.2d 275, 277 (9th Cir. 1988)); see also Blackledge v. Allison, 431 U.S. 63, 75–76 (1977) (vague or palpably incredible or frivolous allegations warrant summary dismissal of a petition for habeas corpus).

### B.    Hayat Has no Evidence of Brady Violations Relating to Aerial Photographs.

The District Court found Hayat's assertions that the existence of additional aerial photographs were exculpatory or material were "conclusory" and that Hayat had not "point[ed] to any existing favorable evidence to support his speculation."  (CR 686 at 12:5-9) (quoting United States v. Lucas, 841. F.3d 796, 809 (9th Cir. 2016)).  A court should not grant habeas relief "on the basis of little more than speculation with slight support," therefore, this Court should deny relief on Hayat's claim.  Wood v. Bartholemew, 516 U.S. 1, 8 (1995) (reversing Ninth Circuit's grant of habeas relief as speculative

---

[115] In addition, the District Court specifically rejected Kyles v. Whitley, 514 U.S. 434 (1995) as a rationale supporting a Brady claim on this record.  (CR 686 at 8:17-23).

second-guessing of trial counsel).

**C.** **Hayat's Conclusory Allegations about the Operational Status of the Balakot Camp Have no Support.**

The District Court found that Hayat's claim that documents discussing the Balakot Camp's operational status must exist based on the FOIA documents "requires drawing unsupported inferences." (CR 686 at 13:25-14:16). Hayat has not introduced evidence that the government failed to disclose Brady material regarding whether the Balakot camp was a functioning militant camp in 2003-2004, therefore he has no evidence to support his claim. Therefore, the government requests that this Court deny Hayat's Brady claim. See Runningeagle v. Ryan, 686 F.3d 758, 770 (9th Cir. 2012) (denying unsupported Brady claim based on "inference and supposition.").

**D.** **Hayat's Warrantless Surveillance Claim Is Purely Speculative.**

This Court has already rejected Hayat's claims concerning surveillance recordings. (CR 630 at 14-15), noting that there was no evidence to suggest he was subjected to warrantless wiretapping or other forms of illegal surveillance. This Court held that Hayat's "generalized statement" was "insufficient to demonstrate that [Hayat] was personally targeted by these programs." (CR 630 at 15). Therefore, Hayat's Brady claim regarding warrantless surveillance is wholly speculative, and this Court should deny the petition on all the Brady claims.

**CONCLUSION**

Hayat has failed to meet his burden to demonstrate that Ms. Mojaddidi labored under an actual conflict of interest that adversely affected his representation, and his various claims that Ms. Mojaddidi provided him with incompetent and prejudicial representation. Hayat also cannot demonstrate that any of his claims of ineffective assistance of counsel satisfy the Strickland standard for ineffectiveness. The deposition of Ms. Mojaddidi and the other evidence developed so far fail to support Hayat's claims, therefore, this Court should deny each of Hayat's claims of ineffective assistance of counsel and deny the Petition.

The petitioner's Brady claims are speculative and lack evidentiary support. In addition, Hayat cannot support a claim that any of his speculative evidence was material and therefore establish prejudice. Therefore, this Court should deny the Petition.

Dated:  May 25, 2018

McGREGOR W. SCOTT
United States Attorney

By:   /s/ ANDRÉ M. ESPINOSA
ANDRÉ M. ESPINOSA
ROGER YANG
Assistant United States Attorneys


By:   /s/ JENNIFER E. LEVY
JENNIFER E. LEVY
Trial Attorney
Counterterrorism Section
National Security Division