# EXHIBIT 1

# (Hearing Exhibit 42)

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FILED

APR 1 9 2001

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
        DEPUTY CLERK

---oOo---

BEFORE THE HONORABLE EDWARD J. GARCIA, JUDGE

---oOo---

I hereby certify that the annexed
instrument is a true and correct copy of
the original on file in my office.
ATTEST: MARIANNE MATHERLY
Clerk, U. S. District Court
Eastern District of California
By_____ Deputy Clerk
Dated   5/25/18

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )
        vs.                        )CR. CR-93-118EJG
                                   )
CLAYTON JACKSON,                   )
                                   )
                Defendant.         )
_____)

---oOo---

REPORTER'S TRANSCRIPT

EVIDENTIARY HEARING

THURSDAY, DECEMBER 14, 2000

---oOo---

REPORTED BY:   CATHERINE R. VESTITO, CSR NO. 9670

412

A P P E A R A N C E S


For the Plaintiff UNITED STATES OF AMERICA:


       OFFICE OF THE U.S. ATTORNEY
       500 "I" Street, Suite 10-100
       Sacramento, CA  95814
       BY:  JOHN VINCENT
          JIM ARGUELLES
       Assistant U.S. Attorneys


For the Defendant CLAYTON JACKSON:

       LAW OFFICE OF RIORDAN & ROSENTHAL
       523 OCTAVIA STREET
       SAN FRANCISCO, CA 94102
       BY:  DENNIS P. RIORDAN
       ATTORNEY AT LAW

I N D E X   F O R   J A C K S O N

THURSDAY, DECEMBER 14, 2000

CHRONOLOGICAL INDEX OF WITNESSES

WITNESSES FOR THE DEFENSE                                    VOL/PAGE
---------------------------------------------------------------

DAVID LEIPPE

DIRECT EXAMINATION BY MR. RIORDAN                                9
CROSS-EXAMINATION BY MR. VINCENT                               28
REDIRECT EXAMINATION BY MR. VINCENT                           46
EXAMINATION BY THE COURT                                      55
RECROSS-EXAMINATION BY MR. VINCENT                            62


FOR THE UNITED STATES
---------------------------------------------------------------


DAVID FECHHEIMER

DIRECT EXAMINATION BY MR. VINCENT                             64
CROSS-EXAMINATION BY MR. RIORDAN                              74
EXAMINATION BY THE COURT                                      75
REDIRECT EXAMINATION BY MR. VINCENT                           79

E X H I B I T   I N D E X   F O R   J A C K S O N


THURSDAY, DECEMBER 14, 2000




                                                    VOL/PAGE


EXHIBITS FOR THE HEARING:                    I.D.        EVID.

--------------------------------------------------------------


1 - COPY OF CASSETTE TAPE                     6            6

SACRAMENTO, CALIFORNIA

THURSDAY, DECEMBER 14, 2000

--oOo--

THE CLERK:  Calling criminal dash 93 dash 118, United States versus Clayton Jackson.

MR. VINCENT:  Good afternoon, Your Honor.  John Vincent and Jim Arguelles on behalf of the United States.

THE COURT:  Mr. Vincent and Mr. Arguelles.

MR. RIORDAN:  Good afternoon, Your Honor.  Dennis Riordan on behalf of the Petitioner Jackson.

THE COURT:  Mr. Riordan.

And who else is with you at counsel table, Mr. Vincent?

MR. VINCENT:  Your Honor, Special Agent Jim Wedick with the F.B.I.

THE COURT:  Was he the case agent?

MR. VINCENT:  Yes, Your Honor.

THE COURT:  Okay.  This matter is on calendar for an evidentiary hearing on Defendants Section 2255 petition and hearing mandated by the Ninth Circuit Court of Appeals on limited agreement.  Before we get started, the Government submitted a cassette tape which I presume is a copy or the original of the so-called threatening phone call?

MR. VINCENT:  Yes, Your Honor.  That is a copy of it.

THE COURT:  Okay.  I haven't listened to it, but I

assume I have everything that's on the tape in the written materials I received?

MR. VINCENT: Yes, Your Honor. There's an introduction on the tape which says "hello," and then there's a delay. You don't have all of it. You have the part of the speaker that is leaving the message.

THE COURT: You mean the subscriber says hello to whoever is calling?

MR. VINCENT: There's a message on the machine when the machine is activated. You don't have that.

THE COURT: In any event, why did you submit it?

MR. VINCENT: Just so that the Court had a copy of the tape. It would be part of the record in the event that it went beyond this.

THE COURT: Okay. Well, any objection then if we receive it into evidence, Mr. Riordan?

MR. RIORDAN: No, Your Honor.

THE COURT: All right. That will be the order. I'm not sure. Let's make it Hearing Exhibit 1.

(Whereupon, Hearing Exhibit 1 was marked for identification and received into evidence.)

THE COURT: Also submitted by the Government and in a memo to the defense is what's described as an unredacted copy of an F.B.I. report of an interview of Mr. Leippe concerning an entirely unrelated case. You want that in evidence also,

Mr. Vincent?

MR. VINCENT:  No, Your Honor.  I just wanted the Court to have a copy of it.  In the event that it came up during the course of the hearing that you would have a copy of it.

THE COURT:  In any event, you have a copy of it, Mr. Riordan?

MR. RIORDAN:  Um, I believe I've been served with a copy of it, Your Honor.

MR. VINCENT:  Yes, Your Honor.  He has a redacted copy where names have been taken out.

THE COURT:  Okay.  So how did we leave it at the last status conference, that we would hear from at least at the start from two witnesses, Mr. Riordan?

MR. RIORDAN:  Your Honor, it was our intention to hear from the former juror Leippe.  Mr. Fechheimer is here. I don't know that I intended to call him unless there was some matter that became relevant during the examination of David Leippe.

THE COURT:  All right.  Mr. Vincent, you may call him.

MR. VINCENT:  Yes, Your Honor.

THE COURT:  Okay.  So let's swear and call the first witness then.

MR. VINCENT:  Your Honor, should we exclude

Mr. Fechheimer while the other witness is on the stand?

THE COURT:  Any objection, Mr. Riordan?

MR. RIORDAN:  I don't have any objection, Your Honor.

THE COURT:  All right.  That will be the order.

(Whereupon, prospective witness Fechheimer exited the courtroom.)

MR. RIORDAN:  I don't know, Your Honor, that we actually settled at the hearing on how we were going to proceed.  I'm prepared to conduct an initial examination of the first witness.  I think it's my burden on the first half of the Ninth Circuit format of going forward on the initial question on which they've amended.

THE COURT:  Okay.  I don't want to hurry counsel, and I want to give you both an opportunity to present everything you want.  I intend to recess this hearing at 4:30 p.m. this afternoon -- that's normally close of business for the Court -- because I have an engagement this evening that I'm committed to.  In the event we run past or into 4:30, I'm available tomorrow, and I have a regular law and motion calendar on Monday.  So I'm available at 9:30 or 9:15 next Monday.  Or if that's not convenient to counsel and the witnesses here, I'll continue it to whatever date you might suggest, okay?

MR. RIORDAN:  Thank you, Your Honor.

MR. VINCENT:  Thank you, Your Honor.

THE COURT:  Mr. Leippe, would you please step forward to be sworn.

DAVID LEIPPE,

having been called by the Defense, after being first duly sworn by the Clerk, was examined and testified as follows:

THE CLERK:  Please be seated.  State your name and spell your last name.

THE WITNESS:  My name is David Leippe.  The last name is L-E-I-P-P-E.

DIRECT EXAMINATION

BY MR. RIORDAN:

Q.   Good afternoon, Mr. Leippe.  My name is Dennis Riordan.  I represent Clay Jackson.  Am I pronouncing the name correct of "leap-ey"?

A.   That's correct.

Q.   Um, Mr. Leippe, at some point you served as a juror in a trial before Judge Garcia; did you not?

A.   Yes, I did.

Q.   And that was around 1993 -- in 1993 if you recall?

A.   Yes.

Q.   And that was the case of United States versus Clayton Jackson and Paul Carpenter?

A.   That's correct.

Q.   And you, in fact, wound up being the jury foreman in that case; did you not?

A.    Yes, I did.

Q.    Um, at some point during the trial you recall that you had returned to your house and found a telephone message on your phone?

A.    That's correct.

Q.    This was a threatening telephone message?

A.    That's correct.

Q.    Do you happen to recall what the content of the message was?

A.    I only heard it once.  It was just basically a life-threatening-type thing, and it's very sort of unprofessional.  It was kind of amusing.  So I just left it on the answering machine tape.

Q.    I'm going to -- for your convenience, Your Honor, there is a stipulation between the parties that Mr. Leippe received this conver -- telephone call on Saturday, November 27th.

      You have an independent recollection of the date?

A.    Actually, I have no recollection other than it would be during the deliberation phase.

      THE COURT:  What date are you suggesting, Counsel?

      MR. RIORDAN:  Saturday, November 27.

      THE COURT:  You agree, Mr. Vincent?

      MR. VINCENT:  Yes, Your Honor.

      THE COURT:  Okay.

Q.    (BY MR. RIORDAN)   It's your recollection, sir, that the deliberations had actually begun before you actually got this telephone call?

A.    That's correct.

Q.    And it was on a weekend, wasn't it?

A.    I don't remember.

Q.    Um, do you remember roughly the time of the day when you discovered the message?

A.    All I remember is I came home.  Obviously no one had been home to answer the phone, and the message was on the tape.  It might have been in the evening or something like that.

Q.    And a death threat naturally caused you some concern; did it not?

A.    Oh, certainly.

Q.    And, um, it caused you enough concern to call the county sheriff's office, correct?

A.    That's correct.

Q.    And you also made a call to the Federal Bureau of Investigation; did you not?

A.    That was after discussing it with the sheriff.  He asked me, you know, if I had any ideas what this might be related to, and I only had three or four other possibilities, and that was one them.  So he recommended in regards to this case that I should contact the F.B.I., which I contacted the

F.B.I. And then because it related to this case, then I was referred to Wetbush I guess -- Is that right? -- or I'm not -- I don't remember the names. There were a number of people involved in the case, but that's where it went and that's why.

Q. Okay. Um, the -- you mentioned that the deputy asked you what it might be related to. And one of the things that you mentioned was that you were serving on a Federal jury, right?

A. That was one of the things, yes.

Q. All right. And, um, you specifically told him that it was a high profile case or well-publicized case? You remember saying anything to that?

A. Just told him what the case was.

Q. You told him it was United States versus Jackson?

A. Yes.

Q. Might you have used the word the "Capscam" case?

A. Yeah. That was a public name for it.

Q. You were aware of that name, and that was the way you would refer to it?

A. Yes. That's the common name.

Q. Um, and do you remember who you spoke to when you called the F.B.I.?

A. I don't. I just remember that there were several names over time. Wedick, that might be one, or Drost or

something like that.  I don't know who I spoke with first or who all I spoke with regarding that matter.

Q.    Do you recall that after you called them you got a call back from the F.B.I., correct?

A.    Yes.

Q.    And, um, the -- an agent identified himself as being from the F.B.I. while -- after you picked up the phone to speak to him, right?

A.    Yes.

Q.    And that agent identified himself as Agent Drost, right?

A.    I guess so.  I don't remember.

Q.    Let me ask you this:  A couple of days after this you returned to the trial in front of Judge Garcia, right?

A.    That's correct.

Q.    And at that time Judge Garcia had you into his chambers with some lawyers present and talked to you about this incident?

A.    Yes.  Lawyers from both sides were present.

Q.    And at the time, of course, these events were much clearer in your mind than they are six years later I assume?

A.    That's correct.

Q.    This was, what, just a day or two after the phone call, right?

A.    Right.

Q.    And do you recall telling Judge Garcia that you had talked to Agent Drost on the telephone?

A.    I don't remember other than -- in fact, I'm not really sure how the -- how I delivered the tape.  If I delivered the tape then or whether it was delivered via the sheriff, I don't remember.  I just know that they have my original tape, and that obviously the Judge had some concern about this.  And the big question was whether it was related to this case at all or not.

Q.    Okay.  You do recall that at the time -- after the deputy came out to your house you were told that you were going to provide the tape to someone, right?

A.    Yes.

Q.    And you were told at the time that the F.B.I. was interested in having the tape, weren't you?

A.    I just, you know, assuming it was related to this case I'm sure they would have an interest.  Since it was on the telephone it's a Federal-type problem anyway.  So --

Q.    Let me ask you this:  If you were to take a minute to take a look at the statements you made to Judge Garcia immediately after, um, this incident when you first came to court, might that refresh your recollection about these events?

A.    Oh, sure.

MR. RIORDAN:  Can I have just a second, Your Honor?

THE COURT: Sure.

Q. (BY MR. RIORDAN) Mr. Leippe, I'm approaching you and I'm going to hand you, oh, about six or seven pages, what appear to be court transcripts, okay?

A. Okay.

MR. RIORDAN: And, Your Honor, for the record, I'm going to be making reference to a few pages from Unites States versus Jackson beginning at page 3719.

Q. And, Mr. Leippe --

THE COURT: Hold on just a minute. Let me find my copy.

MR. RIORDAN: I can provide the Court with a -- the pages that I'm actually going to be referring to.

THE COURT: I've got it. That's not necessary. I have the complete reporter's transcript of the three sessions that I held when this problem arose. And are you showing the witness the entire transcript of those three sessions?

MR. RIORDAN: Your Honor, it was my intention -- what I've handed to him is what I believe --

THE COURT: Just answer my question, Counsel. I have the entire reporter's transcript of the three sessions that I held when this issue arose --

MR. RIORDAN: Right.

THE COURT: -- during the trial. I'm just asking you, are you showing him the entire reporters' transcript or

just a portion where he was present and he answered questions?

MR. RIORDAN:  Your Honor, the latter.  Just the portion where he was present and answered questions.

THE COURT:  Okay.  Okay.  And I have the numbers of the transcripts.  So when you refer to a page number, I'm right with you.

Q.    (BY MR. RIORDAN)  Mr. Leippe, I'm going to ask you to look at page 3722.  It's a couple of pages in the documents.

A.    Okay.

Q.    At about eight or nine lines down you begin to speak. And I'm just going to ask you if you could read down to the bottom of the page.

A.    Okay.

Q.    Um, does that refresh your recollection as to whether you knew whether the F.B.I. was interested in getting a hold of the tape?

A.    Yes.  Well, I -- obviously they were called and certainly would have to take some response.

Q.    And that was because of your presence on a jury in a Federal case, right?

A.    Right.

Q.    That was the understanding.  And you do recall that at some point the tape was surrendered to the police to be conveyed to the F.B.I.?

A.    That's correct.

Q.    And you were told they were going to put an emergency trap on your phone, weren't you?

A.    I don't remember.  They probably would have done that just part of an opportunity to discover evidence or whatever might have been related to it if it reoccurred or something.

Q.    Okay.

A.    It's something I would do if I were an agent.  I would try and do that.

Q.    Um, an Agent Drost is mentioned in that section that you just read.

A.    Yes.

Q.    You were aware that he was one of the case agents on the Jackson case, right?

A.    Um, I don't know that he was.  I know that I knew that he was one of the case agents.  To me reading this it suggests that I perhaps wouldn't have known he was, and that he was just sort of a neutral agent who was just going to -- it looks like I apparently was going to give him a tape.

Q.    Um, do you recall that Agent Drost had been a witness against Mr. Jackson, a prosecution witness?

A.    No, I don't remember that.

Q.    Um, now, at some point in 1997 you talked to a private investigator --

A.    Right.

Q.    -- correct?  And do you remember his name?

A.    Something like Fetchman or Fechheimer or something like that.  It was kind of a clever name for an investigator, private investigator, whatever he is.

Q.    Fair enough.  And you told Mr. Fechheimer that at the time that you got this call you thought it could have come from one of a couple of different sources?

A.    That's correct.

Q.    Um, one of them was local politics, right?

A.    That's correct.

MR. VINCENT:    Your Honor, I will object to this because I believe it misstates what is contained in Mr. Fechheimer's report.  And I would ask that before he's cross-examined about it, he be given an opportunity to see that report.

MR. RIORDAN:    I have no objection to him seeing the report, Your Honor.

THE COURT:    Okay.  Why don't you show it to him.

MR. RIORDAN:    For the sake of convenience, Your Honor, that report has been attached to the Government's brief as Government Exhibit E and is on file with the Court.  So I will show Mr. Leippe what's been marked as Government Exhibit E and refer to it as that hereafter.

THE COURT:    Incidently, Mr. Riordan, was this exhibit, that is the investigator's report of the

investigation, was that attached to the 2255 motion before the Court or on appeal?

MR. RIORDAN:  It was not attached to the, um, Mr. Fechheimer's affidavit before the Court.

THE COURT:  How about before the Ninth Circuit Court of Appeals?

MR. RIORDAN:  Well, Your Honor, nothing would be before the Ninth Circuit that hadn't been before the Court, Your Honor.  No, it was not.

THE COURT:  Okay.

THE WITNESS:  Okay.

MR. RIORDAN:  Okay.

THE WITNESS: I read that page.

MR. VINCENT:  Your Honor, I would just ask that he read the entire report since he may be questioned about it.

THE COURT:  Well, since you're doing the objection, Mr. Riordan, since you have no objection, is that okay?

MR. RIORDAN:  I have no objection, Your Honor.

THE COURT:  Go ahead and take your time and read the entire report.  It isn't that long if I recall.  It's just two pages.

THE WITNESS:  Just two?  Okay.  Okay.

Q.    (BY MR. RIORDAN)  Thank you, Mr. Leippe.  So during the course of the conversation with Mr. Fechheimer you mentioned that one thought that you had when you got the call

is that it could have been related to local politics, right?

A.    That's correct.

Q.    And that's because you had been involved in -- in some legal skirmishes with other people in the utility district, right?  There was some issues that had arisen over how the utility district's affairs were being conducted, right?

A.    It's not a utility district, but it was a specific district.  And also I can't say too much because it's also Grand Jury related.

Q.    Oh, okay.  Um, but at any rate that -- that issue and that set of issues didn't have anything to do with the trial in Federal court, right?

A.    They were just independent concurrent events I guess would be the phrase.  And with a history of problems in the district other people had experienced, there was -- it wasn't that uncommon to have vigilante-type things going on, and it could just as well been some of the people in the district playing games.

Q.    And that was one explanation.  And another explanation that you discussed with Mr. Fechheimer is that it occurred to you that this might have been an attempt to hang the jury?

A.    Oh --

Q.    In the Jackson --

A.    -- that's all certainly possible, right.

Q.    And you talked about if that was the cause, you had some thoughts as to who was the likely source of this attempt, right?

A.    Yeah.  There were two choices in the case.  If it was somebody related to the case, it would be either Mr. Jackson or Mr. Carpenter.

Q.    And what were your thoughts on Mr. Carpenter that you discussed with David Fechheimer?

A.    Well, it was just kind of an academic thing.  If you were going to pick one and say, well, Paul Carpenter identified himself as having been trained in psychological warfare in the military and say, okay, well, maybe this is -- he's using a little bit of his training or, um, it could have been Mr. Jackson just feeling that he just did not deserve to be convicted of something, whether you agreed or not with the jury's decision, and this would be a desperate attempt by either party to try and play with the jury and perhaps cause a mistrial.

Q.    And do you recall where you got your information on Mr. Carpenter's information?

A.    Yes.  In the trial.

Q.    So it was your recollection when you were -- at the time when this call was made it occurred to you that Mr. Carpenter you had learned during the trial had training

in psychological warfare?

A.   Sure.

Q.   Which he had gotten from the military?

A.   Right.

Q.   And you use the term psych-ops?

A.   Psych-ops.

Q.   Right.  And how would you define that?

A.   Psychological operations.  Psychological warfare.
It's a formal military school for that, and I think it's in
Florida.

Q.   And was your impression at the time was that this was
where Mr. Carpenter had trained?

A.   Well, that's what was stated in the trial, yes.
That's where he went for school.

Q.   Um, and when you talked to Mr. Fechheimer, you
weren't saying that at that time you felt clearly that it was
the local district or it was Carpenter or Jackson, it was a
50/50 possibility in your mind?

A.   Well, I mean I felt that it could have been union
related, United related, Space Shuttle Challenger related.
It could have been these people in the trial.  I mean I can't
-- I can't be growing 10 sets of eyes in the back of my head
watching everybody.  The tape itself spoke for itself.  It
was rather an amateur attempt to do something.  I don't know.
I don't know what they attempted to do with that, but it

certainly didn't frighten me.  It didn't frighten my family. It was just something that definitely needed to be reported. Just it was an academic exercise to me.

Q.    Um, and subsequently much more recently you had a conversation with Special Agent from the F.B.I., Mr. Lester; did you not?

A.    Yeah.  That was I think in the past 12 months I think.

Q.    Right.  He called you to tell you that there had been a decision, a legal decision that might require you to appear in the case again, didn't he?  Is that right?

A.    Yeah.  I was told I would probably be subpoenaed to appear at a hearing sometime in the future regarding some district court appeal.

Q.    And you had a conversation with Mr. -- Agent Lester as well as what the possible sources of this phone call might have been, right?

A.    I don't remember.

Q.    Might it refresh your recollection if you saw a report of that conversation done by Mr. Lester -- Agent Lester?

A.    Sure.

MR. RIORDAN:  Your Honor, can I approach the witness with a copy of the 302 by Agent Lester dated 5/2/00?

THE COURT:  Yeah.  However, is it an exhibit that's

before the Court in the materials submitted?

MR. VINCENT:  Your Honor, I believe that counsel attached it to his Exhibit A.  I think -- I'm sorry.  It's --

MR. RIORDAN:  I think it's B, Your Honor.

MR. VINCENT:  I'm sorry.  Exhibit B.

MR. RIORDAN:  Right.  It's attached to Defendant Jackson's prehearing memorandum as Exhibit B.

THE COURT:  Give me a minute to see if I can find it.

MR. RIORDAN:  I have additional copies as well, Your Honor.

THE COURT:  What exhibit?

MR. RIORDAN:  It's attached to Defendant's memorandum as Exhibit D, Your Honor.

THE COURT:  Okay.  Hold it.  I got Defendant Jackson's prehearing memorandum filed December 8, 2000, and it only goes up to Exhibit C.

MR. RIORDAN:  Right.  I'm sorry.  B as in boy, Your Honor.  I may have said "D."  "B" as in boy.

THE COURT:  Oh, okay.  Go ahead.

Q.   (BY MR. RIORDAN)  Mr. Leippe, I'm going to ask you to turn to the second page of that document and just review the first paragraph.

A.   Okay.  Okay.

Q.   So these are the same things that you had discussed with Mr. Fechheimer I believe.  The first thing is that you

did tell Agent Lester that you think that the phone call could have been related to a local committee in of which you were a member in Shingle Springs?

THE COURT: Excuse me. You referred him to the first paragraph of the first page?

MR. RIORDAN: I'm sorry, Your Honor. I believe I referred him to the first paragraph of the second page.

THE COURT: Okay.

Q.    (BY MR. RIORDAN)  So you mentioned to Agent Lester that this could have been connected to local politics?

A.    Correct.

Q.    And then you also mentioned that it could have been connected to the Jackson trial, correct?

A.    Yeah.  It's all just very consistent speculation, but all speculation.

Q.    And you mentioned that you felt it wouldn't have been above Jackson's arrogance to leave the message on your phone to try and hamper your performance as the foreman of the jury, right?

A.    Um, that -- apparently that's what I said.  I'm sure that's not what I meant.  Somebody related to perhaps Jackson or Carpenter or the local politics.  We don't know, do we?

Q.    And you -- all right.  And you mentioned that again, Carpenter, if it was related to the trial, would be the most likely candidate because of his training in psychological

warfare, right?

A.   Yeah.  At times I've thought that and other times I've talked myself out of it and thought it could have gone the other way.  It's a -- if I had to guess, um, that's what I would guess one minute, and the next minute I might guess the other.

Q.   Um, I'm going to direct your attention to page four of that document.  The last paragraph which begins "Leippe thought that only his name."  Page four.  About halfway down, page four.

A.   Um, to the last paragraph?

Q.   I'm sorry?

A.   Page four?

Q.   Right.  The last paragraph I believe begins "Leippe thought that only his name" --

A.   Right.

Q.   Okay.  Um, you're referring there to the fact that it was your belief that only your name was announced in court because you were the foreman, right?

A.   That was the impression I got because everybody else's seemed to like have a lottery number in the beginning, and I was the only one addressed in the court that I was aware of.  When we came out of deliberations, it was questions or further instruction-type things we needed.

Q.   And the fact that only you were named in court was --

it occurred to you that that might have been the reason why you got a telephone call, right?

A.    Yes.   That's -- I don't know how else anybody would know.   And also peculiar is my phone's not listed.

Q.    Um, at some point in the last couple of years, um, you made a phone call to a call-in news discussion, didn't you, on the radio or television about the O.J. Simpson case?

A.    Not that I know of.

Q.    You have no recollection of calling in and mentioning your jury service on the television show or radio show?

A.    It doesn't ring a bell at all to me.

Q.    Um, again, I'm going to show you a document to see if it refreshes your recollection.   It may or may not.

A.    Okay.

MR. RIORDAN:   Um, Your Honor, I'm going to show the witness what's been attached to Defendant Jackson's memorandum as Exhibit C.

THE WITNESS:   It sounds like it's referring to a Dave from Cameron Park, but I don't recall this.   I don't have any recollection of this.

MR. RIORDAN:   Thank you.

If I can just have 10 seconds, Your Honor.   I don't have anything further, Your Honor.

THE COURT:   Very well.   Any questions, Mr. Vincent?

MR. VINCENT:   Yes, Your Honor.

CROSS-EXAMINATION

BY MR. VINCENT:

Q.   Mr. Leippe, I'm John Vincent with the United States Attorney's Office.  I had a few questions for you.  Have you listened to the tape of the threat recently?

A.   No.  I -- when I gave the sheriff or whoever I gave the tape to, I'd only heard it once, and I don't have a copy of it.  I had no reason to keep it.

Q.   Did you recognize the voice of the person on the tape?

A.   No.

Q.   Did the caller identify himself?

A.   No.

Q.   Did the caller identify who the message was for?

A.   No.

Q.   Did the caller refer to you by name?

A.   No.

Q.   Did the caller connect the call to the trial?

A.   No.

Q.   Did the caller connect the call to your jury service?

A.   No.

Q.   Did the caller connect the call to anything?

A.   No.

Q.   You testified earlier you were not scared by the call?

A.   That's correct.  I was not scared.

Q.   Now, you graduated from the Air Force academy?

A.   That's correct.

Q.   And were you a pilot in the Air Force?

A.   Yes.

Q.   What did you fly in the Air Force?

A.   I flew B52's and Strategic Air Command for about four years from late '67/'68 until partway through 1972 serving one term in Vietnam on the B52 and then later assignment to what we call the AC119K, a modification of a cargo plane.  It was used in Vietnam as a gun ship, a low altitude attack airplane.

Q.   So you served in combat?

A.   Yes.

Q.   When did you go -- you went to work at some point for United Airlines?

A.   That's correct.

Q.   When did you go to work for United Airlines?

A.   It was June of 1979.

Q.   And in 1993, going back to the time that you were serving as a juror in this case, what aircraft were you flying for United Air?

A.   I was flying the Boeing 727.

Q.   727?  Are you used to stress in your line of work?

A.   Well, it's sort of a daily thing.

Q.   Now, you've testified just a moment ago that the phone that on which this message was left, it was not in your name; is that correct?

A.   That's correct.

Q.   Um, now, if -- for a moment, if you could refer to Exhibit E which is in front of you there which relates to your conversation with Mr. Fechheimer, and I'm also going to give you what has been attached to the Government's pleading as Exhibit F, I'd ask you, please, to take a moment to take a look at Exhibit F.

THE COURT:  F is attached to your brief?

MR. VINCENT:  Yes, it is, Your Honor.

THE COURT:  Okay.

THE WITNESS:  Okay.

MR. VINCENT:  May we have the lights turned down, please?  Referring to page two of --

THE COURT:  Is that in focus or are my eyes failing me?  That's a little better.  Going the wrong way.  That's okay.  I have the exhibit before me I think.

Q.   (BY MR. VINCENT)  Going back to the time of this call in November of 1993, were you having difficulties with United Airlines?

A.   Um, what was the date of the question again?

Q.   This was in November of 1993.

A.   I wouldn't say I was having difficulties with United

other than for many years prior to that I had done a lot of investigating work regarding the corporation and CEOs, and I was doing this for the union.  And over time I actually uncovered quite a number of things that were well documented in SEC disclosure statements.  And there were a lot of secondhand stuff by people that were directly involved with writing certain checks and things that were inappropriate.

And they were -- in 1993 we were approaching this what everybody calls the ESOP at United, which is just a fraud.  It's not an ESOP at all.  It was just sort of a temporary lease of the company by the employees who got script, not stock, and so on.  But, yeah, I've always had a problem with working for United in that there's always -- I mean my job I enjoy.  And then dealing with corporate culture is just a whole other can of worms.

THE COURT:  Excuse me.  Is ESOP an acronym for something?

THE WITNESS:  Employee Stock Ownership Plan.

Q.   (BY MR. VINCENT)   Mr. Leippe, focusing on the statement that you gave to Mr. Fechheimer, do you recall telling Mr. Fechheimer February of 1997 that you had been threatened with dismissal by United Airlines?

A.   That's correct.

Q.   And that you had been threatened with dismissal if you brought economic harm to the airlines through your

interest in the Challenger explosion?

A.    That's correct.

Q.    Did you also tell Mr. Fechheimer that you had incurred the enmity of United management through research you had done through the Airline Pilots Association?

A.    That's correct.

Q.    Is that the union you were just referring to?

A.    Yes, sir.

Q.    And that United was upset because you had done research into United's business practice and pension funding shenanigans; is that correct?

A.    That's correct.

Q.    And did you also tell Mr. Fechheimer that you had incurred the displeasure of union officers because of your knowledge of certain sweetheart deals they had made with United management?

A.    That's correct.

Q.    And did you say that you had also made enemies and been threatened with lawsuits by the officials of your local utility district because of your opposition to their illegal violations of the Brown Act?

A.    Except for the fact that it's not a utility district. It's a community service district which could provide a utility-type service, but it's a road district.

Q.    And did you tell Mr. Fechheimer that you considered

that any one of these above groups, that is people at United, people at the Airline Pilots Association or people associated with this district might have caused the threat to be made against you?

A.   That's correct.

Q.   And did you also tell Mr. Fechheimer that you thought it was as likely one of them as it was Carpenter or Jackson or so you thought at the time?

A.   That's correct.

Q.   In looking at the pages that counsel showed you before of your appearances during the hearing in chambers, if you'd look please at page 3721.

A.   Okay.

Q.   And during that -- during your appearance in chambers did you tell the Court that your neighbor had filed suit against this district and received crank calls?

A.   That is correct.

Q.   And had you received any crank calls before?

A.   Um, yes.  We used to receive crank calls up until it became -- until the telephone company became rather digital, and you had call back, and you could just automatically log calls.  And all of a sudden people could no longer play these games without being discovered easily.

Q.   Had you gotten crank calls before November of 1993?

A.   Yes.

Q.   And you had concluded that those calls had been related to the district; is that right?

A.   Yes.

Q.   Now, you recall that you were called into Judge Garcia's chambers on a Monday morning before deliberations; is that correct?

A.   Yes.

Q.   Had you told any of the juror -- any other jurors about this call that you had received over the weekend?

A.   No.  I never even afterwards never told any other jury members that that had happened.

Q.   And you -- if you look at your -- why don't you take a moment, please, to just review your statements that you made to the Court during that in-chambers hearing.  I believe that's pages 30 -- 3719 to 3725.

A.   Okay.

Q.   All right.  Mr. Leippe, did you tell the Court that you thought the call that you had received was probably related to the utility district?

A.   Yes, I did.

Q.   And was that your belief at the time?

A.   Yes, it was.

Q.   And you also told the Court that you did not think it would affect your ability to serve as a juror in the case; is that right?

A.    That's correct.

Q.    And was that your belief at that time?

A.    That was.

Q.    Were you lying to the Court when you said that you thought the call was probably related to the district?

A.    No.

Q.    Were you lying when you said that you did not think the call would affect your ability to serve as a juror in the case?

A.    No.

Q.    Were you trying to deceive the Court when you said that?

A.    No.

Q.    Were you thinking that there was a good chance that this call was related to the trial, but you didn't want to tell anybody about it?

A.    Um, say that again.

Q.    Were you thinking that there was a good chance that this threatening call was related to the trial, you just didn't want to tell anybody about it?  You didn't want to admit that you thought it was related to the trial.  You were trying to hide it?

A.    No.  I wasn't trying to hide it at all.

Q.    Were you thinking that the call was related to the trial, but you wanted to stay on the jury so you could be

there to convict the Defendants?

A.   I just wanted to keep everybody on the same page, and this was what was happening to me, and I was subsequently involved in a trial.

Q.   Did the call affect the conduct of your deliberations?

A.   Not at all.

MR. RIORDAN:   I object under 606.   It's inadmissible under 606.

MR. VINCENT:   Your Honor, I have not asked him for his thought process.   I asked him whether it could have focused on the conduct of his deliberations.   I simply asked him about the conduct of his deliberation.

MR. RIORDAN:   Your Honor --

THE COURT:   I happen to have run across this legal issue during my independent research in the case and, frankly, the case that says that you're not supposed to ask a juror as to his thought processes, I think that principle is not applicable here.   The objection is overruled.   I'll cite the case into the record eventually that lead me to that conclusion.

Q.   (BY MR. VINCENT)   Did this call affect the conduct of your deliberations?

A.   No, it did not.

Q.   Did it have any impact on your deliberations?

A.    No.

Q.    Did it -- did you make your decision based only on the evidence that you heard in the trial?

A.    That's correct.

Q.    Did you agree with the verdict?

A.    I certainly did.

Q.    And did you agree with the verdict before you had received the call?

A.    Yes, I did.

Q.    Now, referring to Mr. Fechheimer's visit, had he called you before he showed up?

A.    No.  He just appeared basically as a ship in the night.  He just knocked on my door.  It was cold out.  He looked -- he was driving a snazzy Jaguar convertible.  He was dressed nice.  And I didn't feel concerned.  I allowed him into the house to -- since he gave me his business card, and I just was kind of curious.

You know, he did not come out and say exactly why he was there at first.  He just started asking little questions here and there.  And then I had just remembered from the -- after the close of the trial that Judge Garcia had told all the jurors that we were free at this point to discuss anything with anybody that we wanted to.  That was up to us whether we wanted to be interviewed or not interviewed, and this was -- he just -- I thought I'd answer some of his

questions.  And later on when I figured out where he was going, I just disagreed with where he was going and chose not to be involved anymore with his curiosity.

Q.    Did he show you anything before he started questioning you?  Did he show you, for example, the transcript pages of your appearance during the hearing in chambers?

A.    No.

Q.    Did he play the message for you to refresh your memory or anything like that?

A.    No.

Q.    Did he show you anything to try and refresh your memory?

A.    No.

THE COURT:  Let me interrupt a moment while I still have in mind Mr. Riordan's objection.  To the series of questions put to the witness regarding whether the phone call might have affected his impartiality, Mr. Riordan, you're citing a federal rule of procedure or evidentiary rule, excuse me.

MR. RIORDAN:  Yes, Your Honor.  Rule 606(B).

THE COURT:  Yeah.  I'm overruling the objection, Mr. Riordan, on the strength of a very recent Ninth Circuit case which I picked up on independent research.  It's Sassounian v. Earnest Roe, cited at 2000 Westlaw, 1593388.

Ninth Circuit. It has a section on jury misconduct. And as I read through the case it makes statements such as this:

"Jurors may testify regarding extraneous prejudicial information or improper outside influences. They may not be questioned about the deliberative process or subjective effects of extraneous information nor can such information be considered by the trial or appellate courts."

That goes along with your objection I think. It goes on to say "therefore, we may consider testimony concerning whether the improper evidence was considered" -- let me start again.

"Therefore, although we may consider testimony concerning whether the improper evidence was considered, we may not consider the jurors' testimony about the subjective impact of the improperly admitted evidence."

It goes on to say "There is no bright line test for determining whether a defendant has suffered prejudice from an instance of juror misconduct."

That worried me. So then I very carefully read the entire case and eventually concluded that it is not applicable to the hearing before the Court because this is not a case of juror misconduct. It's a jury -- an ex parte communication to a juror and in no way is related to juror misconduct. And that's why I overruled your objection.

MR. RIORDAN: Thank you, Your Honor. On that point I

assume that I preserve an objection to any of the questions that went to the impact on the objection?

THE COURT:  Mr. Riordan, you're an Appellate lawyer. We've got a court reporter working here, and I'm sure she's taking down all of your objections.

MR. RIORDAN:  Thank you, Your Honor.

THE COURT:  I'll instruct her not to delete them from the reporters' transcript.

Q.   (BY MR. VINCENT)   Going back, Mr. Leippe, to the meeting that you had with Mr. Fechheimer, did he tell you that he had spoken to other jurors before he talked to you?

A.   He did, but he didn't say who or how many.

Q.   Going back now, please, to Exhibit E, I'll place that back on the screen.  May I have the lights turned down?

When you were interviewed with -- interviewed by Mr. Fechheimer, did you tell Mr. Fechheimer that Clay Jackson's testimony had been self-impeaching?  You see where I'm referring to?

A.   Yes.

Q.   Did you tell Mr. Fechheimer that you thought Jackson's testimony had been self-impeaching?

A.   Yes.

Q.   Did you also tell Mr. Fechheimer "the whole thing was outrageous, Jackson's outsized ego.  He was unbelievable"?

A.   Yes.

Q.   Did you also tell Mr. Fechheimer "then there were the 72 hours of tapes"?  Did you tell Mr. Fechheimer?

A.   That's true.

Q.   Now, did you later talk to Mr. Fechheimer over the telephone?

A.   I believe he called and wanted me to sign an affidavit or some such document based on that conversation. And after he had left I had just decided that that was, you know, I kind of figured out where he was going.  That I just disagreed, and I would not sign anything for his cause.

Q.   Did you tell Mr. Fechheimer during that second conversation that you agreed with the jury's verdict?

A.   Yes.

Q.   And finally going back now to Exhibit E, did you tell Mr. Fechheimer that you never met with an F.B.I. agent concerning this call?

A.   Um, yes.

Q.   And did you also tell him that you had no idea if the Government ever followed up on the investigation or the identity of the caller?

A.   That's correct.

Q.   And did you also tell Mr. Fechheimer that since the session in the judge's chambers you had not heard from anyone about the threatening call?

A.   That's correct.

Q.   And was that accurate with regard to Mr. Fechheimer?

A.   With the exception -- I think it's mentioned in here that minutes after we left the judge's chambers when the trial was done, we went out the back door.  And when I stepped onto the sidewalk in front of the other courthouse, that some individual posing as a reporter -- I believe he claimed he was from the union -- I didn't get a business card, but he stepped right into my face and put a microphone and started asking me about this death threat.  And there were several jurists walking with me, and they were all quite surprised.  And I just said "I don't know what you're talking about.  Get out of my way."  And I just kept going.  I was kind of surprised myself that somebody who claimed to be from the press was supposedly aware of this incident.  I didn't know what happened when we were in deliberations, and the Court might be having other little hearings on the matter if that had been made a public event.

Q.   All right.

A.   But --

Q.   So that's the only other person?

A.   That's the only other time.

MR. VINCENT:  All right.  Your Honor, if I may have a moment?

THE COURT:  Okay.

MR. VINCENT:  Your Honor, I have no other questions.

The only thing I wanted to do is submit to the Court, if I may, a cleaner copy of a note which were attached to Exhibit -- Defendant's Exhibit B, and that's -- with that I will conclude.

THE COURT:  All right.  Just a minute.  There was something that was not very legible.  Okay.  It's an attachment to the typewritten report and, frankly, I didn't -- I read it or tried to.  I didn't know what it meant.  Is this -- are these purported to be rough notes of the investigator?

MR. VINCENT:  Your Honor, those are rough notes of Mr. Jacobs.

THE COURT:  Is he the one that submitted the typewritten report?

MR. VINCENT:  No.  No, Your Honor.  Mr. Jacobs was with our office.

THE COURT:  I guess that's what confused me.  Let me see if I got this straight.  Exhibit B, the Defendant Jackson's prehearing memorandum, contains a typewritten F.B.I. investigative report apparently by Special Agent Lester.  Am I right?

MR. RIORDAN:  That's correct, Your Honor.

THE COURT:  Okay.  Now, attached to that typewritten report by that agent is an illegible document about some four pages.  Whose notes are those?

MR. VINCENT:  Mr. Jacobs', Your Honor.  They were not -- they were not -- this should not have been connected to the F.B.I.'s 302 date.  They are separate.

THE COURT:  Okay.  See I assumed they were the rough notes in connection with the typewritten report.

MR. VINCENT:  No, Your Honor.

MR. RIORDAN:  Yes.

MR. VINCENT:  They're separate.  And I am giving you a cleaner copy.

THE COURT:  And whose notes are they?

MR. VINCENT:  Mr. Jacobs', Your Honor.

THE COURT:  The AUSA Jacobs?

MR. VINCENT:  Formerly.  I have one explanatory note that may help Your Honor in terms of clearing up what this is.

Exhibit B was submitted by my office, and actually what they did is they include -- there's a cover letter to it.  We had been sent two separate documents by the Government.  One is the Lester 302 which is from May of this year.  The other is a set of handwritten notes by Mr. Jacobs from a telephone conversation he had with Mr. Leippe back on December 21st, 1993.  At the beginning --

THE COURT:  What date?

MR. RIORDAN:  December 21st, 1993.  We haven't had any questioning about those yet, Your Honor.  I had three

questions, and one of them actually to Mr. Leippe. One of them actually does deal with that date. That might clear it up.

THE COURT: All right. Just a minute, please.

MR. RIORDAN: Okay.

THE COURT: What added to the confusion is the copy that you attached to your brief. At least the copy I received to chambers is illegible. And now I'm looking at what purports to be a more legible copy. Hardly. Hardly. It's undated. It's dated 12/21/93, but it doesn't say who wrote it nor what it relates to.

For example, it says you submitted it, Mr. Riordan. What's the last sentence say? Could you read it to me?

MR. RIORDAN: Um, the document or the first page, Your Honor?

THE COURT: The last sentence.

MR. RIORDAN: Of the --

THE COURT: Handwritten notes.

MR. RIORDAN: -- document? Well, again, I'm interpreting Mr. Jacobs. I think it says I thank him for info. Said I'd see what, if anything, um, could be productively done with it and trust that I, um, and that I might call him back.

THE COURT: Okay. And that scribble at the bottom is supposed to be his signature. Is that the idea?

MR. RIORDAN:  I believe so.  As I say, Your Honor, these were provided to us in discovery by the Government as Mr. Jacobs' notes on a conversation he had with Mr. Leippe.

THE COURT:  Okay.  Well, let's get to the relevance of the document.  Maybe most of it's not relevant.

MR. RIORDAN:  That's true, Your Honor.  Let me ask Mr. Leippe one question about that.

REDIRECT EXAMINATION

BY MR. RIORDAN:

Q.    Do you recall about a month after the trial you had a telephone conversation with Assistant United States Attorney Jacobs about a month after the trial, after the verdict had come in?

A.    I don't remember a month after the trial.  If I -- if it was, it was related to some other district matter because I was brought in by some other people in the community that they had an ongoing or what turned out to be an F.B.I. investigation of government in El Dorado County, and they were eager to look at some of my files and examples of misconduct by local legislatures, members of local legislative bodies.

Q.    Let me frame it this way:  Do you recall that you would have had a conversation with an Assistant United States Attorney about the research that you had done on the Challenger?

A.    Um, I don't know, I don't recall that.  But if you're saying the date of these notes is December 21st, then that was certainly -- that was only about two weeks after the trial.  It wasn't a month.  A month would have been January.

Q.    Okay.

A.    But, regardless, there were -- there were -- see I've had other dealings with the F.B.I., not necessarily of my own initiative or anything to do with this case.  That's possible --

Q.    And --

A.    -- why I don't remember.  This would be years ago obviously.

Q.    Let me ask you this:  As reflected in your conversation with Mr. Fechheimer, um, you have in your past done a lot of research into the Challenger explosion, correct?

A.    I was an eyewitness.

Q.    And in addition to that you did a lot of scientific research thereafter about the potential causes, right?

A.    Um, not really scientific, just investigative research.  And then by discovery a retired NASA engineer who was also in great disbelief of the Rogers Commission findings that he did lots of scientific investigation and brought up a lot of grave concerns about the validity of that report.  And with my eyewitness observations of the launch and his

scientific review of the telemetry and time lines, everything fit perfect and totally unrelated to what NASA reported about the loss of that space vehicle.

Q.    And you had brought that research to the attention of people in the media like Bill Curtis, right?

A.    I --

MR. VINCENT:  Objection, Your Honor, as to the relevancy of this.

THE WITNESS:  It's not relevant, but that's true.

THE COURT:  Just a minute.  I'll determine what's relevant, okay?

THE WITNESS:  Right.  Yes.  I --

THE COURT:  Just a minute.  Just a minute.

THE WITNESS:  Okay.

THE COURT:  Well, the witness has testified that this hardly legible document that you're submitting as an exhibit, Mr. Riordan, is unrelated to the trial.  Now, I'm aware that even though it may be unrelated to the trial that's before me, the Jackson trial, that it may contain information that would be otherwise relevant as you examine the witness.  But I don't know what you're getting to.

MR. RIORDAN:  Your Honor, if I may --

THE COURT:  It all started with this illegible document.  Give me just a minute, please.

MR. RIORDAN:  Okay.

THE COURT:  Apparently someone believed Mr. Leippe that the accident involving the Challenger Space Shuttle was caused by defective O rings.

THE WITNESS:  Oh, that was the published report, yes.

THE COURT:  I can make out O-rings in this note.  And I think what you're telling us is that you disagreed with that?

THE WITNESS:  Yes.

THE COURT:  Okay.  So you're going to take it someplace from there, Mr. Riordan?

MR. RIORDAN:  No.  All I'm trying to do is this, Your Honor, is the Government has given us these notes on the assertion that they are notes of Mr. Jacobs of the telephone conversation with Mr. Leippe on December 21st, 1993.  There are things in here that Mr. Jacobs would have known only if Mr. Leippe had told him.  And I think with one or two questions I'll be able to establish, even if Mr. Leippe doesn't have a recollection of it right now, that he did have a conversation with Mr. Jacobs about this.  And there is -- there is one reason why him having a conversation about the Challenger may be relevant to the closing arguments that we're about to give.

THE COURT:  I'm not so much interested in hearing the closing arguments.  I'm interested in what you're offering as evidence in support of your closing arguments.

MR. RIORDAN: My questions are merely to establish that these notes do reflect the conversation with Mr. Leippe.

THE COURT: Okay. Then my question would be so what? What's the relevance?

MR. RIORDAN: The relevance of that will simply be that the Government was as of '93 very much aware of Mr. Leippe's knowledge of, interest in, the Challenger. Because one of the things that I think they want to argue is that we left out his references to the Challenger from his conversation with Mr. Fechheimer for some -- for some tactical reason. In fact, the Government was well aware of Mr. Leippe's research, interest in, and involvement in the controversy over the Challenger. They had had their own interview with them.

MR. VINCENT: Your Honor --

THE COURT: I'm still not sure I follow you. I asked you a question earlier because it's obvious to me that you left out a lot of what was in your conversation the witness had with your investigator when you filed the affidavit in connection with a Petition 2255. That's why I asked that question.

MR. RIORDAN: Mm-hm.

THE COURT: Now, I'm aware that you left things out, and this is apparently one of them. And you're suggesting that the Government is going to use it somehow?

MR. RIORDAN:  I'm suggesting that this is something that the Government was well aware of and could have submitted themselves.  They had -- they certainly had notes reflecting that Mr. Leippe had been very much involved in the Challenger controversy.  They had -- Mr. Jacobs had had a very long conversation with him about the Challenger in 1993.

THE COURT:  Okay.  I still don't see the relevance.

Mr. Vincent?

MR. VINCENT:  Your Honor, Your Honor, we have not claimed and left anything out with respect to the Challenger.  We have claimed that they left out other statements that he made concerning possible sources for the threatening call.  That's what we claim.  Not the Challenger.  I do though, Your Honor, want to make sure that you understand these notes. The top half of the first page appear to relate to this -- to this case, the top half of the first page.

THE COURT:  Well, I can't make out what that says either.

MR. VINCENT:  All right.  But that's why they were turned over to the defense, but --

THE COURT:  Okay.  Just --

MR. VINCENT:  -- we are not --

THE COURT:  Just a minute.

At end of trial left courthouse with some others.  A person I.D.'d himself as a reporter for the Bee.  Want to ask

you about phone call you got over weekend.  New -- I think the next word is specifics.  Wanted to know how info got out. Speculated that something came out in court.  I said I didn't know.  I assume that's the AUSA.  Nothing in open court.

Was Mr. Jacobs co-counsel during the trial?

MR. VINCENT:  Yes, Your Honor.

THE COURT:  Okay.

MR. RIORDAN:  I don't have anything further on the notes, Your Honor.

THE COURT:  Okay.  Well, it says this judge had not gagged but had asked us to be -- I think the next word is quiet.  Could only presume that one of defense attorneys leaked it.  Certainly we didn't.  Oh, these are illuminations of the prosecuting attorney.  Vote didn't change --

MR. VINCENT:  I understand from Mr. Jacobs, Your Honor --

THE COURT:  -- before Friday.

MR. VINCENT:  No, Your Honor.  I understand from Mr. Jacobs that is "between."

THE COURT:  Vote didn't change between --

MR. VINCENT:  Friday and Monday.

THE COURT:  -- Friday and Monday.

Now, this is an exhibit I'm assuming -- addressing both counsel that exhibits that I ultimately determine are relevant to the issues before the Court that are attached to

your submittals, to your briefs as exhibits, are to be received into evidence for all purposes.

I assume the foundation is okay, Mr. Vincent?

MR. VINCENT:  Yes, Your Honor.

THE COURT:  Mr. Riordan?

MR. RIORDAN:  Yes, Your Honor.

THE COURT:  Okay.  Well, since you say that there's one exhibit in here that is completely without foundation, but I haven't heard all the witnesses yet.  So I'll wait before I comment on that.

Go ahead, Mr. Riordan.  I thought you were going to some bias that there was something in here that could show that the witness is biased against your client, and that he was biased improperly other than by evidence or his feelings about the Defendant as he testified during the trial which bias would be perfectly proper.

Q.     (BY MR. RIORDAN)  Mr. Leippe, just a couple more questions.  Do you still have in front of you the 302 from Mr. Lester, that Agent Lester that we discussed, four pages?  That's the interview of 5/2/2000.

A.     What?  Where was it?

THE COURT:  What's the exhibit number?

MR. RIORDAN:  I'm going to approach, Your Honor.

THE WITNESS:  Oh, I do.  Okay.

MR. RIORDAN:  It's Defendant's B, and Mr. Leippe has

located it.

THE COURT:  Okay.

Q.   (BY MR. RIORDAN)  At page four of that in the third paragraph you told Agent Lester that you had recently found the people that you had contacted when you received the death threat, right?

A.   Um, yes.  That's what it says here.

Q.   And one of the people whose names you had retained as having been contacted by you was special Agent Todd Drost with the F.B.I., right?

A.   Um, that's what it says.  It would have been through the sheriff.

Q.   Okay.  Now, you mentioned in your answers to Mr. Vincent that you weren't at all scared by this death threat given your past life experiences, right?

A.   And current life experiences, yes.

Q.   And -- but you thought that one source of it was -- could have been Mr. Carpenter and Mr. Jackson, right?

A.   Yeah.

MR. VINCENT:  Objection, Your Honor.  Asked and answered.

THE COURT:  Sustained.  You want to explain further?

THE WITNESS:  There's nothing more to explain on that.  It's simple.

THE COURT:  Okay.  The next question.

Q.     (BY MR. RIORDAN)   And that would have disgusted you if they had done that, right?

A.     It wouldn't have surprised me.

Q.     Okay.

MR. RIORDAN:   Thank you, Your Honor.   I don't have anything further with Mr. Leippe, Your Honor.

THE COURT:   I heard you.

Mr. Vincent?

MR. VINCENT:   No further questions, Your Honor.

THE COURT:   I think I have some questions, Mr. Leippe.   But I have so much paperwork I don't know if I can find the questions I wanted to ask you.

EXAMINATION BY THE COURT

Q.     It's been suggested in the paperwork submitted, Mr. Leippe, that although you never suggested that you were influenced by that threatening call, that that was because you were never asked the question.   Now, in going over the transcripts or the transcript of the interview I held in chambers --

A.     Yes, sir.

Q.     -- ultimately that's one of the questions I think I'm supposed to answer in connection with the Defendant's petition.   I won't bother to explain it to you, but I think the question was asked.   It's implicit in the transcript and so are your answers, but let me ask you the question now.

Were you in any way influenced in your decision by that threatening phone call?

A.      Absolutely not.

Q.      Another thing I have to determine I think is to the extent that you thought that there was some possibility that the threatening phone call was related to the trial.  You told me during the interview that I conducted that you didn't believe it was.  And then it appears that you may have told the private investigator for the Petitioner that it was after the reporter -- a reporter contacted you after you had been discharged as a juror that you began to believe more strongly that it may have been related to the Jackson case.

A.      Yes, Your Honor.

Q.      See, one of the things I'm trying to probe and I think the Ninth Circuit wants me to determine is whether the statements that you made to the investigator some three years and three months after the jury trial were colored, the statements you made to the investigator to the extent that it might be inconsistent with what you told me.  Were they colored by anything that may have happened after you were discharged, for example, this reporter having contacted you?

A.      Well, yes.  I was rather annoyed that the instant I was in the public mainstream that I was face-to-face with a reporter that knew everything about this.  And I thought this was rather abrupt.  I didn't think that the Court would

publish this. I don't know that the Court did or did not. I mean I never saw it in a newspaper, but I was irritated and surprised. I mean it was so abrupt.

Then I had other jurists with me that knew nothing about it and then all of a sudden were questioning me "What's going on here?" And I'm "I don't know what he's talking about." I just -- just right away it just sort of, you know, it's like sixth sense like. Well, this is sort of -- where else could it come from? If it didn't come from the Court, somebody in this process put that out there in hopes of maybe just selling newspapers. I don't know.

Q. Here's what I'm leading up to --

A. But I mean beyond that point then that, you know, it was just made -- and suspicion of it was more than likely it was something -- something -- the whole process instigated by one or the other of the Defendants.

Q. Now, is that because you may have believed that that person who embraced you after you were discharged, he was a reporter or whomever he was, was that because you were surprised that he knew about the threat?

A. Yes. I was surprised that somebody in -- standing there in public knew this.

Q. Okay. It had to be somebody connected with the trial. Is that what your reasoning was?

A. Yes. We just left you and your chambers.

Q.   So this was an afterthought then?

A.   Yes.  Post-like.

Q.   That's what I'm trying to determine.  I'm not saying that necessarily your interview with the private investigator hired by the Petitioner, that those questions were really inconsistent with the responses you gave me.  I'm just trying to determine to what extent you told the investigator may have been afterthoughts after you were discharged from the jury.

A.   That's correct.

Q.   Okay.  Now, I haven't heard from the investigator at this hearing, but I have read his report of his interview with you.  And it -- as you saw when you were shown the exhibit, it had several paragraphs.  I don't know if the paragraphs are in sequence with your interview, but what I want to ask you is it's being suggested or apparently you're being quoted as telling the investigator that at the time you thought that it could have been related, the threat could have been related to your service in the Jackson case.

Now, what I'm focusing on is the investigator is quoting you as saying "at the time."  And my question is when -- let's assume he's accurate and he's correctly quoting you. What could you have meant by "at the time"?

A.   Um --

Q.   Is that during your deliberations or during the

trial, or was it this afterthought that you've now told me about?

A.    I believe it was already stated in your interview that this was already one of the possibilities given my current state of affairs --

Q.    Okay.

A.    -- at the time of deliberations, and that that would be true regardless of the post event with the reporter.  Or, regardless, there was a thought -- there was a possibility, but there were multiple possibilities, and it really was, you know, just more of an annoyance.  Just it really had nothing to do with the work in front of the jury and --

THE COURT:  Okay.  As has been suggested by both of the attorneys, there's little evidence before the Court that this phone call -- and based on your testimony that this phone call was connected with the trial due to the attenuated nature of that evidence -- by that I mean slim, if at all -- is that one of the reasons why you've told me that you were not affected by the threat because there was slim evidence that the threat might have been connected with the trial?

A.    Well, even if I knew it was, I am -- I feel I'm a fairly objective, analytical-type person, and the work that -- I was involved in a duty.  And if -- if it had turned out to be a mistrial or hung jury 11 to 1, it would have been -- I would have been the one.  And it wasn't.  It was 12 to 0.

And so I don't think that since none of the other 11 people knew anything about my apparent predicament, that it's obvious that the evidence spoke for itself.  And the 12 people agreed on the evidence, and there was no --

Q.    Okay.  You're getting dangerously close to issues that I think I'm not supposed to go into.

A.    Okay.

Q.    Let me continue looking through my notes.  When the private investigator for the Petitioner contacted you, he told you that he had interviewed other jurors?

A.    Yes, he did.

Q.    Did you ask him or did he volunteer that?

A.    He volunteered that.

Q.    But I think you testified he didn't tell you how many?

A.    That's correct.  And if I can add, I believe that sort of the way he beat me out of the interview to suggest that he had already spoke with other jurors and wanted to collaborate or verify or validate things that he had already supposedly discovered from other jurors.

Q.    Well, you've been around long enough to know that's a standard interview technique to get you to tell the truth.

A.    Right.  Right.

Q.    The interviewer wants you to believe that he knows already what your answer's are going to be.

A.    Right.

Q.    It's been suggested that you were untruthful when I questioned you in chambers, and I think that's one of the issues that I have to decide.  Is there anything that you told me in connection with that interview that you believe could be construed as untruthful?

A.    I don't think there's anything there that's even slightly colored or -- I think it was just as straightforward as I could be then, and I don't think that there's any -- I don't know even what you would refer to would be suggestive of not telling the truth.  I just told you the way it was. That I had other -- other things in my life that you know -- you know the threat itself was such a sort of an amateurish thing that it was -- you know one thought in my mind was somebody's trying to mess with the jury, and I had an obligation to present that to the Court I felt and -- I don't know.

I had thought of saying I wonder if I don't say anything, if somehow somebody would somehow figure out a way to leak this out that I had hidden something like that, what would happen.  I wonder if that's some other game.  Well, I can only do the right thing and say this happened.  What do you want to do with it?

Q.    Okay.

A.    You know you could have decided mistrial right then

and there and started over.

Q.   Okay.  In one of your responses to Mr. Riordan's questions this afternoon he was asking you about the possibilities of who could be responsible for the phone call, and you ended up by saying it was all speculation on your part at the time that you were talking and suggesting that it may have been one of three or four sources?

A.   Yes.  That's always and still, you know, all possibilities.

Q.   Okay.  You also use the word "guess."  That's just another word for speculation in your mind?

A.   Yes, Your Honor.

THE COURT:  I have no further questions.  I'll now invite counsel if they wish to ask any further questions and follow-up to the questions I've asked.  Mr. Riordan?

MR. RIORDAN:  No, Your Honor.

THE COURT:  Mr. Vincent?

MR. VINCENT:  Very quickly.

RECROSS-EXAMINATION

BY MR. VINCENT:

Q.   Mr. Leippe, following up on the Court's last question where you say three or four sources, one of those sources was possibly people at United Airlines; is that right?

A.   That's correct.

Q.   Another source was officers of the Airline Pilots

Association?

A.    That's correct.

Q.    And one of the sources was people that were upset with you over work at the district; is that right?

A.    That's correct.

MR. VINCENT:  Okay.  That's all.  Thank you.

THE COURT:  Mr. Riordan?

MR. RIORDAN:  Nothing further, Your Honor.

THE COURT:  All right.  Thank you, Mr. Leippe. You're excused.  Though you were subpoenaed, thank you for coming in.

THE WITNESS:  You're welcome, sir.

THE COURT:  Any further witnesses, Mr. Riordan?

MR. RIORDAN:  No, Your Honor.

THE COURT:  Do you have any witnesses you wish to call, Mr. Vincent?

MR. VINCENT:  Yes, Your Honor.  United States would call Mr. Fechheimer.

THE CLERK:  Raise your right hand.

DAVID FECHHEIMER,

called as a witness by the Government, after being first duly sworn by the Clerk, was examined and testified as follows:

THE CLERK:  Thank you.  Please be seated.  State your name and spell your last name.

THE WITNESS:  David Fechheimer.  F as in Frank,

E-C-H-H-E-I-M-E-R.

THE COURT:  And that's pronounced "Fetch-high-mer"?

THE WITNESS:  Yes, sir.

DIRECT EXAMINATION

BY MR. VINCENT:

Q.    Mr. Fechheimer, how are you employed?

A.    I'm a private investigator.

Q.    And how long have you been a private investigator?

A.    Over 30 years.

Q.    Have you done work for Mr. Riordan before this case?

A.    I don't believe so.

Q.    This was the first time the interview of Mr. Leippe? This was the first time you had been hired BY MR. RIORDAN?

A.    Yes, sir.

Q.    Is this the first time you had been hired by his firm?

A.    Possibly.

Q.    Um, did you interview a David Leippe at his house on February 3rd, 1997?

A.    Yes, I did.

Q.    And did you call Mr. Leippe before you went to his house to interview him?

A.    No, I did not.

Q.    When you showed up, did you show him any documents to try and refresh his memory about what had happened during the

period of time he served on the Jackson jury in 1993?

A.    I don't believe so.

Q.    I'm going to place on the screen what has been marked for identification.  Actually, it's Exhibit E.  Is this a copy of the report that you did of your first interview with -- of your first conversation with David Leippe?

MR. RIORDAN:  Your Honor, could we get the lights lowered?

THE COURT:  I don't know how to do it.

MR. ARGUELLES:  Do you want me to get them, Your Honor?  I can just --

THE WITNESS:  Yes, sir.

Q.    (BY MR. VINCENT)  All right.  And then I'm going to show you Exhibit F.  Is this a copy of the second report that you did based on your conversation with Mr. Leippe?

A.    Yes, it is.

Q.    And then did you submit a Declaration in this case which discussed what Mr. Leippe said during the course of your interview with him?

A.    Yes.  I signed the Declaration.

Q.    I'm going to show you Exhibit D.

Your Honor, this is -- these letters refer to the letters of the exhibits attached to the Government's brief.

A.    I -- Exhibit D is my Declaration.

Q.    Yes.  All right.  Let's go, first of all, to Exhibit

E there.   During the course of your interview with Mr. Leippe, did you tell him you had been -- you had talked to other jurors in this case?

A.    I don't recall.

Q.    You don't recall.  Had you talked to other jurors in this case?

A.    I had attempted to.

Q.    But had you talked to any of the others?

A.    I'm not sure of the timing.

Q.    Well, how many jurors did you end up talking to?

A.    I believe that Mr. Leippe was the only juror I interviewed in person.

Q.    Well, how many did you talk to?

A.    I know that I talked to Mr. Artichier.

Q.    Anybody else?

A.    Not that I recall.

Q.    All right.  Let me show you what I have marked as Government's Exhibit H.

Your Honor, this is a report that was supplied to us by defense counsel.

THE COURT:  Do I have that with the submittals?

MR. VINCENT:  No, Your Honor.  But I have another copy here for the Court.

THE COURT:  Okay.

Q.    (BY MR. VINCENT)   Does that refresh your memory as

to when you talked to Mr. Artichier?

A.    Yes, it does.

Q.    And when did you talk to Mr. Artichier?

A.    Approximately on April 16th of 1997.

Q.    So that was after you had interviewed Mr. Leippe; is that correct?

A.    Yes, sir.

Q.    And it was after you spoke to Mr. Leippe the second time which is in the report reflected as Exhibit F; is that correct?

A.    Yes, sir.

Q.    So you had not spoken to any other jurors before you talked to Mr. Leippe; is that right?

A.    Not that I recall.

Q.    During the course of your -- may we have the lights lowered, please?

THE CLERK:  Yes.

Q.    (BY MR. VINCENT)   During the course of your interview of Mr. Leippe, did he tell you that Jackson's testimony had been self-impeaching?  Do you see that?  I'm looking at the second paragraph of Exhibit F.

A.    I don't see that.

Q.    You see where I've marked it on Exhibit F on the screen?

A.    Isn't that Exhibit E on the screen?

Q. I'm sorry. "E."

A. The second paragraph I don't see that phrase.

Q. Well, Mr. Fechheimer, will you look on the screen there. Exhibit E, do you see that?

A. That's the third paragraph.

Q. All right. How about the third paragraph. Did he describe Jackson's testimony self-impeaching?

A. Yes.

Q. And did he say the whole thing was outrageous, Jackson's outsized ego?

A. Yes.

Q. Did he also say Jackson was unbelievable?

A. Yes.

Q. Did he also say that then there were the 72 hours of tapes?

A. Yes.

Q. Did Mr. Leippe also tell you during that interview that with respect to -- let's look at the fourth paragraph. With respect to the telephone threat he received, Leippe stated that he never met with an F.B.I. agent?

A. Yes.

Q. And that he had no idea if the Government ever followed up on the investigation of the identity of the caller?

A. That's correct.

Q.   And did he say that since the session in the judge's chambers he has not heard from anyone about the threatening call?

A.   Yes.

Q.   Look at the last paragraph, please, of Exhibit E. Did Mr. Leippe tell you that the other jurors hadn't known anything about the threatening call?

A.   That's what he said.

Q.   And did Mr. Leippe also tell you that as far as he knew there had not been any public disclosure of the threat?

A.   Yes.

Q.   Now, please turn to page two of Exhibit E.  Do you see the paragraph that I'm referring to here on the screen?

A.   He was threatened with dismissal by United Airlines.

Q.   Right.  Did Mr. Leippe tell you that he had been threatened with dismissal by United Air if he brought economic harm to United in his interest in the Challenger explosion?

A.   Yes.

Q.   Did he also tell you that he had incurred the enmity of United management through research he had done through the Airline Pilots Association of United's business practices and pension funding shenanigans?

A.   Yes.

Q.   Did Mr. Leippe tell you that he had also incurred the

displeasure of the Airline Pilots Association officers because of his knowledge of certain sweetheart deals they had made with United management?

A.    Yes.

Q.    Did he also say that he had made enemies and been threatened with lawsuits by the officials of his local utility district because of his opposition to their illegal violations of the Brown Act methods and policies?

A.    Yes.

Q.    Did Mr. Leippe also tell you that he considered that any one of the above groups of enemies might have caused the threat to be made against him?

A.    Yes.

Q.    Did he say that it was as likely one of them as it was Carpenter and Jackson or so he thought at the time?

A.    Yes.

Q.    Did he say it could have been someone from the district or it could have been trial related?

A.    Yes.

Q.    Did he tell you that the Judge asked him if it would affect me, and he said, no, that's it?

A.    Yes.

Q.    And then if you look at Exhibit F, referring to your second conversation with Mr. Leippe, did Mr. Leippe tell you that he agreed with the jury's verdict?  You see where I'm

referring to on Exhibit F?

A.    Yes.

Q.    Now, in your Declaration, which you submitted to the Court which is Exhibit D, did you mention anything in your Declaration about that Mr. Leippe said that he had been threatened with dismissal by United Airlines?

MR. RIORDAN:  Your Honor, the Declaration speaks for itself.

THE COURT:  Well, are you stipulating, Counsel, that it's true and accurate --

MR. RIORDAN:  That --

THE COURT:  -- in all respects?

MR. RIORDAN:  I am certainly stipulating that the exhibit presented to the Court is a true and accurate representation of Mr. Fechheimer's Declaration, yes, Your Honor.

THE COURT:  Overruled.

Q.    (BY MR. VINCENT)  In your Declaration filed with the Court, did you tell -- did you say that Mr. Leippe had also told you that he had been threatened with dismissal by United Airlines?

A.    No.

Q.    Did you tell the Court that Mr. Leippe had said he had been threatened with dismissal by United Air if he brought economic harm to the airline through his interest in

the Challenger explosion?

A.   No.

Q.   Did you tell the Court that Mr. Leippe had also told you during your interview of him that he had incurred the enmity of United management through research he had done through the Airline Pilots Association of United's business practices and pension funding shenanigans?

A.   No.

Q.   Did you tell the Court that during your interview of Mr. Leippe that he stated that he had also incurred the displeasure of the Airline Pilots Association officers because of his knowledge of certain sweetheart deals they had made with United management?

A.   No.

Q.   Did you tell the Court that during the course of your interview with Mr. Leippe he had told you that he had made enemies and been threatened with lawsuits by the officials of his local utility district because of his opposition to their illegal violations of the Brown Act methods and policies?

A.   No.

Q.   Did you tell the Court in your Declaration that during the course of your interview with Mr. Leippe that he had told you that any one of the above groups of enemies might have caused the threat to be made against him?

A.   No.

Q.   Did you tell the Court that in your Declaration that during the course of your interview with Mr. Leippe that he stated that it was as likely one of them, that is, United Airlines, Airline Pilots Association or utility district, that it was as likely one of them as it was Carpenter or Jackson or so he thought at the time?

A.   No.

Q.   Did you tell the Court in your Declaration that during the course of your interview with Mr. Leippe that he said that it could have -- that the Judge asked him if it would affect him, and he said no?

A.   I don't believe so.

Q.   Did you tell the Court in your Declaration that during your second conversation with Mr. Leippe that he told you that he agreed with the jury's verdict?

A.   No.

Q.   How much were you paid to conduct this interview of Mr. Leippe and prepare these reports?

A.   I don't have any idea now, but it would have been at my normal hourly rate.

Q.   And what was that?

A.   150 I believe.

Q.   $150 an hour.  Where is your office located?

A.   San Francisco.

Q.   And so you interviewed Mr. Leippe at his house, his

residence?

A.  Yes.

Q.  And where was that located?

A.  It's in Placer County.

Q.  In Shingle Springs?

A.  Yes.

Q.  How long of a drive was that for you?

A.  I suppose a couple of hours.

Q.  And then how long was your interview with him?

A.  I think about an hour, hour-and-a-half.

Q.  And then you talked to him again on the phone?

A.  Yes.

Q.  And then you had to draft these reports?

A.  Yes.

Q.  And are you being paid to testify here today?

A.  Yes.

Q.  At your normal hourly rate?

A.  Yes.

MR. VINCENT:  No further questions, Your Honor.

THE COURT:  Do you have any questions, Mr. Riordan?

MR. RIORDAN:  One, Your Honor.

                    CROSS-EXAMINATION

BY MR. RIORDAN:

Q.  Who drafted this Declaration?

A.  I believe you did.

Q.    And then I submitted it to you to see whether the statements in it were true and accurate?

A.    That's correct.

MR. RIORDAN:  Thank you.  I don't have anything further, Your Honor.

THE COURT:  Mr. Vincent?

MR. VINCENT:  No, Your Honor.

EXAMINATION BY THE COURT

Q.    Based on the answers that you've been giving, Mr. Fechheimer, it appears that you left a lot of things out of the Declaration that you signed.  I assume you read it before you signed it?

A.    Yes, sir.

Q.    So it is your Declaration?

A.    Yes.

Q.    Now, did you -- well, let me put it to you straightforward.  Why did you leave out all those other things?

A.    First of all, I didn't prepare the Declaration.

Q.    I know, but you signed it.

A.    Yes.

Q.    It must have been clear to you that there was a lot left out favorable to the Government.  I assume if you had been an investigator for 30 years, you'd recognize that when you signed a Declaration.

A.   I'm not sure that I follow you, Your Honor.

Q.   The questions that you've been asked by the Government's lawyer this afternoon has brought out all of the things that you left out of your Declaration that you included in your investigative report; isn't that right?

A.   Yes.

Q.   Now, it must have been clear to you that a lot of things were left out.

A.   My assumption was they went to the legal point of issue.

Q.   Okay.  So you've -- you're telling me that you thought it through before you signed it.  Is that the idea?

A.   I read it and --

Q.   My question is you thought it through and didn't believe it was relevant to the issues before the Court?

A.   I read it and saw that nothing that was in it was untrue.

Q.   Well, you're dodging my question.  During your investigation, Mr. Fechheimer, did anything come up that lead you to believe that other jurors may have been aware of this threat that you were questioning Mr. Leippe about?

A.   Um, my investigation never got to that point.

Q.   You mean somebody cut you off?

A.   Yes.

Q.   Somebody told you to stop investigating?

A.    Yes, sir.

Q.    Who was that?

A.    Well, at some point I was under the impression that the papers had been filed, and this was in 1997.  And then in 2000 I was asked to resume the investigation, and then I was told that you had cut it off.

Q.    Okay.  You mean since these hearings had commenced?

A.    I guess.

Q.    Yeah.  I'm talking about in April of 1997 when you were apparently actively seeking out jurors to ask them about whether they knew about the threat.  Wasn't that your assignment or at least part of it?

A.    Um, yes.  Yes, sir.

Q.    And there were some 12 jurors, and you were only able to actually interview two?

A.    As my recollection today is that for whatever reason, um, the time for filing his papers had run out.

Q.    Did you talk to any other jurors over the telephone other than Mr. Artichier and Mr. Leippe?

A.    Not that I recall.

Q.    Since you were interviewing Mr. Leippe about an event over some three years later, why didn't you furnish him with copies of statements that he had made some three years earlier to refresh his memory?

A.    I don't believe that I had such statements.

Q.   You didn't have any documentation as to what you were investigating?

A.   I'm not aware what you're referring to, Your Honor.

Q.   Well, for example, a reporters' transcript of an interview by -- of Mr. Leippe by myself in connection with this threat that you were investigating.

A.   I don't recall that I have such or had such a document.

Q.   Did it occur to you to get it?

A.   Well, I know that I asked for whatever materials were available.

Q.   And what were you told?

A.   It had been over four years I think.

Q.   I know.  You see that's why I'm asking the question. You're having trouble recalling things that happened three or four years ago.  Don't you think that maybe Mr. Leippe did too?

A.   I -- I don't know, Your Honor.

THE COURT:  Okay.  Do any counsel have any follow-up questions to ask the witness in connection with what I've been asking him?  Mr. Riordan?

MR. RIORDAN:  No, Your Honor.

THE COURT:  Mr. Vincent?

MR. VINCENT:  Just one, Your Honor.

///

REDIRECT EXAMINATION

BY MR. VINCENT:

Q.   Mr. Artichier that you spoke to, did he tell you that he was unaware with any threat, anything being made to any of the jurors?  That's Exhibit H.

A.   I don't think we discussed that.

Q.   Well --

THE COURT:  You mean you can't recall?

THE WITNESS:  Oh, independently I don't recall it. But it says he stated that he was unaware of any threat having been made to any of the jurors.

Q.   (BY MR. VINCENT)  That's what Mr. Artichier told you?

A.   Yes.

Q.   And that's what you put in your report which is Exhibit H?  May I please have the lights --

A.   Yes.

MR. VINCENT:  All right.  That's all.  Thank you.

THE COURT:  Mr. Riordan?

MR. RIORDAN:  Nothing further, Your Honor.

THE COURT:  All right.  Thank you.  Mr. Fechheimer, you're excused.  I'm sorry.  It's "Fetch-high-mer?"

THE WITNESS:  Yes, sir.

THE COURT:  Any further witnesses, Mr. Vincent?

MR. VINCENT:  No, Your Honor.

THE COURT:  Mr. Riordan?

MR. RIORDAN:  No, Your Honor.  Your Honor, I would move to withdraw Exhibit C which was submitted in --

THE COURT:  Hold it.  Mr. Fechheimer, would you remain out in the hall for a minute, please.

THE WITNESS:  Yes, sir.

(Whereupon, Mr. Fechheimer exited the courtroom.)

THE COURT:  That's right.  There's an exhibit here that I'm very curious where it came from.  There's no foundation for it.  Is that what you're attempting to withdraw?

MR. RIORDAN:  Exhibit C, Your Honor.

THE COURT:  Right.  And what is Exhibit C?

MR. RIORDAN:  It's a transcript of a tape recording obtained from KCRA -- NBC in Sacramento.

THE COURT:  Where did that come from?

MR. RIORDAN:  It came from the Executive Media Video Clip Service.  If the Court is asking the full background on it, someone heard --

THE COURT:  Well, I'm trying to figure out since apparently it doesn't -- it wasn't the jury foreman that made that phone call, I'm just curious what foundation you have for the tape or the transcript of the tape.

MR. RIORDAN:  Well, Your Honor, I do believe -- absolutely believe it was the jury foreman.  I believe that the voices are similar.

THE COURT: Wait a minute. Wait a minute. There's no evidence that it was.

MR. RIORDAN: Your Honor, I understand that the jury foreman did not recall this conversation. I have listened to the tape.

THE COURT: He was a little stronger than that. Go on.

MR. RIORDAN: I have listened to the tape. I believe it is Mr. Leippe. But I agree that --

THE COURT: Why? You recognize the voice?

MR. RIORDAN: Yeah. I believe the voice is quite similar, but I agree that without Mr. --

THE COURT: When did you hear Mr. Leippe talk prior to today?

MR. RIORDAN: Um, I didn't.

THE COURT: Hold it. Then how did you recognize his voice?

MR. RIORDAN: I didn't prior to today, Your Honor. I did not.

THE COURT: Okay.

MR. RIORDAN: I had a tape in which Dave from Cameron Park --

THE COURT: You mean today you formed the opinion that it's the same voice?

MR. RIORDAN: In my own mind? Yes, I did, Your

Honor.

THE COURT:  Okay.

MR. RIORDAN:  The reason it was offered is that the tape involved a juror named Dave from Cameron Park who said that he had received a death threat during the Jackson trial. I believe that it is Dave who called in.  But I don't think that I'm going to be able to make the foundation on it if Mr. Leippe doesn't recall the conversation.  So I'm moving to withdraw it.

THE COURT:  Any objection, Mr. Vincent?

MR. VINCENT:  No, Your Honor.

THE COURT:  The motion is granted.  It will be deemed withdrawn and not referred to in these proceedings.

We're 15 minutes from close of business, counsel. How do you wish to proceed?

MR. RIORDAN:  Um, Your Honor, I can -- I have a closing remark no more than three minutes.  So I'm prepared to submit them to the Court if the Court feels we can complete the hearing today.

THE COURT:  Well, I'm not so sure we can complete the hearing today, but I'm pleased to hear you say that you only have a three-minute argument.

How long do you estimate you'll argue the case, Mr. Vincent?

MR. VINCENT:  About three minutes, Your Honor.

THE COURT:  Okay.  Then that would leave you, what, a minute-and-a-half for rebuttal, Mr. Riordan?

MR. RIORDAN:  I suppose, Your Honor.

THE COURT:  Go ahead.

MR. RIORDAN:  Um, Your Honor, I'm referring to the opinion in this case from the Ninth Circuit 209 F.3d 1103. As I see it they remanded the Court the case back for the decision of two questions.  Whether Mr. Leippe at the time of the trial -- and I'm quoting -- believed that the phone call might have been an attempt by one of the Defendants to hang the jury.

I believe we've met our burden on that question under the Court's questioning as well as my own.  Mr. Leippe affirmed that while his opinion got stronger later, there was no question that at the time of the call he believed that one of the explanations of it was that it was an attempt by one of the Defendants to hang the jury.  So I believe we've met the burden on that.

Then the burden shifts to the Government to prove it harmless beyond a reasonable doubt.  I suspect that the Government will rely on Mr. Leippe's very clear assertion on the witness stand that it did not influence his deliberations and his vote.  We -- they -- we have a respectful disagreement over that, Your Honor.  I believe that testimony is inadmissible under 606.  If it is inadmissible, I believe

the Government has failed to meet his burden of proving his threat and his perception of it as being possibly related to the Defendant to be harmless. And I'll submit it with that, Your Honor.

THE COURT: Okay. Mr. Vincent?

MR. VINCENT: Your Honor, this is a perfect example of why some districts have rules preventing parties from talking to jurors after a verdict. This was basically a setup. Mr. Leippe was not given any advance warning. Someone shows up. He wasn't shown anything to refresh his memory. The investigator lies to him, tells him "I've talked to other jurors" when he hasn't. And you can see that the clear attempt is to trick him into saying something that the Defense can then use to try and attack his conviction.

Then when he says things which refute the defense theory, they just leave it out. So when he talks about the possibility of the threat coming from United Airlines, the Airline Pilots Association, the district, the airline pilots, all that's just dropped out. He says it could have been any one of those things. That's just dropped out. That's dropped out for a reason because it refutes what their argument is going to be.

The Defense has -- the reason why we're here because the Defense has argued to this Court and certainly to the Ninth Circuit that what the jurors said during the interview

with Mr. Fechheimer was profoundly different from what he told you in the chambers hearing. He's putting the odds at 50/50. It's clear the Ninth Circuit was misled by that, and that's why it was sent back here. And that's -- that's why I submit other districts have rules not allowing party lawyers and their PIs to contact jurors.

What is unrefuted is that it did not affect the jurors' deliberations. That is unrefuted. That is what he said at the time. That is what he's told Mr. Fechheimer. That is what he has said here. And I believe that we are entitled to ask him if it affected the conduct of the deliberations because that's what Dutkel says. It's -- we're supposed to ask him did it affect the course of deliberations. He has said no. And there's no evidence that it did.

The fact of the matter is that what he has said here today is no different than what he -- in effect, no different than what he told the Court in chambers. He never excluded the possibility that the call was related to trial -- to this trial. He never excluded the possibility. He said it was probably the district.

He said that the call -- he had called -- all of the parties knew that he had called the El Dorado Sheriff's office, that he had talked to the F.B.I., that he had talked to Agent Drost. That he knew the F.B.I. had put a trap trace

on his phone.  There was nothing hidden.  The parties knew this.  And yet, nevertheless, they allowed him to continue to deliberate, and there's nothing that has been said here today which changes the decision that the Court made at the time, and that was that he continue to serve as a juror.

The only really new facts that we did not have before this hearing is that during his interview with the private investigator the juror gave two other possible sources for the call besides the utility district and the trial itself, and that was United airlines and the Airline Pilots Association.  So we would submit, Your Honor, that the facts are as they were before, and that is that he recalled did not affect his deliberations.  It was as he referred to it as an annoyance.  He thought it could have come from any number of sources.  And we'll submit it.

THE COURT:  Rebuttal, Mr. Riordan?

MR. RIORDAN:  Your Honor, the Ninth Circuit said that Mr. Leippe told you before that the call came -- probably came from other sources.  He had said that before.  He had said other sources.  Not another source, but other sources. But the Ninth Circuit said he did not tell you was that there was a 50/50 chance that the threat came from the Defendant. There has been -- Mr. Leippe has been fully aware of this.

He had a full examination here.  He reaffirmed that yes indeed he told Mr. Fechheimer, and it was true that at

that time he believed it was 50/50 that the threat came from a Defendant.  That is what is different, and that is precisely the statement that the Ninth Circuit said if Mr. Leippe affirms that statement that that was his belief at the time, then you have made a showing that he believed the phone call may have came from one of the Defendants, and the burden shifts.  Thank you.

THE COURT:  Well, didn't -- just a minute, please, Mr. Riordan.

MR. RIORDAN:  Okay.

THE COURT:  I specifically asked him -- Mr. Leippe if he was speculating in connection with either the 50/50 chance or that it could have been from some other source, three or four other sources, and he said, yes, that was pure speculation.  And he also said that he reasoned it out, and it became more solidified after someone apparently connected with the trial embraced him out in the street after he was discharged.

MR. RIORDAN:  Right.

THE COURT:  And that's why I -- I'm trying to determine if this -- if the statements that he made to your investigator years later to the extent that they are stronger than what he told me was afterthought.

MR. RIORDAN:  Well, Your Honor, actually I thought they -- his examination by you was the most important part of

the case because you clearly pointed out that he told the investigator actually that it got stronger afterwards. And you said you told it had got stronger? He said that's true. It did get stronger. And then he was clear it was one of the possibilities at the time. "I thought it could have been the Defendants at the time, but it got stronger."

So he -- his statement before the Court under the Court's examination today confirm that he did believe that the phone call, and I quote, might have been an attempt by one of the Defendants to hang the jury.

He again and again said he thought it might have been one of several possibilities, might have been. He -- he agreed with the 50/50 statement, that he had made that, and that is the first prong. And then we're into the burden shifting of the Government proving harm beyond a reasonable doubt.

Mr. Leippe, when all is said and done -- and just one point on this, Your Honor. When we submitted the Declaration, we submitted it because the key different fact to what we put in the Declaration was the different fact, the 50/50. We sought an evidentiary hearing. We now got one. We immediately asked this Court to provide mutual discovery. We provided the report to the Government by Mr. Fechheimer. There's never been any attempt to disguise the report from Mr. Fechheimer. The original Declaration is the key fact

that triggered it.  And it's a true fact that he said 50/50. That's what the Ninth Circuit seized on.  That's what he affirmed today.

THE COURT:  I don't doubt that maybe that's what the Ninth Circuit seized on, Mr. Riordan.  You know I went over my personal notes of this case post verdict, and you might recall that I believed that you and co-counsel on appeal were hiding the ball from the Ninth Circuit.  And I have several papers in my personal notes that I put on record that you were hiding the ball.

MR. RIORDAN:  I'm sorry, Your Honor.  As to this 2255?

THE COURT:  No.  No.  I said post verdict period you and other co-counsel on appeal were handling.  And as a matter of fact, it was in connection with your seven or eight attempts to get the Defendant out on bail pending appeal. That's what I noted for the record that you were hiding the ball from the Ninth Circuit, and it bothered me.  And by not attaching the entire investigative report on the appeal from the denial of the Defendant's petition on the 2255, you've done it again.

You correctly point out that maybe the Ninth Circuit seized only the portions of the affidavit that might be favorable to the Petitioner.  But brought out at this hearing were a lot of things that were not favorable to your theory

of this case.  In any event, I'm going to take the matter under submission.  I want to collect my thoughts.  And for that purpose I'm going to have you come back -- I don't necessarily want to write a memorandum decision on this limited remand.  I'm going to have you come back, and then I'll give an oral analysis.

MR. RIORDAN:  Shall we set a date, Your Honor?

THE COURT:  Yeah.  A date convenient with counsel.

MR. RIORDAN:  If the Court --

THE COURT:  Give me at least the weekend.  For example, the earliest date that I suggest would be next Monday.

MR. RIORDAN:  Well, Your Honor, it -- I have a couple of appearances, and it's the week before the holiday.  I wonder whether we can go over into the week of January, Your Honor?

THE COURT:  Yeah.  I have no problem with that.  I meant it when I said it's at the convenience of counsel.

MR. VINCENT:  That's fine, Your Honor.

MR. RIORDAN:  Is there a particular date of the week that --

THE COURT:  Well, I prefer Monday, law and motion calendars.  But one of them is crowding up because of the holidays.  That's the second Monday in January that's crowding up.

THE CLERK:  Yes, Your Honor, the 8th.

THE COURT:  Shall we go to the third week in January?

MR. RIORDAN:  That's a holiday.

THE CLERK:  That's a holiday.

THE COURT:  Tuesday afternoon, 1:30 -- 2:00 p.m.?

THE CLERK:  2:00 p.m.

MR. RIORDAN:  I believe that's the 16th, Your Honor.

THE COURT:  That's very good, Counsel.  Yes.  16th.
And it would be at 2:00 p.m.

MR. RIORDAN:  Thank you, Your Honor.

MR. VINCENT:  Thank you, Your Honor.

THE COURT:  Mr. Vincent, is that date agreeable then?

MR. VINCENT:  Yes, Your Honor.

THE COURT:  All right.  Thank you.  The matter is
submitted.

(Whereupon, proceedings were

continued to January 16th, 2001,

2:00 p.m., Courtroom 8.)

STATE OF CALIFORNIA   )
                      )      ss.
COUNTY OF SACRAMENTO  )

I, CATHERINE R. VESTITO, hereby certify:

That I am a Certified Shorthand Reporter of the State of California;

That in pursuance of my duties as such, I attended the proceedings in the foregoing matter and reported all of the proceedings and testimony taken therein;

That the foregoing is a full, true and correct transcript of my shorthand notes so taken.

Date:   April 20, 2001

_____
CATHERINE R. VESTITO, CSR 9670