# EXHIBIT 2

# (Hearing Exhibit 43)

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE EDWARD J. GARCIA, JUDGE THEREOF.

---oOo---

I hereby certify that the annexed instrument is a true and correct copy of the original on file in my office.
ATTEST: MARIANNE MATHERLY
Clerk, U. S. District Court
Eastern District of California
By _____
Deputy Clerk
Dated _____ 5/25/18

THE UNITED STATES OF AMERICA, )
)
)
            Plaintiff, )
)
VS. )        NO. CV-S-97-691
)            CR-93-118
CLAYTON JACKSON, )
)
            Defendant. )
_____ )

ORIGINAL

---oOo---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MONDAY, JANUARY 22, 2001

FILED

FEB - 6 2001

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

REPORTED BY:                    ESTHER F. WIATRE
                                CSR NO. 1564

APPEARANCES


FOR PLAINTIFF:

    UNITED STATES ATTORNEY
    501 Fifth Street, Tenth Floor
    Sacramento, California 95814
    BY:  JOHN VINCENT, ESQ.
            and
      JIM ARGUELLES, ESQ.

FOR DEFENDANT:

    RIORDAN & ROSENTHAL
    523 Octavia Street
    San Francisco, California  94102
    BY:  DENNIS P. RIORDAN, ESQ.

SACRAMENTO, CALIFORNIA

MONDAY, JANUARY 22, 2001, 10:00 A.M.

---oOo---

THE CLERK:  Calling Criminal S-93-118, the United States versus Clayton Jackson.

MR. VINCENT:  Good morning, your Honor.

John Vincent and Jim Arguelles on behalf of the United States.

THE COURT:  Mr. Vincent and Mr. Arguelles.

MR. RIORDAN:  Good morning, your Honor.

Dennis Riordan on behalf of the Defendant and Movant Jackson.

THE COURT:  Mr. Riordan.

This matter is before the Court under submission. However, before I read my notes into the record, there is some things I want to bring up that came up as I was reviewing the matter before me, and more carefully reviewed the exhibits that were submitted along with the testimony and other evidence.

Do any of counsel have a full or partial reporter's transcript of the hearing?

Mr. Vincent?

MR. VINCENT:  No, your Honor.

THE COURT:  Mr. Riordan?

MR. RIORDAN:  I do not, your Honor.

THE COURT:  I took copious notes of the hearing.  But for several reasons I wanted a more exact record of the testimony and arguments of counsel, so that I ordered a draft of the typewritten transcript of the proceedings. What I got was what the court reporter labeled a rough draft and is very rough.  It is not finished, and the only reason I used -- the only thing I used it for was for quotes and other evidence and testimony at the hearing.

Let me bring up a couple of things that I have been considering while the matter has been under submission.

First of all, in evidence before the Court is an exhibit attached to petitioner's pretrial memorandum, Exhibit B, which quotes Juror Lieppe as saying that he did not change his vote from Friday to Monday after receiving the recorded phone call at home on the intervening Saturday.

Exhibit B was discussed during the hearing in a somewhat confusing fashion.  And it was partially illegible, so that during the hearing the government supplied the Court with a more legible copy of the exhibit, and that is now ordered filed along with Exhibit B to petitioner's pretrial memorandum.

The question arises as to whether or not the Court can properly consider, can consider, that statement by Lieppe that he did not change his vote after having received that

phone message.  You'll recall that during the hearing petitioner objected under Rule of Evidence 606, Subdivision (b), as in Baker, was it, Mr. Riordan?

MR. RIORDAN:  That's right, your Honor.

THE COURT:  That the Court should not and could not consider testimony about the subjective impact of the improperly admitted evidence.  During the time that I had the matter under submission, the government wrote me a supplemental letter brief, I guess that is what I would characterize it, dated January 5, copied to counsel for the petitioner, in which letter he argues that I can consider Lieppe's testimony at the hearing in connection with what affect the phone call made on his verdict or on his deliberations.

I have concluded, Mr. Riordan, that you were right and I erred in overruling your objections, and I am going to cover that in my analysis.  I will not consider any subjective impact it may have had or any testimony by Mr. Lieppe as to subjectively what affect that reported phone call may have made on his thought processes.  I did some independent research after I took the matter under submission and surprisingly I disagree in part with this letter brief of January 5 that the government submitted. But it did cause me to read carefully the two cases, Ninth Circuit cases, cited by the government in that letter brief.

And particularly apparently relevant is the case of Sassounian v. Roe, 230 Federal 3rd, 1097, a Ninth Circuit 2000 case. It is a jury misconduct case in which the jury considered extrinsic evidence not received at trial.

The misconduct in Sassounian was the juror's communication of the extrinsic evidence to the other jurors during deliberations. The interest I took in that case is it described a standard that this Court should consider in evaluating the affect that the phone call may have had on jury deliberations. The standard is, quoting from Sassounian v. Roe, whether the extrinsic information had a substantial and injurious affect or influence in determining the jury's verdict. The basis for that statement in the Ninth Circuit case is a citation to the U.S. Supreme Court in 1993, Brecht v. Abrahamson, 113 Supreme Court 1710, cited within the Ninth Circuit case.

The Ninth Circuit case states in addition that I must make an objective review of the affect the phone call may have had on jury deliberations, and I quote from it as follows: I may "consider testimony concerning whether the improper evidence was considered, but I may not consider the juror's testimony about the subjective impact of the improperly admitted evidence."

My first impression when I read that is that is gobbledygook. It didn't seem to make much sense. It seemed

to be contradictory.  However, this statement in defendant's Exhibit B that quotes Mr. Lieppe as saying that he was -- that he did not change his verdict between Friday and Monday when he received the intervening call on Saturday seems to fit within the Sassounian case standard that says that I may consider testimony or evidence concerning whether the improper evidence was considered.

Since neither counsel argued that at the hearing, if you will make a note, I will allow further argument on that issue, and if any of counsel request it, I may consider putting the matter over so that you can study the matter further if you are not presently familiar with the Sassounian v. Roe case.  We will cover that in just a minute.  That is one of the things I wanted to mention to you.

The other thing I want to mention to you is that I carefully played government's Exhibit 1, the tape-recorded message that was received in evidence.  In fact, I played it several times in my chambers while I had the matter under submission.  And I want to ask counsel if they agree with me or disagree with me or wish to hear the tape now.  We made arrangements to have the tape played and a video of a popular horror movie called Friday the 13th.

Let me find my place in my notes.

After having listened to the tape, this is why I

characterize the call, the exact message is "Beware, I am going to get you. I am going to kill you." One of the investigators from the Sheriff's office believed that the voice was purposely disguised. What I am focusing on and what I want counsel to focus on now is preceding that threatening message are several cadence sounds, and the threat itself is voiced in a feigned, ominous whisper, and there is laughter, what appears to be laughter, at the end of the call.

Another investigator in a report of the Deputy Sheriff told the Deputy Sheriff that he believed that the phone call was a prank because the sounds, these cadence sounds, precede the threat were an attempt to mimic the background sounds from a popular teenage horror movie, Friday the 13th.

Now, has counsel listened to that tape carefully enough or do you want it played now in court to see if you agree or disagree with me that there are cadence, several cadence sounds preceding the threat, which seems to track the sounds in the horror movie, Friday the 13th? Neither counsel raised this issue in your pretrial briefs or in your arguments. So to be perfectly fair I am willing to play that tape now for you and allow further argument now.

Do you want to hear the tape again, Mr. Vincent?

MR. VINCENT: The tape of the phone call, no, your

Honor.

THE COURT:  Mr. Riordan?

MR. RIORDAN:  No, your Honor.

THE COURT:  Then take my word for it, and any reviewing court should listen to it carefully, there are several cadence sounds prior to the threat.

Now it happens that some time ago I recall seeing a video of the movie Friday the 13th.  To refresh my memory over the weekend I purchased a copy of the video, Friday the 13th.  A copy of that is here in court.  It only takes about three or four minutes at the start of that movie to see what I am talking about and what the investigator was talking about when he says that it appears the caller was trying to mimic the movie, Friday the 13th.

You want to hear the first three or four minutes of that tape now, Mr. Vincent?

MR. VINCENT:  If I may, your Honor, I've never seen the movie.

THE COURT:  Okay.  If either counsel wishes to hear it, I am going to play it.

You want to hear it, Mr. Riordan?  Have you seen the movie?  It is before our time, I am telling you that.

MR. RIORDAN:  Your Honor, I think the Court is about to make a finding that the similarity exists, and I have no objection to that finding.  I am not going to question it.

THE COURT:  What I will do, then, is that I am going to make a copy of the Friday 13th video a Court's exhibit and make it part of the record in the event this matter goes beyond this Court.

Any objection to that, Mr. Vincent?

MR. VINCENT:  No.

THE COURT:  Mr. Riordan?

MR. RIORDAN:  No, your Honor.

THE COURT:  That will be the order.

Let's get back to this first thing that I mentioned. What about, Mr. Riordan, the fact that you submitted as an exhibit a statement quoting the juror that he did not change his vote from Friday to Monday when he received the call? Do you think that falls within the proscription of the rule that you cite?

MR. RIORDAN:  It's -- as the Court is aware from reading these cases, which I have reviewed because I have litigated this issue before, this is a thorny evidentiary issue.  I do think, for instance, and in other cases have taken position that the objective vote that a Court could for instance take into consideration what a vote was at one point in the deliberations and what a vote was at another point in the deliberations, if it could be established factually, with accuracy by the appropriate evidentiary standard that votes were taken and the numbers were such and

such at each time.

The -- unlike State court where you can -- where you can take a vote number, seven-five, but not believe -- the judge is never supposed to inquire. My understanding is in that in Federal Court under the Brass Bill Rule a federal judge couldn't inquire during deliberations as to what the numerical split was. I think the real problem with the statement is not necessarily its admissibility, but we don't -- my view of that is that we don't know whether the juror is saying there was a vote, all 12 of us voted several times, and my vote did not change, or whether he was saying my inclination as to how I was going to vote was not affected by this.

If it were the latter, then I think it is within the proscription. If he were saying that there were three votes and they were essentially seven-five, seven-five, seven-five a long period of time and my vote didn't change, that might be a different matter. Actually, I don't know from his statement whether he is referring to a vote cast in the jury room or to an opinion formed. So, if it were an opinion formed, then it is subjective. If it were a vote cast, it might not have been. I don't believe the record allows us to say that he is referring to straw ballots taken by the jurors during the course of the deliberations. And for that reason I don't know that my objection is so much on an

admissibility as in terms of probative value. Since we don't know what he meant, it's difficult to weigh in the equation of figuring out.

THE COURT: Mr. Vincent.

MR. VINCENT: Your Honor, I believe you have enough information to conclude. He said my vote did not change. So it doesn't really make any difference whether, in the government's view, whether this was a formalized voting process. The point that he's making, which he made when he testified, was this call did not affect me. It did not.

I believe that the Court can take that into account under Dutkel because Dutkel specifically says that your inquiry has to be whether or not this call affected the conduct.

THE COURT: You are going too far. Dutkel does not allow me to consider his statement that it did not affect him. However, in an objective analysis it appears that I can consider the fact that he voted guilty on Friday and then voted guilty on Monday, and that his vote never changed. That is objective. But I don't think I can consider this statement that you just made, that I can consider his testimony as to how it affected him.

MR. VINCENT: Your Honor, I believe from what he testified, because he was asked about this. I specifically asked him, "Did your vote change between Friday and --" from

before the time.  I asked him -- I can find my exact question.  It was --

THE COURT:  I didn't find that in the reporter's transcript.  I found it in Defense Exhibit B.

MR. VINCENT:  I understand, your Honor.  What I asked him was: Did you agree with the verdict before the call?  He said yes.  Did you agree with the verdict after the call?  He said yes.

THE COURT:  Now we are getting into what Mr. Riordan just raised.  That is not evidence that there was a full ballot taken on Friday.  If what you are saying were true, then they would have reached a verdict on Friday.

MR. VINCENT:  Not necessarily, your Honor.  He may have -- they may very well have had a straw vote or taken a vote, and they did not have a unanimous verdict on Friday.  He voted for conviction and then came back on Monday.

THE COURT:  I agree with the first part of your argument, Mr. Vincent, that it is evidence of his vote.  But I am not going to go beyond that to say that it is evidence that all jurors agreed or that they even took a straw vote.  It is just that his vote didn't change between Friday and Monday, and I really don't want to go before that because I don't completely understand this Sassounian case and even Brecht against Abrahamson, although I will note that Abrahamson also is a habeas corpus case.

Is the matter submitted, Mr. Vincent?

MR. VINCENT:  Yes, your Honor.

THE COURT:  Mr. Riordan?

MR. RIORDAN:  The matter is submitted, your Honor.

THE COURT:  In an opinion filed April 20th last year, the Ninth Circuit Court of Appeals affirmed in part, vacated in part and remanded for further proceedings this Court's order of October 27, 1998, denying defendant's Section 2255 petition to vacate his sentence in this matter.

The limited remand order directs the Court to hold a hearing in which the Court is to determine the circumstances of the threatening phone call made to a juror's residence during a weekend recess of jury deliberations.  And, secondly, the Court was further directed to determine the impact it may have had on the juror or jurors at the time.  And then, thirdly, whether or not it was prejudicial to the petitioner.

This Court held that hearing on December 14, this past year, during which the Court heard two witnesses, received exhibits, heard argument and took the matter under submission.  The matter is now on calendar for the Court's decision after hearing.

As to the circumstances of the call, the hearing showed that it was received on a telephone message recording device at the residence of Juror David Lieppe, the foreman of the

jury on the Saturday morning shortly after 10:00 a.m.  The jury at the time was on a weekend recess from deliberations in the trial of petitioner's case, the matter having been submitted to the jury the preceding Monday.

The phone message, which was recorded, stated "Beware. I am going to get you.  I am going to kill you." It was completely anonymous, and a County Deputy Sheriff who initially investigated the call stated that the voice was possibly disguised.

The threat was preceded by several cadence sounds and the threat itself was voiced in a feigned ominous whisper, and there is laughter at the end of the call.  The wife of the juror who played back the call told the County Deputy Sheriff who initially investigated the call that the caller could have been a young person.  FBI Special Agent Drost, who also played back the call, told the deputy that he believed the call was a prank because the sounds that the caller made were an attempt to mimic the background sounds from a popular teenage horror movie, Friday the 13th.  See Exhibit A to the government's prehearing memorandum.

The call was not directed to anyone in particular at the residence, and the threat did not refer to Mr. Lieppe a juror nor to the trial in progress nor to anyone else in the family.  Three persons lived in the residence at the time of the phone call: Mr. Lieppe, his wife and their

college-aged child.

The telephone that received the call was not listed under Lieppe's name.  It was listed under his wife's maiden name.  There is no evidence anyone connected with the trial would have known the wife's maiden name.  The jurors' phone numbers under the clerk's procedures are not available to attorneys or investigators to a case without a prior court order.  So, as I say, there is no evidence that anyone connected with the trial could have known the wife's maiden name.

At the hearing Mr. Lieppe testified he found the call "amateurish" and "amusing" and that it didn't scare him or his family.  The Court has listened to the tape carefully several times, and I also find it more amusing than anything else.

I now find that the threatening phone call was not related to the trial simply because there is no evidence that it was.  On this issue the burden of proof is on petitioner, and he has failed to carry his burden.  In fact, absent speculative ruminations as to the source of the call, which after the fact ponderings, I will consider shortly, the evidence that it was related to the trial is to the contrary.  Having listened to the tape, I now believe the call was a childish prank and not related to the trial.

In addition to determining the circumstances of the

call, the remand order directed the Court to determine the impact the call may have had on the juror or jurors at the time of their deliberations.

First of all, it is clear that no juror other than Mr. Lieppe knew of or was aware of the threatening phone call. At the hearing Mr. Lieppe testified that he told no one else on the jury about the phone call. He recalled that I had admonished him to that affect and he testified that he followed the admonition.

The record also shows that the Court took action at the time upon learning of the phone call to ensure that no other juror was aware of it.

Petitioner's investigator who contacted at least one other juror post trial during his investigation into the matter testified at the hearing that there was no evidence he was aware of that any other juror knew of the phone call. Thus, there is no evidence that the phone call had any impact on any of the other 11 jurors or the jury as a whole, for that matter.

The issue of impact thus boils down to whether Juror Lieppe believed at the time of the trial that the phone call might have been an attempt by one of the defendants to hang the jury. Received as evidence at the hearing were two of petitioner's investigator's reports upon which the investigator's declaration was based.

This declaration attached as an exhibit to petitioner's Section 2255 motion appears to be the sole basis for the evidentiary hearing that has been ordered by the Ninth Circuit.  The statements attributed to the juror in the declaration, that is that the juror suspected the phone call was a desperate attempt to hang the jury or that it was 50/50 whether the phone call was from a neighborhood group or the defendants, are, first of all, unfairly taken out of context, as can be readily seen by comparison of the investigator's full report of the interview of Mr. Lieppe and his declaration.

Counsel advised that since the investigator's full report had not been attached to the Section 2255 as it was presented to this Court, it also was not presented to the Ninth Circuit.

Secondly, the testimony at the hearing showed that the statements by the juror as to the possible source of the phone call was pure speculation.  The juror told the investigator and testified at the hearing that there were possibly four or five sources of the threat, and that he was guessing or speculating as to what the threats was related to.  Called upon to speculate by petitioner's investigator, the juror did so over three years after the event.  As framed by the panel on remand, the issue is whether the juror actually believed during deliberations that the

telephone threat received had come from one of defendants in the trial.  In other words, was there jury tampering?

Based on the evidence and the testimony received at the trial, I find that the defendant has not carried his burden of showing jury tampering.  I have already shown that the circumstances and the content of the phone call fail to prove the call was, in fact, related to the trial then in progress.  As to the juror's belief at the time his testimony regarding his statement to the investigator, as quoted in the investigator declaration, were guesses and speculation.  And to the extent his belief focused on the defendants, they were afterthoughts colored by post trial events.  As he thought about it and was pressed to relate the threat to something in his life experiences, he included the defendants as possible sources.  But he testified that there were three or four other possible events the phone call could have been related to.  He said it could be related to disagreements he was having with his corporate employer, disagreements he was having with his pilots' union, his disagreements with official reports of the cause of the Challenger spaceship explosion or his disagreements with how his community district was operating.

But it bears repeating that during his testimony Mr. Lieppe emphasized more than once that this was all speculation.  He expressly used the term "guess," "guesses,"

all of which belies the notion that he actually believed at the time that the phone call was related to the trial or any attempt to affect his vote on the verdict.

He testified at the hearing that he was truthful when he told us at the in camera hearing during the trial that he didn't believe the call was related to the trial. From Mr. Lieppe's demeanor on the stand during the hearing this past year his forthright and direct answers to questions put to him by both attorneys and the Court, as well as other evidence received at the hearing, I find that he did not actually believe during the trial that the phone call came from one of the defendants or was otherwise connected to the trial.

At the hearing Mr. Lieppe evidenced no bias or prejudice as to the results of the proceedings we were conducting, other than his strong conviction as to petitioner's guilt based on the evidence adduced at the trial. Contrast that with the investigator's testimony whose bias was evident and whose answers to questions adverse to petitioner asked during the hearing were evasive or he said he couldn't recall. Also, I do not believe Lieppe's statement to the petitioner's investigator, in fact, conflict with his previous statements to the Court in the in camera session. Nor do I find they in any way evidence that Lieppe lied to the Court or attempted to

deceive the Court.

To the extent that it is argued that they do conflict in any substantial way, I find the contemporaneous statements made in the in camera session during the trial to more accurately reflect Mr. Lieppe's true feelings at the time of the event.  The phone call was then fresh in his mind as was the trial, and the events he guessed the call could have been related to and post trial events do appear to have colored his recall when he stated his connection of the case to the trial was triggered by the chance encounter of someone who identified himself as a reporter who he believed would only have known of the call if he had been tipped by the defendants or the defendants' lawyers.

Consider also the unannounced appearance at his home of the defendant's investigator over three years after the trial who attempted to play on Mr. Lieppe's sympathy by suggesting to Mr. Lieppe that Jackson had already served enough time.

Having determined that there is insufficient evidence upon which to base a finding that the threatening phone call was an attempt at jury tampering or that it was an extra judicial communication that is in any way connected to the judicial proceeding in progress, I next determined, as directed by the remand order, if the recorded phone call as a happenstance was prejudicial to the petitioner.

Let me start by stating that I believe I erred during the hearing when I overruled petitioner's evidence Rule 606 (b) objections to questions put to Mr. Lieppe, which asked him if he was in any way influenced during the deliberations by the threatened phone call or if it affected his verdict in any way. I did some independent research on the objection and now see the questions were improper under the rule, and I should have sustained petitioner's objections.

According to the rule and pertinent case law, including a U.S. Supreme Court case not cited by the parties, Mattox v. U.S., 13 Supreme Court 50, a 1892 case, a juror may testify to any facts bearing upon the question of the existence of any extraneous influence, but not as to how far that influence operated on his mind.

As a matter of fact, as one Ninth Circuit case pointed out, whose citation now escapes me, Evidence Rule 606 (b) is with a codification of the U.S. Supreme Court Mattox case. So I now reverse myself, sustain the objections and strike Mr. Lieppe's answers in that regard.

In deciding the prejudice issue, I will not consider or refer to any of Mr. Lieppe's testimony as to how the phone call may have affected his verdict. As I understand my function on the prejudice issue, I must make an objective assessment of whether the threatening phone call was harmless beyond a reasonable doubt. I so find.

In his prehearing memorandum petition states that Juror Lieppe may have had doubts of petitioner's guilt and he, quoting the brief, "There is evidence the jurors struggled with their decision whether to convict Defendant Jackson" because, quoting again from the brief, "the jurors deliberated for five days prior to reaching verdict."

I find that the evidence and the record belies such a conclusion. Juror Lieppe's testimony at the hearing and his post trial statements to petitioner's investigator demonstrate that he harbored little if any doubt as to petitioner's guilt. Also the juror did not deliberate for five full days. Due to other commitments of the Court and the intervening two-day Thanksgiving recess during the deliberations, the jurors did not deliberate every day nor for full days. The clerk's record shows that their deliberations took place over some 28 hours, nor did the length of the deliberations establish this was a close case as petitioner argues.

The case involved two defendants charged in a total of 12 counts, some of which charged only petitioner and others which charged only his codefendant. The trial was both relatively lengthy, extending over 28 trial days, and factually and legally complex. The jury apparently searched the evidence during deliberations for evidence corroborating Senator Alan Robbins' testimony, a key witness whose

testimony the Court instructed was to be viewed with caution.  Ultimately the jury convicted petitioner only on counts where Robbins was corroborated by other convincing evidence and acquitted on others.

To the extent -- excuse me, and acquitted on others.

The Ninth Circuit in its affirmance on direct appeal made a note of the jury's deliberation, commenting "They carefully -- the jurors conducted a careful and independent consideration of each offense."

To the extent it can be said jury deliberations were lengthy, it was not because it was a close case.  The evidence of petitioner's guilt was, in fact, overwhelming.  As a Ninth Circuit panel on direct appeal also noted, it was not a close call.

Petitioner's offer of a $250,000 bribe to Senator Robbins was captured on tape and played to the jury.  Jackson's explanations at the trial was so incredible his sentence was enhanced on recommendation of the probation officer and after determination by the Court for perjury.  Petitioner also argues "Any doubts the foreman had about Jackson's guilt would have been resolved in his mind by belief that Jackson and Carpenter resorted to extra judicial attempts to influence the cause of the deliberations."

The Court rejects this argument.  Based on evidence adduced at the hearing, Mr. Lieppe had no doubts of

defendant's guilt.  He told petitioner's investigator and he testified at the hearing that Jackson's testimony was "self-impeaching.  The whole thing was outrageous.  He was unbelievable.  There were 72 hours of tapes."

As already noted, this Court, which presided over the trial and heard and saw the evidence and observed the demeanor of the witnesses during the trial, ruled that post verdict proceedings with a full-on Court analysis at the evidence of defendant's guilt was overwhelming.  So did the Ninth Circuit panel who reviewed the record on direct appeal and confirmed Jackson's conviction.

Only petitioner believed that there was room for doubt.  Not only does the Court believe and find that the phone call was apparently a childish prank, a happenstance and no way connected to the trial, it also believes that it was an event that has been blown way out of proportion and now that it has been aired finds that it was harmless beyond a reasonable doubt.

Mr. Vincent, I am going to ask you to prepare a summary order cited to the Court's oral analysis and attaching, if you find it more convenient, a copy of the reporter's transcript of the Court's analysis and denial of the motion.

MR. VINCENT:  Yes, your Honor.

THE COURT:  As directed by the Ninth Circuit, the Court

now enters a new order denying petitioner's Section 225

motion to vacate this sentence.

Anything further to take up for now, Mr. Vincent?

MR. VINCENT:  No, your Honor.

THE COURT:  Mr. Riordan?

MR. RIORDAN:  No, your Honor.

THE COURT:  Thank you, Counsel.

(Court adjourned at 12:00 p.m.)

---oOo---

REPORTER'S CERTIFICATE

---oOo---

STATE OF CALIFORNIA   )
                      )      ss.
COUNTY OF SACRAMENTO  )


I, ESTHER F. WIATRE, certify that I was the Official Court Reporter, pro tem, and that I reported verbatim in shorthand writing the foregoing proceedings; that I thereafter caused my shorthand writing to be reduced to typewriting, and the pages numbered 3 through 26, inclusive, constitute a complete, true, and correct record of said proceedings:


COURT:  UNITED STATES DISTRICT - EASTERN CALIFORNIA

JUDGE:  EDWARD J. GARCIA

CAUSE:  U.S.A. V. CLAYTON JACKSON

DATE:  JANUARY 22, 2001


IN WITNESS WHEREOF, I subscribe this certificate at Sacramento, California, on this 31st day of January, 2001.


_____
ESTHER F. SCHWARTZ
CSR NO. 1564