McGREGOR W. SCOTT
United States Attorney
ANDRÉ M. ESPINOSA
ROGER YANG
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

JENNIFER E. LEVY
Trial Attorney
Counterterrorism Section
National Security Division
U.S. Department of Justice
10th and Constitution Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 514-1092

Attorneys for Respondent/Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 2:05-CR-240-GEB |
|---|---|
| Respondent/Plaintiff, | UNITED STATES' OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS (DOC 734) |
| v. | |
| HAMID HAYAT, | COURT: Hon. Garland E. Burrell, Jr. |
| Petitioner/Defendant. | |

UNITED STATES' OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND
RECOMMENDATIONS

TABLE OF CONTENTS

I.    INTRODUCTION ...............................................................................................................1

    A.    Background and the Magistrate Judge's Findings and Recommendations. .......................2

    B.    The Magistrate Judge misapplied the Strickland standard. ................................................4

II.    PROCEDURAL HISTORY...............................................................................................4

    A.    District court proceedings. ...................................................................................................4

    B.    Direct and collateral review. ...............................................................................................6

III.    STATEMENT OF RELEVANT FACTS .........................................................................8

    A.    The government's case at trial. .............................................................................................8

        1.    Hayat told cooperating witness Naseem Khan of his intentions to attend a jihadi training camp in Pakistan. ................................................................8

        2.    After initial denials, Hayat confessed to the FBI that he attended jihadi training and intended to wage violent jihad in the United States. .........................10

            a.    In a videotaped interview, Hayat confessed to attending a jihadist training camp in Pakistan for months in 2003-2004, and suggested training might last only weeks.............................................11

            b.    Hayat confessed that his parents and uncle Anas knew he attended camp while in Pakistan in 2003-2004, that his maternal grandfather was associated with the camp leadership, and that other family and friends from his village attended camp. ....................................................................................................13

        3.    Umer Hayat admitted he knew Hamid Hayat went to training camps and that Umer personally saw a camp. ................................................................13

        4.    A series of extremist publications from 1999-2003 discovered in Hayat's living space further evidenced Hayat's intent. .......................................14

        5.    Expert testimony regarding the existence of militant camps in the Balakot region corroborated Hayat's confession to the FBI................................15

        6.    Expert testimony and satellite evidence corroborated Hayat's confession that he attended a jihadi camp in the Balakot region. .........................15

        7.    The jihadi supplication Hayat carried provided further evidence that Hayat returned to the United States intending to engage in violent jihad...........................................................................................................16

    B.    The defense case at trial. ....................................................................................................16

IV.    THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS............................18

A.  This Court reviews the Magistrate Judge's Findings and Recommendations *de novo*..................................................................................................................19

ARGUMENT................................................................................................................20

A.  Standard for relief under § 2255. ...........................................................................20

    1.  The two-prong Strickland standard governs Hayat's ineffective assistance of counsel claims..................................................................................20

    2.  Strickland imposes a strong presumption that trial counsel's strategic decisions were objectively reasonable, which Hayat must overcome. ..................21

    3.  Hayat also bears the burden to show that any alleged ineffectiveness undermines confidence in the verdict. ..................................................................24

V.  MS. MOJADDIDI PROPERLY AND ADEQUATELY INVESTIGATED THE SUPPOSED "ALIBI DEFENSE" AND REASONABLY SELECTED A SPEEDY TRIAL AND SUFFICIENCY OF THE EVIDENCE STRATEGY..............................................24

A.  The Magistrate Judge's misapplication of law undermines any finding of a Sixth Amendment violation from Ms. Mojaddidi's decision to set aside the alibi defense and pursue a more viable defense at trial. ...................................................25

    1.  The Magistrate Judge affirmatively misapplied the law.......................................25

        a.  The Magistrate Judge contravened the Strickland standard by according Ms. Mojaddidi's strategic decision-making "little or no deference" because of her limited criminal law experience. ................26

        b.  The Magistrate Judge substituted the flawed and unreliable opinions of Hayat's defense attorney experts for the presumption of adequate performance by trial counsel and other controlling law. ...............................................................................29

B.  The Magistrate Judge's analysis and conclusions are based on incomplete and erroneous factfinding, and are not supported by reasonable inferences from the facts and law...................................................................................................38

    1.  Ms. Mojaddidi's considered and strategic decision to pursue a speedy trial and sufficiency of the evidence defense instead of an alibi defense was well within the wide range of competent representation...............................38

        a.  Ms. Mojaddidi made reasonable efforts to investigate any potential alibi witnesses she, Hayat, or his family identified, including witnesses in Pakistan. ..............................................................41

        b.  Ms. Mojaddidi believed others in Pakistan might have seen Hayat engaged in innocent activities but she did not believe she could construct an effective alibi defense for the entire relevant period Hayat was in Pakistan..............................................................47

c.    Ms. Mojaddidi discussed with Mr. Griffin the value of a potential alibi defense for both defendants but both attorneys ultimately agreed that it was not a sound defense strategy. ........................ 54

2.    Ms. Mojaddidi decided to concentrate on a constitutionally effective challenge to the government's evidence and burden of proof. ............................ 55

C.    Hayat has not established prejudice from Ms. Mojaddidi's failure to investigate the alibi defense in Pakistan. ............................................................. 61

1.    The testimony of the live alibi witnesses and deponents was unreliable, would not have altered the evidentiary picture at trial, and cannot carry Hayat's burden to demonstrate prejudice. ............................................................. 62

a.    The four deponents' testimony did not establish prejudice. ..................... 63

b.    The deponents claimed firm memories of ordinary interactions with Hayat nearly 15 years earlier, frequently contradicted their own testimony and that of others, admitted their bias, and conceded their poor recollection of other facts from the same period. ............................................................................................. 64

c.    The two live alibi witnesses also claimed firm memories of ordinary interactions with Hayat nearly 15 years earlier, contradicted their own and others' testimony, admitted their bias, and conceded their poor recollection of other facts from the same period. ....................................................................... 75

2.    The testimony of the declarants and live witnesses cannot demonstrate prejudice. ............................................................................................... 82

3.    The Magistrate Judge correctly dismissed the 2014 declarations as not establishing prejudice. ...................................................................................... 87

a.    The failure by Hayat and his family to identify in 2005 more than a dozen relatives and close friends who claim they spent time with Hayat daily, weekly, or monthly over a two-year period undermines the reliability of the declarants' claims. ..................... 87

b.    The process by which Hayat's advocates collected the declarations rendered them unreliable. ....................................................... 89

4.    The declarants' claims of seeing Hayat ten years earlier on a daily, weekly, or monthly basis strains credulity and renders the declarations unreliable. ............................................................................................. 95

a.    The District Court's earlier critique of the purported alibi declarations as unreliable and insufficient to satisfy Hayat's burden on summary judgment also applies on the merits. ......................... 96

VI.   MS. MOJADDIDI WAS NOT INEFFECTIVE MERELY BECAUSE THE COURT EXCLUDED HER PROFFERED "FALSE CONFESSION" EXPERT AND HER DECISION TO RELY ON DIRECT AND CROSS-EXAMINATION TO CHALLENGE THE RELIABILITY OF HAYAT'S CONFESSION WAS WITHIN THE WIDE RANGE OF COMPETENT REPRESENTATION.................................................98

A.   Ms. Mojaddidi attempted to introduce an expert to challenge Hayat's confession but this Court excluded him because his testimony would not assist the jury. ...............................................................................................................98

B.   Ms. Mojaddidi vigorously cross-examined government agents and elicited testimony in support of the defense theory that Hayat's confession was unreliable and he did not attend a jihadist camp................................................101

1.   May 30, 2005 Interview...................................................................101

2.   June 3, 2005 Interview....................................................................102

3.   June 4 and 5, 2005 Interviews........................................................102

C.   Ms. Mojaddidi did not provide ineffective assistance by not calling an alternative expert witness to support Hayat's defense theory that his confession was unreliable and that he did not attend a jihadist camp. ...........................106

1.   Dr. Leo's testimony confirmed the effectiveness of Ms. Mojaddidi's efforts to challenge the reliability of Hayat's confession and revealed his own work to be unreliable and unhelpful to a jury. .....................................107

a.   Dr. Leo's hearing testimony demonstrated that his hypothetical trial testimony would have overlapped substantially with Wedick's proposed trial testimony, which this Court excluded. .............108

b.   Dr. Leo conceded that his research is not predictive and does not prove correlation, and his testimony demonstrated that his hypothetical trial testimony would have merely confused the jury and usurped its judgment.................................................108

c.   Dr. Leo conceded that calling him or an expert like him at trial is not the only effective method of challenging the reliability of a confession.......................................................................109

d.   Dr. Leo conceded that courts have strongly criticized his methodology and rejected his proposed testimony................................109

2.   Ms. Mojaddidi's efforts to challenge the reliability of Hayat's confession were effective...............................................................110

3.   Ms. Mojaddidi did not act based on ignorance of the law and this is not a situation in which any competent counsel necessarily would have retained a false confessions expert.................................................112

D.   Hayat has not established prejudice as a result of Ms. Mojaddidi's purported failure to admit testimony of a false confession expert. ...................................114

UNITED STATES' OBJECTIONS TO THE MAGISTRATE
JUDGE'S FINDINGS AND RECOMMENDATIONS

VII.    DR. MOHAMMED'S TESTIMONY WAS ADMISSIBLE, THEREFORE, ANY FAILURE TO OBJECT IS NOT INEFFECTIVE, AND CANNOT BE PREJUDICIAL ................................................................................................118

    A.    This Court should adopt the Magistrate Judge's finding that Dr. Mohammed's testimony did not violate Rule 702, therefore Hayat failed to show prejudice................118

    B.    The Magistrate Judge's adoption of the dissent in Hayat to justify re-opening the issue of whether Dr. Mohammed violated FRE 704 is an abuse of discretion..................................................................................................118

        1.    The Magistrate Judge misinterpreted Span II, which involves an unpreserved claim and basic Strickland analysis.................................120

        2.    The Magistrate Judge misinterprets Carthorne II, which does not affect law of the case, and explicitly differentiates between plain error and ineffective assistance of counsel under Strickland. ............................122

        3.    Span II did not disturb precedent concerning law of the case or the case law holding that the determination of an issue on direct appeal precludes an ineffective assistance of counsel claims based on the same claim. ................................................................................123

        4.    Adoption of the dissent is not warranted, when the Ninth Circuit has re-affirmed the precedent on Rule 704(b) that the panel majority relied upon in the opinion in Hayat on direct appeal. ....................................126

        5.    The existence of a dissent does not establish ineffectiveness and prejudice................................................................................127

VIII.    COUNSEL IS NOT INEFFECTIVE FOR FAILING TO FIND A BETTER EXPERT. ..........................................................................................128

    A.    Ms. Mojaddidi did not provide ineffective assistance by using Dr. Weiss to counter Dr. Mohammed's testimony, and Hayat cannot establish prejudice. .................129

        1.    The Magistrate Judge ignores the deference to Ms. Mojaddidi's choice of an expert, and applies a "better expert" standard of reasonableness prohibited by caselaw. ..............................................................130

        2.    The Magistrate Judge's Factual Findings Are Wrong. ......................131

    B.    Dr. Haykel's testimony does not establish ineffectiveness or prejudice because he substantially agreed with Dr. Mohammed's testimony except for the conclusion and cannot say that Hayat's interpretation was not a jihadist's interpretation. ....................................................................................133

    C.    Hayat fails to establish ineffectiveness or prejudice with regard to the handling of Dr. Mohammed's testimony. .......................................................139

IX.    MS. MOJADDIDI WAS NOT INEFFECTIVE FOR WITHHOLDING AN OBJECTION TO THE PROSECUTOR'S CLOSING ARGUMENT AND, EVEN IF SHE COULD HAVE DONE MORE, HAYAT CANNOT ESTABLISH PREJUDICE ............140

X.    THE MAGISTRATE JUDGE ERRED IN CONCLUDING THAT THERE WAS AN ACTUAL CONFLICT ................................................................................................142

A.    By Refusing to apply deference or the strong presumption of reasonableness, the Magistrate Judge finds a legally and factually unsupported actual conflict from the decision to request a trial as soon as possible. .................................144

B.    The Magistrate Judge applied the wrong legal standard by giving "little to no deference" to the strategic decisions of trial counsel. ......................................145

C.    An actual conflict requires active representation of the conflicting interest, which is absent from the Magistrate Judge's legal or factual analysis. ...........148

1.    No support exists for a conclusion that when, in a court's view, a strategy to test the government's evidence before it can conduct additional investigation is no longer in the interests of one co-defendant, an actual conflict arises. ......................................................148

a.    The Magistrate Judge misinterprets dicta from a Ninth Circuit case to apply a "do diverge" standard that eliminates the need to find an actual, direct conflict of interests between the defendants. ..............................................................................148

b.    The Supreme Court has rejected use of possible or potential conflicts to support a finding of an actual conflict without active representation of competing interests. .........................................150

c.    There Is no Support for a Conclusion that a Decision to Test the Government's Evidence Was Against Hayat's Interest or Protected Umer's Interest. .................................................................152

D.    The Magistrate Judge's interpretation of Rodrigues and other caselaw fails to require Hayat to show the competing loyalty *caused* the counsel's decision..................154

E.    Applying the Correct Standards, Hayat Cannot Show the Factual Requirements for Finding an Actual Conflict...............................................................157

1.    The Magistrate Judge Failed to Find the Required Active Representation of an Interest against Hayat's......................................................157

2.    The Magistrate Judge's finding of joint representation and an actual conflict from the joint representation is clearly erroneous based on the evidence. ...............................................................................................159

a.    The superseding indictment was not a watershed or significant moment in the progression of the case....................................................164

b.    The evidence concerning the motion to suppress shows that Ms. Mojaddidi understood the issues, and made a strategic decision not to move to suppress. ..........................................................167

c.    Neither failure to file a motion for a bill of particulars nor the failure to obtain a security clearance is evidence of an actual conflict. .....................................................................................................168

3.    Basing findings on attorney expert testimony made the findings speculative or conclusory...................................................................170

A.    The Magistrate Judge's application of the plausible alternative standard without the two basic elements of an actual conflict to find an adverse effect on Ms. Mojaddidi's representation was clearly erroneous. .............................................173

XI.    THIS COURT SHOULD ADOPT THE MAGISTRATE JUDGE'S FINDING THAT MS. MOJADDIDI FAILURE TO OBTAIN A CLEARANCE DID NOT, AND COULD NOT PREJUDICE HAYAT, BUT REJECT THE UNNECESSARY FINDING THAT MS. MOJADDIDI WAS POTENTIALLY INEFFECTIVE.........................175

CONCLUSION...................................................................................................178

# TABLE OF AUTHORITIES

## CASES

Adams v. Quarterman,
 324 F. App'x 340 (5th Cir. 2009) ............................................................................................... 59

Al-Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury,
 686 F.3d 963 (9th Cir. 2012) ................................................................................................... 177

Allen v. Woodford,
 395 F.3d 979 (9th Cir. 2005) ..................................................................................................... 23

Am. Pac. Whaling Co. v. Kristensen,
 93 F.2d 17 (9th Cir. 1937) ....................................................................................................... 138

Babbitt v. Calderon,
 151 F.3d 1170 (9th Cir. 1998) ..................................................................................... 57, 133, 176

Bashor v. Risley,
 730 F.2d 1228 (9th Cir. 1984) ................................................................................................... 44

Bergmann v. McCaughtry,
 65 F.3d 1372 (7th Cir. 1995) ..................................................................................................... 82

Bieghler v. McBride,
 389 F.3d 701 (7th Cir. 2004) ..................................................................................................... 59

Blake v. United States,
 723 F.3d 870 (7th Cir. 2013) ................................................................................................... 159

Bonin v. Calderon,
 59 F.3d 815 (9th Cir. 1995) ................................................................................................. passim

Brady v. Maryland,
 373 U.S. 83 (1963)............................................................................................. 5, 6, 7, 9, 18,

Bragg v. Galaza,
 242 F.3d 1082 (9th Cir. 2001) ................................................................................................... 44

Brown v. Hall,
 No. CIV S-03-1965 FCD KJM, 2006 WL 3524503 (E.D. Cal. Oct. 23, 2006) ................................... 44

Burger v. Kemp,
 483 U.S. 776, 783-95 (1987). ............................................................................................... passim

Butler v. McEwen,
 No. CV 11-3543-DDP(RNB), 2014 WL 2566069 (C.D. Cal. Feb. 20, 2014).................................... 59

Californians for Disability Rights, Inc. v. Cal. Dep't. of Transp.,
 249 F.R.D. 334 (N.D. Cal. 2008).............................................................................................. 126

Campbell v. Wood,
 18 F.3d 662 (9th Cir.) ............................................................................................................... 22

Chandler v. United States,
  218 F.3d 1305 (11th Cir. 2000) ................................................................................................ 56, 60

Commonwealth of Pennsylvania v. Alicia,
  92 A.3d 753 (Pa. 2014) ..................................................................................................................... 116

Cooper v. Fitzharris,
  586 F.2d 1325 (9th Cir. 1978) ................................................................................................ 21, 125

Crane v. Kentucky,
  476 U.S. 683 (1986)........................................................................................................................... 111

Cuevas v. Chrans,
  3 F.Appx. 528 (7th Cir. 2001) ............................................................................................... 168, 170

Cuevas v. Henderson,
  801 F.2d 586 (2d Cir. 1986)............................................................................................................... 62

Cullen v. Pinholster,
  563 U.S. 170 (2011)...................................................................................................................... 27, 146

Cummings v. Sirmons,
  506 F.3d 1211 (10th Cir. 2007) ........................................................................................... 167, 170

Cunningham v. Wong,
  704 F.3d 1143 (9th Cir. 2013) .............................................................................................. 140, 141

Cuyler v. Sullivan,
  446 U.S. 335, 350 (1980).  ......................................................................................................... passim

Darden v. Wainwright,
  477 U.S. 168 (1986).............................................................................................................................. 22

Dawson v. Marshall,
  561 F.3d 930 (9th Cir. 2009) ............................................................................................................ 19

Dean v. Duckworth,
  748 F.2d 367 (7th Cir. 1984) ............................................................................................... 151, 152

Decastro v. Branker,
  642 F.3d 442 (4th Cir. 2011) ......................................................................................................... 153

DeFazio v. Wallis,
  459 F.Supp.2d 159 (E.D.N.Y. 2006) ..................................................................................... 25, 98

Dep't of the Navy v. Egan,
  484 U.S. 518 (1988)........................................................................................................................... 177

Dokes v. Lockhart,
  992 F.2d 833 (8th Cir. 1993) .......................................................................................................... 172

Dorfmont v. Brown,
  913 F.2d 1399 (9th Cir. 1990) ....................................................................................................... 177

UNITED STATES' OBJECTIONS TO THE MAGISTRATE
JUDGE'S FINDINGS AND RECOMMENDATIONS

Dowell, Inc. v. Jowers,
    166 F.2d 214 (5th Cir. 1948) ........................................................................................ 57, 165

Duncan v. Ornoski,
    528 F.3d 1222 (9th Cir. 2008) ............................................................................................ 43

Dura Auto. Sys. of Ind., Inc. v. CTS Corp.,
    285 F.3d 609 (7th Cir. 2002) .............................................................................................. 33

E.E.O.C. v. Fed. Exp. Corp.,
    558 F.3d 842 (9th Cir. 2009) .............................................................................................. 26

Earp v. Cullen,
    623 F.3d 1065 (9th Cir. 2010) ............................................................................................ 30

Eggeleston v. United States,
    798 F.2d 374 (9th Cir. 1986) ........................................................................................ 21, 43

Egger v. United States,
    509 F.2d 745 (9th Cir. 1975) ............................................................................................ 123

Estate of Barabin v. AstenJohnson, Inc.,
    740 F.3d 457 (9th Cir. 2014) .............................................................................................. 30

Featherstone v. Estelle,
    948 F.2d 1497 (9th Cir. 1991) ...................................................................................... 140, 142

Fitzpatrick v. McCormick,
    869 F.2d 1247 (9th Cir. 1989) .......................................................................................... 174

Florida v. Nixon,
    543 U.S. 175 (2004) .......................................................................................................... 152

Freund v. Butterworth,
    165 F.3d 839 (11th Cir. 1999) .......................................................................................... 158

General Elec. Co. v. Joiner,
    522 U.S. 136 (1997) .......................................................................................................... 170

Gimenez v. Ochoa,
    821 F.3d 1136 (9th Cir. 2016) .......................................................................................... 125

Glasser v. United States,
    315 U.S. 60 (1942) ............................................................................................................ 149

Grayson v. Thompson,
    257 F.3d 1194 (11th Cir. 2001) .......................................................................................... 21

Greiner v. Wells,
    417 F.3d 305 (2d Cir. 2005) ............................................................................................... 22

Guam v. Santos,
    741 F.2d 1167 (9th Cir. 1984) ............................................................................................ 22

Harrington v. Richter,
562 U.S. 86 (2011).................................................................................................................... passim

Harris v. Wood,
64 F.3d 1432 (9th Cir. 1995) ..................................................................................................... 118

Hart v. Massanari,
266 F.3d 1155 (9th Cir. 2001) ...................................................................................... 126, 127, 128

Heishman v. Ayers,
621 F.3d 1030 (9th Cir. 2010) ................................................................................................... 171

Hinton v. Alabama,
571 U.S. 263 (2014).......................................................................................................... 129, 130

Holloway v. Arkansas,
435 U.S. 475 (1978)................................................................................................................... 160

Holy Land Foundation for Relief & Development v. Ashcroft,
333 F.3d 156 (D.C. Cir. 2004) ................................................................................................... 177

Hovey v. Ayers,
458 F.3d 892 (9th Cir. 2006) .......................................................................................... 30, 148, 156

Hughes v. Borg,
898 F.2d 695 (9th Cir. 1990) ....................................................................................................... 22

In Re Grand Jury Subpoena,
739 F.2d 1354 (8th Cir. 1984) ......................................................................................... 23, 36, 37

Ioane v. United States,
2015 WL 2238669 (E.D. Cal., May 12, 2015) ............................................................................ 119

Jack v. Trans World Airlines,
854 F. Supp. 654 (N.D. Cal. 1994) ............................................................................................... 91

James v. Borg,
24 F.3d 20 (9th Cir. 1994) ........................................................................................................... 22

Johnson v. Finn,
665 F.3d 1063 (9th Cir. 2011) ..................................................................................................... 86

Johnson v. Lockhart,
921 F.2d 796 (8th Cir. 1990) ....................................................................................................... 40

Kimmelman v. Morrison,
477 U.S. 365 (1986)............................................................................................................... 22, 24

Knowles v. Mirzayance,
556 U.S. 111 (2009).......................................................................................................... 22, 44, 56

LaGrand v. Stewart,
133 F.3d 1253 (9th Cir. 1998) ............................................................................................... passim

UNITED STATES' OBJECTIONS TO THE MAGISTRATE
JUDGE'S FINDINGS AND RECOMMENDATIONS

Langford v. Day,
    110 F.3d 1380 (9th Cir. 1997) ...................................................................................................... 41

Lau Ah Yew v. Dulles,
    257 F.2d 744 (9th Cir. 1958) ...................................................................................................... 161

Lawson v. Caspari,
    963 F.2d 1094 (8th Cir. 1992) ...................................................................................................... 44

Lema v. United States,
    987 F.2d 48 (1st Cir. 1993) .......................................................................................................... 40

Lightbourne v. Dugger,
    829 F.2d 1012 (11th Cir. 1987) .................................................................................................. 158

Lockhart v. Terhune,
    250 F.3d 1223 ............................................................................................................................ 154

Lord v. Wood,
    184 F.3d 1083 (9th Cir. 1999) ...................................................................................................... 43

Loza v. Mitchell,
    766 F.3d 466 (6th Cir. 2014) ...................................................................................................... 116

Lugo v. United States,
    350 F.2d 858 (9th Cir. 1965) ...................................................................................................... 173

Lunbery v. Hornbeak,
    605 F.3d 754 (9th Cir. 2010) ...................................................................................................... 113

Manufactured Home Communities Inc. v. City of San Jose,
    420 F.3d 1022 (9th Cir. 2005) ...................................................................................................... 29

Martinez v. Ryan,
    566 U.S. 1 (2012).......................................................................................................................... 23

Matylinsky v. Budge,
    577 F.3d 1083 (9th Cir. 2009) ................................................................................................. 21, 22

McCauley–Bey v. Delo,
    97 F.3d 1104 (8th Cir. 1996) ........................................................................................................ 82

McClure v.Thompson
    23 F.3d 1233, 1248 (9th Cir. 2003) ........................................................................... 149, 156, 158, 159

McFarland v. Yukins,
    356 F.3d 688 (6th Cir. 2004) ...................................................................................................... 158

McMann v. Richardson,
    397 U.S. 759 (1970)...................................................................................................................... 21

Medrano v. United States,
    315 F.2d 361 (9th Cir. 1963) ...................................................................................................... 123

UNITED STATES' OBJECTIONS TO THE MAGISTRATE
JUDGE'S FINDINGS AND RECOMMENDATIONS

Mickens v. Taylor,
    535 U.S. 162 (2002)................................................................................ 150, 152, 158

Miranda v. Arizona,
    384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)..................................................... 11

Molina v. Rison,
    886 F.2d 1124 (9th Cir. 1989) ............................................................................ 123

Morris v. State of Cal.,
    966 F.2d 448 (9th Cir. 1991) ............................................................................. 150

Mosier v. Murphy,
    790 F.2d 62 (10th Cir. 1986) ............................................................................ 160

Mukhtar v. Cal. State Univ., Hayward,
    299 F.3d 1053 (9th Cir. 2002) ............................................................................ 30

Murray v. Schriro,
    745 F.3d 984 (9th Cir. 2014) ............................................................................ 134

Murtishaw v. Woodford,
    255 F.3d 926 (9th Cir. 2001) ............................................................................ 129

Ochoa v. Davis,
    CV 99-11129 DSF, 2016 WL 3577593 (C.D. Cal. June 30, 2016)....................................................... 41

Odom v. United States,
    455 F.2d 159 (9th Cir. 1972) ............................................................................ 123

Ortiz v. Stewart,
    149 F.3d 923 (9th Cir. 1998) ...................................................................... 23, 36, 147

Parker v. Parratt,
    662 F.2d 479  (8th Cir. 1981) ............................................................................ 160

Parle v. Runnels,
    505 F.3d 922 (9th Cir. 2007) ............................................................................ 118

Patiwana v. United States,
    928 F.Supp. 226 (E.D.N.Y. 1996) ......................................................................... 153

People v. Gilliam,
    670 N.E.2d 606 (Ill. 1996)............................................................................... 112

People v. Kowalski,
    821 N.W.2d 14 (Mich. 2012)................................................................... 109, 115, 117

Phillips v. Woodford,
    267 F.3d 966 (9th Cir. 2001) ............................................................................ 56

Ramonez v. Berghuis,
    490 F.3d 482 (6th Cir. 2007) ............................................................................ 43

UNITED STATES' OBJECTIONS TO THE MAGISTRATE
JUDGE'S FINDINGS AND RECOMMENDATIONS

Rector v. Johnson,
    120 F.3d 551 (5th Cir. 1997) ........................................................................................................ 58

Reynolds v. Chapman,
    253 F.3d 1337 (11th Cir. 2001) ................................................................................................ 158

Rich v. Calderon,
    187 F.3d 1064 (9th Cir. 1999) .................................................................................................. 154

Rios v. Rocha,
    299 F.3d 796 (9th Cir. 2002) ............................................................................................... 43, 56

Ritt v. Dingle,
    142 F.Supp.2d 1142 (D. Minn. 2001) ....................................................................................... 111

Rogers v. Zant,
    13 F.3d 384, 387 (11th Cir. 1994) ....................................................................................... 56, 60

Romero v. Tansy,
    46 F.3d 1024 (10th Cir. 1995) ............................................................................................. 82, 88

Roybal v. Davis,
    148 F.Supp.3d 958 (S.D. Cal. 2015) ........................................................................................ 134

Sanders v. Ratelle,
    21 F.3d 1446 (9th Cir. 1994) .................................................................................................... 174

Sanders v. United States,
    373 U.S. 1 (1963) ..................................................................................................................... 125

Sawyer v. Smith,
    497 U.S. 227 (1990) ............................................................................................................. 21, 23

Seminole Tribe v. Florida,
    517 U.S. 44, (1996) .................................................................................................................... 26

Sexton v. French,
    163 F.3d 874 (4th Cir. 1998) ............................................................................................ 167, 170

Seymour v. Walker,
    224 F.3d 542 (6th Cir. 2000) ..................................................................................................... 82

Shackleford v. Hubbard,
    234 F.3d 1072 (9th Cir. 2000) .................................................................................................. 174

Siripongs v. Calderon,
    133 F.3d 732 (9th Cir.1998) ....................................................................................................... 58

Smith v. White,
    815 F.2d 1401 (11th Cir. 1987) ............................................................................................... 159

SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.,
    188 F.3d 11 (1st Cir. 1999) ......................................................................................................... 32

State v. Cobb,
   43 P.3d 855 (Kan. Ct. App. 2002) ............................................................................ 112

State v. Davis,
   32 S.W.3d 603 (Mo. App. 2000) .............................................................................. 112

State v. Davis,
   110 Ariz. 29 (1973).................................................................................................. 160

State v. Free,
   351 N.J.Super. 203, 798 A.2d 83............................................................................. 112

State v. Ritt,
   599 N.W.2d 802 (Minn. 1999).................................................................................. 111

State v. Tellier,
   526 A.2d 941 (Me. 1987).......................................................................................... 112

Strickland v. Washington,
   466 U.S. 668 (1984).............................................................................................. passim

Thomas v. Scully,
   854 F.Supp. 944 (E.D.N.Y. 1994) ............................................................................ 62

Turk v. White,
   116 F.3d 1264 (9th Cir. 1997) .................................................................................. 44

Turner v. Calderon,
   281 F.3d 851 (9th Cir. 2002) ............................................................................ 23, 130

United States ex rel. Kleba v. McGinnis,
   796 F.2d 947 (7th Cir. 1986) .................................................................................... 41

United States ex rel. Maxwell v. Gilmore,
   37 F.Supp.2d 1078 (N.D. Ill. 1999) ......................................................................... 83

United States v. 10.48 Acres of Land,
   621 F.2d 338 (9th Cir. 1980) .................................................................................. 138

United States v. Adams,
   271 F.3d 1236 (10th Cir. 2001) ........................................................................ 111, 116

United States v. Addonizio,
   442 U.S. 178 (1979)................................................................................................... 20

United States v. Allen,
   831 F.2d 1487 (9th Cir. 1987) .......................................................................... 154, 174

United States v. Alvarez,
   137 F.3d 1249 (10th Cir. 1998) .............................................................................. 159

United States v. Alvarez,
   837 F.2d 1024 (11th Cir. 1988) ......................................................................... 64, 94

United States v. Antone,
  412 Fed. Appx. 10 (9th Cir. 2011)............................................................................................ 113, 116

United States v. Barnes,
  909 F.2d 1059 (7th Cir. 1990) ......................................................................................................... 160

United States v. Beltran-Gutierrez,
  19 F.3d 1287 (9th Cir. 1994) ...................................................................................................... 57, 165

United States v. Benally,
  541 F.3d 990 (10th Cir. 2008) .................................................................................................. 113, 116

United States v. Bowser,
  667 F.Appx. 188 (9th Cir. 2016)...................................................................................................... 126

United States v. Carthorne,
  726 F.3d 503 (4th Cir. 2013) ..................................................................................................... 122, 124

United States v. Carthorne,
  878 F.3d 458 (4th Cir. 2017) ....................................................................................... 118, 122, 124, 125

United States v. Chang,
  207 F.3d 1169 (9th Cir. 2000) ......................................................................................................... 91

United States v. Cochrane,
  985 F.2d 1027 (9th Cir. 1993) ......................................................................................................... 21

United States v. Crespo de Llano,
  830 F.2d 1532 (9th Cir. 1987) ................................................................................................. 153, 170

United States v. Cronic,
  466 U.S. 648 (1984)................................................................................................................. passim

United States v. Crouch,
  731 F.2d 621 (9th Cir. 1984) ..................................................................................................... 57, 165

United States v. Daas,
  198 F.3d 1167 (9th Cir. 1999) ......................................................................................................... 140

United States v. Daoud,
  755 F.3d 479 (7th Cir. 2014) ........................................................................................................... 177

United States v. Diaz,
  876 F.3d 1194 (9th Cir. 2017) ......................................................................................................... 126

United States v. Dillman,
  15 F.3d 384 (5th Cir. 1994) ............................................................................................................. 64

United States v. Duncan,
  42 F.3d 97 (2d Cir. 1994) ......................................................................................................... 38, 151

United States v. Feijoo-Tomala,
  751 F. Supp. 40 (E.D.N.Y. 1990) .................................................................................................... 94

United States v. Finlay,
  55 F.3d 1410 (9th Cir. 1995) ........................................................................................ 149, 150, 172

United States v. Frady,
  456 U.S. 152 (1982)............................................................................................................... 20

United States v. Gambino,
  864 F.2d 1064 (3d Cir. 1988)........................................................................................... passim

United States v. Gomez-Norena,
  908 F.2d 497 (9th Cir. 1990) .............................................................................................. 128

United States v. Gonzalez-Lopez,
  548 U.S. 140 (2006)............................................................................................................. 166

United States v. Gonzalez-Robles,
  603 F.Appx. 558 (9th Cir. 2015)......................................................................................... 126

United States v. Hamilton,
  792 F.2d 837 (9th Cir. 1986) ................................................................................................ 21

United States v. Hayat,
  710 F.3d 875 (9th Cir. 2013) ......................................................................................... passim

United States v. Hayes,
  231 F.3d 1132 (9th Cir. 2000) ..................................................................................... 123, 124

United States v. Holy Land Found. for Relief and Development,
  2010 WL 11541819 (N.D. Tex. May 24, 2010) ................................................................. 159

United States v. King,
  936 F.2d 477 (10th Cir. 1991) .............................................................................................. 41

United States v. Lewis,
  786 F.2d. 1278 (5th Cir. 1986) ....................................................................................... 23, 36

United States v. Libby,
  429 F.Supp.2d 264 (D.D.C. 2006) ...................................................................................... 177

United States v. Lopez,
  762 F.3d 852 (9th Cir. 2014) .............................................................................................. 131

United States v. McMullen,
  98 F.3d 1155 (9th Cir. 1996) ................................................................................................ 24

United States v. Merritt,
  528 F.2d 650 (7th Cir. 1976) ..................................................................................... 23, 36, 37

United States v. Milian-Rodriguez,
  828 F.2d 679 (11th Cir. 1987) .............................................................................................. 64

United States v. Miller,
  874 F.2d 1255 (9th Cir. 1989) ............................................................................................ 111

United States v. Mims
   928 F.2d 310 (9th Cir. 1991) ........................................................................................... 173

United States v. Molina,
   934 F.2d 1440 (9th Cir. 1991) ......................................................................................... 140

United States v. Moore,
   159 F.3d 1154 (9th Cir. 1998) ......................................................................................... 142

United States v. Morales,
   108 F.3d 1031 (9th Cir. 1997) .................................................................................. 126, 128

United States v. Morales-Beltran,
   534 F.Appx. 598 (9th Cir. 2013)...................................................................................... 126

United States v. Morelli,
   169 F.3d 798 (3d Cir. 1999)............................................................................................. 148

United States v. Necoechea,
   986 F.2d 1273 (9th Cir. 1993) ......................................................................................... 140

United States v. Omene,
   143 F.3d 1167 (9th Cir. 1998) ........................................................................................... 64

United States v. Ornelas,
   906 F.3d 1138 (9th Cir. 2018) ......................................................................................... 123

United States v. Ott,
   827 F.2d 473 ...................................................................................................................... 177

United States v. Perez,
   CV 08-06648 MMM, 2010 WL 11602349 (C.D. Cal. May 24, 2010)................................ 23

United States v. Puchi,
   441 F.2d 697 (9th Cir. 1971) ............................................................................................. 64

United States v. Quintero-Barraza,
   78 F.3d 1344 (9th Cir. 1995) .............................................................................................. 20

United States v. Redd,
   759 F.2d 699 (9th Cir. 1985) ........................................................................................... 123

United States v. Redlightning,
   624 F.3d 1090 (9th Cir. 2010) ......................................................................................... 113

United States v. Rodrigues,
   347 F.3d 818 (9th Cir. 2003) .................................................................... 154, 155, 158, 173

United States v. Salim,
   855 F.2d 944 (2d Cir. 1988)............................................................................................... 94

United States v. Saltzer,
   No. 1:14-cv-0451 BLW, 2015 WL 8215744 (D. Idaho Dec. 8, 2015).................................. 27, 28, 146

United States v. Sanchez-Cervantes,
    282 F.3d 664 (9th Cir. 2002) ........................................................................................... 21

United States v. Schaflander,
    743 F.2d 714 (9th Cir. 1984) ........................................................................................... 21

United States v. Scrivner,
    189 F.3d 825 (9th Cir. 1999) ................................................................................... 118, 123

United States v. Shwayder,
    312 F.3d 1109, 1118 (9th Cir. 2002) ...................................................................... 155, 158

United States v. Simmons,
    923 F.2d 934 (2d Cir. 1991)........................................................................................... 147

United States v. Smith,
    415 F.Appx. 826 (9th Cir. 2011)................................................................................... 131

United States v. Span,
    75 F.3d 1383 (9th Cir. 1996) ................................................................ 118, 121, 122, 124

United States v. Span,
    970 F.2d 573 (9th Cir. 1992) .................................................................... 120, 121, 124

United States v. Stinson,
    647 F.3d 1196 (9th Cir. 2011) ....................................................................................... 138

United States v. Taylor,
    802 F.2d 1108 (9th Cir. 1986) ......................................................................................... 20

United States v. Various Slot Machines on Guam,
    658 F.2d 697 (9th Cir. 1981) ......................................................................................... 171

United States v. Walter-Eze,
    869 F.3d 891 (9th Cir. 2017) ................................................................................... passim

United States v. Wells,
    394 F.3d 725 (9th Cir. 2005) ........................................................................ 143, 156, 159

United States v. Younger,
    398 F.3d 1179 (9th Cir. 2005) ..................................................................... 119, 126, 127

United States v. Zuno-Arce,
    44 F.3d 1420 (9th Cir. 1995) ........................................................................................... 64

Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Corp., Inc.,
    546 F.2d 530 (3d Cir. 1976)........................................................................................... 161

Vent v. State,
    67 P.3d 661 (Alaska Ct. App. 2003)............................................................................. 112

Waters v. Thomas,
    46 F.3d 1506, 1510 (11th Cir. 1995) .............................................................................. 60

UNITED STATES' OBJECTIONS TO THE MAGISTRATE
JUDGE'S FINDINGS AND RECOMMENDATIONS

Watts v. United States,
    841 F.2d 275 (9th Cir. 1988) ................................................................................................ 89

Weaver v. Palmateer,
    455 F.3d 958 (9th Cir. 2006) ................................................................................................ 22

Weeks v. Angelone,
    528 U.S. 225 (2000).............................................................................................................. 142

Weisgram v. Marley Co.,
    169 F.3d 514 (8th Cir. 1999) ................................................................................................ 171

White v. Singletary,
    972 F.2d 1218 (11th Cir. 1992) ...................................................................................... passim

Williams v. Armontrout,
    912 F.2d 924 (8th Cir. 1990) ................................................................................................ 59

Williams v. Woodford,
    384 F.3d 567 (9th Cir. 2004) ................................................................................................ 171

Willis v. United States,
    614 F.2d 1200 (9th Cir. 1979) .............................................................................................. 173

Winkler v. Keane,
    7 F.3d 304 (2d Cir. 1993) ..................................................................................................... 158

Wong v. Belmontes,
    558 U.S. 15 (2009)................................................................................................................ 139

Woodland v. Somberg,
    CV-06-1035-PHX-PGR (LOA), 2007 WL 2156390 (D. Ariz. July 25, 2007) .................................... 23

Woods v. McBride,
    430 F.3d 813 (7th Cir. 2005) ................................................................................................ 153

Woods v. Sinclair,
    655 F.3d 886 (9th Cir. 2011) ................................................................................................ 23

Woods v. Sinclair,
    764 F.3d 1109 (9th Cir. 2014) .............................................................................................. 147

Woratzeck v. Ricketts,
    820 F.2d 1450 (9th Cir. 1987) .............................................................................................. 22

Yarborough v. Gentry,
    540 U.S. 1 (2003)........................................................................................................... 146, 170

Zapien v. Davis,
    849 F.3d 787 (9th Cir. 2015) ................................................................................................ 153

## STATUTES

18 U.S.C. App. 3.................................................................................................................... 29

28 U.S.C. § 636(b)(1)(C) ........................................................................................................ 19

28 U.S.C. § 2255 ........................................................................................................ 6, 20, 24

**RULES**

Fed. R. Civ. P. 16(b)(1)(B) ........................................................................................ 100, 114

Fed. R. Civ. P. 72(b)(3)................................................................................................. 19

Fed. R. Crim. P. 15(a) ................................................................................................. 64

Fed. R. Evid. 602 ..................................................................................................... 131

Fed. R. Evid. 702 ............................................................................................... 100, 118

Fed. R. Evid. 702-705 ................................................................................................ 100

Fed. R. Evid. 704(b)............................................................................................... passim

McGREGOR W. SCOTT
United States Attorney
ANDRÉ M. ESPINOSA
ROGER YANG
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814

JENNIFER E. LEVY
Trial Attorney
Counterterrorism Section
National Security Division
U.S. Department of Justice
10th and Constitution Avenue, N.W.
Washington, D.C. 20530

Attorneys for Respondent/Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO.  2:05-CR-240-GEB |
|---|---|
| Respondent/Plaintiff, | UNITED STATES' OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS |
| v. | |
| HAMID HAYAT, | COURT: HON. GARLAND E. BURRELL, JR. |
| Petitioner/Defendant. | |

## I.      INTRODUCTION

The Magistrate Judge's conclusions that Hamid Hayat's Sixth Amendment rights were violated by his trial counsel's deficient performance are the consequence of a misapplication of the legal standard governing *habeas* review, including that court's erroneous refusal to give deference to trial counsel's decisions because of her inexperience, and the reversal of the presumption of adequate performance that resulted from the Magistrate Judge's substitution of Hayat's defense attorney experts' flawed opinions for the controlling law.  The Magistrate Judge's legal conclusions also flow from incomplete and erroneous factfinding.  The United States objects to those conclusions.  After *de novo* review, this Court should set aside the Magistrate Judge's findings of Constitutional violations, decline that court's recommendation that Hayat's conviction be vacated, and deny all of Hayat's meritless *habeas* claims.

1

**A.**   **Background and the Magistrate Judge's Findings and Recommendations.**

In 2002 and 2003, Hamid Hayat repeatedly told his best friend, in recorded conversations, that he planned to attend a jihadi training camp in Pakistan. They discussed the location, leadership, and training at some of those camps. In April 2003, Hayat went to Pakistan, to the region where he said some of those camps were located. From there, Hayat affirmed to his friend his plan to attend a jihadi training camp. In August 2003, Hayat told his friend he would attend a camp after Ramadan, at the end of November 2003. When Hayat returned to California in May 2005, the FBI interviewed him. In a videotaped confession, Hayat admitted he attended a jihadi training camp in 2000 and between October 2003 and November 2004. Hayat also admitted to FBI investigators that he trained to wage violent jihad in the United States and was awaiting orders.[1]

Hayat's confession was corroborated by other facts. His father, Umer, corroborated Hayat's confession. In his own videotaped statement, Umer admitted he knew his son attended training camps, and that Umer visited a camp and stood at the gate. Umer reported his son attended camps in 2000 and in late 2003 to early 2004, and corroborated other facts in Hayat's confession. Hayat's confession was also corroborated by circumstantial evidence demonstrating his intent, including publications showing his belief in violent jihad. Hayat collected those publications and more into a "jihadi scrapbook" that contained articles extolling the virtues of Islamic extremism, criticizing the United States government as "an enemy of Islam," and expressing support for Osama Bin Laden and the Taliban.

Against that backdrop, Wazhma Mojaddidi faced a daunting task in her first federal criminal trial. Her client had: (i) pledged to attend a jihadi training camp; (ii) traveled to the region where he knew those camps were located; (iii) affirmed his pledge and set a date he planned to go; and (iv) confessed that he attended a camp in the period he said he would—a confession Umer corroborated with his own statement. Ms. Mojaddidi defended Hayat in a joint defense agreement with her more experienced co-counsel, Johnny Griffin, who represented Umer. In the context of their joint defense agreement, Ms. Mojaddidi conferred with Mr. Griffin on strategic and tactical issues. However, she also conducted independent research on those issues, and always retained independent decision-making

---

[1] Hayat initially denied attending a camp. Yet, Hayat's cousin described Hayat as a person who is untruthful "a lot," and said he and others warned Hayat that his untruthfulness would eventually "catch up" with him.

authority for Hayat's defense.

The charges against Hayat and his father were closely related, as were their defense options. Hayat was charged with providing material support to terrorists by attending a jihadist camp and returning to the United States to commit violence. Both Hayat and his father were charged with falsely denying that Hayat attended a militant camp. Each had a strong interest in quickly putting the government to its proofs on cases built primarily around their confessions and circumstantial evidence. For each, the passage of time permitted the government to strengthen its evidence proving Hayat attended a jihadi camp, thus increasing the odds of conviction for both defendants. Ms. Mojaddidi and Mr. Griffin pressed for as fast a trial as possible even after this Court, over their objections, granted continuances sought by the government. Trial began only eight months after the defendants' arrest and less than five months after he was charged with providing material support to terrorists. Despite Ms. Mojaddidi's efforts on Hayat's behalf, she could not change the evidence against him. The jury convicted Hayat of on all counts. A separate jury considered the evidence against Umer and could not reach a verdict. The Ninth Circuit affirmed Hayat's conviction and sentence.

In this *habeas* action, Hayat alleges more than a dozen claims. Specifically, he argues his Sixth Amendment right was violated because Ms. Mojaddidi labored under an actual and financial conflict of interest that adversely affected her representation of him, and her performance was ineffective in various ways. He also argues the government violated his Fifth Amendment due process rights by withholding exculpatory evidence. After an evidentiary hearing and post-hearing briefing, the Honorable Deborah Barnes (the "Magistrate Judge"), issued Findings and Recommendations finding merit in three of Hayat's ineffectiveness claims (along with two sub-arguments of those claims). The Magistrate Judge also found that Ms. Mojaddidi represented Hayat jointly with Mr. Griffin and in an actual conflict with the interests of Hayat's co-defendant/father.[2] On that basis, the Magistrate Judge recommends this Court vacate Hayat's conviction and sentence. The government objects to the Magistrate Judge's

---

[2] The Magistrate Judge found only a single instance of ineffectiveness *and* prejudice (alleged failure to investigate and present alibi witnesses). However, the Magistrate Judge found prejudice concerning certain other claims *only* cumulative with other alleged errors and not independently (alleged failure to: procure a false confession expert, move to exclude a government witness under 704(b), call a defense expert concerning Hayat's ta'wiz, and rebut the prosecutor's statement in closing about expert testimony).

3

erroneous findings and legal conclusions concerning those claims.  The Magistrate Judge denied the balance of Hayat's *habeas* claims in rulings to which the government does not object.

### B.   The Magistrate Judge misapplied the Strickland standard.

The Magistrate Judge failed to correctly apply the controlling law.  The core principles of the Strickland standard are the requirements that a reviewing court must presume trial counsel's adequate performance and accord a heavy measure of deference to trial counsel's strategic decision-making.  The Magistrate Judge not only ignored those tenets but affirmatively contravened them.  First, the Magistrate Judge expressly refused to give deference to Ms. Mojaddidi's strategic decisions because of her limited experience, erroneously relying on overruled and inapposite legal authority to re-write the controlling law.  Second, the Magistrate Judge reversed the presumption of adequate performance by substituting the flawed opinions of Hayat's defense attorney experts for controlling law.  The failure to apply the correct legal standard is contrary to law, and requires rejection of the Magistrate Judge's findings of Sixth Amendment violations.

The Magistrate Judge's legal analysis and conclusions supporting any findings of Sixth Amendment violations also flow from incomplete and erroneous factfinding, and inferences not logically supported by the law or facts.  The full record reveals that nothing about Ms. Mojaddidi's decisions while representing Hayat affected the fundamental fairness of his trial or prejudiced him, and that she operated in his sole interest and under no conflict.  Accordingly, this Court should reject the Magistrate Judge's flawed findings of Constitutional violations, decline that court's recommendations, and deny all of Hayat's *habeas* claims.

### II.   PROCEDURAL HISTORY [3]

### A.   District court proceedings.

On June 7, 2005, Hamid Hayat ("Hayat") and Umer Hayat ("Umer"), son and father, were each charged in a Complaint with one count of Making a False Statement.  (CR 1).  Johnny Griffin appeared as retained counsel for Umer and stood in for Ms. Mojaddidi, whom Hayat later retained as counsel. [4]

---

[3] All of the exhibits referenced in this memorandum have been previously filed by the parties and are in the court record. The government will provide the Court with a courtesy copy of all exhibits referenced in this memorandum.

[4] Both defendants were ordered detained following detention hearings (CR 3, 5) and remained in custody throughout the district court proceedings.

(CR 1; CR 5). On June 16, 2005, Hayat was charged in an Indictment with Making False Statements (Counts One and Two), and Umer was charged with Making a False Statement (Count Three).  (CR 8).  On July 1, 2005, this Court set trial for August 24, 2005, at the request of the defense.  (CR 17; Defense Exhibit in Support of Motion for Summary Judgment ("Def. Ex.") EEE.2 at 1:20-2:4).  On July 6, 2005, the government moved for an exclusion of time under the Speedy Trial Act.  The defense opposed the motion and this Court subsequently denied the motion on July 15, 2005.  (CR 18, 20, 22, 25, 26).  On August 4, 2005, the government moved to vacate the August 24, 2005 trial date, and for an exclusion of time under the Speedy Trial Act.  Over the objection of the defendants, on August 5, 2005, this Court granted the motion and set the matter for further status on October 7, 2005.  (CR 29, 30, 31; Def. Ex. EEE.4 at 10:1-14:24).

On September 22, 2005, Hayat was charged in a Superseding Indictment with Providing, Concealing and Attempting to Conceal Material Support and Resources (Count One), and Making False Statements (Counts Two and Three).  Umer was charged with Making a False Statement (Count Four).  (CR 50).  On October 6, 2005, the government moved for an exclusion of time under the Speedy Trial Act.  On October 7, 2005, this Court granted the motion and set the matter for further status on January 6, 2006.  (CR 74).  On January 6, 2006, this Court set the case for trial on February 14, 2006.  (CR 136).

On January 13, 2006, the defendants filed nine motions *in limine*, a motion to dismiss the indictment for outrageous governmental conduct, a motion to compel discovery, a motion for disclosure of Brady/Jencks material, and a motion to dismiss Count Two of the Superseding Indictment on multiplicity grounds.  (CR 143-147).  This Court denied the motions *in limine* and motion to dismiss for outrageous governmental conduct on January 19, 2006.  (CR 149, 152).

On January 26, 2006, Hayat was charged in a Second Superseding Indictment with Providing, Concealing and Attempting to Conceal Material Support and Resources (Count One), and Making False Statements (Counts Two through Four), and Umer was charged with Making False Statements (Counts Five and Six).  (CR 162).  On January 30, 2006, Ms. Mojaddidi filed a revised motion to dismiss Counts Two and Three of the Second Superseding Indictment on multiplicity grounds.  (CR 168).  On February 2, 2006, this Court deferred ruling on the multiplicity motion until after trial (CR 178).  On February 3, 2006, and April 3, 2006, this Court denied the motion to compel discovery.  (CR 185, 280, 281).

5

Hayat and his father were tried by separate juries from February 14, 2006 to April 25, 2006.[5]  On April 25, 2006, Hayat was found guilty of all charges by his jury; Umer's jury could not reach a verdict and this Court declared a mistrial as to the charges against him.  (CR 328, 331, 325).  On May 17, 2007, this Court denied Hayat's motion for a new trial.  (CR 329, 339, 441, 482).  On September 10 and 11, 2007, the Court sentenced Hayat to 288 months in custody.  (CR 500, 501).[6]  On November 7, 2007, this Court dismissed without prejudice Hayat's first, premature Section 2255 motion.  (CR 496, 516).

**B.      Direct and collateral review.**

On March 13, 2013, the Ninth Circuit affirmed Hayat's conviction.  See United States v. Hayat, 710 F.3d 875 (9th Cir. 2013).  On April 30, 2014, Hayat filed a new petition for relief under 28 U.S.C. § 2255 alleging Ms. Mojaddidi represented him under an actual conflict of interest that adversely affected her performance, that her representation was ineffective and prejudiced him, and that the government withheld exculpatory evidence contrary to the holding of Brady v. Maryland, 373 U.S. 83 (1963).

Hayat's *habeas* petition was initially assigned to the Honorable Craig M. Kellison ("Judge Kellison").  (See CR 534).  The parties informally produced or made documents relevant to the petition available for inspection from June to July 2014.  On August 11, 2014, the parties conducted a deposition of Ms. Mojaddidi.  (CR 540; see also Gov. Sup. Ans. Ex. 22: August 11, 2014 Deposition of Wazhma Mojaddidi ("W.M. Depo.")).  The parties also scheduled the deposition of Mr. Griffin for September 19, 2014.  (CR 540).  Mr. Griffin refused to answer any questions as part of the deposition, claiming that Umer refused to waive the attorney-client privilege, and this Court postponed his deposition until further notice. (See CR 542).

On November 13, 2014, Hayat filed a motion for summary judgment on his claims of conflict and ineffective assistance.  (CR 548).  The government filed its opposition on February 27, 2015.  (CR 555, 557).  Hayat filed a reply on March 20, 2015.  (CR 558).  On April 22, 2015, Judge Kellison heard the

[5] On or about March 16, 2006, the defense filed a motion for unredacted Jencks material (CR 246), which the Court denied on March 21, 2006.  (CR 249).

[6] Hayat is in the custody of the Bureau of Prisons and has a scheduled release date of May 2, 2026.

parties' arguments on Hayat's motion for summary judgment.[7] (CR 569). On March 10, 2016, Judge Kellison issued Findings and Recommendations, recommending this Court deny Hayat's motion for summary judgment. (CR 588). Hayat filed objections on April 29, 2016. (CR 593). The government filed a response to those objections on May 27, 2016. (CR 596). On August 3, 2016, Hayat's petition was reassigned to the Honorable Deborah Barnes (the "Magistrate Judge.") (CR 599). On November 11, 2016, this Court affirmed the denial of Hayat's summary judgment motion, adopting in part and rejecting in part Judge Kellison's Findings and Recommendations. (CR 600).

On January 13, 2017, the Magistrate Judge held a status conference. (CR 604-05). On March 14, 2017, the Magistrate Judge granted the government leave to file a substantive supplemental answer based on the exhibits and discovery to that point, which argued, in part, that no evidentiary hearing was necessary and Hayat's claims were ripe for disposition on the record at that time. (CR 609-611). On June 7, 2017, the Magistrate Judge ordered an evidentiary hearing on Hayat's conflict and ineffective assistance claims, which began on January 29, 2018, and lasted five days. (CR 616, 621, 663, 664, 696, 697, 699, 700, 701, 703). Over the government's objection, the Magistrate Judge also permitted remote depositions by video-conference of four witnesses from Pakistan, whose testimony was taken on February 14 and 15, 2018, during night-court session between approximately 6:30 p.m. and 10:00 p.m. (CR 675, 683). The parties preserved objections to hearsay and relevance. (Tr. 440-41, CR 708).[8]

Meanwhile, before the evidentiary hearing began, the Magistrate Judge granted in part Hayat's motion seeking discovery related to his Brady claims. (CR 630). The government moved for reconsideration, which Hayat opposed. (CR 633, 635). The Magistrate Judge granted the motion for reconsideration but affirmed the earlier order on modified grounds in a second order. (CR 649). The government moved for a stay of the Magistrate Judge's discovery orders and sought reconsideration of those orders by this Court, which granted the motion to stay and reversed the Magistrate Judge's discovery orders. (CR 661, 665, 668, 686).

---

[7] While his summary judgment motion was pending, Hayat filed motions seeking leave to: (i) take foreign depositions, (CR 571); and (ii) to conduct discovery by interrogatories and requests for admissions, (CR 574), which the government opposed. (CR 581). This Court denied both discovery motions as premature. (CR 584).

[8] Tr. Refers to the transcript of the 2018 evidentiary hearing on the merits of Hayat's effectiveness and conflict claims. (CR 712-18).

After the evidentiary hearing, the Magistrate Judge ordered post-hearing briefing.  (CR 706, 709, 719, 720).  Hayat filed his opening brief, and a separate supplement, on April 18, 2018. (CR 721, 722). The United States filed its opposition on May 25, 2018.  (CR 725-727).  Hayat filed a reply and supplemental reply on June 18, 2018.  (CR 730, 731).  On January 11, 2019, the Magistrate Judge issued Findings and Recommendations, finding Sixth Amendment violations, recommending this Court grant in part and deny in part Hayat's *habeas* petition, and ordering the parties to file any objections before this Court.  (CR 734).  This objection follows.[9]

### III.      STATEMENT OF RELEVANT FACTS

#### A.      The government's case at trial.

At trial, the government presented abundant evidence to prove that Hayat wanted to attend jihadist training camps in Pakistan, that he attended a jihadist training camp in Pakistan (for a period of several days, several weeks, or several months) between 2003 and 2004, that he returned to the United States with the intent to wage violent jihad, and that he lied about his training and intentions to the FBI—all consistent with his confession to FBI agents.  In its case in chief, the government called eleven percipient witnesses and three expert witnesses.[10]  A summary of the relevant trial testimony follows.

#### 1.      Hayat told cooperating witness Naseem Khan of his intentions to attend a jihadi training camp in Pakistan.

Naseem Khan ("Khan"), a cooperating government witness, met Hayat in 2002.  (RT 847:4-22). Thereafter, Khan, whom Hayat described as his "best friend" (Government's Exhibit to Supplemental Answer ("Gov. Sup. Ans. Ex.") 67.1 at 37), participated in a series of recorded and unrecorded

---

[9] The government specifically incorporates by reference all of the arguments it asserted in its post-hearing briefing, (CR 725-727), and waives none of those arguments.

[10] The percipient witnesses were: (1) Special Agent ("SA") Lawrence Futa (RT 444-490) (May 30 interview of Hayat); (2) SA Harry Sweeney (RT 490-536) (June 4, 2005 interview of Hayat); (3) SA Tenoch Aguilar (RT 536-792) (June 4-5, 2005 interviews of Hayat); (4) Linguist Mr. Abdul (RT 792-837) (translations); (5) Cooperating Witness Nasseem Khan (RT 838-1385, 1758-1846; 2935-87) (interactions with Hayat); (6) Linguist Pamas Bhatti (RT 1852-1886) (translations); (7) SA Timothy Harrison (RT 1887) (seizure of supplication from Hayat); (8) SA Bridget Cox (RT 1939-68, 2116-85, 2277-2419) (search of Hayat home); (9) SA Walter Hart (RT 2185-97) (air travel by Hayat from Pakistan); (10) Inspector David Martinez (RT 2198-2204) (Hayat's air travel); and (11) Linguist Syed Abbas (RT 2204-67) (translation of Hayat scrap book).  The expert witnesses were: (1) Khaleel Mohammed (RT 1924-39, 1968-2116) (jihadi supplication); (2) Hassan Abbas (RT 2560-2934) (Pakistani matters); and Eric Benn (RT 2987-3119) (satellite imagery).

RT refers to the record transcript of the trial proceedings.  (See Gov. Sup. Ans. Ex. 20).

conversations with Hayat. Hayat often spoke with Khan about the existence of jihadi training camps in Pakistan and Hayat's intent to attend such a camp. Hayat described a number of jihadi camps to Khan and told Khan several times that jihadi training was going on in Mansehra, a city and district of Pakistan located in Khyber Pakhtunkhwa, formerly known as the Northwest Frontier Province.[11] (Gov. Sup. Ans. Ex. 2 at 5-6). Hayat explained that the camp in Mansehra was run by Jaish-e-Muhammed ("JEM") and its leader Masood Azhar ("Azhar"), and he discussed the nature of training at the camp. (Gov. Sup. Ans. Ex. 2 at 7-8, 10, 26-27). Hayat told Khan that people came to the camp from all over the world, including America, and that there were lots of people, including Hayat's grandfather and his uncle, who could help someone get into a camp. (Gov. Sup. Ans. Ex. 2 at 25-26).

Hayat told Khan that Hayat intended to attend a jihadi training camp and then engage in violent jihad. Starting in late March 2003, Hayat pledged to Khan that Hayat was ready for jihad, stating, "I'm ready, I swear, friend." (Gov. Sup. Ans. Ex. 3 at 18). In April 2003, Hayat told Khan that Hayat had "one objective now" – "I'm going for training." (Gov. Sup. Ans. Ex. 4 at 65). In July 2003, Hayat, then in Pakistan, told Khan that the training camps had been closed and that Hayat's grandfather had advised Hayat that he should go to camp but that the conditions were not right at that time. Hayat then stated that if the camp had been open, Hayat would have "been there." (Gov. Sup. Ans. Ex. 5 at 10). Finally, in August 2003, Hayat told Khan that Hayat was going to attend a training camp after Ramadan, which was to occur at the end of November 2003. (Gov. Sup. Ans. Ex. 6 at 14-15; RT 2599:1-13).

Hayat's conversations with Khan demonstrated that Hayat had a clear interest in violent jihad and served as further evidence of Hayat's knowledge and intent in this case. Hayat asserted that jihad was the duty of all Muslims, and that it was "our duty" to help Muslims anywhere in the world where Muslims or Muslim countries were attacked. (Gov. Sup. Ans. Ex. 2 at 31). Hayat spoke with pride to Khan about young men, many from his grandfather's madrasa in Pakistan, who had gone to jihadi training or for jihad in Afghanistan. (Gov. Sup. Ans. Ex. 1 at 10-13; Gov. Sup. Ans. Ex. 2 at 28-30).

---

[11] Hayat lived with his grandparents in Rawalpindi, Pakistan, between the ages of approximately 7 and 18, from 1990 until 2000, and was familiar with Pakistan. (See Gov. Sup. Ans. Ex. 8 at 49-50). From approximately mid-2000 through early 2003, Hayat resided in Lodi, California. Id. On or about April 23, 2003, Hayat re-entered Pakistan. Hayat left Pakistan to return to the United States approximately two-years later, on or about May 27, 2005. (See RT 550:6-555:17, 559:18-25, 2187:17-2194:7; 2196:11-2197:5).

9

Hayat also said that participating in jihad was a path to martyrdom.  (See Gov. Sup. Ans. Ex. 1 at 40 (knowing martyrs of extremist group Sipah-e-Sahaba ("SSP") and supporting their families)); Gov. Sup. Ans. Ex. 2 at 29 (relating story of "fortunate" Afghan martyrs); Gov. Sup. Ans. Ex. 2 at 29-30 (relating story of friend going to jihad and inspired to "die in God's path" for forgiveness of his sins)).  Hayat expressed open disdain for groups that Sunni Muslims considered infidels, including Shia and Jews.  For example, Hayat stated that he was "so pleased" that a jihadi group had cut Wall Street Journal reporter Daniel Pearl "into pieces."  Hayat noted that Pearl "was Jewish" and that as a result of this "good job," now "they can't send one Jewish person to Pakistan."  (Gov. Sup. Ans. Ex. 4 at 49; see also Gov. Sup. Ans. Ex. 1 at 21 (describing Shias as "a big nasty group" of "unbelievers")).

Hayat spoke to Khan unflinchingly about his hatred for the United States.  At one point Hayat told Khan that the United States was his country "in name only" and that his "heart is in Pakistan." (Gov. Sup. Ans. Ex. 1 at 35; see Gov. Sup. Ans. Ex. 4 at 37 (referring to the President as "Bush, the worm"); Gov. Sup. Ans. Ex. 1 at 38-40 (speaking approvingly of extremist attacks on an American hotel, Embassy, and cinema in Islamabad)).

Hayat also demonstrated his familiarity with numerous Pakistani extremist groups and their leadership in his conversations with Khan.  For example, Hayat made clear that he admired Azhar, the JEM leader, and was familiar with the contents of Azhar's anti-Semitic book: The Forty Maladies of Jews.  (Gov. Sup. Ans. Ex. 2 at 19-20; see also Gov. Sup. Ans. Ex. 7 at 3-9 (expressing familiarity with extremist group SSP and describing audio tapes Hayat gave Khan featuring a speech by an SSP leader)).

### 2.    After initial denials, Hayat confessed to the FBI that he attended jihadi training and intended to wage violent jihad in the United States.

On May 30, 2005, while Hayat was at the airport in Tokyo on his return trip to the United States from Pakistan, FBI Special Agent ("SA") Larry Futa questioned Hayat about his time in Pakistan. Hayat denied that he attended any kind of terrorist camp in Pakistan or elsewhere.  (RT 457:7-12).  A few days later, on June 3, 2005, FBI SAs Tenoch Aguilar and Sean Wells questioned Hayat about his time in Pakistan at Hayat's home in Lodi, California.  Hayat again denied that he ever attended a jihadi camp, attended a jihadi madrasa, or that he was a jihadi member.  (RT 566:2-23).

The next day, June 4, 2005, FBI SA Harry Sweeney ("SA Sweeney") questioned Hayat at the Sacramento FBI offices.  After waiving his <u>Miranda</u>[12] rights, Hayat initially denied that he had received any weapons training at a jihadi terrorist training camp and denied that he had received any training at a jihadi camp to fight against the United States. (RT 493:11-497:12, 499:9-500:5).  After SA Sweeney asked Hayat whether it was possible that Hayat did not realize he was going to a jihadi training camp and thought it was something else like a religious education camp, Hayat admitted that he had attended a jihadi training camp in 2000 for several days and explained details about the camp and his attendance. (RT 520:21-522:3, 521:4-522:10).  SA Sweeney next told Hayat that the FBI had certain "technical" capabilities, and asked Hayat whether there would be any reason for Hayat's image to be on a satellite photograph during his 2003 visit to Pakistan.  (RT 525:7-526:4).  Hayat then admitted that he attended a jihadi training camp in 2003, in the vicinity of Balakot, for three months and explained details about the camp and his attendance.  (RT 500:24-503:6).

### a. In a videotaped interview, Hayat confessed to attending a jihadist training camp in Pakistan for months in 2003-2004, and suggested training might last only weeks.

Agents interviewed Hayat on videotape between 4:45 p.m. and 7:00 p.m., on June 4, 2005, and between approximately 12:37 a.m. and 3:00 a.m., on June 5, 2005.  (RT 582:19-584:1).  Excluding breaks, each interview lasted approximately two hours.  (<u>Id.</u>)  Hayat repeatedly admitted that he attended a jihadi camp in 2003-2004 (Gov. Sup. Ans. Ex. 8 at 2, 9, 11, 12, 15, 17, 18, 19, 21, 41, 52, 90-92), as well as in 2000, for a period of days (Gov. Sup. Ans. Ex. 8 at 48-49, 50-52, 91).  Hayat told agents at least six separate times that the camp he attended was in the vicinity of Balakot, in the Northwest Frontier Province.  (Gov. Sup. Ans. Ex. 8 at 14, 21-22, 110, 113, 197).  Hayat explained, in detail, how he traveled from Rawalpindi to the camp in the Province.  (Gov. Sup. Ans. Ex. 8 at 4, 7-8, 82-83).  Hayat stated that he was at the camp for between three and one-half to four months (Gov. Sup. Ans. Ex. 8 at 11, 15, 18, 68) and, five to six months.  (Gov. Sup. Ans. Ex. 8 at 114-15).  He also suggested that training could take more or less time than a period of months, and stated that new trainees arrived every few weeks.  (Gov. Sup. Ans. Ex. 8 at 17, 73).   He identified various time periods that he attended the

---

[12] <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)

camp, all from approximately October 2003, through November 2004. (Gov. Sup. Ans. Ex. 8 at 15, 19-21, 90-91).

Hayat described the layout of the camp including buildings, designated living and teaching facilities, and an explosives and firearms training area. (Gov. Sup. Ans. Ex. 8 at 83-87, 89, 194-196). Hayat stated that there were numerous attendees, once suggesting as many as seventy attendees, and later suggesting 200. (Gov. Sup. Ans. Ex. 8 at 9-10, 196). Hayat described the trainees as being between ages 18 to 30 (Gov. Sup. Ans. Ex. 8 at 61), mostly Pakistani (Gov. Sup. Ans. Ex. 8 at 13), and speaking mostly Urdu with some Pashto (Gov. Sup. Ans. Ex. 8 at 13-14). Hayat stated that the camp trained him in physical fitness (Gov. Sup. Ans. Ex. 8 at 18, 44), fighting (Gov. Sup. Ans. Ex. 8 at 69), firearms (Gov. Sup. Ans. Ex. 8 at 18, 42-43, 45-46, 115), as well as what Hayat believed to be explosives (Gov. Sup. Ans. Ex. 8 at 39, 46-48). Hayat reported that he received pistol training (Gov. Sup. Ans. Ex. 8 at 18) and training with a rifle or shotgun (Gov. Sup. Ans. Ex. 8 at 45), and specifically that he first shot at a bull's-eye and, later, that he shot at targets with pictures of U.S. leaders on them.[13] (Gov. Sup. Ans. Ex. 8 at 43-44, 96, 115, 174-75). Hayat initially stated that he did not know the duration of the training (Gov. Sup. Ans. Ex. 8 at 11) but later said that the training lasted approximately five to six months. (Gov. Sup. Ans. Ex. 8 at 79). Finally, Hayat stated repeatedly that the purpose of the camp was to train individuals for jihad. (Gov. Sup. Ans. Ex. 8 at 12, 53, 67-68).

Hayat made a number of statements regarding his intentions after training. At one point, Hayat stated that attendees at these camps could to go wherever they wanted to go after training (Gov. Sup. Ans. Ex. 8 at 53) and that trainees were not given specific assignments. (Gov. Sup. Ans. Ex. 8 at 48). Hayat told agents that he was prepared to fight if he received orders (Gov. Sup. Ans. Ex. 8 at 127-28), that he had not yet been told what targets to attack, and that the target would come with the orders. (Gov. Sup. Ans. Ex. 8 at 157-58). Hayat also admitted that he was training for jihad, that he came to the United States for jihad, and that he was awaiting orders. (Gov. Sup. Ans. Ex. 8 at 160-61). He reiterated that he had been trained for jihad and was told to come to the United States for jihad. (Gov. Sup. Ans. Ex. 8 at 161-64).

---

[13] Umer Hayat also stated that he visited a camp and saw trainees shooting at targets with pictures of American leaders on them. (Gov. Sup. Ans. Ex. 21 (4U5.4-4U5.6)).

12

**b.**    **Hayat confessed that his parents and uncle Anas knew he attended camp while in Pakistan in 2003-2004, that his maternal grandfather was associated with the camp leadership, and that other family and friends from his village attended camp.**

Hayat admitted to agents that his mother, father and uncle Anas knew that he attended a jihadist training camp while he was in Pakistan between October 2003, through November 2004.  (Gov. Sup. Ans. Ex. 8 at 37, 75-76, 77-78, 107).  Hayat stated that his uncle, Anas, attended a militant training camp five years before Hayat. (Gov. Sup. Ans. Ex. 8 at 37).

Hayat stated that grandfather, Saeed-ur-Rehman, was associated with the leadership of the militant camp Hayat attended, and that he was "75 or 80%" sure his grandfather ran the camp he attended.  (Gov. Sup. Ans. Ex. 8 at 169-70).

Hayat stated that his friend Sadiq Shoaib attended a militant training camp while in Pakistan, and that members of his village were aware of it and talked about it.  (Gov. Sup. Ans. Ex. 8 at 119-23, 166).  Hayat stated his cousins, Usama Ismail, attended a militant training camp while in Pakistan.  (Gov. Sup. Ans. Ex. 8 at 132-33).  Hayat stated that his uncle Attique Ur Rehman and his cousin Jaber Ismail, attended training at militant training camps in Pakistan.  (Gov. Sup. Ans. Ex. 8 at 183-87).

**3.**    **Umer Hayat admitted he knew Hamid Hayat went to training camps and that Umer personally saw a camp.**

On June 4, 2005 and June 5, 2005, FBI agents also conducted videotaped interviews of Umer Hayat.  (Gov. Sup. Ans. Ex. 21 (4U1.1-4U8.3); RT at 1420:13-1426:14; Gov. Sup. Ans. Ex. 21 (5U1.1-5U8.2); RT 1426:15-1430:3).  During both interviews, Umer stated he knew that his son attended a training camp. (Gov. Sup. Ans. Ex. 21 (4U1.1); RT 1432:8-1433:13; RT 1433:14-21; RT 1434:7-1435:5 (5U1.1-1.6)  Umer also stated that he visited one of the camps that Hamid attended, and stood at the gate.  (Gov. Sup. Ans. Ex. 21 (4U5.1-4U5.4, 5U5.1-5U5.2)).  In addition, Umer stated that Hamid attended a camp in 2000, and another one in late 2003 to early 2004, corroborating Hamid's confession.  Umer also confirmed that Hamid's grandfather (Umer's father-in-law) was heavily involved in Pakistani politics and could grant access to the camps.  (Gov. Sup. Ans. Ex. 21 (5U5.2, 5U8.2)).  Umer also stated that Hamid's uncle, Attique Ur-Rehman, had trained at camps and gone to fight in the Afghan-Soviet war as a mujahedin. (Gov. Sup. Ans. Ex. 21 (5U1.3)).

**4.      A series of extremist publications from 1999-2003 discovered in Hayat's living space further evidenced Hayat's intent.**

At trial, the government introduced a series of publications Hayat possessed, many that pre-dated his friendship with Khan, that showed Hayat's belief in violent jihad and his intent in this case.  First, the government introduced Hayat's "jihadi scrapbook" (Gov. Sup. Ans. Ex. 9; RT 2216:11-2226:17), a scrapbook of Urdu newspaper and magazine articles – most from 1999, when Hayat previously was in Pakistan – bearing Hayat's name and found by FBI investigators in a converted garage Hayat used at his parents' house.  (RT 857:21-858:6, 2159:3-2168:18, 2172:-2173:4; Gov. Sup. Ans. Ex. 1 at 5; Gov. Sup. Ans. Ex. 3 at 19).

Articles in the scrapbook extolled the virtues of Islamic extremism.  For example, the articles: described a "death to America" procession and a "long live Taliban" rally; criticized the United States government as the "biggest terrorist" and "an enemy of Islam;" expressed support for Osama Bin Laden and the Taliban; praised notorious Pakistani/Egyptian terrorists or extremist clerics; and threatened harm against Americans if Afghanistan was attacked.  (See RT 2216:11-2226:17, 2780:20-2806:15).  Many of the articles came from publications associated with Pakistani extremist groups including JEM and Harakut-ul-Mujahedin ("HUM").  (See RT 2216:11-2226:17, 2803:16-23; 2788:9-22, 2792:6-18).

Hayat showed Khan the scrapbook and highlighted extremist articles of interest.  (See, e.g., RT 895:8-915:11, 917:19-928:11).  For example, Hayat expressed sympathy towards the Taliban while showing Khan scrapbook articles, and Hayat even boasted that Hayat's grandfather had a close relationship with Taliban leader, Mullah Omar.  (Gov. Sup. Ans. Ex. 1 at 19, 28-34; RT 907:16-908:11, 912:10-913:2, 926:17-928:11; see also Gov. Sup. Ans. Ex. 1 at 25-26; RT 921:6-923:12 (describing article about "Taliban" rioting and burning cars of white "unbelievers" at English newspaper in Pakistan); Gov. Sup. Ans. Ex. 1 at 9-21; 2795:13-2796:2 (describing article about the murder of a prominent Shia as "the best news of all"); Gov. Sup. Ans. Ex. 1 at 21-25; RT 913:21-914:21, 2802:2-12 (reviewing article about, and speaking approvingly of, extremist cleric, Ludhianvi)).

The government also introduced at trial a magazine (Gov. Sup. Ans. Ex. 10; Gov. Sup. Ans. Ex. 11 at 1-2) recovered by FBI investigators during a search of the converted garage Hayat occupied.  (RT 2116:25-2119:5).  The magazine was a weekly JEM publication, issued in Pakistan in June 2000, at a

14

time when Hayat previously was in Pakistan.  (RT 2735:1-22, 2737:1-2738:7).  The magazine, edited by Azhar, the JEM leader: instructs readers to focus on jihad; details a JEM attack in the Kashmir; profiles jihadi "martyrs" in the Kashmir, details efforts of Filipino mujahedin, and explains Muslims' obligations to help mujahedin everywhere.  (Gov. Sup. Ans. Ex. 11 at 1-2; RT 2735:23-25, 2744:7-2751:21).  Agents also recovered two other Urdu books authored by Azhar: The Virtues of Jihad (Gov. Sup. Ans. Ex. 12; Gov. Sup. Ans. Ex. 13 at 1-3), published in 2000 in Karachi, Pakistan, from Hayat's garage area (RT 2116:25-2119:5, 2127:5-11; 2719:15-2720:6); and Reports from the Window of Prison (Gov. Sup. Ans. Ex. 14; Gov. Sup. Ans. Ex. 15 at 1-2), published in 2003 in Karachi, Pakistan, from the laundry room of Hayat's parents' home.  (RT 1859:25-1864:6, 2753:18-2754:6).  In these books, Azhar: extols and celebrates the concept of violent jihad; argues that violent jihad was compulsory for every Muslim; argues that violent jihad should be waged all over the world, including in the United States; expresses hatred toward Indians, Hindus, Jews, Christians, Muslim minority groups, and Americans; and argues that the ideal system of government would be an Islamic state, such as the government of the Taliban. (RT 2720:12-2722:6, 2754:18-2756:22).

### 5.  Expert testimony regarding the existence of militant camps in the Balakot region corroborated Hayat's confession to the FBI.

Hassan Abbas ("Abbas"), a government expert on Pakistani political and extremist groups, testified that jihadi training camps, in fact, existed in Pakistan between 2000 and 2005.  (RT 2622:4-2623:13).  Abbas described: the extremist groups known to run the camps (RT 2623:14-2624:15); the purpose of the camps (RT 2624:23-2625:5); typical camp attendee backgrounds (RT 2625:19-2630:6); the typical camp size and facilities, including security and training (RT 2631:20-2634:4, 2637:12-2638:9); typical religious, political and paramilitary training at the camps (RT 2638:10-2640:12); typical length of training at the camps (RT 2640:20-2641:10); what attendees did after they attended these camps (RT 2641:11-20); and the regions where these camps were known to be located (RT 2634:14-2636:9).  Of note, Abbas testified about the existence of a particular JEM camp in Balakot, known as the madrasa Ahmed Shaheed (RT 2691:1-2692:4).

### 6.  Expert testimony and satellite evidence corroborated Hayat's confession that he attended a jihadi camp in the Balakot region.

Government expert Eric Benn ("Benn"), a senior imagery analyst from the Department of

15

Defense (RT 3004:11-19), confirmed that militant training camps, in fact, existed in Pakistan including camps in the vicinity of Balakot. (RT 3082:7-3083:1). In addition, viewing certain 2001 and 2004 satellite-derived images in the vicinity of Balakot, Benn opined that it was a "good solid possible" – that is, a 50% confidence or thereabouts – that the buildings and location depicted on the images constituted a militant training camp. (RT 3062:2-12). Finally, based on his review of the images combined with Hayat's videotaped interview statements, Benn opined that he was "very confident" that the buildings and location depicted in the images were a militant training camp – that is, a "ballpark" of 60% to 70% confidence level; "much more likely than not."[14] (RT 3073:5-3075:1, 3114:24-3115:3).

### 7. The jihadi supplication Hayat carried provided further evidence that Hayat returned to the United States intending to engage in violent jihad.

The government introduced at trial an Arabic supplication, or ta'wiz, Hayat possessed in his wallet. (Gov. Sup. Ans. Ex. 16, RT 1968:19-1970:20). Government expert Dr. Khaleel Mohammed testified that this ta'wiz was an uncommon and non-peaceful supplication which translated as: "Oh Allah, we place you at their throats and we seek refuge in you from their evils." (RT 1970:1-23, 1973:18-22, 1974:7-19, 2007:22-2008:12). He opined, among other things, that the ta'wiz would be used by a jihadi or a warrior who perceived himself to be engaged in a war for God against an enemy and who was completely ready to act. (RT1974:15-1975:1; 2008:24-2009:13; 2018:13-2019:17).

### B. The defense case at trial.

At trial, Ms. Mojaddidi thoroughly cross-examined all fourteen government witnesses. In addition, the defense called percipient witnesses and an expert of its own.[15] As set forth in more detail below, Ms. Mojaddidi zealously challenged the government's evidence, presented substantial defense evidence, and forcefully argued that the government failed to prove its case. (See RT 4285:6-4330:21).

---

[14] Benn also testified about certain signatures of these camps. For instance, he: identified buildings that would be found in militant training camps (RT 3033:1-12); explained that the camps are usually rurally located (RT 3021:1-3024:1; 3030:24-3031:8; 3044:15-19; 3032:4-20); explained that there is frequently security at the camps (RT 3032:21-25); and explained that these camps have physical and weapons training (RT 3033:13 3034:21).

[15] The percipient witnesses were: (1) SA Eric Barnhart (RT 3188-3316) (handling cooperating witness Khan); (2) SA Rachel Pfifer (RT 3316-3413) (same); (3) SA Terry Rankhorn (RT 3414-34) (interactions with Khan); (4) SA Michael Caputo (RT 3498-3580, 3896-3913) (handling Khan); (5) James Lazor (RT 3580-3614) (visit to Balakot area); (6) SA Gary Schaaf (RT 3614-3750) (Hayat interview); (7) SA Keith Slotter (RT 3813-43) (decision to record Hayat interview); (8) Taj Khan (RT 3843-3854) (whether two wanted men gave speeches at a Lodi mosque in 1998-99). The expert was Dr. Anita Weiss (RT 4044-4177) (Pakistani culture and practice of carrying a ta'wiz).

16

However, the jury convicted Hayat on the strength of the compelling evidence of guilt offered by the government at trial.

In sum, Ms. Mojaddidi argued that:

- The government's cooperating witness, Naseem Khan, also known as "wildcat," was a wildly out-of-control, unsupervised, highly paid, liar and manipulator who encouraged Hayat to go to a camp and induced Hayat to say that he would go to a camp. (RT 4292:3-4307:20).

- Hayat visited Pakistan with his family for innocent and lawful purposes during the time in question. Hayat sincerely cooperated during initial FBI interviews, truthfully recounted his innocent experiences in Pakistan, and truthfully denied attending a camp. (RT 4307:21-4311:9).

- Hayat's confession during subsequent FBI interviews was meaningless and unreliable. Through leading questions and coercion, Hayat was intimidated to say the things that the FBI wanted him to say. Indeed, the reason Hayat could not accurately describe a camp in Pakistan was because he never went to such a camp. (RT 4311:10-4320:17).

- The four jihadi publications found at the Hayat home were commonly circulated books and articles in Pakistan. Anti-American sentiments are common among Pakistanis and it is not shocking that the articles and books espoused those views. None of the items indicated that Hayat actually attended a camp. Moreover, reading about jihad doesn't make you a jihadi, any more so than reading a murder novel makes you a murderer. (RT 4321:7-25).

- The ta'wiz Hayat carried did not prove that he attended a camp. The government expert, Dr. Mohammed, had no reliable basis to testify that it was a prayer carried by a jihadi warrior, and had no understanding of the cultural context for carrying such a prayer in Pakistan. Defense expert Dr. Anita Weiss, by contrast, reasonably testified that travelers in Pakistan commonly carry prayers in Arabic, such as the one at issue, for safety reasons. (RT 4323:15-18).

- The government's expert, Hassan Abbas, was biased against Pakistan and his highly-paid expert testimony was not trustworthy. (RT 4324:3-4325:24).

- Satellite images offered by the government that purportedly depicted a military training camp did not prove that Hayat attended a camp, and, in fact, suggested that there was a reasonable doubt on the question. The government's expert, Eric Benn, testified that, after watching videotape of Hayat's purported confession, he was 60 to 70 percent sure that the camp was a militant training camp. Thus, by the government's expert's own estimation, there was a 30 to 40 percent chance

17

that the satellite images did not depict a camp which could constitute reasonable doubt. (RT 4327:20-24).

- It was implausible that the governments of Pakistan and the United States would allow a camp to persist after 2001. Both government expert Eric Benn and defense witness James Lazor testified that there was a Pakistani military site just two miles away from the camp depicted in the satellite imagery. Pakistan and the United States would have shut this camp down if it really was a terrorist training camp. (RT 4328:1-4329:7).

## IV.      THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS

After the evidentiary hearing, the Magistrate Judge considered the parties' written arguments on Hayat's claims and issued Findings and Recommendations denying most of Hayat's performance-based claims, his financial conflict claim, and his Brady claims. (Findings and Recommendations ("F&R") at 53, 55, 67, 70, 82, 85, 96, 98, 102, 114-16). The Magistrate Judge found merit in three of Hayat's claims of ineffectiveness (along with two sub-arguments), and also found that Ms. Mojaddidi represented Hayat jointly with Mr. Griffin and in actual conflict with the interests of Hayat.[16] Specifically, the Magistrate Judge found that Ms. Mojaddidi was ineffective in five ways, including one instance resulting in prejudice to Hayat, and others resulting in cumulative prejudice.

First, the Magistrate Judge found Ms. Mojaddidi ineffective for failing to present testimony from purported alibi witnesses at Hayat's trial, resulting in prejudice. (F&R at 31-33, 53). Second, the Magistrate Judge found Ms. Mojaddidi ineffective for failing to procure and present the testimony of a false confession expert, concluding the error cumulatively prejudiced Hayat. (Id. at 59-60, 65). Third, the Magistrate Judge found Ms. Mojaddidi ineffective for failing to object to a government expert's testimony concerning the meaning of a ta'wiz or du'a Hayat carried, concluding the error cumulatively prejudiced Hayat. (Id. at 82-84). Fourth, the Magistrate Judge found Ms. Mojaddidi ineffective for failing to procure and present a defense expert to rebut the same government expert's testimony concerning the meaning of the ta'wiz Hayat carried, concluding the error cumulatively prejudiced

---

[16] The Magistrate Judge found only a single instance of ineffectiveness *and* prejudice (alleged failure to present alibi witnesses). The Magistrate Judge found Ms. Mojaddidi was ineffective with respect to other specific claims and sub-arguments (alleged failure to: procure a false confession expert, move to exclude a government witness under 704(b), call a defense expert concerning Hayat's ta'wiz, and rebut the prosecutor's statement in closing). However, the Magistrate Judge found prejudice concerning those claims *only* cumulative with the other alleged errors, and not independently.

18

Hayat. (Id. at 85-91). Fifth, the Magistrate Judge found Ms. Mojaddidi ineffective for failing to object to the prosecutor's argument in rebuttal closing about trial testimony, concluding the error cumulatively prejudiced Hayat. (Id. at 91-92).

Finally, the Magistrate Judge found Ms. Mojaddidi represented Hayat under an actual conflict of interest caused by the joint defense agreement with Mr. Griffin, who represented Hayat's father, Umer. The Magistrate Judge found that joint defense agreement effectively amounted to a joint defense of Hayat and Umer by both lawyers in which Ms. Mojaddidi ceded decision-making to Mr. Griffin, who made decisions in the best interest of his client and not Hayat, resulting in adverse effects for Hayat. (Id. at 101-111). The Magistrate Judge found the balance of Hayat's claims lacked merit and recommends this Court deny those claims. The government does not object to those recommendations.[17]

A. **This Court reviews the Magistrate Judge's Findings and Recommendations *de novo*.**

A district court must make a *de novo* determination of those portions of the findings and recommendations to which a party properly objects and may accept, reject, or modify, in whole or in part, the findings and recommendation made by the magistrate judge. 28 U.S.C. § 636(b)(1)(C); see also Fed. R. Civ. P. 72(b)(3); EDCA Local Rule 304(f); Dawson v. Marshall, 561 F.3d 930, 933 (9th Cir. 2009) ("De novo review means that the reviewing court 'do[es] not defer to the lower court's ruling but freely consider[s] the matter anew, as if no decision had been rendered below.'") (citation omitted). Here, after *de novo* review—applying the correct legal standards to the full record—this Court should conclude that Hayat's chosen counsel, Ms. Mojaddidi, provided him with independent, zealous, and competent representation. Nothing about Ms. Mojaddidi's strategic decisions while representing Hayat affected the fundamental fairness of his trial or prejudiced him, and she operated in his sole interest and under no actual conflict. Thus, as discussed in more detail below, because the Magistrate Judge's findings of Sixth Amendment violations result from an erroneous application of law and are unsupported

[17] The Magistrate Judge found Hayat failed to meet his burden to show Ms. Mojaddidi was ineffective for not obtaining a security clearance because he demonstrated no prejudice. F&R at 65:26-66:2. While the government agrees with that conclusion, it objects to any finding that Ms. Mojaddidi's failure to seek a security clearance was deficient. Id. at 65:24-26. As discussed below, this Court should reverse that finding because it is unnecessary to dispose of Hayat's claim and, more importantly, establishes a rule, contrary to law, that defense counsel in a case possibly involving classified information is *per se* ineffective for failing to seek and obtain an unnecessary security clearance.

by logical inferences from the law and relevant facts, this Court should reject those findings and deny Hayat's *habeas* petition.

## ARGUMENT

### A.      Standard for relief under § 2255.

Under 28 U.S.C. § 2255, a district court may discharge or re-sentence a defendant if it concludes that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. A *habeas* petitioner may not prevail merely by showing that some error occurred before the trial court. Rather, relief is available only if "the claimed error constituted a fundamental defect which inherently results in a complete miscarriage of justice." United States v. Addonizio, 442 U.S. 178, 185 (1979), abrogated on other grounds by rule, (internal quotation marks and citations omitted). A petitioner seeking relief in a collateral attack "must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1982) ("we have long and consistently affirmed that a collateral challenge may not do service for an appeal."); see also Addonizio, 442 U.S. at 184 ("It has … long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.").

#### 1.      The two-prong Strickland standard governs Hayat's ineffective assistance of counsel claims.

The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. Strickland v. Washington, 466 U.S. 668, 686 (1984); see also Harrington v. Richter, 562 U.S. 86, 110 (2011) ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."). In Strickland, the Supreme Court established a two-pronged test that requires a defendant to establish by a preponderance of the evidence: (1) that his counsel's performance fell below an objective standard of reasonableness; and (2) that the deficient performance prejudiced his defense. Id. at 687; United States v. Quintero-Barraza, 78 F.3d 1344, 1347 (9th Cir. 1995); United States v. Taylor, 802 F.2d

1108 (9th Cir. 1986). "If either prong is not met, [the Court] must dismiss the claim." United States v. Sanchez-Cervantes, 282 F.3d 664, 671 (9th Cir. 2002).

### 2. Strickland imposes a strong presumption that trial counsel's strategic decisions were objectively reasonable, which Hayat must overcome.

To satisfy Strickland's first prong, a defendant must show that counsel made errors so serious that she was not functioning as the counsel guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 685. The Constitution does not guarantee infallible representation. Cooper v. Fitzharris, 586 F.2d 1325, 1330 (9th Cir. 1978). To establish ineffectiveness, the defendant must identify the acts or omissions that are outside the broad range of reasonable professional judgment.[18] Id. at 689-690; Eggeleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986); United States v. Schaflander, 743 F.2d 714, 717-718 (9th Cir. 1984) cert. denied, 470 U.S. 1058 (1985). A defendant must prove serious derelictions on the part of counsel. McMann v. Richardson, 397 U.S. 759, 774 (1970). "The object of an ineffectiveness claim is not to grade counsel's performance." Strickland, 466 U.S. at 697. Rather, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689; accord Matylinsky v. Budge, 577 F.3d 1083, 1091 (9th Cir. 2009), cert. denied, 588 U.S. 1154 (2010). The Court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. 466 U.S. at 718. To be unreasonable, the performance must be such that "*no competent counsel would have taken the action that [the petitioner's] counsel did take*." Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis in original).

The Supreme Court and the Ninth Circuit have recognized a strong presumption that counsel's conduct fell within the wide range of reasonable representation. Strickland, 466 U.S. at 689; United States v. Cochrane, 985 F.2d 1027, 1030 (9th Cir. 1993); United States v. Hamilton, 792 F.2d 837, 839 (9th Cir. 1986). Consequently, judicial scrutiny of counsel's performance must be highly deferential

---

[18] Hayat claims that Ms. Mojaddidi's inexperience left her "incapable of providing Hamid with a constitutionally adequate defense." (Pet. at 5:11-13). At its core, the Magistrate Judge's flawed Findings and Recommendations embrace the same erroneous conclusion. Yet, the Supreme Court has rejected inexperience in general and inexperience in the subject matter as grounds for ineffectiveness in United States v. Cronic, 466 U.S. 648, 665-66 (1984), overruled on other grounds by Sawyer v. Smith, 497 U.S. 227 (1990).

because it is "all too tempting for a convicted defendant to second-guess counsel's assistance after conviction or adverse sentence." Strickland, 466 U.S. at 689. "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 690-91; see also Knowles v. Mirzayance, 556 U.S. 111, 124 (2009).

Trial counsel's strategic decisions are constitutionally effective so long as they "might be considered sound trial strategy." Darden v. Wainwright, 477 U.S. 168, 186 (1986). Given the strong presumption in favor of competence, the petitioner's burden of persuasion is a heavy one. Kimmelman v. Morrison, 477 U.S. 365, 384 (1986). Trial counsel's inability to remember her reasons for conducting the trial in the manner that she did will not overcome the Strickland presumption of effective performance. Harrington, 562 U.S. at 109 (a court "may [not] insist counsel confirm every aspect of the strategic basis for his or her actions. There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'"); Greiner v. Wells, 417 F.3d 305, 326 (2d Cir. 2005).

The objective reasonableness standard recognizes that defense counsel have a broad range of tactical choices. See James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994); Strickland, 466 U.S. at 689-90 ("Even the best criminal attorneys would not defend a particular client in the same way."). Counsel need not recognize and assert every possible defense and argument. Woratzeck v. Ricketts, 820 F.2d 1450, 1453 (9th Cir. 1987), vacated on other grounds, 859 F.2d 1559 (9th Cir. 1988). A tactical decision by counsel that is not objectively unreasonable, but with which the defendant disagrees, does not constitute ineffective assistance of counsel. Guam v. Santos, 741 F.2d 1167, 1169 (9th Cir. 1984); Hughes v. Borg, 898 F.2d 695, 703 (9th Cir. 1990). The Ninth Circuit has continuously warned it will "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." Matylinsky, 577 F.3d at 1091; Weaver v. Palmateer, 455 F.3d 958, 966 (9th Cir. 2006); Campbell v. Wood, 18 F.3d 662, 673 (9th Cir.) (en banc), cert. denied, 511 U.S. 1119 (1994); see also Hays v. Janda, CIV 13-5700-SJO (SH) (C.D. Cal. July 30, 2014) at *15. Therefore, "the defendant 'must overcome the presumption that under the circumstances the challenged action might be considered sound trial

22

strategy.'" Turner v. Calderon, 281 F.3d 851 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 689).

While the "character of a particular lawyer's experience may shed light in an evaluation of his actual performance … it does not justify a presumption of ineffectiveness in the absence of such an evaluation." United States v. Cronic, 466 U.S. 648, 665 (1984) (rejecting ineffectiveness claim in fraud case based on allegations appointed counsel was young, practiced real estate law, and was facing his first jury trial), overruled on other grounds by Sawyer v. Smith, 497 U.S. 227 (1990). To the contrary, "in considering a claim of ineffective assistance of counsel, it is not the experience of the attorney that is evaluated, but rather, [her] performance." LaGrand v. Stewart, 133 F.3d 1253, 1275 (9th Cir. 1998). Mere lack of criminal experience and lack of trial experience do not automatically render an attorney ineffective to represent criminal clients. Id. See also Cronic, 466 U.S. at 665 ("Every experienced criminal defense attorney once tried his first criminal case."); Ortiz v. Stewart, 149 F.3d 923, 933 (9th Cir. 1998) (rejecting ineffectiveness claim in murder and arson case and argument that counsel had practiced four years before taking case, two of which were spent as a justice of the peace), overruled on other grounds by Martinez v. Ryan, 566 U.S. 1, 9 (2012); United States v. Lewis, 786 F.2d. 1278, 1281 (5th Cir. 1986) ("An attorney can render effective assistance of counsel even if [s]he has had no prior experience in criminal advocacy."); In Re Grand Jury Subpoena, 739 F.2d 1354, 1358 (8th Cir. 1984) ("Unfamiliarity with an area of the law does not justify a presumption of ineffectiveness."); United States v. Merritt, 528 F.2d 650, 651 (7th Cir. 1976) ("[a]dmission to the bar allows [a court] to assume that counsel has the training, knowledge, and ability to represent a client."). Cf Allen v. Woodford, 395 F.3d 979, 998 (9th Cir. 2005). ("Trial counsel [in a capital case preceding the 1985 ABA recommendation to the contrary] cannot be said to be constitutionally ineffective for deciding not to bring in co-counsel, unless there is some reason ... why the first lawyer is unable to provide adequate representation."); United States v. Perez, CV 08-06648 MMM, 2010 WL 11602349 at *2 (C.D. Cal. May 24, 2010); Woodland v. Somberg, CV-06-1035-PHX-PGR (LOA), 2007 WL 2156390 at *7 (D. Ariz. July 25, 2007). As with all ineffectiveness claims, Hayat must show that Ms. Mojaddidi engaged in specific acts or omissions that were ineffective. Woods v. Sinclair, 655 F.3d 886, 907 (9th Cir. 2011), judgment vacated on other grounds, 132 S. Ct. 1819 (2012).

**3.      Hayat also bears the burden to show that any alleged ineffectiveness undermines confidence in the verdict.**

In addition to overcoming the presumption of reasonable, a defendant alleging ineffective assistance also "must show there is some reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; United States v. McMullen, 98 F.3d 1155, 1157 (9th Cir. 1996).  This standard is "rigorous" and "highly demanding." Kimmelman, 477 U.S. at 381-82.  In assessing prejudice, the Court must also consider the applicable legal standard.  Strickland, 466 U.S. at 695 (e.g., when conviction challenged, would fact finder have had a reasonable doubt, absent counsel's errors).

**V.      MS. MOJADDIDI PROPERLY AND ADEQUATELY INVESTIGATED THE SUPPOSED "ALIBI DEFENSE" AND REASONABLY SELECTED A SPEEDY TRIAL AND SUFFICIENCY OF THE EVIDENCE STRATEGY**

Hayat claims Ms. Mojaddidi's failure to present testimony from purported alibi witnesses was ineffective.  (OPHB at 20-63).[19]  He argues Ms. Mojaddidi should have traveled to Pakistan or sent an investigator there to locate and interview alibi witnesses and that her failure to do so constitutes ineffective representation.  (OPHB at 21; Pet. at 37).[20]  For support, Hayat relies on declarations of relatives and close friends who claim he did not leave his village for more than 10 days between April 2003 and May 2005, and could not have attended a militant camp.  (See Def. Ex. S through JJ).  At the 2018 evidentiary hearing, six witnesses, five of whom authored such a declaration, testified.  (Tr. 123-189, 299-364, 926-982, 994-1045).

The full record establishes that Ms. Mojaddidi effectively investigated the alibi defense, including witnesses in Pakistan, and elected to pursue an alternative defense strategy.  That decision was a strategic choice made after her thorough investigation.  Thus, it is entitled to "a heavy measure of deference" and is "virtually unchallengeable."  See Strickland, 466 U.S. at 690-91.  Consequently, the unreliable memories of Hayat's purported alibi witnesses are irrelevant.  The Court should reject the Magistrate Judge's contrary conclusion because it results from a misapplication of the controlling legal

---

[19] OPHB refers to Hayat's Opening Post-Hearing Brief.  (CR 721).

[20] Pet. refers to Hayat's April 30, 2014 Petition, under § 2255, to vacate his conviction and sentence.  (CR 531-32).

standard and is not supported by the law or the facts.

A.   **The Magistrate Judge's misapplication of law undermines any finding of a Sixth Amendment violation from Ms. Mojaddidi's decision to set aside the alibi defense <u>and pursue a more viable defense at trial.</u>**

The Magistrate Judge's analysis not only ignores the core tenets of the controlling law, it contravenes those tenets. The failure to correctly apply controlling law renders the Magistrate Judge's conclusions on this claim, and all of Hayat's ineffectiveness claims, contrary to law. See DeFazio v. Wallis, 459 F.Supp.2d 159, 163 (E.D.N.Y. 2006) ("An order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure."). This Court should set aside the Magistrate Judge's recommendations on this and Hayat's other claims and evaluate those claims as though the Magistrate Judge made no findings at all.

## 1.   The Magistrate Judge affirmatively misapplied the law.

A court reviewing a *habeas* claim must accord a heavy measure of deference to trial counsel's strategic decisions-making and presume her adequate performance. See Strickland, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."). Here, the Magistrate Judge did the opposite. First, the Magistrate Judge refused to give deference to Ms. Mojaddidi's strategic decisions because of her limited experience. See F&R at 24; 105 (mis-citing Strickland in both instances and, in the latter, expressly acknowledging giving "little or no deference" to Ms. Mojaddidi's strategic decisions because of her lack of criminal experience). Second, the Magistrate Judge compounded that error by reversing the presumption of adequate performance in adopting the opinion testimony of Hayat's defense attorney experts and substituting them in place of the controlling law. See F&R at 15-16, 22-23, 30 n.17.[21] The resulting misapplication of the controlling legal standard is contrary to law.

---

[21] These citations refer only to Hayat's alibi witness claim. The Magistrate Judge also erroneously relied on the opinions of Hayat's defense attorney witnesses to establish the legal standard concerning the other effectiveness claims she credited. See F&R at 57, 59-60, 87, 101, 103-106, 110, 111.

**a.    The Magistrate Judge contravened the <u>Strickland</u> standard by according Ms. Mojaddidi's strategic decision-making "little or no deference" because of her limited criminal law experience.**

The Magistrate Judge's denial of Ms. Mojaddidi the deference central to the <u>Strickland</u> analysis was error and undermines any findings of Constitutional violations.  At the outset of the Findings and Recommendations, the Magistrate Judge stated the <u>Strickland</u> standard and its analytical requirements, including the principle that a reviewing court must apply "a heavy measure of deference to counsel's judgments."  F&R at 22 (citing <u>Strickland</u>, 466 U.S. at 691).  Yet, later, the Magistrate Judge abandoned that legal standard and embraced an erroneous standard created from reliance on overruled and inapposite case law.  <u>See</u> F&R at 24:4-7, 105:18-19.  The Magistrate Judge refused to defer to Ms. Mojaddidi's decisions because of her lack of experience.  <u>Id.</u>  Application of that distorted legal standard is plainly erroneous.  <u>Compare Strickland</u>, 466 U.S. at 679-683 (summarizing Court of Appeals decision) with <u>Strickland</u>, 466 U.S. at 691 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments").

Specifically, the Magistrate Judge relies on an incorrect citation to the <u>Strickland</u> majority's summary of the decision of the Eleventh Circuit under review in <u>Strickland</u>, and which the Supreme Court did not adopt in announcing the now-well-known two-part <u>Strickland</u> test.  <u>See</u> F&R at 24:4-7 (citing <u>Strickland</u>, 466 U.S. at 681).  It should go without saying that the portion of an opinion describing a lower court's holding before reversing that court's judgment and announcing a new legal rule does not constitute the Supreme Court's holding in that case, and cannot be cited as binding precedent.  <u>See, e.g.</u>, <u>E.E.O.C. v. Fed. Exp. Corp.</u>, 558 F.3d 842, 853 (9th Cir. 2009) ("a lower court should examine a case in light of the reasoning as well as the narrowest possible holding of a Supreme Court decision.").  When the Supreme Court reversed the Eleventh Circuit in <u>Strickland</u>, it replaced that court's holding with the legal principles announced in its opinion and those principles necessary to implement that holding.  <u>See Seminole Tribe v. Florida</u>, 517 U.S. 44, 67, (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.").  The Magistrate Judge's reliance on any part of the Eleventh Circuit's reversed opinion was error.  Nowhere in <u>Strickland</u> did the Supreme Court establish or endorse an

26

inverse relationship between an attorney's experience and the deference owed her strategic decisions in the Strickland analysis.

In an initial analysis of Ms. Mojaddidi's reasonable decision to set aside the alibi defense and pursue an alternative defense strategy, the Magistrate Judge did not expressly refuse to afford Ms. Mojaddidi's judgments the required deference. F&R at 24:4-7. However, a review of the entire analysis makes clear that is exactly what happened. Later, in a section analyzing the same issue in the context of Hayat's conflict claim, the Magistrate Judge again incorrectly cites the same passage of Strickland, reciting a summary of the Eleventh Circuit's decision reversed in Strickland. See F&R at 105:18-19. The Magistrate Judge followed that citation with an explicit refusal to give deference to Ms. Mojaddidi's strategic decisions, stating, "Because Mojaddidi lacked any criminal law experience, little or no deference is due her 'strategic' decisions." F&R at 105:18-19. That refusal made clear the Magistrate Judge applied an erroneous denial of deference throughout her analysis, undermining the entirety of the Magistrate Judge's conclusions and any findings of Constitutional error.

The Magistrate Judge did not explain this refusal, which is contrary to the "general rule that the strategic decisions of counsel are entitled to deference," acknowledged earlier in the Findings and Recommendations. Id. at 105:10-12 (citing Cullen v. Pinholster, 563 U.S. 170, 197 (2011) and Strickland, 466 U.S. at 691). Nor did the Magistrate Judge cite to any other legal authority for this re-writing of a critical component of the Strickland standard. Presumably, if any such controlling authority existed, the Magistrate Judge would have identified it. Instead, the Magistrate Judge relies on United States v. Saltzer, No. 1:14-cv-0451 BLW, 2015 WL 8215744, at *3 (D. Idaho Dec. 8, 2015), a case with no precedential or persuasive value.

Saltzer provides no support for the Magistrate Judge's erroneous rewriting of the Strickland standard. See F&R at 105:15-16. In Saltzer, the district court dismissed the petitioner's *habeas* action challenging his conviction and 30-year sentence. 2015 WL 8215744, at *1. Before addressing and rejecting the merits of each of the petitioner's claims, the district court stated:

> the Court notes the high level of deference given to attorneys and their
> decisions during the course of representation. [Petitioner's trial counsel] is an
> experienced criminal defense attorney who has practiced in Boise for 20+
> years and sits on the Idaho Supreme Court criminal rules committee. This is

27

not to say that [Petitioner's trial counsel] is infallible, but to show that he does have significant experience in criminal law, that he is a professional, and that his strategic decisions during the course of representation should not be disregarded frivolously. In the "harsh light of hindsight" it is easy to guess how things could have gone "if only ...", but the reality is that the strategic choices attorneys make as to how to defend a case are "virtually unchallengeable." See Strickland v. Washington, 466 U.S. 668, 690 (1984). "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." Id. at 681.

Saltzer, 2015 WL 8215744, at *1.

Set forth in full, it is clear that the passage from Saltzer relied on does not support the Magistrate Judge re-writing of the Strickland standard. The district court in Saltzer stated the law accurately, and acknowledged the high level of deference owed to attorneys' decisions while evaluating an effectiveness claim on *habeas* review. Separately, the district court observed that the petitioner's counsel had significant experience. But that observation is not a statement of law. Indeed, the district court never asserted that it afforded petitioner's counsel greater deference because of his experience. Nor did the district court state that it afforded less experienced lawyers less deference, or that the law permitted diminishment or elimination of the deference owed to counsel's strategic decisions based on that counsel's experience. The passage from Saltzer cited by the Magistrate Judge does not support her decision to deny Ms. Mojaddidi the deference required under Strickland.[22] That decision was contrary to law.

The Magistrate Judge's creation of a new rule of law, conjured from erroneous reliance on overturned and inapposite case law providing no support for that rule, undermines the entirety of that

[22] Even if Saltzer stood for the proposition that an attorney with significant experience is entitled to enhanced deference, the Magistrate Judge's reliance on Saltzer to establish a new standard of law, namely the inverse principle, represents a failure of logic. The inverse of a conditional statement is not necessarily true under basic principles of logic. See Jerry Cederbloom & David W. Paulsen, Critical Reasoning: Understanding and Criticizing Arguments and Theories, Ch. 6, 159-61 (4th ed. 1996) (explaining the error of denying the antecedent); Nancy Cavender & Howard Kahane, Logic and Contemporary Rhetoric: The Use of Reason in Everyday Life, Ch. 2, § 2, pp. 34-35 (9th ed. 2002) (illustrating deductive invalidity of the inverse). Here, the conditional proposition, <if an attorney is experienced, then the attorney is given deference> does not mean that <if an attorney is not experienced, then the attorney is given little or no deference> is true. See David H. Sanford, If P, then Q: Conditionals and the Foundations of Reasoning, 40-41 (1989) (denying the antecedent is an invalid logical fallacy). Yet that is exactly the inference the Magistrate Judge draws from Saltzer. The logical contra-positive, <if there is no deference to be given, the attorney must be inexperienced,> is foreclosed by the clear Supreme Court directive that the amount of deference to counsel on *habeas* review of effectiveness depends only on the reasonableness of counsel's strategic decisions and not on her experience or qualifications. Cronic, 466 U.S. at 665 (1984) ("character of a particular lawyer's experience may shed light in an evaluation of [her] actual performance … it does not justify a presumption of ineffectiveness in the absence of such an evaluation.").

28

court's analysis, requiring rejection of any findings of Constitutional violations.  See Manufactured Home Communities Inc. v. City of San Jose, 420 F.3d 1022, 1037 (9th Cir. 2005) ("Applying the incorrect legal standard is an abuse of discretion.").  This Court should set aside the conclusions in the Magistrate Judge's flawed Findings and Recommendations concerning all of Hayat's effectiveness claims and independently analyze those claims.  As set forth below, that independent analysis can only lead to the same conclusions with respect to each claim:  Ms. Mojaddidi's representation was effective and did not result in prejudice to Hayat

           **b.**        **The Magistrate Judge substituted the flawed and unreliable opinions of Hayat's defense attorney experts for the presumption of adequate performance by trial counsel and other controlling law.**

Compounding the above legal error, throughout the Findings and Recommendations, the Magistrate Judge substituted the testimony of career defense attorneys Hayat called as experts on the Strickland standard for the presumption of adequate performance by Ms. Mojaddidi and other controlling legal standards.  Those witnesses merely restated Hayat's legal arguments, cloaked as expert testimony.  Those purported experts also misstated the controlling law, including the presumption that Ms. Mojaddidi was ineffective based on her limited experience.  The result was so-called expert testimony on the Strickland standard that distorted  the Supreme Court standard and narrowed its observance of the wide range of Constitutionally effective representation.  The Magistrate Judge's substitution of those opinions for the controlling legal standard effectively lowered Hayat's legal burden, and is contrary to law.  That error undermines the Magistrate Judge's findings of any Sixth Amendment violations.

           **1)**        **Hayat's defense experts offered flawed, unsupported, and unreliable opinions, which this Court should reject.**

At the 2018 evidentiary hearing, Hayat called three defense attorneys who offered opinions about the operation of the Strickland standard in this case: (1) Doron Weinberg ("Mr. Weinberg"); (2) Daniel Broderick ("Mr. Broderick"); and (3) John Cline ("Mr. Cline"). [23]  (CR 637, Exs. 9-11, 16).  The

---

[23] Hayat planned to elicit from those witnesses testimony "bearing on many, if not all, aspects of [Hayat's] claims alleging conflict of interest as well as prejudicial deficient performance under Strickland."  (CR 637 at ¶¶ 11-13 18).  Mr. Cline testified concerning the operation of the Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. 3, including why, in his assessment, Hayat's trial counsel would have needed to apply for and obtain security clearance to render

29

government objected to the testimony, arguing, among other things, that it would usurp the judgment of the court. The Magistrate Judge overruled the objection, which the government preserved.[24] (Tr. 8:5-16).

Expert testimony is not necessary to determine claims of ineffective assistance of counsel. See Earp v. Cullen, 623 F.3d 1065, 1075 (9th Cir. 2010) (citing Hovey v. Ayers, 458 F.3d 892, 910 (9th Cir. 2006)). Yet, it was within the Magistrate Judge's discretion to permit Hayat's attorney experts to testify. Hovey, 458 F.3d at 911 (holding that when determining whether to admit expert testimony, courts must consider probative value of testimony, which "hinges on the court's ability to 'assess the issues.'"); Bonin v. Calderon, 59 F.3d 815, 836-38 (9th Cir. 1995) (affirming exclusion of a Strickland expert when the judge is "qualified to assess the likely responses of a jury to certain evidence and is also qualified to understand the legal analysis required by Strickland.").

Here, the Magistrate Judge's overreliance on Hayat's attorney experts' opinions effectively substituted their judgments for the applicable standard and any independent analysis of the facts of this case and the record at trial. The resulting legal analysis reversed the presumption of adequate performance by adopting Mr. Broderick's opinion that Ms. Mojaddidi could not have been Constitutionally effective. The Magistrate Judge's misapplication of the Strickland standard, distorted by the flawed opinions of Mr. Broderick and Mr. Weinberg, was error.[25]

### (i)   Mr. Weinberg's opinions are flawed and unreliable.

At the 2018 evidentiary hearing, Hayat offered the expert testimony of his lead counsel's

---

competent assistant to Hayat. (Id. at ¶ 13).

[24] The Magistrate Judge granted the government's motion to limit Hayat's experts from offering opinions on the ultimate legal conclusions of whether Ms. Mojaddidi was ineffective and/or whether Hayat was prejudiced. See Mukhtar v. Cal. State Univ., Hayward, 299 F.3d 1053, 1063 (9th Cir. 2002) ("[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law."), overruled in part on other grounds by Estate of Barabin v. AstenJohnson, Inc., 740 F.3d 457, 467 (9th Cir. 2014) (en banc); (CR 681). Yet, Mr. Weinberg had been persuaded before testifying that Ms. Mojaddidi "suffered from an actual conflict of interest," and that her alleged deficient performance prejudiced Hayat. (See CR 637, Ex. 9 at ¶¶ 20-30, 34-38.). Thus, despite the Magistrate Judge's order, during his testimony Mr. Weinberg admitted his opinion "indirectly" asserted that Hayat was deprived of his Sixth Amendment rights. (Id. at 449:23-450:1).

[25] The government does not object to the Magistrate Judge's analysis of Hayat's remaining ineffectiveness claims. The government has no quarrel with conclusions that Hayat failed to meet his burden concerning claims evaluated under the significantly lowered legal standard resulting from the Magistrate Judge's erroneous application of law.

colleague and personal friend, Mr. Weinberg, a career criminal defense attorney.[26] (Tr. 442-48). The basis for Mr. Weinberg's opinion was scant, tainted, and insufficient to support testimony providing meaningful guidance to this Court. According to a declaration outlining his background and proposed testimony, to prepare his opinion, Mr. Weinberg reviewed: (i) the Ninth Circuit opinion on direct appeal of Hayat's case; (ii) "a nearly final draft of" Hayat's § 2255 petition, including the factual recitations and record excerpts contained therein at the time; (iii) the declarations of Mr. Riordan, Quin Denvir, John Cline, Richard Leo, and Donald Horgan; and (iv) the "filings referenced in district court docket numbers 345, 353, 356, and 362, concerning Ms. Mojaddidi's request that the court appoint her as counsel" for Hayat for post-trial proceedings.[27] (CR 637, Ex. 9 at ¶ 18).

Mr. Weinberg also "discussed the case and the bases for the § 2255 motion at length with Mr. Riordan." (Id.) He conceded that the "factual, foundational statements concerning the nature of this case, qualifications of counsel, and developments at trial on which [he] … based [his] opinions are founded upon [his] information and belief." (Id. at ¶ 19). At the 2018 evidentiary hearing, Mr. Weinberg testified he read Hayat's complete section 2255 petition and exhibits, the government's "pleadings in response," Ms. Mojaddidi's deposition, the retainer agreements, and other unidentified documents. (Tr. 448:19-25). Mr. Weinberg did not read the complete trial transcript or the many other pleadings the parties filed during trial, appeal, or in this *habeas* matter. (Tr. 484:12-16). Accordingly, his only source of information about what Ms. Mojaddidi did before, during, or after Hayat's trial is what Mr. Riordan told him and his review of Hayat's legal arguments.[28]

Thus, Mr. Weinberg's opinions were merely restatements of Hayat's claims, offered as expert testimony. He admitted he relied principally on Hayat's *habeas* petition to prepare his opinions. (See

---

[26] Mr. Weinberg spent nearly all of his 43-year legal career as a criminal defense lawyer, with a small percentage of his practice devoted to counseling lawyers in disciplinary proceedings. (Tr. at 442:17-443:15); (CR 637, Ex. 9 at ¶¶ 2-3). He and Hayat's lead counsel, Mr. Riordan, have practiced law in the same building for thirty years, and are friends who attend social events, dinners, and other events together. (Tr. at 482).

[27] Mr. Riordan is Hayat's lead *habeas* counsel, Mr. Denvir was the Federal Defender for the Eastern District of California and a proposed Strickland expert, Mr. Leo was Hayat's proposed false confession expert, and Mr. Horgan is one of Hayat's *habeas* lawyers.

[28] The Strickland standard is an objective one. Strickland, 466 U.S. at 687. The problem with blindly substituting attorney expert testimony for the objective standard is that it not only introduces into the Strickland standard "the distorting effects of hindsight" based on what the attorney is willing to claim should be the standard of constitutional effectiveness, but it provides a vehicle for advocates to transform their legal arguments into a "standard of care" regardless of whether it is contrary to established Supreme Court case law. Id.

31

Def. Ex. F ¶ 18).  He also relied on a collection of declarations from other defense witnesses and proposed witnesses, including Mr. Riordan, Mr. Horgan (another of Hayat's *habeas* lawyers), and others recruited by Hayat to assail Ms. Mojaddidi's performance.  (See id.)  Mr. Weinberg also admitted he relied on lengthy discussions with his decades-long friend, Mr. Riordan, about "the bases for [Hayat's] § 2255 motion."  (Id.)  The faulty basis for Mr. Weinberg's opinions renders his testimony fundamentally flawed and unreliable.

Mr. Weinberg's opinions are not rooted in an independent evaluation of the trial record and law. He did not study each pleading, consider each Court order, and factor into his opinions Ms. Mojaddidi's explanations for her conduct or the circumstances he identified as the basis of a potential conflict.  He did not produce an independent, comprehensive report of his findings with citations to facts and law. Rather, he simply studied Hayat's written arguments, conferred at length with Hayat's chief advocate, and studied the declarations of Hayat's other paid witnesses (again, including two of Hayat's several lawyers).  To be sure, an expert cannot hope to offer a reliable opinion if he merely repeats the arguments of the party that paid him to offer an opinion.  See SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp., 188 F.3d 11, 25 (1st Cir. 1999) (expert may not blindly rely on a client's representations). Yet, the record makes clear that is precisely what Mr. Weinberg did.

Moreover, Mr. Weinberg's knowledge of the details of the case were so tenuously rooted in the record that he included a disclaimer in his declaration that his opinions were based upon his "information and belief."  (Def. Ex. F ¶ 19).  In his testimony at the 2018 evidentiary hearing, he demonstrated only a bare knowledge of the rudimentary facts of Hayat's case.  (See Tr. 450:18-451:17). He was not even sure of the charges against Hayat.  (Tr. 450:10-17).  Additionally, Mr. Weinberg appeared ignorant of the extent and details of the incriminating statement Hayat's father, Umer, gave to FBI investigators.  These critical gaps in Mr. Weinberg's knowledge about the facts of Hayat's case is discussed in more detail below, in the section of this memorandum discussing the Magistrate Judge's analysis of Hayat's conflict claim.  Indeed, Mr. Weinberg's ignorance of facts about which he offered purported expert opinions was so stark that the Magistrate Judge was forced to acknowledge it.  (See F&R at 103 n. 46 (acknowledging Mr. Weinberg's ignorance of critical facts concerning the alleged divergence of Hayat and Umer's interest at trial).  Yet, the Magistrate Judge nevertheless credited Mr.

32

Weinberg's unreliable opinion throughout the Findings and Recommendations.

Finally, Mr. Weinberg's close friendship with Hayat's chief advocate only compounded the unreliability of his opinions. (See Tr. 482:14-21). Mr. Weinberg testified that he formed his opinions, in part, based on his lengthy discussions with Mr. Riordan about Hayat's claims. (See CR 637, Ex. 9 at ¶ 18; Tr. 483:4-484:16). Mr. Riordan initially noticed himself as an expert on his own client's claims, and planned to offer such testimony at the evidentiary hearing. (See CR 637 at ¶ 18). He reconsidered that approach after sharing his opinions with Mr. Weinberg during their discussions, hopelessly tainting Mr. Weinberg's opinions with his advocacy. See, e.g., Dura Auto. Sys. of Ind., Inc. v. CTS Corp., 285 F.3d 609, 614 (7th Cir. 2002) (an expert may not merely parrot what the other expert said, vouch for that expert, or become that expert's "spokesman"). Indeed, Mr. Weinberg's reliance on Mr. Riordan's legal arguments in this case and his views of how Ms. Mojaddidi should have acted (as well as his reliance on the declarations of Hayat's other advocates and defense witnesses), stripped any veneer of independent judgment from Mr. Weinberg's opinions and reduced them to unhelpful mimicry of Hayat's claims.

### (ii) Mr. Broderick's opinions are flawed and unreliable.

At the 2018 evidentiary hearing Hayat also presented the testimony of Mr. Broderick, another career criminal defense lawyer. (Tr. 365-427). Mr. Broderick served as the Federal Public Defender for the Eastern District of California from 2006 through 2012, a position he reached after starting his service in that office in 1991.[29] (CR 637, Ex. 10 at ¶ 1). In preparation for his testimony, Mr. Broderick initially examined only Ms. Mojaddidi's deposition. (See CR 637 at Ex. 10, at ¶ 5). Although he reviewed additional documents before testifying, including Hayat's arguments in his § 2255 petition, he did not examine the complete trial transcript, motions filed by the parties, orders of the court, appellate briefs, or other relevant material in this case. (Tr. 369: 17-25). At the hearing, Mr. Broderick admitted he could not recall clearly the facts of Hayat's claims or what Ms. Mojaddidi actually did at trial,

---

[29] The government's position was that expert testimony on the Strickland standard was unnecessary. Even if it took a different position, it's easy to imagine the strenuous objections if the government had noticed a former U.S. Attorney for any federal district with decades of government service to opine (after reviewing only part of the relevant record, and for pay) that Ms. Mojaddidi's performance was effective and her representation was conflict-free. Yet, throughout her analysis the Magistrate Judge notes that the government called no expert to rebut the assertions of Hayat's defense attorney experts, as though a swearing contest between career prosecutors and career defense attorneys would have assisted this Court in resolving the legal issues presented in Hayat's *habeas* claims. (See F&R at 21, 32, 59, 105 n. 47).

although he claimed to recall facts from Ms. Mojaddidi's deposition.[30] (Tr. 420:21-421:17).

Mr. Broderick asserted in a pre-hearing declaration that he was convinced Ms. Mojaddidi "performed incompetently" and that Hayat was "severely prejudiced." (CR 637, Ex. 10 at ¶ 37). In that declaration, Mr. Broderick devoted significant effort to discussing Ms. Mojaddidi's qualifications at the time she represented Hayat, and judged her harshly. (See CR 637, Ex. 10 at ¶¶ 6-7, 10-12, 17, 26). He declared that an application from Ms. Mojaddidi for appointment to the Criminal Justice Act ("CJA") panel, in 2005, would have been rejected—presumably by him.[31] (See id. at ¶ 11). At the hearing, Mr. Broderick testified about his supervision of the CJA panel, (Tr. 372:12-376:9), although Ms. Mojaddidi never sought appointment to the panel in 2005. Indeed, Ms. Mojaddidi was not appointed to represent Hayat. Rather, his family selected and retained her as Hayat's counsel. (W.M. Depo. 21:4-13, 125:16-25, 126:3-7).[32] Despite his preoccupation with the standards of the CJA panel, Mr. Broderick acknowledged that the Constitution permits any criminal defendant to retain counsel of his choice. (Tr. 418:24-419:9). Mr. Broderick was also aware that a trial judge's erroneous removal of a defense lawyer selected by a defendant would constitute a structural error requiring a new trial, but he was not able to discuss that case law specifically. (Id. at 419:10-420:4).

Ninth Circuit case law is replete with decisions cautioning that ineffectiveness claims must be judged based on an attorney's performance and not her qualifications. See LaGrand, 133 F.3d at 1275. Yet, Mr. Broderick did not even bother to read the trial transcript in preparing his "expert" opinion of Ms. Mojaddidi's trial performance. (See CR 637, Ex. 10 at ¶ 5). Rather, he based his opinion only on his assessment of her qualifications in 2005, on her 2014 deposition, and on Hayat's habeas petition. (Id. Tr. 369: 17-25). On that basis, he opined that Ms. Mojaddidi was "unqualified to represent anyone in a federal criminal case (misdemeanor or felony)," and her "lack of experience and qualifications" prejudiced Hayat. (CR 637, Ex. 10 at ¶¶ 6-7). Such a legally flawed opinion, based on who Ms.

[30] Mr. Broderick erroneously asserted Hayat was born in Pakistan, not in the United States. (Tr. 370:4-9).

[31] While that might be so, the record shows that, in May 2006, Mr. Broderick recommended that this Court appoint Ms. Mojaddidi to represent Hayat in post-trial litigation through sentencing, under the tutelage of an experienced attorney (initially Mark Reichel). (See CR 353 at 3-4). Later, on or about May 19, 2006, Mr. Riordan appeared as associate counsel with Ms. Mojaddidi, and Mr. Broderick filed an amended recommendation with this Court. (See CR 360).

[32] W.M. Depo. refers to the transcript of Ms. Mojaddidi's 2014 deposition. (See Def. Ex. FFF).

34

Mojaddidi was at the time and not on how she performed at trial, cannot assist a trier of fact.

### 2)    The Magistrate Judge substituted Mr. Broderick's flawed opinion for the controlling standard and denied Ms. Mojaddidi the presumption of adequate performance.

Even if the basis for Mr. Broderick's opinion had been more reliable, the standard about which Mr. Broderick opined was fundamentally flawed as a matter of substance. First, his opinion described what he or some other very experienced lawyer might have done in the circumstances, ignoring the Supreme Court's acknowledgement of the wide variation of Constitutionally effective performance. Second, and contrary to Supreme Court and Ninth Circuit precedent, he focused almost exclusively on Ms. Mojaddidi's experience and qualifications and flatly rejected the idea that *she or any other lawyer with similar experience* could have been effective under the circumstances. Thus, Mr. Broderick reversed the presumption of adequate performance and opined about a standard not found in the controlling law. The Magistrate Judge's reliance on that erroneous opinion to establish the standard under which to evaluate Ms. Mojaddidi's performance is contrary to law and undermines any finding of a Constitutional violation.

In his testimony, Mr. Broderick offered opinions about what a lawyer with *his* significant experience might do. (Tr. 420:6-15). At times his opinion established an even higher standard. More than once, he qualified his opinion about what an attorney should do as applicable in a "perfect" situation, establishing a standard far higher than required by law. (Tr. 398:1, 398:23, 415:11). At a minimum, Mr. Broderick's opinion described what he believed those experienced lawyers he would have permitted on the CJA panel in 2005 might do. (CR 637, Ex. 10 at ¶¶ 6-12; Tr. 372:12-376:9, 378:24-379:381-13). Mr. Broderick's opinion simply refused to account for the possibility that a lesser experienced lawyer could provide effective representation. Discussing the parameters of reasonable conduct recognized by the Strickland standard, he testified that it included only "the really good counsel and great counsel and perfect counsel." (Tr. 423:13-18). He did not acknowledge that the standard also recognizes a minimum effective performance by a new or lesser-experienced attorney. In the words of the Eleventh Circuit, "[t]he test [under Strickland] has nothing to do with what the best lawyer would have done. Nor is the test even what most good lawyers would have done." White v. Singletary, 972 F.2d 1218, 1220-21 (11th Cir. 1992). Instead, courts ask "only whether some reasonable lawyer at the

trial could have acted, in the circumstances, as defense counsel acted at trial." Id.  Thus, Mr. Broderick's opinion reversed the presumption of adequate performance and held Ms. Mojaddidi to a higher legal standard than required by law.

Moreover, Mr. Broderick's opinion did not merely imply denial of the presumption of adequate performance, he affirmatively opined that no lesser-experienced attorney could have effectively represented Hayat.  In doing so, he focused on his subjective view of the qualifications necessary for Constitutional effectiveness and not on what a reasonable attorney would do in similar circumstances. (Tr. 380:18-381:13).  He opined Ms. Mojaddidi could not have been effective under any circumstances because she lacked those objective qualifications.  (Id.)  He even opined that with 5 or 10 years to prepare, Ms. Mojaddidi would not have been qualified to represent Hayat.  (Id.)  Discussing Ms. Mojaddidi's election to shift from an alibi defense to a speedy trial/sufficiency-of-the-evidence defense, Mr. Broderick described the approach as "simply crazy," and insisted such an approach was "not just unreasonable, it's crazy."  (Tr. 412:9-16).  Mr. Broderick admitted that his strong language reflected his "strong feelings" about Ms. Mojaddidi's performance in Hayat's case. (Tr. 424:3-9).

Mr. Broderick's opinion was not an expert analysis of whether Ms. Mojaddidi's performance was objectively reasonable, presuming her effectiveness and acknowledging the wide variation in Constitutionally reasonable representation.  Rather, the standard about which Mr. Broderick opined— focused on her qualifications and not her conduct—bears no relation to the standard applicable to *habeas* jurisprudence.  See Cronic, 466 U.S. at 665 (rejecting ineffectiveness claim in fraud case based on allegations appointed counsel was young, practiced real estate law, and was facing his first jury trial); Ortiz, 149 F.3d at 933 (rejecting ineffectiveness claim in murder and arson case where attorney had practiced only four years, two of which as a justice of the peace); see also Lewis, 786 F.2d at 1281; In re Grand Jury Subpoena, 739 F.2d at 1358; Merritt, 528 F.2d at 651.  By relying upon an evaluation of Ms. Mojaddidi's experience in establishing the operative standard, Mr. Broderick erroneously reversed the presumption of adequate performance, presumed Ms. Mojaddidi could not have been effective, and ignored what she actually did and why she did it.  See LaGrand, 133 F.3d at 1275 ("in considering a claim of ineffective assistance of counsel, it is not the experience of the attorney that is evaluated, but rather, [her] performance.").  The Magistrate Judge's adoption of that error undermines her conclusions.

36

**(i)** **The Magistrate Judge relied on Mr. Broderick's erroneous opinion to establish the standard of conduct and ignored what Ms. Mojaddidi actually did.**

The Magistrate Judge clearly relied on Mr. Broderick's legally erroneous opinion to establish the legal standard applicable to this and Hayat's other performance claims.  Under the title, "Standards for Determining the Reasonableness of a Decision to Forego an Alibi Defense," the Magistrate Judge quoted Mr. Broderick's opinion at least six times, using it to set the applicable standard.  F&R at 21, 22, and 23.  To decide whether Ms. Mojaddidi's actions were reasonable, the Magistrate Judge used Mr. Broderick's erroneous opinion to establish three "misconceptions" under which she asserted Ms. Mojaddidi operated, each flowing directly from his opinions.  Compare F&R at 21-23 with F&R at 28-29.  The Magistrate Judge then discussed how Ms. Mojaddidi failed to do the things that Mr. Broderick opined she should have done.  F&R at 28-33.  In adopting Mr. Broderick's erroneous opinion for the applicable legal standard, the Magistrate Judge indirectly incorporated his legal error into her analysis.  See In Re Grand Jury Subpoena, 739 F.2d at 1358 ("Unfamiliarity with an area of the law does not justify a presumption of ineffectiveness.").

In addition to indirectly incorporating Mr. Broderick's legal error into her analysis, the Magistrate Judge directly embraced the more serious flaw in his testimony—concluding that Ms. Mojaddidi's inexperience made it impossible for her to have performed effectively.  In the midst of an analysis of whether Ms. Mojaddidi's conduct was reasonable, the Magistrate Judge devoted a paragraph to discussing her experience and qualifications.  F&R at 30.  In that discussion, the Magistrate Judge noted that Ms. Mojaddidi had no significant criminal law experience at the time of Hayat's trial and quoted Mr. Broderick's opinion, in a footnote, that Ms. Mojaddidi *simply could not have been effective, no matter her performance on behalf of Hayat*.  Id. at n. 17 ("Broderick testified that an attorney with no criminal law experience would '[a]bsolutely not' be qualified to represent a defendant facing" a serious charge.").  The Magistrate Judge's reference to Mr. Broderick's erroneous opinion on that point should have included a rejection of his faulty assertion.  See Merritt, 528 F.2d at 651 ("[a]dmission to the bar allows [a court] to assume that counsel has the training, knowledge, and ability to represent a client.").  It did not.  Instead, the Magistrate Judge applied it, asserting that even if Ms. Mojaddidi's performance was not the result of the misconceptions identified by Mr. Broderick, her efforts to investigate a possible

alibi defense "were objectively unreasonable on their face." F&R at 31. That analysis, reversing the presumption of adequate performance and instead presuming ineffectiveness, was contrary to law.

This Court should reject the Magistrate Judge's erroneous substitution of governing case law with the unreliable and legally erroneous opinions of Mr. Broderick. See United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the [factfinder] what result to reach, this does not *aid* the [factfinder] in making a decision, but rather attempts to substitute the expert's judgment for the [factfinder's].") (emphasis in original). Mr. Broderick's opinion distorted the applicable legal standard by reversing the presumption of adequate performance and imposing a presumption of ineffectiveness on Ms. Mojaddidi, which the Magistrate judge adopted and applied. Thus, the Magistrate Judge's conclusions are undermined by that error and should be rejected.

**B.      The Magistrate Judge's analysis and conclusions are based on incomplete and erroneous factfinding, and are not supported by reasonable inferences from the facts and law.**

Even if this Court finds no error in the application of the legal standard, the Magistrate Judge's analysis and conclusions supporting findings of Sixth Amendment violations flow from incomplete and erroneous factfinding and from inferences and conclusions not logically supported by the record. Viewed fairly and in its entirety, the full record reveals that nothing about Ms. Mojaddidi's strategic decisions while representing Hayat affected the fundamental fairness of his trial or prejudiced him. Below, the government addresses each ineffectiveness claim the Magistrate Judge accepted and demonstrates its lack of merit. On *de novo* review, this Court can and should accept those arguments notwithstanding the flawed conclusions reached by the Magistrate Judge. Nevertheless, the government also addresses the Magistrate Judge's flawed analysis, which, under any standard, should be rejected.

**1.      Ms. Mojaddidi's considered and strategic decision to pursue a speedy trial and sufficiency of the evidence defense instead of an alibi defense was well within the wide range of competent representation.**

Ms. Mojaddidi took on her role as counsel with zeal and conducted an exhaustive review of the evidence. She reviewed all material produced in discovery. (W.M. Depo. 161:23-162:2). Ultimately, there were well over 7,000 pages of written discovery (the bulk of which were in foreign languages) as well as scores of hours of audio and video tape (much in foreign languages). In addition, voluminous records and items seized from the Hayat residence (also primarily in foreign languages) were also made

38

available to counsel for inspection and copying.  In Ms. Mojaddidi's opinion, she knew and studied the evidence much more than Mr. Griffin.  (Id. at 72:4-23, 162:3-11).

Working with Mr. Griffin, Ms. Mojaddidi considered and ultimately determined that the best defense strategy for Hayat was to push the government to trial as rapidly as possible and challenge the sufficiency of the evidence against him.  (Id. at 163:5-13, 170:17-171:10, 223:21-22).  Ms. Mojaddidi testified that the defense assessed "the amount of evidence that the government had produced in terms of discovery" and, based on that "limited amount of evidence," the defense believed that "[the government] wouldn't ultimately succeed if they were pushed to trial with what they had and that it was a good idea for [the defense team] to push for a speedy trial."  (Id. at 53:18-24).  In Ms. Mojaddidi's words:  "As the evidence kept coming in, I just didn't think the government was going to meet its burden."  (Id. at 163:19-24; 170:24-171:1).

The defense felt that the government had simply "charged the case" and was "build[ing] it later" with the "evidence . . . just trickling in."  (Id. at 171:8-10).  The defense further believed that, given the perceived weakness of the government's case, "it was a good idea . . . to push for a speedy trial."  (Id. at 53:23-24).  Indeed, the defense was concerned that, if given more time to prepare, "[the government] would continue to gather evidence and create the case [it needed] against [Hayat]."  (Id. at 171:13-14).  Ms. Mojaddidi testified she never believed it would have been in her interest to take a separate strategic path or to change her decision to seek a trial as rapidly as possible and advance a failure of proof defense.  (Id. at 305:21-306:4).  Thus, even when this Court granted continuances of the trial date in August and in November, Ms. Mojaddidi and Mr. Griffin requested the earliest available new date.  (Id. at 171:24-172:7).[33]

In choosing to press for a rapid trial and challenge the sufficiency of the evidence, Ms.

---

[33] Hayat alleges Ms. Mojaddidi only pursued a Speedy Trial Act tactic that ultimately failed.  (Pet. at 18-20; OPHB at 64-65, 71, 81).  The argument incorrectly implies the *only* strategic objective was to force a trial within 70 days under the Speedy Trial Act or to somehow seek dismissal under the Act.  Ms. Mojaddidi confirmed the defense had two objectives:  (a) pushing the government to trial as soon as possible; and (b) making sure Hayat received a speedy trial under the Act.  (W.M. Depo. 175:2-8).  She explained: "The focus was to push the government to trial and if[,] along the way[,] there was a violation [of the Act], then there was a violation and we could raise it."  (Id.)  She also confirmed that focus persisted even after the Court granted continuances.  (Id. at 171:24-172:7).  The main defense theory was sufficiency of the evidence.  (Tr. at 751:13-25, 755:9-20).

Mojaddidi selected a well-trodden strategic road.  As the Supreme Court has stated: "[t]o support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." Harrington, 562 U.S. at 109.  Courts routinely conclude that challenging the government's case and arguing that the evidence is insufficient is more than enough to meet the constitutional requirement of effective representation.[34] See, e.g., Johnson v. Lockhart, 921 F.2d 796, 800 (8th Cir. 1990) ("Since the government has the burden…it may not be necessary for the defense to introduce evidence to meet the constitutional requirement of effective representation.  … Given the tenuous nature of the state's case against [defendant] and given that [counsel] did interview [defendant]'s alibi witnesses, [counsel]'s trial strategy was not unreasonable."); Lema v. United States, 987 F.2d 48, 54-55 (1st Cir. 1993) ("Where the prosecution's case is less than compelling … the risk of 'rocking the boat' may warrant a decision by trial counsel to forego the presentation of further defense testimony, even favorable testimony.").

Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691.  "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id.  Moreover, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id.  "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Id.  "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." Id.  "In particular, what investigation decisions are reasonable depends critically on such information." Id.

---

[34] On this point, and others, the Magistrate Judge's analysis demonstrates the error inherent in reversing the presumption of adequate performance.  Rather than presume the soundness of Ms. Mojaddidi's decision to pursue a rapid trial and challenge evidence she viewed as weak, which was supported by her consistent deposition and hearing testimony, the Magistrate Judge presumes ineffectiveness and suggests her strategic decision could only be validated by an expert's endorsement. See F&R at 105 n. 47.  Of course, that is not the standard Strickland established.  No expert testimony is required to affirm the reasonableness of counsel's conduct.  The law presumes it.  Moreover, with regard to the use of expert witnesses at trial or in this proceeding, "Strickland does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." Harrington v. Richter, 562 U.S. 86, 111 (2011).  The Magistrate Judge's preoccupation with and undue reliance on expert testimony reveals the failure of that court's application of the law in evaluating Hayat's claims.

40

### a.   Ms. Mojaddidi made reasonable efforts to investigate any potential alibi witnesses she, Hayat, or his family identified, including witnesses in Pakistan.

Ms. Mojaddidi considered and investigated an alibi defense but concluded it would not be a sound strategy.  (W.M. Depo. 172:8-24; Tr. 727:16-19).  She based her determination on information Hayat and his family supplied, and she reasonably relied on their knowledge of how and with whom Hayat spent his time while in Pakistan between April 2003 and May 2005. (Tr. 728:10-23) (testifying she interviewed Hayat and his family for information about specific potential alibi witnesses).[35]  Ms. Mojaddidi's investigative efforts were reasonable and discharged her duty to consider the viability of an alibi defense at trial.  That reasonable investigation entitled Ms. Mojaddidi's strategic decision to "a heavy measure of deference."  Strickland, 466 U.S. at 691.  Consequently, any purported alibi witnesses Hayat now proffers are irrelevant to the disposition of his *habeas* claims.  Ms. Mojaddidi was not ineffective.  She reasonably investigated an alibi defense, reasonably concluded the evidence did not support such a defense, and pursued an alternative strategy.  That ends the Strickland analysis and the Court need not consider testimony aimed at Hayat's irrelevant allegation of prejudice.

Hayat identified to Ms. Mojaddidi which of his family members and friends he interacted with during his time in Pakistan between 2003 and 2005.  (Tr. 727:20-15).  He did not provide her with a list of specific people she should talk to as potential alibi witnesses because "he did not seem to have perfect recollection of the whole time that he was there."  (Id. at 728:1-19).  Rather, Ms. Mojaddidi generally questioned him and assessed from his answers a list of potential alibi witnesses.[36] (Tr. 728:1-19; see also W.M. Depo. 34:3-12, 150:23-152:18).  Ms. Mojaddidi specifically interviewed Hayat's family members, especially his mother, Salma Hayat, about potential alibi witnesses in Pakistan.  (Tr. 728:20-25).  Based on the information she elicited from Hayat, his mother, his older sister, and an uncle, Ms. Mojaddidi was able to compile a list of potential alibi witnesses.  (Tr. 729:1-11).  Ms. Mojaddidi did not speak to

---

[35] It is well recognized that counsel's decision on the course of action to take quite reasonably depends on information provided by the defendant as well as on the defendant's own statements and actions.  Strickland, 466 U.S. at 691; Langford v. Day, 110 F.3d 1380, 1386-87 (9th Cir. 1997); Ochoa v. Davis, CV 99-11129 DSF, 2016 WL 3577593 at *69 (C.D. Cal. June 30, 2016); see also United States v. King, 936 F.2d 477, 480 (10th Cir. 1991); United States ex rel. Kleba v. McGinnis, 796 F.2d 947, 958 (7th Cir. 1986).

[36] At her 2014 deposition, Ms. Mojaddidi recalled a more directed discussion with Hayat about potential alibi witnesses. (W.M. Depo. 150:23-151:6).  The variation is a distinction without a difference.  In both instances, she recalled compiling a list of potential alibi witnesses in discussions with Hayat.

41

Hayat's younger sister, Raheela, at the time because "she was a little girl," between 8 and 10 years old, and neither Hayat nor his family suggested Raheela was a potential alibi witness. (Tr. 729:18-23, 730:3-8, 185:10-186:21).

The potential alibi witnesses Ms. Mojaddidi identified were:  (1) Hayat's mother, Salma Hayat; (2) his cousin, Usama Ismail; (3) his uncle, Attique Ur Rehman; and (4) his grandfather, Saeed Ur Rehman.  (W.M. Depo. 148:18-151:25).  At her deposition, Ms. Mojaddidi testified that neither Hayat nor his family members mentioned any other potential alibi witnesses.  (W.M. Depo. 154:6-12).  She was certain of that fact, and testified:

> I know what Hamid told me and what the family members told me about the potential people I could have talked to.  And I'm certain that beyond the names that were given to me, and the family members, the names that I had listed, that *there was nobody else that they ever mentioned.  I'm certain of that*.

(Id. at 273:6-12) (emphasis supplied).

Ms. Mojaddidi also reviewed the discovery produced by the government, including FBI reports of investigation and other "documents," for independent sources of potential alibi witnesses.  (Tr. 728:6-8).  She independently identified Hayat's brother, Arsalan Hayat, as a potential witness.  (W.M. Depo. 148:18-149:5).  She also identified Hayat's wife in Pakistan as a potential alibi witness but concluded that because she and Hayat were married "right before" Hayat returned to the United States in May 2005, she would likely not be a useful alibi witness.  (W.M. Depo. 151:24-152:3).

To the best of her recollection, Ms. Mojaddidi either spoke with or reviewed interview reports of Arsalan Hayat (report), Salma Hayat (interview), Usama Ismail (likely report), and Attique Ur Rehman (phone interview), to assess whether they would be good alibi witnesses.  (W.M. Depo. 35:6-17, 148:18-154:5, 168:3-170:13, 186:4-17, 189:12-190:7).  She spoke with Saeed Ur Rehman, and also recalled generally speaking with many of Hayat's other immediate family members.  (Id. at 148:18-150:14, 190:8-191:16).  Ms. Mojaddidi asked everyone she spoke to whether he or she could identify additional potential alibi witnesses.  (Id. at 160:23-161:14).  None provided her with any additional names.  (Id.)  Ms. Mojaddidi would have followed up with any person identified as a potential alibi witness.  (Id. at 161:15-20)

At the time, the only potential alibi witnesses Ms. Mojaddidi identified who were living in Pakistan were Hayat's wife, his uncle Attique Ur Rehman, and his grandfather Saeed Ur Rahman. (W.M. Depo. 149:19-25, 151:24-152:3; Tr. 729:12-17). Ms. Mojaddidi spoke to Hayat's uncle by phone. (W.M. Depo. 149:18-21; Tr. 729:14). She believed she had one conversation with Hayat's grandfather. (W.M. Depo. 149:22-25; Tr. 729:15). And she concluded Hayat's wife would not be a good alibi witness because she and he were married immediately before Hayat returned to the United States in May 2005.[37] (W.M. Depo. 151:24-152:3). Accordingly, having considered all of the identified potential Pakistani alibi witnesses, Ms. Mojaddidi did not send an investigator to Pakistan to interview those people again. (W.M. Depo. 35:18-25; Tr. 729:12-17).

This is not a case where Ms. Mojaddidi made no effort to investigate or evaluate a possible alibi defense, like the inapposite cases cited by the Magistrate Judge. See F&R at 29.[38] Rather, this is a case where Ms. Mojaddidi reviewed the statements and interviewed the witnesses identified by Hayat and his family (including witnesses in Pakistan), identified other potential alibi witnesses based on her independent review of the evidence, and came to a professional judgment that the witnesses had credibility issues and other defects that undermined their persuasiveness in light of the evidence at trial. (W.M. Depo. 34:3-12, 148:18-149:5, 150:23-152:18; 172:8-24; 273:6-12; Tr. 731:4-733:6). Ms. Mojaddidi had knowledge of what those witnesses had to say, and her choice not to personally interview those whose statements were captured in reports cannot be ineffective. See LaGrand, 133 F.3d at 1274 (rejecting argument counsel must personally interview each witness); Eggeleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986) (stating counsel need not interview witness if witness's account is known

---

[37] Ms. Mojaddidi was correct in that determination. Hayat's wife did not provide a declaration in support of his alibi claim. (See CR 532; Def. Exs. S-JJ).

[38] None of the cases the Magistrate Judge cites present facts similar to this case, in which Ms. Mojaddidi took affirmative steps to investigate and develop a list of alibi witnesses, interviewed those witnesses or reviewed interviews, and consider whether each was a viable witnesses in light of other facts in the case. See Duncan v. Ornoski, 528 F.3d 1222, 1235 (9th Cir. 2008) (counsel's "mere" belief that certain testimony "might not be helpful" provided no basis to decide not to investigate further); Ramonez v. Berghuis, 490 F.3d 482, 489 (6th Cir. 2007) (decision to forego investigation into witnesses based on a "guess" about what they might say is unreasonable); Rios v. Rocha, 299 F.3d 796, 806 (9th Cir. 2002) (an unreasonable assumption is no basis for a reasonable strategic decision); Lord v. Wood, 184 F.3d 1083, 1095 (9th Cir. 1999) (counsel's "vague impression" that witnesses were not credible insufficient to excuse failure to interview them). Those cases might be relevant if Ms. Mojaddidi did *nothing* to investigate an alibi defense, or acted on a mere belief or guess. But that did not happen here. Rather, Ms. Mojaddidi affirmatively investigated the alibi defense and spoke to and evaluated witnesses, including witnesses in Pakistan. The Magistrate Judge's reliance on those inapposite cases is misplaced.

to counsel).

A strategic decision to reject an alibi defense in favor of pursuing an alternative defense does not constitute ineffective assistance of counsel and is not a basis for granting *habeas* relief. Counsel is "not require[d] ... to raise every available nonfrivolous defense" or "pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." Knowles, 556 U.S. at 123. Abandoning a defense that has "almost no chance of success" is reasonable, even if there is "nothing to lose" by preserving the defense. Id. at 119-23. The "duty to investigate and prepare a defense is not limitless" and does not require that every conceivable witness be interviewed. Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) amended on denial of rehearing, 253 F.3d 1150 (9th Cir. 2001); see also Lawson v. Caspari, 963 F.2d 1094 (8th Cir. 1992) (counsel's decision not to call alibi witnesses based on reasonable trial strategy, including extensive cross-examination of government witnesses); Brown v. Hall, No. CIV S-03-1965 FCD KJM, 2006 WL 3524503, at *9 (E.D. Cal. Oct. 23, 2006), report and recommendation adopted, No. CIV S-03-1965 FCD KJM, 2006 WL 3617989 (E.D. Cal. Dec. 7, 2006), aff'd sub nom. Brown v. Attny. Gen. of Ca., 292 F. App'x 674 (9th Cir. 2008). In assessing such a decision, court should apply "a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691. Once defense counsel makes a reasonable tactical decision to pursue one defense strategy, "the need for further investigation [of the other theory] may be considerably diminished or eliminated altogether." Id. See also Turk v. White, 116 F.3d 1264, 1267 (9th Cir. 1997) (finding counsel reasonably selected self-defense theory, discharging duty to investigate competency defense). Moreover, tactical decisions regarding whether and how to present evidence do not constitute ineffective assistance of counsel simply because, with the benefit of hindsight, a chosen strategy was incorrect. See Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir. 1984).

Here, Ms. Mojaddidi reasonably investigated the alibi defense, including considering witnesses in Pakistan, determined it was not viable, and adopted an alternative defense strategy. No more was required.

**1)  Ms. Mojaddidi considered and rejected as problematic all potential alibi witnesses she, Hayat, or his family identified, including witnesses in Pakistan.**

Ms. Mojaddidi testified that the witnesses Hayat identified, or who the defense thought might

44

offer alibi testimony, "all seemed to have different levels of problems." (W.M. Depo. 164:10-13; see also Tr. 731:7-20). For example, Ms. Mojaddidi initially thought Hayat's uncle, Attique Ur Rehman, an attorney, and Hayat's grandfather, Saeed Ur Rehman, might offer helpful testimony. (W.M. Depo. 35:22-37:14). However, she concluded they would not be good witnesses. (W.M. Depo. 36:7-8; Tr. 731:7-20). Ms. Mojaddidi testified the names of Hayat's grandfather and uncle were "all over all the evidence," referring to Hayat's statements and some of the documentary evidence.[39] (W.M. Depo. 164:14-21; RT 2806:6-15 (testimony about article documenting meeting between Saeed Ur-Rehman and Mullah Omar); Tr. 733:7-15, 734:17-735:5).

The allegations, Ms. Mojaddidi pointed out, were that these two relatives "guid[ed] [Hayat] to do what he was doing" in connection with the camps. (W.M. Depo. 164:16-18). As for the grandfather, Ms. Mojaddidi knew that it was alleged that the grandfather "had the [jihadi] madrassa [in Pakistan] that was helping to train … people." (W.M. Depo. 36:2-4; Tr. 731:16-20). She testified in 2018 that "from everything [she and Mr. Griffin saw,]" the government considered Hayat's uncle and grandfather "terrorists." (Tr. 731:9-11; 735:1-5). In short, she determined that it "might hurt [Hayat's] case if they testif[ied]." (W.M. Depo. 164:18-21).

### 2) Hayat admitted that certain of his family members attended training camps and knew he attended a camp.

In his confession, Hayat admitted his mother, father, and uncle Anas knew he attended a jihadist training camp while he was in Pakistan between October 2003, through November 2004. (Gov. Sup. Ans. Ex. 8 at 37, 75-76, 77-78, 107). Hayat stated his uncle, Anas, attended a militant camp five years earlier. (Gov. Sup. Ans. Ex. 8 at 37). Hayat stated that Saeed-ur-Rehman, his grandfather, was associated with the leadership of the camp Hayat attended, and that he was "75 or 80%" sure his grandfather ran the camp. (Gov. Sup. Ans. Ex. 8 at 169-70). Hayat also stated his friend Sadiq Shoaib attended a militant camp while in Pakistan, and that members of Hayat's village were aware of it and talked about it. (Gov. Sup. Ans. Ex. 8 at 119-23, 166). Hayat stated his cousins, Usama and Jaber

---

[39] This is reinforced by Umer's confession, in which he stated that Hayat's grandfather sent students from his madrasa to training camps, and also that Hayat's uncle Attique Ur-Rahman, also trained at a camp and encouraged Hayat to go to a militant camp. (Gov. Sup. Ans. Ex. 21, 5U1.1, 5U1.3). Umer Hayat stated that Attique Ur-Rahman fought in the Afghan – Soviet War. (Gov. Sup. Ans. Ex. 21, 5U1.3).

Ismail, and his uncle, Attique Ur Rehman, attended training at militant training camps in Pakistan. (Gov. Sup. Ans. Ex. 8 at 183-87).  Having reviewed the discovery in the case, including Hayat's confession, Ms. Mojaddidi was well-aware that Hayat had cast a shadow of suspicion and doubt over many close family members, friends, and members of his village in his statements about them during his confessions.  (See W.M. Depo. 161:23-162:2; Tr. 728:6-8).  Coupled with her other efforts, it was reasonable for Ms. Mojaddidi to decline to pursue calling those individuals as alibi witnesses.

### 3)    Umer Hayat admitted he knew Hayat went to a training camp and Umer personally saw a camp.

In June 2005, FBI agents also conducted videotaped interviews of Umer.  (Gov. Sup. Ans. Ex. 21 (4U1.1-4U8.3); RT at 1420:13-1426:14; Gov. Sup. Ans. Ex. 21 (5U1.1-5U8.2); RT 1426:15-1430:3).  During those interviews, Umer stated he knew his son attended a training camp. (Gov. Sup. Ans. Ex. 21 (4U1.1); RT 1432:8-1433:13; RT 1433:14-21; RT 1434:7-1435:5 (5U1.1-1.6)  Umer also stated that he visited one of the camps Hayat attended, and stood at the gate.  (Gov. Sup. Ans. Ex. 21 (4U5.1-4U5.4, 5U5.1-5U5.2)).  In addition, Umer stated that Hayat attended a camp in 2000, and another one in late 2003 to early 2004, corroborating Hayat's confession.  Umer also confirmed that Hayat's grandfather (Umer's father-in-law) was heavily involved in Pakistani politics and could grant access to the camps, corroborating Hayat's confession about his grandfather's relationship to the camp leadership.  (Gov. Sup. Ans. Ex. 21 (5U5.2, 5U8.2)).  Umer also stated that Hayat's uncle, Attique Ur-Rehman, had trained at camps and gone to fight in the Afghan-Soviet war as a mujahedin, also corroborating part of Hayat's confession. (Gov. Sup. Ans. Ex. 21 (5U1.3)).

Accordingly, Ms. Mojaddidi was aware at the time of Hayat's trial that Umer and Hayat's statements both incriminated specific, extended family members and undermined their usefulness as alibi witnesses.  (Tr. 733:2-6, 734:10-21).  Ms. Mojaddidi knew the jury would see and hear recordings of Hayat incriminating those family members.  (See W.M. Depo. 161:23-162:2; Tr. 728:6-8, 734:24-735:5).  Even if she didn't believe Hayat's confession (Tr. 782:5-11), she knew those witnesses were not viable alibi witnesses because of their vulnerability on cross-examination and potential exposure to criminal charges.  It was reasonable for her to exclude them from consideration as alibi witnesses.

It was also reasonable for Ms. Mojaddidi to conclude that Hayat's mother, Salma Hayat, would

be a poor witness because she had difficulty responding to questions even in her native language, and was a quiet and timid person. (W.M. Depo. 165:8-12; Tr. 729:5-8, 737:18-23). Although she could not remember the precise reasons, Ms. Mojaddidi also determined that Usama Ismail and Arsalan Hayat were not going to be good witnesses. (W.M. Depo. 165:13-166:2, 168:25-169:11; see Tr. 737:21-738:9). Additionally, Ismail had Fifth Amendment concerns. (W.M. Depo. 166:23-167:4, 187:2-22).[40] Ms. Mojaddidi might not have recalled at her deposition or at the 2018 hearing but, in his confessions Hayat stated his cousins, Usama and Jaber Ismail, attended training at militant camps in Pakistan. (Gov. Sup. Ans. Ex. 8 at 183-87). Having reviewed Hayat's confession, Ms. Mojaddidi was aware that Hayat's cousins, certain other family members, and at least one friend in his village were not viable alibi witnesses. (See W.M. Depo. 161:23-162:2; Tr. 728:6-8). Thus, her reason for excluding those possible alibi witnesses was based on her investigation and careful consideration, and were sound.

>    **b.**      **Ms. Mojaddidi believed others in Pakistan might have seen Hayat engaged in innocent activities but she did not believe she could construct an effective alibi defense for the entire relevant period Hayat was in Pakistan.**

Ms. Mojaddidi did not believe she could construct an alibi defense for the entire relevant period Hayat was in Pakistan between April 2003 to May 2005. She acknowledged that there were likely people in Pakistan who observed Hayat doing all the daily innocent activities that Hayat claimed he did while in Pakistan, such as playing cricket, visiting his mother in Rawalpindi, and hanging out at a store in Behboodi. (W.M. Depo. 268:4-17; Tr. 727:16-19). She explored the possibility of presenting an alibi defense relying on such witnesses.[41] (Tr. 727:16-19). However, she concluded that it would not "work" for any of these Pakistani individuals to serve as alibi witnesses. (W.M. Depo. 37:4-14, 269:1-16; Tr. 735:24-736:25). Ms. Mojaddidi explained that the testimony of such potential alibi witnesses would not be helpful "because the argument could have been that just because [Hayat] did those things [such as

---

[40] Ms. Mojaddidi was not aware of evidence suggesting the government intentionally caused Ismail to invoke the Fifth Amendment right against self-incrimination to distort the fact-finding process. (W.M. Depo. 191:18-192:24). In a 2005 FBI interview, Ismail offered favorable information concerning Hayat's activities while Hayat was in Pakistan. (Def. Ex. J). In the same interview, Ismail agreed to submit to an FBI polygraph test under conditions to which the FBI agreed but Ismail refused to participate in the polygraph, calling into question the veracity of his earlier statements. (Id.)

[41] Neither Hayat nor his family ever provided Ms. Mojaddidi with a list of people with whom Hayat played cricket, despite Ms. Mojaddidi's efforts to collect information from them about potential alibi witnesses, (Tr. 783:1-13), nor did Hayat tell Ms. Mojaddidi that he played cricket every day while in Pakistan. (Tr. 781:13-15).

play cricket or hang out at a store] doesn't mean that he could not have attended a camp at some point when he wasn't doing those things." [42] (W.M. Depo. 270:5-13; see Tr. 730:9-15).

### 1)    Any alibi defense would have had to account for shorter periods than the three months charged in the indictment.

Ms. Mojaddidi concluded that, to craft a viable alibi defense, she would likely have to find an alibi witness for every single day Hayat was in Pakistan during the 2003-2004, which she did not believe was possible. (Tr. 730:9-15). Hayat's expert, Mr. Broderick testified such a thing would "be almost impossible to do." (Tr. 399:1-3; 730:11-15). Ms. Mojaddidi's concerns about that task were undoubtedly informed by the uncertainty and inconsistency in Hayat's confession about exactly how long he was at camp, how long training lasted, how frequently others came and went from the camp, and how long he stayed in camp on an earlier occasion. (See Tr. 781:25-782:1). In her closing argument at Hayat's trial, Ms. Mojaddidi spent significant time discussing the inconsistency of Hayat's confession, including the shifting durations of the period he said he attended camp. (RT 4316-4317).

In his confession, Hayat repeatedly admitted he attended a camp in 2003-2004 for conflicting periods of at least "something like" or "maybe like" three months. (Gov. Sup. Ans. Ex. 8 at 2, 9, 11, 12, 15, 17, 18, 19, 21, 41, 52, 90-92). That ambiguity left open the possibility that he attended a camp for *less than three months*. Moreover, Hayat told agents that new trainees at the camp arrived every few weeks, suggesting that a stay, including his own, could last days or weeks. (Gov. Sup. Ans. Ex. 8 at 17, 73). At the time of Hayat's trial, Ms. Mojaddidi was aware of the wide variation in the duration of the period Hayat said or suggested he might have been at camp. (W.M. Depo. 49:5-14, 68:16-18, 162:18-19, 207:6-11; Tr. 743:2-4, 781:16-782:8).

Further complicating Ms. Mojaddidi's analysis of the potential for a viable alibi defense was Hayat's confession to agents that on an earlier occasion, in 2000, he attended a militant training camp

---

[42] Ms. Mojaddidi acknowledged that she did not consider whether depositions or affidavits from potential witnesses in Pakistan might have been useful in negotiations with the government. (W.M. Depo. 40:3-25). However, she also insisted that, while she was likely unaware of the possibility of pursuing Rule 15 depositions of Pakistani witnesses in 2005, she did not forego pursuing those potential witnesses for that reason. (Tr. 735:24-736:25). Rather, she assessed the Pakistani witnesses her investigation identified and determined they were not viable alibi witnesses. (Id.) Thus, the speculative likelihood of using Rule 15 depositions to preserve testimony, and the even more speculative and remote possibility that any such statements would have been admitted by this Court at trial, are not relevant. Moreover, Ms. Mojaddidi was aware in 2005 from her work in immigration cases of the severe challenges associated with attempting to obtain visas for foreign nationals to enter the United States under circumstances like those in this case. (Tr. 683:9-11, 735:24-736:12).

48

for a period of only three days. (Gov. Sup. Ans. Ex. 8 at 48-49, 50-52, 91; W.M. Depo 161:23-162:2, 270:10-271:10; Tr. 730:3-731:22). She knew the jury would see that, and they did. (See RT 419:23-420:15, 500:13-14, 501:9-13). She knew that evidence would add to the inconsistent evidence of the duration Hayat stayed at camp in 2003-2004, the period charged in the superseding indictment. (Tr. 781:16-782:8). Accordingly, she understood that, for an alibi defense to be effective in rebutting the inconsistent evidence of the duration of Hayat's time at camp, she would have to proffer witnesses who could account for as much of Hayat's 2003-2005 stay in Pakistan as possible. (Tr. 730:9-15). She also understood that, because of the length of Hayat's stay between 2003 and 2005, finding an alibi witness for every day was "a difficult argument to make." (Tr. 730:20-22). Indeed, Hayat's expert, Mr. Broderick, testified such a task would "be almost impossible to do." (Tr. 399:1-3; 730:11-15). Informed by the above factors, which the Magistrate Judge ignores or dismissed in a conclusory analysis, Ms. Mojaddidi made strategic decisions not to send an investigator to Pakistan to rove about in an unfocused, wasteful, and likely fruitless effort to locate other unidentified alibi witnesses. (W.M. Depo. 35:18-20).

**(i)   Ms. Mojaddidi knew jurors would hear recordings of Hayat describing the duration of camp as only 40 days.**

Having reviewed the evidence while preparing for trial, Ms. Mojaddidi correctly concluded that a successful alibi defense must account for all of the various time-periods the evidence supported as possible periods during which Hayat undertook militant training. Hayat's inconsistent descriptions of the duration of his stay armed prosecutors with evidence of many possible durations from as short as days or weeks, periods of months including a forty-day period, periods as long as "maybe" three months, and periods up to six months. The evidence did not *only* support a period of three months and no less. Ms. Mojaddidi knew that, and considered that in assessing the viability of an alibi defense. (See Tr. 732:2-10) (explaining the joint defense strategy "morphed" in response to the ongoing disclosure of discovery, affecting the viability of an alibi defense). Aware of that reality, Hayat insisted to the Magistrate Judge that Ms. Mojaddidi needed alibi testimony for no less than a three-month period, only. (OPHB at 20-27). His argument ignored the totality of the evidence and focused only on the evidence he preferred to consider. It also requires the conclusion that his jury found him guilty of

49

attending camp for no fewer than three months within the period charged in the second superseding indictment.  Of course, there is no way for Hayat to know that, and the totality of the evidence requires no such conclusion.

In addition to the wide variation in Hayat's confession for the duration of his stay at camp, jurors also heard a recorded call from March 2003, in which Hayat told Naseem Khan that training at a jihadi camp could take as few as forty days or successive forty-day periods.  (Gov. Sup. Ans. Ex. 2 at 7-8; RT 940).  Based on that evidence alone, the jury could have convicted Hayat if jurors concluded he attended a militant camp for only forty days, instead of one of the other various time periods he identified or suggested.  Similarly, a period of eighty days would have also satisfied the allegation in the second superseding indictment that Hayat attended a camp "during a period of months sometime between in or about October, 2003 and in or about November, 2004," and would have been consistent with the evidence presented at trial.  (See CR 162 ¶ 7; Gov. Sup. Ans. Ex. 2 at 7; RT 940).  Hayat ignores this evidence now but the jury heard testimony about it and the prosecutor discussed it during his closing argument—and, more important, Ms. Mojadiddi was aware of it when considering the merits of an alibi defense and the impossibility, which Hayat concedes (see Tr. 399:1-3; 730:11-15), of establishing an alibi through eye-witnesses for every day of his stay in Pakistan from 2003-2005.

Consistent with Ms. Mojadiddi's pretrial analysis, in the government's closing at Hayat's trial, the prosecutor reminded the jury of Hayat's March 2003 claim that militant training, at a camp in a region that included Balakot, could take a little as forty days, using the specific charging language of the second superseding indictment:

> Focus your attention first, ladies and gentlemen, on the March 11, 2003 recorded conversation with Naseem Khan. On that date, Hamid Hayat explained to Naseem Khan that training now was in Mansehra, Pakistan. Naseem Khan asked Hamid Hayat where he would go for jihad training, "In the Kashmir," he asked. Hamid Hayat stated, a number of times, "Mansehra. In the North West Frontier Province." *Hamid Hayat indicated that the camp was there even at that time, and that it involved 40 days of training, including training in weapons, training in physical fitness.*
>
> This, ladies and gentlemen, is significant, this statement of Hamid Hayat on March 11, 2003, because, remember this, Mansehra, Mansehra is a district in the North West Frontier Province, and that district includes the town of Balakot.

50

(RT 4245:5-19) (emphasis supplied). In another passage, the prosecutor also focused the jury on Hayat's statement to Khan about the length of militant training. The prosecutor argued, "Take a look at the conversation on March 11th. Hamid Hayat admiringly described the older brother of Qari Yaqoob *who went for 40 days of training* in Afghanistan." (RT 4232:12-13) (emphasis supplied).

The prosecutor also reminded the jury of the "various" time periods Hayat described for the militant training he undertook, and argued the evidence proved he attended militant training "sometime no early than October '03 and no later than November '04." (RT 4255:14-21, 4259:16-20). The prosecutor did not insist Hayat trained for no less than three months, and even if he had, the jury was entitled to rely on the evidence it heard and saw to determine Hayat's guilt. After summarizing the evidence supporting the conclusion that Hayat attended a camp, the prosecutor argued: "All of that evidence, in combination, points to the inescapable conclusion that Hamid Hayat attended a jihadi camp in Balakot in the 2003-2004 time period…." (RT 4266:13-16). In his final summary of the evidence, the prosecutor argued:

> In sum, the government has proven that Hamid Hayat had a jihadi heart and had a jihadi mind. Hamid Hayat pledged his belief in violent jihad. *He pledged to go to a jihadi training camp. And he went to a jihadi training camp in Pakistan*. When defendant did that, he knew and intended that his training and his person would be used to prepare for violent jihad in the United States. And when he came back to the United States, he concealed what he had done from the FBI with that same knowledge and with that same intent.

(RT 4284:3-11) (emphasis supplied). The prosecutor did not insist that the jury was required to find Hayat attended a camp for any specific period. Rather, he left them to decide whether the evidence proved that he attended a militant camp during the charged period. That included a period of forty days, which is more than one month, or eighty days, which is less than three-months.

The arguments made by the prosecutor in his closing were precisely the arguments Ms. Mojaddidi knew an alibi defense had to rebut but could not. Like Hayat's purported expert Mr. Broderick, Ms. Mojaddidi understood that presenting an effective alibi defense to cover a two-year period would "be almost impossible to do."[43] (Tr. 399:1-3; 730:11-15). She knew that trying to prove

---

[43] Cued by Hayat's counsel, Mr. Broderick retreated from his bold position and asserted that presenting an alibi defense

the negative that Hayat did not attend a militant camp for one and a half months, or eighty days, during a fourteen-month period was no easier task. She knew the evidence well. (W.M. Depo. 98:6-8). She had listened to the recordings of Hayat's conversations Khan, and therefore knew Hayat described a training-period of less than three months to Khan.[44] (See, e.g., 734:25-735:2). In her 2014 and 2018 testimony, she tried to express the consequence of that knowledge. (See W.M. Depo. 270:2-13; Tr. 730:11-15). She understood the government's written accusation did not define the proof at trial. Rather, she understood the reverse was true, and the evidence at trial either satisfied the written accusation or not. (Id.)

> **(ii)** **The Magistrate Judge dismissed Ms. Mojaddidi's knowledge of evidence Hayat might have attended camp for only 40 days in a conclusory analysis and did not consider it in evaluating the reasonableness of her conduct, denying her the presumption of adequate performance.**

Despite the above facts, the Magistrate Judge asserted "this court cannot imagine how a reasonable attorney should have assumed a jury might credit this one general statement when it considered the length of time Hayat attended a training camp. Reasonable counsel would have known that there was no evidence to support a jury finding that Hayat's attendance at a jihadi camp during the 2003/2004 period alleged in the indictment was anything less than three months." F&R at 21. The Magistrate Judge's conclusory analysis simply ignores the evidence of the varying time periods Hayat might have attended camp, Ms. Mojaddidi had to account for in assessing the viability of an alibi defense. As set forth above, Ms. Mojaddidi knew her client had offered inconsistent explanations of the duration of his stay at camp. She testified she reviewed the evidence and believed she knew it better than anyone. Based on her evaluation of the evidence, she feared the government might simply argue "that just because [Hayat] did those things [such as play cricket or hang out at a store] doesn't mean that

---

for a three-month period would be "moderately easy," which he then shifted to "very easy." (Tr. 402:15-25). In any case, Mr. Broderick's flawed opinion reversed the presumption of adequate performance, presumed Ms. Mojaddidi was ineffective, and asserted a standard in the "perfect situation." (Tr. 396:23).

[44] Moreover, it is a matter of fact—however inconvenient to Hayat's position in this matter—that any 40-day period would encompass parts of more than one month and, thus, constitute a "period of months." The superseding indictment did not allege that the period of months at issue was one that included more than two complete months. Consequently, the jury could have convicted Hayat at trial, consistent with the allegation in the superseding indictment, if it found he attended a camp for 40 days—which was supported by the evidence presented at trial and argued by the prosecutor in closing.

he could not have attended a camp at some point when he wasn't doing those things." (W.M. Depo. 270:5-13; see Tr. 730:9-15). That is, essentially, what the government argued at trial.[45] (See RT 4266:13-16) ("All of that evidence, in combination, points to the inescapable conclusion that Hamid Hayat attended a jihadi camp in Balakot in the 2003-2004 time period…..").

The Magistrate Judge's conclusory analysis erroneously dismissed any possibility Ms. Mojaddidi could have been reasonably concerned about the government capitalizing on the inconsistent evidence of the duration of Hayat's stay at camp to prove he went to camp for the shortest possible period supported by the evidence. F&R at 21 n. 12 ("even if there is some basis for an attorney to have thought that the jury could have found Hayat's attendance at the camp was as short as 40 days, that fact would not excuse Mojaddidi's failure to investigate Pakistani alibi witnesses."). Yet, the Magistrate Judge's narrow view of this fact contradicts Strickland's "presumption that, under the circumstances, the challenged action might be considered sound trial strategy." 466 U.S. at 689. It also flatly ignores Ms. Mojaddidi's testimony that she was concerned precisely about that threat. (W.M. Depo. 270:5-13; see Tr. 730:9-15).

The possibility that Hayat stayed in camp for only 40 days, or less, would not, alone, "excuse" Mojaddidi's decision to shift to an alternative defense. Rather, it is one of many data points, set forth above, that the Magistrate Judge failed consider in evaluating the reasonableness of Ms. Mojaddidi's investigation of a potential alibi defense and her strategic choice to shift to an alternative defense. The full record demonstrates that reasonableness of Ms. Mojaddidi's strategic choice. She sought information about alibi witnesses from Hayat and his family. She interviewed those potential alibi witnesses, including at least two in Pakistan, and made reasonable judgments that they were not viable alibi witnesses. She studied the evidence and knew Hayat offered inconsistent descriptions of the duration of his time at camp, and that he had admitted traveling to camp in 2000 for only three days. She knew the jury would hear that.

---

[45] Consistent with Ms. Mojaddidi's testimony, the government charged the material assistance offense against Hayat using an approximate period that accounted for the conflicting evidence, and crafted its closing arguments to avoid insisting on a particular period, leaving the jury to make that determination. In light of all of the evidence and Ms. Mojaddidi's reasonable efforts to investigate a potential alibi defense, her independent decision to pursue an alternative defense strategy was sound and well within the scope of competent representation.

53

She also knew Hayat told agents that his cousins, uncle, and a friend in his village went to camp, and that others in the village were aware.  She knew the jury would hear that.  Thus, she knew the people in Hayat's village who would be the most likely alibi witness possibilities would not be particularly valuable in that role because the government could argue: "Of course they would lie for Hayat, they are the same people who Hayat admitted knew he was at the camp."  Ms. Mojaddidi knew Hayat told agents his close family knew he went to camp, and she knew Hayat's father confirmed many aspects of Hayat's confession, including facts complicating a viable alibi defense.  She knew the jury would hear what Hayat said.  She studied FBI reports, including those containing derogatory information about certain potential alibi witnesses.  She knew that material would support effective cross-examinations.  She also heard Hayat's recorded calls with Khan about the duration of training at camp, and she knew the jury would hear those calls.

Viewing the complete record from Ms. Mojaddidi's perspective at the time, and properly applying the presumption of adequate performance, this Court can and should conclude that Ms. Mojaddidi possessed sufficient information, after reasonable investigation, to shift from attempting a near impossible alibi defense to a more viable alternative defense.  See Strickland, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").  The Magistrate Judge's conclusory evaluation, which applied an erroneous standard and was overly reliant on Mr. Broderick's faulty opinion, simply denied Ms. Mojaddidi the "fair assessment" Strickland requires.  See id.  This Court should reject the Magistrate Judge's conclusion.

> **c.    Ms. Mojaddidi discussed with Mr. Griffin the value of a potential alibi defense for both defendants but both attorneys ultimately agreed that it was not a sound defense strategy.**

Ms. Mojaddidi exercised her own independent judgment in making the decision to pursue an alternative defense strategy over an alibi defense, based on the totality of facts known to her and based on her belief that it would be in the best interests of Hayat.  (W.M. Depo. 172:5-174:1; Tr. 734:3-6, 732:8-15).  She spoke to Mr. Griffin about the possibility of pursuing an alibi defense.  (Tr. 731:23-732:15).  She testified that Mr. Griffin "obviously" thought that an alibi defense might help Umer

54

because in Umer's videotaped confession Umer admitted taking Hayat to a militant camp. (Tr. 732:8-15) Thus, alibi witnesses who could help prove the negative that Hayat did not attend a militant camp could have helped Umer's defense as well as Hayat's. (Tr. 732:1-733:6; W.M. Depo. 51:5-23).

Ms. Mojaddidi also testified that the evidence disclosed by the government influenced her considerations about which defense strategy to pursue and her conclusions "may have morphed over time." (Tr. 732:2-7). She and Mr. Griffin discussed defense strategy in light of the evidence and their assessment of the soundness of potential alibi witnesses. (Tr. 732:1-15). After they received most of the discovery from the government, they concluded the evidence "was lacking," and that pursuing as fast a trial possible and challenging the sufficiency of the evidence "made sense." (Tr. 735:6-13). Ms. Moajddidi also noted that recordings made by Khan included mention of Hayat's uncle and grandfather, two of the potential alibi witnesses she considered who also lived in Pakistan, and "certainly affected her decision" to pursue an alternative defense strategy. (Tr. 734:15-735:5). Thereafter, she and Mr. Griffin independently elected to shift to a sufficiency of the evidence defense strategy and committed to pushing for as fast a trial as possible. (Tr. 735:10-13, 732:1-15). Ms. Mojaddidi's decision was sound.

### 2. Ms. Mojaddidi decided to concentrate on a constitutionally effective challenge to the government's evidence and burden of proof.

In making the decision to shift away from an alibi defense and pursue an alternative defense, Ms. Mojaddidi considered advice from Mr. Griffin, but ultimately exercised her own independent judgment. (W.M. Depo. 172:5-173:22; Tr. 734:3-6). She did not make that decision because Mr. Griffin told her to do so and she did not feel compelled to follow Mr. Griffin's advice. She made her own independent professional decision based on the totality of facts known to her and based on her belief that it would be in the best interests of Hayat.[46] (W.M. Depo. 173:23-174:1; Tr. 732:1-15, 735:6-13).

Ms. Mojaddidi reasonably concluded, based on investigation and her professional judgment, that pursuit of an alibi defense was not the best strategic course. Ms. Mojaddidi appropriately turned to Hamid and his family to identify potential alibi witnesses and she followed-up and assessed those identified alibi witnesses. See Strickland, 466 U.S. at 691 ("Counsel's actions are usually based, quite

---

[46] At her deposition Ms. Mojaddidi denied that she ever told Mr. Riordan she believed Hamid "ought to go on the offense and prove his innocence through affirmative alibi witnesses." (W.M. Depo. 265:14-18). In 2018, she testified she initially considered an alibi defense but changed course after reviewing the evidence. (Tr. 732:1-15).

properly, on … information supplied by the defendant … In particular, what investigation decisions are reasonable depends critically on such information."). Ms. Mojaddidi spoke with the identified alibi witnesses and concluded they would not make good witnesses and might even be harmful to Hayat's defense. See id. (counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). Ms. Mojaddidi was "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." Harrington, 562 U.S. at 107.

Strickland's approach toward investigation "reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." Rogers v. Zant, 13 F.3d 384, 387 (11th Cir. 1994). "[G]iven the finite resources of time and money that face a defense attorney, it simply is not realistic to expect counsel to investigate substantially all plausible lines of defense." White v. Singletary, 972 F.2d 1218. 1224 (11th Cir. 1992). "A reasonably competent attorney often must rely on his own experience and judgment, without the benefit of a substantial investigation, when deciding whether or not to forego a particular line of defense. . . ." Id. In addition, "[o]nce counsel reasonably selects a defense, it is not deficient performance to fail to pursue alternative defenses." Rios v. Rocha, 299 F.3d 796, 807 (9th Cir. 2002); Phillips v. Woodford, 267 F.3d 966, 980 (9th Cir. 2001). "The law does not require counsel to raise every available nonfrivolous defense." Knowles, 556 U.S. at 127. "[C]ounsel's reliance on particular lines of defense to the exclusion of others--whether or not he investigated those other defenses--is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable." Chandler v. United States, 218 F.3d 1305, 1318 (11th Cir. 2000) (*en banc*).

**(i)    The Magistrate Judge's erroneous denial of deference to Ms. Mojaddidi's strategic decision was a misapplication of the Strickland standard.**

Here, Ms. Mojaddidi made a reasonable professional judgment to forego further efforts to identify and interview unidentified and undisclosed potential alibi witnesses in Pakistan to pursue a speedy trial/reasonable doubt defense. Her judgment is entitled to "a heavy measure of deference." See Strickland, 466 U.S. at 691. Yet, the Magistrate Judge denied Ms. Mojaddidi that deference, instead applying a re-written standard derived from erroneous reliance on overruled and inapposite case law.

See F&R at 24:4-7, 105:18-19 (relying on erroneous citation and asserting that deference owed to trial counsel may be diminished or denied if counsel lacks significant experience). That distorted legal standard is plainly erroneous. Compare Strickland, 466 U.S. at 679-683 (summarizing Court of Appeals decision) with Strickland, 466 U.S. at 691 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments").

Moreover, the Magistrate Judge's misplaced focus on the speculative possibility that Ms. Mojaddidi might have used Rule 15 depositions to gather information from potential alibi witnesses, results from that court's denial of the deference due to her strategic decision to shift defense strategies after determining an alibi defense was not viable. Ms. Mojaddidi insisted that, while she was likely unaware of the mechanism to use Rule 15 depositions to develop testimony from potential Pakistani alibi witnesses, she did not forego pursuing potential witnesses in Pakistan for that reason. (Tr. 735:24-736:25). Rather, she assessed the alibi witnesses her investigation identified and concluded they were not viable.[47] (Id.) Consequently, the speculative possibility of using Rule 15 depositions to obtain testimony, and the much more speculative and remote possibility this Court would have admitted any of that testimony at trial, are not relevant. That is especially the case in light of Ms. Mojaddidi's knowledge, at the time of trial, that Hayat admitted to agents that his family members knew he attended camp, some of his family members and at least one friend in Pakistan had also attended a camp, and members of his village in Pakistan knew his friend attended camp.[48]

"[T]he relevant inquiry under Strickland is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." Babbitt v. Calderon, 151 F.3d

---

[47] The Magistrate Judge concedes Mr. Riordan's testimony recounting Ms. Mojaddidi's alleged statements to him is hearsay and may only be used to impeach her. F&R at 27 n. 15; 108 n. 51. Yet the Magistrate Judge quotes Riordan's testimony as direct, substantive evidence despite that acknowledgment, including that Ms. Mojaddidi allegedly told Riordan she felt an alibi defense would not work because there was "simply no way she knew of to obtain that testimony." F&R at 27:24-28:1 (citing Tr. 798, 815). The Magistrate Judge's reliance on impeachment evidence as substantive evidence is legal error. See United States v. Beltran-Gutierrez, 19 F.3d 1287, 1289-90 (9th Cir. 1994) (illustrating difference between impeachment evidence and direct evidence in Fifth Amendment context); United States v. Crouch, 731 F.2d 621, 623 (9th Cir. 1984) (impeachment evidence may not be used to present otherwise inadmissible substantive evidence); see also Dowell, Inc. v. Jowers, 166 F.2d 214, 218 (5th Cir. 1948) (stating impeachment evidence "can have no probative value; it affects only the credibility of the witness impeached."). This *additional* legal error further undermines the Magistrate Judge's analysis and any finding of Constitutional error. This Court should reject that analysis and those conclusions.

[48] (Gov. Sup. Ans. Ex. 8 at 37, 75-76, 77-78, 107; 119-23, 166, 169-70, 183-87; see W.M. Depo. 161:23-162:2; Tr. 728:6-8; Tr. 733:2-6, 734:10-21).

57

1170, 1173 (9th Cir. 1998) (rejecting "several arguments predicated upon showing what defense counsel could have presented, rather than upon whether counsel's actions were reasonable."); Siripongs v. Calderon, 133 F.3d 732, 736 (9th Cir.1998) (same); see also White v. Singletary, 972 F.2d at 1220-21 ("[t]he test [under Strickland] has nothing to do with what the best lawyer would have done.  Nor is the test even what most good lawyers would have done;" instead, courts ask "only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.")  Here, it is irrelevant that Ms. Mojaddidi didn't pursue speculative Rule 15 depositions.  What is relevant is the long list of factors supporting her reasonable decision to shift from pursuit of an alibi defense to a more viable defense, after investigating potential alibi witnesses.

The Magistrate Judge's failure to give deference to Ms. Mojaddidi's judgments in evaluating an alibi defense fueled that court's focus on what else Ms. Mojaddidi could have done, instead of what she actually did.  The Magistrate Judge describes the record as "sparse" concerning Ms. Mojaddidi's efforts to evaluate alibi witnesses.  F&R at 31.  But the opposite is true: the full record demonstrates her thorough efforts to interview every potential alibi witness she was directed to or whom she discovered herself.[49]  Contrary to the Magistrate Judge's conclusory analysis, Ms. Mojaddidi's effort to evaluate the viability of an alibi defense did not merely "begin and end" with questioning Hayat and a few family members.  See F&R at 32.  Rather, Ms. Mojaddidi considered all of the witnesses who were identified to her and whom she independently identified.  She filtered that consideration through her deep knowledge of the evidence, including Hayat's statements (confirmed by Umer in many respects) to investigators that effectively excluded many close and extended family members from consideration as alibi witnesses, as well as certain villagers he claimed knew that he or others attended a militant camp.  On that basis, she concluded the evidence was more hurtful than helpful.  See Rector v. Johnson, 120 F.3d 551, 564 (5th Cir. 1997) ("a tactical decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable, and therefore does not amount to deficient performance.")

Instead of focusing on Ms. Mojaddidi's many affirmative efforts to develop and evaluate an alibi

[49] (See, e.g., W.M. Depo. 34:3-12, 35:6-25, 148:18-154:12, 161:15-20, 168:3-170:13, 172:8-24, 186:4-17, 189:12-190:7, 190:8-191:16, 273:6-12; Tr. 727:16-20, 728:1-19, 729:1-17, 731:4-733:6).

defense—and giving deference to those considered judgments, the Magistrate Judge's conclusory analysis dismisses those efforts, reversing the presumption of adequate performance and aggravating that error by also denying Ms. Mojaddidi's strategic decisions any deference whatsoever.  The Magistrate Judge shrugs off the government's argument concerning the failure of Hayat's purported alibi witnesses—all family or close friends—to come forward at the time of trial.[50]  See F&R at 32.  However, it is not unreasonable for Ms. Mojaddidi to have expected Hayat's family and friends to tell her about alibi information they possessed when: (i) they knew Hayat had been arrested; (ii) they knew he had counsel who had been in contact with individuals in or near Hayat's village; and (iii) in some cases, they had actually spoken to Ms. Mojaddidi or someone in contact with her *before trial*, as was the case for *all* of the live alibi witnesses at the 2018 hearing.[51]  Indeed, courts have generally rejected ineffectiveness claims based on alibi witnesses who never came forward until after conviction, and whom the defendant did not identify as alibi witnesses.  See Bieghler v. McBride, 389 F.3d 701, 708 (7th Cir. 2004) (rejecting ineffective assistance claim when alibi witness "did not come forward before or during trial and that she was discovered by chance later on."); Williams v. Armontrout, 912 F.2d 924, 933 (8th Cir. 1990) (denying ineffectiveness claim when alibi witness "did not come forward until ten months after Williams was convicted.").  Here, the decisions by Ms. Mojaddidi fell well within the spectrum of reasonable decision-making.

Further, it is irrelevant that Hayat has proffered declarations from other relatives and close friends in support of his alibi defense, well after he was convicted and sentenced to more than 20 years

[50] On this point, the Magistrate Judge again relies on less than persuasive authority, two inapposite, unpublished, and out-of-circuit decisions. See F&R at 32 (citing Butler v. McEwen, No. CV 11-3543-DDP(RNB), 2014 WL 2566069, at *33 (C.D. Cal. Feb. 20, 2014) and Adams v. Quarterman, 324 F. App'x 340, 348 (5th Cir. 2009)).  Even assuming any persuasive value, both are distinguishable.  In Butler, the court found counsel ineffective for ending an alibi investigation of individuals at a party at a specific location in a six-hour period who saw the petitioner leave the party to go home, corroborating his post-arrest denial and his statement about where he was at the time of the crime.  2014 WL 2566069, at *26-33.  Adams, dealt not with an alibi defense at trial but mitigation at a death penalty sentencing in which counsel failed to interview "five or six" siblings of the defendant he knew existed, and in which counsel's conduct was governed by specific standards.  324 F. App'x at 345 n. 17.  Unlike those cases, Ms. Mojaddidi evaluated everyone about whom she learned and took steps to find others.  Her efforts included interviews of individuals across the globe in Pakistan and consideration of derogatory information, including from her client's confession, about potential local and foreign alibi witnesses.  The Magistrate Judge's reliance on those inapposite cases is misplaced.

[51] (See Tr. 949:9-950:20, 951:12-18, 952:1-10, 977:1-25, 1012:24-1014:7, 1013:13-18, 1011:20-24, 997:1-25, 1043:1-1045:11, 185:10-186:21, 363:11-364:4, 325:18-25).  The fact that each of the purported alibi witnesses who testified at the 2018 hearing had contact with Ms. Mojaddidi or someone in contact with her, *before* Hayat's trial, and never offered any alibi testimony, weighs heavily against the credibility of their recent claims.

of imprisonment.  (See Def. Exs. S-JJ).  The relevant legal question is whether Ms. Mojaddidi's decision was reasonable at the time she made it, which it was.  The law is clear:

> Once we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced. Nor do we need to decide whether the information that would have resulted from further investigation would have necessarily been used at trial by every reasonable lawyer who was armed with such information. If the act of conducting no investigation of a particular defense is reasonable, the matter is closed; there can be no question about the reasonableness of having failed to present evidence of which the lawyer was unaware as a result of a reasonable decision to investigate no further.

Rogers, 13 F.3d at 388; see also Chandler, 218 F.3d at 1317 n. 20 ("basing the inquiry on whether an investigation (if one had been undertaken) would have uncovered mitigating evidence (or witnesses) is an example of judging counsel's acts from the benefit of hindsight");  Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir. 1995) (*en banc*) (noting that "[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel" and that "with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings").

Finally, the Magistrate Judge suggests this Court has already concluded that Ms. Mojaddidi's investigation of an alibi defense was unreasonable.  See F&R at 32 n. 18.  That is not so.  This Court did not rule expressly on that issue.  Rather, it determined that Hayat failed to show prejudice, obviating the need to expressly rule on the first step of the Strickland analysis.[52]  Specifically, this Court stated that Hayat gave Mojaddidi "enough information for her to have conducted a more thorough investigation of a potential alibi defense." (CR 600 at 17).  This Court's analysis was based on facts developed during the summary judgment phase, more than a year before the 2018 evidentiary hearing.  That record included a less developed analysis by the parties of each factor affecting Ms. Mojaddidi's evaluation of an alibi defense, including facts concerning the silence of the alibi witnesses who testified in 2018 during their pre-trial contact with Ms. Mojaddidi or others in touch with her.  On the expanded record,

---

[52] "A court may decline to reach the performance prong of the ineffective assistance test if convinced that the prejudice prong cannot be satisfied."  Waters v. Thomas, 46 F.3d at 1510.

this Court should conclude that Ms. Mojaddidi's investigation of the alibi defense was reasonable.

Ms. Mojaddidi made an informed and reasonable decision to shift from a near-impossible alibi defense, after evaluating information Hayat provided and that she developed on her own, to pursue the more viable defense of an insufficient evidence strategy. As a result, what she might have discovered had she decided to send an investigator to Pakistan is legally irrelevant to a determination of her constitutional effectiveness. The record establishes that Ms. Mojaddidi's decisions were reasoned and strategic given what Hayat and his family told her about potential alibi witnesses, and her consideration of all of the facts and evidence.

Accordingly, this Court should deny Hayat's ineffective assistance of counsel claim and need not consider evidence of alleged prejudice.

### C. Hayat has not established prejudice from Ms. Mojaddidi's failure to investigate the alibi defense in Pakistan.

Even if the Court considered Hayat's prejudice argument, which it need not do, he cannot demonstrate that the outcome of his trial would have been any different if Ms. Mojaddidi had called the six witnesses he presented at the 2018 evidentiary hearing, all of whom were his family members or close friends, and all of whom offered inconsistent and unbelievable "alibi" testimony on his behalf. Nor do the 2014 declarations from other witnesses Hayat proffered establish prejudice. Indeed, even applying the flawed legal analysis discussed above, the Magistrate Judge correctly found that those declarations are unreliable and cannot establish prejudice. See F&R at 49. Consequently, this Court need not consider them. In any event, the process by which they were collected, along with the bias of the declarants, reveal the unreliability of those hearsay writings. Hayat cannot demonstrate prejudice and his claim must fail.

Hayat bears the burden of establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 669. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Strickland asks "whether it is 'reasonably likely' the result would have been different." Harrington, 562 U.S. at 111. This does not require a showing that counsel's actions "'more likely than not altered the outcome,' but the difference between Strickland's prejudice standard and a more-probable-than-not

standard is slight and matters 'only in the rarest case.'" Id. at 112. "The likelihood of a different result must be substantial, not just conceivable." Id. Hayat cannot meet his burden.

### 1. The testimony of the live alibi witnesses and deponents was unreliable, would not have altered the evidentiary picture at trial, and cannot carry Hayat's burden to demonstrate prejudice.

At the 2018 hearing, Hayat presented testimony from six purported alibi witnesses, two of whom testified in person, his younger sister Raheela Hayat, and his first cousin Jaber Ismail. (Tr. 123-189, 299-364). The others testified in Rule 15 depositions, via video-conference from Pakistan, during evening court sessions. (Tr. 926-982, 994-1045). On cross-examination, the government impeached all six including by eliciting testimony that, knowing the charges against Hayat before his trial, they failed to come forward as alibi witnesses until the new trial motion (Jaber Ismail) or the filing of his *habeas* petition (the others). See Cuevas v. Henderson, 801 F.2d 586, 591 (2d Cir. 1986) (approving of impeachment of purported alibi witnesses at trial with failure to come forward); Thomas v. Scully, 854 F.Supp. 944, 959-60 (E.D.N.Y. 1994) (stating that alibi witness's "failure to disclose such information until the time of the trial is a factor a jury should consider in assessing the weight to be given to the testimony") (internal quotations and citation omitted). The Magistrate Judge ignored those cross-examinations in summarizing the witnesses' testimony. See F&R at 38-41.

Instead of discussing the witnesses' failure to share their purported alibi information with Ms. Mojaddidi through Hayat's mother (who was in touch with the witnesses after Hayat's arrest), the Magistrate Judge emphasized that the witnesses had no duty to come forward. See F&R at 50. Yet, even after conceding such a failure is a proper consideration in evaluating credibility, the Magistrate Judge did not consider how the witnesses' failure to share alibi information with Hayat's mother (who was in touch with Ms. Mojaddidi before Hayat's trial), sometimes intentionally, affected their credibility. See id. Rather, the Magistrate Judge simply "reject[ed] the government's repeated argument that these witnesses should be disbelieved because they did not come forward sooner." Id.

Notwithstanding the Magistrate Judge's conclusory analysis, the consequences of the witnesses' post-charge, pre-trial communications with Hayat's mother are clear: either (1) Hayat and his family knew of alibi witnesses and declined to identify them to Ms. Mojaddidi, despite her requests; or (2) the purported alibi evidence offered by those witnesses was simply fabricated long after Hayat's

62

conviction.[53]  Faced with those two possibilities, it is clear jurors would have treated any purported alibi testimony  from witnesses who waited a decade to disclose to *habeas* counsel, despite being in contact with trial counsel at the time of the charges, for what it seems:  a recent fabrication.

### a.      The four deponents' testimony did not establish prejudice.

All four of the deponents, Muhammad Anas, Rafaqat, Dr. Fahim, and Tayyaba Fahim, submitted a declaration in 2014 in support of Hayat's petition.  (See Def. Ex. T, Z, EE, and II).  Their testimony at the hearing was no more reliable in 2018.  While the Magistrate Judge swore all four under United States law, none was subject to the reach of a United States judicial authority because each testified via video-conference from Pakistan and was effectively immune from perjury charges.  The inherent unreliability of that testimony fatally undermines its credibility.  The Magistrate Judge found the government failed to preserve objections to the form of oath administered to the deponents and failed to remedy the specter of sanction-free perjury that arose from permitting remote testimony from Pakistan. That is not so.

Before the 2018 evidentiary hearing, the government moved *in limine* to exclude the testimony of all of the purported alibi witnesses and opposed Hayat's motion for Rule 15 depositions.  (See CR 644, 678).  In its opposition to Hayat's Rule 15 motion, the government argued the ineffectiveness of a domestic oath to insure the reliability of the testimony of foreign deponents.  (See CR 678 at 14).  At the hearing, the government preserved all of its pre-hearing objections in its motions *in limine*, after a colloquy with the Magistrate Judge.  (Tr. 8:5-16).  This Court should find that the failure of the domestic oath as a means to insure the reliability of the deponents' testimony undermines the credibility of such testimony.

///

///

///

---

[53] Hayat's family would have no reason to hide helpful evidence from Ms. Mojaddidi.  That is why the witnesses' post-charge, pretrial contact with Hayat's mother are so troubling.  It necessarily implies that the recent testimony is false because there is no credible explanation for a family member or close friend to withhold helpful testimony in circumstances like Hayat's prosecution.  Of course, if any witness *refused* to speak with Ms. Mojaddidi, through Hayat's mother or otherwise, she cannot have been ineffective for not securing and presenting that testimony, and Hayat cannot now rely on a witness who was then unwilling to come forward to demonstrate prejudice.

**1)    Establishing prejudice from Rule 15 deposition testimony is speculative because this Court would likely not have permitted the depositions or admitted the testimony at trial.**

As a threshold matter, it is unlikely this Court would have approved a pretrial motion to conduct Rule 15 depositions in Pakistan in 2005. Thus, the substance of the deponents' 2018 testimony is irrelevant and cannot establish prejudice. Indeed, the legal threshold to warrant foreign depositions is as steep as the practical challenges of conducting them. For the same reasons the Magistrate Judge denied Hayat's 2017 motion to take Rule 15 depositions in Pakistan—including danger, expense, and extraordinary logistical challenges—this Court would likely have also denied such a motion in 2005.[54] See CR 683 at 9. The possibility of video-depositions being ordered in 2005 is also speculative and unlikely. Even if technology permitted, Hayat can only speculate whether this Court would agree to permit such an unusual procedure. The 2018 depositions took place in open court between approximately 6pm and 10pm over several evenings. (See CR 705-706.) Even if Hayat had persuaded this Court to permit Rule 15 depositions in Pakistan, by video-conference, written interrogatory, or otherwise, he can only speculate about whether this Court would have admitted any resulting testimony at trial. See Rule 15(f) ("An order authorizing a deposition to be taken under this rule does not determine its admissibility. A party may use all or part of a deposition as provided by the Federal Rules of Evidence"). Accordingly, Hayat's effort to demonstrate prejudice from a failure to present testimony obtained by Rule 15, at the time of trial, is purely speculative.

**b.    The deponents claimed firm memories of ordinary interactions with Hayat nearly 15 years earlier, frequently contradicted their own testimony and that of others, admitted their bias, and conceded their poor recollection of other facts from the same period.**

In sum, all four deponents claimed to remember seeing Hayat too frequently between April 2003

---

[54] Foreign depositions are permitted only in "exceptional circumstances [where] it is in the interest of justice that the testimony of a prospective witness be taken and preserved for possible use at trial." United States v. Omene, 143 F.3d 1167, 1170 (9th Cir. 1998); Fed. R. Crim. P. 15(a). "The words 'exceptional circumstances' bespeak that only in extraordinary cases will depositions be compelled." United States v. Dillman, 15 F.3d 384, 389 (5th Cir. 1994). Depositions are disfavored in criminal cases, United States v. Milian-Rodriguez, 828 F.2d 679, 686 (11th Cir. 1987), and foreign deposition testimony, because of the absence of a sanction for perjury, is generally "suspect." United States v. Alvarez, 837 F.2d 1024, 1029 (11th Cir. 1988). The burden of proof on a Rule 15 motion rests upon the movant. United States v. Zuno-Arce, 44 F.3d 1420, 1424-25 (9th Cir. 1995). The district court has "broad discretion" in granting or denying the motion. United States v. Puchi, 441 F.2d 697, 701-02 (9th Cir. 1971).

and May 2005 for him to have left Behboodi for months of training at a jihadist camp. However, those incredible claims failed on cross-examination. Each made concessions and admissions that undermined any claim of specific memories of ordinary, daily interactions with Hayat—over a two year period between 13 and 15 years earlier—while being unable to remember any special occasions or events with him.[55] The testimony could not have changed the evidentiary picture at Hayat's trial, could not have rebutted Hayat's confession, and cannot demonstrate prejudice to support Hayat's *habeas* claim.

### 1) Muhammad Anas.

Muhammad Anas is Hayat's maternal uncle. His testimony provided no true alibi because he admitted his memory of seeing Hayat between April 2003 and May 2006 was only approximate. Thus, nothing he said rebutted Hayat's confession that he trained at a jihadist camp between November 2003 and December 2004. Such testimony could not have changed the evidentiary picture at trial and cannot demonstrate prejudice to support Hayat's *habeas* claim.

Anas claimed on direct that between 2003 and 2005—15 to 13 years earlier—he recalled the longest period of time that passed during which he did not see Hayat was one week. (Tr. 936:8). At the time, Anas was a busy teacher, instructing courses in "Islamic studies and Urdu language." (Tr. 942:2-19, 941:2-25). He taught "five days or six days" per week. (Id.) He was also recently married and had young children. (Tr. 943:1-25). Despite the demands on his time, Anas claimed he made a weekly, 90-minute round trip drive from Rawalpindi to Behboodi, for no special purpose, where he saw Hayat. (Tr. 935:3-7, 942:20-943:12). He testified his children were in school and would not always accompany him on those trips. (Tr. 942:24-943:19). However, he later corrected himself after remembering that his children were not yet in school in 2003, so they must have accompanied him. (Tr. 943:23-945:9). The exchange emphasized what Anas would later admit: his memory of how he spent each day or week between April 2003 and May 2005 was unclear and could not support his claim that he remembered, in 2018, seeing Hayat weekly during that period, 15 years earlier.

---

[55] Each of the deponents failed the memory standard offered by Hayat's lead *habeas* counsel in his testimony at the 2018 hearing that: people recall facts that are unusual and important, such as arguing before the Supreme Court of the United States or representing famous clients. (See Tr. 888:17-889:18). The deponents claimed the opposite: that they recall in detail, after the passage of 13 to 15 years, typical, ordinary, and mundane interactions with Hayat nearly every day for almost two years. Those claims defy common sense and are objectively unreasonable.

On cross-examination, Anas conceded his memory was worse in 2018 than in 2014 or earlier, admitting, "the age, you know, your memory goes down." (Tr. 954:1-4). Concerning his claim that he saw Hayat every week between 2003 and 2005, Anas admitted his recollection was only approximate, undermining any claim his testimony could rebut and overcome Hayat's recorded confession. (Tr. 955:9-956:8). Anas also admitted he did not remember every week of the period, and it was "possible" he "might have missed a week." (Tr. 955:17-19). Struggling to answer whether he might have missed more than one week, Anas admitted he could not be sure, and explained, "[l]ook, look, so much time has passed. It – look, so much time has passed in-between, so I cannot give you the exact. But I can say a week, ten days, not more than that." (Tr. 955:25-956:2). Anas' concession that his memory is simply unclear because of the passage of time shows his testimony could not have rebutted Hayat's confession. The government then attempted to ask Anas, "[s]o is it fair to say that you don't remember every week between 2003 and 2005 seeing Hamid Hayat?" Hayat's counsel objected to the question, claiming it was asked and answered. (Tr. 956:3-8). The Court sustained the objection and instructed the witness not to answer. (Id.) It is clear from Anas's prior answers that, if permitted to respond, he would have conceded he did not remember seeing Hayat every week for two years.

Anas also admitted facts demonstrating his strong bias in favor of his nephew. (Tr. 956:9-18). He admitted he is married to Hayat's mother's sister. (Id.) He admitted he wanted to help Hayat with his testimony. (Id.) He admitted he "absolutely" did not want Hayat to be in prison any longer. (Id.) He insisted Hayat was not guilty of any crime. (Id.) He admitted he would do "whatever is in [his] control" to help Hayat. (Id.)

Anas admitted he learned Hayat had been arrested and charged in the summer of 2005. (Tr. 949:9-950:20). He admitted he spoke to Hayat's mother every 10 or 15 days after Hayat was charged, "and sometimes more than that too." (Tr. 951:12-18). Anas admitted he discussed Hayat's case with Hayat's mother after Hayat was charged, and that he expressed interest in Hayat's case. (Tr. 952:1-10). Curiously, however, Anas claimed he would "especially" not discuss Hayat's lawyer with Hayat's mother.[56] (Id.)

---

[56] Anas's testimony that he spoke to Hayat's mother frequently about the charges against Hayat shows that either (1) Hayat's family was aware of potential alibi witnesses and did not share them with Ms. Mojaddidi, despite her requests; or (2)

### 2)     Rafaqat.

Like Anas, Rafaqat claimed on direct that between 2003 and 2005—15 to 13 years earlier—he recalled the longest period of time that passed in which he did not see Hayat was one week.  (Tr. 964:3-9).  Rafaqat also testified he saw Hayat every day he was in Behboodi between 2003 and 2005 and that Hayat never left the village for more than three months.  (Tr. 960:12-14, 964:3-9).  However, also like Anas, Rafaqat's claims did not withstand cross-examination.  Rafaqat admitted he was unable to recall facts about significant events, which undermined his memory claims concerning his ordinary, daily interactions with Hayat.  His testimony could not have changed the evidentiary picture at Hayat's trial, could not have rebutted Hayat's confession, and cannot demonstrate prejudice to support Hayat's *habeas* claim.

On direct, Rafaqat offered contradictory testimony, including that Hayat did *not* play cricket every day, but stated, "we would play, normally, every day, because that was our routine."  (Tr. 963:1-5).  On cross-examination Rafaqat undermined his claim that he remembered seeing Hayat every week he was in Behboodi from 2003 to 2005 by being unable to recall other, more significant events and by contradicting the testimony of others who claimed they saw Hayat every day during the same period.  For example, Rafaqat could not recall whether he attended Nawaz's wedding with Hayat in 2003 or 2004.  The wedding was a destination event, where Rafaqat and Hayat stayed with Rafaqat's uncle.  (Tr. 967:6-968:8).  Rafaqat struggled to recall the year of that destination wedding, and explained, "I do not remember the confirmed date but I remember that we did go to" the wedding.  (Tr. 967:15-17).  Rafaqat's inability to recall the year of a destination wedding he attended with Hayat undermined his claims that he recalled seeing Hayat every day during the two-year period in which the wedding took place, and his claim that Hayat never left Behboodi during that period.  If Rafaqat could not recall an unusual event like a destination wedding, it is far less likely that he could recall ordinary day-to-day interactions with Hayat, especially after the passage of 13 to 15 years.

Rafaqat also admitted that, before 2003, he hardly knew Hayat.  (Tr. 965:10-967:5).  Rafaqat was

_____

the purported alibi evidence offered by Anas in his 2014 declaration and his 2018 testimony was fabricated long after Hayat was convicted.  Of course, if Anas refused to speak with Ms. Mojaddidi before Hayat's trial, she cannot be ineffective for not securing and presenting his testimony and Hayat cannot rely on it to demonstrate prejudice.

a friend of Hayat's brother-in-law, and did not become close friends with Hayat until 2003, when they met again at Usman's wedding. (Tr. 965:1-9, 965:12-966:11). Rafaqat claimed that he was not aware that Hayat was a hafiz, or that he had been an imam. (Tr. 971:8-24). In view of this testimony, Rafaqat's claim that he became such good friends with Hayat, so quickly after a 2003 wedding, that he spent every day with Hayat for the next two years, strains credulity. At the time, Rafaqat operated a full-time tailoring business that was open during regular business hours, six days per week. (Tr. 972:3-17). Rafaqat also got married in 2002, and had a newborn child in 2003, significantly diminishing the amount of time available to him to spend with Hayat, who was unemployed during the period. (Tr. 972:18-973:2, 978:17-24).

Rafaqat also challenged the accuracy of his 2014 declaration (casting doubt on the accuracy of the others). He claimed on cross-examination that he played cricket with Hayat in the evenings and not in the afternoons, as his declaration erroneously stated. (Tr. 975:9-19; Def. Ex. Z). Rafaqat contradicted the testimony of Hayat's cousin Jaber Ismail, who claimed he would watch Hayat play cricket most evenings. (Tr. 310:9-12). Rafaqat stated he did not remember seeing Ismail at the cricket fields and guessed Ismail "may have seen" Hayat and him play cricket.[57] (Tr. 976:3-21). Rafaqat also did not recall seeing Ismail at the baithak, contradicting Ismail's testimony that he visited the baithak at least every Thursday. (Tr. 311:5-11, 976:1-21). Rafaqat testified Hamid would come by his shop around 10 to 11 a.m., and stay for one or two hours, usually parting ways for lunch. (Tr. 978:3-16) This contradicts Jaber Ismail's testimony that Jaber would meet with Hayat every day for an hour at 11 a.m., which he would spend with Hayat. (Tr. 305:4-307:23, 309:25-311:4). Additionally, Rafaqat denied meeting or seeing Raheela Hayat in his interactions with Hamid. (Tr. 968:9-15, 969:9-970:4, 978:1-2). Rafaqat noted the baithak is for men only, therefore Raheela's testimony concerning Hamid going to the baithak is necessarily hearsay. (Tr. 973:11-974:13).

Rafaqat learned of Hayat's arrest and claimed the entire village "was kind of in [a] very serious state about" it. (Tr. 977:1-25). Of course, that implies the entire village was aware of Hayat's arrest, yet no one mentioned to his family their availability to provide alibi information (or the villagers were

---

[57] Jaber claimed he saw Rafaqat "every day" with Hayat between 2003 and 2005. (Tr. 349:5-8).

aware of Hayat's camp attendance and knew they could not offer alibi information). Rafaqat testified he spoke to Hayat's maternal uncle "Attique" and others in Hayat's family about his "sorrow" over Hayat's arrest.[58] (Id.) He denied, however, that he spoke to Hayat's mother or other Hayat family members about the charges, despite claiming the "whole world came to know about the charges" against Hayat. (Id.) The denial rang hollow in light of the close relationship Rafaqat claimed to have with Hayat, and in light of the public interest in the charges against Hayat that Rafaqat claimed. Rafaqat also testified that he knew Hayat's uncle Attique and his grandfather Saeed were important political figures associated with JUI. (Tr. 970:10-23). A tailor such as Rafaqat could be susceptible to intimidation, particularly by a politically powerful family with ties to militant groups. Like Anas, Rafaqat also admitted his bias in favor of Hayat, admitting he considered Hayat a "close friend," and he wanted to help Hayat. (Tr. 981:4-12). Rafaqat admitted he was willing to do whatever he could to help Hayat. (Id.)

### 3) Dr. Fahim.

Much of Dr. Fahim's direct testimony addressed his recollection of Hayat's 2000 bout of meningitis. (Tr. 997-1001). When asked how frequently he saw Hayat between 2003 and 2005—13 to 15 years earlier—Dr. Fahim admitted his memory was not reliable because of the passage of time. (Tr. 1002:14-25). He testified, "[i]t's been such a long time, I don't remember exactly," and guessed he saw Hayat every week or ten days, "or maybe every two weeks."[59] (Id.) Thus, like Anas and Rafaqat Dr. Fahim's admissions undermined his initial memory claims concerning his ordinary, daily interactions with Hayat. Dr. Fahim's testimony could not have changed the evidentiary picture at Hayat's trial, could not have rebutted Hayat's confession, and cannot demonstrate prejudice to support Hayat's *habeas* claim.

When pressed by Hayat's counsel on direct, Dr. Fahim shifted jarringly from acknowledging his

---

[58] Ms. Mojaddidi spoke to Attique to determine whether he would make a reliable alibi witness. She asked him (and everyone else she spoke to) whether he could identify additional potential alibi witnesses. (Id. at 160:23-161:14). Neither he nor anyone else provided her with any additional names. (Id.) Ms. Mojaddidi would have followed up with any person that any family member or other person identified as a potential alibi witness. (Id. at 161:15-20). Rafaqat's testimony that he spoke to Hayat's uncle about the charges against Hayat shows that either (1) Hayat's family was aware of potential alibi witnesses and did not share them with Ms. Mojaddidi, despite her requests; or (2) the purported alibi evidence offered by Rafaqat in his 2014 declaration and his 2018 testimony was simply fabricated long after Hayat was convicted.

[59] However, after admitting the unreliability of his memory, Dr. Fahim later declared it was not possible that a three-month period passed between 2003 and 2005 in which he did not see Hayat. (Tr. 1003:11-24).

69

faulty memory for very old facts to near total certainty about the same very old facts. (Tr. 1002:19-1003:21). Asked if it was even *possible* that he did not see Hayat for a period of three months between 2003 and 2005, Dr. Fahim replied emphatically: "Oh, for God's sake, no." (Id.) When asked to explain his certitude, he contradicted his earlier answer and stated he was now certain that he saw Hayat every week or ten days. (Id. at 1003). He did not explain why he had grown certain in the span of five questions. Nor did he link his refreshed memory to any particular triggering facts. He simply reversed course from being uncertain to being emphatically certain. Responding to a question about whether Hayat "liked to travel alone," Dr. Fahim again swore to "God as the witness," and declared that he had never seen Hayat alone "anywhere," and had not seen him alone on "any public transportation." (Tr.1003:22-1004:1).

On cross-examination, Dr. Fahim again admitted his faulty memory. Dr. Fahim testified that some weeks he saw Hayat in Behboodi and some weeks he saw him in Rawalpindi. (Tr. 1009:1). When asked to identify which weeks he recalled seeing Hayat in Behboodi and which weeks he recalled seeing him in Rawalpindi, Dr. Fahim answered: "It's been 12 or 14 years, *I have no recollection* of which times [he saw Hayat in which locations]." (Tr. 1008:2-23) (emphasis supplied). Asked to identify which weeks in the month of April 2003 he saw Hayat in Rawalpindi and which weeks in the same month he saw Hayat in Behboodi, Dr. Fahim admitted: "[s]o the truth is this, that it's been a long time, *I cannot remember accurately*." (Id.) (emphasis supplied). He nevertheless claimed he saw Hayat during those weeks, even if he could not recall where. He did not explain his certainty. (Id.) Dr. Fahim conceded that if asked the same question concerning every month between April 2003 and May 2005, he would not be able to identify where he saw Hayat in each week of each month. (Id.) He simply had no reliable recollection.

Dr. Fahim struggled to recall what activities he observed Hayat engage in during their weekly encounters between 2003 and 2005, and whom he saw with Hayat. (Tr. 1014:8-1015:4). He again admitted his weak memory of old facts. (Id.) During the exchange, he also appeared reluctant to answer the question he was asked and gave non-responsive answers concerning other topics. (Id.) For example, the following exchange took place:

70

Q.   What kinds of things did you observe him doing during that
     period?

A.   Even before, his thinking was less. And after the illness, it was
     even less.

Q.   What kinds of things did you observe Hamid Hayat do between
     2003 and 2005 when you would see him?

A.   *It's been a long time, so I don't remember that many things,* but his
     memory had reduced, and he always appearing like he was like
     scared.

Q.   Dr. Fahim, what kinds of activities did you observe Hamid Hayat
     do during the times you saw him between 2003 and 2005?

A.   Believe me, that even at that time I remember he would be in the
     house, and he was playing video games. And then – and then, if he
     was bored, like, he would play cricket with his friend or, you
     know, chat. And God as a witness for this.

(Id.) (emphasis supplied). Dr. Fahim could not name any specific people he observed Hayat play cricket

or video games with, even though almost a dozen declarants claimed they were with Hayat everyday

between 2003 and 2005. (Id.) Dr. Fahim claimed he only ever saw Hayat play video games or cricket

with his "brother, sister, cousin, these people." (Id.) His answers to those easy questions undermined

his claims to have spent as much time as he claimed with Hayat between 2003 and 2005, and his claim

that he was sure Hayat was never away from Behboodi for a three-month period.

Dr. Fahim also admitted that he and his wife, Tayyaba Fahim, who was also a deponent, traveled

together the morning of their testimony and discussed the substance of their testimony with one another.

(Tr. 1012:2-6). Despite admitting to conversations that tainted both their testimony, Dr. Fahim asserted

he and his wife knew they had to "give [their] own individual testimony." Dr. Fahim conceded that he

reviewed "carefully" the declaration he gave in 2014 and did not catch or correct the "Balakot" error.

(Tr. 1012:7-23). Furthermore, Dr. Fahim testified that a man typed up his statement, contradicting

another witness. (Compare Tr. 228:18-230:19 with 1012:7-23).

Dr. Fahim testified he learned of Hayat's arrest within two or three days of Hayat's return to the

United States in May 2005. (Tr. 1012:24-1014:7). He was not sure who told him about the charges

71

against Hayat but recalled it was a Hayat family member.[60]  (Id.)  He denied, however, that he spoke to Hayat's mother or anyone else in the United States about the charges, despite claiming that the "whole world came to know about the charges" against Hayat.  (Id.)  The denial rang hollow in light of the close family and doctor-patient relationship Dr. Fahim described having with Hayat, and in light of the public interest in the charges against Hayat he described.  Dr. Fahim claimed he did not offer himself as an alibi witness in 2005 to Hayat's mother or Hayat's family members because "he did not talk on the phone."  (Tr. 1013:13-18).  This nonsensical answer contradicted Dr. Fahim's direct testimony that he used the phone days earlier to arrange his testimony with Mr. Gilani, Hayat's local counsel in Pakistan, and used the phone in 2000 to receive the report of Hayat's meningitis from Hayat's aunt Asma.  (Tr. 1011:20-24, 997:1-25).  Dr. Fahim also asserted that he did not speak to Hayat's family in the United States about the charges against Hayat by any other means.  (Tr. 1014:3-7).

Finally, Dr. Fahim also admitted his bias in favor of Hayat.  (Tr. 1015:5-22).  He admitted he loved his nephew, Hayat—although he initially refused to acknowledge his love for Hayat and declared his love for "all the children," explaining, "[c]hildren are my love."  (Id.)  He refused to acknowledge that he did not want anything bad to happen to Hayat, claiming instead that he did "not want anybody to be in harm."  (Id.)  He agreed that he did not want Hayat to remain in prison, insisting that Hayat is "innocent, and he should spend time with his family."  (Id.)  However, he denied he would say anything to help Hayat, and claimed he would only "speak the truth."  (Id.)

### 4) Tayyaba Fahim.

Tayyaba Fahim is Hayat's aunt and his mother's sister.  (Tr. 1017-1045).  Mrs. Fahim is married to Dr. Fahim.  (Tr. 1018:20-23).  Her testimony about her interactions with Hayat between 2003 and 2005 was vague and limited to her recollection of seeing him and eating with him "many times."  (Tr. 1022:5-1023:14, 1038:2-11).  Her testimony was also inconsistent with the testimony of others, and she admitted she could not remember if Hayat ever traveled anywhere other than Rawalpindi or Behboodi during the relevant period.  Like the other deponents, Mrs. Fahim's admissions undermined her other

---

[60] Dr. Fahim's testimony that he spoke to Hayat's family after Hayat's arrest shows that either (1) Hayat's family was aware of potential alibi witnesses and did not share them with Ms. Mojaddidi, despite her requests; or (2) the purported alibi evidence offered by Dr. Fahim in his 2014 declaration and his 2018 testimony was simply fabricated long after Hayat was convicted.

memory claims. Her testimony could not have changed the evidentiary picture at Hayat's trial, could not have rebutted Hayat's confession, and cannot demonstrate prejudice to support Hayat's *habeas* claim.

On direct, Mrs. Fahim testified about Hayat's 2000 bout of meningitis. (Tr. 1019:25-1021:13). She confirmed that between 1993 and 2000, Hayat memorized the Koran and became a hafiz, and also attended a madrasa run by his grandfather before transferring to another madrasa. (Tr. 1039:6-13). Without additional detail, Mrs. Fahim claimed that between 2003 and 2005, she saw Hayat "many times" when he visited Rawalpindi with his mother. (Tr. 1022:5-1023:14). She also claimed she ate with Hayat "many times" in Rawalpindi but she could not recall any particular meals or special meals. (Tr. 1022:5-1023:14, 1038:2-11). She testified she "absolutely saw [Hayat]" in Behboodi during that period but did not identify any frequency or provide any other detail about the alleged encounters. (Tr. 1022:5-1023:14). She testified when she saw Hayat in Behboodi he was always at home, which contradicts the testimony of others that Hayat visited shops, went to baithaks, and spent a large amount of time outside of the house. (Tr. 1032:10-1033:4). Mrs. Fahim could not remember if Hayat ever traveled anywhere other than Rawalpindi or Behboodi during the relevant period. (Id.) Specifically, Mrs. Fahim testified she never saw Hayat leave to go to Islamabad, (Tr. 1032:3-4), contradicting the testimony of Raheela (Tr. 136:4-137:25, 138:5-17), and Jaber (Tr. 313:11-24, 316:2-9).

Despite being unable to recall if Hayat ever traveled beyond Rawalpindi or Behboodi, or how frequently they were together in either location, Mrs. Fahim insisted she recalled for sure, after 13 to 15 years, that no three-month period passed during which she did not see Hayat in either location. (Tr. 1024:3-6). She insisted, without explanation for her certainty, that "[t]his never happened." (Id.) However, on cross-examination, Mrs. Fahim admitted she could not identify seeing Hayat on particular days during particular weeks in either Rawalpindi or Behboodi. (Tr. 1030:3-1031:7). She also admitted she could not recall the first time she saw Hayat in 2003. (Id.) She also admitted she could not recall what she did on several Pakistani national holidays between 2003 and 2005, or on which holidays she traveled to Behboodi. (Tr. 1033:5-1034:18).

On direct, Mrs. Fahim asserted that she reviewed her 2014 declaration for accuracy and found no mistakes. (1024:7-18). However, on cross-examination, she admitted the declaration erroneously listed

73

her residence as Hazro instead of Rawalpindi, and she never lived in Hazro. (Tr. 1025:8-25). Mrs. Fahim conceded her brother Attique Ur Rehman is a JUI leader in Punjab, and her father (Hayat's grandfather) Saeed Ur Rehman was a government minister in Punjab and ran a madrasa in Rawalpindi. (Tr. 1026:11-1029:12). Mrs. Fahim testified that in Rawalpindi she practiced "purdah," the separation of the sexes and wore a burqa and niqab. (Tr. 1036:4-18). Mrs. Fahim testified she did not see Jaber and Usama Ismael with Hayat during her encounters with him in Behboodi or Rawalpindi, contradicting assertions in their 2007 declarations, and Jaber's 2018 testimony that he saw Mrs. Fahim "a lot" with Hayat in Behboodi. (Tr. 1042:7-17, 309:12-313:18, 333:24-334:6; See CR 441, Ex. K & L). Mrs. Fahim testified she did not see Jaber and Usama between 2003 and 2005, at all. (Id.) Jaber testified he saw Mrs. Fahim *every day* with Hayat during the period. (Tr. 349:18-25).

Finally, Mrs. Fahim admitted her close relationship with Hayat, and that she "absolutely" did not want him to be in prison. (Tr. 1043:1-1045:11). She also testified she wanted to help Hayat, and that "whatever [she] can do, [she] will." (Id.) Unlike Dr. Fahim, who dubiously claimed he did not use the telephone to call Hayat's family in the United States after learning of Hayat's arrest, Mrs. Fahim admitted she learned of Hayat's arrest in a telephone discussion with his family. (Id.) She could not recall exactly who told her about Hayat's arrest. (Id.) Mrs. Fahim said she did not know if she ever offered to tell Hayat's trial attorney what she remembered about Hayat's time in Pakistan between 2003 and 2005.[61] (Id.) She also claimed she had no recollection whether she offered to tell Hayat's family about what she remembered of Hayat's time in Pakistan between 2003 and 2005. (Id.)

None of the above testimony from any of the deponents could have changed the evidentiary picture at Hayat's trial. None of that testimony could have rebutted Hayat's confession. And none of that testimony demonstrates prejudice to support Hayat's *habeas* claim.

///

///

///

---

[61] Mrs. Fahim's testimony that she spoke to Hayat family after his arrest shows that either (1) Hayat's family was aware of potential alibi witnesses and did not share them with Ms. Mojaddidi, despite her requests; or (2) the purported alibi evidence offered by Mrs. Fahim in her 2014 declaration and her 2018 testimony was simply fabricated long after Hayat was convicted.

  **c.**  **The two live alibi witnesses also claimed firm memories of ordinary interactions with Hayat nearly 15 years earlier, contradicted their own and others' testimony, admitted their bias, and conceded their poor recollection of other facts from the same period.**

At the 2018 hearing, Hayat also presented testimony from two in-person alleged alibi witnesses, his younger sister Raheela Hayat, and his first cousin Jaber Ismail. (Tr. 123-189, 299-364). Like the four deponents, the two live "alibi" witnesses claimed they saw Hayat too frequently between April 2003 and May 2005 for Hayat to have left Behboodi for months of training at a jihadists camp. Also like the deponents, the incredible claims asserted by the live witnesses failed on cross-examination. Both made concessions and admissions that undermined her or his claims to have specific memories of ordinary, daily interactions with Hayat—over a two year period between 13 and 15 years earlier—while being unable to remember any special occasions or events with him.[62] Their testimony could not have changed the evidentiary picture at Hayat's trial, could not have rebutted Hayat's confession, and cannot demonstrate prejudice to support Hayat's *habeas* claim.

    **1)**  **Raheela Hayat.**

Raheela Hayat is Hayat's younger sister. (Tr. 122:8-9). Her testimony was unbelievable on its face because she was too young to have formed memories such as those she claimed during her testimony. She never authored a declaration in which she committed her memory to writing to later refresh her recollection if necessary. (Tr. 186:8-21). Instead, as she ultimately admitted, Raheela's memories were actually based on hearsay stories told to her by her parents. Her testimony was totally unreliable. It could not have changed the evidentiary picture at Hayat's trial, could not have rebutted Hayat's confession, and cannot demonstrate prejudice in support of Hayat's *habeas* claim.

Raheela was born on February 2, 1995, which means that in April 2003, she had been 8 years old for two months. (Tr. 122:17-18). During her testimony, she claimed to have a present recollection of a car ride between her grandparents' home in Rawalpindi and Behboodi in 1997, when she was 2 years

---

[62] Each of the live alibi witnesses failed the memory standard offered by Hayat's lead *habeas* counsel in his testimony at the 2018 hearing: that people recall facts that are unusual and important, like arguing before the Supreme Court of the United States or representing famous clients. (See Tr. 888:17-889:18). The live alibi witnesses claimed the opposite: that they recalled in detail, after the passage of 13 to 15 years, typical, ordinary, and mundane interactions with Hayat nearly every day for almost two years. Those claims defy common sense and are objectively unreasonable.

75

old, although she testified she did not remember the airplane ride that took her to Pakistan weeks earlier.[63]  (Tr. 168:6-25).  That impossible assertion represents the many additional unbelievable memory feats Raheela claimed during her testimony.

Raheela claimed to recall Hayat's bout with meningitis in 2000, when she would have been approximately 5 years old.  (Tr. 169:3-18, 169:7-8).  She claimed she remembered the name of the hospital where Hamid was treated, "Shaifa International," and claimed that as a 5-year-old, she could read that name from the wall of the building.  (Tr. 171:3-172:17).  Despite claiming to remember the name of that Pakistani hospital, Raheela admitted she could not name the clinic where Hayat was treated after he returned to the United States the same year.  (Tr. 173:12-174:22).  More importantly, Raheela later admitted that she *did not*, in fact, recall the name of the Pakistani hospital from her memory as a 5-year-old.  (Tr. 172:3-17).  Rather, she admitted that her mother told her the name of the hospital and that is how she remembered it.  (Id.)

Similarly, Raheela admitted that most of the childhood memories about which she testified at the 2018 hearing were based on hearsay and not her personal, independent recollection.  (See Tr. 172:18-25).  She testified that, since 2006, she spoke to her parents about the events in the life of their family between 1997 and 2006, including Hayat's 2004 wedding.  (Tr. 173:1-11).  After first admitting her conversations with her parents included discussions of her first trip to Pakistan, between 1997 and 2000, she later backtracked and testified she only spoke to her parents about the second trip she took with them to Pakistan, between April 2003 and May 2005.  (Id.)  On that hearsay foundation, Raheela claimed that, as she sat in the witness box at the hearing, she had a present recollection of seeing Hayat every day between April 2003 and May 2005—when she was between ages 8 and 10.  (Tr. 177:19-178:25).  She later clarified that she saw Hayat every day in that period except for a few days in 2004 when he went to Multan for a wedding.  (Id.)

Aside from being vastly overstated and based on a hearsay foundation, Raheela's memory claims contradict the 2007 declarations of Jaber and Usama Ismael, as well as Jaber's 2018 testimony.  Raheela testified that she did not see Jaber and Usama regularly in Behboodi, but both Jaber and Usama said they

---

[63] Although she claimed to remember driving between Rawalpindi and Behboodi as a two-year-old, Raheela could not recall how she spent her third birthday while she was in Pakistan.  (Tr. 169:10-20).

saw Hayat nearly *every day*.  (Id. See also 308:18-25, 311:25-312:14; See CR 441, Ex. K & L).  Both claims cannot be accurate, although both can be false.  Raheela also testified that Hayat picked her up from school every day he was in Behboodi between April 2003 and May 2005.  (Tr. 179:1-180-13, 148:14-25).  She claimed he engaged a driver to make the 40-minute round trip between Hazro, where her school was located, and their home in Behboodi.  (Id.)  However, Raheela did not explain how Hayat, who was unemployed, was able to pay for a car and driver to pick her up every day.

On cross-examination Raheela admitted that photos she identified during her direct examination were date-stamped.  (Tr. 181:25-185:9).  She initially claimed that she recalled the specific dates on the photos from her own memory.  (Id.)  However, she retreated from that position and claimed she recalled the year the photos were taken but not the month and day.  (Id.)  Raheela also admitted the camera used to take the photos did not belong to her because she was eight years old at the time.  (Id.)  She agreed that she did not set the date-stamp feature in the camera and could not be sure if any of the dates on the photos were accurate.  (Id.)

Raheela also admitted that, in 2005 when she was 10 years old, her mother never asked her to be a witness for Hayat or her father at their trials.  (Tr. 185:10-186:21).  Raheela admitted that, in 2005, her father never asked her, during her visits to the jail, to be a witness for him or Hayat at their trials.  (Id.)  Raheela also admitted that, in 2005, Hayat never asked her, during her visits to the jail, to be a witness for him or their father.  (Id.)  Raheela also conceded that, in 2005, she never told her parents that she wanted to testify for her brother or father.  (Id.)  Of course, even if Ms. Mojaddidi had been informed by Raheela's parents of Raheela's alleged "alibi" testimony, Ms. Mojaddidi would have had a strong basis to consider whether it was wise to call the defendant's 10-year old sister as a witness and subject her to cross-examination about the basis, strength, and independence of her memory.

Finally, Raheela admitted her bias in favor of her brother.  (Tr. 187:4-20).  She admitted she loved her brother and did not want him to be in jail.  (Id.)  She admitted she would do whatever she could to help Hayat, although she claimed she would not lie for him.  (Id.)

### 2)      Jaber Ismail.

Like Raheela, Jaber Ismael's testimony was unbelievable.  Jaber made extreme assertions about the strength of his memory without explanation for his claims.  More importantly, Jaber also tainted his

testimony by reviewing the declarations of other witnesses to prepare for the 2018 hearing. Finally, Jaber was simply not available to testify as a witness at Hayat's trial because he was in Pakistan until October 2006, and did not attempt to return to the United States until after the jury reached a verdict in Hayat's trial. Moreover, Ms. Mojaddidi knew before Hayat's trial that Hayat told FBI agents that Jaber attended a militant training camp in Pakistan, and she therefore reasonably excluded him as an alibi witness. Jaber's testimony could not have changed the evidentiary picture at Hayat's trial, could not have rebutted Hayat's confession, and cannot demonstrate prejudice.

Jaber is Hayat's first cousin. (Tr. 335:16-25). His mother is Hayat's father's sister. (Id.) In 2003, Jaber was 15 years old. (Tr. 336:10-21). Like Raheela, Jaber made unsupportable claims about his memory. For example, he claimed he recalled the precise date he traveled to Pakistan in 2001. (Tr. 337:7-338:11). Jaber initially explained he was excited in 2001 to start the process of memorizing the Koran and becoming a hafiz. (Id.) He said he was pleased at the prospect of fulfilling his mother's dream for one of her kids to become a hafiz. (Id.) However, when asked if those memories were the reasons he was able to recall the precise date he traveled to Pakistan in 2001, Jaber said they were not. (Id.) Instead, Jabber claimed he recalled the date he traveled in 2001 because he simply remembered it—17 years later. (Id.) The claim defied reason and undermined the credibility of the remainder of Jaber's claimed memory feats.

Jaber admitted discussing his testimony with Hayat's *habeas* lawyers as many as seven times before his testimony. (Tr. 340:24-343:20). He admitted that during those seven sessions, Hayat's *habeas* lawyer worked with him to rehearse his testimony and he practiced giving answers to questions as he would give then in court. (Id.) Jaber practiced his answers about the people he spent time with in Behboodi and Rawalpindi, and how much time he remembered they spent with Hayat. (Id.)

Jaber candidly admitted that during his preparation sessions with Hayat's *habeas* counsel, he reviewed the declarations of other witnesses. (Id.) He claimed that he only "glimpsed over" those declarations, then he agreed that he "skimmed" them. (Id.) He claimed he reviewed the declarations only to confirm the names of certain people. (Id.) Yet, he ultimately agreed that he "reviewed many of" the declarations submitted by other witnesses. (Id.) Jaber admitted that, while reviewing the declarations of other witnesses, he "was more focused on the time that he spent with [Hayat]," appearing

78

to imply he reviewed the declarations to sharpen his own recollection of how much time he spent with Hayat. (Id.) In light of the discussion below about the deep flaws in the declarations, Jaber's reliance on them to prepare for the 2018 hearing hopelessly tainted his testimony.

Jaber claimed he spent nearly every day with Hayat during 2001, when they were neighbors in California, and when Jaber was 14 and Hayat was approximately 20. (Tr. 343:22-344:25). Jaber claimed he was unaware of the exact age difference between himself and Hayat. (Id.) He also claimed that, except for time Hayat was away from home, he spent nearly every day with Hayat between April 2003 and May 2005, while they both lived in Behboodi, Pakistan. (Id.) Jaber made the unbelievable claim that, as he sat in the witness box in January 2018, he had a *present recollection* of seeing Hayat every day he was in Behboodi between April 2003 and May 2006—between 13 and 15 years ago. (347:24-348:14). He claimed his sharp memory of such a long stretch of time, so many years ago, arose out of his shared interests with Hayat. (347:24-348:14). However, he did not explain how their shared interest in "Bollywood movies" and discussions of "girls" imprinted his alleged interactions with Hayat so permanently in his memory as to permit Jaber a detailed recollection of his ordinary, daily encounters with Hayat 15 years later.[64] (See id.)

Jaber also conceded he did not travel with Hayat to Rawalpindi and did not know if Hayat actually went there or someplace else when he was away from Behboodi. (Tr. 345:1-25). Although he insisted that Hayat was honest with him, Jaber admitted that Hayat was *untruthful to others*. (Tr. 345:21-346:25). Jaber and his friends warned Hayat, several times, that his dishonesty was "going to catch up with [him]." (Id.) Jaber offered an example of Hayat's dishonesty, which involved Hayat lying to a physician who visited Hayat's grandparents' home. (Id.) Without prompting, Hayat began to lie to the physician about his family background, including claiming his father owned a K-Mart in the United States. (Id.) Jaber testified that Hayat's display of dishonesty appeared to trouble Hayat's brother Arslan and Hayat's cousin Usama, who "were sitting in the living room just looking at [Hayat]." (Id.) After the physician left, Hayat's cousin Usama scolded Hayat for his dishonesty and warned Hayat that

---

[64] Additionally, Jaber conceded that he did not share Hayat's strong interest in cricket, but would sometimes tag along with Hayat to games at Hayat's request. (Tr. 348:11-14). That significant gap in their interests would more likely than not have created distance between the two and not fostered closeness, undermining Jaber's memory claims.

79

"one day, this bullshit is going to catch up to you." (Id.)

Jaber's memory claims were also undermined on cross-examination by his failure to recall the people he claimed Hayat spent time with in Pakistan between 2003 and 2005, after Jaber affirmed a list of those same people on direct examination. (Compare Tr. 326:6-334:22 with 348:15-350:9). Jaber was asked about all 17 declarants on direct and offered his alleged memory of them. (Id.) On cross-examination, only minutes later, he claimed he only mentioned 12 people. (Id.) When asked to name all 12 of those people, he could only list eight. (Id.) Jaber admitted that he simply could not remember the other people, despite his claims he saw them every day or regularly between 2003 and 2005, and despite discussing them with Hayat's counsel only minutes earlier. (Id.) During this exchange, Jaber claimed he saw Dr. Fahim every day with Hayat. (Tr. 349:18-25). However, minutes later, he admitted that was impossible because Dr. Fahim lived in Rawalpindi at the time. (Tr. 350:12-21, 351:3-21). Despite admitting he overstated his memory of seeing Dr. Fahim's with Hayat, in the same sentence Jaber insisted he could recall seeing Hayat between 2003 and 2005 every day.[65] The entire exchange demonstrated Jaber's false memory claims.

Jaber was also unable to recall how he spent significant holidays during the same period he claimed to have total recall of seeing Hayat. (Tr. 354:11-356:8). Jaber could not remember how he spent the Fourth of July in 2003. (Id.) He explained that he did not celebrate that holiday while visiting Pakistan. (Id.) He also could not recall if he celebrated the Fourth of July at any time in his life while he lived in the United States. (Id.) He claimed he was too focused on school to recall. (Id.) Jaber also could not recall how he spent his birthday in 2003. (Id.) He explained that "[b]irthdays are not a big thing in our culture," and that he also did not celebrate his birthday while living in the United States. (Id.) Jaber could not remember how he spent New Year's Eve in 2003, 2004, or 2005. (Id.) He explained that New Year's Eve is "not a big thing" for his family. (Id.)

Jaber testified he believed Hayat would have told him about wanting to attend jihadist training. (Tr. 357:12-24). He admitted he learned at some point that Hayat told Naseem Khan, on multiple occasions, that Hayat planned to attend a jihadist camp. (Id.) He admitted that Hayat never shared that

---

[65] Jaber also claimed that after Hayat's wedding in December 2004, "nothing changed," and he would still see Hayat every day. (Tr. 356:21-357:11).

desire with Jaber.  (Id.)  The exchange demonstrates that Jaber, like all of the family and close friends who have emerged as purported alibi witnesses long after Hayat's conviction, did not know Hayat as well as they claimed because Hayat kept his desire to train at a jihadist camp a secret from them, as he hid from them the jihadi scrapbook he made.  The exchange also reveals that Jaber knew some of the details of the evidence against Hayat, which may have influenced his after-the-fact testimony.

Jaber testified he learned of the charges against Hayat in an internet café before he returned home to the United States from Pakistan in October 2006.  (Tr. 357:25-360:24).  While struggling to recall exactly when he learned of the criminal charges against Hayat, Jaber admitted, "[i]t's so long ago, it's hard to remember stuff," revealing the true unreliability of his memory of that time.  (Tr. 358-21-22).  Jaber then reversed his earlier testimony and claimed he did not know of the charges against Hayat before he left Pakistan.  (Tr. 359:7-360:11).  Immediately thereafter, he reversed his testimony again and agreed that he did know of the charges against Hayat before he left Pakistan because he learned of them at an internet café in April 2006.  (Id.)  During the exchange, he appeared to be struggling to select the answer he believed might best help Hayat and not the answer that he actually remembered.

Finally, Jaber admitted he spoke to Hayat's mother from Pakistan about the charges against Hayat.  (Tr. 360:16-364:3).  He testified he was heartbroken over the charges against Hayat and felt like he "couldn't do anything."  (Id.)  Yet, he claimed that he did not talk to Hayat's mother about his potential alibi testimony.  (Tr. 361:10-362:4).  He claimed he did not share with Hayat's mother that he could testify that he was with Hayat every day from April 2003 to May 2006 (which she would have presumably already known from being in Behboodi at the same time and living with Hayat).[66]  (Id.)  Jaber testified that after he had difficulty returning to the United States from Pakistan in May 2006, Ms. Mojaddidi called him after someone in the United States gave her his phone number.  (Tr. 363:11-364:4, 325:18-25).  Jaber did not explain why, in April 2006 or earlier, he did not ask Hayat's mother to speak to Ms. Mojaddidi about testifying on Hayat's behalf.  (Id.)  Nor did he explain why Hayat's mother or

---

[66] Jaber's testimony that he spoke to Hayat's mother after Hayat was charged shows that either (1) Hayat's family was aware of potential alibi witnesses and did not share them with Ms. Mojaddidi, despite her requests; or (2) the purported alibi evidence offered by Jaber in his 2014 declaration and his 2018 testimony was fabricated long after Hayat was convicted.  Of course, if Jaber refused to speak with Ms. Mojaddidi before Hayat's trial, she cannot be deemed ineffective for not securing and presenting his testimony and Hayat cannot rely on it to demonstrate prejudice.

other family member did not give Ms. Mojaddidi Jaber's contact information earlier than May 2006. (Id.)  Jaber insisted that he and Hayat's mother "didn't talk about the case," even though he was heartbroken over the charges.  (Tr. 363:22-24).

Jaber's claims about his conversations with Hayat's mother conflict with Ms. Mojaddidi's 2007 affidavit in support of Hayat's new trial motion.  (See CR 441-2).  There, Ms. Mojaddidi asserted that Jaber called *her* in April 2006 while Hayat's jury was deliberating.  (Id. at ¶ 8).  Consequently, either Jaber *did* discuss Hayat's case with Hayat's mother, who put him in touch with Ms. Mojaddidi or Jaber discussed Hayat's case with someone else who did so.[67]

None of the above testimony from either of the live "alibi" witnesses could have changed the evidentiary picture at Hayat's trial.  None of that testimony could have rebutted Hayat's confession. And none of that testimony demonstrates prejudice to support Hayat's *habeas* claim.

### 2. The testimony of the declarants and live witnesses cannot demonstrate prejudice.

None of the testimony outlined above supports a finding of prejudice on Hayat's "alibi" claim. All of that testimony can be summarized as Hayat's biased friends and family simply *insisting*, contrary to the demonstrated unreliability of their memories, that they recall seeing Hayat nearly every day between 2003-2004.[68]  The claims are unbelievable and would have been disregarded by any neutral factfinder.  Courts across the country have agreed that failure to call family members or friends with close relationships to the defendant as alibi witnesses does not give rise to an ineffective assistance of counsel claim.  See Seymour v. Walker, 224 F.3d 542, 556 (6th Cir. 2000) (counsel not defective for failing to call witness/sister who "would likely be considered by the jury to be biased"); McCauley–Bey v. Delo, 97 F.3d 1104, 1106 (8th Cir. 1996) (finding no prejudice from counsel's failure to call witnesses because impact of uncalled witness would have been negligible due to their close relationship to defendant); Bergmann v. McCaughtry, 65 F.3d 1372, 1380 (7th Cir. 1995) (counsel not ineffective for failing to call family members who would easily have been impeached for bias); Romero v. Tansy, 46

---

[67] She also asserted Hayat told her he spent time with Jaber in Pakistan but she was unable to subpoena him because he was out of the country.  (Id. at ¶ 7).  Even if she could have subpoenaed him, Jaber was unable to return to the United States until clearing the No Fly List.  (See id. at ¶ 8).

[68] (See Tr. 956:9-18, 981:4-12, 1015:5-22, 1043:1-1045:11, 187:4-20, 335:16-25, 343:22-344:25).

F.3d 1024, 1030 (10th Cir. 1995) (testimony by defendant's family members is of "significantly less exculpatory value than the testimony of an objective witness"); United States ex rel. Maxwell v. Gilmore, 37 F.Supp.2d 1078, 1089 (N.D. Ill. 1999) (trial counsel reasonably could have thought petitioner's mother and girlfriend would not be credible alibi witnesses given their "obvious personal interest in his acquittal").  Here, the purported alibi witnesses' close relationships with Hayat would have led to easy impeachment, undermining their value as witnesses and eliminating any impact on the evidentiary picture at trial.

Additionally, the purported alibi witnesses' memory claims were simply not supported by their testimony and collapsed on cross-examination.  The Magistrate Judge's summary of that testimony focuses almost exclusively on facts supporting Hayat's claim and ignores the witnesses' sometimes outlandish and contradictory answers on cross-examination, and their many admissions and concessions about the weaknesses of their memories.  See F&R at 38-41.  Based on that skewed summary, the Magistrate Judge found "no problem accepting the fact that family members and good friends, who typically saw Hayat on a daily or weekly basis when he was in Pakistan at that time, would have remembered such an extended absence."  F&R at 51.  The Magistrate Judge asserted that the witnesses' "memories did not need to be perfect about the events of those two years" to support the recollection of seeing Hayat every day for nearly two years.  Yet, common human experience reveals the opposite is true.  It would be next to impossible to remember seeing someone every day over a two-year period between 13 and 15 years earlier without a near perfect memory.  Indeed, the Magistrate Judge's analysis simply ignored the patently unbelievable claims of Raheela and Jaber, who both testified under oath that while sitting in the witness box in 2018, each possessed a "present recollection" of seeing Hayat every day between April 2003 and May 2005, between 13 and 15 years ago (and when Raheela was between 8 and 10 years old).  (See Tr. 177:19-178:25, 347:24-348:14).  The outlandishness of such claims undermines those witnesses' entire testimony.  The Magistrate Judge ignored the government's challenges to the claims.

While conceding that the alibi witnesses' memories were not "perfect," the Magistrate Judge credited their broad claims of not recalling Hayat being away from Behboodi for longer than 10 days during a two-year period between 13 and 15 years ago.  Yet, the presentation of the witnesses' claims as

a negative memory instead of as a positive memory obscures the unreliability of the claims and glosses-over the failure of those claims to withstand scrutiny.  Claiming to not remember Hayat being away from home for more than 10 consecutive days in at least a year-long period is not the same as *affirmatively* remembering his presence on every day over that period.  The former offers a nearly untestable proposition while the latter can be interrogated.  The only way to test a witness' memory of the absence of an event is to demonstrate the presence of that event in the same person's memory or establish the reliability of that person's overall memory by examining her recollection of other specific events.  None of Hayat's alibi witnesses demonstrated clear, reliable recollections of even the most objectively memorable events,  such as birthdays or national holidays.  Rather, all struggled to demonstrate recollections of those specific events in their own lives.  Yet all claim to recall Hayat's comings and goings with enough detail to be sure he was never away from home for more than 10 days.  Such unbelievable claims cannot constitute credible alibi evidence establishing Hayat's whereabouts in Pakistan and could not have altered the evidentiary picture at trial.

Even in brief summary, the witnesses' memory failures reveal the unreliability of their claims that they recall seeing Hayat every day for a two-year period between 13 and 15 years earlier.  Anas admitted his memory of seeing Hayat during the period was only approximate and that his memory had faded over time, but claimed to recall seeing Hayat every day over the period.  (Tr. 954:1-4, Tr. 955:9-956:8, 955:17-19, 955:25-956:2).  Rafaqat could not recall the *year* of a destination wedding he attended with Hayat but claimed to recall seeing Hayat every day over the period. (Tr. 967:15-17).  Dr. Fahim admitted his memory was weak and that he could not accurately recall facts from so long ago but claimed to recall seeing Hayat every day over the period.  (Tr. 1002:14-25, 1008:2-23).  Mrs. Fahim could not recall what particular days or weeks she saw Hayat in either Rawalpindi or in Behboodi but claimed to recall seeing Hayat every day over the period.  (Tr. 1032:10-1033:4, 1030:3-1031:7).  Raheela admitted her memory of the relevant period, when she was 8 years old, was informed by hearsay stories shared with her by her family but claimed to recall seeing Hayat every day over the period.  (Tr. 172:18-25).  Jaber's testimony was tainted by his review of the declarations of other potential witnesses, he erroneously claimed he saw Dr. Fahim every day until remembering they lived in different cities at the time, and he couldn't remember how he spent major holidays during the period.

(Tr. 340:24-343:20, 349:18-25, 350:12-21, 351:3-21, 354:11-356).  Yet, he, too, claimed to recall seeing Hayat every day over the period.  None of the witnesses offered a reliable basis to support their memory claims.

The Magistrate Judge's conclusory analysis simply glossed over the absence of support for the witnesses' claims.  In a footnote, the Magistrate Judge briefly discussed the wide chasm between the recollections of two witnesses, who recalled that the same event—a destination wedding—happened in different years.  See F&R at 52 n. 28.  The witnesses' conflicting memories highlight the unreliability of the alibi testimony: Raheela and Rafaqat disagreed on the year of a stand-out event but claim a clear and reliable memory of mundane, day-to-day interactions with Hayat over a two-year span between 13 and 15 years ago.  It also reveals the impossibility of the alibi witnesses' claims, in 2018, that they recall Hayat not being away from Behboodi for more than a week in 2003-2004.

Yet, notwithstanding that and other major inconsistencies raised during the cross-examinations (and ignored in the Findings and Recommendations), the Magistrate Judge concluded that the alibi witnesses "did not need to account for every day of Hayat's time in Pakistan, nor did they have to account for every week or every month. Rather, their accumulated testimony needed to show that Hayat was not absent from Behboodi or Rawalpindi for any consecutive three-month period."  See F&R at 51.  That analysis did not address in any meaningful way what specific support the Magistrate Judge found to merit accepting the witnesses' memory claims.  Without evidence that the witnesses' memories are precise enough to support their broad claims, in light of their acknowledged bias *and Hayat's contemporaneous confession*, there is no reasonable basis to accept the purported alibi testimony.

Two specific flaws flow from the Magistrate Judge's conclusory reasoning.  First, the Magistrate Judge did not weave together the purportedly reliable parts of the various testimony, separated from the unreliable or contradictory parts, to demonstrate any clear accumulation of testimony covering the entire relevant period.  Of course, that is because such an accumulation does not emerge from the contradictory and unreliable testimony.  Also, for the proffered alibi testimony to have value as framed by the Magistrate Judge, that accumulation would have to cover *every,* not *any,* three-month period while Hayat was in Pakistan between 2003 and 2004, because Hayat could have gone to camp during any single period in the broader range.  See F&R at 51.  The witnesses' testimony does not support any such

85

accumulation. Yet, instead of any analysis, the Magistrate Judge merely accepts uncritically the testimony, concluding: "The court has no problem accepting the fact that family members and good friends, who [claim they] typically saw Hayat on a daily or weekly basis when he was in Pakistan at that time, would have remembered such an extended absence." See F&R at 51. The Magistrate Judge's legal conclusion concerning the effect of the alibi witnesses' testimony is not logically supported by the facts or even the record of the testimony taken during the hearing. This Court should reject that conclusion.[69]

Second, the witnesses' testimony does not account for all of the time periods necessary to alter the evidentiary picture at trial. In his confession, Hayat offered inconsistent descriptions of the duration of his stay at camp, which armed prosecutors with evidence of durations from as short as days up to as long as six months. The evidence did not *only* support a period of three months. Rather, the evidence included many data points establishing a basis for Hayat's conviction. Hayat admitted he attended a jihadi camp in 2003-2004 for conflicting periods of at least "something like" or "maybe like" three months, leaving open the possibility the duration was less than three months. (See Gov. Sup. Ans. Ex. 8 at 2, 9, 11, 12, 15, 17, 18, 19, 21, 41, 52, 90-92). Hayat also told agents new trainees arrived at the camp every few weeks, suggesting a stay, including his own, could last days or weeks. (Gov. Sup. Ans. Ex. 8 at 17, 73). Hayat also confessed attending a militant camp in 2000 for only three days. (Gov. Sup. Ans. Ex. 8 at 48-49, 50-52, 91; W.M. Depo 161:23-162:2, 270:10-271:10; Tr. 730:3-731:22). Thus, for an alibi defense to be effective, and for Hayat to demonstrate prejudice here, the witnesses must account for almost every day of the Hayat's 2003-2005 stay in Pakistan. It is no surprise they failed. As Mr. Broderick testified, establishing an alibi defense for such a long period would "be almost impossible to

---

[69] While the Magistrate Judge did not make explicit credibility findings, her legal conclusion indicates she accepted the witnesses' memory claims as true, despite their inconsistencies, contradictions, and admission of strong bias. On *de novo* review, this Court may undertake its own analysis of the witnesses' claims and reach its own conclusions. The Court should conclude that, as a matter of law, taken in its entirety, the probative value of the witnesses' testimony, in light of the other evidence, would not have changed the evidentiary picture at trial and is insufficient to result in a different outcome. Thus, Hayat has not demonstrated prejudice.

Alternatively, this Court should reject the Magistrate Judge's credibility determinations concerning those witness. If it does so, the Ninth Circuit has held in an analogous context, that the Court must independently evaluate the credibility of those witnesses, including by considering live testimony. See Johnson v. Finn, 665 F.3d 1063, 1074 (9th Cir. 2011) (requiring new hearing on disputed credibility findings in Batson claim on *habeas* review). Assuming Finn applies here, this Court should reject the Magistrate Judge's credibility findings and hold a new evidentiary hearing to reconsider the alibi witnesses' testimony. The Court should also require testimony from Mr. Griffin and Mr. Riordan. (See CR 725 at 74-80).

do." (Tr. 399:1-3; 730:11-15).

In sum, Hayat has failed to prove that any failure to investigate undisclosed alibi witnesses was prejudicial. The record establishes Hayat's witnesses are primarily his family and friends, whose testimony would not have been credible, nor sufficient on the merits, to cause the jury to have reached a different verdict. Even if Ms. Mojaddidi could have done more to investigate a potential alibi defense, Hayat has not met his burden under Strickland to demonstrate prejudice from any failure to present alibi testimony from his close family and friends. Accordingly, this Court should reject the Magistrate Judge's finding of a Sixth Amendment violation and deny this claim.

### 3. The Magistrate Judge correctly dismissed the 2014 declarations as not establishing prejudice.

Nearly ten years after Hayat's arrest, his family convened meetings in Rawalpindi and Behboodi, Pakistan, for the purpose of organizing and collecting declarations from witnesses they never mentioned to Ms. Mojaddidi before Hayat's trial, despite her requests.[70] (Tr. 194:12-195:11, 198:17-199:5). At the gatherings, Hayat's family members and friends proceeded through an assembly line during which Hayat's advocates read them scripts that included "guiding questions." (Tr. 226:24-227:9). Even if that process had not been for the specific purpose of generating material to advance Hayat's *habeas* claims, it could not have produced reliable evidence, especially about facts that occurred more than ten years earlier. Undoubtedly, the shared goal of Hayat's family and friends—to try to free Hayat—was discussed among the declarants, alongside the substance of their faded memories, before anything was memorialized in writing. That intermingling of those decade-old memories among individuals all biased in Hayat's favor, tainted the substance of the declarations. The unreliability of that process is self-evident. As the Magistrate Judge found, the declarations are insufficient to demonstrate prejudice.

### a. The failure by Hayat and his family to identify in 2005 more than a dozen relatives and close friends who claim they spent time with Hayat daily, weekly, or monthly over a two-year period undermines the reliability of the declarants' claims.

The after-acquired assertions of Hayat's interested family and close friends, as set forth in the

---

[70] Except for Hayat's uncle Attique Ur Rahman, who Ms. Mojaddidi spoke to and excluded as an alibi witness. (See Tr. 192:12-19, 193:1-4, 194:12-195:25; W.M. Depo. 154:13-160:23).

hearsay declarations, cannot support the conclusion that their testimony at Hayat's trial would have created a substantial likelihood of a different outcome.  First, as described above, the government presented evidence establishing Hayat's guilt beyond a reasonable doubt.  Second, it is highly unlikely that testimony from any of the recently discovered purported alibi witness would have been afforded great weight by an objective trier of fact.  Indeed, *none* of the witnesses proffered by Hayat was or is a disinterested, objective third-party witness.  All of the witnesses are either blood relatives of Hayat, relatives through marriage, or friends who have known Hayat for all or most of his life.[71]  See Romero, 46 F.3d at 1030 (discounting alibi testimony proffered by relatives after conviction).

Thus, significant reliability concerns exist.  Each of Hayat's proffered declarants claims to have spent near-daily or otherwise frequent time with Hayat in Pakistan between 2003 and 2005.  Yet, neither Hayat nor his family ever identified any of them to Ms. Mojaddidi as a potential alibi witness after Hayat's 2005 arrest.  Rather, the declarants did not emerge until *nine years* after Hayat was arrested, and later tried, convicted, and sentenced to prison.  Moreover, Hayat's confession contradicts the declarants' proffered assertions, as does the confession of Hayat's father, along with the other record evidence.

Indisputably, in June 2005, Hayat and his family were in the best position to know everyone Hayat spent time with while he was in Pakistan at the relevant time.  Yet they only identified the four people Ms. Mojaddidi assessed and rejected as viable alibi witnesses.  Thirteen of the purported alibi

---

[71] The Magistrate Judge divided the non-testifying declarants into two groups, one she dismissed as irrelevant for not offering sufficiently specific information, and one that did not support a finding of prejudice but were relevant to show witnesses might have been deposed in Pakistan before trial.  See F&R at 44-45, 49.  The Magistrate Judge rejected:  (1) Attique Ur Rahman, Hayat's maternal uncle, age 31 in 2004 (Def. Ex. S); (2) Muhammad Saeed, Hayat's friend since childhood, age 18 in 2004 (Def. Ex. BB); (3) Nisar Ahmad, Hayat's cousin on his father's side, age 13 in 2004 (Def. Ex. CC); (4) Pashmina (no other name declared and declaration signed with a thumbprint), Hayat's maternal grandmother who cared for Hayat for a decade, age 67 in 2004 (Def. Ex. FF); (5) Muhammad Nauman, Hayat's cousin, now brother-in-law age 17 in 2004 (Ex GG); (6) Malik Ihtesham Mumtaz, Hayat's friend since childhood, age 24 in 2004 (Ex. HH); (7) Bibi Asama, Hayat's maternal aunt and the mother-in-law of Hayat's brother, Arslan, age 43 in 2004 (Def. Ex. JJ).  F&R at 45.

The Magistrate Judge found the following relevant as potential pretrial deponents but not to show prejudice:  (1) Muhammad Daud, Hayat's friend since 1997, age 24 in 2004 (Def. Ex. U); (2) Muhammad Usman, Hayat's brother-in-law (married to Hayat's older sister), age 14 in 2004 (Def. Ex. V); (3) Hammad Ishfaq, Hayat's cousin on his mother's side, age 16 in 2004 (Def. Ex. W); (4) Muhammad Qasim, grocer who has known Hayat since he was a child, age 48 in 2004 (Def. Ex. X); (5) Sajjad Ishfaq, Hayat's second cousin, age 16 in 2004 (Def. Ex. Y); (6) Salahuddin (no other name declared), second cousin on Hayat's mother's side, age 14 in 2004 (Def. Ex. AA); (7) Shakeel Ahmad, Hayat's friend since childhood and his wife's cousin, age 21 in 2004 (Def. Ex. DD).  F&R at 49.

The government agrees with the Magistrate Judge that Hayat cannot rely on any of the above declarations to establish prejudice.  However, the government objects to the assertion any of those declarations demonstrate Ms. Mojaddidi's alibi investigation was unreasonable.  They do not.

witnesses Hayat now proffers are related to him by blood or marriage.  The rest are close friends who have known him all or most of his life.  That Hayat and his family failed to earlier identify those witnesses—all of whom were well-known to him and his family in summer 2005—undermines the credibility of their after-the-fact declarations.  See Watts v. United States, 841 F.2d 275, 278 (9th Cir. 1988) (affirming credibility determination on affidavits and finding defendant's earlier silence about allegedly exonerating facts refuted present claims).  Hayat does not and cannot credibly argue that he did not know the declarants at the time of his arrest.  Nor can he credibly claim that Ms. Mojaddidi should not have relied on him to identify 11 people who claim they spent time with Hayat every single day, every other day, or every week for more the two years while Hayat was in Pakistan from April 2003 through May 2005—and six more who claimed to have monthly or other regular contact with Hayat during the same period.  (See Def. Exs. S through JJ).

### b.    The process by which Hayat's advocates collected the declarations rendered them unreliable.

The process by which the declarations were collected was deeply flawed and rendered them unreliable.  At the 2018 hearing, Hayat called Maryam Ahmed, who testified about the process by which she and Syeda Amna collected the declarations.  (See Tr. 190-243).  Ahmed's testimony and the testimony of others demonstrates that the collection process was fundamentally flawed, and could not have produced reliable results.  Yet based upon the foundation Ahmed laid, the Magistrate Judge admitted the declarations into evidence.  (Tr. 191-220; see also Def. Ex. S-JJ).  Ms. Mojaddidi testified at her 2014 deposition that, before Hayat's trial, neither Hayat nor his family identified any of those relative and close friends as potential alibi witnesses, except for Hayat's uncle, whom Ms. Mojaddidi ruled out as set forth above.  (W.M. Depo. 154:13-160:23, 164:14-21, 35:22-37:14, 36:7-8; Tr. 731:7-20, 733:7-15, 734:17-735:5).

Ahmed and Amna were advocates for Hayat and were paid $2,000 to travel to Pakistan to collect evidence to advance his *habeas* claims.  (Tr. 192:20-25).  Ahmed was formerly a lawyer in Pakistan and currently promotes "social entrepreneurship" in Lahore.  (Tr. 190-18-25).  Amna is a journalist who, at the request of Hayat's lead *habeas* counsel, was writing a story about Hayat's conviction and efforts to overturn his conviction  when she told Ahmed about Hayat's case.  (Tr. 191:16-192:6).  Neither is a

professional investigator.  Ahmed and Amna went in with a set of questions to ask everyone, and apparently took no notes and had no disagreements on what the witnesses said.  (Tr. 226:24-227:9, 227:21-228:10).  In January 2014, Ahmed and Amna traveled to Pakistan.  (Tr. 192:10-19).  Hayat's lead *habeas* counsel put them in touch with Hayat's maternal uncle, Muhammad Anas, who resided in Rawalpindi, Pakistan.  (Tr. 194:12-25; see Def. Ex. T).  Ahmed and Amna visited Anas, along with Amna's aunt, Mrs. Shah.  (Tr. 194:23-195:15).

### 1)   The declarations are unreliable because they were tainted by hearsay discussions among the declarants.

Conversations among the declarants about the subject of their memories before Ahmed and her team arrived to meet with them tainted the resulting declarations.  At Anas's residence, Ahmed, Amna, and Mrs. Shah met with Anas and four or five of the declarants, who were already gathered at his home when they arrived.  (Tr. 196:1-4, 198:11-15).  On cross-examination, Ahmed claimed Anas had not spoken to the assembled declarants about their memories before Ahmed arrived.  (Tr. 235:9-236:4, 236:14-25).  Obviously, there is no way Ahmed could have known that because she was not present.  There is almost no possibility that Hayat's assembled friends and family did not speak about the topic they were gathered to discuss before Ahmed arrived.  Further straining credulity, Ahmed claimed that Anas could not have spoken to the declarants about the subject of their declarations because he did not know what she planned to ask.  (Tr. 235:16-24).  That she would make such an unsupportable claim demonstrated her awareness of the flawed collection process.  Ahmed also asserted she "asked [the declarants] if anyone talked to them [about the subject of their declarations], and no one did."  (Tr. 235:25-236:25).  None of the declarations includes such a specific denial.[72]

Anas also helped arrange similar interviews of Hayat's family and close friends at Hayat's grandmother's house in Rawalpindi, and at a community center in Behboodi.  (Tr. 195:19-25, 198:17-25, 200:19-25).  Arslan Hayat and Muhammad Nauman helped arranged interviews and the venue in Behboodi.  (Tr. 240:2-22).  Ahmed did not take any steps to prevent them from discussing the subject of

---

[72] The declarations include only a general, boilerplate claim that they are based on personal knowledge.  Assuming the declarants did not already know that discussing their testimony would taint it and render it unreliable, Ahmed did not tell Anas to prohibit such discussions.  (Tr. 235:21-24).

90

the interviews with the declarants.  (Id.)  The interview process was the same at all three locations.  (Tr. 199:3-5).  Ahmed and Hayat's other advocates interviewed each declarant individually, while the remaining declarants waited together (free to discuss their memories).  (Tr. 196:7-21).  Ahmed asked questions from a scripted list that included "guiding questions" that she, Amna, and Mrs. Shah created after being given instructions about the "kind of information that [they] had to gather."  (Tr. 225:5-9).  Ahmed's testimony demonstrated that her mission in Pakistan was less like that of an objective investigator and more like that of an advocate working to generate precisely the kind of testimony Hayat needed to support his *habeas* claim.

> **2)      The declarations are unreliable because they were tainted by the synthesis of the recollections of three note-takers, their accuracy cannot be tested because the underlying notes were destroyed, and Maryam Ahmed's testimony was unreliable.**

Ahmed's failure to preserve the raw notes from the declarants' interviews, and her other errors, undermined the reliability of the declarations.  The interviews were conducted in Urdu, except for one.  (Tr. 198:7-10).  During the interviews, Ahmed, Amna, and Mrs. Shah took notes, which they later "compared, compiled, and condensed into a single statement."  (Tr. 197:7-18).  Mrs. Shah then handwrote the statements in Urdu.  (Tr. 202:23-203:2).  Ahmed claimed that while they "synthesized" their separate notes concerning each interview, there were no disagreements about the content of any of the statements.  (Tr. 227:21-228:10).  Her assertion could not be tested because she admitted she destroyed the notes of all 17 interviews.  (Id.)  Amna later translated the Urdu to English, a process Ahmed claimed she "peer-reviewed."  (Tr. 201:19-22).  Ahmed testified that she spoke Urdu, (Tr. 191:12-13), but Hayat offered no evidence that the Urdu-to-English translations she and Amna undertook were accurate, or that Mrs. Shah was able to accurately record the statements in Urdu.  Thus, the declarations fail to satisfy Federal Rule of Evidence 604 and 901, and this Court should strike them.[73]  See, e.g., Jack v. Trans World Airlines, 854 F. Supp. 654, 659 (N.D. Cal. 1994). (excluding foreign language affidavits due to translator's failure to properly certify the translation).

---

[73] Rather than consider whether Hayat's proffered evidence satisfied the requirement for admission, the Magistrate Judge asserted the government must *disprove* the accuracy of the translations.  To the contrary, the proponent of evidence bears the burden of establishing its admissibility. See United States v. Chang, 207 F.3d 1169, 1177 (9th Cir. 2000).  Even if this Court does not strike the declarations, it should adopt the Magistrate Judge's conclusion that they do not establish prejudice.

The reliability of the declarations was further undermined by an error in one that Ahmed could not explain at the hearing.  The error called into question Ahmed's claim that the declarants did not speak to each other about their memories before being interviewed.  It also called into question her claim that the declarants reviewed their synthesized statements for accuracy and found no mistakes.  Ahmed testified that the interview of Dr. Fahim ud Din was conducted in English.  (Tr. 207:22-209:9).  Yet, she also produced an English "translation" of his declaration.  (Id.)  Ahmed denied on direct examination that there was any error in Dr. Fahim's declaration.  (Id.)  However, Hayat's counsel directed her attention to a passage in the fourth paragraph of the "translated" declaration, and Ahmed agreed, contrary to her earlier testimony, that the declaration contained an error after all.  (Id.)  Specifically, the declaration stated Dr. Fahim met with Hayat weekly between April 2003 and May 2005, so it was not possible Hayat left his village of "Balakot" for more than two weeks.[74]  (Id. See also Def. Ex. EE).

Ahmed characterized the error as a "typo."  (Id.)  However, Ahmed admitted she did not author Dr. Fahim's type-written declaration, and used the pronoun "we" to describe who recorded it, before claiming it was Amna.[75]  (Tr. 228:18-230:19).  Nor did Ahmed review the finished declaration with Dr. Fahim.  (Id.)  She could not recall the circumstances of that review, assuming it happened at all, and suggested she would "have to check exactly…what happened."  (Id.)  She used words like "maybe," "I guess," and probably in response to questioning about the purported review, revealing her poor recollection, generally.  (Id.)  Despite not being present for any review, Ahmed claimed that Dr. Fahim reviewed his declaration with Amna but conceded that neither Amna nor Dr. Fahim detected the substantial error in the declaration, which confuses Hayat's home village for the location of the jihadist camp he was convicted of attending.  (Id.)

The error Ahmed identified carries significant consequences.  First, the error reveals the unreliability of Ahmed's testimony overall.  It also reveals the unreliability of Ahmed's claim that each declarant reviewed the prepared statements that she, Amna, and Mrs. Shah synthesized from their notes, and that any such review resulted in the correction of any errors in the declarations.  Indeed, the mistake

---

[74] Balakot is the location of the camp Hayat admitted attending.  He lived in the village of Behboodi.

[75] Dr. Fahim's testimony contradicted Ahmed's testimony and claimed a man typed his declaration.  (Tr. 1012:7-15).  In her testimony, Ahmed did not mention receiving assistance during her work in Pakistan from any man other than Hayat's family members or friends.

in Dr. Fahim's declaration reveals that even a major error in a typed declaration (in English), was not detected and corrected by the (apparently ineffective) quality-control process Ahmed claimed she used during the collection of the declarations.  Ahmed's testimony forces the question of how many other errors went undiscovered in the declarations she collected, including errors associated with the frequency that the declarants claimed they saw Hayat or other key assertions.

Second, the "Balakot" error in Dr. Fahim's declaration reveals there were discussions among the declarants and/or with Ahmed about Hayat's conviction and his *habeas* claims.  That revelation makes clear the process of collecting the alibi declarations was not an objective fact-finding mission but, rather, an organized effort to generate helpful evidence.  The resulting taint undermines the reliability of all of the declarations.  Dr. Fahim's declaration does not include a discussion of the charges against Hayat.  Nor does it directly mention Hayat's conviction or the underlying details.  Yet, Dr. Fahim mentions Balakot three times in his declaration, including in his claim that Hayat could not have traveled to Balakot alone.  (Def. Ex. EEE).  Dr. Fahim also claimed Hayat was too easily intimidated to play with a toy gun.  (Id.)  The reason Dr. Fahim mentioned Balakot and guns, was that he was thinking about Hayat's conviction from recent discussions with someone about those facts.  The "Balakot" error is not just a simple typo.  It is a window into the deeply flawed process by which his and the other declarations were collected, and the fundamental unreliability of those declarations.

### 3) The use of stamp paper did not remedy the unreliability of the declarations.

The use of "stamp paper" by Ahmed and her team did nothing to improve the reliability of the declarations.  Ahmed and her team recorded the statements on stamp paper, which Ahmed claimed is used for legal documents in Pakistan.  (Tr. 199:6-13).  Amna, and not Ahmed, took the finished declarations to an oath commissioner to be stamped in the manner of a notary—except that the declarants were not present, no fingerprints were taken, and the oath commissioner purportedly compared the signatures on the declarations to copies of the declarants' signatures from their national identification cards.  (Tr. 200:12-18; 224:1-226:20).  Amna did not testify and Ahmed offered only her hearsay-based belief about how the oath commission process unfolded.  (Tr. 223:18-226:20).

Ahmed did not know whether the oath commissioners were subject to the same kinds of

93

regulations as notaries in the United States. (Tr. 226:2-4). She did not know whether oath commissioners were required to keep records of the stamp paper they signed. (Tr. 226:5-10). She "believed" Amna took copies of the declarants' identifications cards with her to the oath commissioner but did not know and was unable to produce copies of those identification cards during her testimony, Hayat did not otherwise produce copies, and no verification could be performed. (Tr. 223:8-23). The use of stamp paper did nothing to cure the unreliability of the declarations.

### 4)      The declarations are unreliable because Hayat's family and close friends faced no consequence for making false statements.

The declarations also raise the significant specter of sanction-free perjury. They lack the indicia of reliability that comes with an enforceable penalty for perjury. While the declarations state they were made under penalty of perjury under United States law, none of the declarants made their claims in the United States, while subject to its law. Thus, the declarations are "so incompatible with our fundamental principles of fairness or so prone to inaccuracy or bias as to render the testimony inherently unreliable." See United States v. Salim, 855 F.2d 944, 953 (2d Cir. 1988) (discussing unreliability of Rule 15 deposition testimony not subject to penalty for perjury). That is, in large part, because the "the absence of a sanction for perjury" renders them "suspect." See Alvarez, 837 F.2d at 1029; accord United States v. Feijoo-Tomala, 751 F. Supp. 40, 43 (E.D.N.Y. 1990) (discussing unreliability of Rule 15 deposition testimony not subject to penalty for perjury).

Unlike the domestic witnesses Hayat called at the 2018 hearing, the Pakistani declarants are beyond the reach of United States law and would bear no legitimate fear of perjury sanctions (apart from individual conscience).[76] Hayat proffered no evidence concerning the existence of a testimonial oath or its administration or enforcement in Pakistan. Ahmed testified she did not place any of the declarants under oath, under Pakistani civil law or Islamic law. (Tr. 230:20-233-7). Rather, she claimed she merely told them they had to tell the truth and that lying "is illegal." (Id.) She did not describe any penalty that applied if a declarant was untruthful. Ahmed acknowledged she was aware that perjury

---

[76] While an extradition treaty exists between the United States and Pakistan, 47 Stat. 2122 (U.S.-U.K. treaty) the four proposed witnesses could not be prosecuted in the United States for perjury committed in Pakistan. Also, the four Rule 15 deponents Hayat called at the hearing, all of whom were also declarants, were not truly subject to any meaningful penalty for perjury because the oath they took under United States law cannot be enforced in Pakistan.

94

occurs in Pakistan. (Tr. 233:25-234:2). Ahmed did not challenge any of the assertions made by the declarants. (Tr. 236:23-25). Hayat's failure to insure the declarants were subject to, and aware of, a meaningful penalty for perjury undermines the reliability of the declarations, who had a strong incentive—subconscious or otherwise—to say whatever necessary to help Hayat. As a result, the declarations are too unreliable to satisfy Hayat's substantial burden.

### 4.    The declarants' claims of seeing Hayat ten years earlier on a daily, weekly, or monthly basis strains credulity and renders the declarations unreliable.

The substance of the claims made by the declarants concerning their interactions with Hayat between April 2003 and May 2005 are inherently unreliable because of the close relationships between Hayat and the declarants. Moreover, the declarants' assertions that each recalled—ten years after the fact—daily, weekly, or otherwise routine interactions with Hayat in Behboodi or Rawalpindi, without any absences is risible. People do not commit to memory every ordinary interaction with another person, whatever the frequency. Even if a person was particularly memorable, the passage of ten years typically erodes detail from memory and leaves only impressions and outlines. People do not naturally recall the absence of activity with another person for 40 days, 60 days, or 90 days, particularly when that absence of activity occurred years earlier. The declarants' claims defy common sense. They are vague, generic, lack particular detail, and omit mention of specific triggers supporting their broad assertions.[77] As the Magistrate Judge ruled, albeit for other reasons, the declarations cannot support Hayat's claim of ineffective assistance of counsel.

The fact that the declarants consistently described observing Hayat engaged in innocent activities like playing video games or cricket while he was in Pakistan during the relevant period is not significant. Hayat's confession was played in open court and he claimed he engaged in those activities and others in that recording. He likewise discussed visiting Rawalpindi, getting married, and making other excursions from Behboodi during his confession. Moreover, Hayat's 2007 new trial motion included declarations from two of his cousins, Usama and Jaber Ismail, who purported to offer alibi evidence of Hayat's

---

[77] As Mr. Riordan testified at the 2018 hearing, people recall facts that are unusual and important, such as arguing before the Supreme Court of the United States or representing famous clients. (Tr. 888:17-889:18). The declarants claim the opposite: that they recalled in detail, after the passage of ten years, typical, ordinary, and mundane facts. Their claims defy common sense.

innocent conduct in Pakistan, including that Hayat played cricket and video games, rarely left his village, and was not away for more than three months between April 2003 and May 2005.[78]  (See CR 441, Ex. K & L).  Those declarations remain on the public docket, available to anyone in the world for review.  Indeed, those earlier declarations offer a roadmap on which the 2014 declarants could have based their consistent claims.  The declarations are unreliable and cannot satisfy Hayat's burden to demonstrate prejudice.

**a.    The District Court's earlier critique of the purported alibi declarations as unreliable and insufficient to satisfy Hayat's burden on summary judgment also applies on the merits.**

In its order denying Hayat's summary judgment motion, this Court found the declarations unreliable and insufficient to demonstrate prejudice.  This Court's critique of the vagueness and lack of personal knowledge that characterized the declarations applies on the merits and requires the same conclusion now:  the declarations cannot support Hayat's burden to demonstrate prejudice.  The reasoning for that conclusion also applies to the 2018 testimony of Hayat's six purported alibi witnesses.

After reviewing the declarations, this Court found that "[n]one of [the] declarations . . . squarely contradict Hayat's confession."  (See CR 600 at 17-18).  This Court concluded, "[t]he evidence Hayat's [*habeas* counsel] provides in support of Hayat's motion does not alter the 'evidentiary picture' involved with his conviction, which includes Hayat's confession that he trained at the Balakot camp …."  Id. This Court also observed that "the individuals declaring they spent time with Hayat while he was in Pakistan fail to provide specifics such as actual dates on which they saw Hayat, and personal knowledge about Hayat's activities when they were not with him."  Id.  Thus, this Court found the potential alibi testimony was "insufficient to satisfy Hayat's 'burden of showing that the decision [the factfinder] reached would reasonably likely have been different absent the [trial counsel's failure to more

---

[78] Curiously, the 2007 declarations of Hayat's cousins make no mention of his bout with meningitis in 2000, a matter addressed directly or indirectly in nine of the seventeen 2014 declarations.  (See Def. Ex. W, X, DD, EE, FF, GG, HH, II, JJ). Those declarants describe Hayat as "simple," "easy to intimidate," "timid," weak-minded, senseless, and afraid of loud sounds.  (See id.)  Hayat's meningitis is also not mentioned in his 2007 new trial motion.  (See CR 441).  Nor is it mentioned in the initial *habeas* petition he filed in 2007.  (See CR 496).  It remained unmentioned until these declarations in support of Hayat's 2014 *habeas* petition, which featured the alleged effects of Hayat's meningitis among its ineffectiveness arguments. In any event, Hayat's recorded conversations with Naseem Khan, in which he is boastful and self-confident, refute the claims of the declarants about his mental condition.  Likewise, Ms. Mojaddidi's testimony that she never detected that Hayat was unable to understand her during their many meeting also contradicts the declarants' claims, as does Hayat's recorded confession.

96

extensively investigate alibi witnesses]." Id.

Even if this Court focused in its summary judgment order on Hayat's time training during his 2000 camp visit, and not his 2003-2004 visit, its reasoning still holds. Hayat provided inconsistent and widely varying evidence about the duration of his time at camp in 2003-2004. That wide range included suggestions in his confession as short as days or weeks, suggestions in recordings with Khan implying a forty or eighty-day period, and statements in his confession of a period as long as "maybe" three months or up to six months. The evidence did not *only* support a period of three months and no less, which Ms. Mojaddidi knew while assessing the viability of an alibi defense. (See Tr. 732:2-10). Therefore, on the basis of that conflicting evidence of the duration of Hayat's time at camp in 2003-2004, this Court may again correctly conclude that the declarations do not alter the "evidentiary picture" supporting Hayat's conviction. That reasoning applies even after the 2018 hearing.

The trial evidence supported the conclusion that Hayat might have trained for as little as a few days, a few weeks, forty or eighty-days, "maybe" three months or up to six months. Thus, the jury would have had to conclude that the feats of extraordinary memory[79] claimed by the purported alibi witnesses, despite their inconsistencies, contradictions, and admission of strong bias, outweighed Hayat's confession and the other evidence of his guilt. The 2018 testimony, like the 2014 declarations, lacks sufficient indicia of reliability to make the question a close one. In light of the above factors, the 2018 purported alibi witnesses (and 2014 declarants) would have been viewed with extraordinary skepticism by any objective trier of fact, and the impact of their testimony on the jury's deliberation and verdict would have been minimal. The Magistrate Judge rejected the declarations as insufficient to demonstrate prejudice because the government was unable to cross-examine the declarants. This Court should reach the same conclusion for that reason and all the other reasons discussed above. This court should also apply its earlier reasoning to the 2018 testimony of Hayat's six purported alibi witnesses. Hayat cannot rely on the 2014 declarations or 2018 testimony to carry his burden to demonstrate

---

[79] In 2006 the declarants would have been asserting the still unbelievable claims of a then-current recollection that Hayat was never absent from Behboodi or Rawalpindi for days, weeks, or months—two years after the fact. The claim of a perfect recollection of the absence of activity, whether asserted two year or ten years after the fact, defies common sense and is inherently unbelievable, especially when asserted by biased witnesses with an interest in protecting a family member or friend. The testimony would not have altered the evidentiary picture at trial.

prejudice.

**VI.    MS. MOJADDIDI WAS NOT INEFFECTIVE MERELY BECAUSE THE COURT EXCLUDED HER PROFFERED "FALSE CONFESSION" EXPERT AND HER DECISION TO RELY ON DIRECT AND CROSS-EXAMINATION TO CHALLENGE THE RELIABILITY OF HAYAT'S CONFESSION WAS WITHIN THE WIDE RANGE OF COMPETENT REPRESENTATION**

Like the Magistrate Judge's analysis of Hayat's claims concerning Ms. Mojaddidi's investigation of an alibi defense, on this claim the Magistrate Judge again merely adopted the erroneous opinions of Hayat's defense attorney experts—despite the legal error inherent in those opinions.  See F&R at 59-60. Consequently, the Magistrate Judge's analysis is tainted by the same error.  The resulting misapplication of the legal standard produced conclusions that are contrary to law.  See DeFazio, 459 F.Supp.2d at 163 (E.D.N.Y. 2006) ("An order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure.").  This Court should reject those conclusion.  Ms. Mojaddidi's strategic choices to challenge the voluntariness and reliability of Hayat's confession were reasonable and, even if she could have done more, Hayat cannot demonstrate prejudice.

**A.    Ms. Mojaddidi attempted to introduce an expert to challenge Hayat's confession but this Court excluded him because his testimony would not assist the jury.**

Ms. Mojaddidi reviewed all of Hayat's FBI interviews and believed that the most important evidence against him was his confession.  (W.M. Depo. 49:5-14, 68:16-18, 162:18-19, 207:6-11; Tr. 743:2-4).  Ms. Mojaddidi was familiar with methods to challenge purported false confessions, had "learned about" the law governing voluntariness of a confession, and had discussed it with Mr. Griffin and James Wedick, a former FBI special agent with 35 years of experience, who was an investigator for Hayat and Umer before and through their 2006 trials.  (W.M. Depo. 41:9-14, 70:4-16; Tr. 574:14-610:22, 583:6-11, 744:2-15).  Ms. Mojaddidi originally intended to challenge Hayat's confession with a defense expert on false confessions and cross-examination of his government interrogators.  (W.M. Depo. 207:12-209:17).  Contrary to Hayat's argument, (OPHB 73:23-27), Ms. Mojaddidi "certainly" knew a challenge to the "voluntariness" of a confession was a legal basis for a motion to suppress.  (Tr. 744:18-20).

The defense intended to call Wedick as an expert to explain why Hayat's confession was unreliable.  (W.M. Depo. 70:9-16; Tr. 594:6-9).  As an FBI agent, Wedick had conducted hundreds of

interviews and interrogations, and agreed to serve as an expert to offer an opinion on the techniques used to elicit Hayat's confession, among other things. (W.M. Depo. 207:16-208:4; Tr. 575:12, 604:6-21, 724:9-25; Gov. Sup. Ans. Ex. 18). Ms. Mojaddidi was aware Wedick had never previously qualified as an expert in the field of false confessions but she believed he would be "good" and would be deemed qualified to testify. (W.M. Depo. 70:21-23, 71:5-7, 208:16-17, 286:4-6). Ms. Mojaddidi was aware there were other potential false confession experts, and considered information sent to her by other experts in the field but did not contact them. (Id. at 70:24-71:7, 208:7-17). Ultimately, she decided to utilize Wedick as an expert on behalf of Hayat.[80] (W.M. Depo. 208:18-209:1; Tr. 594:6-9).

To prepare, Wedick reviewed tapes of Hayat's interview and met with Ms. Mojaddidi and Mr. Griffin. (W.M. Depo. 209:21-25; 592:17-24, 594:12-14, 604:3-605:1). Wedick prepared a draft expert disclosure that Ms. Mojaddidi and/or Mr. Griffin reviewed and edited. (W.M. Depo. 209:23- 210:12, 285:16-25; Tr. 604:18-21). According to the March 22, 2006, disclosure, Wedick intended to opine:

> [T]he interviewing agents did not consider but should have considered [Hayat's] vulnerabilities as an interviewee. Specifically, ... the agents should have considered [Hayat's] age, intelligent (sic) quotient, level of education, mental handicap, language barrier, health, marriage and/or family status, occupation and employment status, religion and/or belief in God, illiteracy, fatigue, social isolation, and inexperience with the criminal justice system. [A]ll of these factors should be considered by FBI agents in conducting interviews to insure the validity of any elicited 'confessions.'
> [The agents] all used leading questions during the interviews of [Hayat], [listing purported examples]. [T]he agents did not ask sufficient open-ended questions. [T]he agents' use of leading questions throughout the interview contaminated the 'confessions' to render them unreliable.

(Gov. Sup. Ans. Ex. 18 at 8).

The government moved to exclude Wedick's testimony (CR 251), which the defense opposed (CR 271). On March 31, 2006, this Court excluded Wedick's opinions during trial, finding his opinions "would not assist the trier of fact, that is, the jury, with understanding the evidence, or with determining a fact in issue." (RT 3521:17-3552:21). The Court's ruling did not concern, and specifically excluded consideration of Wedick's qualifications. (RT 3552:21) ("My tentative ruling didn't cover his qualifications."). After the Court's in-trial ruling, and in light of the state of law at the time and since, as

---

[80] Ms. Mojaddidi and Mr. Griffin thought Wedick was the best person to testify about the confessions of both defendant's because of his more than 30 years of experience as an FBI agent and because he "had come out of" the Sacramento Division of the FBI. (W.M. Depo. 286:19-287:5).

discussed below, it was reasonable for Ms. Mojaddidi to conclude it was strategically unwise to spend time attempting to procure an alternative false confession expert and, instead, to focus on demonstrating the unreliability of Hayat's confession by using direct and cross-examination of his FBI interrogators to reveal flaws in their techniques which, from her perspective, produced Hayat's unreliable statements.[81]

After Hayat was convicted, this Court issued a written order, on May 17, 2007, denying his new trial motion. (CR 482). Among other things, Hayat claimed this Court erred in excluding Wedick's testimony at trial. (Id.)  This Court rejected that argument and confirmed its earlier ruling that Wedick's "testimony would have had little probative value and would not have assisted the jury as contemplated by Rule 702." (Id. at 51-55).  The Court also noted "the circumstances of Hayat's interrogation and confession were readily apparent to the jury through the testimony of the interviewing FBI agents and the videotapes, and therefore, Wedick's testimony was not necessary to inform the jury about the circumstances surrounding Hayat's confessions." (Id. at 47-48).  The Court supplemented its earlier ruling and found Wedick was not "qualified as an expert in the field of psychology or psychiatry," nor "otherwise had the qualification to give expert testimony regarding Hayat's alleged susceptibility to suggestion and coercion." (Id. at 50).  The Court held that "any connection that Hayat wanted Wedick to make between the factual circumstances of Hayat's confession and factors that may lead to unreliable confessions could have been and was ultimately made by defense counsel during closing arguments." (Id. at 52).  The Court's later ruling on Hayat's new trial motion does not transform the reasoning of the Court's earlier trial ruling. See United States v. Hayat, 710F.3d 875, 903 (9th Cir. 2013) ("The district court excluded Wedick's testimony…finding [it] was of 'marginal probative value' and that its value was outweighed by the risk of confusing the jury, wasting time, and presenting needless cumulative evidence. The court also concluded [the] testimony 'would not assist the trier of fact.').

///

///

---

[81] Any new expert would have been excluded because Hayat could not have complied with his discovery obligations to permit the government pre-trial notice of the experts opinions and qualifications, and the right to challenge the expert under the rules of evidence. See Fed. R. Crim. P. 16(b)(1)(B) & (C); FRE 702-705. Ms. Mojaddidi fulfilled her duty by retaining an expert whom she and her co-counsel reasonably believed would be permitted to testify on the subject of improper interrogation techniques.  This Court's disagreement with them (because the proposed expert testimony would not assist the jury in understanding the circumstances of an interrogation that was videotaped), does not make the decision unreasonable.

**B.**     **Ms. Mojaddidi vigorously cross-examined government agents and elicited testimony in support of the defense theory that Hayat's confession was unreliable and he did not attend a jihadist camp.**

As this Court held in its order denying Hayat's new trial motion, "any connection that Hayat wanted Wedick to make between the factual circumstances of Hayat's confession and factors that may lead to unreliable confessions could have been and was ultimately made by defense counsel during closing arguments." (CR 482 at 52).  Indeed, Ms. Mojaddidi's vigorous challenge to the reliability of Hayat's confession through cross-examination his interrogators was reasonable and well within the range of effective advocacy.  Specifically, she vigorously cross-examined FBI special agents called by the government as part of its case, including SA Lawrence Futa, SA Harry Sweeney, SA Tenoch Aguilar.  Ms. Mojaddidi also called SA Gary Schaff as part of the defense case and subjected him to a vigorous examination.  Ms. Mojaddidi questioned each of those witnesses in a fruitful effort to elicit testimony in support of Hayat's contentions that: (i) Hayat had not attended a camp; (ii) Hayat truthfully denied that he attended a camp in initial interviews with the FBI; and (iii) Hayat was induced to offer false admissions by the FBI in later interviews.  No more was required and this Court should deny Hayat's claim, and reject his arguments to the contrary.

**1.     May 30, 2005 Interview.**

SA Futa interviewed Hayat on May 30, 2005, when Hayat's inbound plane from Pakistan was diverted to Tokyo because Hayat was on the "No-Fly" list.[82]  During cross-examination by Mojaddidi, SA Futa confirmed Hayat was cooperative, friendly, and not in any way argumentative or resistant during a one-hour interview.  (RT 470:18-23, 474:19-20, 476:3-4).  Hayat's relatives were also interviewed and, according to SA Futa, were also cooperative.  (RT 470:24-25, 471:1-4).

SA Futa conceded Hayat denied attending any meetings related to terrorism, denied being a member of any terrorist group, and denied ever participating in any terrorist training.  (RT 472:22-473:8).  SA Futa testified Hayat told him the main reason Hayat went to Pakistan was to care for his mother while she was undergoing treatment for Hepatitis C.  (RT 474:9-12).  SA Futa testified Hayat claimed while Hayat was in Pakistan he cared for his ill mother, played cricket, went to the mosque,

---

[82] Before the interview, SA Futa confirmed with SA Aguilar that Hayat was on the No Fly List, (RT at 466:12-18), and had received information indicating that Hayat potentially had ties to terrorism and might have participated in a terrorist training camp.  (RT at 482:5-18).

went to Islamabad for vacation, and got married.  (RT 473:9-23).  SA Futa also testified Hayat stated that when Hayat returned to the United States, he intended to become a truck driver like his uncle, and wanted to attend school to improve his English.  (RT 473:24-474:8).  SA Futa acknowledged that, based on his interview and observations, Hayat did not appear to be someone who had recently attended anything involving rigorous training.  (RT 474:24-475:12).  Moreover, based on SA Futa's observations and the interview, SA Futa and others came to the conclusion Hayat did not pose a threat to the aircraft, could be removed from the No Fly List, and should be allowed to return to the United States.  (RT 470:6-12, 478:8-23).

## 2.    June 3, 2005 Interview.

Under cross-examination by Ms. Mojaddidi, SA Aguilar confirmed that, during the June 3, 2005 interview of Hayat at his home in Lodi, Hayat was cooperative, pleasant, and did not show any signs of resistance.  (RT 690:10-14, 697:6-9).  SA Aguilar testified Hayat told him Hayat went to Behboodi, Pakistan, about two years prior – approximately April 2003 – and that the purpose of his trip was to care for his ailing mother who was suffering from Hepatitis C.  (RT 692:14-20).  Hayat stated he did not work while in Pakistan because he would have earned only approximately $1 for twelve hours of work, and he did not go to school because the schools were not very good.  (RT 692:24-693:7).  Hayat stated that, instead, he played cricket, hung out with his cousins, played Playstation, and every other weekend he and his mother traveled to Rawalpindi to obtain medical treatment for her.  (RT 693:11-20).  The other weekends he would visit Islamabad with friends to eat American food, watch movies, and go cruising.  (RT 693:21-694:1).  SA Aguilar testified Hayat claimed he married while in Pakistan.  (RT 694:2-3).  SA Aguilar conceded Hayat denied ever attending a training camp in Pakistan, that he would ever be involved in anything related to terrorism, and that he went to a jihadi madrasa.  (RT 694:13-696:13).

## 3.    June 4 and 5, 2005 Interviews.

Under cross-examination by Ms. Mojaddidi, SA Sweeney confirmed he interviewed Hayat from noon until 4:15 on June 4, 2005.  (RT 515:9-14, 518:25-519:3).  SA Sweeney conceded that for the first three and one-half hours of the interrogation, Hayat denied he attended a terrorist training camp in Pakistan at least five or six times, and also denied any connection to jihadi training.  (RT 519:15-

520:17).

During cross-examination of SA Sweeney, Ms. Mojaddidi elicited testimony about contradictory answers Hayat gave during the June 4 and 5, 2005 FBI interviews, which supported the defense theory that Hayat's confession was unreliable. SA Sweeney confirmed Hayat denied wrongdoing during hours of questioning until SA Sweeney asked Hayat two ruse questions. SA Sweeney confirmed he first asked Hayat: "Is it possible, Hamid, that you didn't know that you were going to a jihadi training camp? Is it possible that you may have thought it was something else, like a religious education camp?" (RT 520:24-521:3). In response, Hayat made his first admission. (RT 531:3-9). Next, even though the FBI did not possess satellite photographs of Hayat attending a training camp, SA Sweeney suggested to Hayat that "the FBI had technical capabilities," and asked Hayat another ruse question: would there be any reason why Hayat's image would be on a satellite photograph during his most recent visit to Pakistan. (RT 534:6-14, 535:1-24; RT 3715:1-8). Thereafter, Hayat admitted he was, in fact, at a camp in 2003 for a much longer period of time. (RT 525:15-20). SA Sweeney also confirmed to Ms. Mojaddidi that the initial interview he conducted with Hayat, including his admissions and denials, was not recorded. (RT 528:3-529:24, RT 3635:4-11).

During SA Aguilar's testimony, the defense published the entire four hours of Hayat's videotaped interviews on June 4 and June 5, 2005. (RT 716:11-719:9, 750:2-752:3, 757:5-21). Ms. Mojaddidi then led SA Aguilar through a series of questions to demonstrate Hayat had given different answers to many questions throughout the interviews, and that many of Hayat's statements about the camp were not confirmed by law enforcement investigation. SA Aguilar conceded Hayat made different statements about when he attended camp indicating, at one point, that he attended camp in roughly October or November 2003 (RT 760:9-11), and at another point that he attended in October or November of 2004. (RT 760:12-761:6). SA Aguilar conceded he was unable to confirm Hayat attended a camp on either of those dates without Hayat's statements. (RT 762:9-12).

Under cross-examination by Ms. Mojaddidi, SA Aguilar also conceded Hayat made a variety of statements about the camp location, indicating at various times that it was in Balakot, in the Kashmir, in Afghanistan, near Islamabad, in Tora Bora or Dorhum, in the Northwest Frontier Province, and near his village of Behboodi. (RT 762:17-763:25). SA Aguilar testified he was not able to confirm Hayat

103

attended camps in any of those locations, "minus [Hayat's] statements." (RT 764:10-14). SA Aguilar confirmed Hayat gave varying testimony about the length of his stay at the camp, once indicating he was there for three to four months and later stating he was there for six to seven months. SA Aguilar conceded the FBI was unable to confirm the length of Hayat's stay. (RT 764:15-765:2).

Ms. Mojaddidi also cross-examined SA Aguilar about Hayat's account of camp leadership. SA Aguilar conceded Hayat gave conflicting answers on the subject, claiming at various points in the interviews that: there was no leadership, it was led by Harakat-ul-Ansar, Hayat's grandfather ran the camp, Hayat's uncle ran the camp, and al-Qaeda ran the camp. SA Aguilar acknowledged the FBI was unable to confirm Hayat attended a camp run by any of these people or groups. (RT 766:1-3). SA Aguilar also confirmed Hayat made varying statements concerning the number of people attending camp, at one point claiming there were between thirty-five and fifty people and at another, claiming there were over 200 attendees. (RT 766:4-12). SA Aguilar also confirmed Hayat made conflicting statements about the training he received at camp. At one point, Hayat stated he received pistol training and at another point he stated he did not receive much training at all. (RT 767:3-7). SA Aguilar testified that without Hayat's statements, law enforcement agents were not able to confirm what training Hayat received. SA Aguilar also conceded Hayat gave varying responses concerning the length of a camp stay for an attendee, stating at different times during the interview that it was five months to a year, six to seven months, and that one could stay for as long as one wanted. (RT 767:8-21). SA Aguilar conceded the FBI was not able to confirm the typical duration. (RT 767:22-768:1).

Ms. Mojaddidi elicited a series of additional concessions from SA Aguilar to support the defense theory that Hayat's confession on June 4 and 5, 2005 was unreliable. SA Aguilar acknowledged that, over sixty times, Hayat answered questions or premised his answers with statements like: "I'll say," or "I'll say that." (RT 768:2-8). SA Aguilar confirmed Hayat complained of being tired, complained of being sleepy, complained of having a headache and stated at one point that his mind "was not working." (RT 768:9-20). SA Aguilar conceded fatigue appeared to affect Hayat's responses to the questions asked at the end of the interview. (RT 769:1-5). Additionally, SA Aguilar did not dispute that, at certain times during the interviews, agents grew frustrated and, at least five times, told Hayat that his statements did not make any sense. (RT 770:23-771:3). SA Aguilar testified that, even though Hayat

104

twice asked if he could go home, Hayat was never told he could go home if he wanted to.  (RT 771:4-22).

Ms. Mojaddidi also elicited a series of concessions from SA Schaaf to support the defense theory that Hayat's confession during the June 4 and 5, 2005 interview was not reliable.  SA Schaaf conceded, in substance, that he used leading questions when he asked Hayat: (1) whether he attended "jihadi" training camps (RT 3638:9-3639:7); (2) whether he had traveled by bus to the camp from Pindi (RT 3639:9-18; (3) whether he had gone to the Northwest Frontier Province while he traveled to the camp (RT 3643:3-8, 3644:3-12); (4) whether Hayat arrived at camp in the dark (RT at 3644:13-3645:2); (5) whether weapons and explosives training was offered at camp (RT at 3645:3-9); (6) whether there were different functions going on in the camp  (RT 3645:14-20); (7) whether individuals took supplies up the trail to the camp (RT 3645:17-24); (8) whether there was rifle training, other weapons training,  and explosives training at the camp (RT 3646:1-24); (9) whether there were Kalishnikovs – Russian-made machine guns – at the camp (RT 3647:2-4); (10) whether there were buildings at the camp, (RT 3648:19-3649:21); (11) whether Hamid had been at the camp for multiple months (RT 3650:2-17); (12) whether various militant groups were associated with the camp, including Harakuat ul-Mujaheden, Harakat ul-Ansar, Sipah-e-Sahaba, and JUI (RT 3650:18-3651:18); and (13) whether they were "teaching people how to kill American troops" at the camps.  (RT 3661:17-3662:10).  SA Schaaf testified he could not recall whether there was an FBI protocol concerning when to ask leading questions or whether he had ever received training with respect to leading questions.  (RT 3640:4- 3641:10).  He conceded that open-ended questions were preferred and that he had asked leading questions of Hayat. (RT 3641:7-10, 3666:21-3667:4).

Ms. Mojaddidi also highlighted a series of seemingly incredible statements by Hayat.  SA Schaaf conceded there were some statements Hayat made that he simply did not believe.  (RT 3719:18-25).  For example, at one point Hayat said there were no knives anywhere in the camp, not even in the kitchen. (RT 3647:5-19).  Hayat claimed he washed vegetables at the camp on most dates, implying that he did nothing else.  (RT 3659:4-16).  Hayat suggested he had been fooled into going to a camp and later that he had run away from camp.  (RT 3659:17-3661:9).  At one point, SA Schaaf told Hayat: "That's your story but it doesn't mean it's true."  (RT 3667:5-8).

105

Ms. Mojaddidi led SA Schaaf through a series of questions to demonstrate Hayat gave different answers to many questions throughout the interviews.  In response to Ms. Mojaddidi's questioning, SA Schaaf confirmed Hayat made inconsistent statements about the camp location, suggesting it was located in Afghanistan, Kashmir, Tora Bora, Dorhum, near Islamabad, and near his village, Behboodi.  (RT 3715:17-3716:1).  SA Schaaf confirmed that, in discussing the number of camp attendees, the number of attendees reported by Hayat "changed as it went along."  (RT 3716:12-18).  SA Schaaf also confirmed he never told Hayat he was free to go home.  (RT 3719:4-9).  Even though Hayat told SA Schaaf he was jet-lagged and tired, SA Schaaf admitted he continued the questioning.  (RT 3719:13-18).

In sum, it is clear that Ms. Mojaddidi, through direct and cross-examination, was able to elicit evidence to support the defense theory that Hayat's confession was unreliable, and she powerfully argued the same in closing.  Ms. Mojaddidi's effective direct and cross-examinations of government witnesses strongly challenged the reliability of Hayat's confession, addressing specific interrogation techniques used by his interrogators.  She reasonably expected to present Wedick's expert testimony addressing the same issues and to supplement her effective examinations and argument.  It was not ineffective for her to make that informed strategic choice.  The fact that this Court ruled Wedick's testimony would not assist the jury to evaluate a four-hour videotaped confession that they watched in full, does not transform Ms. Mojaddidi's competent representation on this point into ineffectiveness.

    **C.**    **Ms. Mojaddidi did not provide ineffective assistance by not calling an alternative expert witness to support Hayat's defense theory that his confession was unreliable and that he did not attend a jihadist camp.**

At the 2018 hearing, Hayat presented the testimony of Dr. Richard A. Leo ("Dr. Leo") who offered his opinions "on risk factors that can occur in an interrogation." (Tr. 18:22-25).  Dr. Leo's testimony did not advance Hayat's effort to meet his burden to show Ms. Mojaddidi was ineffective for relying on vigorous direct and cross-examination, and argument, to challenge the reliability of his confession.  Rather, Dr. Leo's testimony confirmed Ms. Mojaddidi's efforts were effective.  Moreover, in his testimony, Dr. Leo demonstrated that, if he had been called at Hayat's trial, he would have merely told the jury what they could already see by watching Hayat's recorded confession.  He also admitted his flawed methodology is not predictive of any outcome, and that the presence of all or none of the risk factors he identified in any given interrogation could produce either a true or a false confession.  Such

testimony could not have aided Hayat's jury.  Indeed, it would have suffered the same fate as Wedick's proposed testimony, and this Court would have excluded it as unhelpful and because it risked usurping the judgment of the jury.  It fares no better in this *habeas* action, and cannot help Hayat meet his burden on this claim.[83]

### 1.    Dr. Leo's testimony confirmed the effectiveness of Ms. Mojaddidi's efforts to challenge the reliability of Hayat's confession and revealed his own work to be unreliable and unhelpful to a jury.

After discussing his training and research on direct, Dr. Leo described what he claimed are risk factors that correlate to the possibility of false confessions.  (Tr. 26:11-39:9).  He identified certain of those purported risk factors in Hayat's video-recorded confession.  (Id. at 53:13-73:14).  He summarized his testimony by noting he believed Hayat's interviewers used a false evidence ploy, inducement regarding leniency / threat of worse consequences, and sleep deprivation.  (Id. at 72:22-73:11).

On cross-examination, Dr. Leo answered questions about his background and credentials.  He admitted the "overwhelming majority" of the cases he listed on his 56-page curriculum vitae cited to articles he had written or co-written and did not affirm his conclusions in any particular case, including the three citations by the U.S. Supreme Court.  (Tr. 76:1-78:18, 99:14-101:19).  He also admitted that he did not compile the list or review its accuracy.  (Id.)  He admitted only 10% of his appearances as a witness were in federal court, and that he was paid $250 per hour to testify on Hayat's behalf.  (Id. at 79:8-80:11).  Dr. Leo also conceded that although he earned a law degree, he has never practiced law, and had only observed legal proceedings.  (Id. at 89:12-19).

Dr. Leo discussed the goals of his testimony in a given case.  He testified he viewed his role as

---

[83] On this claim, Hayat relies on Mr. Weinberg's parroting of his legal claims to argue that "every competent attorney knows that one of the best ways to attack a false confession is with expert testimony on the possibility of false confessions." (OPHB at 78).  Of course, Mr. Weinberg's testimony about what "best" practices might be do not illuminate the Strickland analysis, which evaluates whether particular decisions were within the broad range of effective representation.  See White v. Singletary, 972 F.2d at 1220-21  ("The test [of effective counsel] has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.").  Mr. Weinberg's unreliable opinion on this question, like the other areas in which Hayat attempts to use his testimony to replace the applicable legal standard, is irrelevant.

The Magistrate Judge uncritically accepted Mr. Weinberg's testimony and, in combination with Mr. Broderick's flawed testimony, substituted their opinions for the applicable legal standard.  In the resulting analysis, the Magistrate Judge failed to analyze what Ms. Mojaddidi actually did, failed to apply the presumption of adequate performance, and failed to defer to her reasonable decisions.  See F&R at 59-60.

working to give jurors a "framework" and "specific context" in which to undertake their deliberations about the reliability of a defendant's statement. (Id. at 82:5-83:12). He explained he worked to help people understand that false confessions happen and consider their internal bias against the belief that innocent people do not falsely confess to crimes. (Id. at 82:12-20). He also admitted he viewed the purpose of his testimony as helping "effect [sic] the jurors' review of a particular…defendant's statement." (Id. at 83:3-12).

### a. Dr. Leo's hearing testimony demonstrated that his hypothetical trial testimony would have overlapped substantially with Wedick's proposed trial testimony, which this Court excluded.

Dr. Leo also answered questions about his evaluation of Hayat's interrogation on cross-examination. He agreed that nearly all of the factors about which Wedick planned to testify, (and which Wedick listed in his pretrial expert disclosure), were among the factors Dr. Leo typically considered relevant to his evaluation of purported risk factors present in an interrogation. Those co-extensive factors included age, intelligence, level of education, mental handicap, language barrier, health, marriage and/or family status, employment status, inexperience with the criminal justice system, use of leading questions, insufficient open-ended questions, and contamination. (Compare Tr. 84:6-89:9 with Gov. Sup. Ans. Ex. 18 at 8). Dr. Leo also conceded the truism that there is nothing illegal or immoral about law enforcement officers' use during interrogations of the techniques he characterized as risk factors for producing an unreliable confession. (Id. at 80:12-81:6).

### b. Dr. Leo conceded that his research is not predictive and does not prove correlation, and his testimony demonstrated that his hypothetical trial testimony would have merely confused the jury and usurped its judgment.

Dr. Leo's most important admission was that his research predicts no outcome in any case in which all, some, or none of the purported risk factors he identified are present in an interrogation. (Id. at 107:17-108:17, 102:7-15). He conceded that *all* of the so-called risk factors could be present and the resulting confession could nevertheless be true. (Id. at 102:2-22). He also conceded that *none* of the risk factors could be present and the resulting confession could be false. (Id. at 108:2-10). Moreover, he conceded the correlation between those risk factors and a false confession has not been subjected to direct testing beyond academic laboratory experiments involving role-playing volunteers, and that he

had never conducted any research on that correlation.  (Id. at 107:3-16, 102:2-6).

    **c.**  **Dr. Leo conceded that calling him or an expert like him at trial is not the only effective method of challenging the reliability of a confession.**

  Dr. Leo also conceded that calling him or an expert like him at trial is not the only effective method of challenging the reliability of a confession.  (Id. at 90:23-91:4).  He agreed that a lawyer could question interrogators about their training and techniques to challenge the reliability of a confession.  (Id. at 91:2-94:4).  He conceded that a long list of potential direct or cross-examination questions could be effective in challenging the reliability of a confession.  (Tr. 90:23-92:22).  Thus, in effect, he contradicted the testimony of Hayat's defense attorney experts who asserted that effective advocacy required Ms. Mojaddidi to call a so-called false confession expert to reasonably challenge a confession, although he denied making such a concession.  (Tr. 90:23-91:7, 92:23-94:4).

  Specifically, Dr. Leo agreed a lawyer could question interrogators on the use of leading questions to challenge the reliability of a confession.  (Id. at 91:8-11).  He agreed a lawyer could question interrogators on the use of ruses and evidence ploys to challenge the reliability of a confession.  (Id. at 91:12-16).  He agreed a lawyer could question interrogators about their training to challenge the reliability of a confession.  (Id. at 91:19-22).  He agreed a lawyer could question interrogators about inconsistent answers a subject gave during an interrogation to challenge the reliability of a confession.  (Id. at 91:23-92:1).  He agreed that, to challenge the reliability of a confession, a lawyer could question interrogators about whether other investigative work confirmed any incriminating statements.  (Id. at 92:2-5).  He agreed a lawyer could also question interrogators to show that a subject answered questions with prefatory statements like, "I'll say," or, "I guess," to challenge the reliability of a confession.  (Id. at 92:12-16).  He agreed a lawyer could also question interrogators about a subject's complaints of having a headache or being tired to challenge the reliability of a confession.  (Id. at 92:17-22).

    **d.**  **Dr. Leo conceded that courts have strongly criticized his methodology and rejected his proposed testimony.**

  Dr. Leo also admitted that courts have rejected and criticized his methodology.  Specifically, he conceded the Supreme Court of Michigan called the methodology and application of his research and the basis of his conclusions into question in People v. Kowalski, 821 N.W.2d 14, 31-32 (Mich. 2012).  (Tr. 95:2-97:20).  He conceded the Michigan Supreme Court affirmed findings that his methodology

was "unreliable at every stage[,]" the underlying data "were prone to inaccuracy or bias and, in nearly all instances, had not been subjected to the rigorous standards of scientific peer-review," and that his unreliable methodology "resulted in conclusions consistent with Leo's own preconceived beliefs rather than testable results consistent with an objective, scientific process." (Tr. 96:3-97:20). Notably, Dr. Leo testified that in the wake of the Michigan Supreme Court's harsh criticism of his work, he did nothing to adjust his methodology, data collection, or any other aspect of his work. (97:21-98:10). Instead, Dr. Leo simply declared that the Michigan Supreme Court and the lower courts it affirmed were "wrong."[84] (Id.) Dr. Leo conceded other courts have also rejected his conclusions and excluded his testimony. (Tr. 98:11-100:12).

**2.    Ms. Mojaddidi's efforts to challenge the reliability of Hayat's confession were effective.**

The techniques Ms. Mojaddidi deployed in her vigorous direct and cross-examinations during Hayat's trial were effective methods of challenging the reliability of Hayat's confession. See Hayat, 710 F.3d at 903 (finding exclusion of Wedick was proper and observing that "Hayat's counsel thoroughly explored the conduct of the agents who participated in [his] interview, including the improper use of leading questions, during her cross-examination of those agents."). It would have been wholly reasonable for a competent attorney to elect not to present Wedick or any alternative expert testimony concerning the phenomenon of false confessions. See, e.g., Harrington, 562 U.S. at 108 ("Even if it had been apparent that expert blood testimony could support [the defendant's] defense, it would be reasonable to conclude that a competent attorney might elect not to use it."). Ms. Mojaddidi's effort to execute effective direct and cross-examinations of Hayat's interrogators, and to call Wedick to provide a framework though which the jury could evaluate the techniques that elicited Hayat's confession, exceeded the Strickland standard of competent representation. She was not ineffective simply because this Court disagreed with her about whether Wedick's testimony would assist the jury.

---

[84] The Magistrate Judge ignores completely the Michigan Supreme Court's endorsement of strong criticisms of Dr. Leo's methodology, which was thorough and withering. See F&R at 62. Indeed, the Magistrate Judge cloaked the strength of those criticisms by referring merely to a 2008 "Michigan court," likely referring to the lower court the Michigan Supreme Court affirmed and adopted. Id. On this issue, like many others, the Magistrate Judge did not confront and engage facts and law that undercut Hayat's claim.

First, Ms. Mojaddidi elected to play the entire, four hours of Hayat's confession.  (RT 713:10-718:20, 750:2-752:3, 757:4-21).  Upon that foundation, she weaved together concessions she elicited from his FBI interrogators with her effective arguments assailing the reliability of Hayat's confession. Even without Wedick's testimony, Ms. Mojaddidi knew she would be able to—and ultimately did— present a full record of the circumstances of Hayat's various interviews by the FBI, including a trove of helpful testimony to advance the defense theory that Hayat's confession was not reliable.  See Crane v. Kentucky, 476 U.S. 683, 690 (1986) (noting playing of full confession allows defense to attack reliability of confession).  Wedick's testimony may have enhanced that approach but was only a supplement to her baseline approach, which, on its own, was effective.

Second, by the time of Hayat's trial, numerous federal and state courts had held that when the full circumstances of a confession are in the record for examination by the jury, expert testimony about the phenomenon of false confessions, even from a qualified expert, may properly be excluded because it would usurp the jury's function in making credibility findings and because of its minimal probative value and substantial improper prejudicial value.  See United States v. Miller, 874 F.2d 1255, 1266 (9th Cir. 1989) (affirming exclusion of testimony by a psychology professor regarding purported false admissions as unhelpful); United States v. Adams, 271 F.3d 1236, 1245-46 (10th Cir. 2001) (affirming exclusion of psychologist's expert testimony on false confession because it "necessarily touches upon witness credibility, invades the province of the jury and exceeds the scope of the witness's expertise."); Ritt v. Dingle, 142 F.Supp.2d 1142, 1145 (D. Minn. 2001) (affirming exclusion of psychologist's expert testimony on false confessions concerning interrogation technique because petitioner "was allowed to present the jury a videotape of her interrogation by [a police detective,] which showed the circumstances of her confession."); State v. Ritt, 599 N.W.2d 802, 812 (Minn. 1999) (holding that a psychologist's expert testimony about potential coercive effect of interrogation techniques during a videotaped interview was not helpful when jury had sufficient information to evaluate whether technique was coercive enough to make an ordinary innocent person confess).

In sum, given the state of the law and the basis offered by this Court in excluding Wedick's testimony, it was reasonable for Ms. Mojaddidi to conclude, as a matter of strategy and tactics, that it was not worthwhile to spend additional time to seek and attempt to present the type of general false

confession testimony Dr. Leo described, especially given the real likelihood it, too, would have been excluded.[85]  Instead, Ms. Mojaddidi took advantage of ample opportunities to challenge the reliability of Hayat's confession through direct and cross-examination, and argument.  Her fruitful effort shows why, on the facts of this case, any competent counsel might have reasonably elected not to call an alternative expert witness to assail the reliability of Hayat's confession.

        **3.**      **Ms. Mojaddidi did not act based on ignorance of the law and this is not a situation in which any competent counsel necessarily would have retained a false confessions expert.**

The Magistrate Judge failed to analyze whether Ms. Mojaddidi's strategy to present Wedick and also cross-examine Hayat's interrogators was a reasonable method to challenge Hayat's confession.  Rather, embracing the flawed opinions of Hayat's defense attorney experts, the Magistrate Judge simply presumed Ms. Mojaddidi's ineffectiveness, applying the 20/20 hindsight Strickland warns against.  Thus, in the conclusory fashion that characterizes much of the Findings and Recommendations, the Magistrate Judge found it was "clear that [Ms.] Mojaddidi did not seriously consider using a false confessions expert."  F&R at 60.  Yet, the relevant question is whether Ms. Mojaddidi's strategic decisions concerning how to challenge to Hayat's confession were reasonable.  They were.  The Magistrate Judge also asserts Ms. Mojaddidi could have (and should have) offered Wedick *and* a separate false confession expert at Hayat's trial.  That assertion demonstrates a consistent analytical error in the Findings and Recommendations, which over-emphasizes the flawed opinion Hayat's defense attorney experts (who presumed ineffectiveness) and does not focus on what Ms. Mojaddidi did or the reasonableness of those strategic choices.

[85] Hayat's argument that "it was essential that Ms. Mojaddidi locate and retain a qualified false confession expert," (OPHB at 68), ignores the basis for Wedick's exclusion and cases specifically excluding psychologists and psychiatrists, including Dr. Leo himself.  See Vent v. State, 67 P.3d 661, 670 (Alaska Ct. App. 2003) (affirming exclusion of Dr. Leo's expert testimony as unreliable and an invasion of the province of the jury); State v. Cobb, 43 P.3d 855, 869 (Kan. Ct. App. 2002) (affirming exclusion of Dr. Leo's expert testimony because it "invades the province of the jury"); State v. Free, 351 N.J.Super. 203, 798 A.2d 83, 95-96 (App. Div. 2002) (holding that trial court abused its discretion in admitting expert testimony on false confessions and interrogation techniques because it was it was of no assistance to the jury, and the jury would recognize that coercive methods have the potential for causing a false confession); State v. Davis, 32 S.W.3d 603 (Mo. App. 2000) (affirming exclusion of Dr. Leo's expert testimony, finding his testimony was "specific credibility testimony that encroaches upon the jury's duty to determine the reliability of defendant's statement," and noting adequate cross); People v. Gilliam, 670 N.E.2d 606, 619 (Ill. 1996) (affirming limitation of psychologist's expert testimony on false confession when jury heard testimony of other witnesses and because false confessions are "not a concept beyond the understanding of ordinary citizens"); State v. Tellier, 526 A.2d 941, 943-44 (Me. 1987) (affirming exclusion of expert testimony on false confessions on 403 grounds).

Ms. Mojaddidi reasonably believed that Wedick's experience in conducting FBI interrogations would be sufficient to establish his qualifications to offer an expert opinion concerning the defense theory of Hayat's purportedly unreliable confession.  (W.M. Depo. 70:21-23, 71:5-7, 208:16-17, 286:4-6).  Ms. Mojaddidi and Mr. Griffin[86] opposed the government's motion to exclude Wedick's testimony and it was clear they understood the relevant law in this area.  (See CR 271).  That this Court disagreed and excluded Wedick's testimony does not prove Ms. Mojaddidi was ignorant and deficient.  At the time of trial, a number of other courts had excluded false confession expert testimony—especially when, as in this case, the confession was videotaped—because such testimony simply did not aid a trier of fact.  Nevertheless, defense counsel in this case dutifully attempted to persuade this Court to exercise its discretion to admit Wedick's testimony.  The failure of that effort to win an uphill legal battle cannot be fairly branded a product of ignorance or incompetence.

Before the Magistrate Judge, Hayat also contended Ms. Mojaddidi should have "aggressively attacked" the "validity" of Hayat's confessions.  (OPHB at 75).  He cited to a concurrence by Judge Hawkins,[87] ignoring the case law that suggests that it is difficult to admit false confession testimony.  See United States v. Redlightning, 624 F.3d 1090, 1110-15 (9th Cir. 2010) (extensively discussing and affirming district court's exclusion of false confessions expert); United States v. Antone, 412 Fed. Appx. 10, 10 (9th Cir. 2011) (affirming exclusion of false confessions expert); United States v. Benally, 541 F.3d 990, 994-96 (10th Cir. 2008) (affirming exclusion of false confessions expert because it would usurp a critical function of the jury).  His argument ignores the law, which makes clear that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way."  See Harrington, 562 U.S. at 106.  "Rare are the situations in which the 'wide latitude counsel must have in making

---

[86] Mr. Griffin argued the motion.  (RT 3515:-3552:21).  His client, Umer, similarly confessed on videotape and Mr. Griffin made the same strategic choice to use Mr. Wedick to undermine the impact of the confession.  Given the alignment of their clients' interests, it cannot reasonably be argued that these choices were the result of a conflict between Umer and Hayat.  At the 2018 hearing, Wedick implied that since Hayat's trial, he has been qualified as an expert on interrogation techniques.  (See Tr. 593:4-12).  If so, Ms. Mojaddidi's chosen course to rely on his opinion was clearly reasonable because it was adopted by another lawyer and another court permitted his testimony.  Hayat's current claim is merely a second appeal—after rejection by the Ninth Circuit—of this Court's exercise of discretion to exclude Wedick's testimony.

[87] The dicta concerning the false confessions expert in the main opinion of Lunbery v. Hornbeak, 605 F.3d 754,760 (9th Cir. 2010) cites to the Ninth Circuit's *en banc* opinion in Richter v. Hickman, which was later unanimously reversed by the Supreme Court in Harrington v. Richter, 562 U.S. at 91 ("That judicial disregard is inherent in the opinion of the Court of Appeals for the Ninth Circuit here under review…. This was clear error.").

113

[strategic or] tactical decisions' will be limited to any one technique or approach." Id. at 106.

Here, the record establishes Ms. Mojaddidi chose a reasonable technique to challenge the reliability of Hayat's confession. When Wedick's testimony was excluded during trial, Ms. Mojaddidi focused her efforts on challenging the reliability of Hayat's confession with vigorous cross-examination of his FBI interrogators and powerful closing argument. She made a reasonable strategic and tactical choice to avoid distraction and potential delay by seeking an alternative expert, whose opinion would have been vulnerable to exclusion for discovery violations, see Fed. R. Civ. P. 16(b)(1)(B) & (C), and for the same reasons the Court excluded Wedick's proposed testimony (which was nearly co-extensive with Dr. Leo's proposed testimony, compare Tr. 84:6-89:9 with Gov. Sup. Ans. Ex. 18 at 8), namely: that it would not assist the jury in understanding the evidence, which included a videotape of Hayat's interviews. Hayat has failed to overcome the strong presumption that Ms. Mojaddidi's conduct fell within the wide range of competent representation. His claim must fail.

**D.      Hayat has not established prejudice as a result of Ms. Mojaddidi's purported failure to admit testimony of a false confession expert.**

Even if Ms. Mojaddidi's purported failure to procure an alternative expert to testify about the phenomenon of false confessions was somehow defective, Hayat cannot demonstrate a substantial likelihood of a different outcome at trial, and his claim must fail.

First, as described above, Ms. Mojaddidi elicited substantial evidence from a variety of witnesses to support her argument that Hayat's confession was unreliable, including testimony concerning: (i) Hayat's initial, persistent denials; (ii) agents' use of leading questions; (iii) Hayat's conflicting answers about camp location, his manner of travel, when he attended camp, how long he attended camp, how many others attended camp, the duration and composition of training; (iv) answers from Hayat that agents found unbelievable; (v) that Hayat complained of being tired, jet-lagged, having a headache, and that his mind "was not working"; (vi) that interrogators grew frustrated with Hayat and told him several times that his answers did not make sense; and (vii) that interrogators never told Hayat he was free to go home during the interview. Ms. Mojaddidi relied on that evidence to zealously argue in her closing that Hayat's confession was unreliable. (RT 4308:5-4320:17). The additional background testimony of an expert witness would not have meaningfully enhanced the jurors' common-sense evaluation of the

114

circumstances of Hayat's confession or their conclusions about its credibility.

Second, Dr. Leo's proposed expert testimony regarding the phenomenon of false confessions would likely have been excluded for the same reason the Court excluded Wedick's testimony, namely that it would not assist the jury in understanding the evidence.  Dr. Leo's testimony would have covered nearly all of the same ground about which Wedick planned to testify.  (Compare Tr. 84:6-89:9 with Gov. Sup. Ans. Ex. 18 at 8).  Dr. Leo also conceded there is nothing illegal or immoral about investigators deploying the interview techniques Dr. Leo characterized as risk factors.  (Tr. 80:12-81:6).  The Magistrate Judge listed factors about which Dr. Leo testified at the 2018 hearing, including the use of: evidence ploys, inducements, minimizing and maximizing, leading questions, suggestions of fact, and potential contamination.  See F&R at 62-63.  Yet, the Magistrate ignored that those factors were nearly co-extensive with the factors in Wedick's expert notice to this Court, which included: age, intelligence, level of education, mental handicap, language barrier, health, marriage and/or family status, employment status, inexperience with the criminal justice system, use of leading questions, insufficient open-ended questions, and contamination.  (See Gov. Sup. Ans. Ex. 18 at 8).  Despite that significant overlap, the Magistrate Judge dismissed without analysis the government's argument that this Court would have excluded Dr. Leo's testimony.  F&R at 61.

Dr. Leo also conceded the unhelpfulness of his research, which predicts no outcome in any case in which all, some, or none of the his risk factors are present.  (Id. at 107:17-108:17, 102:7-15).  He admitted all of the so-called risk factors could be present and the resulting confession could still be true, and that none could be present and the resulting confession could be false.  (Id. at 102:2-22, 108:2-10).  Dr. Leo also conceded the correlation between the presence of those risk factors and a false confession has not been subjected to meaningful direct testing, and that he had never conducted any research on that correlation.  (Id. at 107:3-16, 102:2-6).  He also conceded that calling him or an expert like him at trial is not the only effective method of challenging the reliability of a confession, and agreed that a lawyer could question interrogators about their training and techniques to challenge the reliability of a confession.  (Id. at 90:23-94:4).  The Magistrate Judge ignored those concessions.

Finally, Dr. Leo also admitted he did nothing to revise his methodology, data collection, or any other aspect of his work, after the Supreme Court of Michigan found and affirmed findings by lower

courts in <u>People v. Kowalski</u>, 821 N.W.2d at 31-32, that his methodology was "unreliable at every stage[,]" the underlying data "were prone to inaccuracy or bias and, in nearly all instances, had not been subjected to the rigorous standards of scientific peer-review," and that his unreliable methodology "resulted in conclusions consistent with Leo's own preconceived beliefs rather than testable results consistent with an objective, scientific process." (Tr. 95:2-98:10). The Magistrate Judge refused to acknowledge the severity of the Michigan Supreme Court's criticisms of Dr. Leo's unreliable methods or discuss its merits, and also downplayed the criticism by referring only to the lower court opinions the Michigan Supreme Court affirmed and whose stinging critiques it adopted. <u>See</u> F&R at 62. Instead, the Magistrate Judge glossed-over that significant criticism and uncritically embraced Hayat's arguments concerning the merits of Dr. Leo's proposed testimony.

Additionally, at the time of Hayat's trial, numerous courts had already recognized that general expert testimony about the phenomenon of false confessions, even from a qualified expert, should be excluded because the testimony would usurp the jury's function in making credibility findings and because of its minimal probative value and substantial improper prejudicial effect. Since then, courts including the Ninth Circuit have reached similar conclusions. <u>See</u> <u>Antone</u>, 412 Fed.Appx. at 10 (holding although expert testimony about false confessions met <u>Daubert</u> test, district court properly excluded it because of danger it would usurp the jury's function); <u>see also</u> <u>Loza v. Mitchell</u>, 766 F.3d 466, 485 (6th Cir. 2014) (affirming exclusion of false confession expert because defendant presented other evidence on credibility of his confession, jury viewed videotaped confession and observed the "tone and manner of the interrogation, the number of officers present, the physical characteristics of the room, and the length of the interrogation."); <u>Benally</u>, 541 F.3d at 994-95 (affirming exclusion of false confession expert on 403 grounds, and because it encroached upon jury's credibility evaluation).

Dr. Leo's proposed testimony, which is little more than his opinion on Hayat's credibility, is exactly the type of testimony courts have excluded because it usurps the jury's exclusive duty to make credibility determinations. <u>See</u> <u>Adams</u>, 271 F.3d at 1245-46 (affirming exclusion false confession psychologist because it "necessarily touches upon witness credibility, invades the province of the jury and exceeds the scope of the witness's expertise"); <u>see</u> <u>also</u> <u>Commonwealth of Pennsylvania v. Alicia</u>, 92 A.3d 753 (Pa. 2014) (holding "expert testimony such as the proposed testimony of Dr. [Richard A.]

116

Leo constitutes an impermissible invasion of the jury's role as the exclusive arbiter of credibility" and "the matter of whether [a defendant's] confession is false is best left to the jury's common sense and life experience, [after proper development of the particular circumstances in which confession was elicited] using the traditional and time-honored techniques of cross-examination and argument."); Kowalski, 821 N.W.2d at 31-32 (affirming exclusion of expert false confession testimony of Dr. Leo because its prejudicial effect substantially outweighed its probative value).

Accordingly, even if Ms. Mojaddidi's proffer of Wedick as an expert was somehow defective, Hayat cannot show that this Court would have permitted another expert, including Dr. Leo, to testify and, if so, that such testimony would have caused the jury to reach a different outcome.  See generally David A. Perez, Comment, The (In)Admissibility of False Confession Expert Testimony, 26 Touro Law Review 23, 59 (2010) (surveying law concerning expert testimony on false confessions and observing that "there is no need for expert testimony that tells the jury what it already knows" because "[a]s it stands, most jurors have a nuanced understanding that false confessions occur, but only rarely. An expert witness that simply repeats this fact is not 'assisting the trier of fact.'").  Indeed, almost a full page of the Magistrate Judge's summary of Dr. Leo's testimony is comprised of his narrative of Hayat's confession with his commentary about the true meaning of Hayat's words and the true implications or effects of the interrogators' questions.  See F&R at 63-64.

Dr. Leo's proposed testimony would not have helped the jury understand Hayat's confession. Thus, for the same reason it excluded Wedick's proposed testimony, this Court would not have permitted Dr. Leo to testify at Hayat's trial.  Moreover, Dr. Leo's testimony is a clear effort to usurp the jury's role by telling it not to believe its eyes and ears—and Hayat's confession—but to instead adopt Dr. Leo's interpretation of that confession.  Yet, the Michigan Supreme Court held that Dr. Leo's methodology (which he admitted not changing since the Michigan Supreme Court's criticism) is "unreliable at every stage[,]" the underlying data are "prone to inaccuracy or bias and, in nearly all instances, had not been subjected to the rigorous standards of scientific peer-review," and his unreliable methodology "resulted in conclusions consistent with Leo's own preconceived beliefs rather than testable results consistent with an objective, scientific process."  (See Tr. 96:3-97:20; Kowalski, 821 N.W.2d at 31-32.  It is difficult to fathom that any court would permit testimony from a purported expert

117

who had been so thoroughly discredited.  This Court would have excluded such testimony because it would not have assisted the jury.  Hayat's cannot demonstrate prejudice and his claim must fail.

Finally, the Magistrate Judge did not find independent prejudice arising from this claim.  Rather, the Magistrate Judge found prejudice arising only from cumulative error.[88]  See F&R at 65.  However, because Hayat has not demonstrated any deficiencies resulting in prejudice, there is no cumulative prejudice to be found.

## VII.    DR. MOHAMMED'S TESTIMONY WAS ADMISSIBLE, THEREFORE, ANY FAILURE TO OBJECT IS NOT INEFFECTIVE, AND CANNOT BE PREJUDICIAL

### A.    This Court should adopt the Magistrate Judge's finding that Dr. Mohammed's testimony did not violate Rule 702, therefore Hayat failed to show prejudice.

Hayat contested the admission of Dr. Mohammed's testimony on direct appeal, and the Ninth Circuit ruled his testimony was admissible under Rule 702, because "Mohammed's analysis of the meaning of the supplication was well within the scope of his expertise."  Hayat, 710 F.3d at 900.  The Magistrate Judge recommended denying claims based on a failure to challenge Dr. Mohammed's testimony under Rule 702 because the "Ninth Circuit found Mohammed satisfied the requirements of Rule 702" and "Hayat fails to show prejudice."  F&R at 81:25-82:6.  This Court should adopt that recommendation, except that this Court should explicitly conclude that the issue of the admissibility of Dr. Mohammed's expert testimony is law of the case, and therefore, the Magistrate Judge's failure to apply law of the case is an abuse of discretion.  See United States v. Scrivner, 189 F.3d 825, 827 (9th Cir. 1999) ("In this case, Scrivner's Fifth Amendment claim was presented to this court on direct appeal in Scrivner I and rejected on the merits.  That decision is binding on our resolution of the case.").

### B.    The Magistrate Judge's adoption of the dissent in Hayat to justify re-opening the issue of whether Dr. Mohammed violated FRE 704 is an abuse of discretion.

The Magistrate Judge uses United States v. Span, 75 F.3d 1383, 1389-90 (9th Cir. 1996) (Span II) and United States v. Carthorne, 878 F.3d 458, 463-70 (4th Cir. 2017) (Carthorne II), to refuse to apply law of the case or give preclusive effect to the Ninth Circuit's panel decision in Hayat concluding

---

[88] See Parle v. Runnels, 505 F.3d 922, 928 (9th Cir. 2007).  The Ninth Circuit has applied this principle in the context of Strickland and has held that prejudice may result from the cumulative effect of multiple deficiencies by counsel.  Harris v. Wood, 64 F.3d 1432, 1438 (9th Cir. 1995).

Dr. Mohammed's testimony did not violate Federal Rule of Evidence 704(b).[89]  F&R at 78:15-80:18, 80:4-82:6, 82:8-84:25.  The Magistrate Judge claimed that, "In both of those appellate cases, the courts made a predicate finding of error, but held that those errors did not rise to the level of plain error."  F&R at 81:20-22.[90]  The Magistrate Judge interpreted Carthorne II and Span II, to hold that, "[w]hen considering the ineffective assistance of counsel claims on collateral review, the courts looked to the predicate finding of error on appeal to hold that defense counsel was unreasonable in failing to raise the issue at trial and that the defendant was prejudiced by that failure.  This analysis works here as well."  F&R at 81:22-25.  This is an incorrect analysis of both of these cases, and demonstrates legal error.

The Magistrate Judge compounded that erroneous threshold analysis with additional error.  Next, the Magistrate Judge adopts Judge Tashima's dissent from the direct appeal.  F&R at 82:22-83:18.  Again invoking Carthone II and Span II, the Magistrate Judge found "the split of opinion in Hayat's appeal demonstrates two things," "that Mojaddidi should have challenged Mohammed's testimony on the grounds that it was an impermissible opinion on the state of mind of Hayat under Rule 704(b)" and "Judge Tashima's argument in dissent demonstrates that there was a reasonable probability that had Mojaddidi challenged this aspect of Mohammed's testimony, it would have been excluded or stricken."  F&R at 83:19-25.  The Magistrate Judge reasoned that "Mohammed's testimony about the supplication, while challenged on cross-examination by Mojaddidi, was unrebutted by contrary expert testimony."  F&R at 84:1-2.  The Magistrate Judge then extrapolates that "Mohammed's testimony amounted to evidence that Hayat was a card-carrying member of a jihadi group."  F&R at 84:5-6.  The Magistrate Judge then concludes that if the alibi witnesses had been procured, and the expert on false confessions had been called to testify, and Dr. Mohammed's testimony had been excluded under Rule 704(b), then

[89] The Ninth Circuit's determined:

> Mohammed testified about the kind of person who would carry a note such as the one found in Hayat's wallet, but he never commented directly on Hayat's mental state.  Mohammed's testimony about the typical 'person' carrying the supplication is indistinguishable in its degree of precision from the expert testimony found admissible in Younger and Gonzales.  710 F.3d at 902.

[90] In support of the decision not to apply law of the case, the Magistrate Judge analyzes Judge Lawrence J. O'Neill's decision in Ioane v. United States, 2015 WL 2238669, *4-6 (E.D. Cal., May 12, 2015), where this Court applied law of the case as a procedural bar to ineffectiveness claims based on issues raised and rejected on direct appeal. Ioane supports application of law of the case as a procedural bar.  The Court should apply law of the case as a procedural bar to re-litigating the issues presented on direct appeal and rejected by the Ninth Circuit.

119

there would have been a different result.  F&R at 84:7-14.

### 1. The Magistrate Judge misinterpreted Span II, which involves an unpreserved claim and basic Strickland analysis.

Span II cannot be read to state that a finding of plain error allows a collateral attack based on ineffective assistance of counsel for the same issue decided on appeal.  In that direct appeal, the Ninth Circuit ruled on whether the district court should have *sua sponte* instructed "on an excessive force theory of defense" based on the facts presented at trial.  United States v. Span, 970 F.2d 573, 578 (9th Cir. 1992) (Span I).  The Ninth Circuit noted a subtle difference between the affirmative defense of the right to defend oneself from the use of excessive force by a law enforcement officer and the general right of self-defense that is lost if the person knows that the person they are assaulting is a federal law enforcement officer.  Span I, 970 F.2d at 577-78, 578 n.5.  The defense counsel failed, however, to present facts sufficient to establish the excessive force defense; rather, the defendants "characterized their actions as those of private citizens defending themselves from attack by others they thought to be private citizens."  Span I, 970 F.2d at 578.  The defendants claimed that they did not know the two marshals attempting to serve an arrest warrant on their brother were federal marshals.  Span I, 970 F.2d at 578.  Therefore, the Ninth Circuit concluded "that the district court did not commit plain error by failing to offer *sua sponte* an instruction on an excessive force theory of defense not raised at trial."  Span I, 970 F.2d at 578.

The Ninth Circuit next discussed the distinctions between federal officers engaged in their official duties versus those engaged in unlawful acts, and noted that the district court's instruction was the more accurate statement of the law, and found that the court's instruction on this issue was not erroneous.  Span I, 970 F.2d at 581.  The holding in Span I clarified some of the distinctions between various defenses to assault on a federal officer, noting "that officers engaged in good faith performance of their duties may not be forcibly resisted.  An officer who uses excessive force is not acting in good faith."  Span I, 970 F.2d at 581.  The Ninth Circuit concluded:

> On its own terms, the instruction does not foreclose acquittal based on an excessive force theory of defense.  Even if it did, however, we would not find reversible error here because the Spans did not present this theory of their case at trial.  The Spans have essentially asked us to find error in an instruction that they say precludes a theory of defense on which they did not rely at trial and for which they offered no instruction themselves.  This

120

we cannot do.  Span I, 970 F.2d at 581.

The Ninth Circuit ruled that the instruction was not erroneous, even though it precluded a potential theory of defense, because that defense had not been actually presented or relied upon at trial.  Span I, 970 F.2d at 581.  Therefore, the Ninth Circuit did not find an instructional error, but rather that a potential theory of defense was not supported by the record, therefore claims related to that defense could not be determined on direct appeal.  Span I, 970 F.2d at 851

On *habeas*/*coram nobis* review, the Ninth Circuit summarized its direct appeal conclusion: "[w]e found error in the jury instructions, but did not reverse because trial counsel had waived the error." Span II, 75 F.3d at 1386.  The panel then discussed four potential defense theories, including the third, a lack of probable cause / unlawful arrest theory, and a fourth, the resisting excessive force theory.  75 F.3d at 1388.  Regarding the unlawful arrest theory, the Ninth Circuit noted "Defense counsel objected specifically to their exclusion, but the appellate court affirmed the district court ruling."  Span II, 75 F.3d at 1388; see also Span II, 75 F.3d at 1389 (noting affirmance on unlawful arrest and rejection of defendant's interpretation of defense).  The Ninth Circuit concluded defense counsel's complete failure to present the excessive force defense or to request a jury instruction that would have allowed argument of the excessive force defense was unreasonable.  Span II, 75 F.3d at 1390.  The Ninth Circuit found counsel's errors "were the result of a misunderstanding of the law."  Span II, 75 F.3d at 1390.

The Ninth Circuit's review on collateral attack did not present an issue concerning law of the case, or overcoming plain error review.  Span II, 75 F.3d at 1387-90.  The Span II panel engaged in a general Strickland review.  Span II, 75 F.3d at 1386-87.  Specifically, that panel noted "[w]e held that while there was error- defendants lost an opportunity to instruct the jury on an important affirmative defense – *trial counsel failed to preserve the issue for appeal and the conviction was affirmed*."  Span II, 75 F.3d at 1387 (emphasis added).  Nowhere in Span II did the panel claim that the finding of potential error automatically meant that counsel was ineffective.  Therefore, Span II cannot be read to support a conclusion that, on *habeas* review, an issue addressed and decided on direct appeal may be ignored by the reviewing court, if the Court of Appeals decided the issue on plain error review.  The Magistrate Judge erred by both ignoring the preclusive effect of the Ninth Circuit's ruling on direct appeal and suggesting the ruling supported a finding of ineffectiveness despite a finding the district court *properly*

admitted the testimony under established Ninth Circuit precedent.  See Hayat, 710 F.3d at 902.

**2.**    **The Magistrate Judge misinterprets Carthorne II, which does not affect law of the case, and explicitly differentiates between plain error and ineffective assistance of counsel under Strickland.**

In United States v. Carthorne, 726 F.3d 503, 515-16 (4th Cir. 2013) (Carthorne I), the Fourth Circuit analyzed the Virginia assault and battery on a police officer statute, and concluded it was not categorically a crime of violence under the residual clause.  Because the law was unsettled during the defendant's sentencing, however, the Fourth Circuit found that "the district court did not commit plain error in holding that the Virginia ABPO conviction categorically qualified as a crime of violence under the residual clause of Section 4B1.2(a)(2)" and affirmed the sentence.  On *habeas*, the Fourth Circuit found trial counsel ineffective for failing to object or challenge the prior conviction as a crime of violence (triggering the Career Offender guideline).  United States v. Carthorne, 878 F.3d 458, 466-470 (4th Cir. 2017) (Carthorne II).

The Fourth Circuit explicitly pointed out the difference between the prejudice analysis in plain error review and for ineffective assistance of counsel claims.  Carthorne II, 878 F.3d at 465-66 ("Although both the plain error standard and the ineffective assistance of counsel standard require a showing of prejudice, the inquiries are not identical").  The Fourth Circuit cited Span II for the proposition that "even when a district court has not committed plain error, counsel can have rendered ineffective assistance when counsel's errors 'were the result of a misunderstanding of the law.'  United States v. Span, 75 F.3d 1383, 1389-90 (9th Cir. 1996) (holding that counsel's failure to raise an objection to jury instructions was ineffective assistance, even though district court's instructions were not plainly erroneous.)."  Carthorne II, 878 F.3d at 466 (citation and parenthetical included).  Although the Fourth Circuit's parenthetical mischaracterizes the basis for the finding of ineffective assistance and prejudice, the conclusion the Court of Appeals explicitly drew from their analysis was that "the plain error and ineffective assistance of counsel standards do not necessarily generate identical outcomes with respect to the same alleged error."  Carthorne II, 878 F.3d at 466.  This is the *opposite* of the Magistrate Judge's claim that, "When considering the ineffective assistance of counsel claims on collateral review, the courts looked to the predicate finding of error on appeal to hold that defense counsel was unreasonable in failing to raise the issue at trial and that the defendant was prejudiced by that failure."

F&R at 81:22-25. The Fourth Circuit then performed the Strickland analysis and held "that counsel's failure here to demonstrate a grasp of the relevant legal standards, to conduct basic legal research relating to those standards, and to object to the sentencing enhancement (even though there was a strong basis for such objection) taken collectively, constituted deficient performance." Therefore, Carthorne II did not endorse an automatic finding of ineffectiveness if error is found on direct appeal, even if it is not plain error.

### 3.    Span II did not disturb precedent concerning law of the case or the case law holding that the determination of an issue on direct appeal precludes an ineffective assistance of counsel claims based on the same claim.

Span II does not overrule or disturb longstanding precedent that "[t]he law in this circuit is clear that when a matter has been decided adversely on appeal from a conviction, it cannot be litigated again on a 2255 motion." Odom v. United States, 455 F.2d 159, 160 (9th Cir. 1972). "When a defendant has raised a claim and has been given a full and fair opportunity to litigate it on direct appeal, that claim may not be used as a basis for a subsequent § 2255 motion." United States v. Hayes, 231 F.3d 1132, 1139 (9th Cir. 2000); see Scrivner, 189 F.3d at 828 (rejecting Fifth Amendment claim "presented to this court on direct appeal in Scrivner I and rejected on the merits."); Egger v. United States, 509 F.2d 745, 748 (9th Cir. 1975) ("Grounds which were apparent on original appeal cannot be made the basis for a second attack under § 2255") (citing Medrano v. United States, 315 F.2d 361, 362 (9th Cir. 1963) ("We know of no reason, and none is urged, why we should change the previously announced controlling rule of law."). This is true "if the basic thrust or 'gravamen' of the legal claim is the same, regardless of whether the basic claim is supported by new and different legal arguments." Molina v. Rison, 886 F.2d 1124, 1129 (9th Cir. 1989). Repackaging a claim as an ineffective assistance of counsel claim does not save the rejected claim. See United States v. Redd, 759 F.2d 699, 701 (9th Cir. 1985) (stating "[petitioner] raised this precise claim in his direct appeal, and this court expressly rejected it. Therefore this claim cannot be the basis of a § 2255 motion" and rejecting ineffective assistance claim based on failure to raise issue rejected by the Ninth Circuit).

Span I and Span II simply state that failing to present a defense theory or to properly preserve for appeal an issue concerning the self-defense instruction based on the unpresented defense theory may be the basis for an ineffective assistance of counsel claim. See United States v. Ornelas, 906 F.3d 1138,

123

1147-48 (9th Cir. 2018) (discussing Span I and Span II, and emphasizing defendants neither presented at trial an excessive force theory nor preserved for direct appeal a challenge based on that theory and finding ineffective assistance for failing to present defense).  The panel in Span I, 970 F.2d at 581, noted that issue was not properly presented in the case.  The panel in Span II, 75 F.3d at 1387, expressly stated that trial counsel failed to preserve the issue for appeal, and that the issue of whether the excessive force defense applied had not been squarely presented on direct appeal.  Furthermore, Span II involved basic Strickland analysis of counsel's failure to present the excessive force defense that was best supported by the facts and law, despite counsel's claimed intent to present the defense.  75 F.3d at 1390.  Nothing in either Span I or Span II undermines law of the case, or the case law that, "[w]hen a defendant has raised a claim and has been given a full and fair opportunity to litigate it on direct appeal, that claim may not be used as a basis for a subsequent § 2255 motion."  Hayes, 231 F.3d at 1139.  The Magistrate Judge abused her discretion by failing to apply the law of the case, or by ignoring the case law preventing re-litigation of a claim rejected on direct appeal in a § 2255 petition.  This Court should reject the Magistrate Judge's conclusion because it conflicts with the Ninth Circuit's holding in Hayat, 710 F.3d at 901-02 that, under established precedent, Dr. Mohammed's testimony was proper under Rule 704(b).

Neither Span II nor Carthorne II addressed law of the case, or the preclusive effect of the rejection of a claim squarely presented on direct appeal.  See Span II, 75 F.3d at 1387, 1390-91; Carthorne II, 878 F.3d at 466-470.  Both cases simply note that when evaluating an ineffective assistance of counsel claim, Strickland standards apply.  Span II, 75 F.3d at 1390 (failing to present only applicable legal defense supported by the evidence after demonstrating understanding that it was the best defense was ineffective); Carthorne II, 878 F.3d at 468-70 (concluding counsel demonstrated lack of understanding of categorical analysis and unreasonably conceded that ABPO statute was a crime of violence).  In Span II, the Ninth Circuit concluded the instructional / legal claim regarding the excessive force defense was not squarely presented on direct appeal.  75 F.3d at 1387.  Thus, failure to find error on direct appeal did not trigger any discussion of law of the case or preclusive effect on an ineffective assistance claim.  In Carthorne I, the Fourth Circuit found the district court erred by concluding the prior conviction was a crime of violence, but concluded the district court did not plainly err because of the unsettled law.  726 F.3d at 515-16.  On *habeas* review, the Fourth Circuit again did not discuss law of

124

the case or preclusive effect because it found error; rather the Fourth Circuit noted that the prejudice inquiries are different, and conducted a Strickland analysis. Carthorne II, 878 F.3d at 468-70. Therefore, neither of these cases support the proposition that a finding of plain error on direct appeal means that defense counsel was ineffective. F&R at 81:22-25. In fact, the Ninth Circuit has concluded that where no error is found, or where the error is found not to be prejudicial, those errors may not be successfully attacked on *habeas* review. *See* Cooper v. Fitzharris, 586 F.2d at 1333 (*en banc*) ("If such errors may be successfully attacked where no prejudice appears simply by asserting them under the name of ineffective assistance of counsel, the requirement that prejudice be shown to challenge these errors on direct appeal or collateral attack would be empty form").

In Gimenez v. Ochoa, the Ninth Circuit noted that the petitioner filed a previous *habeas* petition alleging deficient use of expert testimony, which the Circuit rejected on the merits. 821 F.3d 1136, 1140 (9th Cir. 2016) (summarizing prior proceedings and claims). Quoting Sanders v. United States, 373 U.S. 1, 14-16 (1963), the Ninth Circuit stated, "Gimenez's ineffective assistance claim concerns errors primarily related to the use of expert testimony. We must dismiss this claim if it is identical to the one raised in his first *habeas* petition – that is, if the two share the same 'legal basis for granting… relief.'" 821 F.3d at 1140-41. The Ninth Circuit affirmed the dismissal of the ineffective assistance claims, concluding that petitioner's claims "echo the same grounds for relief he presented to the district court in his first *habeas* petition: Counsel should have used better experts" therefore, "[b]ecause the impact of counsel's deficiencies in utilizing experts 'has already been adjudicated,' Gimenez's new arguments don't present a distinct claim for relief." Id. at 1141.

Hayat's claims "echo the same grounds for relief" as his direct appeal, and he should not receive another opportunity to re-litigate this issue. Id. at 1141. This Court should apply law of the case and the preclusive effect of a determination of an issue on direct appeal to dismiss Hayat's claim that Ms. Mojaddidi was ineffective for not objecting to Dr. Mohammed's testimony under Rule 704(b). The Ninth Circuit majority rejected this claim when Hayat presented it on direct appeal. Thus, any failure to object to Dr. Mohammed's testimony based on Rule 704(b) was not unreasonable or prejudicial, and this Court should reject the Magistrate Judge's speculative and unsupported finding that Ms. Mojaddidi was ineffective.

125

**4.    Adoption of the dissent is not warranted, when the Ninth Circuit has re-affirmed the precedent on Rule 704(b) that the panel majority relied upon in the opinion in <u>Hayat</u> on direct appeal.**

"Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court." <u>Hart v. Massanari</u>, 266 F.3d 1155, 1171 (9th Cir. 2001).  A dissenting opinion is not authority.  <u>See</u> <u>Californians for Disability Rights, Inc. v. Cal. Dep't. of Transp.</u>, 249 F.R.D. 334, 339 (N.D. Cal. 2008) (rejecting invitation to embrace reasoning of two dissenting opinions over established Ninth Circuit precedent).  Therefore, a dissent is neither precedential, nor justification for departing from controlling authority.  <u>See</u> <u>id.</u> at 1172 ("if a controlling precedent is determined to be on point, it must be followed.").

The Magistrate Judge urges this Court to adopt Judge Tashima's dissent from the direct appeal in <u>Hayat</u> and reject any preclusive effect from the panel majority's finding that Dr. Mohammed "never commented directly on Hayat's mental state" therefore it "is indistinguishable in its precision from the expert testimony found admissible in <u>Younger</u> and <u>Gonzales</u>." <u>Hayat</u>, 710 F.3d at 902.  The panel majority stated that "while we might like to agree with Judge Tashima that the expert evidence in this case crossed the Rule 704(b) line, we are prevented from doing so by the court's caselaw." <u>Id.</u>

Here, the government knew exactly where the line set by precedent was, and were careful that Dr. Mohammed would not cross it. (RT 1916:2-14, 1917:14-1918:13; 2018:7-2019:17).  The Ninth Circuit continues to follow the precedents allowing expert testimony under Rule 704(b) so long as the expert "never directly commented on *defendant's* mental state, and the jury could have accepted his testimony and still infer that defendant was atypical." <u>United States v. Younger</u>, 398 F.3d 1179, 1190 (9th Cir. 2005); <u>see</u> <u>United States v. Diaz</u>, 876 F.3d 1194, 1197-99 (9th Cir. 2017) (doctor regarding prescription abuse); <u>United States v. Bowser</u>, 667 F.Appx. 188, 189 (9th Cir. 2016) (affirming testimony of expert on laser strikes, citing <u>United States v. Morales</u>, 108 F.3d 1031, 1038 (9th Cir. 1997) (*en banc*)); <u>United States v. Gonzalez-Robles</u>, 603 F.Appx. 558, 561 (9th Cir. 2015) (citing <u>Younger</u>); <u>United States v. Morales-Beltran</u>, 534 F.Appx. 598, 601 (9th Cir. 2013) (street value of drugs). Allowing expert testimony that does not comment on the defendant's mental state is settled law in the Ninth Circuit, and there is no reason for this Court to accept the Magistrate Judge's invitation to adopt the non-precedential dissent or use the dissent as a basis for factual findings or legal conclusions.

126

Although the Magistrate Judge characterizes the panel's opinion as being decided on plain error, the panel opinion stated that the testimony "is indistinguishable in its degree of precision from expert testimony found admissible [by precedent]," and that "if the district court erred at all in admitting the testimony, such error certainly was not *plain*, given our precedents limiting Rule 704(b) essentially to a semantic preclusion." Compare F&R at 82:8-21 with Hayat, 710 F.3d at 902. The panel opinion concludes that Dr. Mohammed's testimony fell squarely within the areas permitted by precedent, forcing the panel majority to follow precedent and case law. Hayat, 710 F.3d at 902. Essentially, the panel majority concluded that Younger and Gonzales were controlling authority, therefore "it must be followed." Hart, 266 F.3d at 1172. "A district court bound by circuit authority, for example, has no choice but to follow it, even if convinced that such authority was wrongfully decided." Id. at 1175. This Court does not have the power to adopt the findings and legal conclusions of a dissent. Therefore, this Court should reject the Magistrate Judge's conclusions regarding Hayat's claim that Ms. Mojaddidi was ineffective for not objecting to testimony the Ninth Circuit found admissible on direct appeal as "indistinguishable" from admissible testimony under controlling precedent. Hayat 710 F.3d at 902.

**5.    The existence of a dissent does not establish ineffectiveness and prejudice.**

Nor do "the analyses in Carthorne and Span" demonstrate that: 1) Ms. Mojaddidi should have challenged Mohammed's testimony because the legal precedent raised serious questions about application of Rule 704(b) or 2) that a dissent established prejudice or that this Court would have excluded or stricken the testimony. See F&R at 83:19-25. It strains credibility to state, without legal support, that "there was a reasonable probability that had Mojaddidi challenged this aspect of Mohammed's testimony, it would have been excluded or stricken." F&R at 83:24-25; 84:11-14. The government specifically circumscribed Dr. Mohammed's testimony to conform with existing case law. (RT 1916:2-14, 1917:14-1918:13; 2018:7-2019:17). The Ninth Circuit concluded as much, stating that Dr. Mohammed "never commented directly on Hayat's mental state." Hayat, 710 F.3d at 902. The majority found that an expert could offer testimony "supporting an inference or conclusion that a defendant does or does not have the requisite mental state, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony." Id. at 901 (citing United States v. Younger, 398 F.3d 1179,

127

1189 (9th Cir. 2005) (internal quotations omitted)).  This is long-standing case law in the Ninth Circuit.  See United States v. Morales, 108 F.3d 1031, 1038 (9th Cir. 1995) (*en banc*) (overruling prior precedent and allowing testimony supporting an inference or conclusion about mental state).  The panel majority summarized past rulings, and noted that Dr. Mohammed's testimony was "indistinguishable" from prior admissible testimony.  Hayat 710 F.3d at 901 (citing United States v. Gomez-Norena, 908 F.2d 497, 501-02 (9th Cir. 1990)).  There were no "serious questions" about application of Rule 704(b), and any questions were resolved by the precedential majority opinion.  Hayat 710 F.3d at 901-02.  Based on the government's careful cabining of Dr. Mohammed's testimony, and the relevant case law admitting this testimony, the failure to object to admissible testimony cannot be ineffective.

As noted above, this Court would have been bound, like the panel majority, by the long-standing case law in the Ninth Circuit admitting Dr. Mohammed's testimony.  Hayat, 710 F.3d at 902 ("we are prevented from doing so by this court's caselaw."); Hart, 266 F.3d at 1175.  To find prejudice because, "Judge Tashima's argument in dissent demonstrates that there was a reasonable probability that had Mojaddidi challenged this aspect of Mohammed's testimony, it would have been excluded or stricken" is purely speculative, fails to give definitive effect to the Ninth Circuit's precedential opinion, and is an invitation to this Court to commit legal error.  The Ninth Circuit found the testimony to be admissible.  710 F.3d at 901-02.  As a result, Hayat cannot show prejudice, absent adoption of the dissent or speculation regarding counter-factual admissibility.  See Cooper, 586 F.2d at, 1333 (noting allowing ineffective assistance claims based on issues already found not to be prejudicial "would be empty form.").  Therefore, this Court should reject the Magistrate Judge's determinations, and conclude that Ms. Mojaddidi's failure to object to admissible evidence was reasonable, and that any prejudice is foreclosed by law and purely speculative.

**VIII.   COUNSEL IS NOT INEFFECTIVE FOR FAILING TO FIND A BETTER EXPERT.**

Ms. Mojaddidi could not obtain an Arabic-speaking expert to opine on the correctness of Dr. Mohammed's translation and focused instead on effectively cross-examining him.  However, even if Ms. Mojaddidi had retained at trial the experts Hayat now proffers, the result would not have been different.  Regarding the use of expert witnesses, "Strickland does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the

128

defense." Harrington v. Richter, 562 U.S. 86, 111 (2011); see also Hinton v. Alabama, 571 U.S. 263, 274 (2014) (cautioning against "examination of the relative qualifications of experts hired and experts that might have been hired."). Failure to obtain a perfect, or even better, expert is not a proper basis to find counsel constitutionally ineffective. See Murtishaw v. Woodford, 255 F.3d 926, 943-49 (9th Cir. 2001) (rejecting myriad theories that counsel were ineffective for not securing better experts). Indeed, the Ninth Circuit adheres to the Supreme Court's admonishments not to use hindsight or speculation when analyzing what counsel could have done regarding expert testimony. Id. at 946 ("However, counsel's actions are not deficient just because, through 'the fabled twenty-twenty vision of hindsight,' a better course of action becomes apparent.") (quotation omitted).

### A.    Ms. Mojaddidi did not provide ineffective assistance by using Dr. Weiss to counter Dr. Mohammed's testimony, and Hayat cannot establish prejudice.

The Magistrate Judge summarizes Dr. Weiss's testimony at trial concerning the Pakistani cultural practice of carrying a ta'wiz, as well as Ms. Mojaddidi's testimony about what she did to try to find an expert to testify about Hayat's ta'wiz. F&R at 85:8-85:21. Ms. Mojaddidi, or Dr. Weiss acting on her behalf, contacted a series of other experts recommended by Dr. Weiss and Ms. Mojaddidi's contacts across the country who they thought might testify about the meaning of Hayat's ta'wiz. (W.M. Depo. at 199:14-201:7). Ms. Mojaddidi testified in her deposition that, even though she "desperately" look[ed] for "a lot" of experts, she was not successful. (Id. at 199:14-201:7, 206:9-25). Of the "at least ten" individuals contacted, she found "nobody . . . who would help." (Id. at 199:14-201:7, 239:6). Ms. Mojaddidi explained there were a lot of people who did not want to be involved in a federal terrorism trial and that she ran into that issue seeking experts and help. (Id. at 197:7-11). She explained: "[i]n 2005 things were different, and these Muslim leaders or scholars weren't as willing to go up against the government." (Id. at 200:19-21). Ultimately, Dr. Weiss was able to testify about various cultural practices regarding the carrying of a ta'wiz, as well as their talismanic uses.[91] (RT 4177:3-4180:3, 4184:24-4187:11, 4192:8-19, 4193:23-4194:7, 4194:21-4195:14).

The Magistrate Judge noted that a journalist located several experts (two professors and a journalist) for an article in Atlantic Monthly that was published in October 2006, after Hayat's

---

[91] There was some indication that Dr. Weiss knew what the ta'wiz stated, in Arabic. (RT 4189:15-4190:16).

conviction.  F&R at 86:22-87:2.  The Magistrate Judge then notes testimony from one of Hayat's

defense attorney experts about contacting the Federal Defender's Office, and states:

> Such contacts could very well have been fruitful, particularly with respect
> to procuring experienced experts.  There is no indication Mojaddidi took
> any of those reasonable steps to attempt to find an Arabic language expert.
> Rather, it appears she asked Weiss for contacts and Mojaddidi contacted
> people she already knew.  As discussed above, Mojaddidi did not have any
> experience in criminal law.  There is no indication that her contacts were
> people who had experience as experts at trial.

F&R at 87:5-10.  Relying on Mr. Weinberg's opinion about what a reasonable attorney would do, F&R

at 87:11-15, the Magistrate Judge "finds Mojaddidi acted unreasonably when she failed to procure an

appropriate expert to counter Mohammed's testimony.  These findings, based on the "attorney experts'"

testimony, failed to apply the significant deference given to trial counsel's handling of expert witnesses

and also failed to give credit to the significant ways that Ms. Mojaddidi countered the testimony of Dr.

Mohammed.  Therefore, this Court should reject the Magistrate Judge's conclusions on this issue.

**1.    The Magistrate Judge ignores the deference to Ms. Mojaddidi's choice of an expert, and applies a "better expert" standard of reasonableness prohibited by caselaw.**

As noted above, the Magistrate Judge's finding is contrary to the standard requiring deference to

an attorney's selection of an expert witness or how to address expert testimony.  Harrington, 562 U.S. at

111; Hinton, 571 U.S. 274-75 ("We wish to be clear that the inadequate assistance of counsel we find in

this case does not consist of the hiring of an expert who, though qualified, was not qualified enough.").

"The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that,

when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'"  Hinton,

571 U.S. at 274-75 (quoting Strickland, 466 U.S. at 690).  Applying hindsight or a better expert standard

of reasonableness erroneously violates the Supreme Court's mandates that the selection of an expert is

virtually unchallengeable, and that the existence of more qualified experts cannot support an

ineffectiveness claim.  Harrington, 562 U.S. at 111; Hinton, 571 U.S. at 274-75; see also Turner v.

Calderon, 281 F.3d 851, 876 (9th Cir. 2002) (rejecting better expert argument, stating, "Mr. Ellery

cannot be deemed ineffective because, with the benefit of hindsight, we now determine that other trial

strategies or expert witnesses may have been a better choice.").

The Magistrate Judge's mention of Ms. Mojaddidi's experience shows that the Magistrate Judge

did not give deference to Ms. Mojaddidi's choice of experts when assessing Ms. Mojaddidi's effectiveness and reasonableness. F&R at 86:18-21, 87:9-10. By relying on Mr. Broderick and Mr. Weinberg's testimony to conclude Ms. Mojaddidi's actions were unreasonable, the Magistrate Judge explicitly applied the attorney experts' opinions that consulting with the Federal Defender's Office might have produced a better or more "experienced" experts, instead of giving Ms. Mojaddidi the strong deference given to the virtually unchallengeable strategic choice of an expert. F&R 86:22-87:16. The conclusory reference to "an appropriate expert" applies a "better expert" standard that is contrary to law. F&R at 87:15-16. The Magistrate Judge failed to give deference to Ms. Mojaddidi's strategic decision to select Dr. Weiss, and applied a prohibited better expert standard. The Court should apply the required deference under Strickland, and conclude that Ms. Mojaddidi acted reasonably in choosing Dr. Weiss to present some evidence to counter Dr. Mohammed's testimony.

### 2. The Magistrate Judge's Factual Findings Are Wrong.

The Magistrate Judge merely repeats Hayat's arguments regarding how Ms. Mojaddidi addressed the ta'wiz evidence. F&R at 90:18-91:5. The Magistrate Judge claims that "Haykel's testimony was clear and unequivocal – the supplication Hayat carried was commonly used by many Muslims, not just jihadis." F&R at 90:18-19. The Magistrate Judge adopts Judge Tashima's argument that "Mohammed's opinion left no room for dissent – a person carrying that supplication had to be a jihadi." F&R 90:23-24. The Magistrate Judge discusses the admissibility of Imam Tahir Anwar's testimony, and finds it admissible.[92] F&R at 19:20-91:3. The Magistrate Judge then finds that "the error Hayat argues, and that this court finds Mojaddidi made, was not procuring an expert on the supplication." The Magistrate Judge then states, confusingly, "This court considers Tahir's testimony only as supplemental to Haykel's but does not rely on it in finding that Mojaddidi's failure to secure an expert regarding the supplication,

---

[92] Tahir Anwar's affidavit and testimony, (Def. Ex. CCC; CR 685 at 7:23-8:25, Tr. 550-573), was inadmissible because he was not a percipient witness and therefore could not offer a lay opinion about facts he did not perceive. Fed. R. Evid. 602; United States v. Lopez, 762 F.3d 852, 863-64 (9th Cir. 2014). He testified he was not a percipient witness to the creation of the ta'wiz, that he did not write it or give it to Hayat, and he did not directly witness anything relevant to Hayat's case. (Tr. 563:10-21). Therefore, Ms. Mojaddidi cannot be ineffective for failing to find a witness whose testimony would not have been admissible at trial. See United States v. Smith, 415 F.Appx. 826, 828 (9th Cir. 2011) (denying petition because failure "to investigate, obtain, and present" evidence that "was plainly inadmissible" cannot be ineffective). The government objected to the testimony, and the Magistrate Judge overruled the objection. (CR 685:8:23-25, CR 693) This Court should overrule the Magistrate Judge's admission of Anwar's testimony (F&R 90:24-25), strike his affidavit and testimony, and refuse to consider that inadmissible evidence.

when considered with her other errors set out above, prejudiced Hayat." F&R at 91:3-5.  To the extent this is an acknowledgement that Imam Tahir's testimony was improperly admitted, this Court should accept the offer to correct the record and set it aside.

As discussed below, Dr. Haykel's testimony was not unequivocally favorable to Hayat, nor was it completely contrary to Dr. Mohammed's testimony.  Judge Tashima's interpretation of the evidence at trial was wrong, because Dr. Mohammed testified on cross-examination there were other interpretations of the ta'wiz or du'a, including the interpretation championed by Dr. Haykel.[93]  (RT 2060:22-2061:18; Tr. 651:11-652:5, 652:6-13, 652:17-23).  Ms. Mojaddidi's cross-examination also established that the du'a could have alternative uses, as demonstrated through Dr. Mohammed's discussions with other scholars.  (RT 2069:19-25, 2071:16-2072:20 (Abur Rahmaan Saaleh), 2072:21-2073:16 (Dr. Mehmood Chatta), 2074:1-21 (Zafar Ishaq Ansari), RT 2074:22-2076:7 (Gulfiya), RT 2076:8-2077:6 (Ahmed Subhy).  This testimony corroborated Dr. Weiss's testimony about the cultural practice of carrying a ta'wiz, which offered an alternative explanation for why Hayat had the du'a in his wallet.[94]  (RT 4177:3-4180:3, 4184:24-4187:11, 4192:8-19, 4193:23-4194:7, 4194:21-4195:14).  Ms. Mojaddidi adequately countered Dr. Mohammed's testimony through cross-examination and Dr. Weiss's testimony.

The Magistrate Judge engaged in a flawed fact-finding process, introducing inadmissible evidence, relying on counter-factual and flawed attorney expert testimony, and limiting the government's cross-examination of Dr. Haykel.  This Court should reject the factual findings that Ms. Mojaddidi acted unreasonably by leaving Dr. Mohammed's testimony unrebutted.  Rather, the trial record and evidence, as well as the acknowledgement by Hayat's witnesses that Ms. Mojaddidi introduced contrary evidence through cross-examination, establish that these factual findings are clearly erroneous.  For example, the finding that, "There is no indication Mojaddidi took any of those reasonable steps to attempt to find an Arabic language expert" is contrary to Ms. Mojaddidi's

[93] Earlier, the Magistrate Judge argues that "Mohammed's testimony about the supplication, while challenged on cross-examination by Mojaddidi, was unrebutted by contrary expert testimony." F&R at 84:1-2. Again, the Supreme Court specifically states that, "Strickland does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." Harrington, 562 U.S. at 111.

[94] While this should Court strike Anwar's inadmissible testimony, the evidence introduced at trial makes the testimony cumulative, and, if anything, demonstrates that Ms. Mojaddidi adequately countered Dr. Mohammed's expert testimony. (Tr. at 568:16-21 (agreeing with literal translation), 570:11-571:16, 572:22-573:3 other interpretations before the jury)).

132

uncontested testimony that she consulted with Dr. Weiss and attempted to find an Arabic language expert.  It also substitutes Mr. Broderick's testimony for an objective evaluation of the reasonableness of Ms. Mojaddidi's efforts.  (W.M. Depo. at 199:14-201:7).  While Ms. Mojaddidi may not have consulted with the Federal Defender's Office, she explicitly consulted with Dr. Weiss, and the Magistrate Judge acknowledges that "Mojaddidi testified at her deposition that she attempted to find an Arabic language expert who could testify about the meaning of the supplication."  F&R at 86.

Similarly, the finding that "Mojaddidi acted unreasonably when she failed to procure an appropriate expert to counter Mohammed's testimony" is based on Mr. Weinberg's testimony that a reasonable attorney would have elicited "contrary expert testimony about the circumstances under which people carry such scriptures, and whether the scripture, in fact, has the connotation that the prosecution expert places on it."  F&R at 87:11-15.  There is simply no duty to contact other experts or the most qualified experts, and reliance on the attorney experts to this effect is error.  See Babbitt v. Calderon, 151 F.3d 1170, 1173-74 (9th Cir. 1998) (rejecting claims based on showing what counsel could have presented, rather than on whether counsel's actions were reasonable; based on reasonableness of expert presented, no consulting other experts was reasonable).

This finding ignores that Dr. Weiss actually testified as an expert "about the circumstances under which people carry such scriptures" (RT 4177:3-4180:3, 4184:24-4187:11, 4192:8-19, 4193:23-4194:7, 4194:21-4195:14), and that Ms. Mojaddidi elicited "whether the scripture, in fact, has the connotation that the prosecution expert places on it" from Dr. Mohammed on cross-examination.[95]  Finally, this Court should reject any factual findings that, in essence, Ms. Mojaddidi should have found an expert qualified to render an Arabic interpretation.  F&R at 86:18-21, 87:3-16; see Babbitt, 151 F.3d at 1174 (rejecting ineffectiveness argument "that counsel was ineffective because his expert was not qualified to make certain diagnoses and because his experts presented conflicting testimony.").

**B.      Dr. Haykel's testimony does not establish ineffectiveness or prejudice because he substantially agreed with Dr. Mohammed's testimony except for the conclusion and <u>cannot say that Hayat's interpretation was not a jihadist's interpretation.</u>**

Without acknowledging case law clearly stating a criminal defendant has no constitutional right

---

[95] Compare F&R at 87:11-15 with (RT 2069:19-25, 2071:16-2072:20, 2072:21-2073:16, 2074:1-21, RT 2074:22-2076:7, RT 2076:8-2077:6; Tr. 651:11-652:5, 652:6-13, 652:17-23).

133

to the best expert, the Magistrate Judge relies on Hayat's attorney experts to conclude "Mojaddidi acted unreasonably when she failed to procure an appropriate expert to counter Mohammed's testimony." F&R at 87:3-16.  Once again, the Magistrate Judge appears to refuse to apply the presumption of reasonableness because Ms. Mojaddidi was inexperienced.  F&R at 86:18-21 ("Because she had no experience with experts at trial, there is an even greater chance that the 'experts' she contacted would not have been qualified to testify about both the translation of the supplication and its meaning and use among Pakistani Muslims,") 87:9-10 ("As discussed above, Mojaddidi did not have any experience in criminal law.  There is no indication that her contacts were people who had experience as experts at trial.").  Ms. Mojaddidi found Dr. Weiss, used her own knowledge of Islam and the hadiths to draw out favorable testimony from Dr. Mohammed, and entered into evidence the more benign interpretations of the du'a that Dr. Haykel testified to during the evidentiary hearing.[96]

Counsel is entitled to "great deference" in matters relating to how to handle expert witnesses. Murray v. Schriro, 745 F.3d 984, 1018 (9th Cir. 2014) ("we note that many of these decisions are likely to have been strategic in nature, requiring us to provide trial counsel with great deference." citing Strickland, 466 U.S. at 690)); see also Roybal v. Davis, 148 F.Supp.3d 958, 1075 (S.D. Cal. 2015) ("Petitioner now asserts that had additional records been obtained, and had additional tests been performed, the expert testimony would have been stronger and would have withstood cross-examination and rebuttal testimony, that is not the standard.").

Here, Dr. Bernard Haykel could not have fully rebutted Dr. Mohammed's testimony.  (See Def. Ex. BBB; CR 694).  Dr. Haykel declared that a supplication like the one Hayat possessed could have, in fact, been carried by a jihadist.  (Id.; CR 694 at ¶ 5; see also Pet. at 88).  Thus, even if Dr. Haykel had testified, his concession that a jihadist might carry Hayat's ta'wiz would have necessarily left the jury in nearly the same position during deliberations: with substantial basis to credit Dr. Mohammed's testimony and some evidence to refute it.  Because Haykel's testimony, at best, only narrows but still admits the possibility of Dr. Mohammed's conclusion, it does not follow that the jury would have reached a different verdict.

---

[96] (Compare RT 2069:19-25, 2071:16-2072:20, 2072:21-2073:16, 2074:1-21, RT 2074:22-2076:7, RT 2076:8-2077:6; with Tr. 651:11-652:5, 652:6-13, 652:17-23).

Dr. Haykel agreed with Dr. Mohammed's literal translation of the du'a as "Oh, God, we ask you to be at the throats – and here it's not mentioned, our enemies, that's the implication. And we seek your help and assistance from their evils or their misdeeds." (Tr. 638:17-639:6, 645:16-21). Dr. Haykel, consistent with his declaration, testified that "jihadists can also use this supplication," and that it is "not necessarily" a warrior prayer. (Tr. 651:14-22). When asked if this supplication was defensive or offensive, Dr. Haykel's answer was not definitive, stating: "It's associated with travel in the lifetime of the Prophet, but it can be used against fellow Muslims. So, an offensive invocation would never be used against other Muslims, because you're not supposed to fight Muslims, whereas this can be used against Muslims, or to ward off the harm that Muslims can inflict on you, but also the harm non-Muslims can inflict on you."[97] (Tr. 641:21-642:19). Agreeing with Dr. Mohammed, Dr. Haykel testified that the paper found in Hayat's wallet was a supplication or du'a (RT 1973:23-1974:3; Tr. 635:5-18), is a Hadith (RT1933:24-1934:20; Tr. 635:19-24), that Abu Musa Al-Ashari was the relator of the Hadith (RT 1979:14-17; Tr. 647:5-648:8; CR 694 ¶ 2), that it is found in several different compilations of Hadiths (RT 1979:18-1980:4, 1981:23-1983:17, 1985:24-1987:10, 1991:20-1995:21; Tr. 636:15-637:6), and that this particular Hadith is found in two places in the Riyadh al-Salih compilation: in the Book of Etiquette of Prayer, and the Book of Jihad (RT 1987:5-1988:25; Tr. 646:17-647:4).

Some Hadiths, the words and deeds of the Prophet Muhammad, are difficult to interpret. (Tr. 635:19-24). Dr. Haykel acknowledged that Hadiths can be interpreted differently by people with ideological agendas. (Tr. 645: 25-646:4). The Saudi Arabian government has created a special institute to try to standardize interpretation of the Hadiths to prevent their abuse by terrorist movements. (Tr. 646:5-16). Dr. Haykel provided additional context to the circumstances under which the Prophet Muhammad said the supplication, and why. (Tr. 646:17-647:4). The relator of this Hadith, Abu Musa al-Ashari, was an early convert to Islam and a companion of the Prophet. (Tr. 647:23-648:8). The Prophet sent al-Ashari on mission trips to Ethiopia and Africa, but he returned to the Prophet at some point. (Tr. 648:9-24). When al-Ashari returned, Muhammad was about to begin the [military] expedition of Dhat al-Riqa. (Tr. 648:25-649:1). At around the same time, the Prophet Muhammad

[97] The government notes that Dr. Haykel did not testify that Exhibits 26.6 and 26.7 were, in fact, a ta'wiz. Dr. Mohammed explained what a ta'wiz is, as did Dr. Weiss. (RT 2006:21-2007:12, 4178:3-4180:3, 4192:8-21, 4194:4-7)

instituted rules allowing the shortening of prayers in times of war.  (Tr. 649:5-8).  Between when al-Ashari returned to Muhammad and when he left for Yemen, Muhammad engaged in a series of military campaigns.  (Tr. 649:9-650:12).  Several of these campaigns were offensive campaigns into enemy territory.  (Tr. 650:13-15).  As a result, several Hadiths from this time say terrible things about polytheists and Jewish people.  (Tr. 650:16-24).

Contrary to Hayat's argument, Ms. Mojaddidi was able to get Dr. Mohammed to acknowledge other interpretations of the supplication before the jury.  (Tr. 651:11-652:5, 652:6-13, 652:17-23).  Dr. Haykel testified that he did not recall Dr. Mohammed testifying about beheading videos or al-Qaeda, yet his declaration speculates that is the motive of Dr. Mohammed's translation.[98]  (Tr. 653:2-11; Haykel Decl. ¶ 16).  Dr. Haykel testified, consistent with his declaration, that jihadists would be familiar with this du'a and no doubt use it, too.  (Tr. 657:19-25; CR 694 ¶ 5 ("Jihadis would be familiar with this invocation and no doubt use it, too.")).  Specifically, Dr. Haykel testified:

> Q.    And you stated in your direct testimony that jihadis would be familiar with this du'a, and no doubt use it, correct?
>
> A.    Yes.
>
> Q.    How would they use it?
>
> A.    They would use it whenever they were threatened and they felt an enemy was to harm them. They would use it just like other Muslims use it.
>
> Q.    But their interpretation overall would be a little more offensive, correct?
>
> A.    Well, they're involved in war. They're engaged in war. So, they're engaged in an offensive war. When they use du'a offensively, it's fairly clear. They don't hide what du'a they use.
>
> Q.    And you agree that this could also apply to the situation where someone is venturing into enemy territory, correct?
>
> A.    Where you would use this du'a, yes, absolutely.

(Tr. 657:19-658:8).  Dr. Haykel went on to testify that the Islamic State (aka ISIS) interprets Hadiths in

_____

[98] Dr. Haykel also acknowledged that he may have been premature in attacking "Subhi" in his declaration at paragraph 21.  (Tr. 655:15-657:18).  It is unclear whether he was given an incomplete transcript to review, or what his motivation was for attacking "Subhi" in his declaration.  Regardless, there are at least two well-known Hadith scholars named Subhi who are not polemicists.  (Tr. at 656:12-657:18).

a very aggressive manner, in that "[t]hey cherry-pick the Hadiths and in the Koran to justify their behavior and their actions." (Tr. 658:17-18). Dr. Haykel acknowledged that Jamiat Ulema-e-Islam is a political party in Pakistan that supports militant movements, including a militant group called Jaish-e-Muhammad. (Tr. 659:5-660:1).

In his supplemental disclosure, Dr. Haykel stated, "As for proof to establish that someone is partaking in jihadi ideological thought and belief, one would need to obtain considerably more than this invocation to assert that a person is a jihadi. Jihadis have a considerable repertoire of ideas, books, authorities that they invoke and cite openly, and which mark them off from the rest of the Muslim community as jihadis. To label someone a jihadi, or as someone who partakes in the jihadi ideological system of beliefs, one needs to adduce the ideas and references that jihadis use and invoke." (CR 694 ¶ 8). Dr. Haykel reaffirmed this testimony at the hearing. (Tr. 658:25-659:4).

Dr. Haykel was asked to consider some of the materials found in Hayat's possession, Hayat's statements to Naseem Khan, and evidence from Hayat's confession. (Tr. 660:2-664:2, 664:3-665:20, 665:21-666:23). Dr. Haykel agreed that these materials showed an interest in jihadi movements. (Tr. 660:25-661:11). Dr. Haykel also tried to make light of the situation, noting that "if you were to look at my computer, you would think that I'm also a member of these movements, because I follow them and I have all these documents on my computer." (Tr. 661:12-15). Dr. Haykel also noted that it would be a fair inference that Hayat's reference to men from the madrasa volunteering to go to jihad in 2003 (or in the 2000s) meant men going to fight Americans. (Tr. 665:21-666:23). All of these items involved materials consistent with anti-American militant groups, groups interested in militancy or jihad, or other violence. (Tr. 660:2-664:2, 664:3-665:20, 665:21-666:23). In this case, Dr. Haykel's testimony is consistent with the testimony of Dr. Mohammed other than the final conclusion or opinion. Both agree about the technical, word-for-word translation of the du'a, that there are competing interpretations, that Muhammad is reported to have uttered the supplication during wartime, and that the du'a appears in the Book of Etiquette of Prayer and the Book of Jihad in the Riyadh al-Salihin.[99]

---

[99] (RT 1970:1-3; Tr. 638:17-639:6, 645:16-21; RT 1973:23-1974:3; Tr. 635:5-18; RT1933:24-1934:20; Tr. 635:19-24; RT 1979:14-17; Tr. 647:5-648:8; CR 694 ¶ 2; RT 1979:18-1980:4, 1981:23-1983:17, 1985:24-1987:10, 1991:20-1995:21; Tr. 636:15-637:6; RT 1987:5-1988:25; Tr. 646:17-647:4; RT 1984:7-1998:9; Tr. 647:23-650:15).

Furthermore, Dr. Haykel's supplemental declaration stated that it is possible "to establish that someone is partaking in jihadi ideological thought and belief," by analyzing their "considerable repertoire of ideas, books, authorities that they invoke and cite openly, and which mark them off from the rest of the Muslim community as jihadis."  CR 694 ¶ 8.  At the hearing, the government cross-examined Dr. Haykel on whether knowing that Hayat had certain material in his scrapbook, what he said to Naseem Khan, his ties to groups that Dr. Haykel testified were militant groups, and other trial evidence might increase, or decrease the likelihood that someone has "jihadi ideological thought" or ideas that "mark them off from the rest of the Muslim community."  (Tr. 658:10-666:23, 667:12-673:19, 673:21-674:1).  Although the government was not allowed to finish its cross-examination,[100] Dr. Haykel would have eventually had to concede that, given Hayat's recorded statements to Naseem Khan, his scrapbook, his statements of intent, his direct ties to militant political parties that support extreme militant groups, and other trial evidence all together, that the inference could be drawn that Hayat had "jihadi ideological thought" or ideas that mark him "off from the rest of the Muslim community," or lose credibility with the jury.[101]  (CR 694 ¶ 8).  Dr. Haykel agreed that Ms. Mojaddidi introduced interpretations more consistent with mainstream Islamic thought through cross-examination.  (Tr. 651:11-652:5, 652:6-13, 652:17-23).  Interpretations consistent with Dr. Haykel's interpretation were in evidence at trial, and Ms. Mojaddidi pointed out the other interpretations as well as the testimony of Dr.

[100] The Magistrate Judge's curtailment of the cross-examination of Dr. Haykel was an abuse of discretion. (Tr. 667:12-674:4, CR 694); see United States v. 10.48 Acres of Land, 621 F.2d 338, 340 (9th Cir. 1980) ("the scope and extent of cross-examination of expert witnesses rests in the sound discretion of the trial court and 'is not subject to exception unless wholly arbitrary, unreasonable and abusive, and the examination need not be extended to permit interrogation about collateral, immaterial or irrelevant matters.'") (citation omitted).  Dr. Haykel submitted a supplemental expert disclosure, CR 694, that stated that "Jihadis would be familiar with this invocation and no doubt use it too" and "As for proof to establish that someone is partaking in jihadi ideological thought and belief, one would need to obtain considerably more than this invocation to assert that someone is a jihadi.  Jihadis have a considerable repertoire of ideas, books, authorities that they invoke and cite openly, and which mark them off from the rest of the Muslim community as jihadis.  To label someone a jihadi, or as someone who partakes of the jihadi ideological system of beliefs, one needs to adduce the ideas and references that jihadis use and invoke."  CR 694 at ¶ 5, ¶ 8.  Asking hypotheticals based on the evidence in the case to test Dr. Haykel's opinions in his supplemental expert disclosure was proper expert cross-examination.  See  United States v. Stinson, 647 F.3d 1196, 1214 (9th Cir. 2011).  It is permissible to use trial evidence "to test the knowledge, accuracy, and credibility of the witness." Am. Pac. Whaling Co. v. Kristensen, 93 F.2d 17, 20 (9th Cir. 1937).

[101] The trial evidence was that: Hayat was studying at his grandfather's madrasa, which was directly linked to JUI and JEM between 1993 and 2000, that Hayat collected the scrapbook materials and obtained the militant magazines during that time period, that Hayat brought the scrapbook back to the United States and kept it for three years, that Hayat showed Naseem Khan the scrapbook in the context of discussing an interest in militant training and anti-American militant groups, and that Hayat was not in community college or working in a field where he would need to collect and keep these materials. (RT 473:9-23, 563:18-21, 838-1385, 1758-1846; 2935-87).

Weiss when she attacked Dr. Mohammed's testimony in her closing argument. (RT 4322:1-4324:2). Therefore, Dr. Haykel's testimony does not establish a reasonable probability that the result of the proceeding would have been different.

       **C.**       **Hayat fails to establish ineffectiveness or prejudice with regard to the handling of Dr. Mohammed's testimony.**

The Magistrate Judge cites Judge Tashima's dissent and general conclusions to justify a finding that "not procuring an expert on the supplication" was prejudicial. F&R at 90:18-91:5. This appears to be a misapplication of the standard and burden of proof. "Strickland places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different." Wong v. Belmontes, 558 U.S. 15, 27 (2009). Ms. Mojaddidi effectively prepared for, and cross-examined Dr. Mohammed. (W.M. Depo. 198:16-202:7, W.M. Depo. 281:10-15). Dr. Haykel acknowledged that the interpretation he testified to was before the jury because Ms. Mojaddidi brought it out on cross-examination. (Tr. 651:11-652:5, 652:6-13, 652:17-23). She also effectively used Dr. Weiss to counter Dr. Mohammed's testimony.[102] Dr. Haykel testified that jihadists and militants would use this du'a, that it is susceptible to offensive or more aggressive interpretations by jihadists and militants. (CR 694 ¶¶ 5, 8; Tr. 641:14-642:19, 657:19-658:8, 658:10-23). Further, based on his declaration, his supplemental disclosure, and common sense, Dr. Haykel likely would have testified, on cross-examination, that Hayat's ideas, books, and authorities as well as his statements would place him closer to jihadist or militant interpretation of this du'a and outside of mainstream Muslim interpretation of this du'a. (Tr. 658:25-666:23). That testimony, and other testimony where Dr. Haykel and Dr. Mohammed agree, eliminates any prejudice, and therefore, this Court should deny Hayat's petition based on his claim regarding the handling of Dr. Mohammed's testimony. See Wong, 558 U.S. at 28 ("Schick's mitigation strategy failed, but the notion that the result could have been different if only Schick had put on more than the nine witnesses he did, or called expert witnesses to bolster his case, is fanciful.").

---

[102] (RT 4178:21-4180:2, 4184:24-4185:4, 4185:18-24, 4186:10-4187:11, 4192:9-19, 4194:1-7, 4194:21-4195:14, W.M. Depo. 205:12-206:7).

**IX. MS. MOJADDIDI WAS NOT INEFFECTIVE FOR WITHHOLDING AN OBJECTION TO THE PROSECUTOR'S CLOSING ARGUMENT AND, EVEN IF SHE COULD HAVE DONE MORE, HAYAT CANNOT ESTABLISH PREJUDICE**

The Magistrate Judge found that Ms. Mojaddidi was ineffective for not objecting to the prosecutor's rebuttal closing argument characterizing the process and results of Dr. Mohammed's consultation with others about the meaning of Hayat's ta'wiz. See F&R at 91-92. The prosecutor described the people Dr. Mohammed consulted as "highly qualified colleagues . . . highly qualified Islamic scholars," and claimed they held a "uniform opinion was that this was a piece of paper with a prayer on it that would be carried by a holy warrior, a violent, jihadi, who felt himself to be traveling in an enemy land, and who was ready to commit violent jihad." See F&R at 91. As set forth below, Ms. Mojaddidi's failure to object to this argument in the prosecutor's closing was not unreasonable. Even if Ms. Mojaddidi should have objected, Hayat cannot demonstrate any prejudice.

Many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, and withholding such objections is within the "wide range" of permissible professional legal conduct. United States v. Necoechea, 986 F.2d 1273, 1281 (9th Cir. 1993), as amended on denial of reh'g (Apr. 15, 1993) (citing Strickland, 466 U.S.at 689). See also Cunningham v. Wong, 77 1143, 1159 (9th Cir. 2013) (holding trial counsel's decision not to object during prosecutor's closing argument, possibly to avoid highlighting it, was a reasonable strategic decision); United States v. Daas, 198 F.3d 1167, 1179 (9th Cir. 1999) (trial counsel's failure to object to possible vouching during the prosecutor's closing argument "falls within the range of permissible professional conduct of trial counsel"); Featherstone v. Estelle, 948 F.2d 1497, 1507 (9th Cir. 1991) (holding, on *habeas* review, that counsel's failure to object to improper argument at trial did not prejudice petitioner where other evidence supported a guilty verdict and the jury was told closing argument was not evidence); United States v. Molina, 934 F.2d 1440, 1447–48 (9th Cir. 1991) (applying presumption of adequate performance and holding "We cannot say that the failure to object to the one improper passage in the prosecutor's closing argument was professionally unreasonable."). In this case, notwithstanding the factual errors in the Magistrate Judge's analysis, Ms. Mojaddidi's conduct was reasonable.

First, the prosecutor's arguments at issue were not totally off target. As the Magistrate Judge notes, five of the eight people with whom Dr. Mohammed consulted were Islamic scholars, two

140

appeared to be students, and the last consulted with students and imams from various regions of Pakistan.[103] F&R at 91-92. One of the scholars generally agreed with Dr. Mohammed's interpretation of the meaning of Hayat's ta'wiz. Id. at 91. The others reached other conclusions of varying degrees of difference from Dr. Mohammed's interpretation. Id. at 91-92. Even if the prosecutor misstated the evidence, it would have been reasonable for Ms. Mojaddidi to withhold an objection to avoid drawing additional attention to the misstatement. See Cunningham, 704 F.3d at 1159.

Second, the Magistrate Judge's analysis on this point contains several significant factual errors. The Magistrate Judge erroneously asserts that "While Mojaddidi did not object to the prosecutor's characterization of the information Mohammed received from colleagues, she could have remedied that problem during her closing argument. She did not." F&R at 92. In fact, Ms. Mojaddidi had already given her closing argument by the time the prosecutor delivered his rebuttal closing argument. Compare RT 4285 (Ms. Mojaddidi's closing begins on April 12, 2006, at 1:02 p.m.) with RT 4331 (the prosecutor's rebuttal closing begins on April 12, 2006, at approximately 3:00 p.m.). That significant factual error in the chronology of the proceedings likely influenced the Magistrate Judge's erroneous conclusion that Ms. Mojaddidi's failure to object was unreasonable. It was not.

Even if the Magistrate Judge had correctly observed the chronology of the closing arguments at Hayat's trial, the substance of that court's analysis is also wrong. The Magistrate Judge erroneously claims that Ms. Mojaddidi did not address Dr. Mohammed's testimony in her closing. F&R at 92:16-22. In fact, Ms. Mojaddidi argued, "Dr. Mohammed admitted on the stand that his views were controversial amongst Muslim scholars," rebutting the prosecutor's argument. (See RT 4322:4-6). The Magistrate Judge also erred by asserting Ms. Mojaddidi did not challenge "the government's characterization of these people as all scholars and as 'uniformly' finding the supplication associated with terrorists." F&R at 92. As set forth above, Ms. Mojaddidi did make such an argument concerning the latter proposition. She also rebutted the prosecutor's statement that Dr. Mohammed consulted only with scholars, contrary to the Magistrate Judge erroneous assertion. Id. Ms. Mojaddidi argued "In fact, [Dr. Mohammed] had to send e-mail asking former students of his, who are not scholars, what the significance of carrying

[103] Hayat described four as scholars, two as Ph.D. or post-graduate students (Umar and Dr. Chatta), one as "of the International Islamic University [in] Islamabad" (Saaleh), and the last as a student (Gulfiya). (OPHB at 99-100).

such a prayer was in Pakistan." (RT 4322). On every element of this claim, the facts contradict Hayat's claim and the Magistrate Judge's analysis. This Court should reject the Magistrate Judge's conclusion that a "reasonable attorney would have made a better effort to demonstrate to the jury how and why the prosecutor's statement was wrong," because it is not supported by the record. Id.

Finally, Hayat cannot show any prejudice associated with this narrow claim. Before the parties' closing arguments, this Court instructed the jury that those arguments are not evidence. (RT 4206:3-13). Jurors are presumed to follow instructions. Weeks v. Angelone, 528 U.S. 225, 234 (2000). Thus, no prejudice can arise from Ms. Mojaddidi's failure to object to the prosecutor's arguments, even if they were misstatements of the evidence. See Featherstone, 948 F.2d at 1507. Moreover, the jurors heard evidence at trial that contradicted the prosecutor's statement at issue in this claim. Specifically, Dr. Mohammed testified on cross-examination that there were other interpretations of Hayat's ta'wiz or du'a, including the interpretation championed by Dr. Haykel. (RT 2060:22-2061:18; Tr. 651:11-652:5, 652:6-13, 652:17-23). Ms. Mojaddidi's cross-examination also established that the du'a could have alternative uses, as demonstrated through Dr. Mohammed's discussions with others, including those scholars and students the Magistrate Judge discusses in analyzing this claim. (RT 2069:19-25, 2071:16-2072:20 (Abur Rahmaan Saaleh), 2072:21-2073:16 (Dr. Mehmood Chatta), 2074:1-21 (Zafar Ishaq Ansari), RT 2074:22-2076:7 (Gulfiya), RT 2076:8-2077:6 (Ahmed Subhy); see also F&R at 91. This testimony corroborated Dr. Weiss's testimony about the cultural practice of carrying a ta'wiz, which offered an alternative explanation for why Hayat had the du'a in his wallet. (RT 4177:3-4180:3, 4184:24-4187:11, 4192:8-19, 4193:23-4194:7, 4194:21-4195:14).

There was no prejudice cumulative or otherwise.

## X.   THE MAGISTRATE JUDGE ERRED IN CONCLUDING THAT THERE WAS AN ACTUAL CONFLICT

Courts presume prejudice as a result of an actual conflict "only if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." Burger v. Kemp, 483 U.S. 776, 783 (1987). A "conflict of interest is the existence of competing interests potentially affecting counsel's capacity to give undivided loyalty to his client's interests." United States v. Moore, 159 F.3d 1154, 1158 (9th Cir. 1998). "In the absence

of an 'actual' conflict which squarely places the interests of the client in opposition to those of the attorney, and is likely to compromise a reasonable attorney's ability to comply with his legal and ethical obligation to represent his client with undivided loyalty, the Cuyler standard cannot be met." Bonin v. Calderon, 59 F.3d 815, 827 (9th Cir. 1995).

Although there appear to be many formulations of the concept, a finding of a Sixth Amendment violation from an actual conflict of interest requires 1) an actual conflict, which an active representation of directly conflicting interests that is more than a possible or potential conflict; and 2) an adverse effect, that is a demonstration that the conflict caused counsel to take an action (or fail to perform a duty to the client) that was against the client's interests. See Burger, 483 U.S. at 783-85 (an actual conflict must be more than a possible or potential conflict); United States v. Wells, 394 F.3d 725, 733 (9th Cir. 2005) (requiring showing that any "alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."). The Magistrate Judge in this case reaches an extraordinary result: a finding that Ms. Mojaddidi's strategic decision to push the government to trial as soon as possible created an actual conflict despite no evidence that it was against Hayat's interest or an active representation of someone else's interest, or any evidence that it was motivated or caused by the unspecified direct conflict. F&R at 99:1-109:23. This finding of an actual conflict and presuming prejudice is the result of a myriad of legal and factual errors, and this Court must reject the findings after applying the proper legal standards and making appropriate factual findings.

The Magistrate Judge's refusal to give strong deference to the strategic decisions of counsel, and explicit statement that, "Because Mojaddidi lacked any criminal law experience, little or no deference is due her 'strategic' decisions" is contrary to law. That fundamental error infects all of the Magistrate Judge's findings of ineffectiveness and the finding of actual conflict. The Magistrate Judge picks out certain phrases from the cases considering actual conflict claims to create a new standard: that as soon as co-defendants' "interest diverge" because there are "plausible alternative" strategies, an actual conflict exists, without regard to whether there is an active representation of conflicting interests, or an adverse effect *caused by* the alleged conflict. This lower legal standard for finding an actual conflict is contrary to law. Finally, the Magistrate Judge shifted the burden by refusing to give deference or apply the presumption of reasonableness, and finds a conflicted joint representation despite no evidence that Umer

and Hamid's defenses were actually in conflict, or any evidence that Ms. Mojaddidi was motivated to protect the interests of anyone other than her client. The Magistrate Judge's finding of an actual conflict is contrary to law, and factually, clearly erroneous.

### A. By Refusing to apply deference or the strong presumption of reasonableness, the Magistrate Judge finds a legally and factually unsupported actual conflict from the decision to request a trial as soon as possible.

The Magistrate Judge found that Ms. Mojaddidi was acting under an actual conflict, because when Hayat was charged with material support for terrorism, somehow Hayat's interests diverged from Umer's with regard to the timing of the trial, therefore there was an actual conflict and prejudice may be presumed. F&R at 99:1-109:23. The Magistrate Judge correctly distinguishes between concurrent and successive representation as potential sources of conflict when discussing the legal standards, as well as conflicts between counsel and the client. F&R at 99:8-14. The Magistrate Judge also correctly notes that "Under Sullivan, a successful conflict of interest claim requires proof of two things: (1) the attorney 'actively represented conflicting interests,' and (2) that conflict 'adversely affected [the] lawyer's performance.'" F&R at 101:14-16 (quoting Cuyler, 446 U.S. at 348). The Magistrate Judge then correctly rejects the financial arrangement as a source of conflict between Umer and Hayat's interests.[104] F&R at 101:22-102:7.

The Magistrate Judge then states, "However, this court further finds a stark conflict when it comes to the best strategies for representation of each defendant." F&R 102:7-9. The Magistrate Judge then begins an examination of adverse effect without identifying the actual basis for a finding of a conflict. F&R at 102:10-111:14. The Magistrate Judge's basis for finding an actual conflict appears to be "[t]he unreasonable choice of strategy for the representation of Hamid Hayat demonstrates the conflict between the defendants here." Notably, neither Hayat nor the Magistrate Judge, can cite a single case that supports the idea that pushing "for a speedy trial because the government was just buying more time to obtain more evidence" is unreasonable or against a client's interest. F&R at

---

[104] Curiously, the Magistrate Judge states, "This court finds that the financial arrangement alone did not create a conflict. However, this court further finds a stark conflict when it comes to the best strategies for representation of each defendant." F&R at 102:7-9. To the extent that the Magistrate Judge creates ambiguity and uses the financial arrangement to support its finding of an actual conflict, this Court should clarify there is no financial conflict and any suggestion of impropriety finds no factual or legal support in the record.

144

102:10-103:10. To justify the finding of an actual conflict, the Magistrate Judge wrote, "However, this court also has no basis to conclude that this strategy was a reasonable one to defend Hamid against the charge of providing material support for terrorism. The only person to indicate that it was a reasonable strategy is Mojaddidi, an attorney with no criminal law experience and no jury trial experience. Hayat presented the testimony of three expert witnesses on the standard of care for an attorney representing a client charged with material support for terrorism. Not one opined that rushing to trial, and foregoing significant pretrial preparation and motions, would have been a reasonable strategy in a case like Hamid Hayat's." F&R at 103:3-10. The Magistrate Judge did not give deference to Ms. Mojaddidi's strategic decisions, and abdicated the Court's role of applying the objective standards of Strickland in favor of the biased "attorney expert" witnesses who merely converted Hayat's legal arguments into "opinions" on Strickland. F&R at 102:7-103:10; 103:11-105:7 (summarizing expert opinions), 105:8-25 (rejecting deference as noted above).

The Magistrate Judge noted that, "The government presented no evidence contrary to the expert opinions presented by Hayat" in justifying refusal to give deference to the three strategic decisions the Magistrate Judge used to support a finding of an actual conflict. F&R at 105:8-10. "The government simply repeats its position that Mojaddidi's strategic decisions are entitled to deference." F&R at 105:9-10. Because the Magistrate Judge did not give deference to Ms. Mojaddidi's strategic choice to attempt to bring the case to trial before the government could do more investigation and corroboration, and further refused to presume that Ms. Mojaddidi's tactical decisions not to file frivolous or unnecessary motions or seek a security clearance were reasonable, the Magistrate Judge's applied erroneous legal standards, and this Court must reject the finding of an actual conflict.

**B.     The Magistrate Judge applied the wrong legal standard by giving "little to no deference" to the strategic decisions of trial counsel.**

The Magistrate Judge explicitly refused to give deference to Ms. Mojaddidi's strategic decisions, stating, "Because Mojaddidi lacked any criminal law experience, little or no deference is due her 'strategic' decisions." F&R at 105:18-19. The Magistrate Judge cites no case law or other justification for this refusal, which is directly contrary to the "general rule that the strategic decisions of counsel are entitled to deference" acknowledged earlier in the Findings and Recommendations. Id. at 105:10-12

(citing Cullen v. Pinholster, 563 U.S. 170, 197 (2011) and Strickland, 466 U.S. at 691). The Magistrate Judge quotes a passage from Strickland that the "experience of the attorney," is "relevant to deciding whether particular strategic choices are reasonable" and an unpublished case giving great deference to an attorney with "significant experience in criminal law" to justify this extraordinary departure from settled precedent. First, as discussed above, the passage quoted from Strickland was from the summary of the Court of Appeals' decision, not the Supreme Court's articulated standard. Compare Strickland, 466 U.S. at 679-683 (summarizing Court of Appeals decision) with Strickland, 466 U.S. at 691 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments"). The Supreme Court's actual holding, that counsel's performance "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments," finds reinforcement in the Supreme Court's subsequent decisions specifically rejecting "*post hoc* rationalization" and applying "a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" Harrington, 562 U.S. at 109 (quoting Yarborough v. Gentry, 540 U.S. 1, 8 (2003) (*per curiam*)); see also Cullen v. Pinholster, 563 U.S. 170, 191 (2011) (stating that analyses "begin with the premise that 'under the circumstances, the challenged action [] might be considered sound trial strategy.'") (quoting Strickland, 466 U.S. at 689).

Second, the Magistrate Judge cites an unpublished case to support the common sense proposition that an attorney's "significant experience in criminal law" allowed the district court to conclude "that attorney's strategic decisions entitled to great deference." F&R at 105:15-16 (citing United States v. Saltzer, No. 1:14-cv-0451 BLW, 2015 WL 8215744 at *3 (D. Idaho Dec. 8, 2015)). As discussed above, however, Judge Winmill did not imply that less experienced counsel are entitled to "little or no deference." F&R at 105:18. The district court noted that a high level of deference is given to *all* attorneys, consistent with Strickland and its progeny, and not that deference is only given to experienced attorneys. There is simply no legal support[105] for the Magistrate Judge's creation of a new standard of

[105] Even if Saltzer stood for the proposition that an attorney with significant experience is entitled to enhanced deference, the Magistrate Judge's use of Saltzer to establish a new standard that for attorneys who "lack[] any criminal law experience, little or no deference is due her 'strategic' decisions" represents a basic failure of elementary logic. F&R at 105:18-19. The inverse of a conditional statement is not necessarily true under basic principles of logic. See supra at n. 22.

146

deference for less experienced attorneys, and the application of this new standard to find an actual conflict based on the Magistrate Judge's disagreement with trial counsel on what would be the best strategy would have been, is an incorrect application of the law and must be overruled.

Third, the Supreme Court explicitly rejected any presumption of ineffectiveness for inexperienced attorneys in United States v. Cronic, 466 U.S. 648, 665 (1984), stating, "[e]very experienced criminal defense attorney once tried his first criminal case…. The character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation." The Ninth Circuit has repeatedly rejected the idea that a different standard of ineffectiveness applies to attorneys with limited criminal defense experience. See Ortiz, 149 F.3d at 933 ("It is well established that an ineffective assistance claim cannot be based solely on counsel's inexperience."); LaGrand, 133 F.3d at 1275 ("In considering a claim of ineffective assistance of counsel, it is not the experience of the attorney that is evaluated, but rather, his performance."); see also United States v. Simmons, 923 F.2d 934, 956 (2d Cir. 1991) (applying Strickland despite counsel's inexperience and noting that displeasure with strategy employed is insufficient to establish ineffectiveness).

There is no legal support for giving "little or no deference" to the strategic decisions of counsel because of her inexperience. The burden remains on the petitioner to overcome the "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance. Woods v. Sinclair, 764 F.3d 1109, 1132 (9th Cir. 2014) (applying presumption to inexperienced counsel). Crediting the attorney experts' opinions on reasonableness and noting that the government did not produce counter-experts is directly contrary to application of the "strong presumption" that counsel's conduct was reasonable. Id. Because the Magistrate Judge explicitly gave little or no deference as the justification for abdicating application of Strickland and substituting the opinions of attorney experts for the "strong presumption" of reasonableness, the Magistrate Judge's application of the wrong legal standards is contrary to law. This Court should reject the any finding of an actual conflict.

///

147

C.    **An actual conflict requires active representation of the conflicting interest, which is absent from the Magistrate Judge's legal or factual analysis.**

1.    **No support exists for a conclusion that when, in a court's view, a strategy to test the government's evidence before it can conduct additional investigation is no longer in the interests of one co-defendant, an actual conflict arises.**

The Magistrate Judge found "no basis to conclude that the rush-to-trial strategy was a reasonable one for Hamid Hayat." F&R 105:19-20. This despite Ms. Mojaddidi's unrebutted testimony that she decided on this strategy after investigating and considering various defenses and the possibility that the government's case would improve with additional investigation. (Tr. 741:16-23). The entire "actual conflict" the Magistrate Judge identifies, is that "when the first superseding indictment charged Hamid with material support for terrorism, the basic defense strategy for the representation of Hamid came into conflict with Griffin's strategy for the representation of Umer." F&R at 105:20-22. Basically, because the Magistrate Judge disagrees with trial counsel's decision to put the government to its proof before it could do additional investigation and marshal additional resources to improve its case—and applying 20/20 hindsight that it was not be the best strategy for Hamid—the Magistrate Judge finds an actual conflict existed. F&R at 105:18-25, 106:2-8, 109:16-23.

a.    **The Magistrate Judge misinterprets dicta from a Ninth Circuit case to apply a "do diverge" standard that eliminates the need to find an actual, direct conflict of interests between the defendants.**

The Magistrate Judge cites language from United States v. Walter-Eze, 869 F.3d 891, 901 (9th Cir. 2017) that quotes Cuyler v. Sullivan, 446 U.S. at 356 n.3, stating, "[t]here is an actual, relevant conflict of interests if, during the course of the representation, the defendants' interests do diverge with respect to a material factual or legal issue or to a course of action."[106] The Magistrate Judge used this passage from Walter-Eze (and by quotation, the Supreme Court in Cuyler) to conclude that an actual conflict occurred as soon as "the basic defense strategy for the representation of Hamid came into conflict with Griffin's strategy for the representation of Umer." F&R at 105:20-22. The quoted

---

[106] Only the Third Circuit has adopt this language. See United States v. Morelli, 169 F.3d 798, 810 (3d Cir. 1999) (noting Third Circuit has elaborated on the Cuyler standard with this language). The Third Circuit has also acknowledged, however, that "we have noted that an actual conflict is more likely to be found where 'an attorney takes positive steps on behalf of one client prejudicial to another' as opposed to cases where 'the attorney's actions are based on inaction and are passive.'" Id. (quoting United States v. Gambino, 864 F.2d 1064, 1070 (3d Cir. 1988)). This elaboration brings this interpretation in line with Supreme Court and other case law requiring active representation of a conflicting interest. See Hovey v. Ayers, 458 F.3d 892, 908 (9th Cir. 2006) ("actual conflict is defined by its impact" on counsel's representation and noting court properly found no conflict because the failure to investigate "was not motivated by any conflict of interest").

148

footnote, however, comes from Justice Marshall's concurrence and dissent in Cuyler, not the Court's opinion. See Cuyler, 446 U.S. at 354-58 (Marshall, J., concurring and dissenting). The footnote discusses the ABA model standards and rules concerning avoiding conflicts, and explicitly states, "The ABA materials do not, of course, define the constitutional standard. However, they are consistent with [Glasser v. United States, 315 U.S. 60, 70 (1942)]'s emphasis on the interests of the defendants, and the corresponding duties owed by the attorney, rather than the empirical question of the effect of the conflict on the attorney's performance." Cuyler, 446 U.S. at 356 n.3. The footnote from Justice Marshall's dissent then quotes from a comment in the Journal of Criminal Law and Criminology from 1977, including the passage quoted by the Ninth Circuit in Walter-Eze. No subsequent Supreme Court case has adopted Justice Marshall's dissent that a defendant did not need "to demonstrate that his attorney's trial performance differed from what it would have been if the defendant had been the attorney's only client" to show actual conflict.[107]  Cuyler, 446 U.S. at 355 (Marshall, J. concurring and dissenting). Therefore, there is no legal support for concluding that a defendant does not need to show active representation of another client's interest that directly conflicts with the defendant's (an actual conflict) in order to find an actual conflict. See, e.g., McClure v. Thompson, 323 F.3d 1233, 1248 (9th Cir. 2003) ("Without this factual showing of inconsistent interests, the conflict is merely possible or speculative.").

The Supreme Court stated in Cuyler v. Sullivan, that, "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." Cuyler v. Sullivan, 446 U.S. 335, 350 (1980). The burden of showing an actual conflict is on the petitioner, not the government. See United States v. Finlay, 55 F.3d 1410, 1415 (9th Cir. 1995) ("His burden is less than showing actual harm; he must show actual conflict."). The Magistrate Judge's refusal to apply deference or a presumption of reasonableness shifted the burden away from the petitioner, and furthermore, eliminated the legal requirement of an actual conflict *causing*

---

[107] The only actual conflict found in Walter-Eze, was a conflict between the attorney and the client, not an actual conflict between co-defendants. See Walter-Eze, 869 F.3d at 903-04 (noting court's threat of sanctions "squarely placed Darden's interests in opposition to Walter-Eze's and explicitly compromised Darden's ability to comply with his legal and ethical obligation to represent his client with undivided loyalty.") (internal quotations and punctuation omitted). Therefore, the Ninth Circuit also requires a showing that the alleged conflict squarely places interests at odds and explicitly has an adverse effect before finding an actual conflict. Id.

the purported conflicted adverse effect. The Magistrate Judge applied dicta from Walter-Eze,[108] quoting Justice Marshall's dissent, to lower the burden of proof and find an actual conflict without any evidence that Ms. Mojaddidi was actively representing Umer's interests against Hayat's interest because of her unspecified duty to Umer. F&R at 105:20-25, 106:2-8, 109:16-23. As a result, the finding that Ms. Mojaddidi's decisions to push for a quick trial and forego futile and non-prejudicial pre-trial motions, without any evidence that the strategy was against Hayat's interest and that it was actively in Umer's interest, misstates the standard and is therefore a misapplication of the law.

> **b.      The Supreme Court has rejected use of possible or potential conflicts to support a finding of an actual conflict without active representation of competing interests.**

The burden is on the petitioner to show an actual conflict. Finlay, 55 F.3d at 1415. A possible or potential conflict is insufficient to meet the actual conflict standard. See Burger v. Kemp, 483 U.S. 776, 783-95 (1987). In Burger, the Supreme Court reaffirmed that the Court has "never held that the possibility of prejudice that 'inheres in almost every instance of multiple representation' justifies the adoption of an inflexible rule that would presume prejudice in all such cases." 483 U.S. at 783 (quoting Cuyler, 446 U.S. at 348). "An actual conflict must be proved through a factual showing on the record." Morris v. State of Cal., 966 F.2d 448, 455 (9th Cir. 1991). "Instead, we presume prejudice only if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." Burger, 483 U.S. at 783 (citations and internal quotations omitted). The Supreme Court then stated that, when evaluating claims of actual conflict, "we generally presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client." Burger, 483 U.S. at 784. The Court has reaffirmed these standards over and over, requiring that defendant demonstrate that his counsel was actively representing conflicting interests before presuming prejudice. See Mickens v. Taylor, 535 U.S. 162, 175 (2002) (restricting application of Cuyler, emphasizing the passage at 446 U.S., at 350, "'[U]ntil,' [Cuyler] said, 'a defendant shows that his counsel *actively represented* conflicting interests, he has not established the constitutional predicate

---

[108] Walter-Eze rejected presuming prejudice outside of the joint representation context and ultimately found no prejudice from an assumed conflict because "[t]here is no indication that counsel's failure to disclose the presentation on time was at all related to the conflict of interest, and thus it cannot serve as an example of prejudice *resulting from* the conflict." 869 F.3d at 905-907.

for his claim of ineffective assistance.'").

The Magistrate Judge's Findings and Recommendations regarding actual conflict are full of conclusory statements and speculation.  After rejecting deference to Ms. Mojaddidi's strategic decisions, the Magistrate Judge states without legal or other support that, "[a]ccordingly, when the first superseding indictment charged Hamid with material support for terrorism, the basic defense strategy for the representation of Hamid came into conflict with Griffin's strategy for the representation of Umer."[109] F&R at 105:20-22 (citing Walter-Eze, 869 F.3d at 901).  By reading the language that when "the defendants' interests do diverge" along with the "plausible alternatives" language to create a new standard that does not require a direct conflict between the conflicted parties, but rather a mere divergence of interests, the Magistrate Judge eliminates the mandated requirement that the Court find that counsel "actively represented conflicting interests."  Compare F&R at 106:19-22, 107:2-109:23 with Burger, 483 U.S. at 783; Cuyler, 446 U.S. at 348.

In Dean v. Duckworth, 748 F.2d 367, 370 (7th Cir. 1984), the Seventh Circuit analyzed a district court's finding that an actual conflict between co-defendants existed because the district court concluded that the petitioners did not in fact have a joint defense.  The district court "reasoned that because petitioners did not claim to have spent the entire night of September 12-13, 1977 together, their alibis ceased to be joint at precisely the most critical juncture in their defense."  Id.  The Seventh Circuit reversed the finding of an actual conflict, stating:

> All of the evidence presented by the prosecution was offered against both petitioners.  There was nothing presented that would implicate one more than the other thereby putting defense counsel in the position of having to choose the interest of one over the other.  We reject the conclusion inherent in the District Court's opinion that because petitioners did not have identical defenses they necessarily had conflicting defenses.  In short, we find no evidence of any actual conflict of interest or any adverse effect upon trial counsel's performance.

Id.

---

[109] The Magistrate Judge's prior finding that, "[t]his court finds no basis to conclude that the rush-to-trial strategy was a reasonable one for Hamid Hayat" simply establishes that the Magistrate Judge was not applying the presumption of reasonableness or deference to Ms. Mojaddidi's strategic decision.  F&R at 105:19-20.  The footnote to this statement reinforces the refusal to apply the presumption or reasonableness or strong deference to strategic decisions, and represents an abdication of the Court's function to apply Strickland in favor of expert testimony.  F&R at 105 n. 47; see United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the [factfinder] what result to reach, this does not aid the [factfinder] in making a decision, but rather attempts to substitute the expert's judgment for the [factfinder's].") (emphasis in original).

151

This Court should similarly reject the Magistrate Judge's conclusion that because Umer and Hamid's charges differed, they no longer had a common defense, therefore they necessarily had a conflict.  Compare F&R at 105:20-22, with Dean, 748 F.2d at 370 (District Court "reasoned that their alibis ceased to be joint at precisely the most critical juncture in their defense" therefore an actual conflict existed even though co-defendants did not have conflicting defenses).  As noted above, the Ninth Circuit has not adopted a standard that an actual conflict exists once the defendants' interests potentially or hypothetically diverge, and no case has ever held that the decision to try a case before the government can gather more evidence can be the basis for an actual conflict.  The Magistrate Judge does not cite any case concluding that pushing a case to trial, and making reasonable strategic choices not to file futile motions, is contrary to the client's interests.

The cases cited by the Magistrate Judge to illustrate an actual conflict reinforce the idea that to find an actual conflict, the petitioner must show some sort of active representation of the conflicted party's interests to the detriment of the petitioner.  See Mickens, 535 U.S. at 171 (requiring "a conflict *that affected counsel's performance* – as opposed to a mere theoretical division of loyalties.").  No court (other than the Magistrate Judge) has concluded that a decision concerning the timing of the trial created an actual conflict between co-defendants in the absence of actually conflicting defenses, conflicting duties of loyalty, or other interests "which squarely places the interests of the client in opposition to those of the attorney."  Bonin, 59 F.3d 827.  The Magistrate Judge's analysis is contrary to law.

> **c.**  **There Is no Support for a Conclusion that a Decision to Test the Government's Evidence Was Against Hayat's Interest or Protected Umer's Interest.**

The Magistrate Judge's attempt to find an actual conflict based on Ms. Mojaddidi's failure to take futile actions that could potentially benefit her client, rather than active representation of the alleged conflicting interest, turns the actual conflict standard on its head.  Except for the case "in which counsel fails meaningfully to oppose the prosecution's case," it is error to apply a presumption of deficient performance or a presumption of prejudice.  Florida v. Nixon, 543 U.S. 175, 178 (2004).  The Magistrate Judge cites no cases to support her conclusion that Ms. Mojaddidi's strategic decision to push

152

the case to trial was an unreasonable one or that it was contrary to Hayat's interests.[110]  See Patiwana v. United States, 928 F.Supp. 226, 234-35 (E.D.N.Y. 1996) aff'd,  173 F.3d 845 (2d Cir. 1999) (rejecting actual conflict, noting, "Presumably, the alternative defense strategy that Litman failed to employ was the pursuit of a quick retrial.  The Court finds, however, that Litman's decision to employ a strategy of delay was independent of his representation of other clients since he plausibly thought the strategy was beneficial").  The only evidence in the record is Ms. Mojaddidi's testimony that she thought it was in Hayat's best interests to go to trial before the government could gather more evidence against Hayat. (Tr. at 741:16-23).

Applying the presumption that declining to file unnecessary motions is a reasonable tactical choice is the proper way to analyze this case, particularly when the defendants' interests are not directly in conflict.  See United States v. Crespo de Llano, 830 F.2d 1532, 1540-41 (9th Cir. 1987) (rejecting argument that failure to file "unnecessary" motions or request mooted limiting instructions demonstrated actual conflict and noting defendants' interests were "identical, rather than in conflict").  Mr. Griffin, Mr. Riordan, and the experts did not testify that the motion to suppress Hayat's confession would have harmed Umer's interests, or that Ms. Mojaddidi decided not to move to suppress in order to protect Umer's interests.  Requiring the government to use an expert to explain that counsel makes a valid strategic choice in refusing to file a meritless motion to suppress is contrary to the Supreme Court's direction to apply a strong presumption that counsel's decisions are proper tactical choices, and shows that the Magistrate Judge applied the wrong legal standard in finding an actual conflict based on the expert testimony.  See Burger, 483 U.S. at 784 (presuming counsel aware of ethical obligations); Harrington, 562 U.S. at 109 (strong presumption that counsel's decisions are tactical and strategic); compare F&R at 103:2-5 ("This court has no basis to question the reasonableness of [pushing for trial]. However, this court also has no basis to conclude that this strategy was a reasonable one to defend Hamid against the charge of providing material support for terrorism"), 105:8-10 ("The government

---

[110] Many cases conclude that a reasonable doubt strategy is reasonable.  See Zapien v. Davis, 849 F.3d 787, 795 (9th Cir. 2015) (concluding that reliance on reasonable doubt rather than aggressive impeachment was not ineffective); Decastro v. Branker, 642 F.3d 442, 451 (4th Cir. 2011) (affirming finding of effectiveness when "defense counsel chose a strategy of casting reasonable doubt as to whether Petitioner was present at the scene of the crime."); Woods v. McBride, 430 F.3d 813, 825 (7th Cir. 2005) ("trial counsel pursued a reasonable doubt strategy during the guilt phase of trial and reserved its mitigation arguments for the penalty phase, a strategy that was not inherently unreasonable.").

presented no evidence contrary to the expert opinions presented by Hayat.  The government simply repeats its position that Mojaddidi's strategic decisions are entitled to deference."); 105 n.47 ("This court recognizes that the strategy pursued was not simply rushing to trial but was focusing on challenging the sufficiency of the government's evidence.  Again, no expert opined that such a strategy made sense in Hamid Hayat's case.").  "A claim that a conflict produced adverse impact is not made out by simply claiming such; it must be an impact that significantly worsens the client's representation." Rich v. Calderon, 187 F.3d 1064, 1069 (9th Cir. 1999).  Because the Magistrate Judge did not give deference to Ms. Mojaddidi's strategic choice to attempt to bring the case to trial before the government could do more investigation and corroboration, and refused to presume that Ms. Mojaddidi made tactical decisions not to file frivolous or unnecessary motions or seek a security clearance, the Magistrate Judge's applied erroneous legal standards, and this Court must reject the finding of an actual conflict.

**D.    The Magistrate Judge's interpretation of Rodrigues and other case law fails to require Hayat to show the competing loyalty *caused* the counsel's decision.**

"The central question that [the courts] consider in assessing a conflict's adverse effect is 'what the advocate [found] himself compelled to refrain from doing' because of the conflict." Lockhart v. Terhune, 250 F.3d 1223, 1231 (alteration in original) (quoting United States v. Allen, 831 F.2d 1487, 1497 (9th Cir. 1987)) (internal quotation marks omitted).  The Magistrate Judge analysis of adverse effect is as follows:

> To show a conflict affected counsel's performance adversely, Hayat must establish that the source of the conflict (1) "influenced the attorney not to pursue a particular litigation strategy," and (2) the "foregone litigation strategy would have been a viable alternative." United States v. Rodrigues, 347 F.3d 818, 824 (9th Cir. 2003). The first step in this analysis is answered in the section above. The rush-to-trial strategy for Umer Hayat was not a reasonable strategy for Hamid Hayat. To the extent Mojaddidi can be considered to have had a choice of strategies given her inexperience, her choice was obviously affected by Griffin's determination that the rush-to-trial strategy was best.

F&R at 110:2-9.

Although Rodrigues states the petitioner may be entitled to a hearing if he can show that a conflict "influenced the attorney not to pursue a particular litigation strategy," the Ninth Circuit still requires that the petitioner allege and prove that the decision not to pursue a particular litigation strategy was caused by the alleged conflict.  Rodrigues, 347 F.3d at 823 (noting "the Ninth Circuit recently held

that '[t]he showing must be that counsel was influenced in his basic strategic decisions' by loyalty to another client or former client." quoting Shwayder, 312 F.3d at 1118).  But Rodrigues' "influenced the attorney" language was not meant to lower the standard by eliminating the requirement that a petitioner show that the conflict *caused* the choice of alternative strategies.  Rather, the Ninth Circuit made that explicit, "Under the applicable Sixth Amendment standard, Rodrigues is not entitled to relief unless he can allege specific facts that, if true, would demonstrate 'that counsel was influenced in his basic strategic decisions' *by loyalty to another client or former client*."  Rodrigues, 347 F.3d at 828 quoting Shwayder, 312 F.3d at 1118) (emphasis added).  The panel in Rodrigues specifically rejected an actual conflict claim because the Ninth Circuit credited counsel's testimony that "the non-viability of witness cooperation theory, rather than the firm's relationship with the RTC appears to have been Neal's motivation for not introducing the settlement agreement at trial."  347 F.3d at 826.[111]  Because neither Walter-Eze, nor any other case law eliminated the requirement to show some sort of causal link from a direct conflict, this Court should apply the proper standard and reject the Magistrate Judge's finding.  Hayat failed to show that any of the strategic choices about which he complains were motivated by loyalty or duty to Umer, or that Ms. Mojaddidi made the choice because of the alleged conflicted loyalty.

The case cited by the Magistrate Judge to support "the defendants' interests diverge," standard, United States v. Gambino, involved an attorney's simultaneous representation of two defendants, (Gambino and Mazzara) in two separate cases and the possibility of linking the client who was not on trial (Mazzara) to a specific drug transaction.  864 F.2d at 1066-69.  The Third Circuit explained

> Clearly, a defendant who establishes that his attorney rejected a plausible defense because it conflicted with the interests of another client establishes not only an actual conflict but the adverse effects of it…. On the other hand, there is no conflict of interest adversely affecting the attorney's performance if an attorney at trial does not raise a defense on behalf of his client because to do so is not in that client's interest even though it is also in the interest of another client that it not be raised.  To the contrary, that is a coincidence of interests.  864 F.2d at 1070-71.

---

[111] The Ninth Circuit affirmed the district court findings that, credited trial counsel's testimony that "explained that he did not pursue this strategy because 'he did not believe that the settlement document could reasonably be read to suggest that it was a witness cooperation agreement, and thus the issue could not be credibly argued.'  On this basis the district court held that Neal had made an informed tactical decision."  347 F.3d at 826.

The Third Circuit went on to analyze trial counsel's testimony, noting:

> Further Evseroff knew, probably before he cross-examined the surveillance agents, that Spatola would testify that Saia was the source of the heroin delivered at the Caffe Milano, and that any attempt to establish that Mazzara had supplied that heroin would undermine Spatola's testimony.  Thus, Evseroff's loyalty to Mazzara did not cause him to forego the Mazzara defense.  The defense was not raised because from appellant's point of view it would have been foolish to do so.  Therefore, Evseroff had no conflict of interest at appellant's trial.  864 F.2d at 1072.

Because there was no proof that trial counsel failed to point the finger at Mazzara *because of* his duty of loyalty to Mazzara, the Third Circuit refused to find active representation of competing interests, and declined to find an actual conflict.  Id. at 1072 (also noting, "It is evident from Evseroff's reasoning as to why he did not raise the Mazzara defense, that he would have not have advanced it even if Mazzara had never been his client.").

In other words, a petitioner alleging an actual conflict must show "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."  United States v. Wells, 394 F.3d 725, 733 (9th Cir. 2005) (internal quotations omitted); see also Hovey, 458 F.3d at 908 ("Here, there was no defense strategy or tactic that counsel abandoned as a result of the conflict.").  That is, Hayat must show that Ms. Mojaddidi did not execute a defense strategy or tactic because of her alleged loyalty to Umer (that conflicted with Hayat's interest) or took some action that was directly against Hayat's interest because of an alleged loyalty to Umer.  Hayat cannot make this showing.

Notably, the Magistrate Judge cites the correct standard, requiring Hayat to demonstrate that "his attorney made a choice between possible alternative courses of action that impermissibly favored an interest in competition with those of the client."  F&R at 111:9-11 (quoting McClure, 323 F.3d at 1248).  However, the Magistrate Judge failed to apply the second part of the standard, requiring that the courses of action impermissibly favor "in interest in competition with those of the client."  McClure, 323 F.3d at 1248.  As noted above, the Magistrate Judge's "plausible alternative" standard applies the first portion of the standard without requiring the actual conflict or inherently conflicting interest.  See Wells, 394 F.3d at 733 ("that some plausible alternative defense strategy or tactic might have been pursued but was

156

not *and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests*.") (emphasis added). The Supreme Court has held that even if an actual conflict is shown, a petitioner must still show a specific harm to his lawyer's advocacy. Burger, 483 U.S. at 785 ("We also conclude that the asserted actual conflict of interest, even if it had been established, did not harm his lawyer's advocacy.").

This Court should apply the correct standard, requiring Hayat to show that Ms. Mojaddidi took some action (or failed to take some action) during the course of her representation because of her purported loyalty to Umer that "squarely places the interests of the client in opposition to those of the attorney." Bonin v. Calderon, 59 F.3d 815, 827 (9th Cir. 1995). As discussed below, Ms. Mojaddidi represented Hayat's interests, and only Hayat's interests, throughout this case, and never made any decisions, strategic or otherwise, against Hayat's interest. Furthermore, there is no evidence that Ms. Mojaddidi chose any strategy because of any loyalty or duty to Umer. Therefore, Hayat cannot show an actual conflict, and this Court should reject the Magistrate's Judges contrary conclusion and deny Hayat's claims alleging an actual conflict.

**E.      Applying the Correct Standards, Hayat Cannot Show the Factual Requirements for Finding an Actual Conflict.**

**1.      The Magistrate Judge Failed to Find the Required Active Representation of an Interest against Hayat's.**

The Magistrate Judge cites the failure to file pre-trial motions as showing the active representation and the adverse effect on performance, while acknowledging that Hayat's interests were not actually impaired or compromised.[112] F&R at 106:1-111:14. The Magistrate Judge noted Hayat's counsel did not argue that he suffered prejudice from the failure to file a motion to suppress or to sever. F&R at 55:14-56:9. Nor did Hayat argue those motions to suppress or for a bill of particulars would have been successful. Pet. at 49-51, 65-66, 69-71. The Magistrate Judge concluded that the failure to file a bill of particulars did not prejudice Hayat's defense. F&R at 53:11-55:13. The Magistrate Judge also found that the failure to obtain a security clearance was not prejudicial under Strickland. F&R at 65:26-66:2. Therefore, the Magistrate Judge concluded that none of the omissions identified as "adverse

---

[112] Ms. Mojaddidi filed motions to dismiss (CR 147, 168, 173, 176), and bail motions (CR 33, 43, 100).

effects" of the alleged conflict using a lower, plausible alternative standard, were actually against Hayat's interests.  F&R at 110:21-111:12.

To prove an ineffectiveness claim based on a conflict of interest, a petitioner "must demonstrate that his attorney made a choice between possible alternative courses of action that impermissibly favored an interest in competition with those of the client."  McClure, 323 F.3d at 1248; F&R at 111:9-12.  The Ninth Circuit in McClure went on to explain, "Because McClure cannot identify specific evidence in the record that suggests that his interests were impermissibly impaired or compromised *for the benefit of another party*, he cannot demonstrate that his counsel 'actively represented a conflicting interest.'"  Id. (quoting Cuyler, 446 U.S. at 350) (emphasis added).  "Without this factual showing of inconsistent interests, the conflict is merely possible or speculative."  Id.; accord Reynolds v. Chapman, 253 F.3d 1337, 1342-43 (11th Cir. 2001) ("To satisfy the 'actual conflict' prong, a defendant must show something more than 'a possible, speculative, or merely hypothetical conflict.'" quoting Lightbourne v. Dugger, 829 F.2d 1012, 1023 (11th Cir. 1987)).   The Magistrate Judge found that the rush to trial strategy was not in Hayat's interest, but did not, and cannot, find that Ms. Mojaddidi chose that strategy to benefit Umer.  F&R at 106:1-109:23, 111:7-12.  In the Ninth Circuit, it is not enough to identify a "possible alternative course[] of action," the choice must also "impermissibly favor[] an interest in competition with those of the client."  McClure, 323 F.3d at 1248.

Finding a "plausible" alternative strategy is not enough, petitioner must also show "'that counsel was influenced in his basic strategic decisions' by loyalty to another client or former client."  Rodrigues, 347 F.3d at 823 (quoting United States v. Shwayder, 312 F.3d 1109, 1118) (9th Cir. 2002)); see also McFarland v. Yukins, 356 F.3d 688, 706 (6th Cir. 2004) (requiring plausible defense "that was inherently in conflict with or not undertaken due to the attorney's other loyalties" quoting Winkler v. Keane, 7 F.3d 304, 309 (2d Cir. 1993) and collecting cases).  The Eleventh Circuit has made this causation requirement explicit, requiring that petitioners "must show some link between the actual conflict and the decision to forgo the alternative strategy of defense."  Freund v. Butterworth, 165 F.3d 839, 860 (11th Cir. 1999) (*en banc*).  This fulfills the Supreme Court's direction in *Mickens*, that an "actual conflict" is "a conflict that *affected counsel's performance* – as opposed to a mere theoretical division of loyalties."  535 U.S. at 171 (emphasis in original).  There is no evidence to show that Ms.

158

Mojaddidi made any strategic decision that harmed Hayat's interest because she was motivated by a desire to protect some unspecified interest of Umer's. McClure, 323 F.3d at 1248.[113]

The Magistrate Judge did not find that any of the identified actions benefitted, or could directly benefit Umer's interests. F&R at 106:2-109:23. Even under a joint representation theory, there is no finding that Mr. Griffin's strategic decisions were directly contrary to Hayat's defense. Id. Therefore, applying the correct standard, there is no actual conflict in this case and the Magistrate Judge clearly erred by finding one without finding an active representation of interests "inherently in conflict." Wells, 394 F.3d at 733. This Court should reject that erroneous conclusion.

### 2. The Magistrate Judge's finding of joint representation and an actual conflict from the joint representation is clearly erroneous based on the evidence.

In a section titled, "Did Counsel Represent Both Defendants," the Magistrate Judge cites Ms. Mojaddidi's inexperience, and states that, "This court finds that by ceding responsibility to Griffin, who had a client with conflicting interests, Mojaddidi was effectively in a joint representation arrangement with Griffin. Both attorneys effectively represented Hamid Hayat." F&R at 106:2-6. A joint defense agreement does not create a joint defense, and a joint defense is not automatically conflicted. See United States v. Holy Land Found. for Relief and Development, 2010 WL 11541819 at *8-*9 (N.D. Tex. May 24, 2010) (concluding that legal defense of three individuals with a joint defense agreement, presenting a unified defense, protected corporate entity with "same defense and defense strategy."). As justification, the Magistrate Judge cites, "The best evidence of this joint representation is the decision that a rush-to-trial strategy was in the best interests of both defendants. Mojaddidi simply followed Griffin's decisions that were in the best interests of his client, not hers." F&R at 106:6-8. There is no

---

[113] See Blake v. United States, 723 F.3d 870, 881-82 (7th Cir. 2013) (although "the appearance of a conflict of interest was indeed strong," petitioner "failed to establish that [trial counsel's] performance on his behalf was adversely affected by virtue of it, that is, that [counsel's] performance on behalf of [petitioner] would have been different, had there been no conflict" and finding no evidence that any decision was motivated by alleged conflict); United States v. Alvarez, 137 F.3d 1249, 1252 (10th Cir. 1998) ("Without a showing of inconsistent interests, any alleged conflict remains hypothetical, and does not constitute ineffective assistance" and "Despite Mr. Alvarez's contentions that his counsel was working for the benefit of Mr. Gastelum-Murgia, nothing in the record suggests a divergence of interests between Mr. Alvarez and his codefendants or a compromise of any kind in counsel's defense of Mr. Alvarez. Counsel vigorously defended Mr. Alvarez throughout trial."); Smith v. White, 815 F.2d 1401, 1401 (11th Cir. 1987) ("We will not find an actual conflict of interest unless appellants can point to specific instances in the record to suggest an actual conflict or impairment of their interests.... Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative causes of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remain(s) hypothetical.").

evidence that Umer and Hamid Hayat had conflicting defenses.  See Mosier v. Murphy, 790 F.2d 62, 65 (10th Cir. 1986) (rejecting actual conflict claim where "[t]here is no indication that attorney Farrar presented a defense which was inconsistent with the innocence of his wife and mother-in-law.").  The uncontroverted evidence in the record is Ms. Mojaddidi's consistent testimony[114] that she independently researched and came to decisions about how to represent Hamid Hayat.  Summarized at F&R at 106:9-19; (W.M. Depo. at 24, 131, 135; Tr. 693, 695, 705, 744).  Furthermore, Ms. Mojaddidi tried Hayat's case, devoting the majority of her time and resources into preparing for and conducting the trial.[115]

Ms. Mojaddidi repeatedly confirmed that she maintained and exercised complete, independent, decision-making authority with respect to Hayat, for both tactical and strategic issues.  (W.M. Depo. 131:2-21; see also Tr. 695:3-12).  She specifically stated in her deposition that she did not blindly agree with Mr. Griffin:

> Q.    What if there was a legal issue about what you know nothing and had experience, who would make the decision then?
>
> A.    Well, I – every time [Mr. Griffin] made a decision, I myself did independent research and tried to see if it was something that I thought made sense and so I didn't blindly agree on everything….

(W.M. Depo. 24:11-17).  Ms. Mojaddidi also emphatically denied that Mr. Griffin required her to cede to him all final decision making power over Hayat's defense.  (W.M. Depo. 131:22-25).

She denied that Mr. Riordan ever even asked her about a potential conflict while he and she were co-counsel for Hayat after his conviction.[116]  (W.M. Depo. 95:19-96:5, Tr. 694:3-21).  She recalled that

---

[114] The Supreme Court has specifically stated that an attorney confronted with a possible conflict of interest "is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop at trial." Holloway v. Arkansas, 435 U.S. 475, 485 (1978) (quoting State v. Davis, 110 Ariz. 29, 31 (1973)).  Also, "defense attorneys have the obligation, upon discovering a conflict of interests, to advise the court at once of the problem."  Id.  Courts have interpreted these passages from Holloway to credit the attorney's explanations regarding conflicts and whether they existed. See United States v. Barnes, 909 F.2d 1059, 1066 (7th Cir. 1990) (rejecting defendant's claim that government telling trial counsel that the defendant put a "hit" out on trial counsel created an actual conflict, stating "we refuse to delve into the wide chasm of speculation and look beyond his attorney's statement to the trial court that he believed that a 'contract' had not been placed on his life."); Parker v. Parratt, 662 F.2d 479 484 (8th Cir. 1981) (rejecting district court's finding of an actual conflict based of difference in strength of cases against the co-defendants by crediting counsel's testimony that he "knew their defenses…. [h]e obviously concluded that there was no inconsistency in the defense, and that he knew of no conflict.").

[115] (W.M. Depo. at 24:14-24, 104:13-16, 132:1-135:17, 249:15-17; Tr. 695:19-21, 696:1-3, 708:14-709:17).

[116] The Magistrate Judge concedes that Mr. Riordan's testimony is hearsay and may only be used to impeach Ms. Mojaddidi.  F&R 27 n. 15; 108 n. 51.  Similarly, Mr. Reichel's testimony was only considered as impeachment evidence. F&R 109 n. 53.  Yet the Magistrate Judge cites Riordan's testimony as direct evidence despite acknowledging that it is not

Mr. Riordan asked her about potential ineffectiveness claims.  (Id.)  She also rejected Mr. Riordan's use of the word "interview," suggesting that he took an indirect route to try to elicit information from her about her representation of Hayat.[117]  (Id. at 96:6-10).

Furthermore, Ms. Mojaddidi's 2018 testimony denying a joint representation or an actual conflict is consistent with her 2014 deposition testimony.  Ms. Mojaddidi and Mr. Griffin discussed strategic and tactical issues daily, and she looked to Mr. Griffin to give her information on these issues so that she could make informed decisions.  (Id. at 131:10-15, 132:1-24; see also Tr. 695:19-25).  She understood that Hayat and his father would be "going through a lot of the same hearings" and she could rely on Mr. Griffin's background and knowledge to supplement her work and judgment concerning how to proceed on Hayat's behalf.  (Tr. 705:8-706:8).  However, she met with Hayat "dozens of times," to discuss "documents" and "issues in the case" with him, and to gather information without Mr. Griffin.  (Tr. 690:4-19, 691:15-19).  She also independently researched issues and based her decisions on the results of her research.[118]  (Tr. 695:19-21, 696:3).

Nothing about the existence of the joint defense agreement undermines this unequivocal testimony or rises to the level of a joint representation.  In this case, during the period of June 5 and 10, 2005, Hayat retained Ms. Mojaddidi and Umer retained Mr. Griffin.  (W.M. Depo. 21:4-13, 125:16-25, 126:3-7).  Initially, Ms. Mojaddidi was contacted by a representative from the Council for American-Islamic Relations ("CAIR") to intervene to stop the interviews of Hayat and his father by FBI investigators.  (Tr. 685:12-688:7).  At the FBI offices that day, June 5, 2005, a government attorney who

direct evidence.  F&R at 27:24-28:1, 108:15-109:5.  To the extent the Magistrate Judge placed "controlling weight … on the opinions of a lawyer associated with defense counsel," that was error.  See Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Corp., Inc., 546 F.2d 530, 539-40 (3d Cir. 1976) (rejecting district court decision in patent case based on lawyer witness testimony).  That is because "an attorney who assumes the burden of a witness while representing his client in a lawsuit does so at a very great detriment to the credibility of his testimony."  Lau Ah Yew v. Dulles, 257 F.2d 744, 746-47 (9th Cir. 1958).

[117] At the 2018 hearing Ms. Mojaddidi also denied that she sat for an "interview type session" with Mr. Riordan or any of Hayat's other *habeas* lawyers.  (Tr. 710:7-8).  She conceded she spoke to Mr. Riordan and Mr. Horgan and "believed us to have a good working relationship."  (Id. at 710:8-13).  She testified she "provided information," "voiced frustrations," "made comments about…how things could have been done differently, because, you know, hindsight is always 20/20."  (Id.)  She described the period of those discussions as "a difficult and emotional time."  (Id.)

[118] Again at the hearing, Ms. Mojaddidi denied, unequivocally, that Mr. Griffin required her to cede authority over Hayat's defense to him, stating the claim was "not true at all."  (Tr. 693:20).  She also denied she told Mr. Riordan that Mr. Griffin insisted she cede decision making authority over Hayat's defense to him.  She testified: "I would never say that because it wasn't true…I did not say that to [Mr. Riordan]."  (Id. at 693:19-21).

did not appear in the case mistakenly told Mr. Griffin that Umer had the "heavier case." (W.M. Depo. 18:3-18, 126:8-127:11; Tr. 688:8-17). Mr. Griffin discussed this fact with Ms. Mojaddidi as they decided which lawyer would represent which client in their effort to stop the interviews of Hayat and his father. (W.M. Depo. 126:18-21; Tr. 662:5-15, 688:12-17). However, the final decision that Ms. Mojaddidi would represent Hayat, beyond stopping the interviews, "was not made the first day." (Tr. 692:9-10). Rather, it was a decision "not made in haste," and only after Ms. Mojaddidi spoke with Hayat "individually." (Tr. 692:12-15).

Hayat knew that Ms. Mojaddidi had no experience in criminal law because she advised Hayat of this prior to his decision to retain her. (W.M. Depo. 22:14-18, 27:17-20; Tr. 689:18-20). Hayat wanted Ms. Mojaddidi to represent him and signed a retainer agreement. (W.M. Depo. 27:21-25, 125:19-21). Ms. Mojaddidi determined that she could handle Hayat's representation. (W.M. Depo. 22:22-23:9). Ms. Mojaddidi felt comfortable in the courtroom but knew she would need some guidance, particularly as to procedural issues. (W.M. Depo. 23:5-7). She recognized that she had to learn on the job to do the case competently and she was "willing to learn it"—"to get in and do it." (Id. at 23:6-9, 24:14-19). In her deposition, Ms. Mojaddidi expressed uncertainty about whether she would have felt qualified to represent Hayat alone if the cases had been severed. (W.M. Depo. 23:10-17). She felt she did not need Mr. Griffin's participation in trial; but she would have wanted another attorney to help. (Id. at 52:25-53:8). In her 2018 testimony, however, she clarified that by the time Hayat's trial actually began, she would have felt able to represent him without any assistance. (Tr. 702:1-8). She conceded that on the eve of trial she felt some "anxiety" about representing Hayat but ultimately decided she could do it on her own, in part, because she felt reassured by Mr. Griffin. (Id. at 702:12, 703:15-704:1, 704:7-9).

The plan, from the start, was that Ms. Mojaddidi would work with Mr. Griffin, an experienced criminal defense attorney, as part of a "joint defense," and would rely on Mr. Griffin for "a lot of things." (Id. at 22:22-23, 24:4-10). Ms. Mojaddidi and Mr. Griffin had an oral and written joint defense agreement: each represented his/her own client and agreed to "work[] jointly" to prepare their cases. (W.M. Depo. 127: 21-25). She testified that the representation arrangement was discussed with the clients and that the arrangement was memorialized in a document that "everybody signed." (Id. at

162

128:2-11, 130:5-16).[119]  Ms. Mojaddidi and Mr. Griffin both looked into whether there was a potential conflict of interest. (Id. at 128:1-5).  They determined that they did not "think there was going to be a conflict," and they discussed their conclusions with both clients, who agreed.[120]  (Id. at 24:25-25:12; Tr. 692:20).  Ms. Mojaddidi based her evaluation of any potential conflict, in part, on her law school training.  (Tr. 896:9-25).  The Magistrate Judge ignored the Supreme Court's instruction, supported by the evidence in this case, that "we generally presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client" to find that the joint defense agreement created an actually conflicted joint representation.  Burger, 483 U.S. at 784.  Ms. Mojaddidi "definitely" discussed the joint defense agreement with Hayat.  (Id. 697:19-24).

In order to make a contrary finding, the Magistrate Judge relies on assumptions and speculation, rather than evidence, to conclude that Ms. Mojaddidi and Mr. Griffin were in a joint representation, and therefore Ms. Mojaddidi was acting under an actual conflict.  F&R at 106:20-109:23; 111:7-12.  Dismissing Ms. Mojaddidi's testimony that she researched all aspects of the law before making strategic decisions such as whether to file motions to suppress, a motion for a bills of particulars, and to seek clearance under CIPA, the Magistrate Judge concludes that Ms. Mojaddidi did not understand the strategic value of these concepts.[121]  All the direct evidence, including the conduct of the trial, showed

[119] Hayat signed a retainer agreement with Ms. Mojaddidi.  (Ex. JJJ.2).  His counsel questioned Ms. Mojaddidi about whether he signed a second retainer in January 2006.  (Tr. 712:7-17).  She "believed" he signed such an agreement.  (Id.)  She conceded he did not after reviewing an email from August 2007, in which she stated she intended for Hayat to sign a second retainer but did not "know why [she] never got the second one signed."  (Id. at 712:13-714:15; Ex. JJJ.2).  In later testimony, she suggested Hayat might have signed the second retainer but that she was never able to locate a signed copy.  (Id. at 716:2-4).  Hayat frames her acknowledgement of her memory failure concerning a discrete act from 11 years earlier as an admission that she gave *false* testimony.  (CR 722 at 2).  The accusation is nonsense.  Characterizing a memory failure as an intentional false statement is as severe a stretch as Hayat's other unpersuasive arguments in support of his conflict claims.  Hayat was aware of the joint defense agreement with Mr. Griffin and his father, the attorneys' agreement to share information, and the fee arrangement.  Therefore, the second retainer is irrelevant.

[120] Ms. Mojaddidi understood at the time that that there could be a potential conflict of interest if one attorney was going to represent more than one defendant.  (W.M. Depo. 26:7-25).  Specifically, she testified. "I knew that that was an issue just from my training in law school and as an attorney, that if you are going to represent more than one defendant, there's a potential conflict of interest."  (Id.)  Her memory was less clear when she was questioned on the subject in 2018, but she did testify that she was aware of conflicts from taking professional responsibility in law school.  (Tr. 696:9:20 (she knew about conflicts generally), 698:9-20 (stating, "it's hard to remember what I thought then.").

[121] F&R at 106:20-26, 107:1-3, 107:7-14, 110:1-111:14; *contra* (W.M. Depo. 225:21-228:1; Tr. 743:24-744:1-20 (Ms. Mojaddidi wanted to challenge confessions with internal inconsistencies and incredibility and no real basis for motion to suppress); Tr. 742:17-743:1 (lack of specificity addressed through discovery motion); W.M. Depo. 55:2-57:20, 210:13-20, 214:12-24, 218:7-20, Tr. 741:24-742:9, 746:4-10, 749:15-751:7, 753:2-12, 774:16-775:1 (no need for security clearance

that Ms. Mojaddidi represented Hayat independently, and made decisions only with regard to what she believed were Hayat's interests.  (W.M. Depo. 24:15-17, 42:2-3, 131:10-15, 132:1-24; Tr. 693:2-8).  Where she disagreed with Mr. Griffin, Ms. Mojaddidi did what was in Hayat's interest.  (W.M. Depo. at 132:25-133:6, 133:7-11, 195:3-196:1).  The Magistrate Judge's factual findings are erroneous because the direct evidence, as well as Ms. Mojaddidi's conduct during trial, shows that she made independent, strategic decisions based on a correct and thorough understanding of the law and facts in the case.[122]

### a.      The superseding indictment was not a watershed or significant moment in the progression of the case.

The Magistrate Judge found that "when the first superseding indictment charged Hamid with material support for terrorism, the basic defense strategy for the representation of Hamid came into conflict with Griffin's strategy for the representation of Umer."  F&R at 105:20-22.  Other than the Magistrate Judge's bare conclusion that there was a conflict, the Magistrate Judge does not identify any point where Umer's defense actually conflicted with Hayat's defense.  F&R at 105:18-25, 106:2-8, 109:16-23.  In fact, the Magistrate Judge acknowledges that, "the evidence showed that the defendants pursued the same strategic course before and during trial."  F&R at 108:1-2.  This alignment of interests is corroborated by counsel's statements before and during trial that although each attorney represented only their clients, they did not perceive any conflict, as well as the conduct of the trial.  (RT 60:17-61-15, 61:18-21, RT 19:7-8).

### 1)      Ms. Mojaddidi continued representing Hayat after the superseding indictment and investigating on Hayat's behalf with no interference from Mr. Griffin.

After September 2005, when the grand jury indicted Hayat for providing material support to terrorism along with the initial false statement charges, Hayat did not fire Ms. Mojaddidi, and she did not reconsider her decision to represent him.  (Tr. 706:9-708:3).  At her deposition, Ms. Mojaddidi explained she thought the new charge was "eventually going to happen."  (W.M. Depo. 65:11-12).  The new charges did not affect the basic theory of the case, that Hamid did not attend a camp.  (October 7,

based on government's approach to CIPA)).

[122] The Magistrate Judge does not make an explicit finding that Mr. Griffin acted against Hayat's interests.  F&R at 101:21-111:14.  If this were a joint representation, then the petitioner would have to show that Mr. Griffin actively represented a conflicting interest as well.  Absent this finding, petitioner would have failed to meet his burden based on the alleged "joint representation."

164

2005 RT at 10:19-14:7).  She did not reconsider her decision to represent Hayat because she had already put in months of hard work on the case, she was "intimately knowledgeable of the evidence," her confidence was growing, she felt capable to stay on, and she knew Mr. Griffin, who had more experience, was there to assist.  (W.M. Depo. 66:9-19).  Ms. Mojaddidi responded to the new charge by independently researching and working to develop strategies to defend against it.  (See Tr. 708:4-709:4).

Among other things, Ms. Mojaddidi worked to develop evidence that the Pakistani government had shut down militant camps in Pakistan.  (Id. at 708:14-25).  She also searched for useful information and expert witnesses.  (Id. at 708:23-25).  She attempted to secure a witness from the Pakistani government who might provide testimony that Pakistan had closed all militant camps.  (Id. at 709:1-4).  In those efforts, Ms. Mojaddidi acted independently of Mr. Griffin.  (Id. at 709:14-17).  When he learned of Ms. Mojaddidi's efforts, Mr. Griffin "may have" commented that the Pakistani government would not be of assistance.  (Id. at 709:10-13).  However, Ms. Mojaddidi testified with certainty that Mr. Griffin did not interfere with her work, and "didn't instruct [her] to cease [her] efforts."  (Id. at 709:14).  Before long, Ms. Mojaddidi and Mr. Griffin settled on a joint defense strategy that accounted for the closely aligned interests of their separate clients.

### 2)    There is no evidence of an actual divergence of interests or a joint representation.

Mr. Riordan did not testify that Ms. Mojaddidi perceived an actual conflict, or that she made any strategic decision to protect Umer's interest (or against Hayat's interest).[123]  The Magistrate Judge only cites Mr. Riordan's testimony as impeachment of Ms. Mojaddidi regarding her reliance on Mr. Griffin.  F&R at 108:15-16.  Mr. Riordan did not, and cannot, testify that Ms. Mojaddidi admitted she acted against Hayat's interest at any time.  The Magistrate Judge attempts to use Mr. Reichel's testimony in much the same manner, as "impeachment" of Ms. Mojaddidi, but none of Mr. Reichel's testimony supports an actual conflict or that Ms. Mojaddidi was motivated by a need to protect some interest of

[123] As noted throughout the Magistrate Judge's Findings and Recommendations, Mr. Riordan's testimony is merely impeachment of Ms. Mojaddidi's testimony, and therefore is not direct, substantive evidence of ineffectiveness or conflict. See United States v. Beltran-Gutierrez, 19 F.3d 1287, 1289-90 (9th Cir. 1994) (illustrating difference between impeachment evidence and direct evidence in Fifth Amendment context); United States v. Crouch, 731 F.2d 621, 623 (9th Cir. 1984) (impeachment evidence may not be used to present otherwise inadmissible substantive evidence); see also Dowell, Inc. v. Jowers, 166 F.2d 214, 218 (5th Cir. 1948) (stating impeachment evidence "can have no probative value; it affects only the credibility of the witness impeached.").

Umer's that conflicted with Hayat's interest.  F&R at 108:18-109:5; 109 n. 53 (Reichel's testimony is impeachment only).  Mr. Reichel testified that he was not present for strategic discussions between Ms. Mojaddidi and Mr. Griffin.  (Tr. at 545:3-10, 545:22-25).  None of this impeachment testimony supports the Magistrate Judge's legal conclusion that a joint representation, existed, or that it created an actual conflict in this case.

Similarly, the Magistrate Judge cited Mr. Wedick's testimony as evidence there was a joint defense agreement, and that all decisions made for either defendant "went through" Mr. Griffin.  F&R at 109:5-8.  (Tr. at 589).  Mr. Wedick did not witness Ms. Mojaddidi's meetings with Hayat, however, and was not privy to every strategic conference between Mr. Griffin and Ms. Mojaddidi.  (Tr. at 605:2-12).  Mr. Wedick acknowledged that Ms. Mojaddidi hired someone to do investigation in Pakistan, that Ms. Mojaddidi independently found an expert on Pakistani culture, and that Ms. Mojaddidi directed Mr. Wedick to perform research on behalf of Hayat independent of Mr. Griffin's instructions.  (Tr. at 599:10-19).  The Magistrate Judge failed to note that Mr. Wedick's testimony minimizing Ms. Mojaddidi's independent investigation and representation of Hayat was substantially impeached on cross-examination by documentary evidence.  (Tr. at 599:20-602:3).  Mr. Wedick's testimony that Mr. Griffin "picked both juries" had to be retracted.  (Compare Tr. at 589:19-21 to Tr. at 605:13-16).  The Magistrate Judge also failed to note that Mr. Wedick's uninformed legal opinions included unconstitutional ideas about what should have been done with regard to Hayat's representation at trial.[124]  (Tr. at 590:21-592:16, 605:17-606:12); see United States v. Gonzalez-Lopez, 548 U.S. 140, 148-150 (2006) (discussing defendant's right to retained counsel of choice).

None of Mr. Wedick's lay testimony established the existence of an actual conflict; if anything, Mr. Wedick corroborated Ms. Mojaddidi's testimony that Umer and Hayat's interests were aligned.  (Tr. at 589:1-6) (Ms. Mojaddidi believed Hayat was innocent, as did Mr. Griffin).  Rather than contradicting Ms. Mojaddidi's assertions of independence, the witnesses' testimony demonstrated that Ms. Mojaddidi met with Hayat, conducted independent legal and factual research, and that there was no actual conflict

---

[124] Mr. Wedick also acknowledged that the previous instance that he could remember of a defense attorney being removed because of an actual conflict involved the removal of a former AUSA from a defense case started while counsel was still an AUSA, and counsel acknowledged the actual conflict.  (Tr. 605:23-606:7).

166

between Umer and Hayat's interests.  Therefore, the Magistrate Judge's factual findings that Hayat did not have independent representation, and that there was an actual conflict as a result of a joint representation are clearly erroneous, and this Court should reject those factual findings.

> **b.**      **The evidence concerning the motion to suppress shows that Ms. Mojaddidi understood the issues, and made a strategic decision not to move to suppress.**

The Magistrate Judge states in a conclusory fashion that, "[t]here is no indication in the record that Mojaddidi understood the value of moving to suppress the confession," and "[t]here is no indication Mojaddidi understood the strategic reasons an attorney might move to suppress a confession, even if that motion might be unsuccessful."  F&R at 106:21-23, 106:24-26; see also F&R at 107:25-26.  This is clearly erroneous because the only direct evidence is Ms. Mojaddidi's specific testimony that she understood the legal issues concerning the motion to suppress, but concluded that the best way to attack the confession was the internal inconsistencies and some of the more unbelievable admissions of the confession.  (W.M. Depo. 263:18-25, 265:4-13; Tr. 744:4-7).  Furthermore, Ms. Mojaddidi's tactical decision to attack the confession as unbelievable on its own is corroborated by her opening and closing statements.  (RT 423:7-14, 434:21-436:1).  Ms. Mojaddidi also testified that the decision not to suppress the statement was not part of the push to trial strategy.[125]  (Tr. at 744:24-745:7).

The only evidence in the record is that Ms. Mojaddidi made the decision not to move to suppress Hayat's confession independently, that she was aware of what constituted actual conflicts, and she did not believe there was a conflict while representing Hayat.  (See W.M. Depo. at 24, 131, 135; Tr. at 692:4-693:13, 694:12-21, 695:3-21, 696:9-698:20, 705:13-706:8).  "The decision whether to file a pre-trial motion to suppress a confession is a classic tactical decisions."  Sexton v. French, 163 F.3d 874, 885 (4th Cir. 1998); see also Cummings v. Sirmons, 506 F.3d 1211, 1225 (10th Cir. 2007) (noting undisputed testimony of counsel regarding why he did not move to suppress, concluding, "[i]n light of this undisputed testimony, we conclude that Faulk made a reasonable strategic decision that cannot be the basis for a valid ineffective assistance of counsel claim.").  There is no evidence that Ms. Mojaddidi

---

[125] The docket reflects that, in fact, the defense filed a series of pretrial motions, including bail motions, discovery motions, and dispositive motions.  (See, e.g., CR 143-47).

167

failed to move to suppress Hayat's statement to protect some interest of Umer's; in fact, she correctly noted that because there were separate juries, the issues concerning the confessions were eliminated. (Tr. at 741:6-23, 770:5-23).  The tactical decision not to file a futile motion[126] to suppress cannot be evidence of an actual conflict, nor can it be an adverse effect on Ms. Mojaddidi's representation.  See Cuevas v. Chrans, 3 F.Appx. 528, 531-32 (7th Cir. 2001) (rejecting district court's finding of ineffectiveness for failing to move to suppress, and affirming finding of lack of prejudice).

**c.      Neither failure to file a motion for a bill of particulars nor the failure to obtain a security clearance is evidence of an actual conflict.**

Ms. Mojaddidi testified she did not file a motion for a bill of particulars because the issue of the location of the camp attended was addressed through discovery and discovery motions.  (W.M. depo. at 232:20-233:17; Tr. 741:16-743:1.)  The Magistrate Judge concluded that the failure to file a bill of particulars did not prejudice Hayat's defense in a material way.  F&R at 53:11-55:13.  Ms. Mojaddidi also testified she learned about security clearances through her own research, and decided not to pursue a clearance because the CIPA procedures allowed the government to provide exculpatory information through ex parte proceedings and in a declassified form.  (W.M. depo. at 56:12-57:20, Tr. at 749:15-751:16).  At the time, Ms. Mojaddidi correctly stated that the Superseding Indictment, and the material support charge did not materially alter the case, because the conduct at issue was the basis of the original false statement charge.  (October 7, 2005 RT 10:19-14:6)  The Magistrate Judge found, in prior analysis, that the failure to obtain a security clearance was not prejudicial to Hayat's defense.  F&R at 65:26-66:2.

Although the Magistrate Judge concluded that Ms. Mojaddidi relied on Mr. Griffin to the point where she was not representing Hamid Hayat, the testimony and her actions during the trial show that Ms. Mojaddidi was Hayat's lawyer, and only Ms. Mojaddidi made decisions to represent Hayat. (W.M. depo. at 22:22-23:9; Tr. at 692:5-693:20, 741:12-23, 770:5-15, 774:13-15, 779:12-20).  Counsel also made repeated representations to the Court before trial, that although they were working together, Ms. Mojaddidi represented Hamid Hayat, and Mr. Griffin represented Umer.  (RT 19:7-8, 60:17-61:15).  The Magistrate Judge's statement that "Mojaddidi did not explain how her research would have been

---

[126] The Magistrate Judge noted that Hayat's *habeas* counsel made no effort to argue that Hayat was prejudiced by failure to file a motion to suppress or to sever.  F&R at 55:14-56:9.  Hayat does not argue that these motions would have been successful.  Pet. at 49-51, 65-66.

sufficient to challenge Griffin's recommendations made based on his significant experience" is contradicted by Ms. Mojaddidi's testimony that she made the decisions concerning Hayat's representation. (W.M. Depo. 24:15-17, 42:2-3, 131:10-13, 131:14-15, 132:1-24; Tr. 693:2-8); contra F&R at 107:24-26. Ms. Mojaddidi testified that her knowledge of immigration matters was superior to Mr. Griffin's, therefore she would not have asked for his advice. (Tr. at 736:3-12). Sometimes she and Mr. Griffin agreed regarding strategic and tactical issues and, other times, they disagreed. (W.M. Depo. at 132:25-133:6). When they disagreed, Ms. Mojaddidi did what she thought was right for her client. (W.M. Depo. at 133:7-11, 195:3-196:1).

Mr. Riordan's testimony that Ms. Mojaddidi knew nothing about CIPA (Tr. 818:14-819:3, 884:9-885:3) is directly contradicted by the record transcript of the trial. At the January 27, 2006 hearing regarding CIPA, Ms. Mojaddidi correctly argued that the government had proceeded under Section 4 so far.[127] (January 27, 2006 RT at 7:18-8:18; Exh. JJJ.1). Government's counsel, Ms. Lever, indicated that Ms. Mojaddidi correctly identified what CIPA litigation had already occurred. (January 27, 2006 RT at 8:19-9:23). Ms. Mojaddidi then correctly stated that the only proceeding at that point that might require a clearance would be a Section 6 hearing. (January 27, 2006 RT at 9:24-11:14). While discussing the potential stipulation, Ms. Mojaddidi accurately summarized the scope of the classified information to be presented at trial, and Ms. Lever agreed that the stipulation would address the issues surrounding the only classified information affecting the trial. (January 27, 2006 RT at 11:21-14:24). Ms. Mojaddidi's testimony that she independently researched CIPA and understood issues concerning the potential use of classified information at trial is corroborated by her advocacy on behalf of Hayat at the January 27, 2006 hearing. (See W.M. Depo. 132:1-135:17, 219:22-220:25, 231:1-232:5; Tr. 695:19-21, 727-771).

By attacking Ms. Mojaddidi's tactical decisions as uninformed despite the evidence that Ms. Mojaddidi researched the issues, the Magistrate Judge failed to apply the Supreme Court's directive that,

---

[127] To the extent Ms. Mojaddidi correctly identified there was a possible CIPA issue that came up at trial regarding Naseem Khan and Pakistan, that is not evidence of her lack of knowledge about CIPA, but rather a collateral issue regarding the cross-examination of Khan. (See Pet. at 48-49; OPHB at 94-95, JJJ-1). This Court expressly ruled on the objection based on Rule 403, therefore Mr. Riordan's attempt to "impeach" Ms. Mojaddidi is simply more evidence his testimony and biased recollection is unreliable. (Compare Tr. 884:14-885:3 with RT 3628:9-12, 3628:13-3629:5). See also CR 725 at 41-63.

"[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."  Yarborough v. Gentry, 540 U.S. 1, 8 (2003).  "The decision whether to file a pre-trial motion to suppress a confession is a classic tactical decision."  Sexton, 163 F.3d at 885; see also Cummings, 506 F.3d at 1225 (10th Cir. 2007) (noting undisputed testimony of counsel regarding why he did not move to suppress, concluding, "[i]n light of this undisputed testimony, we conclude that Faulk made a reasonable strategic decision that cannot be the basis for a valid ineffective assistance of counsel claim."); Cuevas v. Chrans, 3 F.Appx. 528, 530-32 (7th Cir. 2001) (overturning district court's finding that counsel was ineffective for failing to move to suppress confession, but affirming rejection of ineffective assistance of counsel claim on prejudice grounds).  Applying the presumption that declining to file unnecessary motions is a reasonable tactical choice is the proper way to analyze this case, particularly when the defendants' interests are not directly in conflict.  See United States v. Crespo de Llano, 830 F.2d 1532, 1540-41 (9th Cir. 1987) (rejecting argument that failure to file "unnecessary" motions or request mooted limiting instructions demonstrated actual conflict and noting defendants' interests were "identical, rather than in conflict").

Because the Magistrate Judge afforded no deference to Ms. Mojaddidi's strategic choice to attempt to bring the case to trial before the government could do more investigation and corroboration, and further refused to presume that she made sound tactical decisions not to file frivolous or unnecessary motions or seek a security clearance in a case where the clearance was not necessary, the Magistrate Judge's applied an erroneous legal standards.  This Court must reject the finding of an actual conflict.

### 3.   Basing findings on attorney expert testimony made the findings speculative or conclusory.

The Magistrate Judge uses the expert testimony to make conclusory or speculative assertions to justify her finding of an actual conflict.  The expert opinions, which are based on reading Hayat's brief and converting the arguments into opinions without any specific facts, legal support, or analysis regarding why certain acts or omissions would be legally ineffective or prejudicial, were conclusory and therefore should be rejected in their entirety.  See General Elec. Co. v. Joiner, 522 U.S. 136, 143-147 (1997) (reinstating district court's rejection of expert testimony as speculative and unsupported, stating "But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion

170

evidence that is connected to existing data only by the *ipse dixit* of the expert."); United States v. Various Slot Machines on Guam, 658 F.2d 697, 699-700 (9th Cir. 1981) (rejecting conclusory "expert" affidavits containing denials or allegations without factual support as "5 ½ legal-size pages of pettifoggery" and "2 ½ pages of quibble"); see also Weisgram v. Marley Co., 169 F.3d 514, 519-20 (8th Cir. 1999) aff'd by 528 U.S. 440, 445-46 (2000) (concluding district court abused its discretion by permitting qualified experts "to testify as an expert witness regarding matters about which he could only speculate," that had "no reasonable factual basis" and "offer[] nothing more than pure conjecture").

In one example of the Magistrate relying on speculation, the Magistrate Judge states, "Had Mojaddidi brought a motion to suppress, she would have known that the court would not permit James Wedick to testify as an expert.  That would have given her another opportunity to find an appropriate expert on false confessions."  F&R at 107:1-3 (citing Broderick testimony at Tr. 391).  The Magistrate Judge also states that, "It is apparent that Mojaddidi rejected that option without grappling with the various advantages having security clearance, or associating cleared counsel, would have had."  F&R at 107:7-9.  The Magistrate Judge then cites John Cline's testimony about what attorneys who have security clearances can do during CIPA litigation.  F&R at 107:9-14.

This Court has discretion to exclude the testimony of Hayat's defense attorney experts or to decline to consider their testimony.  See Heishman v. Ayers, 621 F.3d 1030, 1041-42 (9th Cir. 2010) ("it is within the district court's discretion to exclude proposed expert testimony concerning a legal standard of care and to rely solely on the briefs.").  Because Hayat's defense attorney experts merely parrot his legal and factual arguments in the form of conclusory opinions, this Court should to reject the opinions. See LaGrand, 133 F.3d at 1271 n. 8 (within court's discretion to exclude proposed expert testimony regarding standard of care for attorneys and rely solely on briefs); Williams v. Woodford, 384 F.3d 567, 613 n. 17 (9th Cir. 2004) (affirming rejection of proposed Strickland expert).

The Magistrate Judge also states in a conclusory manner propositions with no legal support.  For example, the Magistrate Judge states, "The fact that counsel jointly represented Hamid, as illustrated by Griffin's control of basic decisions about Hamid's defense, shows that there was an 'active representation' of those conflicting interests."  F&R at 109:20-22.  The Magistrate Judge also states in a conclusory manner that "The rush-to-trial strategy for Umer Hayat was not a reasonable strategy for

171

Hamid Hayat.  To the extent Mojaddidi can be considered to have had a choice of strategies given her inexperience, her choice was obviously affected by Griffin's determination that the rush-to-trial strategy was best."  F&R at 110:6-9.  Again, no case has ever held that a "rush-to-trial strategy" created an actual conflict.  The only case that considered whether an actual conflict existed regarding timing of trial appears to be Dokes v. Lockhart, 992 F.2d 833, 837 (8th Cir. 1993), where the Eighth Circuit considered whether an actual conflict arose during a joint representation when one defendant testified for the state in a hearing on the merits of a motion to dismiss for a speedy trial violation.  Although the witness defendant was testifying contrary to the co-defendant's interests, the Eighth Circuit noted she was also testifying against her own interests, therefore both defendants had the same interest, and the petitioner "failed to show an actual conflict of interest with respect to the speedy trial issue in the joint representation of [the defendants]."  Id. at 838; accord Finlay, 55 F.3d at 1415 ("The defendants fail to make this showing of actual conflict of interest at trial.  Each had the same interest in being exonerated.  Each was defended by Horie in a way designed to achieve that end.  FTL was not sacrificed for Finlay; he was not sacrificed for the company.").

The Magistrate Judge also concludes without any citation to evidence that, "Among other things, as a result of the conflict and the rush-to-trial strategy, Hayat's counsel failed to investigate and move to suppress Hayat's confession, failed to move for a bill of particulars, and failed to seek a security clearance or associate counsel with clearance."  F&R at 110:10-13.  As noted above and below, the only evidence is Ms. Mojaddidi's testimony that she researched each of these issues, and made a strategic choices that were not motivated by any loyalty to Umer or any perceived conflict.[128]  The Magistrate Judge then argues in a conclusory fashion, "Based on the attorney expert testimony described above, these options were certainly plausible."  F&R at 110:19-20.  The next paragraph of the Magistrate Judge's analysis, arguing plausibility, is pure counter-factual speculation based on Hayat's defense attorney expert testimony:

> With regard to suppressing the confession, Hayat presented evidence at

---

[128] W.M. Depo. 225:21-228:1; Tr. 743:24-744:1-20 (Ms. Mojaddidi wanted to challenge confessions with internal inconsistencies and incredibility and no real basis for motion to suppress); Tr. 742:17-743:1 (lack of specificity addressed through discovery motion); W.M. Depo. 55:2-57:20, 210:13-20, 214:12-24, 218:7-20, Tr. 741:24-742:9, 746:4-10, 749:15-751:7, 753:2-12, 774:16-775:1 (no need for security clearance based on government's approach to CIPA).

172

the evidentiary hearing to show he suffered lasting effects from a bout with meningitis in 2000. As a result, Hayat could have argued, he was more susceptible to the coercive aspects of the interrogation. In addition, as discussed in more detail above, Hayat could have hired an expert on false confessions to explain why the interrogation was coercive. Finally, as Broderick testified, moving to suppress was a reasonable trial strategy even if it might not be successful. Moving to suppress the confession was certainly a viable pretrial option.

Broderick also described the benefits of moving for a bill of particulars, especially in a case like this one with an indictment that was vague as to the location of the jihadist training camp Hayat attended. Finally, as Cline explained, there was no reason for counsel not to seek a security clearance or associate counsel who already had such a clearance. Mojaddidi pursued none of these alternative and instead appeared to accept without question the strategy that her experienced co-counsel chose.

F&R at 110:21-111:6.

The Ninth Circuit stated in United States v. Mims, that, "this court will not 'create a conflict of interest out of mere conjecture as to what might have been shown,'" therefore, this Court should evaluate Ms. Mojaddidi's conduct based on her knowledge and strategic decisions, not counter-factual speculation by attorney experts. 928 F.2d 310, 313 (9th Cir. 1991) (quoting Willis v. United States, 614 F.2d 1200, 1203 (9th Cir. 1979) and Lugo v. United States, 350 F.2d 858, 859 (9th Cir. 1965)); see also Rodrigues, 347 F.3d at 827 ("Rodrigues's bare allegation that KPMG's negligence could have been a defense to the real estate transaction charges, without more, is insufficient to entitle him to an evidentiary hearing"). Mere conjecture or speculation about Ms. Mojaddidi's reasons for pursuing a trial, without any showing that there was an actual conflict between Umer and Hayat's defenses as a result, or that Ms. Mojaddidi was motivated by an unspecified duty to Umer Hayat, cannot support an actual conflict or an adverse effect from that conflict.[129] Therefore, this Court should reject the Magistrate Judge's factual findings as conclusory and speculative.

A.    **The Magistrate Judge's application of the plausible alternative standard without the two basic elements of an actual conflict to find an adverse effect on Ms. Mojaddidi's representation was clearly erroneous.**

The Magistrate Judge's analysis of the adverse performance is explicitly based on the flawed

---

[129] The ultimate decision cited by the Magistrate Judge, the "rush to trial strategy," is not one where "an attorney takes positive steps on behalf of one client prejudicial to another" and is more like where "the attorney's actions are based on inaction and are passive," therefore, it is difficult to find an active representation of conflicted interests from that strategy. Compare F&R at 105:19-20, 106:6-8, 108:4-6, 109:16-23 with United States v. Gambino, 864 F.2d at 1070).

173

standards and analysis for finding an actual conflict.  F&R at 110:5-6 ("The first step in this analysis is answered in the section above.").  The Magistrate Judge says in conclusory terms that "The rush-to-trial strategy for Umer Hayat was not a reasonable strategy for Hamid Hayat" without identifying directly conflicting interests or causation.  F&R at 110:6-7.  The Magistrate Judge then cites Ms. Mojaddidi's inexperience to state that, "her choice was obviously affected by Griffin's determination that the rush-to-trial strategy was best."  F&R at 110:7-9.  The Magistrate Judge then states that the "plausible" options were to move to suppress Hayat's confession, to move for a bill of particulars, and to seek a security clearance, again citing the attorney expert testimony.[130]  F&R at 110:10-13, 110:19-20.  The Magistrate Judge then speculates about potential arguments that could have been made, and states in conclusory terms what benefits the motion to suppress, motion for a bill of particulars, or the security clearance may have had.  F&R at 110:21-111:6.

In this case, Ms. Mojaddidi advocated vigorously on behalf of her client, made informed and strategic choices on how to meet the evidence, and made strategic choices not to file futile motions or seek unnecessary security clearances.[131]  The Magistrate Judge's speculative and conclusory arguments that the timing of trial created some sort of inherent conflict between Umer and Hayat's defense lacks legal or factual support.  Compare Sanders v. Ratelle, 21 F.3d 1446, 1452-56 (9th Cir. 1994) (refusal to interview or cross-examine previously-represented brother who was the actual shooter, but analyzed without presuming prejudice); Fitzpatrick v. McCormick, 869 F.2d 1247, 1251 (9th Cir. 1989) (counsel refused to elicit testimony that prior client committed the crime charged); United States v. Allen, 831 F.2d 1487, 1497 (9th Cir. 1987) (defendant should have pointed the finger at more culpable co-defendant and unindicted bosses paying for counsel in drug case); see also Gambino, 864 F.2d 1068-69

---

[130] The Magistrate Judge raises the issue of meningitis, even though the uncontroverted evidence is that Ms. Mojaddidi spent time with Hayat, and did not observe any signs that he had any lingering effects. (W.M. Depo. 46:3-19, 260:1-3; Tr. 726:2-8, 681:2-4, 691:16-19).  Ms. Mojaddidi testified that Hayat never mentioned suffering any continued effects from it. (Tr. 726:2-8, 681:2-4).  Any discussion of meningitis as a basis for suppressing the confession is purely speculative, based on the video and audio itself, and Ms. Mojaddidi's testimony.  See Shackleford v. Hubbard, 234 F.3d 1072, 1080 (9th Cir. 2000) (denying expansion of certificate of appealability for failure to file motion to suppress based on defendant's mental deficiency, fatigue or drugs because the defendant was lucid and responsive to questions during the confession).

[131] (W.M. Depo. 225:21-228:1; Tr. 743:24-744:1-20 (strategic challenge to confession and no real basis for motion to suppress); Tr. 742:17-743:1 (lack of specificity addressed through discovery motion); W.M. Depo. 55:2-57:20, 210:13-20, 214:12-24, 218:7-20, Tr. 741:24-742:9, 746:4-10, 749:15-751:7, 753:2-12, 774:16-775:1 (no need for security clearance based on government's approach to CIPA)).

(defense counsel could have argued that previous client was responsible for specific drug deal).  There is no evidence that Ms. Mojaddidi's alleged failures resulted from an actual conflict, therefore, there is no adverse effect and no presumption of prejudice.  See Walter-Eze, 869 F.3d at 907 ("There is no indication that counsel's failure to disclose the presentation on time was at all related to the conflict of interest, and thus it cannot serve as an example of prejudice *resulting from* the conflict.") (emphasis in original); see also Gambino, 864 F.2d at 1072 (rejecting conflict because "The defense was not raised because from appellant's point of view it would have been foolish to do so.  Therefore, Eversoff had no conflict of interest at appellant's trial" and "the conflict did not adversely affect his performance" because counsel would not advance defense "even if Mazzara had never been his client.").  The Magistrate Judge committed legal error by applying a lower standard without requiring an actual conflict and an adverse effect *resulting from* the conflict.  Walter-Eze, 869 F.3d at 907.  Therefore, this Court should reject the Magistrate Judge's Findings and Recommendations that there was an adverse effect on Ms. Mojaddidi's representation resulting from an actual conflict and refuse to presume prejudice from futile actions.

**XI.    THIS COURT SHOULD ADOPT THE MAGISTRATE JUDGE'S FINDING THAT MS. MOJADDIDI FAILURE TO OBTAIN A CLEARANCE DID NOT, AND COULD NOT PREJUDICE HAYAT, BUT REJECT THE UNNECESSARY FINDING THAT MS. MOJADDIDI WAS POTENTIALLY INEFFECTIVE**

Hayat claimed that Ms. Mojaddidi was ineffective for failing to obtain a security clearance in a prosecution that involved classified information.  (Pet. at 41-49; OPHB at 80-97).  This Court should reject the passage from the Magistrate Judge's Findings and Recommendations stating, "Hayat argues at length that Mojaddidi's decision to neither apply for a security clearance nor seek the appointment of cleared counsel was not reasonable.  The court finds those arguments persuasive" as unnecessary and not precedential.  F&R at 65:24-26.  The Supreme Court in Strickland specifically stated that, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  Strickland, 466 U.S. at 697.  This is especially important because "Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result."  Id.  A finding that counsel could be ineffective by not seeking a security clearance in a case where it will not make a difference in

175

how the government handles classified information would be such a case, as noted in the case law discussing CIPA and its procedures.

The Magistrate Judge's "finding" that "Ms. Mojaddidi's decision to neither apply for a security clearance nor seek the appointment of cleared counsel was not reasonable," without any legal or factual analysis is unnecessary, and implicitly places a burden on counsel to seek a security clearance in every case, even if it would not be necessary or prudent.[132]  The Magistrate Judge found that Mojaddidi's failure to obtain a security clearance caused Hayat no prejudice, therefore, the Magistrate Judge had no reason to consider whether Mojaddidi's decision not to seek a security clearance created any basis for an ineffective assistance of counsel claim.  F&R at 65:26-66:2.  The Magistrate Judge discussed in detail the trial issues potentially involving classified information and concluded that Mojaddidi's lack of a security clearance caused Hayat no prejudice in her representation of his interests.  Since Mojaddidi's failure to obtain a security clearance caused Hayat no prejudice, there was no reason to discuss this challenge further in her findings and recommendation.  Yet, despite determining no prejudice, the Magistrate Judge found the failure to seek a security clearance to be "not reasonable."   The Magistrate Judge provides no explanation for this conclusion.  If the hearing testimony of John Cline is the Magistrate Judge's basis for such a conclusion, it ignores contrary Ninth Circuit precedent that states that it not ineffective assistance of counsel to consider "whether another lawyer, with the benefit of hindsight, would have acted differently" than trial counsel in this case.  Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998) (quoting Strickland, 466 U.S. at 687).   The Magistrate Judge's conclusion suggests that an ineffective assistance of counsel claim could be found against an attorney who decides not to seek a security clearance, regardless of the existence of prejudice resulting from such a decision.  Such a finding improperly substitutes the judgment of the Magistrate Judge and/or the judgment of another lawyer, for the strategic decision of trial counsel, and ignores the two requirements established by Strickland.  The conclusion that Ms. Mojaddidi was ineffective for failing to seek a clearance or associate cleared counsel is unprecedented and this Court should specifically reject that finding.

In fact, there have been many cases involving classified information in which defense counsel

---

[132] There was plenty of evidence to support a contrary finding that Ms. Mojaddidi's decision not to seek a clearance was entirely reasonable and strategic.  (Tr. at 749:23-760:10).

has not obtained a security clearance, as well as many cases in which cleared defense counsel has not been provided access to classified information.  As the Seventh Circuit observed, it is "a mistake to think that simple possession of a security clearance automatically entitles its possessor to access classified information," because "in addition to having the requisite clearance the seeker must convince the holder of the information of the seeker's need to know" that information.  United States v. Daoud, 755 F.3d 479, 484 (7th Cir. 2014); accord United States v. Libby, 429 F.Supp.2d 264, 287 n.27 (D.D.C. 2006) ("It is axiomatic that even if the defendant and his attorneys had been granted the highest level of security clearances, that fact alone would not entitle them to access to [sic] every piece of classified information this country possesses.").  The originator of the classified information determines when there is a need to know the information, see Executive Order 13292, 68 Fed. Reg. 15315, 15322 (Mar. 25, 2003), and thus, as this Circuit has explained, the government "might have a legitimate interest in shielding materials even from someone with the appropriate security clearance."  Al-Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury, 686 F.3d 963, 983 (9th Cir. 2012); see also Dorfmont v. Brown, 913 F.2d 1399, 1401 (9th Cir. 1990) (Executive Branch determination concerning which persons may be granted access to classified information and under what circumstances, is "sensitive and inherently discretionary."); accord United States v. Ott, 827 F.2d 473, 477 ("Congress has a legitimate interest in authorizing the Attorney General to invoke procedures designed to ensure that sensitive security information is not unnecessarily disseminated to *anyone* not involved in the surveillance operation in question, whether or not she happens for unrelated reasons to enjoy security clearances."); see also Holy Land Foundation for Relief & Development v. Ashcroft, 333 F.3d 156, 164 (D.C. Cir. 2004) (emphasizing "the primacy of the Executive in controlling and exercising responsibility over access to classified information") see generally Dep't of the Navy v. Egan, 484 U.S. 518, 528-29 (1988) (since"[p]redictive judgments" about the possible "compromise [of] sensitive information" involve determining "what constitutes an acceptable margin of error in assessing the potential risk," these judgments "must be made by those with the necessary experience in protecting classified information.") Since the granting of a security clearance is not routine, not automatic, involves a lengthy review of an applicant's background and requires an Executive Branch determination that the individual seeking a clearance has a need to know classified information even before such clearance is provided, an

177

attorney's strategic decision not to seek a clearance in a given case cannot be deemed unreasonable. Given the directives of the Supreme Court as well as the clear precedent in this Circuit and others, the Magistrate Judge's suggestion that Mojaddidi's failure of counsel to seek a security clearance could constitute ineffective assistance is contrary to law and should be rejected.

This Court should adopt the Magistrate Judge's finding that Ms. Mojaddidi's failure to obtain a security clearance did not, and could not, prejudice Hayat under Strickland.  F&R at 65:26-70:8.  But the Court should reject the passage from the Magistrate Judge's Findings and Recommendations stating, "Hayat argues at length that Mojaddidi's decision to neither apply for a security clearance nor seek the appointment of cleared counsel was not reasonable.  The court finds those arguments persuasive."  F&R at 65:24-26.

### CONCLUSION

The Magistrate Judge's determination that Hamid Hayat's Sixth Amendment rights were violated by his trial counsel's deficient performance result from a misapplication of the controlling legal standards governing *habeas* cases, a substitution of unreliable and flawed opinion testimony from Hayat's purported defense attorney experts for the otherwise controlling law, and incomplete and erroneous factfinding.  On *de novo* review—applying the correct legal standards and considering all relevant facts—this Court should reject the Magistrate Judge's findings of Constitutional violations, reject the recommendation that Hayat's conviction and sentence be vacated, and deny all of Hayat's meritless *habeas* claims.

Dated:  April 6, 2019

McGREGOR W. SCOTT
United States Attorney

By:  /s/ ANDRÉ M. ESPINOSA
ANDRÉ M. ESPINOSA
ROGER YANG
Assistant United States Attorneys

By:  /s/ JENNIFER E. LEVY
JENNIFER E. LEVY
Trial Attorney
Counterterrorism Section
National Security Division

178